## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

## DECLARATION OF DAVID BANSMER IN SUPPORT OF
## FIRST DAY APPLICATIONS AND MOTIONS

DAVID BANSMER, being duly sworn, deposes and says:

1.      I am the President and Chief Operating Officer of Sea Island Company, the parent corporation of each of the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (other than Sea Island Coastal Properties, LLC ("SICP")) (collectively with SICP, "Sea Island" or the "Debtors").  In this capacity, I am familiar with the day-to-day operations, business, and financial affairs of Sea Island.

2.      I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined).  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If I were called upon to testify, I would testify competently to the facts set forth herein.

## **BACKGROUND**

3.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").   The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.       The Debtors are currently engaged in operating a collection of exclusive hotel resorts, golf courses, spa and recreational complexes, together with certain related developed and undeveloped real estate held by the Debtors in connection with their real estate development business, all of which are located in or around St. Simons Island and Sea Island, Georgia.   In connection with these operations, the Debtors maintain two "membership programs" commonly referred to as the Sea Island Club and the Ocean Forest Golf Club.

**A.       Company History**

5.       In 1911, after frequently vacationing on the southern coast of Georgia, industrialist Howard Coffin purchased 20,000 acres on Sapelo Island for development opportunities.   In 1926, at the urging of his cousin, Alfred William Jones, Coffin's Sea Island Company purchased land on St. Simon's Island, as well as the land now known as Sea Island.

6.       In 1928, Sea Island Company opened The Cloister Hotel with just 46 rooms. Known as a "friendly little hotel," The Cloister was the focal point of Sea Island's interests. After surviving the Great Depression under A.W. Jones, Sr.'s leadership, Sea Island began to prosper, and over time the hotel grew with additional buildings spread among the historic oaks and along the Atlantic.

7.       On St. Simons, Coffin turned Retreat Plantation into the Sea Island Golf Club, with British Open champion Walter Travis designing the first 9-hole golf course. Today, Sea Island Golf Club includes three spectacular 18-hole courses—Seaside, Plantation and Retreat—

2

ranked among the world's finest.  In addition, the Ocean Forest Golf Club boasts one of the most prestigious courses in America.  The Golf Learning Center offers state-of-the-art facilities and highly individualized instruction from top professionals, including four of the nation's Top 50 instructors.

8.    In 1998, Sea Island embarked on a multi-year Resort Master Plan which resulted in the transformation of the resort.  From 1998 to 2001, three of Sea Island's golf courses were fully redesigned.  In 2001, the newly-constructed, 40-room Lodge opened to visitors.  With the Lodge construction complete, Sea Island began renovations that culminated in the 2006 and 2007 openings of the Cloister, Beach Club and Spa and the development of the Frederica Golf Club and Residential Development.  Sea Island's plan for expansion and renovation was intended to establish Sea Island as a marquee brand so as to provide a foundation for sustainable growth.

**B.    Events Leading to Filing**

9.    The Debtors used long-term debt financing and their cash flows from operation, primarily real estate sales, to fund their expansion and renovation plan.  With a view to a profitable future led by their new luxury real estate resort assets and sustained retail real estate sales activity, the Debtors believed that they would have sufficient resources to repay their obligations in a timely manner.  Their view was bolstered by the fact that the Debtors owned tens of thousands of undeveloped land in Glynn and Camden counties that had been in constant demand by third party developers.

10.    The Debtors' expansion proved to be more costly than budgeted and the newly completed resort did not generate the operating profits that had been projected.  Beginning in 2008, the Debtors took aggressive steps to address the operating losses by rationalizing their cost

structure, streamlining their resort and support operations and terminating certain operating executives.

11.     However, because the Debtors' business model was predicated on the ongoing development and sale of residential real estate in and around their resort communities, the historic collapse of the global financial and real estate markets had a dramatic negative impact on both the Debtors' resort and real estate sales businesses.  Falling home prices and the severely restricted availability of real estate financing left the Debtors with little ability to continue to sell residential real estate.  As a result, the Debtors were left without sufficient liquidity to fund their operations or to repay the indebtedness they had borrowed to finance their development and expansion plan.

12.     The Debtors sought to restructure their operations and their obligations.  Despite their efforts to improve performance, the Debtors were unable to refinance a portion of their indebtedness to Synovus and the Pre-Petition Lenders (as defined below) which matured in January 2009.  The Debtors, Synovus and the Pre-Petition Lenders entered into a Forbearance Agreement on January 10, 2009 to permit the parties to negotiate a restructuring of the Debtors' obligations to Synovus and the Pre-Petition Lenders.  On July 20, 2009, the Debtors reached an agreement with Synovus and the Pre-Petition Lenders to restructure the Pre-Petition Bank Group Obligations (as defined below) on the terms set forth in the Restructuring Agreement (as defined below).

13.     In November 2009, the Debtors reached an agreement with Wachovia Bank, N.A. to convey the Debtors' Frederica development to Wachovia Bank, N.A. in satisfaction of the obligations owed to it.  This was a significant step in the Debtors' efforts to restructure.

14.     Despite the Debtors' significant efforts, the financial and real estate markets did not recover sufficiently to permit the Debtors to comply with the restructured obligations owed to Synovus Bank and the Pre-Petition Lenders and the Debtors defaulted on those obligations in January 2010.  After reviewing all of their strategic alternatives, the Debtors determined that a sale of the Company's assets would result in the best recovery for all of their stakeholders.  The Debtors retained Goldman, Sachs & Co. ("Goldman Sachs") as their investment banker to market their assets.

15.     The Debtors and Goldman Sachs tried to identify and contact all third party purchasers that might be interested in pursuing such a sale transaction.  In connection with this sale process, approximately seventy-nine (79) parties entered into confidentiality agreements with the Debtors and conducted due diligence.   More than twelve (12) parties submitted indications of interest to the Debtors, and the Debtors and their legal and financial advisers reviewed the terms and conditions of these proposals (including the consideration offered) and evaluated the financial capabilities of the submitting parties to identify the strongest offers.

16.     Following the submission of indications of interest, the Debtors fully negotiated asset purchase agreements with three different bidders.  After consultation with their lenders, the Debtors determined that the offer made by Sea Island Acquisition LP, a limited partnership formed by certain investment funds managed by Oaktree Capital Management LP and Avenue Capital Group (the "Stalking Horse Purchaser"), presented the best recovery for all stakeholders.

