**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 FOR A FINAL ORDER (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS, (D) MODIFYING THE AUTOMATIC STAY, AND (E) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Sea Island Company ("SIC"), Sea Island Coastal Properties LLC ("Coastal"), Sea Island Services, Inc. ("SI Services"), First Sea Island, LLC ("First SI"), Sea Island Apparel, LLC ("SI Apparel"), Sea Island Resort Residences, LLC ("SI Residences"), and SICAL, LLC ("SICAL"), each a debtor-in-possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court (the "Motion") for entry of a final financing order (A) authorizing the Debtors to obtain post-petition financing, (B) authorizing the Debtors to use cash collateral of the DIP lenders, (C) granting adequate protection to the pre-petition lenders, (D) modifying the automatic stay, and (E) scheduling a final hearing pursuant to Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  In support thereof, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

Among other things, the Debtors seek authority, after the conduct of a final hearing on the Motion, to obtain post-petition secured loans equal to $5,000,000, subject to the terms and conditions of the DIP Agreement (as hereinafter defined) and the related loan documents, in connection with the Debtors' proposed plan of liquidation (the "Plan of Liquidation") that includes a sale of substantially all the Debtors' assets pursuant to the asset purchase agreement and the bid procedures (the "Asset Purchase Agreement" and the "Bid Procedures" respectively). In accordance with Bankruptcy Rule 4001, below is a summary of the terms of the proposed DIP Facility (as defined below) and the Debtors' use of cash collateral of the DIP Lenders:[1]

(a)  Borrowers.  SIC, Coastal, SI Services, First SI, SI Apparel, SI Residences and SICAL.

(b)  Agent.  Synovus Bank f/k/a Columbus Bank and Trust Company

(c)  Lenders.  Synovus Bank, Bank of America, N.A. and Bank of Scotland, PLC.

(d)  Borrowing Limits.  $5,000,000.

(e)  Interest Rate.  LIBOR Rate plus 10% with a LIBOR Rate floor equal to 2%.  The default interest rate is the otherwise applicable interest rate plus 5%.

(f)  Maturity.  The earliest to occur of (i) February 1, 2011; (ii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and including the effective date) of a plan of liquidation; (iii) the closing of any sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code; or (iv) the acceleration of the loan and the termination of the commitment in accordance with the DIP Agreement.

(g)  Purpose.  The DIP Facility shall be used to provide for the working capital requirements and other general corporate purposes of SIC, Coastal and their subsidiaries during the pendency of the Debtors' chapter 11 cases, in accordance with the terms of the DIP Budget (defined herein).

(h)  Priority and Liens.  Subject to the Carve-out, all obligations under the DIP Facility shall, at all times:  (i) pursuant to section 364(c)(1) of the Bankruptcy Code, be

---

[1] Terms not defined in the summary are defined herein or in the DIP Agreement.

entitled to super-priority claim status in the chapter 11 cases; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all unencumbered property and assets of the Debtors (other than claims or causes of action arising under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, the "Avoidance Actions")); (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property and assets of the Debtors that are subject to valid and perfected liens in existence at the time of the commencement of the chapter 11 cases or to valid liens in existence at the time of such commencement as permitted by section 546(b) of the Bankruptcy Code; and (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all the property of the Debtors of any kind (other than Avoidance Actions), senior to the liens that secure the obligations of the Debtors under the Pre-Petition Loan Documents (the "Primed Liens").

(i)    Use of Cash Collateral.  Cash collateral of the DIP Lenders will be used by the Debtors pursuant to the terms of the DIP Budget.

(j)    Adequate Protection.  The Pre-Petition Lenders as holders of Primed Liens shall receive adequate protection to the extent of any diminution in value of their collateral resulting from the priming of their liens in the form of replacement liens on all assets of the Debtors' estates, junior to the liens securing the DIP Facility, provided, however, that the replacement liens shall not attach to the proceeds of Avoidance Actions and shall be subject to the Carve-Out.  As additional adequate protection, the Prepetition Lenders will be provided a superpriority claim pursuant to Section 507(b) of the Bankruptcy Code, subject only to the Carve Out and the DIP Superpriority Claim.

(k)    Carve-Out.  The Primed Liens and liens and rights granted to the DIP Agent and DIP Lenders are subject in each case only to (i) in the event of an occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred after notice of such Event of Default to the Debtors and any statutory committees appointed in the chapter 11 cases ("Professional Fees") in an aggregate amount up to $250,000 (provided that no more than $50,000 in the aggregate of such amount shall be available for the Case Professionals of the Statutory Committee), (ii) allowed and unpaid Professional Fees incurred prior to notice of an Event of Default pursuant to a budget, and (iii) the payment of the fees pursuant to 28 U.S.C. § 1930 ((i), (ii) and (iii) together, the "Carve-Out").

(l)    Fees and Expenses.  $250,000 origination fee and a 1% per annum unused commitment fee.  The Debtors shall also pay the DIP Agent's and DIP Lender's fees and expenses in connection with (i) the DIP Agreement and related loan documents, (ii) the Bankruptcy Cases; and (iii) the realization of the DIP Agent's and DIP Lender's collateral following an Event of Default.

(m)   <u>Indemnification</u>.   The DIP Lenders are entitled to be indemnified and held harmless for certain liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of the DIP Documents, and to other indemnification provisions as more particularly described in the DIP Agreement.

(n)   <u>Relief From Automatic Stay</u>.   Notwithstanding the automatic stay in 11 U.S.C. § 362 and without the necessity of any further order of the Bankruptcy Court, if an Event of Default occurs, then at all times thereafter, the DIP Agent and the DIP Lenders may, by written notice to the Debtors: (i) terminate the DIP Agent's and DIP Lenders' agreement to allow the Debtors to use all or any portion of DIP Facility and the Collateral, (ii) declare the Loan to be immediately due and payable, and (iii) take any action and exercise any rights and remedies allowed under the Loan Documents.

Notwithstanding the foregoing, but without limiting any of the Agent's or Lenders' rights or remedies, the Agent shall not consummate foreclosure on Collateral or otherwise seize control of any Collateral absent five (5) business days' prior written notice (electronically (including via facsimile) in a manner that generated a receipt for delivery or via overnight mail) of an Event of Default to the Debtors; provided, however, that the Lenders may not consummate foreclosure on Collateral or otherwise obtain possession of any Collateral unless (i) the Asset Purchase Agreement dated August 4, 2010, by among the Debtors and Sea Island Acquisition LP has been terminated or (ii) the Lenders obtain an order from the Court upon notice and a hearing.

(o)   <u>Waiver of Section 506(c) Surcharge</u>.   The Motion proposes to include in the Final Order a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code.[2]

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[2] The description contained herein of the terms of the DIP Facility is intended as a summary of the terms expressly stated in the DIP Term Sheet.  The summary of the terms contained herein is qualified in its entirety by the DIP Term Sheet.  To the extent there is any discrepancy between this summary and the DIP Term Sheet, the DIP Term Sheet controls.

**RELIEF REQUESTED**

2.      The Debtors seek authority, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of a final order, *inter alia,* authorizing the Debtors to obtain a post-petition secured loan (the "DIP Facility") in a principal amount equal to $5,000,000 on the terms set forth on the Term Sheet attached as Exhibit A hereto (the "Term Sheet") and pursuant to that certain Debtor-in-Possession Credit Agreement which will be subsequently filed with the Bankruptcy Court (the "DIP Agreement") by and among SIC and Coastal, as borrowers, Synovus Bank, as a lender and as administrative agent (the "DIP Agent"), and the other lenders signatory thereto (together with the DIP Agent, the "DIP Lenders").

**DEBTORS' PRE-PETITION DEBT STRUCTURE AND HISTORY**

3.      SIC, Coastal and Synovus Bank, formerly known as Columbus Bank & Trust ("Synovus") are parties to (a) the 2003 Bond Credit Agreement, and (b) the 2001 Bond Credit Agreement (collectively with the 2004 Bond Credit Agreement, the "Bond Credit Agreements"), pursuant to which, inter alia, Synovus agreed to issue letters of credit (the "Bond Letters of Credit") for the benefit of SIC and Coastal.  In connection with the issuance of the Bond Letters of Credit, SIC and Coastal issued certain variable rate notes (the "Bonds") and agreed to reimburse Synovus for any drawings under the Bond Letters of Credit.

4.      On June 6, 2007, SIC and Coastal, as borrowers (together, the "Borrowers"), Synovus and certain lenders (the "Prepetition Lenders"), entered into that certain Loan and Line of Credit Agreement (the "2007 Credit Agreement"), pursuant to which, inter alia, the Pre-Petition Lenders agreed to (a) make a $100,000,000 term loan (the "2007 Term Loan"), (b) continue a $96,000,000 term loan (the "2006 Term Loan"), and (c) increase an existing line of

credit from $200,000,000 to $235,000,000 (the "<u>Revolver</u>"; collectively with the 2007 Term Loan and the 2006 Term Loan, the "<u>2007 Bank Group Loans</u>").

5.    In connection with entry into the 2007 Credit Agreement, (a) the Borrowers and Synovus entered into that certain Amended and Restated Agreement (Pari Passu) dated June 6, 2007, and (b) Synovus and the Pre-Petition Lenders entered into that certain Third Amended and Restated Agency Agreement dated June 6, 2007, pursuant to which, inter alia, the indebtedness and other obligations and liabilities incurred by the Borrowers under the 2007 Credit Agreement and the Bond Credit Agreements were all cross-defaulted and all 2007 Bank Group Loans and the reimbursement obligations of the Borrowers under the Bond Credit Agreements and the Bonds (collectively, the "<u>2007 Bank Group Debt</u>") were made pari passu.

