**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 1123 AND 1129**
**(A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTORS WILL**
**SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY**
**ALL OF DEBTORS' ASSETS, (B) APPROVING PROCEDURES RELATED**
**TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) FIXING**
**THE MANNER AND EXTENT OF NOTICE, AND (E) GRANTING RELATED RELIEF**

Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., Sea Island Resort Residences, LLC, Sea Island Apparel, LLC, First Sea Island, LLC, and SICAL, LLC (collectively, the "Debtors") file this motion (the "Motion"), pursuant to sections 105(a), 363(b), 365, 1123 and 1129 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of an order (A) authorizing and scheduling an auction at which the Debtors will solicit the highest or best bid for the sale of substantially all of the Debtors' assets, (B) approving the procedures related to the conduct of the auction, (C) approving the break-up fee payable to the Stalking Horse Purchaser (as defined below), (D) fixing the manner and extent of notice, (E) fixing the cure amounts that must be paid in

connection with the assumption and assignment of executory contracts and unexpired leases, and (F) granting related relief.  In support of this Motion, the Debtors respectfully show the Court as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are 11 USC §§ 105, 363(b), 365, 1123 and 1129.

## BACKGROUND

2.      On August 10, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

3.      On the Petition Date, each Debtor filed a substantially similar motion with this Court seeking to have its bankruptcy case jointly administered with the other Debtors' cases pursuant to Bankruptcy Rule 1015(b).

4.      The factual background relating to the Debtors' commencement of these cases is set forth in detail in the *Declaration of David Bansmer in Support of First Day Applications and Motions* filed on the Petition Date and incorporated herein by reference.

5.      The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the date of this filing, no official committee of unsecured creditors has been appointed in any of these cases, and no request has been made for the appointment of a trustee or examiner.

## RELIEF REQUESTED

7.     By this Motion, the Debtors request that the Court enter an order in the form attached hereto as <u>Exhibit A</u>, (i) approving the Proposed Sale Process and the Bid Procedures, including the procedures for submitting Initial Overbids, conducting the Auction, identifying the Prevailing Bid, and the payment of the Breakup Fee, and (ii) fixing the cure amounts identified on <u>Exhibit B</u> to this Motion as the exact amounts that must be paid to the nondebtor parties to the executory contracts and unexpired leases listed on <u>Exhibit B</u> (the "<u>Executory Contracts/Leases</u>") in connection with any assumption and assignment of such Executory Contracts/Leases.

## BASIS FOR RELIEF

8.     The Debtors are currently engaged in operating a collection of exclusive hotel resorts, golf courses, spas and recreational complexes, together with certain related developed and undeveloped real estate held by the Debtors in connection with their real estate development business, all of which are located in or around St. Simons Island and Sea Island, Georgia (collectively, the "<u>Business</u>").  In connection with the conduct of the Business, the Debtors maintain two "membership programs" commonly referred to as the Sea Island Club and the Ocean Forest Golf Club (collectively, the "<u>Clubs</u>").

9.     In 1998, the Debtors embarked on a multi-year Resort Master Plan which resulted in the transformation of the resort.  From 1998 to 2001, three of the Debtors' golf courses were fully redesigned.  In 2001, the newly-constructed, 40-room Lodge opened to visitors.  With the Lodge construction complete, the Debtors began renovations that culminated in the 2006 and 2007 openings of the Cloister, Beach Club and Spa and the development of the Frederica Golf Club and Residential Development.  The Debtors' plan for expansion and renovation was

intended to establish Sea Island as a marquee brand among the world's finest resorts and resort communities so as to provide a foundation for future projects.

10.    The Debtors used long-term debt financing and their cash flows from operation, primarily real estate sales, to fund their expansion and renovation plan.  With a view to a profitable future led by their new luxury real estate resort assets and sustained retail real estate sales activity, the Debtors believed that they would have sufficient resources to repay their obligations timely.  Their view was bolstered by the fact that the Debtors owned tens of thousands of acres of undeveloped land in Glynn and Camden counties that had been in constant demand by third party developers.

11.    The Debtors expansion proved to be more costly than budgeted and the newly completed resort did not generate the operating profits that had been projected.  The Debtors took aggressive steps to address the operating losses by rationalizing their cost structure, streamlining their resort and support operations and terminating certain operating executives.

12.    However, because the Debtors' business model was predicated on the ongoing development and sale of residential real estate in and around their resort communities, the historic collapse of the global financial and real estate markets had a dramatic negative impact on both the Debtors' resort and real estate sales businesses.  Falling home prices and the severely restricted availability of real estate financing left the Debtors with little ability to continue to sell residential real estate.  As a result, the Debtors were left without sufficient liquidity to fund their operations or to repay the indebtedness they had borrowed to finance their development and expansion plan.

13.    The Debtors sought to restructure their operations and their obligations.  Despite their efforts to improve performance, the Debtors were unable to refinance a portion of their

indebtedness owed to Synovus Bank and certain pre-petition lenders (the "Pre-Petition Lenders") which matured in January 2009. The Debtors and the Pre-Petition Lenders entered into a Forbearance Agreement on January 10, 2009 to permit the parties to negotiate a restructuring of the Debtors' obligations to the Pre-Petition Lenders. On July 20, 2009, the Debtors reached an agreement with the Pre-Petition Lenders to restructure the obligations owed to the Pre-Petition Lenders.

14. Despite the Debtors' significant efforts, the financial and real estate markets did not recover sufficiently to permit the Debtors to comply with their restructured obligations owed to the Pre-Petition Lenders and the Debtors defaulted on those obligations in January 2010. After reviewing all of their strategic alternatives, the Debtors determined that a sale of the Debtors' assets would result in the best recovery for all of their stakeholders. The Debtors retained Goldman, Sachs & Co. ("Goldman Sachs") as their investment banker to market their assets and began their sale process.

15. The Debtors and Goldman Sachs tried to identify and contact all third party purchasers that might be interested in pursuing such a sale transaction. In connection with this sale process, approximately seventy-nine (79) parties entered into confidentiality agreements with the Debtors and conducted due diligence. More than twelve (12) persons submitted indications of interest to the Debtors, and the Debtors and their legal and financial advisers reviewed the terms and conditions of these proposals (including the consideration offered) and evaluated the financial capabilities of the submitting parties to identify the strongest offers.

16. Following the submission of indications of interest, the Debtors fully negotiated asset purchase agreements with three different bidders. After consultation with their lenders, the Debtors determined that the offer made by Sea Island Acquisition LP (the "Stalking Horse

Purchaser"), a limited partnership formed by certain investment funds managed by Oaktree Capital Management LP and Avenue Capital Group, presented the best recovery for all stakeholders.

17.    On August 4, 2010, the Debtors executed the Asset Purchase Agreement (a true and correct copy of which is attached hereto as <u>Exhibit C</u>, the "<u>Agreement</u>")[1] with the Stalking Horse Purchaser, as purchaser, for the sale (the "<u>Plan Sale</u>") of substantially all of its assets (the "<u>Assets</u>") pursuant to the Debtors' Joint Chapter 11 Plan of Liquidation (the "<u>Plan</u>").  The Plan and a related disclosure statement were filed with the Court on August 10, 2010.  The Agreement and the Plan contemplate the sale of the Assets to the Stalking Horse Purchaser (subject to higher or better bids) and contain the following material terms related to the Plan Sale:

- Purchase Price – $197,500,000 (subject to a post-closing purchase price adjustment), paid in immediately available funds at closing, plus Assumed Liabilities;

- Purchased Assets – Substantially all of the Debtors' assets including, but not limited to, the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course, the Ocean Forest Golf Course, the executory contracts and unexpired leases specified in the Agreement, all accounts receivable, inventory and tangible personal property, certain petty cash, permits, goodwill, intellectual property rights, data and records, certain deposits including utility and security deposits, and certain avoidance actions;

- Assumed Liabilities – all trade payables owed to trade vendors and service providers incurred in the ordinary course of business, all "cure costs" payable under assumed contracts, post-closing liabilities under assumed contracts, certain pre- and post-closing liabilities and obligations relating to the Debtors' employees, all of the Debtors' obligations to honor customer reservations, gift certificates and gift cards, all sales and use taxes and certain pro-rated costs, expenses and liabilities;

- Treatments of Membership Claims.  The Stalking Horse Purchaser will offer club members of the Sea Island Club Membership Program and the Ocean

---

[1] The following description of the Agreement is qualified in its entirety by the provisions of the Agreement.  In the event there is any conflict between the description of the Agreement contained in this Motion and the provisions of the Agreement, the provisions of the Agreement shall govern and control.