17.     On August 4, 2010, the Debtors executed the Asset Purchase Agreement (the "Sale Agreement") (a true and correct copy of which is attached as Exhibit C to the Motion To

Approve Bidding Procedures, filed contemporaneously herewith)[1] with the Stalking Horse
Purchaser, as purchaser, for the sale of substantially all of their assets pursuant to the Debtors'
Joint Chapter 11 Plan of Liquidation (the "Plan").  The Plan and a related disclosure statement
were filed with the Court on or about August 10, 2010.  The Sale Agreement and the Plan
contemplate the sale of the Debtors' assets to the Stalking Horse Purchaser (subject to higher or
better bids) and contain the following material terms:

- Purchase Price – $197,500,000 (subject to a post-closing purchase price adjustment), paid in immediately available funds at closing, plus Assumed Liabilities;

- Purchased Assets – the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course, the Ocean Forest Golf Course, the executory contracts and unexpired leases specified in the Agreement, all accounts receivable, inventory and tangible personal property, certain petty cash, permits, goodwill, intellectual property rights, data and records, certain deposits including utility and security deposits, certain avoidance actions, and certain related assets;

- Assumed Liabilities – all trade payables owed to trade vendors and service providers incurred in the ordinary course of business; all "cure costs" payable under assumed contracts, post-closing liabilities under assumed contracts, post-closing liabilities related to or arising from the Assets or the Business, certain pre- and post-closing liabilities and obligations relating to the Debtors' employees, all of the Debtors' obligations to honor customer reservations, gift certificates and gift cards, all sales and use taxes and certain pro-rated costs, expenses and liabilities;

- Treatments of Membership Claims.  The Stalking Horse Purchaser will offer club members of the Sea Island Club Membership Program and the Ocean Forest Golf Club Membership Program the opportunity to join the new Ocean Forest and Sea Island clubs and execute agreements on the terms and conditions of new membership programs.  The new membership programs will be generally consistent with the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program, as applicable, with certain modifications.  The Stalking Horse Purchaser will credit to new member accounts of club members who execute agreements under the new

---

[1] The following description of the Agreement is qualified in its entirety by the provisions of the Agreement.  In the event there is any conflict between the description of the Agreement contained in this Motion and the provisions of the Agreement, the provisions of the Agreement shall govern and control.

membership programs an amount equal to their respective existing membership deposits that had been paid in cash. The Stalking Horse Purchaser will refund member deposits of club members who execute agreements under the new membership programs on the terms set forth in Schedule 11.1(b) of the Agreement.

- Deposit – $10,000,000, tendered on the execution date of the Agreement;
- Postclosing indemnification by Debtors – Debtors responsible for losses or liabilities with respect to theft, loss or damage to non-inventoried baggage in Debtors' care, Inventoried Baggage (as defined in the Agreement) or contents of any safe deposit box, until such items are inventoried; and
- Proposed Breakup Fee – $5,925,000 (i.e., 3% of $197,500,000).

18.    On August 6, 2010, the Debtors and Synovus Bank, as agent and Pre-Petition Lender, Bank of America, N.A., as Pre-Petition Lender, and Bank of Scotland, as Pre-Petition Lender, executed an agreement (the "Plan Support Agreement") whereby the Prepetition Lenders committed to support the Plan and Plan Sale subject to certain terms and conditions set forth in the Plan Support Agreement.  In particular, the Pre-Petition Lenders support the proposed Bid Procedures, including the Break Up Fee, the amount of the Initial Overbid and the incremental bid amounts.

**C.    Description of the Debtors' Current Business Operations**

19.    Since their inception, the Debtors have pursued development in a manner that preserved the environmental character and history of its coastal Georgia home.  Currently, the Debtors own and operate a collection of resort, golf, spa and related real estate assets on St. Simons Island and Sea Island, Georgia.  Among these assets, the Cloister and the Lodge are famous for classic architecture, interior design, sculpted landscape, quality service and outstanding amenities.  In addition, the Debtors own and operate two member clubs, Ocean Forest Golf Club and Sea Island Club with memberships of 530 and 2,900, respectively.  Finally, the Debtors own a portfolio of real estate assets ranging from undeveloped land parcels to fully-developed beachfront residences.

**1.  *The Cloister.*** The Cloister is a full service, luxury hotel located on the primary corridor through Sea Island, Georgia. The hotel consists of rooms and suites, located in the main building and adjacent wings and within the nearby Beach Club and Ocean Villas Rooms and Suites. The Cloister also contains three restaurants, two lounges, several public spaces, a solarium, a library and retail shops. The conference center at the Cloister adjoins the west side of the building and contains eight meeting rooms totaling approximately 13,000 square feet and approximately 3,800 square feet of pre-function space. In addition to the hotel, guests have the opportunity to stay at the beachfront Beach Club Rooms and Suites (sixty-five units) or the Ocean Villas Rooms and Suites (forty units).

Guests have access to a variety of amenities and activities, including a full service spa and fitness center, a beach club, tennis courts, horseback riding, shooting school, beach volleyball, bike rentals, retail shops, a business center and extensive children's programs.

The Cloister Spa and Fitness Center totals approximately 65,000 square feet and contains 23 treatment rooms, a 3,000 square foot weight and cardio studio, two multi-purpose exercise studios and a yoga studio, a full service beauty salon, a water atrium, an indoor four-lane lap pool, a co-ed fitness whirlpool, three squash courts, and full locker rooms equipped with showers, steam room, sauna and massage rooms.

**2.  *The Beach Club.*** The Sea Island Beach Club includes three outdoor swimming pools, poolside cabanas, Big George's casual restaurant and lounge, a snack bar, a poolside bar, some retail stores, a 100-seat movie theatre, extensive patios and lawn areas for sunning and an expanded children's area. It also includes facilities with 650 feet of beach frontage, which provide a venue for water sports.

**3.  *The Lodge.*** The Lodge is a full service golf resort located at the end of the Avenue of the Oaks in St. Simons Island, Georgia. The resort, which opened in 2001, was constructed as part of the redevelopment of the Seaside, Plantation and Retreat Golf Courses. The Lodge serves as both a hotel and golf clubhouse. In addition to thirty-eight guest rooms and two suites, the Lodge contains two restaurants, two meeting rooms and one pre-function room totaling approximately 2,000 square feet, a business center, and concierge, butler, valet and room service.

**4.  *Sea Island's Three Award-Winning Golf Courses.*** Apart from the Ocean Forest Golf Course (discussed below), Golf at Sea Island consists of 54 holes that have been constructed in consultation with renowned golf architects. The Seaside Golf Course was redesigned in 1999 by Tom Fazio in the tradition of legendary Scottish links. The Plantation Golf Course was formed in 1998 by Rees Jones. Finally, the Retreat Golf Course was designed in 2000 and 2001 by Davis Love III and his brother, Mark Love.

**5.  *Cottage Rentals/Property and POA Management.*** Approximately 175 of the more than 600 homes and condominiums on Sea Island are available for rent through Sea Island Cottage Rentals. The cottages range from intimate two-bedroom bungalows to spacious eight-bedroom homes.

8

>    ***6.    Ocean Forest.***    The Debtors own and operate the 150-acre Ocean Forest development, which began construction in 1995 and consists of: (1) the Ocean Forest Golf Course, a private club facility located within the community of Sea Island, (2) a clubhouse, 3 maintenance buildings and a guest house (8 suites including a two-bedroom suite), all totaling approximately 35,000 square feet, and (3) several currently unsold residential parcels.
>
>    ***7.    Landscape Retail.***    The Debtors operate a landscaping business, which provides landscaping supplies and services to residential and commercial clients on Sea Island and St. Simons Island.  Services include landscape design, hardscaping services (masonry, woodworking, stonework, tile installation and construction of decks and patios) and other traditional landscaping services.
>
>    ***8.    Other Real Estate.***    The Debtors own a number of assets, including land, residential property and special use facilities located in various areas throughout Sea Island and St. Simons Island.