6.    In connection with the incurrence of the 2007 Bank Group Debt, the Borrowers and Synovus entered into (a) that certain Master Agreement dated April 20, 2006 and a related Confirmation of Interest Rate Swap Transaction dated April 24, 2006 (the "<u>5.63% Swap</u>"), (b) that certain Confirmation of Interest Rate Collar Transaction dated July 2, 2007 (the "<u>4.65% Collar</u>"), and (c) that certain ISDA Master Agreement dated March 1, 2003 and a related Confirmation Interest Rate Swap Fixed/Floating dated March 21, 2003 (the "<u>6.5% Swap</u>"; collectively with the 5.63% Swap and the 4.65% Collar, the "<u>Hedging Obligations</u>").

7.    In 2008, Synovus, as an individual lender, made a bridge loan in favor of the Borrowers in the original principal amount of $37 million pursuant to that certain Loan Agreement dated August 7, 2008 (the "<u>Bridge Loan</u>").

8.    On January 10, 2009, an event of default under the 2007 Credit Agreement occurred when the Borrowers failed to repay in full the entire outstanding principal of, and accrued but unpaid interest on, the 2007 Term Loan (the "<u>January 2009 Default</u>").

9.     In connection with the January 2009 Default, the Borrowers, Synovus and the Pre-Petition Lenders entered into that certain Forbearance Agreement dated January 10, 2009 (the "Forbearance Agreement"), pursuant to which, inter alia, Synovus and the Pre-Petition Lenders agreed (a) to forbear from exercising their rights and remedies against the Borrowers with respect to the January 2009 Default and other events of default then in existence, and (b) to continue to make advances pursuant to the Revolver to the Borrowers during the term of the Forbearance Agreement (the "Forbearance Period"), each notwithstanding the existence of the January 2009 Default and other events of default then in existence.

10.     On April 10, 2009, the Forbearance Period expired, and the Borrowers requested that the Pre-Petition Lenders consolidate, restructure and amend the 2007 Bank Group Debt, the Bridge Loan and the Hedging Obligations.  Accordingly, on July 20, 2009, the Borrowers, Synovus and the Pre-Petition Lenders entered into that certain Restructuring Agreement (the "Restructuring Agreement"), pursuant to which, inter alia, the 2007 Bank Group Debt and the Hedging Obligations were consolidated or otherwise restructured into the following obligations: (a) a term loan in the principal amount of $73,274,161.03 ("Prepetition Term Loan A"), (b) a term loan in the principal amount of $148,789,618.77 ("Prepetition Term Loan B-1"), and (c) a term loan in the principal amount of $259,985,574.76 ("Prepetition Term Loan B-2"; collectively with Prepetition Term Loan A and Prepetition Term Loan B-1, the "Prepetition Term Loans"). In addition to the Pre-Petition Term Loans, pursuant to the Restructuring Agreement, (i) the Pre-Petition Lenders also agreed to make a $21 million revolving credit line available to the Borrowers, (ii) Synovus agreed to extend to the Borrowers that certain construction loan in the original principal amount of $11,000,000, and (iii) the Bridge Loan was restructured.

11.     In the aggregate, the obligations of the Debtors under the Restructuring Agreement and the Bridge Loan are secured by perfected, valid, binding and non-avoidable first priority security interests and liens upon substantially all of the assets of the Debtors.  The assets of the Debtors that are subject to the liens, security interests, and mortgages of the Pre-Petition Lenders are hereinafter collectively referred to as the "Pre-Petition Collateral."

## THE DEBTORS' POST-PETITION FINANCING ARRANGEMENTS

12.     Without adequate post-petition financing, the Debtors may not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to complete the sale of their assets as contemplated by the Asset Purchase Agreement, the Bidding Procedures and the Plan of Liquidation.  The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms.  More specifically, the Debtors' ability to finance their operations and administer these bankruptcy cases is dependent on their ability to obtain the funds made available under the DIP Facility and to use the cash collateral of the DIP Lenders.

13.     Any disruption of the Debtors' operations would be devastating at this critical juncture.  The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia*, (a) the Debtors' inability to continue the operation of their hotel and golf facilities, as well as their related real estate development business, and/or (b) the breakdown of the competitive marketing, auction and sale process designed to maximize the return available to the Debtors' creditors by and through the sale of substantially all of the Debtors' assets in these bankruptcy cases.  If either of these events were to occur, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of the Debtors' creditors and other constituents.  In light of the foregoing,

the Debtors have determined, in the exercise of their sound business judgment, that a post-petition credit facility, which permits the Debtors to obtain up to $5,000,000 in financing, and to use such credit to finance the operation of their businesses, is critical to their ongoing operations and stability during the period of time necessary to complete the sale of the Debtors' assets and implement the Plan of Liquidation.

14.     The Debtors believe that the debtor in possession financing offered by the DIP Agent presents the best option available to them and would enable the Debtors to preserve their value as a going concern.  The Debtors have engaged in good-faith and extensive, arm's-length negotiations with the DIP Agent.  These negotiations culminated in an agreement by the DIP Agent to provide post-petition financing on the terms and subject to the conditions set forth in the Term Sheet and the final financing order attached hereto as <u>Exhibit B</u> (the "<u>Final Order</u>"). The significant elements of the proposed DIP Facility and the Final Order are set forth above.

## LEGAL BASES FOR REQUESTED RELIEF

### A.     The Proposed DIP Facility

15.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  *See* 11 U.S.C. § 364(c).

16.     Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

17.     The credit provided under the DIP Facility will enable the Debtors to finance their business operations, including the ability to operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest.  It is expected that the availability of credit under the DIP Facility will provide the Debtors with the necessary liquidity to continue their ordinary course business operations, as well as conduct the competitive marketing, auction and sale process designed to maximize the return available to the Debtors' creditors by and through the sale of substantially all of the Debtors' assets in these bankruptcy cases.  Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, vendors and customers and thereby permit the Debtors to continue to operate their businesses during the sale process.

   1.     **The Debtors Do Not Have An Alternative to the DIP Facility**

18.     The Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor have the Debtors been able to obtain

post-petition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

19.     A working capital facility of the type needed in these cases could not have been obtained on an unsecured basis.  Moreover, potential sources of the proposed DIP Facility for the Debtors were extremely limited.  It is well established that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions.  *See, e.g.*, *In re Lyondell Chem. Co.*, No. 09-10023, Transcript of Record at 734-35:24-1 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is available).  Indeed, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing."  *See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

20.     No party in interest can credibly deny that the current market for financing is exceedingly strained as the global economy continues to deal with the current credit crisis.  Simply put, because of current economic conditions, there is no ready market for any financing, including debtor-in-possession financing or otherwise and provisions once considered "extraordinary" in debtor-in-possession financing arrangements have, for the time being, become standard.  *See, e.g.*, *Lyondell*, Tr. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

21.     In this extremely challenging credit market, the Debtor has been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those of the DIP Facility.  The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated by the parties in good faith and at arm's length.  Based on this, as well as the foregoing factors, the DIP Facility is the only feasible financing option for the Debtors and is in the best interests of the Debtors' estates.

### 2.     Application of the Business Judgment Standard

22.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Facility is the only alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

23.     In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981).  Courts

generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513–14 (footnotes omitted).

24.     The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Facility.  The terms of the DIP Facility are fair and reasonable, are the result of arms-length negotiations and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the DIP Agreement and as requested herein.

### 3.     The DIP Facility is Necessary to Effectively Preserve the Assets of the Debtors' Estates and to Operate Their Businesses

25.     As with most other large businesses, the Debtors have significant cash needs.  Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with financing the operation of the Debtors' businesses, including the operation of the hotel and golf facilities and the Debtors' related real estate development business, as well as the costs related to running the competitive marketing, auction and sale process designed to maximize the return available to the Debtors' creditors by and through the sale of substantially all of the Debtors' assets in these bankruptcy cases.  In the absence of access to cash and credit, the Debtors may be unable to operate their businesses or to complete the bankruptcy sale process contemplated by the proposed Asset Purchase Agreement, Bid Procedures and the Plan of Liquidation.  In turn, the Debtors' prospects for a successful reorganization will be seriously

impaired and the Debtors' creditors, estates and other parties in interest will be materially harmed.

26.     Given the Debtors' constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' businesses and preserving the value of the Debtors' assets, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to convert to chapter 7.  Accordingly, the Debtors submit that the availability of credit under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

### 4.     **Adequate Protection**

27.     Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–
>
> (A) the trustee is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1).

28.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  Id. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).   Examples of

adequate protection are provided for in section 361 of the Bankruptcy Code and include, but are not limited to:  (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property.  *See In re C.G. Chartier Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

29.    In accordance with section 364(d), and consistent with the purposes underlying the provision of adequate protection, the proposed Final Order provides that adequate protection will be provided to the Pre-Petition Lenders in connection with the Primed Liens to the extent of any diminution in value of their Pre-Petition Collateral, as follows:  replacement liens on all assets of the Debtors' estates, immediately junior to the liens securing the DIP Facility and the Carve-Out (and excluding Avoidance Actions) and a superpriority claim, immediately junior to the superpriority claim granted to the DIP Lenders and subject to the Carve-Out.

### 5.    The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate

30.    The proposed terms of the DIP Facility are fair, reasonable and adequate in that its terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits.  The purpose of the DIP Facility is to enable the Debtors to meet their ongoing operational expenses and allowed administrative bankruptcy expenses, thereby enabling the Debtors to conduct a competitive marketing, auction and sale process designed to maximize the return available to the Debtors' creditors by and through the

sale of substantially all of the Debtors' assets in these bankruptcy cases through a plan of liquidation.

31.     The proposed DIP Facility provides that the security interests granted to the DIP Lenders are subject to the Carve-Out.  Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel.  *See, e.g.*, *In Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

32.     Likewise, the various fees and charges required by the DIP Lenders under the DIP Facility are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code.  *See, e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316–18 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

33.     The DIP Agreement and the DIP Facility should be approved pursuant to section 364(e) of the Bankruptcy Code.  Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction."  *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction that they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."); *see also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. Mass. 1993) ("The purpose of section 364(e) is to allow good-

faith lenders to rely upon conditions as the time they extend credit and to encourage lenders to lend to bankrupt entities.")