Forest Golf Club Membership Program the opportunity to join the new Ocean Forest and Sea Island clubs and execute agreements on the terms and conditions of new membership programs.  The new membership programs will be generally consistent with the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program, as applicable, with certain modifications.  The Stalking Horse Purchaser will credit to new member accounts of club members who execute agreements under the new membership programs an amount equal to their respective existing membership deposits that had been paid in cash. The Stalking Horse Purchaser will refund member deposits of club members who execute agreements under the new membership programs on the terms set forth in Schedule 11.1(b) of the Agreement.

- Deposit – $10,000,000, tendered on the execution date of the Agreement;

- Postclosing indemnification by Debtors – Debtors responsible for losses or liabilities with respect to theft, loss or damage to non-inventoried baggage in Debtors' care, Inventoried Baggage (as defined in the Agreement) or contents of any safe deposit box, until such items are inventoried; and

- Proposed Breakup Fee – $5,925,000 (i.e., 3% of $197,500,000).

18.     On August 6, 2010, the Debtors and Synovus Bank, as agent and Pre-Petition Lender, Bank of America, N.A., as Pre-Petition Lender, and Bank of Scotland, as Pre-Petition Lender, executed a Restructuring and Lockup Agreement (the "Plan Support Agreement") whereby the Prepetition Lenders committed to support the Plan and Plan Sale subject to certain terms and conditions set forth in the Plan Support Agreement.  In particular, the Pre-Petition Lenders support the proposed Bid Procedures, including the Breakup Fee, the amount of the Initial Overbid and the incremental bid amounts.

19.     The Agreement will be "tested" in the marketplace by the sale and bidding process described below so as to ensure that the Debtors' estates realize the maximum value for the Assets.  The Debtors have developed the following proposed process for continuing to market the Assets for sale (the "Proposed Sale Process").  In connection therewith, the Debtors request that this Court approve the Proposed Sale Process, including the following bid procedures (the "Bid Procedures"):

(i)     <u>Initial Overbid</u>.  Any third party (other than the Stalking Horse Purchaser) that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Brunswick, Georgia on October 4, 2010 (the "<u>Overbid Deadline</u>").  Any such Initial Overbid must:

(a)     Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement, including all schedules and exhibits to the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price in an amount equal to or greater than the sum of (1) $197,500,000, (2) the Breakup Fee (as defined below), and (3) $2,500,000; and (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Agreement;

(b)     Include a cashiers' or certified check in the aggregate amount of $10,000,000 (the "<u>Deposit</u>") to be held as a deposit by an escrow agent (it being understood that the Deposit may also be sent by wire transfer of immediately available funds to the escrow agent);

(c)     To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their sole discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below);

(d)     Be submitted to (i) Sea Island Company, 100 Salt Marsh Drive, Sea Island, Georgia 31522, Attention: James B. Gilbert, Jr. (Facsimile: (912) 634-3124), (ii) counsel to the Debtors, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Sarah R. Borders, Esq. (Facsimile: (404) 572-5100), (iii) counsel to the Prepetition Lenders, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309, Attention: Jason H. Watson (Facsimile: (404) 253-8796), (iv) Goldman, Sachs & Co., 200 West Street, 31st Floor, New York, New York 10282, Attention: Ben Leahy (Facsimile: (212) 902-3000), (v) Office of the U.S. Trustee, 222 W. Oglethorpe Ave., Suite 302, Savannah, GA 31401, Attention: Matthew Mills (Facsimile: (912) 652-4123), and (vi) counsel

for any official committee of unsecured creditors appointed in these cases, in each case so as to be received not later than the Overbid Deadline.

(ii)    <u>Auction</u>.  In the event the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "<u>Qualified Bidder</u>"), then the Debtors will conduct an auction with respect to the sale of the Assets on October 11, 2010 beginning at 10:00 a.m. local time, at the offices of the Debtors' counsel, King & Spalding LLP, located at 1180 Peachtree Street, N.E., Atlanta, Georgia 30309-3521, or at such other location as may be designated by the Debtors (the "<u>Auction</u>").  In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order.  At the Auction, Qualified Bidders and the Stalking Horse Purchaser (it being understood that the Stalking Horse Purchaser shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $1,000,000 greater than the prior bid for the purchase of the Assets until there is only one offer that the Debtors, after consulting in good faith with the Prepetition Lenders, determine, subject to Court approval, is the highest or best offer for the Assets (the "<u>Prevailing Bid</u>").  When bidding at the Auction, the Stalking Horse Purchaser shall receive a cash "credit" in the amount of the Breakup Fee.  All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the hearing (the "<u>Confirmation Hearing</u>") held in these bankruptcy cases to consider (i) confirmation of the Plan, (ii) approval of the highest or best bid for the Assets and (iii) approval of the Plan Sale.  If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Confirmation Hearing will proceed with respect to the Plan, the Plan Sale and the Agreement.  After the Auction has concluded, the Debtors shall present to the Court for consideration and approval at the Confirmation Hearing the Prevailing Bid.

(iii)    <u>Breakup Fee</u>.  Upon the consummation of a sale of all or substantially all of the Assets to any third party (other than the Stalking Horse Purchaser) who submits a Prevailing Bid for the Assets, the Debtors shall pay to the Stalking Horse Purchaser  (or such person or persons as the Stalking Horse Purchaser may designate) cash or other immediately available funds in an amount equal to $5,925,000 (the "<u>Breakup Fee</u>"); <u>provided</u>, <u>however</u>, the Breakup Fee shall not be due and payable if the Stalking Horse Purchaser has committed a material breach of the Agreement prior to any termination of the Agreement pursuant to Section 14.1(g) or Section 14.1(h) of the Agreement and at the time of such termination the Agreement is not terminable by the Stalking Horse Purchaser pursuant to Section 14.1(d) of the Agreement.  The Breakup Fee shall be treated in the Debtors' bankruptcy cases as an administrative expense claim under Section 503(b)(1) and Section 507(a)(1) of the Bankruptcy Code, shall be paid to the Stalking Horse Purchaser (or such person or persons as the Stalking Horse Purchaser may designate) at the closing of such sale to the third party, and shall be paid to the Stalking Horse Purchaser (or such person or persons as the Stalking Horse Purchaser may designate) prior to the payment of the proceeds of such sale

to any third party asserting a lien on the Assets (and no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

(iv)    <u>Confirmation Hearing</u>.  After the conclusion of the Auction and the solicitation of votes with respect to the Plan, the Debtors will ask the Court to confirm the Plan and approve the Plan Sale at the Confirmation Hearing.  At the Confirmation Hearing, the Debtors will seek entry of an order (the "<u>Confirmation Order</u>"), providing, among other things, that (i) the Plan is confirmed and the transactions contemplated therein are approved; (ii) the Agreement (or the agreement evidencing the Prevailing Bid) and the transactions contemplated therein are approved; (iii) on the effective date of the Plan, the Assets shall be sold and/or assigned to the Stalking Horse Purchaser (or to such other party submitting a Prevailing Bid) free and clear of any and all liens, claims and encumbrances (except for certain permitted liens and assumed liabilities); (iv) authorizing the Debtors to assume and assign to the Stalking Horse Purchaser (or to such other party submitting a Prevailing Bid) all contracts and unexpired leases to be transferred pursuant to the terms of the Agreement (or such other Prevailing Bid) in accordance with section 365 of the Bankruptcy Code; and (v) the sale and conveyance of the Assets shall be exempt from any transfer tax, stamp tax or similar tax pursuant to section 1146(a) of the Bankruptcy Code.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Confirmation Hearing.  Upon the failure to consummate a sale of the Assets after the Confirmation Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, the next highest or otherwise best bid, as disclosed at the Confirmation Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Prevailing Bid.

(v)    <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Confirmation Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid.

20.    After extensive arms' length negotiations, the Debtors and the Stalking Horse Purchaser executed the Agreement.  This Motion is intended to seek approval of the Stalking Horse Purchaser as the "stalking horse" bidder in connection with the Debtors' solicitation of higher or better offers for the Debtors' assets.