**D.    Pre-Petition Capital Structure of the Debtors**

    20.    **Corporate Structure.**    Sea Island Company, a Georgia corporation, is the sole owner of one hundred percent of the equity interest in Sea Island Services Inc., a Georgia corporation; Sea Island Apparel, LLC, a Georgia limited liability company; Sea Island Resort Residences, LLC; a Georgia limited liability company; First Sea Island, LLC, a Georgia limited liability company, and SICAL, LLC, a Georgia limited liability company.  Sea Island Company holds 26.5% ownership interest in SICP.  The balance of SICP is owned by the same shareholders that own Sea Island Company, in the same ownership percentage.

    21.    **Prepetition Secured Debt.**    Sea Island Company, SICP and Synovus Bank, formerly known as Columbus Bank & Trust ("Synovus") are parties to (a) the 2003 Bond Credit Agreement, and (b) the 2001 Bond Credit Agreement (collectively with the 2004 Bond Credit Agreement, the "Bond Credit Agreements"), pursuant to which, inter alia, Synovus agreed to issue letters of credit (the "Bond Letters of Credit") for the benefit of Sea Island Company and SICP.  In connection with the issuance of the Bond Letters of Credit, Sea Island Company and

SICP issued certain variable rate notes (the "Bonds") and agreed to reimburse Synovus for any drawings under the Bond Letters of Credit.

22.     On June 6, 2007, Sea Island Company and SICP, as borrowers (together, the "Borrowers"), Synovus and certain lenders (the "Prepetition Lenders"), entered into that certain Loan and Line of Credit Agreement (the "2007 Credit Agreement"), pursuant to which, inter alia, the Pre-Petition Lenders agreed to (a) make a $100,000,000 term loan (the "2007 Term Loan"), (b) continue a $96,000,000 term loan (the "2006 Term Loan"), and (c) increase an existing line of credit from $200,000,000 to $235,000,000 (the "Revolver"; collectively with the 2007 Term Loan and the 2006 Term Loan, the "2007 Bank Group Loans").

23.     In connection with entry into the 2007 Credit Agreement, (a) the Borrowers and Synovus entered into that certain Amended and Restated Agreement (Pari Passu) dated June 6, 2007, and (b) Synovus and the Pre-Petition Lenders entered into that certain Third Amended and Restated Agency Agreement dated June 6, 2007, pursuant to which, inter alia, the indebtedness and other obligations and liabilities incurred by the Borrowers under the 2007 Credit Agreement and the Bond Credit Agreements were all cross-defaulted and all 2007 Bank Group Loans and the reimbursement obligations of the Borrowers under the Bond Credit Agreements and the Bonds (collectively, the "2007 Bank Group Debt") were made pari passu.

24.     In connection with the incurrence of the 2007 Bank Group Debt, the Borrowers and Synovus entered into (a) that certain Master Agreement dated April 20, 2006 and a related Confirmation of Interest Rate Swap Transaction dated April 24, 2006 (the "5.63% Swap"), (b) that certain Confirmation of Interest Rate Collar Transaction dated July 2, 2007 (the "4.65% Collar"), and (c) that certain ISDA Master Agreement dated March 1, 2003 and a related

Confirmation Interest Rate Swap Fixed/Floating dated March 21, 2003 (the "6.5% Swap"; collectively with the 5.63% Swap and the 4.65% Collar, the "Hedging Obligations").

25.    In 2008, Synovus, as an individual lender, made a bridge loan in favor of the Borrowers in the original principal amount of $37 million pursuant to that certain Loan Agreement dated August 7, 2008 (the "Bridge Loan").

26.    On January 10, 2009, an event of default under the 2007 Credit Agreement occurred when the Borrowers failed to repay in full the entire outstanding principal of, and accrued but unpaid interest on, the 2007 Term Loan (the "January 2009 Default").

27.    In connection with the January 2009 Default, the Borrowers, Synovus and the Pre-Petition Lenders entered into that certain Forbearance Agreement dated January 10, 2009 (the "Forbearance Agreement"), pursuant to which, inter alia, Synovus and the Pre-Petition Lenders agreed (a) to forbear from exercising their rights and remedies against the Borrowers with respect to the January 2009 Default and other events of default then in existence, and (b) to continue to make advances pursuant to the Revolver to the Borrowers during the term of the Forbearance Agreement (the "Forbearance Period"), each notwithstanding the existence of the January 2009 Default and other events of default then in existence.

28.    On April 10, 2009, the Forbearance Period expired, and the Borrowers requested that the Pre-Petition Lenders consolidate, restructure and amend the 2007 Bank Group Debt, the Bridge Loan and the Hedging Obligations.  Accordingly, on July 20, 2009, the Borrowers, Synovus and the Pre-Petition Lenders entered into that certain Restructuring Agreement (the "Restructuring Agreement"), pursuant to which, inter alia, the 2007 Bank Group Debt and the Hedging Obligations were consolidated or otherwise restructured into the following obligations: (a) a term loan in the principal amount of $73,274,161.03 ("Prepetition Term Loan A"), (b) a

term loan in the principal amount of $148,789,618.77 ("Prepetition Term Loan B-1"), and (c) a term loan in the principal amount of $259,985,574.76 ("Prepetition Term Loan B-2"; collectively with Prepetition Term Loan A and Prepetition Term Loan B-1, the "Prepetition Term Loans"). In addition to the Pre-Petition Term Loans, pursuant to the Restructuring Agreement, (i) the Pre-Petition Lenders also agreed to make a $21 million revolving credit line available to the Borrowers, (ii) Synovus agreed to extend to the Borrowers that certain construction loan in the original principal amount of $11,000,000, and (iii) the Bridge Loan was restructured.

29.    The Debtors defaulted on the obligations owed under the Restructuring Agreement in January 2010.

### THE FIRST DAY MOTIONS[2]

30.    Contemporaneously with the filing of their bankruptcy petitions and certain other motions, the Debtors filed the motions and applications listed on Exhibit A (collectively, the "First Day Motions"). I submit this declaration in support of the First Day Motions. I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

31.    As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives, and discussions with outside advisors, I have formed opinions as to (a) the necessity of obtaining the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant motion or application.

relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

32.     As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors in possession.

## I.     Procedural Motions

### A.     Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases

33.     The Debtors request the entry of an order directing that their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by Sea Island Company.

34.     The Debtors believe that it would be more efficient for these cases to be jointly administered.  The Debtors anticipate significant activity during these cases and believe that most hearings and contested matters will apply to all of the Debtors' cases equally. Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

### B.     Debtors' Motion for an Order Establishing Notice and Administrative Procedures (the "Notice Procedures Motion")

35.     The Debtors request the entry of an order establishing appropriate notice procedures.  Currently, literally thousands of creditors and parties-in-interest may be technically entitled to receive notice in these cases.  To require the Debtors to provide notice of all pleadings

and other papers filed in these cases to these parties in interest would be extremely burdensome and costly to the Debtors' estates as a result of the photocopying, postage, and other expenses associated with such large mailings.