34.    The DIP Agreement was the result of good faith and arm's length negotiations, with all parties represented by counsel.  As set forth above, the Debtors believe that the terms of the DIP Agreement are fair and reasonable under the circumstances, and that the DIP Lenders are entitled to the benefits of section 364(e) of the Bankruptcy Code.

### 6.    Request for Modification of Automatic Stay

35.    As set forth more fully in the proposed Final Order, the proposed DIP Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the DIP Lenders to take certain actions required or permitted by the Final Order.  More specifically, the Final Order provides the DIP Lenders with relief from the automatic stay upon the occurrence of specified events of default, and after the Debtors' failure to cure or contest same successfully, to allow the DIP Lenders, *inter alia*, to enforce the remedies available to it under the DIP Documents, without having to obtain any further order of this Court. The Final Order further provides that prior to the exercise of any enforcement or liquidation remedies available to the DIP Lenders under the DIP Documents, the DIP Lenders shall be required to give five (5) business days' written notice to each of counsel for the Debtors, any official committees appointed in these cases and the U.S. Trustee.

36.    Stay modification provisions of the sort requested herein are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Agreement and the Final Order.

**B.**    **Cash Collateral**

37.    The Debtors seek to use cash collateral of the DIP Lenders commencing immediately following the entry of the Final Order.  The cash collateral will be used by the Debtors to the extent necessary to meet their working capital needs.

38.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless:  "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  *See* 11 U.S.C. § 363(c)(2).

39.    Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property. . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."  *See* 11 U.S.C. § 363(e).

40.    In addition to the approval of the DIP Facility, the Debtors are also requesting authority to use the full amount of the cash collateral, for the purposes and amounts set forth in the agreed-upon budget (as attached hereto as <u>Exhibit C</u>, the "<u>DIP Budget</u>").

41.    For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates.

**<u>NOTICE</u>**

42.    Notice of this Motion has been provided to the Office of the United States Trustee, counsel for the DIP Agent, the DIP Lenders, the Pre-Petition Lenders, the Pre-Petition Agent, and the Debtors' thirty (30) largest unsecured creditors on a consolidated basis.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

**<u>Conclusion</u>**

WHEREFORE, the Debtors respectfully request that the Court:

(a)      enter the Final Order substantially in the form attached hereto as <u>Exhibit C</u>; and

(b)      grant the Debtors such other and further relief as is just and proper.


Dated:  August 10, 2010              Respectfully submitted,

Atlanta, Georgia

                                 GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.

                                 <u>/s/ Robert M. Cunningham</u>
                                 M. F. Martin, III
                                 Georgia Bar No. 473500
                                 mfmartin@gilbertharrelllaw.com
                                 Robert M. Cunningham
                                 Georgia Bar No. 202228
                                 rcunningham@gilbertharrelllaw.com
                                 777 Gloucester Street, Suite 200
                                 P.O. Box 190
                                 Brunswick, Georgia 31521-0190
                                 Telephone:     (912) 265-6700
                                 Facsimile:     (912) 264-3917

                                        and

KING & SPALDING LLP
Sarah R. Borders
Georgia Bar No. 610649
sborders@kslaw.com
Harris Winsberg
Georgia Bar No. 770892
hwinsberg@kslaw.com
Sarah L. Taub
Georgia Bar No. 556919
staub@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5128

PROPOSED COUNSEL FOR THE
DEBTORS-IN-POSSESSION

# EXHIBIT A

## DIP Term Sheet

## TERMS FOR DEBTOR IN POSSESSION FINANCING FOR
## SEA ISLAND COMPANY AND SUBSIDIARIES

The following is a summary of the key terms of Synovus Bank, Bank of America, and Bank of Scotland, in their capacity as postpetition lenders ("Lenders") debtor in possession financing for Sea Island Company, First Sea Island, LLC, Sea Island Coastal Properties LLC, Sea Island Services, Inc., Sea Island Apparel, LLC, Sea Island Resort Residences, LLC, and SICAL, LLC (collectively, the "Debtors").

| | |
|---|---|
| **BORROWER:** | Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, Sea Island Resort Residences, LLC, and SICAL, LLC as debtors and debtors in possession (collectively, the "Debtors" or "Borrowers"). |
| **LENDERS:** | Synovus Bank, Bank of America, and Bank of Scotland |
| **COMMITMENT AND AVAILABILITY:** | A total commitment (the "Commitment") equal to $5,000,000.00. The loan (the "Loan") will be a non-revolving line of credit. Upon the closing of the Loan facility, Lenders will agree to provide available funds, up to the Commitment, in accordance with the terms and conditions set forth herein, to be used as expressly provided for in an approved Budget (as hereinafter defined). |
| **TERM:** | Borrowings shall be due and payable and the Commitment shall terminate, at the earliest of: (i) February 1, 2011; (ii) September 30, 2010 if the Bankruptcy Court (as hereinafter defined) has not entered a final order approving the Loan on or before September 30, 2010 (the "Prepayment Date"); (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and including the effective date) of a plan of liquidation (a "Plan"), which is confirmed pursuant to an order entered by the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court") in the Chapter 11 Cases filed by each of the Borrowers (the "Bankruptcy Cases") (the "Consummation Date"); (iv) the closing of any sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Date"); or (iv) the acceleration of the Loan and the termination of the Commitment in accordance with the Agreement hereinafter referred to (together with the Maturity Date, the Prepayment Date, the Consummation Date, and the Sale Date, the "Termination Date"). For the avoidance of doubt, upon the Termination Date, Lenders shall not be required to provide Debtors any availability of funds under the Loan and the Borrowers access to the same |

shall cease.

**COLLATERAL:**

Subject to the Carve-Out (defined below), the Loan shall be secured by (a) a valid, enforceable, perfected, and unavoidable first priority lien pursuant to Section 364(c)(2) of the Bankruptcy Code on all assets of the Debtors other than Avoidance Actions (the "Postpetition Collateral"), (b) a valid, enforceable, perfected and unavoidable first priority senior priming lien pursuant to Section 364(d)(1) of the Bankruptcy Code on all of Borrowers' assets on which there currently are liens in favor of any of the Prepetition Lenders, as hereinafter defined, (the "Prepetition Collateral"), and (c) a valid, enforceable, perfected and unavoidable junior lien pursuant to Section 364(c)(3) of the Bankruptcy Code on all of the Borrowers' assets, other than the Prepetition Collateral, on which there are liens (collectively, with the Postpetition Collateral and the Prepetition Collateral, the "Collateral").

Each of the Prepetition Lenders (as hereinafter defined) consents to the priming of its liens as set forth herein.

"Avoidance Actions" means causes of action that the Debtors, their bankruptcy estates, or their successors may assert under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

**SUPERPRIORITY STATUS**

The obligation to repay obligations incurred by Borrowers pursuant to the Loan and all other obligations owing to Lenders in connection with the Loan shall constitute allowed senior administrative expense claims pursuant to Sections 507(b) and 364(c) of the Bankruptcy Code against the Borrowers, with priority over all other claims against the Borrowers, subject to the payment of the Carve-Out (set forth below).

**USE OF LOAN:**

Proceeds of the Loan are to be used solely in accordance with the budget attached hereto as Exhibit "A" ("Budget"). Proceeds from the Loan shall not be funded to the Debtors by the Lenders unless the Debtors first exhaust their cash on hand but for the estimated outstanding checks and expenses incurred in accordance with the Budget both as set forth in the weekly funding request sheet. Transfers from Lenders to Borrowers to pay approved expenses in the Budget will be made within two (2) business days of draw request with supporting documentation, not more frequently than one (1) time per week. Draw requests shall not be funded following a Termination Date, Default, or Event of Default, unless the Lenders otherwise

consent.

**PROFESSIONAL FEE CARVEOUT**

"Carve Out" means (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) after the occurrence of an Event of Default under the Loan Documents and following delivery of written notice of the occurrence of such Event of Default to the Debtors' counsel by the Lenders (the "Carve Out Trigger Notice"), the following expenses: an amount (the "Case Professionals Carve Out") equal to the sum of (a) the allowed and unpaid professional fees and disbursements for any Case Professional (as defined below) incurred after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $250,000 (provided that no more than $50,000 in the aggregate of such amount shall be available for the Case Professionals of the Statutory Committee), plus (b) all unpaid professional fees and disbursements of such Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice to the extent allowed or later allowed and payable by order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 328, 330, 331 or 363 of the Bankruptcy Code or any interim compensation procedures order, but solely to the extent that the same constitute Budgeted Professional Fees. "Budgeted Professional Fees" shall mean those fees and expenses incurred by Case Professionals in accordance with the professional fee schedule which is incorporated as part of the Budget. "Case Professionals" shall mean any professional retained by the Debtors or the Statutory Committee pursuant to an order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code.

**LIMITATIONS ON USE:**

Neither the Loan proceeds nor the Professional Fee Carve-Out may be used to prosecute or otherwise pursue any claims of Borrowers against Bank of America, Bank of Scotland or Synovus Bank (the "Prepetition Lenders") or any affiliate of the Prepetition Lenders.

**INTEREST RATE:**

The interest rate shall be the LIBOR Rate plus 1000 bps, calculated on a 360/actual basis. "LIBOR Rate" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) that appears on Bloomberg as of approximately 12:00 p.m. (New York time) on such date of determination; provided, that if such index ceases to exist or is no longer published or announced, then

the term "LIBOR Rate" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) as published in The Wall Street Journal on such date of determination, provided however that in no event shall the LIBOR Rate be less than two percent (2.00%) per annum.

Interest shall accrue, and absent an Event of Default, be due and payable, at Borrower's option (i) in cash on the first business day of each month, or (ii) at the maturity of the Loan. The default rate shall be five percent (5.00%) over and above the non-default rate.