21.    To induce the Stalking Horse Purchaser to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to the Stalking Horse Purchaser under the

Agreement.  Subject to this Court's approval, the Debtors have agreed to provide the Stalking Horse Purchaser with the Breakup Fee under the conditions specified in the Agreement.  In accordance with the Agreement, the Stalking Horse Purchaser shall be entitled to the Breakup Fee upon the consummation of a sale of all or substantially all of the Assets to any third party (other than the Stalking Horse Purchaser) who submits a Prevailing Bid for the Assets, provided that (a) the Stalking Horse Purchaser has not committed a material breach of the Agreement prior to any termination of the Agreement in connection with the Debtors' execution of a definitive purchase agreement with such third party and (b) at the time of any such termination, the Agreement was not also terminable by the Stalking Horse Purchaser on account of breach by the Debtors.

22.     The Breakup Fee is a material inducement for, and a condition of, the Stalking Horse Purchaser's entry into the Agreement.  The Debtors believe that the Breakup Fee is fair and reasonable in light of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Stalking Horse Purchaser in connection with the proposed transaction, and (b) the fact that, if the Breakup Fee is triggered, the Stalking Horse Purchaser's efforts will have resulted in the Debtors receiving a higher or otherwise better offer for the Assets, to the benefit of the Debtors' creditors.

23.     The Debtors believe that the Proposed Sale Process offers the best opportunity for the Debtors to maximize the value of the Business and the Assets for the benefit of their estates following significant marketing efforts and, therefore, the Debtors believe that implementation of the Proposed Sale Process is in the best interests of their estates and should be approved.

## ARGUMENT

### A.    Section 363(b) Authorizes the Proposed Sale Process.

24.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Bankruptcy Code section 105(a) further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Id. § 105.

25.    Generally, bidding and marketing procedures for the sale of a debtor's assets are encouraged by bankruptcy courts, as long as such procedures do not retard the bidding process by chilling bidder interest.  See In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (stating that the substantial solicitation and marketing efforts of the debtor supported the reasonableness of the offer resulting from such efforts); In re President Casinos, Inc., 314 B.R. 784 (Bankr. E.D. Mo. 2004) (holding that the court would not establish bid procedures for sale of chapter 11 debtors' assets free and clear of liens where, under the circumstances presented by debtors' jointly administered cases, such procedures would not enhance the bid process and might, in fact, chill bidder interest).

26.    Bankruptcy courts in the State of Georgia routinely approve similar bidding and marketing procedures to those requested in this Motion.   See, e.g., In re Lake Burton Development, LLC, No. 09-22830 (Bankr. N.D. Ga. April 1, 2010) (J. Bonapfel); In re Case Engineered Lumber, Inc., No. 09-22499 (Bankr. N.D. Ga. September 1, 2009) (J. Brizendine); In re Firstline Corporation, No. 06-70145 (Bankr. M.D. Ga. August 16, 2006) (J. Walker); In re TI Acquisition, LLC, No. 08-42370 (Bankr. N.D. Ga. August 15, 2008) (J. Diehl); In re Rhodes, Inc., No. 04-78434 (Bankr. N.D. Ga. July 26, 2005) (J. Massey); In re Adventure Parks Group,

12

LLC, No. 06-70659 (Bankr. M.D. Ga. Sept. 14, 2007) (J. Laney); In re Durango Georgia Paper

Company, No. 02-21669 (Bankr. S.D. Ga. November 16, 2005) (J. Davis); In re Dan River, Inc.,

No. 04-10990 (Bankr. N.D. Ga. December 17, 2004) (J. Drake).

27.     Although the Debtors cannot predict the results of the Proposed Sale Process and

the Auction, the Debtors respectfully submit that the Proposed Sale Process fits squarely within

the parameters of the sound business judgment test articulated in the above-referenced

authorities.

28.     As set forth above, the Debtors do not have sufficient liquidity to operate the

Business in a profitable manner, and in order to monetize the Assets for distribution to creditors,

the Debtors are proposing to consummate a sale of the Assets pursuant to the Plan.  The Debtors

believe that the maximum realizable value for the Assets will be obtained through an orderly sale

process that establishes a level playing field for potential bidders.

29.     The Debtors respectfully submit that the notice and timing of the Proposed Sale

Process are adequate and fair, and are reasonably calculated to elicit the highest levels of interest

in acquiring the Assets.  As described above, the Debtors have engaged in significant marketing

of the Business and the Assets and strongly believe that their efforts, coupled with the Proposed

Sale Process outlined above, will garner the highest and best possible value for the Assets.

30.     The Debtors have made, and will continue to make, diligent efforts to seek out all

potentially credible buyers, having already contacted numerous parties.  As in the case of

Delaware & Hudson Ry. Co., the substantial solicitation and marketing efforts of the Debtors

and their professionals support the proposed process and the reasonableness of any offer

ultimately presented through that process.  Moreover, the Proposed Sale Process will create a fair

and reasonable environment in which all legitimate and qualified interest in the Business and Assets can be presented in a competitive, open and level playing field.

31.     The Debtors intend to give notice of the hearing on this Motion (the "Bid Procedures Hearing"), the Auction and the Proposed Sale Process, by mailing a copy of the Motion, on or before August 16, 2010, to (i) all parties who previously have expressed serious interest in acquiring all or a substantial portion of the Assets; (ii) all parties set forth on the Master Service List established by the Debtors and approved by this Court in these cases; (iii) all parties known by the Debtors to assert a lien or security interest in or against the Assets; (iv) all governmental authorities exercising jurisdiction with respect to environmental matters affecting or relating to the Assets; and (v) all nondebtor parties to the Executory Contracts/Leases set forth on Exhibit B hereto (the parties listed in clauses (i) through (v) are referred to collectively as the "Notice Parties").  In addition to the foregoing, the Debtors also propose to give additional notice by mailing a copy of any Bid Procedures Order entered by the Court within two (2) business days of the filing or entry thereof (as the case may be) to each of the Notice Parties. The Debtors submit that the foregoing is sufficient notice of the Auction and the Proposed Sale Process (if and in whatever form approved at the Bid Procedures Hearing).

**B.      The Proposed Bid Procedures and Breakup Fee Are Appropriate.**

32.     The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit an Initial Overbid, and which the Debtors believe is fair and reasonable in view of the assets to be sold.  The Proposed Sale Process and, in particular, the proposed Breakup Fee, are reasonable and supported by applicable case law.

33.    Historically, bankruptcy courts have approved bidding incentives, including break-up fees awarded to an initial bidder or "stalking horse," in the event of a successful overbid based on the business judgment of the debtor.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking"); In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (noting that "the business judgment of the Debtor is the standard applied under the law in this district" and applying the standard to a break-up fee).

34.    The Third Circuit Court of Appeals has also addressed the appropriate standard for determining whether proposed bidding incentives in the bankruptcy context are appropriate. In In re O'Brien Environmental. Energy, Inc., 181 F.3d 527 (3d Cir. 1999), the Court of Appeals held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern bidding incentives in the bankruptcy context.  Finding no "compelling justification" for treating an application for break-up fees and expenses under section 503(b) any differently from other applications for administrative expenses, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  Id. at 535.

35.    In O'Brien, the Third Circuit identified at least two circumstances in which bidding incentives may provide actual benefit to the estate, justifying administrative expense

status.  First, there exists an actual benefit to the estate where "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induces a prospective buyer to research the value of the debtor and submit a bid that serves as a minimum bid on which other bidders can rely, the initial "bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtors is sold will reflect its true worth."  Id.  Both of those circumstances exist in these cases, because the inducement of the Breakup Fee was critical in persuading the Stalking Horse Purchaser to make an initial offer, which will serve as a "floor" for other bidders in connection with the Proposed Sale Process, and to expend the time and resources associated with conducting due diligence regarding the Business and with negotiating and entering into the Agreement.