**C.      Debtors' Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs**

36.      In the Debtors' Motion for an order to Extend Time to File Schedules and Statements of Financial Affairs, the Debtors request the entry of an order extending the time to file their schedules and statements of financial affairs (collectively, "Schedules") until September 8, 2010.

37.      To prepare the Schedules, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' limited and already over-burdened employees. The efforts of the Debtors' employees during the initial stages of these cases are critical and need to be focused on attending to the Debtors' business and maximizing the value of the Debtors' estates. The Debtors currently have employees working diligently to assemble and collate the necessary information. The Debtors anticipate that they will need a minimum of fourteen additional days than that otherwise prescribed by the Bankruptcy Rules in order to prepare and file their Schedules in the appropriate format.

## II.      Operational Motions

**A.      Debtors' Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees and Independent Contractors (the "Employee Obligations Motion")**

38.      The Debtors seek authority to pay the Employee Obligations (as defined in the Employee Obligations Motion) that become payable during the pendency of these chapter 11

14

cases and to continue at this time their practices, programs, and policies with respect to their employees, as such practices, programs, and policies were in effect as of the Petition Date.

39.     The Debtors employ approximately 1,400 people (the "Employees"), of which approximately 80 reside in their corporate offices, with approximately 1,320 people located throughout their hotels, golf courses, clubs and related amenities, and real estate operations.  Of the Debtors' 1,400 employees, approximately 180 are employed on a full-time salaried basis, approximately 650 are employed on a full-time hourly basis, while approximately 570 are employed part time or on a seasonal basis.  The Debtors compensate approximately 1,220 of the Employees on an hourly basis and approximately 180 on an annual salary basis.

40.     The Debtors employ approximately 25 independent contractors (the "Independent Contractors").  Although these individuals are paid through accounts payable, they are paid every two weeks consistent with the payroll schedule.

41.     Even though the Debtors have incurred certain Employee Obligations prior to the Petition Date, certain of the Employee Obligations will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.  The Employee Obligations include, without limitation: (i) wages, salary, and other compensation; (ii) payroll taxes; (iii) vacation, sick, and personal day programs; (iv) qualified 401(k) plan obligations; (v) health and welfare benefits; and (vi) expense reimbursements and other benefit programs.  The Employee Obligations are more specifically described as follows:

- *Wages, salaries, and other compensation.*  These obligations consist of pre-relief wages, salaries, and commissions owed to the Employees (the "Payroll Obligations").    The average semi-monthly gross amount of the Payroll Obligations is approximately $1,800,000.  This gross amount includes certain deductions described separately below, such as payroll taxes owed by the employees, severance payments, and 401(k) contributions.  Approximately 86% of the Payroll Obligations are deposited directly into the employees' bank accounts and the remaining 14% are paid by check.  As of the Petition Date, the

Debtors estimate that they owe approximately $1,425,000 in Payroll Obligations. These numbers do not include employer payroll taxes.

- *Independent Contractors Compensation.* These obligations consist of amounts owed as compensation to approximately twenty-five Independent Contractors. The average monthly gross amount of these obligations is approximately $250,000. As of the Petition Date, the Debtors estimate that they owe approximately $125,000 to the Independent Contractors.

- *Payroll taxes.* These obligations consist of federal, state, and local income taxes, social security, and Medicare taxes. The payroll taxes include the amounts owed by Employees that the Debtors withhold from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtors. The Debtors' average semi-monthly payroll tax liability for Employees is approximately $575,000. This includes $150,000 for the employer obligation and $425,000 for the employee component. The employee component is included in the gross amount of the Payroll Obligations discussed above. As of the Petition Date, the Debtors estimate that they owe approximately $375,000 in payroll taxes.

- *Vacation, sick, and holiday programs.* These obligations consist of time off for vacation, illness and company holidays. The Debtors recognize seven holidays per year. Employees receive sick leave from the date of hire for a maximum of six days or forty-eight hours per year, based upon hours worked per week. Employees receive paid vacation as follows:

  o Salaried employees receive paid vacation based upon years of service as follows: (i) after one year of employment, the employee receives a maximum of 80 vacation hours; (ii) after five years of employment, the employee receives a maximum of 120 vacation hours; and (iii) after ten years of employment, the employee receives a maximum of 160 vacation hours.

  o Full-time hourly employees receive paid vacation based upon hours worked per week and years of service as follows: (i) after one year of employment, the employee receives a maximum of 40 vacation hours; (ii) after two years of employment, the employee receives a maximum of 80 vacation hours; (iii) after ten years of employment, the employee receives a maximum of 120 vacation hours; and (iv) after twenty years of employment, the employee receives a maximum of 160 vacation hours.

Employees accrue the full amount of their allotted vacation on their anniversary date of employment with the Debtors for the upcoming year, however employees may not carry over unused vacation remaining on that anniversary date. At the time of separation, Employees are paid for any earned and unused vacation hours. The Debtors desire to continue to honor their obligations for vacation, sick days, and holidays on a going forward basis. As of the Petition Date, the Debtors

estimate that they owe approximately $1,100,000 in total unused vacation pay that will be due to Employees at the time of separation.

- *401(k) plan obligations*. The Debtors maintain a 401(k) plan, under which Employees may defer a portion of their salary. After completing twelve months of employment working at least 1,000 hours, Employees 21 years of age or older can contribute up to 100% of their annual pay (up to the annual maximum deferral amount). The Debtors do not make matching cash contributions. There is no material cost to the Debtors for this program. Due to the fact that there is no matching program, all collected funds are remitted immediately.

- *Expense Reimbursements and Other Benefits*. The Debtors customarily offer various other employee benefit policies and programs. The Debtors also reimburse eligible employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. These reimbursement obligations include such things as travel expenses, relocation expenses, cellular phone reimbursements, and professional memberships. The amount of these reimbursement obligations is approximately $16,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $16,000 in other expense reimbursements.

- *Flexible Spending Accounts*. The Debtors offer Employees the option of contributing a portion of their pre-tax wages into tax-exempt flexible spending accounts. The amounts contributed may be used for certain qualified expenses such as medical expenses and dependant care expenses not otherwise covered by insurance. As Employees incur eligible expenses, they submit a claim to be reimbursed from their flexible spending account. As of the Petition Date, the Debtors' Employees have contributed approximately $52,100 to their flexible spending accounts for the current calendar year and have sought (and received) reimbursement of approximately $52,800 for qualified expenses. The Debtors believe that its Employees have incurred additional qualified expenses for which no reimbursement request has been submitted. The Debtors request authority to maintain the flexible spending account program and to continue to make reimbursements from the flexible spending accounts in the ordinary course of business regardless of whether the qualified expenses were incurred before or after the Petition Date. There is no material cost to the Debtors for this program.