**EXPENSE REIMBURSEMENT:**

Borrower shall reimburse Lenders on a current basis for expenses incurred by Lenders arising out of the Loan, including: (i) the reasonable fees and expenses of Lenders, Lenders' attorneys, and Lenders' professionals incurred in connection with the negotiation, execution, and drafting of the Loan Documents; (ii) the reasonable fees and expenses of Lenders, Lenders' attorneys, and Lenders' professionals incurred in connection with the Bankruptcy Cases; and (iii) the fees and expenses of Lenders, Lenders' attorneys and Lenders' other professionals from and after the occurrence of an Event of Default or Termination Date. The Lenders shall be authorized to disburse Loan proceeds under the Loan in direct payment or reimbursement of such costs and expenses monthly, on a current basis, without need of further court order. Notwithstanding anything to the contrary contained herein, the Debtors shall not be obligated to pay on a current basis more than $100,000 in expenses prior to the Termination Date.

**CASH COLLATERAL:**

Proceeds of the Collateral shall remain Cash Collateral, as defined under Section 363(a) of the Bankruptcy Code and shall be subject to the order approving the Loan.

As adequate protection to the Prepetition Lenders solely for any diminution in the value of their Prepetition Collateral as a result of the priming of their prepetition liens in the Prepetition Collateral, the Prepetition Lenders will receive the following: (i) a superpriority claim as contemplated by section 507(b) of the Bankruptcy Code immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code being granted to the Lenders in connection with the Loan; and (ii) a lien on all of the Collateral, which adequate protection lien shall have priority immediately junior to the priming and other liens being granted to the Lenders in connection with the Loan.

All such liens and adequate protection provided to the Lenders

shall survive the completion, conversion, or dismissal of one or more of the Bankruptcy Cases and shall remain fully enforceable.

**REPRESENTATIONS AND WARRANTIES:**

The Loan Documents shall include representations and warranties that are similar to those contained in the Restructuring Agreement.

**COVENANTS:**

The Loan Documents (as defined below) shall include those affirmative and negative covenants set forth in Sections 10.1, 10.2, 10.3, 10.4, 10.5, 10.6, 10.7, 10.9, 10.10, 10.14, 10.15, 10.16, 13.1, 13.2, 13.3, 13.4, 13.5, 13.6, 13.7 (other than with respect to the sale of all or substantially all of its assets), 13.8, 13.9, 13.10, 13.12, 13.13, 13.14, 13.15, 13.16, 13.17, 13.18, 13.19, 13.20, 13.21, and 13.22 of the Restructuring Agreement plus 364(c) priorities and waiver of any right to seek any other senior loan or financing from any other lenders or financial institutions under Section 364. Specifically, in addition to the liens and security interests to be granted to the Lenders, and subject to the Carve-Out, the Loan shall have priority pursuant to the provisions of Sections 364(c)(1) and 507(b) of the Bankruptcy Code, over all administrative and priority expenses incurred in the Bankruptcy Cases, including, without limitation, expenses of the kind specified in Section 503(b), 507(a) and 507(a) of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, its creditors, other than the Lenders, and the successors in interest of the Debtor or its creditors, including, without limitation, any trustee appointed in the Bankruptcy Cases, and any trustee in a case under chapter 7 of the Bankruptcy Code into which the Bankruptcy Cases may be converted. The Debtor may not incur any other indebtedness with a lien in any assets that secure the Loan that is senior to the Loan, and any other loan shall have a priority under Section 364(c)(1) junior to that of the Loan.

The Borrowers shall comply with the Reporting Requirements set forth below.

**REPORTING REQUIREMENTS:**

The Loan Documents (as defined below) shall include reporting requirements that include: (i) weekly reports concerning the Budgets (as defined in the Plan Support Agreement) and (ii) such other reports currently provided for in the Restructuring Agreement.

**EVENTS OF DEFAULT:**

The Loan Documents shall include Defaults and Events of Default that relate to: (i) the use of funds other than in accordance with the Budget without Lenders' consent; and

(ii) the appointment of a trustee in the Bankruptcy Cases or a conversion of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code.

Additional Events of Default shall exist under the Loan Documents if (i) the Borrowers fail to, on or the date that is one hundred and five (105) days after the Filing Date, (a) substantially consummate the Plan that provides for the sale of all or substantially all of the Borrowers' assets or (b) close on a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, (ii) there is a default under any cash collateral order entered by the Court, and (iii) there is termination event under that certain Restructuring and Lockup Agreement by and among the Debtors and the Prepetition Lenders.

**506(C) WAIVER:**

Debtor shall support and use its commercial best efforts to obtain the entry of an order that provides for the waiver of any and all rights to surcharge the Lenders' collateral pursuant to section 506(c) of the Bankruptcy Code.

**PAYMENT OF PROCEEDS**

Upon the sale of any or the all of Borrowers' assets, all funds received shall be immediately paid to Lenders in satisfaction of any and all amounts outstanding to Lenders.

**REMEDIES:**

Notwithstanding the automatic stay in 11 U.S.C. § 362 and without the necessity of any further order of the Bankruptcy Court, if an Event of Default occurs, then at all times thereafter, the Agent and the Lenders may, by written notice to the Debtors: (i) terminate the Agent's and Lenders' agreement to allow the Debtors to use all or any portion of Loan and the Collateral, (ii) declare the Loan to be immediately due and payable, and (iii) take any action and exercise any rights and remedies allowed under the Loan Documents.

Notwithstanding the foregoing, but without limiting any of the Agent's or Lenders' rights or remedies, the Agent shall not consummate foreclosure on Collateral or otherwise seize control of any Collateral absent five (5) business days' prior written notice (electronically (including via facsimile) in a manner that generated a receipt for delivery or via overnight mail) of an Event of Default to the Debtors; provided, however, that the Lenders may not consummate foreclosure on Collateral or otherwise obtain possession of any Collateral unless (i) the Asset Purchase Agreement dated August 4, 2010, by among the Debtors and Sea Island Acquisition LP has been terminated or (ii) the Lenders obtain an order from the Court upon notice and

a hearing.

**ORIGINATION FEE**  An origination fee of $250,000 shall be payable, for the pro rata benefit of the Lenders who participate in the Loan, upon closing of the Loan following Bankruptcy Court approval. Such fee shall be nonrefundable under all circumstances.

**UNUSED COMMITMENT FEE:**  An Unused Fee of 1.0% per annum will apply on the unused portion of the Commitment, provided, however, if the Borrower utilizes at least 50% of the Commitment, in accordance with the Budget, an Unused Fee of .5% will apply on the unused portion of the Commitment. Such fees shall be earned and payable monthly.

**BANKRUPTCY COURT DOCUMENTATION:**  All orders of the Bankruptcy Court approving or authorizing the use of Cash Collateral or the Loan, and all motions relating thereto, will be in form and substance reasonably acceptable to Agent.

**LOAN DOCUMENTATION:**  The definitive documentation evidencing the Loan (including, without limitation, collateral documentation) (the "Loan Documents") shall be in form and substance reasonably satisfactory to the Lenders.

**CONDITIONS PRECEDENT:**  Customary and appropriate conditions precedent for financing of this type and for this transaction in particular, among other conditions set forth herein, Lenders' agreement to lend as stated herein is expressly subject to (a) the exhaustions of the Borrowers' cash on hand but for the estimated outstanding checks as set forth in the weekly funding request sheet and expenses incurred in accordance with the Budget and (b) the entry of all necessary and appropriate court orders by the Bankruptcy Court, which final order (the "Order") must not subject to any stay and acceptable to Lenders in their reasonable discretion.

Without limiting in any way the Agent's discretion, such Order shall provide for the following, among other things:

a) That all indebtedness, liabilities, and obligations of the Borrowers to Lenders under the Loan and all fees, charges, and expenses contemplated by this letter, and fees and expenses of attorneys and other professionals, shall be secured by a first priority lien and security interest in all Collateral subject to valid, enforceable, non-avoidable liens disclosed to Lenders and Agent and acceptable to Lenders and Agent.

b) That adequate notice has been given to all necessary parties of the hearing pursuant to which the Bankruptcy Court has entered the Order.

c) A finding that the Agent and Lenders have acted in good faith.

**ACKNOWLEDGEMENTS CONCERNING PREPETITION STATUS:**

Borrower shall agree that: (a) the Prepetition Lenders' liens in the Prepetition Collateral: (i) constitute valid, binding, enforceable, and perfected first priority security interests and liens in the Prepetition Collateral and the proceeds and products thereof, as well as any and all proceeds derived therefrom, and all accessions, appurtenances, substitutions, renewals, improvements, replacements, and additions thereto, then owned or thereafter acquired by the Debtors, and all rights and property of any kind forming the subject matter of any of the foregoing existing as of the Petition Date, including the Cash Collateral and all post-petition proceeds and products thereof under 11 U.S.C. § 552(b), and (ii) the Prepetition Indebtedness constitutes the legal, valid, and binding obligations of Borrowers, and the Prepetition Lenders' prepetition indebtedness and (b) they possess no claims or causes of action of any kind, whether arising under contract, at law or in equity, against the Prepetition Lenders, based in whole or in part on facts existing on or before the Petition Date, that relate to, arise out of or otherwise are in connection with: (i) any loan, transaction, or relationship between or among the Borrowers, on the one hand, and Prepetition Lenders, on the other hand.

The preceding acknowledgment shall be subject to challenge by any non-debtor party in interest, the United States Trustee, and any statutory committee appointed in the Bankruptcy Cases for a prescribed period that shall not extend beyond September 24, 2010.

**NO MATERIAL ADVERSE EFFECT:**

Nothing shall have occurred and the Lenders shall not have become aware of any facts or conditions not previously known which the Lenders shall determine has had, or could reasonably be expected to have, a material adverse effect on the Collateral.