36.    Under the "administrative expense" standard enunciated in O'Brien, as well as the "sound business judgment" standard followed in other jurisdictions, the Bid Procedures proposed by the Debtors should be approved as fair and reasonable.  Moreover, the proposed Breakup Fee of $5,925,000, which is three percent (3%) of the cash purchase price of $197,500,000, is reasonable and well within the range of bidding protection typically approved by bankruptcy courts in the State of Georgia.  See, e.g., In re Lake Burton Development, LLC, No. 09-22830 (Bankr. N.D. Ga. April 1, 2010) (J. Bonapfel) (approving break-up fee equal to 4.75% of the cash purchase price); In re Case Engineered Lumber, Inc., No. 09-22499 (Bankr. N.D. Ga. September 1, 2009) (J. Brizendine) (approving break-up fee equal to 3.5% of the cash purchase price and approving additional expense reimbursement in an amount up to 2.0% of the cash purchase price); In re Firstline Corporation, No. 06-70145 (Bankr. M.D. Ga. August 16, 2006)

(J. Walker) (approving break-up fees equal to 2.25% and 2.6% of the cash purchase prices); In re TI Acquisition, LLC, No. 08-42370 (Bankr. N.D. Ga. August 15, 2008) (J. Diehl) (approving break-up fee equal to approximately 3% of the cash purchase price); In re Rhodes, Inc., No. 04-78434 (Bankr. N.D. Ga. July 26, 2005) (J. Massey) (approving break-up fee equal to 2.5% of the cash purchase price); In re Adventure Parks Group, LLC, No. 06-70659 (Bankr. M.D. Ga. Sept. 14, 2007) (J. Laney) (approving break-up fee equal to 3% of the cash purchase price); In re Durango Georgia Paper Company, No. 02-21669 (Bankr. S.D. Ga. November 16, 2005) (J. Davis) (approving break-up fee equal to 3% of the cash purchase price); In re Dan River, Inc., No. 04-10990 (Bankr. N.D. Ga. December 17, 2004) (J. Drake) (approving break-up fee equal to 5.3% of the cash purchase price).

37.     Furthermore, pursuant to the Agreement, if this Court does not enter a Bid Procedures Order approving the Breakup Fee on or before September 17, 2010, the Stalking Horse Purchaser may immediately terminate the Agreement, in which case, the Stalking Horse Purchaser shall no longer have any obligations under the Agreement, including, without limitation, the obligation to purchase the Assets from the Debtors.  Accordingly, if this Court does not enter the Bid Procedures Order approving the Breakup Fee, the Stalking Horse Purchaser shall not be obligated to close the proposed transaction and purchase the Assets at closing (because it will maintain the ability to terminate the Agreement at all times until the closing of the proposed transaction).

38.     Therefore, because the procedures and incentives included in the Proposed Sale Process, including the proposed Breakup Fee, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets and thereby confer actual benefits upon the

estates herein, and are within the range of incentives customarily approved by courts, such procedures should be approved in these chapter 11 cases.

**C.**    **Establishing the Cure Costs will Facilitate an Orderly Sale Process.**

39.    The Debtors also request that the Court fix the amount of Cure Costs (as such term is defined in the Agreement) due under the Executory Contracts/Leases in connection with the requirement in section 365(b)(1) of the Bankruptcy Code that the debtor-in-possession, at the time of assumption, cure defaults in any executory contract or unexpired lease being assumed, or provide adequate assurance that the default will be promptly cured.  In anticipation of the sale of the Business, the Debtors carefully reviewed their books and records, calculated all of the arrearages and overdue amounts owing on the Executory Contracts/Leases, and determined that the Cure Costs identified on Exhibit B to this Motion are the exact amounts that should be paid to the nondebtor parties to the Executory Contracts/Leases.

40.    To the Debtors' knowledge, there are no defaults under the Executory Contracts/Leases that are required to be cured or for which there is compensation due, other than the Cure Costs set forth on Exhibit B.  Accordingly, the Debtors respectfully request that this Court include provisions in the Bid Procedures Order fixing the Cure Costs on Exhibit B as the exact amounts needed to cure any defaults under the Executory Contracts/Leases.  Fixing the Cure Costs will enhance the ability of bidders to decide which contracts and leases to acquire and will facilitate an orderly sale process.

## NOTICE

41.    This Motion will be served, and further notice of the Auction and the Proposed Sale Process will be given, in accordance with the procedures set forth above.  The Debtors

respectfully submit that such notice is sufficient and proper under the circumstances, and that no other or further notice is or should be required.

## **CONCLUSION**

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court enter an order following the Bid Procedures Hearing, substantially in the form of <u>Exhibit A</u> attached hereto, (i) approving the Proposed Sale Process (including payment of the Breakup Fee), (ii) authorizing the Debtors to take all actions reasonably necessary to effectuate such Proposed Sale Process; (iii) fixing the cure amounts that must be paid to nondebtor parties to Executory Contracts/Leases in connection with the assumption and assignment of such Executory Contracts/Leases; and (iv) granting such other and further relief as the Court deems just and proper.

Dated:  August 10, 2010     Respectfully submitted,
   Brunswick, Georgia

        GILBERT, HARRELL, SUMERFORD &
        MARTIN, P.C.

        /s/ Robert M. Cunningham
        M. F. Martin, III
        Georgia Bar No. 473500
        mfmartin@gilbertharrelllaw.com
        Robert M. Cunningham
        Georgia Bar No. 202228
        rcunningham@gilbertharrelllaw.com
        777 Gloucester Street, Suite 200
        P.O. Box 190
        Brunswick, Georgia 31521-0190
        Telephone: (912) 265-6700
        Facsimile: (912) 264-3917

         and

KING & SPALDING LLP
Sarah R. Borders
Georgia Bar No. 610649
sborders@kslaw.com
Harris Winsberg
Georgia Bar No. 770892
hwinsberg@kslaw.com
Sarah L. Taub
Georgia Bar No. 556919
staub@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:    (404) 572-4600
Facsimile:    (404) 572-5128

PROPOSED COUNSEL FOR THE
DEBTORS-IN-POSSESSION

<u>EXHIBIT A</u>

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| Debtors. | ) | |
| | ) | |

**ORDER (A) AUTHORIZING AND**
**SCHEDULING AN AUCTION AT WHICH DEBTORS WILL**
**SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY**
**ALL OF DEBTORS' ASSETS, (B) APPROVING PROCEDURES RELATED**
**TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) FIXING**
**THE MANNER AND EXTENT OF NOTICE, AND (E) GRANTING RELATED RELIEF**

Upon consideration of the Motion[1] of Sea Island Company, Sea Island Coastal Properties

LLC, Sea Island Services, Inc., Sea Island Resort Residences, LLC, Sea Island Apparel, LLC,

First Sea Island, LLC and SICAL, LLC (collectively, the "<u>Debtors</u>") seeking entry of an order

(A) authorizing and scheduling an auction at which the Debtors will solicit the highest or best

bid for the sale of substantially all of the Debtors' assets, (B) approving the procedures related to

the conduct of the auction, (C) approving the break-up fee payable to Sea Island Acquisition LP

(the "<u>Stalking Horse Purchaser</u>"), a limited partnership formed by certain investment funds

managed by Oaktree Capital Management LP and Avenue Capital Group, (D) fixing the manner

and extent of notice, and (E) granting related relief; and a hearing with respect to the Motion

having been held on _____, 2010 (the "Bid Procedures Hearing"); and based upon all of the evidence proffered or adduced at the Bid Procedures Hearing; and after consideration of any memoranda, objections, or other pleadings filed in connection with the Bid Procedures Hearing; and after consideration of the arguments of counsel made at the Bid Procedures Hearing; and upon the entire record of these cases; and it appearing that the approval of the Bid Procedures as requested in the Motion is in the best interests of the Debtors, their estates, creditors, employees and other stakeholders (including members of the Clubs); and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.    The form and manner of notice of the Bid Procedures and the Bid Procedures Hearing shall be, and hereby are, approved as sufficient and adequate notice.  No other or further notice in connection with the entry of this Order is or shall be required.

B.    The Bid Procedures were proposed by the Debtors in good faith with the goal of maximizing the value of the Business and the Assets for the benefit of all creditors of their estates.  The Bid Procedures will facilitate an orderly sale process and will help establish a level playing field for potential bidders.