- *Directors' Expenses*. The members of the Debtors' Board of Directors incur certain expenses for travel to meetings held at Sea Island. As of the Petition Date, there are no outstanding amounts due to the Board of Directors.

- *Health and welfare benefits*. The Debtors provide several health and welfare benefit plans for their full-time employees, including insurance plans relating to medical, health, prescription, dental, disability, and life insurance.

  o *Health Care Plan*. The Debtors maintain and provide a health care plan to their full-time employees (with six months of continuous service for

17

hourly employees; no waiting period for salaried employees). The Debtors fund the medical plans and Primary Physicians Care manages the claims. Specifically, the Debtors provide medical benefits to employees under a no-deductible PPO plan. Under the plan, employees pay a co-pay and the Debtors cover 100% of each claim up to $165,000 per year. The stop loss provider, ING, covers any additional amounts. Employees are automatically enrolled in the prescription drug plan if they are covered under the Sea Island Healthcare Plan. Also included is a vision benefit which covers routine eye exams, glasses, frames and contact lenses and an employee assistance program which offers confidential and professional counseling and crisis intervention services for full-time employees. The Debtors average monthly premiums and administration fees (which include all of the premium and administration costs associated with the health care, prescription, vision, dental, and employee assistance plans) approximate $60,000 in connection with the health plans (this includes reinsurance, COBRA fees, PPO fees, network fees, etc.). The Debtors believe that approximately $1,400,000 is due and outstanding under the plans for services provided prior to the Petition Date. For 2010, the Debtors estimate that the health (medical, prescription, vision, and employee assistance) programs will cost $6,200,000 (which includes the approximate $60,000 monthly premiums, administration fees and estimated cost of claims). By way of background, the total net program expense was $5,300,000 in 2009 and $9,100,000 in 2008.

- The costs include health insurance for current and former employees. There are 33 former employees covered under COBRA (covered 18 months from departure).

- The Debtors receive claims run each week and pay weekly. The Debtors are current on all payments until each Friday, when the new amounts are due.

o *Dental.* The Debtors maintain and provide a dental plan to full-time employees (with six months of continuous service for hourly employees; no waiting period for salaried employees). Employees pay an annual deductible of $300 and the Debtors cover the remainder up to a cap of $1,500. As previously mentioned, the administration costs of this plan are included as part of the $60,000 covering the health and prescription plan. Claims costs are estimated at $400,000 for 2010. The claims cost were $300,000 in 2009 and $400,000 in 2008. As of the Petition Date, the Debtors owe approximately $100,000.

o *Basic Life Insurance*. The Debtors provide life insurance to full-time employees after six months of continuous service (no wait time for salaried employees) at no cost to employees. The Debtors' average

monthly premium is approximately $7,000. As of the Petition Date, the Debtors owe approximately $7,000.

o  *Accident Death and Dismemberment Insurance*. The Debtors provide Accident Death and Dismemberment Insurance to employees after six months of continuous service (no waiting period for salaried employees). The average monthly cost to the Debtors is $1,300 (due at the end of each month). As of the Petition Date, the Debtors owe approximately $1,300.

o  *Short Term Disability*. After one year of continuous employment, the Debtors provide short-term disability coverage at 60% of the employee's annual salary and wages for employees who work at least 1,250 hours per year and who are totally disabled. This runs from the 8th day of disability through the 90th day (at which time the employee may be eligible for long-term disability). The Debtors estimate that this program will cost $112,000 for 2010 ($137,000 in 2009 and $256,000 in 2008). As of the Petition Date, the Debtors owe approximately $10,000.

**The following are "pass-through" programs for which the Debtors make no contributions or payments. The Debtors withhold the necessary amounts from the Employee's paycheck and remit to the amounts to the benefit provider. Accordingly, the Debtors ask for authority to remit amounts collected from the Employees before the petition date but not yet remitted to the carrier.**

o  *Sickness and Accident Plan*. The Debtors permit part-time employees to purchase a limited benefit medical plan which provides illness, accident and prescription coverage to employees and optional dental and vision coverages. The Debtors collect funds from employees and remit to the insurance company, but do not provide any reimbursement for this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $5,500 in premiums collected from employees but not yet remitted to the carrier.

o  *Supplemental Life Insurance*. The Debtors provide full-time employees who have basic life insurance with the option of increasing their coverage by purchasing supplemental insurance. The Debtors collect funds from employees and remit to the insurance company, but do not provide any reimbursement for this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $6,000 in premiums collected from employees but not yet remitted to the carrier.

o  *Long Term Care Insurance*. The Debtors permit full and part-time employees and certain family members to enroll in long-term care insurance. The Debtors collect funds from employees and remit to the insurance company, but do not provide any reimbursement for this

program.  There is no material cost to the Debtors for this program.  As of the Petition Date, the Debtors hold approximately $1,000 in premiums collected from employees but not yet remitted to the carrier.

o *Long-term Disability*.  After one year of continuous employment, the Debtors provide long-term disability coverage at 60% of the employee's annual salary and wages for employees who are totally disabled after satisfying a 90-day elimination period.  The coverage lasts from the 91st day of disability until the employee turns 65 or is no longer disabled.  The Debtors collect premiums from employees and remit same to the insurance company, but do not subsidize this program.  There is no material cost to the Debtors for this program.  As of the Petition Date, the Debtors hold approximately $13,000 in premiums collected from employees but not yet remitted to the carrier.

42.    The Debtors believe that all or nearly all claims for Employee Obligations would constitute priority claims pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

43.    Any delay in paying Employee Obligations will adversely impact the Debtors' relationships with their Employees and Independent Contractors and will irreparably impair the morale, dedication, confidence, and cooperation of the very people upon whom the Debtors rely for their businesses to be successful.  The Debtors must have the support of their Employees and Independent Contractors in order for the Debtors' reorganization efforts to succeed.  Put quite simply, if the relief requested by the Employee Obligations Motion is not granted, the Debtors will likely be out of business altogether.

44.    Moreover, absent an order granting the relief requested in the Employee Obligations Motion, the Debtors' employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations.  The stability of the Debtors will thus be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives.

45.    The Debtors do not seek to alter their compensation, vacation, and other benefit policies in the Employee Obligations Motion, and the Employee Obligations Motion is not to be deemed an assumption or adoption of any agreement or policy providing for any such benefits. Instead, the Employee Obligations Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with those policies and to permit the Debtors, in their discretion, to continue to honor their practices, programs, and policies with respect to their employees, as such practices, program, and policies were in effect as of the Petition Date.

46.    The Debtors request that they be authorized to pay any cost or penalty incurred by a person to which Employee Obligations are owed in the event that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases.  Though the Debtors estimate any such costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such costs or penalties, then their employees will suffer the exact type of harm that the Employee Obligations Motion seeks to prevent, and the Debtors will suffer from loss of employee goodwill.

**B.    Debtors' Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations (the "Insurance Motion")**

47.    The Debtors seek an order (a) authorizing them to maintain their insurance programs, insurance policies, insurance premium financing programs, workers' compensation program, and any related agreements, as such practices, programs, and policies were in effect as of the Petition Date and to pay, in their sole discretion, pre-petition amounts accrued in connection therewith, and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims.