**INDEMNIFICATION:**

The Borrowers shall indemnify the Lenders from and against any and all losses, claims, damages, liabilities, deficiencies, judgments, or expenses incurred by the Lenders arising out of or related to the Loan, the commitments and agreements thereunder, the use of the Loan proceeds, or any related transaction, or any litigation, investigation, claim or proceeding, pending or threatened (whether or not any indemnified person is

a party thereto), that arise out of or are in any way based upon any of the foregoing, including without limitation, amounts paid in settlement, court costs, and the fees and disbursements of counsel incurred in connection with any such litigation, investigation, claim or proceedings; provided, however, that the foregoing indemnity obligations shall not apply to any such losses, claims, damages, liabilities, deficiencies, judgments or expenses which, as determined by a final, non-appealable judgment of a court of competent jurisdiction, resulted from the gross negligence or willful misconduct of the Lenders.

**GOVERNING LAW:**    The Loan Documents shall be governed by and construed in accordance with the substantive laws of the State of Georgia, without regard to principles of conflicts of laws.

Each of the Lenders by its signature hereto commit to provide to the Borrowers a debtor in possession facility upon and subject to the terms and conditions set forth herein.

Accepted and Agreed to by:

SYNOVUS BANK

By:  _____

Name: Jonathan Payne
Title: Vice President

Notice Address:

Synovus Bank
Attn: Jonathan Payne
1137 First Avenue
Columbus, GA 31901
Telephone:     (706) 649-5376
Facsimile:     (706) 649-6988

Jason H. Watson
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone:     (404) 881-4796
Facsimile:     (404) 253-8796

**SIGNATURE PAGE TO DIP TERM SHEET**

BANK OF SCOTLAND PLC


By: _____
Name:  Julia R Franklin
Title:  Assistant Vice President


Notice Address:

Bank of Scotland plc
1095 Avenue of the Americas
New York, New York 10036
Attention:      Victoria McFadden/Elizabeth
Taduran
Facsimile:      (212) 479-2807

With a copy to:

Bank of Scotland plc
1095 Avenue of the Americas
New York, New York 10036
Attention:      Andrew Keith
Facsimile:      (212) 479-2841

- and -

Al Uluatam
Bank of Scotland plc
1095 Avenue of the Americas
New York, New York 10036
Telephone:      (212) 336-5636
Facsimile:      (212) 479-2845
al.uluatam@us.lloydsbanking.com

- and -

Kenneth E. Noble
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
Telephone:      (212) 940-6419
Facsimile:      (212) 894-5653
kenneth.noble@kattenlaw.com

**SIGNATURE PAGE TO DIP TERM SHEET**

BANK OF AMERICA, N.A.

By: _Norman Trepner_
           Name: Norman Trepner
           Title: Senior Vice President

Notice Address:

Norman Trepner
Bank of America, N.A.
1366 Post Road
Fairfield, CT 06824
Telephone:      (203) 418-2611
Facsimile:      (203) 418-2623

With a copy to:

Cathy Campbell
Bank of America, N.A.
250 South Park Avenue, Suite 400
Winter Park, FL 32789
Telephone:      (321) 527-7813
Facsimile:      (321) 527-7863 or (404) 532-2963

-and-

A. Michelle Willis
Troutman Sanders LLP
600 Peachtree St. NE, Suite 5200
Atlanta, GA 30308
Telephone:      (404) 885-3440
Facsimile:      (404) 962-6722

**SIGNATURE PAGE TO DIP TERM SHEET**

Exhibit A

[Budget]

**Sea Island Company**
**2010 Cash Flow Forecast**
**($'s to Actuals)**

| Week Ending | Actual 29-Jul | Actual 30-Jul | 1 Forecast 6-Aug | 2 Forecast 13-Aug | 3 Forecast 20-Aug | 4 Forecast 27-Aug | 5 Forecast 3-Sep | 6 Forecast 10-Sep | 7 Forecast 17-Sep | 8 Forecast 24-Sep | 9 Forecast 1-Oct | 10 Forecast 8-Oct | 11 Forecast 15-Oct | 12 Forecast 22-Oct | 13 Forecast 29-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 12,110,746 | 15,392,634 | 14,122,636 | 9,699,735 | 9,910,713 | 7,833,058 | 8,163,670 | 7,599,847 | 7,686,985 | 6,535,338 | 5,855,844 | 4,514,752 | 3,081,609 | 1,419,590 | 816,447 |
| **Receipts:** | | | | | | | | | | | | | | | |
| Resort Receipts | 2,146,879 | 2,692,354 | 2,455,876 | 1,706,258 | 1,735,387 | 2,197,266 | 1,847,772 | 962,693 | 960,246 | 990,459 | 1,846,026 | 768,145 | 1,331,142 | 1,382,282 | 3,097,912 |
| Real Estate Receipts | 5,000 | - | - | - | - | 50,000 | - | - | - | - | 50,000 | - | - | - | 50,000 |
| Other Receipts | 57,756 | 24,731 | 116,771 | 228,771 | 3,771 | 3,771 | 2,942 | 227,942 | 2,942 | 2,942 | 2,942 | 3,771 | 228,771 | 3,771 | 3,771 |
| Total Receipts | 2,209,635 | 2,917,085 | 2,402,647 | 1,935,029 | 1,739,158 | 2,251,056 | 1,850,714 | 1,190,635 | 965,188 | 993,401 | 1,898,971 | 771,916 | 1,559,913 | 1,386,054 | 3,151,683 |
| **Operating Expenses:** | | | | | | | | | | | | | | | |
| Payroll, Benefits & Taxes | 1,957,866 | 628,321 | 1,918,344 | 186,093 | 1,898,449 | 411,063 | 1,516,297 | 164,318 | 1,618,507 | 164,318 | 2,482,910 | 134,934 | 1,672,245 | 134,934 | 1,657,092 |
| Vendor Disbursements | 2,909,013 | 2,860,033 | 2,816,412 | 1,244,624 | 2,277,001 | 1,280,040 | 872,005 | 665,835 | 663,057 | 1,387,231 | 814,109 | 1,306,531 | 678,944 | 1,706,918 | 888,992 |
| Capital Expenditures | 5,954 | 33,768 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 |
| Debt Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Principal Payments | - | - | - | 250,000 | - | - | - | - | - | - | - | - | - | - | - |
| Bank Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Expenses | 4,882,834 | 3,522,124 | 4,777,099 | 1,724,060 | 4,016,794 | 1,714,286 | 2,432,746 | 873,496 | 2,326,608 | 1,594,892 | 3,340,363 | 1,484,809 | 2,394,693 | 1,975,196 | 2,789,428 |
| Asset & Real Estate Sale Proceeds | 5,955,067 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Repayment due to Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Operating Cash Flow | 3,281,868 | (615,039) | (2,374,453) | 210,979 | (2,277,636) | 536,791 | (580,032) | 307,139 | (1,341,650) | (596,491) | (1,441,292) | (712,849) | (1,034,719) | (609,145) | 382,255 |
| Total Restructuring Costs | - | - | 2,048,439 | - | - | - | - | - | - | - | - | - | 1,347,500 | - | - |
| Total Cash Flow | 3,281,868 | (1,269,666) | (4,422,892) | 210,979 | (2,277,636) | 536,791 | (580,032) | 307,139 | (1,341,650) | (596,491) | (1,441,292) | (712,849) | (2,382,219) | (609,145) | 382,255 |
| Ending Cash Before Credit Facilities | 15,392,634 | 14,122,636 | 9,699,735 | 9,910,713 | 7,633,066 | 8,169,879 | 7,588,947 | 7,686,986 | 6,535,336 | 5,855,844 | 4,514,752 | 3,661,609 | 1,419,590 | 810,447 | 1,192,702 |
| **DIP Facility:** | | | | | | | | | | | | | | | |
| Beginning Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Draws/(Repayments) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Available on DIP | - | - | - | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| Ending Cash Balance | 15,392,634 | 14,122,636 | 6,686,735 | 9,910,713 | 7,633,066 | 8,169,879 | 7,588,947 | 7,686,986 | 6,555,336 | 5,855,844 | 4,514,752 | 3,661,609 | 1,419,590 | 810,447 | 1,192,702 |
| End Cash Balance & Availability | 15,392,634 | 14,122,636 | 6,686,735 | 14,910,713 | 12,633,066 | 13,169,879 | 12,580,947 | 12,896,986 | 11,555,336 | 10,955,844 | 9,514,752 | 6,874,609 | 6,419,590 | 6,610,047 | 6,192,702 |