C.    Approval of the Breakup Fee is a necessary and appropriate inducement to the Stalking Horse Purchaser to (i) make an initial offer which will serve as a "floor" for further bidding, and (ii) negotiate and enter into the Agreement and consummate the transactions contemplated thereby.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

THAT:

1.      The Motion (document no. \_\_\_) is granted to the extent set forth in this Order.

The following "Bid Procedures" are hereby approved and shall be used in connection with the

proposed sale of the Assets:

(i)    <u>Initial Overbid</u>.  Any third party (other than the Stalking Horse Purchaser) that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Brunswick, Georgia on October 4, 2010 (the "<u>Overbid Deadline</u>").  Any such Initial Overbid must:

(a)    Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement, including all schedules and exhibits to the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for a cash purchase price in an amount equal to or greater than the sum of (1) $197,500,000, (2) the Breakup Fee (as defined below), and (3) $2,500,000; and (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Agreement;

(b)    Include a cashiers' or certified check in the aggregate amount of $10,000,000 (the "<u>Deposit</u>") to be held as a deposit by an escrow agent (it being understood that the Deposit may also be sent by wire transfer of immediately available funds to the escrow agent);

(c)    To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their sole discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction (as defined below); and

(d)     Be submitted to (i) Sea Island Company, 100 Salt Marsh Drive, Sea Island, Georgia 31522, Attention: James B. Gilbert, Jr. (Facsimile: (912) 634-3124), (ii) counsel to the Debtors, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Sarah R. Borders, Esq. (Facsimile: (404) 572-5100), (iii) counsel to the Prepetition Lenders, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309, Attention: Jason H. Watson (Facsimile: (404) 253-8796), (iv) Goldman, Sachs & Co., 200 West Street, 31st Floor, New York, New York 10282, Attention: Ben Leahy (Facsimile: (212) 902-3000), (v) Office of the U.S. Trustee, 222 W. Oglethorpe Ave., Suite 302, Savannah, GA 31401, Attention: Matthew Mills (Facsimile: (912) 652-4123), and (vi) counsel for any official committee of unsecured creditors appointed in these cases, in each case so as to be received not later than the Overbid Deadline.

(ii)     <u>Auction</u>.  In the event the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "<u>Qualified Bidder</u>") in accordance with the Bid Procedures, then the Debtors will conduct an auction with respect to the sale of the Assets on October 11, 2010 beginning at 10:00 a.m. local time, at the offices of the Debtors' counsel, King & Spalding LLP, located at 1180 Peachtree Street, N.E., Atlanta, Georgia 30309-3521, or at such other location as may be designated by the Debtors (the "<u>Auction</u>").  In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with this Order.  At the Auction, Qualified Bidders and the Stalking Horse Purchaser (it being understood that the Stalking Horse Purchaser shall be deemed to be a Qualified Bidder) may submit successive bids in increments of at least $1,000,000 greater than the prior bid for the purchase of the Assets until there is only one offer that the Debtors, after consulting in good faith with the Prepetition Lenders, determine, subject to Court approval, is the highest or best offer for the Assets (the "<u>Prevailing Bid</u>").  When bidding at the Auction, the Stalking Horse Purchaser shall receive a cash "credit" in the amount of the Breakup Fee.  All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the hearing (the "<u>Confirmation Hearing</u>") held in these bankruptcy cases to consider (i) confirmation of the Plan, (ii) approval of the highest or best bid for the Assets and (iii) approval of the Plan Sale.  If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Confirmation Hearing will proceed with respect to the Plan, the Plan Sale and the Agreement.  In determining the Prevailing Bid, the Debtors will consider, among other things: (a) the number, type and nature of any changes to the Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (e) the net benefit to the Debtors' estates.  After the Auction has

4

concluded, the Debtors shall present to the Court for consideration and approval at the Confirmation Hearing the Prevailing Bid.

(iii)    <u>Confirmation Hearing</u>.  After the conclusion of the Auction and the solicitation of votes with respect to the Plan, the Debtors will ask the Court to confirm the Plan and approve the Plan Sale at the Confirmation Hearing.  At the Confirmation Hearing, the Debtors will seek entry of an order (the "<u>Confirmation Order</u>"), providing, among other things, that (i) the Plan is confirmed and the transactions contemplated therein are approved; (ii) the Agreement (or the agreement evidencing the Prevailing Bid) and the transactions contemplated therein are approved; (iii) on the effective date of the Plan, the Assets shall be sold and/or assigned to the Stalking Horse Purchaser (or to such other party submitting a Prevailing Bid) free and clear of any and all liens, claims and encumbrances (except for certain permitted liens and assumed liabilities); (iv) authorizing the Debtors to assume and assign to the Stalking Horse Purchaser (or to such other party submitting a Prevailing Bid) all contracts and unexpired leases to be transferred pursuant to the terms of the Agreement (or such other Prevailing Bid) in accordance with section 365 of the Bankruptcy Code; and (v) the sale and conveyance of the Assets shall be exempt from any transfer tax, stamp tax or similar tax pursuant to section 1146(a) of the Bankruptcy Code.  The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Confirmation Hearing.  Upon the failure to consummate a sale of the Assets after the Confirmation Hearing because of the occurrence of a breach or default under the terms of the Prevailing Bid, the next highest or otherwise best bid, as disclosed at the Confirmation Hearing, shall be deemed the Prevailing Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Prevailing Bid.

(iv)    <u>Highest and/or Best Bid</u>.  At all times during the sale process, the Debtors shall retain full discretion and right to determine, in their sole discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of sections 1123 and 1129 of the Bankruptcy Code.  Without limiting the generality of the foregoing, the Debtors may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid that, in the Debtors' sole discretion, the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors, their estates, creditors, employees or other stakeholders (including members of the Clubs).  The Debtors may adopt rules for the Auction that, in their judgment, will better promote the goals of the Auction.

(v)    <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Confirmation Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid.

2.      During the sale process (including, without limitation, at the Auction), the Debtors shall consult in good faith (to the extent reasonably practicable) with (a) counsel for the Debtors' primary prepetition secured creditors in these cases, and (b) counsel for any official committee of unsecured creditors appointed in these cases.

3.      The "cure costs" set forth on Schedule 1 hereto (the "Cure Costs") constitute all of the amounts that must be paid to the nondebtor parties to the Executory Contracts/Leases in connection with the assumption and assignment of the Executory Contracts/Leases.  Except as set forth on Schedule 1, each nondebtor party to an Executory Contract/Lease shall be forever barred from asserting against the Debtors, the Stalking Horse Purchaser or any party that submits the Prevailing Bid any monetary or non-monetary default allegedly arising or incurred under such Executory Contract/Lease, any actual pecuniary loss resulting from such default, or any other unpaid or unperformed obligation allegedly arising or incurred under such Executory Contract/Lease.

4.      Objections (if any) to approval of any Prevailing Bid (including any objection to approval of any proposed sale of the Assets or any proposed assumption and assignment of executory contracts and unexpired leases (other than any objections relating to Cure Costs, which are governed by Paragraph 3 of this Order) pursuant to any Prevailing Bid) shall be made prior to the deadline for filing objections to the Plan and shall be served upon all parties entitled to receive such objections pursuant to further orders of this Court.

5.      Upon the consummation of a sale of all or substantially all of the Assets to any third party (other than the Stalking Horse Purchaser) who submits a Prevailing Bid for the Assets, the Debtors shall pay to the Stalking Horse Purchaser  (or such person or persons as the Stalking Horse Purchaser may designate) cash or other immediately available funds in an amount

equal to $5,925,000 (the "Breakup Fee"); provided, however, the Breakup Fee shall not be due and payable if the Stalking Horse Purchaser has committed a material breach of the Agreement prior to any termination of the Agreement pursuant to Section 14.1(g) or Section 14.1(h) of the Agreement and at the time of such termination the Agreement is not terminable by the Stalking Horse Purchaser pursuant to Section 14.1(d) of the Agreement.  The Breakup Fee shall be treated in the Debtors' bankruptcy cases as an administrative expense claim under Section 503(b)(1) and Section 507(a)(1) of the Bankruptcy Code, shall be paid to the Stalking Horse Purchaser (or such person or persons as the Stalking Horse Purchaser may designate) at the closing of such sale to the third party, and shall be paid to the Stalking Horse Purchaser (or such person or persons as the Stalking Horse Purchaser may designate) prior to the payment of the proceeds of such sale to any third party asserting a lien on the Assets (and no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

6.      The Bid Procedures (including the Breakup Fee) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets, and will confer actual benefits upon the Debtors' estates.  The Bid Procedures represent an exercise of the Debtors' sound business judgment and will facilitate an orderly sale process.

7.      The Debtors shall serve a copy of this Order as contemplated in the Motion.

SO ORDERED, this ___ day of _____, 2010.