48.    In connection with the operation of their businesses, the Debtors maintain various insurance policies and programs through several different insurance carriers (the "Insurance

21

Carriers"). All of the Debtors' various insurance policies are listed on the <u>Exhibit A</u> to the Insurance Motion, together with a list of the Insurance Carriers, policy terms and the aggregate annual premiums due thereunder.

49.    The Debtors' insurance policies and programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, automobile liability, workers' compensation, fiduciary liability, and directors' and officers' liability.

50.    The Debtors are required to pay premiums based upon a fixed rate established by each Insurance Carrier. The premiums for most of these policies are determined annually and are either directly billed to the Debtors or to the Debtors' insurance broker.

51.    As of the Petition Date, the Debtors believe that they are current on pre-petition premiums with respect to their insurance policies and programs. To the extent there is an outstanding insurance policy premium for the pre-petition period, however, the Debtors seek authority to pay the pre-petition premiums in the ordinary course and as such payments are necessary to keep their insurance policies and programs in force.

52.    In many of the Debtors' policies of insurance, there are certain self-insured retention and deductible amounts set forth in the policy language for each claim. If there are certain deductible amounts set forth in the policy language for each claim, claims for losses and expenses are paid by the Insurance Carriers directly to claimants, attorneys, and investigators, as incurred. The Insurance Carriers then bill the Debtors for reimbursement of losses and expenses that fall under the deductible amounts set forth in the policy.

53.     Paying expenses such as attorneys' fees and costs of investigation that may fall within the self-insured retention or deductible under the Debtors' insurance policies is necessary to continue to address and process claims.

54.     The Debtors spend approximately $4,000,000 annually on insurance premiums. The Debtors are currently parties to two insurance premium financing agreements (the "Premium Financing Programs") whereby certain of the Debtors' insurance policies and programs are financed by Premium Financing Specialists, Inc. ("PFS").  Exhibit A to the Insurance Motion indicates which of the insurance policies and programs are included in the Premium Financing Agreements.

55.     Pursuant to the terms of the Premium Financing Agreement, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then make nine monthly installments (the "PFS Payment Obligations") to PFS toward the balance of the financing over the term of the Premium Financing Agreements.

56.     Under Georgia law, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with coverage for claims arising from or related to their employment with the Debtors.  The Debtors maintain a workers' compensation policy (the "Workers' Compensation Program") with Great American Insurance Group, which covers all employees.   The annual premium for the Workers' Compensation Program is $244,257 and there is an deductible of $250,000 per occurrence.

57.     In connection with the Workers' Compensation Program, the Debtors paid Great American Insurance Group a cash deposit of approximately $200,000.  The Debtors' prior workers' compensation provider, Travelers, holds a similar deposit of $1,200,000.

58.    It is essential to the continued operation of the Debtors' businesses and their efforts to reorganize that their insurance policies and programs, the Premium Financing Programs, and the Workers' Compensation Program (collectively, the "Insurance Programs") be maintained on an ongoing and uninterrupted basis.  The failure to pay premiums when due may affect the Debtors' ability to renew the insurance policies.  If the insurance policies are allowed to lapse, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others.  Such exposure could have an extremely negative impact on the Debtors' ongoing business operations and would also place the Debtors' assets at risk.

59.    Continued effectiveness of directors' and officers' liability policies is necessary to the retention of qualified and dedicated senior management and directors.

60.    Finally, pursuant to the terms of many of their leases and commercial contracts, as well as the guidelines established by the United States Trustee, the Debtors are obligated to remain current with respect to certain of their primary insurance policies.

61.    The amounts the Debtors propose to pay in respect of the Insurance Programs are minimal in light of the size of the Debtors' estates and the potential exposure of the Debtors, absent insurance coverage.  Therefore, it is critical that the Debtors continue to maintain their Insurance Programs on an uninterrupted basis and be permitted to pay any obligations in the ordinary course of business and consistent with pre-petition practices.

62.    The maintenance of the Workers' Compensation Program is likewise justified because applicable state law mandates this coverage, and 28 U.S.C. § 959(b) requires the Debtors to comply with valid state laws.  In addition, the Debtors' employees all depend on the protection that the Workers' Compensation Program provides.

**C.    Debtors' Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing**

**Business Forms, and (C) Continue Existing Investment Practices (the "Cash Management Motion")**

63.    The Debtors respectfully request an order (a) authorizing them to continue to maintain their existing bank accounts and to continue use of their existing cash management system; (b) authorizing them to continue to utilize their existing business forms, including checks; and (c) granting them a waiver, to the extent required, from the United States Trustee's guidelines with respect to those requirements identified above.  Finally, the Debtors seek to continue their investment policies during their bankruptcy cases, without the posting of any bonds pursuant to section 345(b) of the Bankruptcy Code

64.    Prior to the commencement of these chapter 11 cases, the Debtors maintained fifteen bank accounts at Synovus Bank, formerly known as Columbus Bank & Trust, ("Synovus"), Coastal Bank, and other various depositary institutions, a schedule of which is attached to the Cash Management Motion as Exhibit A.  The Debtors' primary cash management banks are Synovus and Coastal Bank.  The Debtors maintain these accounts through which substantially all of their collections are deposited and disbursements are made.  The cash management system operates as follows:

> (a) The Debtors primarily use Synovus for their operating cash needs.  Except for credit card receipts, foreign checks, and checks collected locally, the Debtors' incoming receipts from its hotels, members' dues, real estate sales, cottage rentals, and the like are sent via lockbox, bank deposit, or electronic payment directly into a main depository account with Synovus. Credit card receipts are sent to two merchant accounts maintained with Synovus.  The Debtors maintain a local depository account with Coastal Bank for depositing foreign checks and checks collected locally and receipt of pension reimbursements from the Debtors' third-party plan administrator.

> (b) Each day, the receipts from the Synovus depository account and merchant accounts are automatically swept into the master concentration account. The master account funds three (3) disbursement accounts at Synovus which include an operating account, a payroll account, and a healthcare account.  All payroll-related disbursements, including manual checks,

direct deposits, and payroll taxes, are made from the payroll account. All healthcare claims are funded from the healthcare account. Other disbursements—not related to payroll or healthcare—are made from the operating account, either by check, automatic clearinghouse ("ACH") transfer, or wire transfer.

(c) The local depository account with Coastal Bank referred to above in subparagraph (a) is used to fund the cash registers in the Debtors' various outlets. Such funds are manually transferred, based upon cash needs, and typically any excess balance over $50,000 is transferred into the master account.

(d) The Debtors maintain a separate account, called the BCS Reserves Account with Sun Trust, which is funded from portions of rental payments from Beach Club Suites guests. This account holds funds for improvements and repairs to the Beach Club Suites.

(e) The Debtors maintain a real estate escrow account with Coastal Bank to hold deposits with respect to (i) pending sales of real estate owned by the Debtors, and (ii) pending sales of real estate owned by third parties. These deposits are held in escrow to be applied to the purchase price, or refunded for sales that do not close. In addition, customer deposits for future cottage rentals and insurance proceeds are maintained in this account.