**Sea Island Company**
**2010 Cash Flow Forecast**
**($'s in Actuals)**

| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|
| Week Ending | Forecast 2-Nov | Forecast 9-Nov | Forecast 16-Nov | Forecast 23-Nov | Forecast 30-Nov | Forecast 7-Dec | Forecast 14-Dec | Forecast 21-Dec | Forecast 28-Dec |
| Beginning Cash Balance | 1,192,702 | 1,509,996 | 655,050 | 656,650 | 146,012 | 275,816 | 275,816 | 275,816 | - |
| **Receipts:** | | | | | | | | | |
| Resort Receipts | 1,451,948 | 1,203,499 | 1,231,948 | 2,956,647 | 1,016,783 | 659,659 | 787,047 | 796,498 | 2,382,948 |
| Real Estate Receipts | - | - | - | 50,000 | - | 223,017 | - | - | 50,000 |
| Other Receipts | 3,678 | 228,678 | 3,678 | 3,078 | 3,017 | 225,017 | 3,017 | 3,017 | 3,017 |
| Total Receipts | 1,455,624 | 1,432,177 | 1,235,626 | 3,020,325 | 1,019,800 | 897,715 | 790,064 | 799,515 | 2,435,965 |
| **Operating Expenses:** | | | | | | | | | |
| Payroll, Benefits & Taxes | 185,306 | 1,567,799 | 195,538 | 1,605,632 | 184,316 | 1,461,789 | 184,316 | 1,480,045 | 398,316 |
| Vendor Disbursements | 948,024 | 694,333 | 1,118,716 | 1,242,117 | 729,879 | 488,822 | 488,112 | 1,121,998 | 616,885 |
| Capital Expenditures | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Debt Interest | - | - | - | - | - | - | - | - | - |
| Debt Principal Payments | - | - | - | - | - | - | - | - | - |
| Bank Fees | - | - | - | 1,565 | - | - | - | - | 23,516 |
| Total Operating Expenses | 1,158,330 | 2,287,132 | 1,339,021 | 2,874,313 | 688,696 | 1,976,620 | 647,429 | 2,627,042 | 916,897 |
| Asset & Real Estate Sale Proceeds | - | - | - | - | - | - | - | - | - |
| Debt Repayment due to Asset Sales | - | - | - | - | - | - | - | - | - |
| Net Operating Cash Flow | 317,294 | (854,949) | (103,395) | 146,012 | 129,804 | (1,088,904) | 142,635 | (1,827,529) | 1,594,300 |
| Total Restructuring Costs | - | - | 1,275,000 | - | - | - | 1,310,000 | - | - |
| Total Cash Flow | 317,294 | (854,949) | (1,378,395) | 146,012 | 129,804 | (1,088,904) | (1,167,365) | (1,827,529) | 1,594,300 |
| Ending Cash Before Credit Facilities | 1,509,996 | 655,050 | (723,345) | 146,012 | 275,816 | (813,088) | (1,167,365) | (1,827,529) | 1,594,300 |
| **DIP Facility:** | | | | | | | | | |
| Beginning Balance | - | - | - | 723,345 | 723,345 | 723,345 | 1,536,433 | 2,703,768 | 4,531,325 |
| Draws/(Repayments) | - | - | 723,345 | - | - | 813,088 | 1,167,365 | 1,827,529 | - |
| Ending Balance | - | - | 723,345 | 723,345 | 723,345 | 1,536,433 | 2,703,768 | 4,531,325 | 4,531,325 |
| Available to DIP | 5,000,000 | 5,000,000 | 4,276,655 | 4,276,655 | 4,276,655 | 3,463,567 | 2,296,232 | 468,675 | 468,675 |
| Ending Cash Balance | 1,509,996 | 655,050 | - | 146,012 | 275,816 | - | - | - | 1,594,300 |
| End Cash Balance & Availability | 6,509,996 | 5,655,050 | 4,276,655 | 4,422,667 | 4,552,472 | 3,463,567 | 2,296,232 | 468,675 | 1,972,974 |

## **EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Sea Island Company., et al.,**[1] | ) | **Case No. _____** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364
AND 507 (1) APPROVING POSTPETITION FINANCING,
(2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, AND (4) GRANTING ADEQUATE PROTECTION**

THIS MATTER having come before the Court upon the motion (the "DIP Motion") by Sea Island Company, Sea Island Coastal Properties, LLC, and their subsidiaries, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC and Sea Island Resort Residences, LLC, each as a debtor and debtor in possession (collectively, the "Borrowers" or the "Debtors") in the above-captioned Chapter 11 cases (collectively with any Successor Cases (as defined herein), the "Cases"), pursuant to Sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules, seeking, *inter alia*, entry of a final order (this "Final Order"):

(i)    authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Senior Secured Debtor-In-Possession Credit Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement") by and among the Borrowers, as borrowers, Synovus Bank, as Agent (the "DIP Agent") for and on behalf of itself and the other lenders party

---

[1]    The Debtors are the following entities: Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC and Sea Island Resort Residences, LLC.

thereto from time to time (collectively, including the DIP Agent, the "DIP Lenders"), consistent with the term sheet attached as Exhibit A to the DIP Motion;

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and the other related loan documents, (collectively with the DIP Agreement, the "DIP Documents") by and among the Borrowers, the DIP Agent and the DIP Lenders, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)     granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Agent and DIP Lenders (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases;

(iv)     granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically and properly perfected security interests in and liens on all of the DIP Collateral (as defined herein);

(v)     providing adequate protection to the Prepetition Agent and Prepetition Lenders for any Diminution in Value of their interests in the Prepetition Collateral, including the Cash Collateral (each as defined herein); and

(vi)     scheduling a final hearing to consider the relief requested in the DIP Motion.

The Court having considered the DIP Motion, the DIP Documents, and the evidence and arguments submitted at the final hearing held on [•], 2010 (the "Final Hearing"); and adequate notice of the Final Hearing having been provided in accordance with Bankruptcy Rules 4001 and 9014; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested is in the best interests of the Debtors, their estates, and their creditors and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     *Commencement of Cases*.  On August 10, 2010 (the "Petition Date") each of the Debtors filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the Southern District of Georgia (the "Court") commencing these Cases.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.  The United States Trustee (the "U.S. Trustee") appointed the official committee of unsecured creditors in these Cases (the "Statutory Committee") on [•].

        B.     *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Bankruptcy Rules.  Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.     The Debtors stipulate and agree as follows:

        (i) Pursuant to that certain Loan Agreement, dated as of August 7, 2008 and amended as of July 20, 2009, Synovus Bank f/k/a Columbus Bank & Trust, N.A., extended a non-revolving loan to the Borrowers in the original principal amount of $37,000,000 (the "Bridge Loan Facility");

        (ii) Pursuant to that certain Restructuring Agreement, dated as of July 20, 2009, and amended as of August 31, 2009, by and among Synovus Bank, as Agent (together with Synovus Bank in its capacity as agent under the Bridge Loan Facility ("Prepetition Agent")), the lenders thereto (together with Synovus Bank in its capacity as lender under the Bridge Loan Facility ("Prepetition Lenders")) and the Borrowers, the Borrowers executed and delivered in favor of the agent and lenders thereunder (a) that certain Term Loan A in the original principal amount of $73,274,161.03, (b) that certain Term Loan B-1 in the original principal amount of $148,789,618.77; (c) that certain Term Loan B-2 in the original principal amount of $259,985,574.76; (d) that certain revolving commitment in an original principal amount not to exceed $21,000,000; and (e) that certain a construction loan in the original principal amount of $11,000,000 (the foregoing, together with the Bridge Loan Facility are collectively referred to herein as the "Prepetition Facility"); all obligations under the Prepetition Facility are referred to

herein as the "<u>Prepetition Obligations</u>" and the documents evidencing the same are referred to as the "<u>Prepetition Credit Documents</u>"); and

(iii)    *Prepetition Collateral*.    To secure the Prepetition Obligations, the Borrowers granted to the Prepetition Agent and Prepetition Lenders, security interests in and liens on (the "<u>Prepetition Liens</u>") substantially all of the assets of the Debtors (collectively, the "<u>Prepetition Collateral</u>").

D.    <u>*Findings Regarding Postpetition Financing*</u>.

(i)    *Priming of Liens*.    The priming of the Prepetition Liens and all other liens of the Prepetition Agent and the Prepetition Lenders on the Prepetition Collateral under Section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and will enable to Debtors to continue to operate their businesses and to fund the orderly liquidation process to the benefit of the estates and creditors.    However, the Prepetition Agent and the Prepetition Lenders are entitled to receive adequate protection as set forth in this Final Order pursuant to Sections 361, 363 and 364 of the Bankruptcy Code, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the priming of their liens on the Prepetition Collateral (the "<u>Diminution in Value</u>").

(ii)    *Need for Postpetition Financing*.    The Debtors need to obtain credit pursuant to the DIP Facility to enable the Debtors to facilitate an orderly liquidation of their businesses and to administer and preserve the value of their estates for all stakeholders.    The DIP Facility will provide operational stability and assurance that the Debtors' financing needs can be met.    The ability of the Debtors to finance their operations, maintain business relationships with their customers, to pay their employees and otherwise finance their operations throughout the liquidation process requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of any one of which would immediately and irreparably harm the

4

Debtors, their estates, and their creditors.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iii)    *No Credit Available on More Favorable Terms.*  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than provided for in the DIP Facility.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 364(b)(1) as an administrative expense.  The Debtors have also been unable to obtain sufficient credit: (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on all of the DIP Collateral including the Prepetition Collateral, (2) superpriority claims and liens, and (3) the other protections set forth in this Final Order.

(iv)    *Use of Proceeds of the DIP Facility.*  As a condition to entry into the DIP Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral of the DIP Lenders, the DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders required, and the Debtors agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Documents and in accordance with the approved budget under the DIP Facility (the "Budget").

E.     *Adequate Protection*.  The Prepetition Agent, for the benefit of itself and the Prepetition Lenders, is entitled to receive adequate protection to the extent of any Diminution in Value of its interests in the Prepetition Collateral.

F.     *Good Faith of the Agents and the Lenders*.

(i)     *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to: (1) the entry of this Final Order; (2) final approval of the terms and conditions of the DIP Facility and the DIP Documents; and (3) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Final Order and the DIP Documents will have the protections provided in Section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length among the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders.  Use of Cash Collateral of the DIP Lenders and extensions of credit under this Final Order and the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business

purposes and uses, within the meaning of Section 364(e) of the Bankruptcy Code, and the DIP Agent and DIP Lenders are therefore entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Final Order.

G.     *Notice*.  Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, and whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (v) counsel to the Prepetition Agent for itself and for the Prepetition Lenders; (vi) counsel to the DIP Agent for itself and for the DIP Lenders; (vii) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (viii) all financial institutions at which the Debtors maintain deposit accounts; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Final Order.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.     <u>DIP Motion Approved</u>.  The DIP Motion is granted, subject to the terms and conditions set forth in this Final Order.

2.     <u>Objections Overruled</u>.  All objections to the relief sought in the DIP Motion to the extent not withdrawn or resolved are hereby overruled.

3.      <u>Authorization of the DIP Financing</u>.  The Debtors are expressly and immediately authorized and empowered on a final basis to be party to and perform under the DIP Documents, and to incur and to perform (including, without limitation, the payment of all principal, interest, fees, expenses, indemnities and other amounts) the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Documents, and to deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens.