**[END OF DOCUMENT]**

Prepared and presented by:

KING & SPALDING LLP
Sarah R. Borders

Georgia Bar No. 610649
Harris Winsberg
Georgia Bar No. 770892
W. Austin Jowers
Georgia Bar No. 405482
1180 Peachtree Street
Atlanta, Georgia  30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5128

ATTORNEYS FOR THE DEBTORS

**SCHEDULE 1**

**EXECUTORY CONTRACTS/LEASES AND CURE AMOUNTS**

| EXECUTORY CONTRACTS/LEASES | CURE AMOUNT |
|---|---|
| | |
| Agreement by and among Sea Island Company and E-Z-GO dated August 25, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Georgia Turf & Tractor, Inc. and John Deere Equipment Company dated March 31, 2008. | $0.00 |
| Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007. | $0.00 |
| Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002. | $0.00 |
| Letter Agreement by and among PGA TOUR, INC., David Love III Foundation and Sea Island Company dated January 22, 2010. | $0.00 |
| Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC. | $0.00 |
| Services Agreement by and among Exclusive Resorts Club Management, LLC and Sea Island Company dated May 15, 2007, as amended. | $0.00 |
| Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009. | $0.00 |
| Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated December 12, 2005. | $0.00 |
| Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003. | $0.00 |
| Database Management Services Agreement by and among LMG Data Mining and Sea Island Company dated December 3, 2007. | $0.00 |
| Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007. | $0.00 |
| Landscape Service Agreements by and among Sea Island Company and certain property owners. | $0.00 |
| Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008. | $0.00 |
| Music Services Agreement by and among Sea Island Company and Muzak, LLC dated July 26, 2007. | $0.00 |
| Statement of Work by and among Sea Island Company and Network Services Plus, Inc. dated November 11, 2009. | $0.00 |

| | |
|---|---|
| Hardware Maintenance Agreement by and among Sea Island Company and Postec, Inc. dated June 16, 2005. | $0.00 |
| Client Pricing Agreement by and among Sea Island Company and Pre-employ.com, Inc. dated May 29, 2009. | $0.00 |
| Contract by and among Sea Island Company and Southern Nights dated April 1, 2005. | $0.00 |
| Maintenance Agreement by and among Sea Island Company and Southern Nights dated April 14, 2009. | $0.00 |
| Marketing and Management Services Agreement by and among Sea Island Company and TIG Global dated October 15, 2007. | $0.00 |
| Consulting Services Agreement  by and among Sea Island Company and Ultimate Software dated July 18, 2008. | $0.00 |
| Lease Agreements by and among Sea Island Company and GMAC. | $0.00 |
| Essentials Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Sea Island Golf Club and Toro National Support Network dated May 28, 2008. | $0.00 |
| Classic 36 Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Retreat Golf Club and Toro National Support Network dated May 28, 2008. | $0.00 |
| Lease Agreement by and among Sea Island Company and Golden Isles dated October 1, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Satilla Riverkeeper dated February 15, 2010. | $0.00 |
| Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009. | $0.00 |
| Membership Agreement by and among the Cloister and the Lodge at Sea Island and Associated Luxury Hotels International Holdings, LLC dated January 1, 2010. | $0.00 |
| Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009. | $0.00 |
| Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009. | $0.00 |
| Agreement by and among Sea Island Company and Due South Publishing, Inc. dated April 8, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Elite Meetings International dated September 30, 2009. | $0.00 |
| Subscription Agreement by and among Sea Island Company and Hoovers dated November 28, 2009. | $0.00 |
| Membership Agreement by and among Sea Island Company and IAGTO dated February 15, 2010. | $0.00 |

| | |
|---|---|
| Participation Agreement by and among The Cloister at Sea Island and Kiwi Collection, Inc. dated January 25, 2010 (Visa Luxury Hotel Collection). | $0.00 |
| Agreement by and among Sea Island Company and Preferred Hotel Group, Inc. dated July 1, 2009. | $0.00 |
| Agreement by and among The Cloister at Sea Island and Signature Travel Network effective January 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002. | $0.00 |
| Marketing and Management Services Agreement by and among Sea Island Company and TIG Global, LLC effective January 1, 2010. | $0.00 |
| Subscription Agreement by and among The Cloister at Sea Island and TravelCLICK, Inc. dated December 7, 2009. | $0.00 |
| Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010. | $0.00 |
| Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Roger and Anne Ditmer dated November 26, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Ellen Rogers dated September 12, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Celeste Pittman dated February 17, 2009. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Dulany Hall dated October 2, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Audrey Wood dated October 3, 2008. | $0.00 |
| Agreement by and among Sea Island Company and William Lewis Mason dated July 27, 2009. | $0.00 |
| Letter Agreement by and among Sea Island Company and Davis M. Love III dated August 10, 2006. | $0.00 |
| Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and J&S Associates, Inc. dated July 23, 2010. | $0.00 |
| Product Purchase Agreement by and among Sea Island Company and Institution Food House, Inc. dated August 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Pristine Water Coffee dated May 4, 2010. | $0.00 |
| Master Maintenance Agreement by and among Sea Island Company | $0.00 |

| | |
|---|---|
| and Schindler Elevator Corporation dated May 5, 2010. | |
| Rental/Service Agreements by and among Sea Island Company and Aqua/Quench USA. | $0.00 |
| Service Agreement by and among Sea Island Company and Audio Visual Services Group, Inc. dated September 2, 2009. | $0.00 |
| Agreement by and among Sea Island Company and E-Z-GO dated September 10, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Action Mobile Industries Inc. dated November 1, 2007. | $0.00 |
| Planned Maintenance Agreement by and among Sea Island Company and Agri-Business Technologies, Inc. dated February 11, 2010. | $0.00 |
| Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and CSI Leasing, Inc. dated January 22, 2009. | $0.00 |
| Lease by and among Sea Island Company and Donald C. McCaskill III and Annie Bell McCaskill Friedman dated February 5, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Emery Hardware and Rental Center dated December 1, 2009. | $0.00 |
| Service Agreement by and among Sea Island Company and G&K Services dated September 12, 2006. | $0.00 |
| Gas Service Agreement by and among Sea Island Company and SouthStar Energy Services, LLC d/b/a Georgia Natural Gas dated April 27, 2009. | $0.00 |
| Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Modular Mailing Systems dated May 8, 2007. | $0.00 |
| Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC date July 9, 2007. | $0.00 |
| Meter Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Otis Elevator Company dated July 10, 2002, as amended. | $0.00 |
| Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Stromberg dated December 23, 2005. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated January 20, 2005. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (New Chiller Plant). | $0.00 |

| | |
|---|---|
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (Cloister Hotel). | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated July 20, 2006. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated December 6, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Waste Management of Brunswick dated September 8, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Williams Scotsman, Inc. dated July 21, 2009. | $0.00 |
| Agreement by and among Sea Island Company and Yates-Astro Termite & Pest Co. | $0.00 |
| Lease Agreement by and among Sea Island Company and PNCEF, LLC (f/n/a National City Commercial Capital Company) dated September 24, 2009, as amended January 11, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Hasty's Communications East, Inc. | $0.00 |
| Agreement by and among St. Simons Island Club and Estate Management Services dated September 30, 1996. | $0.00 |
| Agreement by and among Cannon Point Lake and Estate Management Services, Inc. dated June 17, 2004. | $0.00 |
| Agreement by and among Ocean Forest and Estate Management Services dated September 30, 1996. | $0.00 |
| Agreement by and among Lake Sinclair and Estate Management Services dated May 19, 2000. | $0.00 |
| Agreement by and among The Sea Island Golf Club and Estate Management Services dated January 6, 1999. | $0.00 |
| Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005. | $0.00 |
| Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Agilysys, NV, LLC dated January 7, 2010. | $0.00 |
| Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Crystal Enterprises, Inc. dated March 4, 2009. | $0.00 |
| Agreement by and among Sea Island Company and OpenCourse | $0.00 |

| | |
|---|---|
| Solutions, LLC dated October 15, 2004. | |
| Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005. | $0.00 |
| Agreement by and among Sea Island Company and Tri H Friesians LLC dated February 4, 2010. | $0.00 |
| Shared Equity Financing Agreement by and among C. Allen Brown and Sea Island Company. | $0.00 |
| Shared Equity Financing Agreement by and among Todd W. Anderson, Stacey L. Anderson and Sea Island Company. | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (The Cloisters). | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge). | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest). | $0.00 |
| Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004. | $0.00 |
| Agreement by and among Sea Island Company and AG-Hill Farms, Inc. dated August 16, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Tabby House, Inc. dated December 6, 2007. | $0.00 |
| Agreements by and among Sellers and any customer entered into in the ordinary course of business for services or accommodations to be provided to such customer by Sellers. | $0.00 |
| Rental agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences Sea Island Cottages and Beach Club Condominiums by Sea Island Company on behalf of unit owners. | $0.00 |
| Rental management agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences, Sea Island Cottages and Beach Club Condominiums between Sea Island Company and the unit owners. | $0.00 |
| Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008. | $0.00 |
| Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Procleansed, Inc. dated September 17, 2008. | $0.00 |
| National Service Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008. | $0.00 |
| Travel Directory Marketing Agreement by and among The Cloister at Sea Island and Andrew Harper dated October 16, 2009. | $0.00 |