(f) The Debtors also maintain a Sea Island Coastal Properties real estate escrow account maintained with Coastal Bank that is not used on a regular basis and currently hold less than $1,000.00 and is similar to that described in subparagraph (e).

(g) The Debtors maintain an operating account with Sun Trust, which contains cash reserves for operating activities.

(h) The Debtors maintain an account for the amounts due to owners of Beach Club Suites, Cloister Ocean Residences, and Cottages that participate in the Company's rental programs. Each week the Company calculates the gross revenues generated from the rental of condominiums owned by third parties and transfers the owner reimbursement from the Synovus Master Account to the Rental Program Owner Reimbursements account held at Sun Trust. Disbursements are made to the Beach Club Suites and Cottage owners on a monthly basis and Cloister Ocean Residence Owners on a quarterly basis.

(i) The Debtors maintain an account which contains the proceeds from the sale of a Resort Residential Unit completed in September 2009. This account is used to fund operations and transfers are made to the master concentration account upon draw requests submitted by the Debtors to Synovus.

(j) The Debtors maintain an account which contains certain proceeds from the sale of the Debtors' ownership interest in Cabin Bluff in December 2009. This account is used to fund operations and transfers are made to the

master concentration account upon draw requests submitted by the Debtors to Synovus.

(k) The Debtors maintain an account which contains the proceeds from the sale of the Ceylon Land Tract in July 2010.

A chart illustrating the Debtors' cash management system is attached to the Cash Management Motion as Exhibit B.

65.    Authorizing the Debtors to continue to use their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses.  New accounts would inevitably lead to delays, confusion, and disruption of payments to employees that would likely adversely affect employee morale at this critical juncture.

66.    Moreover, a transition to new debtor-in-possession bank accounts at this time would be disruptive and time-consuming.  By permitting existing accounts to remain open, preserving business continuity, and avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties-in-interest, including the Debtors' employees, will be best served, and the Debtors' estates will benefit considerably.

67.    Finally, by virtue of the nature and scope of the Debtors' businesses, the number of accounts, and the numerous employees, suppliers of goods and services, and others with whom the Debtors transact business, it is imperative that the Debtors be permitted to continue to use their existing business forms, including checks.  A substantial amount of time and expense would be required to print new business forms and stationery and would also likely result in a substantial risk of disruption to the Debtors' ordinary business affairs.

68.    The Debtors currently have all of their excess cash in a money market investment. The Debtors' practices generally conform with the intent of section 345(b) to protect and

maximize the value of their estates.  The Debtors believe that their existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, believe that sufficient cause exists to waive the investment requirements of section 345(b) to allow the Debtors to continue their existing investment procedures.

69.    Moreover, the Debtors believe that the deposits at issue are safe because of the relative strength of the bank in which the Debtors' accounts are maintained.  The bank the Debtors use is well-established and invests the Debtors' funds in accordance with their standard investment guidelines.  Requiring the Debtors to open multiple accounts at different banks so that the deposits in each such bank would be insured by FDIC would be unnecessarily burdensome and would lead to the same delays and disruption to the Debtors' businesses that the Cash Management Motion seeks to avoid.

**D.    Debtors' Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations (the "Tax Motion")**

70.    The Debtors seek authority to pay, in their sole discretion, undisputed pre-petition sales and use tax obligations ("Sales and Use Taxes") owed to the state and local taxing authorities listed on the schedule attached to the Tax Motion as Exhibit A (collectively, the "Taxing Authorities") in the ordinary course of business.  As explained more fully in the Tax Motion, (i) such taxes constitute "trust fund" taxes and thus are not property of the Debtors' estates, (ii) such taxes constitute priority taxes, and (iii) the failure to pay such taxes could disrupt the Debtors' reorganization efforts and impair their successful reorganization.  In connection with the normal operation of their businesses, the Debtors collect sales taxes from their customers and other third parties for remittance to the Taxing Authorities.   In addition, the Debtors accrue and incur state use taxes.  The Debtors estimate that, as of the Petition Date, they hold approximately $800,500 in collected but unremitted sales taxes and accrued state use taxes.

71.     The Debtors have sufficient cash reserves and will have sufficient cash from ongoing operations to pay the amounts described in the Tax Motion in the ordinary course of business.

72.     The Debtors' failure to pay the Sales and Use Taxes could have a material adverse impact on their ability to operate in the ordinary course.

**E.      Motion for an Order Authorizing the Debtors to Pay Association Fees and to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto (the "Customer Obligations Motion")**

73.     The Debtors respectfully request entry of an order authorizing the Debtors, in their sole discretion, to honor or pay all Association Fees (as defined below) and all pre-petition obligations arising under the Customer Programs (as defined below, together with the Association Fees, the "Obligations"). The Debtors believe that honoring and paying the Obligations and maintaining the Customer Programs is the best way to maximize the value of the Debtors' estates and to minimize the negative impact of these chapter 11 cases on the Debtors' customers.

74.     In the ordinary course of the Debtors' businesses—as is customary with most resort, hospitality, and real estate sales businesses—the Debtors maintain a number of customer-service policies including, without limitation: gift certificates, member/guest credits, guest and group deposits, cottage rental deposits, and rental management receipts, all of which are designed to enhance the Debtors' ability to generate continuing revenues in their businesses (collectively, the "Customer Programs"). As a result of their real estate sales business, the Debtors are members of several Property Owners' Associations (the "POAs"). The POAs manage and maintain various common areas associated with the Debtors' real estate developments. The POAs contract with independent contractors to provide maintenance and other services. As a member of the POAs, the Debtors are required to pay certain association

fees (the "Association Fees"), typically on a monthly basis.  Finally, the Debtors are parties to approximately six concessionaire agreements (the "Concessionaire Agreements") whereby independent vendors (the "Concessionaires") operate parts of the Debtors' resort.  The Customer Programs, the Associations Fees and the Concessionaires are more particularly described as follows:

1.   Gift Certificates.  As of the Petition Date, the Debtors have approximately 3,200 unredeemed gift certificates outstanding.  These gift certificates total approximately $560,000.

2.   Member/Guest Credits.  As of the Petition Date, the Debtors have approximately 760 member/guest credits outstanding.  These credits, which may be used for retail purchases, total approximately $65,000.

3.   Guest Deposits.  As of August 5, 2010, the Debtors had approximately 1,800 guest/group deposits totaling approximately $2,550,000 and approximately 134 cottage-rental deposits totaling approximately $325,000.

4.   Rental Management Receipts.  The Debtors also hold a certain amount of rental receipts from the rental of Beach Club Suites, Cloister Ocean Residences, and Cottages.  The owners of these units, per the terms of the rental agreement, are entitled to a portion of these receipts.  The owners of the units are currently entitled to approximately $2,230,000.  This property does not constitute property of the Debtors' estate.