4.      <u>Authorization to Borrow</u>.  Until the DIP Termination Date (as defined herein), the Debtors are hereby authorized on a final basis to request extensions of credit (in the form of loans) up to an aggregate principal amount of $5 million at any one time outstanding, subject to terms and conditions set forth in the DIP Documents and this Final Order.

5.      <u>Postpetition Liens</u>.  To secure the DIP Obligations, pursuant to Sections 361, 362 and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") all the prepetition and postpetition property of the Debtors, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired (collectively, the "<u>DIP Collateral</u>"), including all the cash, cash equivalents, proceeds, products, offspring, rents, and profits of the DIP Collateral (the "<u>Cash Collateral</u>"); provided, however, that DIP Collateral shall not include any causes of action that the Debtors, their bankruptcy estates, or their successors may assert under section 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code ("<u>Avoidance Actions</u>").

6.    <u>DIP Lien Priority</u>.    The DIP Liens securing the DIP Obligations are valid, automatically and properly perfected as of the date of entry of this Final Order, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, subject to the Carve-Out (defined below).    Pursuant to Section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Prepetition Liens on all DIP Collateral. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any other subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 proceeding if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code (collectively, the "<u>Successor Cases</u>"), and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code, and/or upon the dismissal of any of the Cases.    The DIP Liens shall not be subject to Sections 510, 549 (to the extent a successful action is brought against any DIP Lender), or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.    <u>Superpriority Claims</u>.    Subject to the Carve-Out, the DIP Agent and DIP Lenders are hereby granted, on a final basis, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases (collectively, the "<u>DIP Superpriority Claim</u>") for all DIP Obligations: (a) with priority over any and all administrative expense claims, Prepetition Obligations and unsecured claims against the Debtors or their estates in any of the Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c),

546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law; provided, however, that the DIP Superpriority Lien shall not be paid from Avoidance Actions.

8.    <u>Reimbursement of Fees and Expenses</u>.    The Debtors shall reimburse the DIP Agent and DIP Lenders for: (i) their reasonable fees and expenses (including, without limitation, reasonable attorneys' fees, financial advisors' fees, and other professionals' fees and expenses) incurred in connection with the negotiation, execution, and drafting of the DIP Documents; (ii) the DIP Agent's and DIP Lenders' reasonable fees and expenses (including, without limitation, reasonable attorneys' fees, financial advisors' fees, and other professionals' fees and expenses) incurred in connection with the Cases; and (iii) the DIP Agent's and DIP Lenders' fees and expenses (including, without limitation, reasonable attorneys' fees, financial advisors' fees, and other professionals' fees and expenses) from and after the occurrence of an Event of Default or Termination Date. The DIP Agent and DIP Lenders are authorized to disburse the proceeds of the DIP Facility in direct payment or reimbursement of such costs and expenses monthly, on a current basis, without need of further Court order. Notwithstanding anything to the contrary contained herein, the Debtors shall not be obligated to pay on a current basis more than $100,000 in expenses before the Termination Date.

9.    <u>No Obligation to Extend Credit</u>.    The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Final Order have been satisfied in full or waived by the DIP Lenders in their sole discretion.

10.    <u>Rights and Remedies Upon Event of Default</u>.  Notwithstanding the automatic stay in section 362 of the Bankruptcy Code and without the necessity of any further order of the Bankruptcy Court, if an Event of Default occurs, then at all times thereafter, the DIP Agent and the DIP Lenders may, by written notice to the Debtors: (i) terminate the DIP Agent's and DIP Lenders' agreement to allow the Debtors to use all or any portion of DIP Facility and the Collateral, (ii) declare the Loan to be immediately due and payable, and (iii) take any action and exercise any rights and remedies allowed under the Loan Documents.  Notwithstanding the foregoing, but without limiting any of the Agent's or Lenders' rights or remedies, the Agent shall not consummate foreclosure on Collateral or otherwise seize control of any Collateral absent five (5) business days' prior written notice (electronically (including via facsimile) in a manner that generated a receipt for delivery or via overnight mail) of an Event of Default to the Debtors; provided, however, that the Lenders may not consummate foreclosure on Collateral or otherwise obtain possession of any Collateral unless (i) the Asset Purchase Agreement dated August 4, 2010, by among the Debtors and Sea Island Acquisition LP has been terminated or (ii) the Lenders obtain an order from the Court upon notice and a hearing.

11.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Final Order, the DIP Facility and the DIP Documents and in accordance with the Budget, the Debtors are authorized to use Cash Collateral in which the DIP Lenders have an interest until the DIP Termination Date.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Final Order, the DIP Facility, the DIP Documents, and the Budget.

12.    <u>Adequate Protection</u>.

(a)    <u>Adequate Protection Liens</u>.  Subject to the Carve-out, pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral on account of the priming of the Prepetition Liens, the Debtors hereby grant on a final basis to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, continuing valid, binding, enforceable and perfected (as of the date of entry of this Final Order) postpetition security interests in and liens on the DIP Collateral (the "<u>Adequate Protection Liens</u>") to the extent of any Diminution in Value.  The Adequate Protection Liens shall be junior only to the Carve-out, the DIP Liens and the Prepetition Liens on the Prepetition Collateral.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(b)    <u>Superpriority Claim</u>.  Subject to the Carve-out, as further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral on account of the priming of the Prepetition Liens, the Prepetition Agent and Prepetition Lenders are each hereby granted on a final basis as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases (the "<u>Prepetition Lenders' Superpriority Claim</u>").   Except as set forth herein, the Prepetition Lenders' Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a),

507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; *provided*, *however*, that the Prepetition Lenders' Superpriority Claim shall be immediately junior to the DIP Superpriority Claim and the Carve-out and shall not be paid from Avoidance Actions.

13.    <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if: (a) the amendment, modification, or supplement is (i) in accordance with the DIP Documents, (ii) beneficial to the Debtors, (iii) consented to in writing by the Prepetition Agent and the Prepetition Lenders, and (iv) not prejudicial in any material respect to the rights of third parties; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to the Statutory Committee and the U.S. Trustee; and (c) the amendment, modification or supplement is filed with the Court; *provided*, *however*, that consent of the Statutory Committee or the U.S. Trustee, and approval of the Court is not necessary to effectuate any such amendment, modification or supplement and provided further that such amendments, modification or supplements shall be without prejudice to the right of any party in interest to be heard.

14.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein including the DIP Liens and the Prepetition Lenders' Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy

law) the DIP Liens and the Prepetition Lenders' Adequate Protection Liens, or to entitle the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to the priorities granted herein.  The Debtors are authorized and directed on a final basis to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agent all such financing statements, mortgages, notices and other documents as the DIP Agent and the Prepetition Agent may reasonably request.  Notwithstanding the automatic stay under Section 362 of the Bankruptcy Code, the DIP Agent and the Prepetition Agent, each in its discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notice of lien or similar instrument.

15.    Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations pursuant to the terms of the DIP Documents, and the termination or the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to repayment of the DIP Obligations.

16.    DIP Termination Date.  On the DIP Termination Date, (a) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate,  and (b) all authority to use Cash Collateral shall cease.  For purposes of

14

this Final Order, the "DIP Termination Date" shall mean the [Maturity Date] as defined in the DIP Agreement.

17.    Carve-Out.  "Carve Out" means (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) after the occurrence of an Event of Default under the DIP Documents and following delivery of written notice of the occurrence of such Event of Default to the Debtors by the Agent or Lenders (the "Carve Out Trigger Notice"), the following expenses: an amount (the "Case Professionals Carve Out") equal to the sum of (a) the allowed and unpaid professional fees and disbursements for any Case Professional (as defined below) incurred after the delivery of a Carve Out Trigger Notice in an aggregate amount not in excess of $250,000 (provided that no more than $50,000 in the aggregate of such amount shall be available for the Case Professionals of the Statutory Committee), plus (b) all unpaid professional fees and disbursements of such Case Professionals incurred prior to the delivery of a Carve Out Trigger Notice to the extent allowed or later allowed and payable by order of the Bankruptcy Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 328, 330, 331 or 363 of the Bankruptcy Code or any interim compensation procedures order, but solely to the extent that the same constitute Budgeted Professional Fees.  "Budgeted Professional Fees" shall mean those fees and expenses incurred by Case Professionals in accordance with the professional fee schedule which is incorporated as part of the Budget.  "Case Professionals" shall mean any professional retained by the Debtors or the Statutory Committee pursuant to an order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) under Sections 327, 328, 363 or 1103(a) of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, neither the Carve-Out nor any portion of the DIP Facility shall be available for any fees or expenses incurred by any party, including the Debtors or the Statutory Committee, if

appointed, in connection with the initiation or prosecution of any claims, adversary proceedings, or other litigation against the DIP Agent or DIP Lenders, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any counterclaim, defense, or offset to, the DIP Documents, the DIP Liens, the Adequate Protection Lien, the DIP Superpriority Claim, or the Prepetition Lenders' Superpriority Claim or any claims or actions to hinder or delay the DIP Agent's or any DIP Lenders' assertion, enforcement, or realization on the DIP Collateral in accordance with the DIP Documents and this Final Order.

18.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.  The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders have acted in good faith in connection with this Final Order and their reliance on this Final Order is in good faith.  Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders, the Prepetition Agent and Prepetition Lenders are entitled to the protections provided in Section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made under this Final Order, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders under this Final Order arising prior to the effective date of any such modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

19.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

20.     <u>Section 506(c) Claims</u>.  No costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agent or the DIP Lenders, or any of their respective claims, the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent and the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

21.     <u>No Marshaling/Applications of Proceeds</u>.  The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

22.     <u>Joint and Several Liability</u>.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

23.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the DIP Lenders', the Prepetition Agent's and the Prepetition Lenders', right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Prepetition Agent and/or the Prepetition Lenders, under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of Section 362 of the Bankruptcy Code,

(ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders.