| | |
|---|---|
| Agreement by and among Sea Island Resorts and Fortibus Marketing of Charleston, LLC July 17, 2009. | $0.00 |
| Affiliate Hotel Agreement by and among Sea Island Resort and Clubcorp USA, Inc. dated August 7, 2009. | $0.00 |
| Cable Television Service Agreement and License by and among Sea Island Company and Owensboro-Brunswick, Inc. d/b/a Adelphia Cable Communications dated March 28, 2006. | $0.00 |
| Bulk Services Agreement by and among Sea Island Company and Comcast of Florida/Georgia, LLC dated April 23, 2008. | $0.00 |
| Container Lease Agreement #GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008. | $0.00 |
| Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008. | $0.00 |
| Net Lease Agreement by and among Sea Island Company and JLV VASI, LLC dated September 5, 2008, as amended December 31, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Nancy Adcock. | $0.00 |
| Google Message Delivery Contract by and among Google, Inc. and Sea Island Company dated January 1, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Alfred W. Jones, III dated October 8, 2007. | $0.00 |
| Microsoft Enterprise Enrollment and Pricing for Office Pro Sea Island dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E611258. | $0.00 |
| Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003. | $0.00 |
| Property Exposure Contract No. 000902-0609-31 by and among The Cloister at Sea Island and Kiwi Collection Inc. dated June 23, 2009. | $0.00 |
| Property Exposure Contract No. 001403-0110-250 by and among The Lodge at Sea Island Golf Club and Kiwi Collection Inc. dated January 15, 2010. | $0.00 |
| Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Barry's Beach Service, Inc. dated June 30, 2006. | $0.00 |
| Letter Agreement by and among Sea Island Company and Atlantic Bike Shop, Inc. dated March 11, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Steve Hightower dated November 30, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Resort | $0.00 |

| | |
|---|---|
| Photography, LLC dated March 6, 2000. | |
| Yacht Charter Agreement by and among Sea Island Company and Captain Brian Quinn dated August 2008. | $0.00 |
| Agreement by and among Sea Island Company and Georgia Power Company dated January 23, 2004. | $0.00 |
| Equipment Service Agreement by and among Sea Island Company and BancTec, Inc. dated January 22, 2007. | $0.00 |
| Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009. | $0.00 |
| Business Rental Preferred Rate Agreement by and among Sea Island and Enterprise Leasing Company – Southeast dated July 8, 2010. | $0.00 |
| Concessionaire Agreement by and among Sea Island Company and Enterprise Rent-A-Car Southeast dated September 8, 2008. | $0.00 |
| Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007. | $0.00 |
| Product Service Agreement by and among Sea Island Company and Dowling-Douglas Co. dated July 22, 2010. | $0.00 |
| Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated February 4, 2005. | $0.00 |
| Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated May 18, 2006. | $0.00 |
| Transport Payment Plan by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005. | $0.00 |
| Services Master Agreement by and among Sea Island Co. and BellSouth Company dated October 4, 2006. | $0.00 |
| Marketing Support Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998. | $0.00 |
| Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002. | $0.00 |
| Master Services Agreement by and among Sea Island Company and International Business Machines Corporation dated December 28, 2005. | $0.00 |
| Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated January 10, 2006. | $0.00 |
| Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001. | $0.00 |
| Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001. | $0.00 |

| | |
|---|---|
| Agreements entered into in the ordinary course of business with certain unaffiliated Persons for the short-term leasing of resort and event space. | $0.00 |
| Commercial lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009. | $0.00 |

## EXHIBIT B

## EXECUTORY CONTRACTS/LEASES AND CURE AMOUNTS

| EXECUTORY CONTRACTS/LEASES | CURE AMOUNT |
|---|---|
| | |
| Agreement by and among Sea Island Company and E-Z-GO dated August 25, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Georgia Turf & Tractor, Inc. and John Deere Equipment Company dated March 31, 2008. | $0.00 |
| Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007. | $0.00 |
| Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002. | $0.00 |
| Letter Agreement by and among PGA TOUR, INC., David Love III Foundation and Sea Island Company dated January 22, 2010. | $0.00 |
| Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC. | $0.00 |
| Services Agreement by and among Exclusive Resorts Club Management, LLC and Sea Island Company dated May 15, 2007, as amended. | $0.00 |
| Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009. | $0.00 |
| Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated December 12, 2005. | $0.00 |
| Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003. | $0.00 |
| Database Management Services Agreement by and among LMG Data Mining and Sea Island Company dated December 3, 2007. | $0.00 |
| Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007. | $0.00 |
| Landscape Service Agreements by and among Sea Island Company and certain property owners. | $0.00 |
| Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008. | $0.00 |
| Music Services Agreement by and among Sea Island Company and Muzak, LLC dated July 26, 2007. | $0.00 |
| Statement of Work by and among Sea Island Company and Network Services Plus, Inc. dated November 11, 2009. | $0.00 |

10

| | |
|---|---|
| Hardware Maintenance Agreement by and among Sea Island Company and Postec, Inc. dated June 16, 2005. | $0.00 |
| Client Pricing Agreement by and among Sea Island Company and Pre-employ.com, Inc. dated May 29, 2009. | $0.00 |
| Contract by and among Sea Island Company and Southern Nights dated April 1, 2005. | $0.00 |
| Maintenance Agreement by and among Sea Island Company and Southern Nights dated April 14, 2009. | $0.00 |
| Marketing and Management Services Agreement by and among Sea Island Company and TIG Global dated October 15, 2007. | $0.00 |
| Consulting Services Agreement  by and among Sea Island Company and Ultimate Software dated July 18, 2008. | $0.00 |
| Lease Agreements by and among Sea Island Company and GMAC. | $0.00 |
| Essentials Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Sea Island Golf Club and Toro National Support Network dated May 28, 2008. | $0.00 |
| Classic 36 Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Retreat Golf Club and Toro National Support Network dated May 28, 2008. | $0.00 |
| Lease Agreement by and among Sea Island Company and Golden Isles dated October 1, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Satilla Riverkeeper dated February 15, 2010. | $0.00 |
| Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009. | $0.00 |
| Membership Agreement by and among the Cloister and the Lodge at Sea Island and Associated Luxury Hotels International Holdings, LLC dated January 1, 2010. | $0.00 |
| Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009. | $0.00 |
| Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009. | $0.00 |
| Agreement by and among Sea Island Company and Due South Publishing, Inc. dated April 8, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Elite Meetings International dated September 30, 2009. | $0.00 |
| Subscription Agreement by and among Sea Island Company and Hoovers dated November 28, 2009. | $0.00 |
| Membership Agreement by and among Sea Island Company and IAGTO dated February 15, 2010. | $0.00 |

| | |
|---|---|
| Participation Agreement by and among The Cloister at Sea Island and Kiwi Collection, Inc. dated January 25, 2010 (Visa Luxury Hotel Collection). | $0.00 |
| Agreement by and among Sea Island Company and Preferred Hotel Group, Inc. dated July 1, 2009. | $0.00 |
| Agreement by and among The Cloister at Sea Island and Signature Travel Network effective January 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002. | $0.00 |
| Marketing and Management Services Agreement by and among Sea Island Company and TIG Global, LLC effective January 1, 2010. | $0.00 |
| Subscription Agreement by and among The Cloister at Sea Island and TravelCLICK, Inc. dated December 7, 2009. | $0.00 |
| Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010. | $0.00 |
| Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Roger and Anne Ditmer dated November 26, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Ellen Rogers dated September 12, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Celeste Pittman dated February 17, 2009. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Dulany Hall dated October 2, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Audrey Wood dated October 3, 2008. | $0.00 |
| Agreement by and among Sea Island Company and William Lewis Mason dated July 27, 2009. | $0.00 |
| Letter Agreement by and among Sea Island Company and Davis M. Love III dated August 10, 2006. | $0.00 |
| Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and J&S Associates, Inc. dated July 23, 2010. | $0.00 |
| Product Purchase Agreement by and among Sea Island Company and Institution Food House, Inc. dated August 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Pristine Water Coffee dated May 4, 2010. | $0.00 |
| Master Maintenance Agreement by and among Sea Island Company | $0.00 |