5.   Association Fees.  The Debtors are members of thirteen POAs.  The cumulative average monthly amount of the Association Fees is approximately $260,000.  In the weeks following the Petition Date, approximately $260,000 in Association Fees come due.

6.   Concessionaires.  As of the Petition Date, the Debtors estimate that they owe approximately $175,000 to the Concessionaires.  This property does not constitute property of the Debtors' estate.

75.   Approximately $1,750,000 of the amounts currently held by the Debtors in connection with the Customer Programs described above will be entitled to priority under section 507(a)(7).  In particular, most of the amounts held pursuant to the Debtors' gift certificates,

member/guest credits, and guest/group deposits constitute customer deposits given in connection with the purchase of property for household use and such amounts typically are less than $2,425.

76.    The success and viability of the Debtors' businesses is dependant upon the loyalty of its customers.  The Debtors believe that the uninterrupted maintenance of the above-described Customer Programs is essential to maintaining such loyalty.  The Debtors' Customer Programs are designed to enable the Debtors to compete effectively with other businesses who offer comparable programs.  Any disruption which would necessarily result from the termination of some or all of these Customer Programs would undoubtedly threaten the Debtors' customer base and have an adverse effect on the value of the Debtors' assets and businesses and their ability to reorganize.  Based on the foregoing, the Debtors submit that approval of the relief requested herein is necessary and appropriate to enable it to reorganize successfully.

77.    Furthermore, if the Association Fees are not paid in the ordinary course, the POAs will not have sufficient funds to maintain the common areas associated with the Debtors real estate.  A deterioration of these common areas would cause a loss in value of the Debtors' real estate and would be against the interest of the Debtors' estates and their creditors.  Furthermore, the POAs use a variety of independent contractors to service and maintain these common areas.  Certain of these independent contractors are currently owed compensation for services performed and materials provided prior to the Petition Date.  If these independent contractors are not paid, they may assert mechanics' liens and materialmen's liens against property in which the Debtors have an interest.

**F.    Debtors' Motion for Interim and Final Orders (A) Establishing Procedures for Utilities to Request Adequate Assurance of Payment, and (B) Establishing Procedures for Resolving Disputes Relating to Adequate Assurance Requests (the "Utilities Motion")**

78.     The Debtors respectfully request the entry of an interim and final order (the "Interim Order" and the "Final Order", respectively): (i) establishing procedures for utilities to request adequate assurance of payment for post-petition services and (ii) establishing procedures for resolving disputes relating to adequate assurance of payment.

79.     Utility services are essential to the Debtors' ability to sustain their operations while these chapter 11 cases are pending.  In the normal conduct of their businesses, the Debtors have relationships with approximately twelve utility companies (collectively, the "Utility Companies") for the provision of telephone, internet, electric, gas, water, sewer, waste management, cable and other services (the "Utility Services").  A list identifying the Utility Companies and their notice addresses is attached to the Utilities Motion as Exhibit A (the "Utilities Service List").[3]

80.     At all relevant times, the Debtors have attempted to remain current with regard to their utility bills.  Furthermore, to the best of the Debtors' knowledge, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

81.     Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during these chapter 11 cases.  Any interruption of utility service to the

---

[3] The listing of any entity on Exhibit A is not an admission that any listed entity is a utility within the meaning of section 366.  The Debtors reserve all rights to further address the characterization of any particular entities listed on Exhibit A as a utility company the meaning of section 366(a) of the Bankruptcy Code.  The Debtors further reserve the right to terminate the services of any Utility Company at any time and to seek an immediate refund of any utility deposit without effect to any right of setoff or claim asserted by a utility company against the Debtors.  The Utilities Motion does not seek assumption or rejection of any executory contract under section 365 of the Bankruptcy Code, and the Debtors reserve the right to claim that any contract with the Utility Companies is or is not an executory contract, as the facts may dictate.  The relief requested in the Utilities Motion is with respect to all utility companies and is not limited only to those listed on Exhibit A.

Debtors' businesses would be severely disruptive and jeopardize the Debtors' chances for a successful reorganization. Because of the nature of the Debtors' operations, termination of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and cause considerable inconvenience to the Debtors' customers and employees. If utility providers are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened.

G.   **Debtors' Emergency Motion For Entry of an Interim and Final Order (A) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (B) Granting Adequate Protection Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c) (the "Cash Collateral Motion")**

82.   The Debtors seek the entry of an order (a) authorizing the Debtors to use cash collateral, (b) granting adequate protection, and (c) scheduling a final hearing (the "Final Hearing").

83.   Without the use of the Cash Collateral, the Debtors do not have sufficient access to working capital to operate their businesses in the ordinary course for a period of time sufficient to sell their assets through a plan of liquidation. More specifically, the Debtors' ability to continue their operations and administer these bankruptcy cases is dependent on their ability to use the Cash Collateral. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first-day orders, to minimize the damage occasioned by their cash flow problems.

84.   Any disruption of the Debtors' operations would be devastating at this critical juncture. The inability of the Debtors to access the Cash Collateral and to make payments on certain obligations on a timely basis may result in, *inter alia*, (a) the Debtors' inability to continue the operation of their hotel and golf facilities, as well as their related real estate

development business, and/or (b) the breakdown of the competitive marketing, auction and sale process designed to maximize the return available to the Debtors' creditors by and through the sale of substantially all of the Debtors' assets in these bankruptcy cases. If either of these events were to occur, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of the Debtors' creditors and other constituents. Additionally, approximately 1,400 employees of the Debtors would immediately lose their jobs if the Debtors were forced to cease operations due to insufficient liquidity and lack of access to the Cash Collateral.

85.    It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first-day orders, to minimize the damage occasioned by their cash flow problems.

86.    The Budget attached as Exhibit A to the Cash Collateral Motion is a reasonable estimate of the expenses projected by the Debtors over the period set forth therein.

**[signature on following page]**

Executed on August 10, 2010, at Brunswick, Georgia.


/s/ David Bansmer
David Bansmer
President and Chief Operating Officer of Sea Island
Company

Further Affiant Sayeth Not.


Sworn To and Subscribed Before me this 10th day of August, 2010.


/s/ Kathy Hutcheson
Notary Public
My Commission Expires: June 2, 2014


[NOTARIAL SEAL]

# EXHIBIT A

# INDEX OF FIRST DAY MOTIONS

| Pleadings |
| --- |
| Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases |
| Debtors' Motion for an Order Establishing Notice and Administrative Procedures |
| Debtors' Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs |
| Debtors' Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees and Independent Contractors |
| Debtors' Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations |
| Debtors' Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Existing Investment Practices |
| Debtors' Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales, Use, Trust Fund, and Other Taxes and Related Obligations |
| Debtors' Motion for an Order Authorizing the Debtors to Pay Association Fees and to Maintain and Administer Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto |
| Debtors' Motion for Interim and Final Orders (A) Establishing Procedures for Utilities to Request Adequate Assurance of Payment, and (B) Establishing Procedures for Resolving Disputes Relating to Adequate Assurance Requests |
| Debtors' Emergency Motion For Entry of an Interim and Final Order (A) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (B) Granting Adequate Protection Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c) |