24.     <u>Binding Effect of Final Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, all other creditors of any of the Debtors, the Statutory Committee or any other committee appointed in the Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, or upon dismissal of any Case.

25.     <u>No Modification of Final Order</u>.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent and the Prepetition Agent, (i) any modification, stay, vacatur or amendment to this Final Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases, equal or superior to the DIP Superpriority Claim or Prepetition Lenders' Superpriority Claims; or (b) without the prior written consent of the DIP

Agent and Prepetition Agent, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents.

26.    <u>Limits on Lender Liability</u>.  Nothing in this Final Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the DIP Lenders of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition efforts.

27.    <u>Final Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Final Order, the provisions of this Final Order shall govern and control.

28.    <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) to the extent permitted by applicable law, dismissing any of the Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases.

29.    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Court this ___ day of _____, 2010.


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT C</u>**

**DIP Budget**

**Sea Island Company**
**2010 Cash Flow Forecast**
**($'s in Actuals)**

| | Actual 23-Jul | Actual 30-Jul | 1 Forecast 6-Aug | 2 Forecast 13-Aug | 3 Forecast 20-Aug | 4 Forecast 27-Aug | 5 Forecast 3-Sep | 6 Forecast 10-Sep | 7 Forecast 17-Sep | 8 Forecast 24-Sep | 9 Forecast 1-Oct | 10 Forecast 8-Oct | 11 Forecast 15-Oct | 12 Forecast 22-Oct | 13 Forecast 29-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 12,110,746 | 15,392,634 | 14,122,826 | 9,699,735 | 9,910,713 | 7,633,088 | 8,169,879 | 7,589,847 | 7,896,986 | 6,555,336 | 5,955,844 | 4,514,752 | 3,801,809 | 1,419,590 | 810,447 |
| **Receipts:** | | | | | | | | | | | | | | | |
| Resort Receipts | 2,146,879 | 2,892,354 | 2,485,676 | 1,706,258 | 1,735,397 | 2,197,286 | 1,847,772 | 952,693 | 982,246 | 992,459 | 1,846,028 | 768,145 | 1,331,142 | 1,362,282 | 3,097,912 |
| Real Estate Receipts | 5,000 | - | - | - | - | 50,000 | - | - | - | - | 50,000 | - | - | - | 50,000 |
| Other Receipts | 57,756 | 24,731 | 116,771 | 228,771 | 3,771 | 3,771 | 2,942 | 227,942 | 2,942 | 2,942 | 2,942 | 3,771 | 228,771 | 3,771 | 3,771 |
| Total Receipts | 2,209,635 | 2,917,085 | 2,602,447 | 1,935,029 | 1,739,168 | 2,251,058 | 1,850,714 | 1,180,635 | 985,188 | 995,401 | 1,898,971 | 771,916 | 1,559,913 | 1,366,054 | 3,151,683 |
| **Operating Expenses:** | | | | | | | | | | | | | | | |
| Payroll, Benefits & Taxes | 1,967,868 | 638,321 | 1,915,344 | 186,083 | 1,696,449 | 411,083 | 1,515,397 | 164,318 | 1,619,507 | 164,318 | 2,482,610 | 134,934 | 1,672,345 | 134,934 | 1,857,092 |
| Vendor Disbursements | 2,909,013 | 2,860,035 | 2,818,412 | 1,244,624 | 2,277,001 | 1,259,840 | 872,005 | 665,835 | 663,987 | 1,387,231 | 814,109 | 1,306,581 | 878,944 | 1,796,918 | 868,992 |
| Capital Expenditures | 5,954 | 33,768 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 | 43,344 |
| Debt Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Principal Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Fees | - | - | - | 250,000 | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Expenses | 4,882,834 | 3,532,124 | 4,777,099 | 1,724,050 | 4,016,794 | 1,714,266 | 2,430,746 | 873,496 | 2,326,838 | 1,594,892 | 3,340,063 | 1,484,859 | 2,594,633 | 1,975,196 | 2,769,428 |
| Asset & Real Estate Sale Proceeds | 5,955,087 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Repayment due to Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Operating Cash Flow | 3,281,888 | (615,039) | (2,174,653) | 210,979 | (2,277,626) | 536,791 | (580,032) | 307,139 | (1,341,650) | (599,491) | (1,441,092) | (712,943) | (1,034,719) | (609,143) | 382,255 |
| Total Restructuring Costs | - | 654,769 | 2,248,439 | - | - | - | - | - | - | - | - | 1,347,500 | - | - | - |
| Total Cash Flow | 3,281,888 | (1,269,808) | (4,423,092) | 210,979 | (2,277,626) | 536,791 | (580,032) | 307,139 | (1,341,650) | (599,491) | (1,441,092) | (712,943) | (2,382,219) | (609,143) | 382,255 |
| Ending Cash Before Credit Facilities | 15,392,634 | 14,122,826 | 9,699,735 | 9,910,713 | 7,633,088 | 8,169,879 | 7,589,847 | 7,896,986 | 6,555,336 | 5,955,844 | 4,514,752 | 3,801,809 | 1,419,590 | 810,447 | 1,192,702 |
| **DIP Facility:** | | | | | | | | | | | | | | | |
| Beginning Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Draws/(Repayments) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Available on DIP | - | - | - | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 |
| Ending Cash Balance | 15,392,634 | 14,122,826 | 9,699,735 | 9,910,713 | 7,633,088 | 8,169,879 | 7,589,847 | 7,896,986 | 6,555,336 | 5,955,844 | 4,514,752 | 3,801,809 | 1,419,590 | 810,447 | 1,192,702 |
| End Cash Balance & Availability | 15,392,634 | 14,122,826 | 9,699,735 | 14,910,713 | 12,633,088 | 13,169,879 | 12,589,847 | 12,896,986 | 11,555,336 | 10,955,844 | 9,514,752 | 8,801,809 | 6,419,590 | 5,810,447 | 6,192,702 |

**Sea Island Company**
**2010 Cash Flow Forecast**
**($'s in Actuals)**

| Week Ending | 14 Forecast 5-Nov | 15 Forecast 12-Nov | 16 Forecast 19-Nov | 17 Forecast 26-Nov | 18 Forecast 3-Dec | 19 Forecast 10-Dec | 20 Forecast 17-Dec | 21 Forecast 24-Dec | 22 Forecast 31-Dec |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1,192,702 | 1,509,996 | 655,050 | - | 146,012 | 275,816 | - | - | - |
| Receipts: | | | | | | | | | |
| Resort Receipts | 1,481,946 | 1,203,499 | 1,231,948 | 2,966,647 | 1,015,783 | 659,699 | 787,047 | 796,498 | 2,369,949 |
| Real Estate Receipts | - | - | - | 50,000 | - | - | - | - | 50,000 |
| Other Receipts | 3,678 | 228,678 | 3,678 | 3,678 | 3,017 | 228,017 | 3,017 | 3,017 | 3,017 |
| Total Receipts | 1,485,624 | 1,432,177 | 1,235,626 | 3,020,325 | 1,018,800 | 887,716 | 790,064 | 799,515 | 2,422,966 |
| Operating Expenses: | | | | | | | | | |
| Payroll, Benefits & Taxes | 195,306 | 1,567,799 | 195,306 | 1,805,532 | 134,316 | 1,461,798 | 134,316 | 1,480,045 | 359,316 |
| Vendor Disbursements | 948,024 | 694,323 | 1,118,715 | 1,042,117 | 729,679 | 489,822 | 488,112 | 1,121,998 | 510,835 |
| Capital Expenditures | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Debt Interest | - | - | - | 1,665 | - | - | - | - | 23,516 |
| Debt Principal Payments | - | - | - | - | - | - | - | - | - |
| Bank Fees | - | - | - | - | - | - | - | - | - |
| Total Operating Expenses | 1,168,330 | 2,287,122 | 1,339,021 | 2,874,313 | 888,996 | 1,976,620 | 647,429 | 2,627,042 | 918,667 |
| Asset & Real Estate Sale Proceeds | - | - | - | - | - | - | - | - | - |
| Debt Repayment due to Asset Sales | - | - | - | - | - | - | - | - | - |
| Net Operating Cash Flow | 317,294 | (854,945) | (103,395) | 146,012 | 129,804 | (1,088,904) | 142,635 | (1,827,528) | 1,504,300 |
| Total Restructuring Costs | - | - | 1,275,000 | - | - | - | 1,310,000 | - | - |
| Total Cash Flow | 317,294 | (854,945) | (1,378,395) | 146,012 | 129,804 | (1,088,904) | (1,167,365) | (1,827,528) | 1,504,300 |
| Ending Cash Before Credit Facilities | 1,509,996 | 655,050 | (723,345) | 146,012 | 275,816 | (813,088) | (1,167,365) | (1,827,528) | 1,504,300 |
| DIP Facility: | | | | | | | | | |
| Beginning Balance | - | - | - | 723,345 | 723,345 | 723,345 | 1,536,433 | 2,703,798 | 4,531,325 |
| Draws/(Repayments) | - | - | 723,345 | - | - | 813,088 | 1,167,365 | 1,827,528 | - |
| Ending Balance | - | - | 723,345 | 723,345 | 723,345 | 1,536,433 | 2,703,798 | 4,531,325 | 4,531,325 |
| Available on DIP | 5,000,000 | 5,000,000 | 4,276,655 | 4,276,655 | 4,276,655 | 3,463,567 | 2,296,202 | 468,675 | 468,675 |
| Ending Cash Balance | 1,509,996 | 655,050 | - | 146,012 | 275,816 | - | - | - | 1,504,300 |
| End Cash Balance & Availability | 6,509,996 | 5,655,050 | 4,276,655 | 4,422,667 | 4,552,472 | 3,463,567 | 2,296,202 | 468,675 | 1,972,974 |