| | |
|---|---|
| and Schindler Elevator Corporation dated May 5, 2010. | |
| Rental/Service Agreements by and among Sea Island Company and Aqua/Quench USA. | $0.00 |
| Service Agreement by and among Sea Island Company and Audio Visual Services Group, Inc. dated September 2, 2009. | $0.00 |
| Agreement by and among Sea Island Company and E-Z-GO dated September 10, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Action Mobile Industries Inc. dated November 1, 2007. | $0.00 |
| Planned Maintenance Agreement by and among Sea Island Company and Agri-Business Technologies, Inc. dated February 11, 2010. | $0.00 |
| Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and CSI Leasing, Inc. dated January 22, 2009. | $0.00 |
| Lease by and among Sea Island Company and Donald C. McCaskill III and Annie Bell McCaskill Friedman dated February 5, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Emery Hardware and Rental Center dated December 1, 2009. | $0.00 |
| Service Agreement by and among Sea Island Company and G&K Services dated September 12, 2006. | $0.00 |
| Gas Service Agreement by and among Sea Island Company and SouthStar Energy Services, LLC d/b/a Georgia Natural Gas dated April 27, 2009. | $0.00 |
| Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Modular Mailing Systems dated May 8, 2007. | $0.00 |
| Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC date July 9, 2007. | $0.00 |
| Meter Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Otis Elevator Company dated July 10, 2002, as amended. | $0.00 |
| Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Stromberg dated December 23, 2005. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated January 20, 2005. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (New Chiller Plant). | $0.00 |

| | |
|---|---|
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (Cloister Hotel). | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated July 20, 2006. | $0.00 |
| Service Agreement by and among Sea Island and Georgia Trane Service Company dated December 6, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Waste Management of Brunswick dated September 8, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Williams Scotsman, Inc. dated July 21, 2009. | $0.00 |
| Agreement by and among Sea Island Company and Yates-Astro Termite & Pest Co. | $0.00 |
| Lease Agreement by and among Sea Island Company and PNCEF, LLC (f/n/a National City Commercial Capital Company) dated September 24, 2009, as amended January 11, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Hasty's Communications East, Inc. | $0.00 |
| Agreement by and among St. Simons Island Club and Estate Management Services dated September 30, 1996. | $0.00 |
| Agreement by and among Cannon Point Lake and Estate Management Services, Inc. dated June 17, 2004. | $0.00 |
| Agreement by and among Ocean Forest and Estate Management Services dated September 30, 1996. | $0.00 |
| Agreement by and among Lake Sinclair and Estate Management Services dated May 19, 2000. | $0.00 |
| Agreement by and among The Sea Island Golf Club and Estate Management Services dated January 6, 1999. | $0.00 |
| Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005. | $0.00 |
| Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Agilysys, NV, LLC dated January 7, 2010. | $0.00 |
| Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Crystal Enterprises, Inc. dated March 4, 2009. | $0.00 |
| Agreement by and among Sea Island Company and OpenCourse | $0.00 |

| | |
|---|---|
| Solutions, LLC dated October 15, 2004. | |
| Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005. | $0.00 |
| Agreement by and among Sea Island Company and Tri H Friesians LLC dated February 4, 2010. | $0.00 |
| Shared Equity Financing Agreement by and among C. Allen Brown and Sea Island Company. | $0.00 |
| Shared Equity Financing Agreement by and among Todd W. Anderson, Stacey L. Anderson and Sea Island Company. | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (The Cloisters). | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge). | $0.00 |
| Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest). | $0.00 |
| Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004. | $0.00 |
| Agreement by and among Sea Island Company and AG-Hill Farms, Inc. dated August 16, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Tabby House, Inc. dated December 6, 2007. | $0.00 |
| Agreements by and among Sellers and any customer entered into in the ordinary course of business for services or accommodations to be provided to such customer by Sellers. | $0.00 |
| Rental agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences Sea Island Cottages and Beach Club Condominiums by Sea Island Company on behalf of unit owners. | $0.00 |
| Rental management agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences, Sea Island Cottages and Beach Club Condominiums between Sea Island Company and the unit owners. | $0.00 |
| Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008. | $0.00 |
| Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007. | $0.00 |
| Agreement by and among Sea Island Company and Procleansed, Inc. dated September 17, 2008. | $0.00 |
| National Service Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008. | $0.00 |
| Travel Directory Marketing Agreement by and among The Cloister at Sea Island and Andrew Harper dated October 16, 2009. | $0.00 |

| | |
|---|---|
| Agreement by and among Sea Island Resorts and Fortibus Marketing of Charleston, LLC July 17, 2009. | $0.00 |
| Affiliate Hotel Agreement by and among Sea Island Resort and Clubcorp USA, Inc. dated August 7, 2009. | $0.00 |
| Cable Television Service Agreement and License by and among Sea Island Company and Owensboro-Brunswick, Inc. d/b/a Adelphia Cable Communications dated March 28, 2006. | $0.00 |
| Bulk Services Agreement by and among Sea Island Company and Comcast of Florida/Georgia, LLC dated April 23, 2008. | $0.00 |
| Container Lease Agreement #GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008. | $0.00 |
| Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008. | $0.00 |
| Net Lease Agreement by and among Sea Island Company and JLV VASI, LLC dated September 5, 2008, as amended December 31, 2008. | $0.00 |
| Professional Services Agreement by and among Sea Island Company and Nancy Adcock. | $0.00 |
| Google Message Delivery Contract by and among Google, Inc. and Sea Island Company dated January 1, 2009. | $0.00 |
| Lease Agreement by and among Sea Island Company and Alfred W. Jones, III dated October 8, 2007. | $0.00 |
| Microsoft Enterprise Enrollment and Pricing for Office Pro Sea Island dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E611258. | $0.00 |
| Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003. | $0.00 |
| Property Exposure Contract No. 000902-0609-31 by and among The Cloister at Sea Island and Kiwi Collection Inc. dated June 23, 2009. | $0.00 |
| Property Exposure Contract No. 001403-0110-250 by and among The Lodge at Sea Island Golf Club and Kiwi Collection Inc. dated January 15, 2010. | $0.00 |
| Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Barry's Beach Service, Inc. dated June 30, 2006. | $0.00 |
| Letter Agreement by and among Sea Island Company and Atlantic Bike Shop, Inc. dated March 11, 2010. | $0.00 |
| Agreement by and among Sea Island Company and Steve Hightower dated November 30, 2008. | $0.00 |
| Agreement by and among Sea Island Company and Resort | $0.00 |

| | |
|---|---|
| Photography, LLC dated March 6, 2000. | |
| Yacht Charter Agreement by and among Sea Island Company and Captain Brian Quinn dated August 2008. | $0.00 |
| Agreement by and among Sea Island Company and Georgia Power Company dated January 23, 2004. | $0.00 |
| Equipment Service Agreement by and among Sea Island Company and BancTec, Inc. dated January 22, 2007. | $0.00 |
| Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009. | $0.00 |
| Business Rental Preferred Rate Agreement by and among Sea Island and Enterprise Leasing Company – Southeast dated July 8, 2010. | $0.00 |
| Concessionaire Agreement by and among Sea Island Company and Enterprise Rent-A-Car Southeast dated September 8, 2008. | $0.00 |
| Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007. | $0.00 |
| Product Service Agreement by and among Sea Island Company and Dowling-Douglas Co. dated July 22, 2010. | $0.00 |
| Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated February 4, 2005. | $0.00 |
| Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated May 18, 2006. | $0.00 |
| Transport Payment Plan by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005. | $0.00 |
| Services Master Agreement by and among Sea Island Co. and BellSouth Company dated October 4, 2006. | $0.00 |
| Marketing Support Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998. | $0.00 |
| Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002. | $0.00 |
| Master Services Agreement by and among Sea Island Company and International Business Machines Corporation dated December 28, 2005. | $0.00 |
| Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated January 10, 2006. | $0.00 |
| Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001. | $0.00 |
| Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001. | $0.00 |

| | |
|---|---|
| Agreements entered into in the ordinary course of business with certain unaffiliated Persons for the short-term leasing of resort and event space. | $0.00 |
| Commercial lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009. | $0.00 |

## **EXHIBIT C**

## **Asset Purchase Agreement**