THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE COURT'S APPROVAL OF THE DISCLOSURE STATEMENT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| Debtors. | ) | |
| | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO THE
## JOINT CHAPTER 11 PLAN DATED AS OF AUGUST 10, 2010

**KING & SPALDING LLP**
Sarah R. Borders (admitted *pro hac vice*)
Harris Winsberg (admitted *pro hac vice*)
Sarah L. Taub (admitted *pro hac vice*)
Jeffrey R. Dutson (admitted *pro hac vice*)
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5128

Dated:  August 10, 2010

**GILBERT, HARRELL, SUMERFORD & MARTIN, P.C.**
M.F. Martin, III
Robert M. Cunningham
777 Gloucester Street, Suite 200
P.O. Box 190
Brunswick, Georgia 31521-0190
Telephone:     (912) 265-6700
Facsimile:     (912) 264-3917

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN DATED AUGUST 10, 2010, FILED BY SEA ISLAND COMPANY; SEA ISLAND COASTAL PROPERTIES LLC; SEA ISLAND SERVICES, INC.; SEA ISLAND APPAREL, LLC; SEA ISLAND RESORT RESIDENCES, LLC; FIRST SEA ISLAND, LLC; AND SICAL, LLC, DEBTORS AND DEBTORS IN POSSESSION (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN").  THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THE PLAN SUPPLEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.   THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY

INTERESTS IN ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

[*Remainder of Page Intentionally Left Blank.*]

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1
II.     OVERVIEW OF THE PLAN ............................................................................... 7
        A.      General Structure of the Plan ................................................................. 7
        B.      Summary of Treatment of Claims and Interests under the Plan ............................ 8
III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ................................... 15
        A.      Notice to Holders of Claims and Interests ............................................ 15
        B.      Voting Rights ........................................................................................ 15
        C.      Solicitation Materials ........................................................................... 16
        D.      Voting Procedures, Ballots and Voting Deadline ................................. 17
        E.      Confirmation Hearing and Deadline for Objections to Confirmation ................. 18
IV.     GENERAL INFORMATION CONCERNING THE DEBTORS ................................... 19
        A.      Overview of Business Operations .......................................................... 19
        B.      History of Sea Island ............................................................................ 19
        C.      Events Leading to Commencement of Chapter 11 Cases ..................................... 20
        D.      Description of the Debtors' Business Operations ................................... 21
        E.      Pre-Confirmation Capital Structure of the Debtors ............................. 22
        F.      Pre-Petition Management and Employees ............................................. 24
        G.      Summary of Assets ............................................................................... 27
        H.      Historical Financial Information .......................................................... 27
        I.      Events Leading to Commencement of the Chapter 11 Cases ............................. 27
V.      THE CHAPTER 11 CASES ............................................................................... 30
        A.      Continuation of Business; Stay of Litigation ....................................... 30
        B.      First Day Motions ................................................................................ 30
        C.      Retention of Professionals ................................................................... 31
        D.      Authorization to Use Cash Collateral of Existing Lenders .................... 31
        E.      Postpetition DIP Financing .................................................................. 32
        F.      Sale and Bid Procedures ...................................................................... 32
VI.     SUMMARY OF THE PLAN .............................................................................. 33
        A.      Overall Structure of the Plan ............................................................... 33
        B.      Substantive Consolidation ................................................................... 34
        C.      Classification and Treatment of Claims and Interests ........................... 34
        D.      Reservation of Rights Regarding Claims .............................................. 39
        E.      Allowed Claims, Distribution Rights and Objections to Claims ................. 39
        F.      Disposition of Executory Contracts and Unexpired Leases .................... 41
        G.      Post-Consummation Corporate Structure, Management and Operation .............. 43
        H.      Confirmation and/or Consummation .................................................... 44

i

|       | I.   | Releases, Injunctions, Exculpation and Indemnification | 46 |
|       | J.   | Preservation of Rights of Action | 49 |
|       | K.   | Retention of Jurisdiction | 49 |
|       | L.   | Amendment, Alteration and Revocation of Plan | 52 |
|       | M.   | Plan Implementation Documents | 52 |
| VII.  |      | CERTAIN RISK FACTORS TO BE CONSIDERED | 53 |
|       | A.   | General Considerations | 53 |
|       | B.   | Certain Bankruptcy Considerations | 53 |
|       | C.   | Claims Estimations | 53 |
|       | D.   | Conditions Precedent to Consummation | 54 |
|       | E.   | Certain Tax Considerations | 54 |
| VIII. |      | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | 54 |
| IX.   |      | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 54 |
|       | A.   | Federal Income Tax Consequences to the Debtors | 55 |
|       | B.   | Federal Income Tax Consequences to Claim Holders | 56 |
|       | C.   | Other Tax Matters | 57 |
| X.    |      | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | 57 |
|       | A.   | Feasibility of the Plan | 57 |
|       | B.   | Acceptance of the Plan | 58 |
|       | C.   | Best Interests Test | 58 |
|       | D.   | Liquidation Analysis | 59 |
|       | E.   | Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation | 60 |
|       | F.   | Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative | 60 |
| XI.   |      | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 60 |
|       | A.   | Alternative Plan(s) of Liquidation | 61 |
|       | B.   | Liquidation Under Chapter 7 | 61 |
| XII.  |      | THE SOLICITATION; VOTING PROCEDURES | 61 |
|       | A.   | Parties in Interest Entitled to Vote | 61 |
|       | B.   | Classes Entitled to Vote to Accept or Reject the Plan | 62 |
|       | C.   | Solicitation Order | 62 |
|       | D.   | Waivers of Defects, Irregularities, Etc. | 62 |
|       | E.   | Withdrawal of Ballots; Revocation | 63 |
|       | F.   | Voting Rights of Disputed Claimants | 63 |
|       | G.   | Further Information; Additional Copies | 64 |
| XIII. |      | RECOMMENDATION AND CONCLUSION | 64 |

## I.    INTRODUCTION

The debtors and debtors-in-possession in the above-referenced chapter 11 cases (these "Chapter 11 Cases") are the following related companies (collectively, the "Debtors" or the "Company"):

Sea Island Company
Sea Island Coastal Properties LLC
Sea Island Services, Inc.
Sea Island Apparel, LLC
Sea Island Resort Residences, LLC
First Sea Island, LLC
SICAL, LLC

The Debtors submit this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the Joint Chapter 11 Plan Dated as of August 10, 2010 (as may be amended, the "Plan"). A copy of the Plan is attached hereto as Appendix A. Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

In this case, the Plan is premised on a sale of substantially all of the Debtors' assets, free and clear of all liens and encumbrances, with the proceeds being used to pay Administrative Claims, DIP Facility Claims, Priority Claims, Secured Claims, and Unsecured Claims in the manner outlined in the Plan. To ensure the Debtors sell the Assets at the highest and best price, an auction shall be held and all qualified purchasers shall have the opportunity to bid at the auction. For any successful bidder to be chosen as the highest or otherwise best bid, in addition to other requirements, that bidder must provide a bid that pays the claims that are required to be paid to confirm a chapter 11 plan. If any potential bidder provides a bid that fails to provide sufficient proceeds to fund a confirmable chapter 11 plan, such bid will not be chosen as the highest or otherwise best bid.

The Debtors have received offers from several reputable potential purchasers and have signed that certain Asset Purchase Agreement (the "Stalking Horse Agreement") with Sea Island Acquisition LP (the "Stalking Horse Bidder" or "Purchaser"), a limited partnership formed by certain investment funds managed by the global investment firms Oaktree Capital Management, L.P. and Avenue Capital Group, who will serve as the "stalking horse" bidder. The Stalking Horse Agreement with the Stalking Horse Bidder will serve as the template for the sale of the Debtors' assets at auction. A copy of the Stalking Horse Agreement is attached hereto as Appendix D. The Debtors presently cannot inform creditors whether another bidder will be chosen as the successful bidder at auction or whether any bids (other than the Stalking Horse Bid) will comply with the Sale and Bid Procedures. The Stalking Horse Agreement does, however, provide a floor that any successful bidder must exceed in order to acquire the assets. Creditors must realize, however, that to receive any distributions from either an auction or stalking horse sale, the Plan must be approved and confirmed.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and liquidation under Chapter 11 and significant events that have occurred during the Chapter 11 Cases.  This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

By order entered on or about [_____, 2010], the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, the Plan Supplement and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are entitled to vote on such plan.  In the Debtors' cases, only Claims in Classes 2, 4, 5 and 6 are both Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  Claims in Classes 1 and 3 are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan.  Holders of Interests in Class 7, which receive nothing under the Plan, are deemed to have rejected the Plan and the Holders of Interests in Class 7 are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN" AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE

PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THE DEBTORS BELIEVE THAT THE PLAN WILL ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## ANSWERS TO CERTAIN QUESTIONS
## ABOUT THE PLAN AND DISCLOSURE STATEMENT

*The information presented in the answers to the questions set forth below is qualified in its entirety by reference to the full text of this Disclosure Statement, including the Plan.* All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, prior to submitting a Ballot to accept or reject the Plan.

### What is this document and why am I receiving it?

On August 10, 2010, each Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their properties and

are managing their businesses as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In connection with the proposed sale of the Debtors' assets in accordance with chapter 11, the Debtors have prepared the Plan, which sets forth in detail the proposed treatment of the Claims of the Debtors' creditors and Interests of the Debtors' equity interest holders. This Disclosure Statement describes the terms of, and certain other material information relating to, the Plan.

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, either a Claim or Claims against the Debtors. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

***Am I eligible to vote to accept or reject the Plan?***

You are entitled to vote to accept or reject the Plan only if you hold an Allowed Claim (or a Claim that has been temporarily allowed for voting purposes) in one or more of the following Classes:

- Class 2 - Secured Lender Claims

- Class 4 - Accepting Unsecured Claims

- Class 5 - Other General Unsecured Claims

- Class 6 - Convenience Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims are not eligible to vote with respect to the Plan as a holder of such Claim. If you hold an Allowed Claim in Class 1 (Miscellaneous Secured Claims) or Class 3 (Other Priority Claims), your claim is Unimpaired and you are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. If you hold a Class 7 Interest, you will not receive or retain any Property under the Plan on account of such Interest and you are conclusively deemed to have rejected the Plan.

***Why should I vote to accept the Plan?***

Simply put, from a creditor's perspective, the Debtors believe that the Plan provides the best means for achieving the maximum distribution on account of your prepetition claim. The Plan is the product of months of difficult negotiations, and is believed to have the support of the major constituencies who have had the financial resources to investigate and pursue alternative courses for achieving a distribution on account of the prepetition claims. It is believed that a failure to achieve confirmation of the Plan will result in a piecemeal liquidation of the Assets, with little or no prospects for distributions to unsecured creditors.

From a Club Members' perspective, confirmation of the Plan will maintain continuity of your use of the club amenities and preservation of the resort. The failure to achieve confirmation of the Plan could result in the closure of the Debtors' club facilities and your loss of access to those amenities.

4

*How do I vote to accept or reject the Plan?*

If you are entitled to vote on the Plan because you are the holder of a Claim in Class 2, Class 4, Class 5 or Class 6 that is Allowed or has been temporarily allowed for voting purposes, as the case may be, you must complete, sign and return your Ballot or Ballots in accordance with the ballot instructions to be provided.

*What if I'm entitled to vote to accept or reject the Plan and don't?*

In general, within any particular class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will affect whether the Plan is accepted by the requisite holders of Claims in such Class. The holders representing at least two-thirds in dollar amount and a majority in number of the Claims in such Class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such Claims who actually vote to accept or to reject the Plan must vote to accept the Plan.

*What happens if the Plan is not accepted by each Class entitled to vote on the Plan?*

If the holders of each Class of Claims entitled to vote on the Plan (*i.e.*, Class 2, Class 4, Class 5 and Class 6) vote to reject the Plan, the Plan will not be confirmed or consummated in its present form. Conversely, as long as the requisite holders of Claims in one of the above enumerated classes vote to accept the Plan, the Debtors may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code (which will require a determination by the Bankruptcy Court that that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtors believe that the Plan satisfies the "cramdown" provisions of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to the extent that Confirmation thereunder requires modification.

*As a current or former Club Member, what will I receive on account of my Claim if the Plan is confirmed and becomes effective?*

If the Plan is approved, each Club Member shall be entitled to elect to have its Claims against the Debtors arising under the Club Member Agreement treated pursuant to the terms of Section 11 of the Stalking Horse Agreement in full satisfaction of such Claims. Specifically, these Club Members, including inactive Club Members who have terminated their membership and are waiting for return of their deposit, will have the opportunity to join the new Ocean Forest and Sea Island clubs and execute agreements on the terms and conditions of new membership programs, which shall set forth and govern the rights of club members post-Closing (the "New Membership Programs"). The New Membership Programs will be generally consistent with the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program, as applicable, with certain modifications, including, but not limited to, those specified in Schedule 11.1(b) of the Stalking Horse Agreement. Purchaser will credit to new member accounts of Club Members who execute agreements under the New Membership Programs ("Electing Club Members") an amount equal to their respective existing membership deposits that had been paid in cash. Purchaser will refund member deposits of Electing Club Members as set forth on Schedule 11.1(b) of the Stalking Horse Agreement in paragraphs 1, 3 and 4 under the heading

5

"Sea Island Club" and paragraphs 1, 2, 3 and 4 under the heading "Ocean Forest Golf Club", as applicable.

In the event a Club Member does not elect in writing to have his or her Claim treated as provided by Section 11 of the Stalking Horse Agreement, all Claims under the applicable Club Member Agreement, including any Rejection Claim shall be treated as either Class 4, Class 5 or Class 6 Claims in accordance with Article III of the Plan.

***What will I receive if my Claim is Disputed?***

No distributions will be made on account of any Claim that is a Disputed Claim unless and until that Claim becomes an Allowed Claim in accordance with the procedures for resolving Disputed Claims set forth in the Plan.

***When will the Plan be confirmed?***

After the Bankruptcy Court has approved the form and adequacy of information in this Disclosure Statement, the Bankruptcy Court will schedule and conduct a hearing concerning Confirmation of the Plan. Typically, the Plan confirmation hearing is scheduled about a month after the Disclosure Statement hearing. The Plan confirmation hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to Confirmation have been met. In addition, the conditions to Confirmation set forth in the Plan must be satisfied or waived in accordance with the Plan before the Plan can be confirmed. Thus, while the Debtors expect the Plan to be confirmed perhaps as early as November 2010, there is no way to predict with any certainty when, if ever, Confirmation will actually occur.

***When will the Plan be effective?***

Even if the Plan is confirmed in November 2010, there are a number of additional conditions that must be satisfied or waived before the Plan can become effective. The Effective Date will not occur until after the Plan has been confirmed and when the sale of the Debtors' assets as contemplated by the Plan shall have occurred. No assurance can be given as to if or when the Effective Date will actually occur.

***What happens if the Plan isn't confirmed or doesn't become effective?***

The Debtors expect that all of the conditions to Confirmation and effectiveness of the Plan will be satisfied (or waived in accordance with the Plan). There is no guaranty, however, that the Plan will become effective. Although the Debtors intend to take all acts reasonably necessary to satisfy the conditions to the Confirmation and effectiveness of the Plan that are within the Debtors' control, if, for any reason, the Plan is not confirmed or does not become effective, the Debtors may be forced to propose an alternative plan or plans of reorganization under Chapter 11 of the Bankruptcy Code. If no plan of reorganization or liquidation can be confirmed, the Debtors may have to convert to a liquidation case under chapter 7 of the Bankruptcy Code.

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors.  The Plan designates six Classes of Claims and one Class of Interests.  These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

### A.    General Structure of the Plan

The Plan is structured as a joint plan and provides for the sale of substantially all of the Debtors' assets through a Court-approved auction process.  The Debtors will pursue all reasonably available actions to maximize distributions under the Plan to Holders of Claims and Interests.

On August 4, 2010, the Debtors executed the Stalking Horse Agreement with the Stalking Horse Bidder for the sale (the "Plan Sale") of substantially all of the Debtors' assets pursuant to the Plan.  Under the Stalking Horse Agreement, the Stalking Horse will pay to the Debtors' estates a cash purchase price of $197,500,000 (less certain purchase price adjustments) and assume certain liabilities of the Debtors.  The Debtors anticipate that the Stalking Horse Agreement will yield gross proceeds to the estates in the amount of over $172,000,000 after payment of approximately $20,000,000 in Administrative Claims (including accrued professional fees), DIP Facility Claims, Priority Tax Claims and Other Priority Claims.  The Debtors further anticipate that they will have approximately $0 of cash on hand as of the closing.  The purchase proceeds plus cash on hand will be used to make a distribution to Holders of secured claims against the Debtors of approximately $170,000,000.  The Plan also provides for a distribution to the holders of unsecured prepetition claims of their Pro Rata share of the General Unsecured Creditors Fund.  The Plan also provides for a distribution to the holders of Accepting Unsecured Claims of their Pro Rata share of the Accepting Unsecured Creditors Fund, provided that (a) Classes 5 and 6 vote to accept the Plan and (b) an allocation of proceeds from the Sale under the Stalking Horse Agreement between encumbered and unencumbered property that is acceptable to the Secured Lenders.

The Debtors believe that the value they will realize from the Stalking Horse Agreement constitutes fair market value for their assets and will support a confirmable Plan that will maximize value to their various creditor constituencies and bring a successful conclusion to these Chapter 11 Cases.  On that basis the Debtors are prepared to proceed with the sale of their business and assets under the terms of the Stalking Horse Agreement and the Plan, subject to higher or better bids in accordance with bid procedures to be established by this Court.

The Debtors have estimated the ultimate distributions that will be made in respect of Allowed Claims and Interests.  As explained more fully in Section VII entitled "Certain Risk Factors to Be Considered," because of inherent uncertainties, many of which are beyond the

Debtors' control, there can be no guaranty that actual performance will meet the Debtors' estimates. The Debtors nonetheless believe that if the Plan is not consummated, it is likely that Holders of Claims against and Interests in the Debtors' estates will receive less than they would if the Plan is confirmed because liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code will not result in a higher distribution to any Class of Claims or Interests.

**B.    Summary of Treatment of Claims and Interests under the Plan**

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, estimated percentage recoveries also are set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including (where not Allowed by the Plan) the amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes 2, 4, 5 and 6 will actually be realized by the Holders of Allowed Claims in such Classes.

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately [$_____] | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Secured Lenders pursuant to the Cash |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
|  | Collateral Order; provided, however, that the term Administrative Claim does not include any Assumed Liabilities under the Stalking Horse Agreement. |
|  | Under the Plan, Administrative Claims are Unimpaired.  Unless otherwise provided for therein, and subject to (x) the bar date provisions set forth in Section 3.03(c) of the Plan and (y) additional requirements for Professionals and certain other entities set forth below, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and extinguishment of such Claim:  (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, (iii) a date agreed to in writing by the Debtors and the Holder of such Administrative Claim, and (iv) the date on which the Administrative Claim becomes due in accordance with its terms; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or as the Bankruptcy Court may order.  Ordinary Course Trade Claims that, but for the proviso to the definition of Administrative Claims, would constitute Administrative Claims shall be assumed by the Purchaser. |
|  | All U.S. Trustee's Fee Claims, as determined, if necessary, by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date by the Debtors. |
|  | Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan. |
|  | Estimated Percentage Recovery: 100% |
| **Unclassified — DIP Facility Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately [$_____] | A DIP Facility Claim is any Secured Claim arising under or pursuant to the DIP Credit Documents. |
|  | Under the Plan, except to the extent that Holders of the DIP Facility Claims agree to different treatment, the DIP Facility Claims shall be repaid by the Debtors in full, in Cash, on the Effective Date in full and final satisfaction, settlement and release of such DIP Facility Claims. |
|  | DIP Facility Claims are not classified and are treated as required by the Bankruptcy Code.  The Holders |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
|  | of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Unclassified — Priority Tax Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately  [$_____] | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8).  The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A), (b) property taxes meeting the requirements of section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C), (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G).<br><br>Under the Plan, Priority Tax Claims are Unimpaired.  Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, in full satisfaction, settlement, release, and extinguishment of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or as the Bankruptcy Court may order.  Prior to the Effective Date, the Debtors shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code.  The Holders of such |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 1 — Miscellaneous Secured Claims**<br><br>Estimated Aggregate Allowed Amount: [$_____] | Class 1 consists of the Miscellaneous Secured Claims, which are any Secured Claims other than the Secured Lender Claims, including without limitation, any Secured Claim arising from a Tax.<br><br>Under the Plan, Class 1 Miscellaneous Secured Claims are Unimpaired.  The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Allowed Miscellaneous Secured Claims.  Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 1 Miscellaneous Secured Claim; (b) Reinstatement of such Allowed Miscellaneous Secured Claim; (c) the Property securing such Miscellaneous Secured Claim without representation or warranty by or recourse against the Debtors; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors.<br><br>Estimated Percentage Recovery: 100% |
| **Class 2 — Secured Lender Claims**<br><br>Estimated Aggregate Allowed Amount: [$_____] | Class 2 consists of Secured Lender Claims against each Debtor, which are the claims of the Secured Lenders arising under the Secured Lender Credit Facilities but only to the extent that such Claims are Secured Claims.<br><br>Under the Plan, Class 2 Secured Lender Claims are Impaired.  On the Effective Date, each Holder of an Allowed Class 2 Secured Lender Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, and as a condition precedent thereto, its share of an amount equal to (i) the portion of the Purchase Price under the Stalking Horse Agreement allocated to the collateral in which the Secured Lender has a Lien, _less_ (ii) certain amounts required to be paid by the Debtors under the Stalking Horse Agreement (including but not limited to Cure Amounts), _less_ (iii) provided that (a) Classes 5 and 6 vote to accept the Plan and (b) an allocation of proceeds |

11

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | from the Sale under the Stalking Horse Agreement between encumbered and unencumbered property by the Debtors that is acceptable to the Secured Lenders, the Accepting Unsecured Creditor Fund, <u>less</u> (iv) an amount necessary to pay Administrative Claims, the DIP Facility Claims, the Priority Tax Claims, Other Priority Claims, and Miscellaneous Secured Claims, to be distributed in accordance with the Prepetition Restructuring Agreement.<br><br>Estimated Percentage Recovery: [___%] |
| **Class 3 -- Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately [$_____] | Class 3 consists of Other Priority Claims, which are any Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claims or Administrative Claims.<br><br>Under the Plan, Class 3 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class 3 Other Priority Claim shall receive, in the sole discretion of the Debtors, in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Other Priority Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Priority Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 3 Other Priority Claim; (b) or such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors.<br><br>The Holders of such Other Priority Claims are Unimpaired and not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Class 4 — Accepting Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: [$_____] | Class 4 consists of Accepting Unsecured Claims, which are claims held by General Unsecured Claims and Convenience Claims held by Holders that voted to accept the Plan.<br><br>Under the Plan, Class 4 Accepting Unsecured Claims are Impaired. Each Holder of an Allowed Class 4 Accepting Unsecured Claim shall receive its Pro Rata share of the Accepting Unsecured Creditors Fund (provided that (a) Classes 5 and 6 vote to accept the Plan and (b) an allocation of proceeds from the Sale under the Stalking Horse Agreement between encumbered and unencumbered property that is acceptable to the Secured Lenders, the Accepting Unsecured Creditor Fund) on or as soon as practicable after the later of (i) the Effective Date, (ii) the |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | date that such Accepting Unsecured Claim becomes Allowed, and (iii) a date agreed to by the Liquidation Trustee and the Holder of such Class 4 Accepting Unsecured Claim.   To the extent that the Allowed Accepting Unsecured Claims are not satisfied through the distribution of the Accepting Unsecured Creditors Fund, the remaining portion of such Allowed Accepting Unsecured Claims shall be treated as Other General Unsecured Claims entitled to the treatment set forth in Section 3.10 of the Plan.<br><br>Estimated Percentage Recovery: [___%] if the holders of all General Unsecured Claims accept the Plan |
| **Class 5 — Other General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: [$_____] | Class 5 consists of Other General Unsecured Claims, which are General Unsecured Claims that voted to reject the Plan or were deemed to have rejected the Plan, <u>plus</u> (i) the Secured Lender Deficiency Claims and (ii) the remaining portion of Accepting Unsecured Claims that were not fully satisfied by the Accepting Unsecured Creditors Fund.<br><br>Under the Plan, Class 5 Other General Unsecured Claims are Impaired.  On either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Other General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 5 Other General Unsecured Claim shall receive its Pro Rata Distribution of the General Unsecured Creditors Fund.  On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee shall continue to make Pro Rata Distributions to Holders of Allowed Class 5 Other General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation Date.<br><br>Estimated Percentage Recovery: [___%] |
| **Class 6 — Convenience Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately  [$_____] | Class 6 consists of Convenience Claims, which are Allowed General Unsecured Claims within the Convenience Class Cap.<br><br>Under the Plan, Class 6 Convenience Claims are Impaired.  On either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 6 Convenience Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount equal to an agreed upon percentage of such Allowed Claim from the General Unsecured Claims Fund.  Any Holder of an Allowed General Unsecured Claim in excess of the Convenience Class Cap may elect to reduce its Claim to the Convenience Class Cap.<br><br>Estimated Percentage Recovery: [___%] |
| **Class 7 — Interests in the Debtors** | Class 7 consists of Interests in the Debtors.  Such Interests include, but are not limited to, any and all equity interests, ownership interests or shares in the Debtors issued by the Debtors prior to the Petition Date (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, membership and other interests in a corporation or limited liability company, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim or Cause of Action related to or arising from any of the foregoing.<br><br>Under the Plan, Class 7 Interests are Impaired. Holders of Class 7 Interests in the Debtors shall not receive or retain any property under the Plan on account of such Interests. On the Effective Date, all Interests shall be cancelled.<br><br>Estimated Percentage Recovery: 0% |

14

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

### III.        PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.        Notice to Holders of Claims and Interests**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.  No such information will be relied upon in making a determination to vote to accept or reject the Plan.

**B.        Voting Rights**

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan.  In these Chapter 11 Cases, under the Plan, only Holders of Claims in Classes 2, 4, 5 and 6 are entitled to vote on the Plan.  Claims and Interests in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are Holders as of the Voting Record Date, which Voting Record Date is September 14, 2010.

## C.   Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent Epiq Bankruptcy Solutions (the "Voting Agent"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail:**

SEA ISLAND COMPANY BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
F.D.R. STATION
P.O. BOX 5014
NEW YORK, NY 10150-5014

**If by overnight courier or hand delivery:**

SEA ISLAND COMPANY, VOTING DEPARTMENT
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017

**If by telephone:**

EPIQ BANKRUPTCY SOLUTIONS, LLC
(646) 282-2400

**D.      Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot.  You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [_____ __,] 2010, AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

**If by regular mail:**

SEA ISLAND COMPANY, VOTING DEPARTMENT
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
F.D.R. STATION
P.O. BOX 5014
NEW YORK, NY 10150-5014

**If by overnight courier or hand delivery:**

SEA ISLAND COMPANY, VOTING DEPARTMENT
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017

UNLESS    OTHERWISE    PROVIDED    IN    THE    INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID.  DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge on the Sea Island Company, et al. case website: http://dm.epiq11.com/seaisland.  If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail:**

SEA ISLAND COMPANY, VOTING DEPARTMENT
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
F.D.R. STATION
P.O. BOX 5012
NEW YORK, NY 10017

**If by overnight courier or hand delivery:**

SEA ISLAND COMPANY, VOTING DEPARTMENT
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017

**If by telephone:**

EPIQ BANKRUPTCY SOLUTIONS, LLC
(646) 282-2400

For further information and general instruction on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.    Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for [_____ \_\_, **2010**], at [_____] (prevailing Eastern time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.  Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Southern District of Georgia, 801 Gloucester Street, Brunswick, Georgia 31520, www.gasb.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before 5:00 p.m. (**prevailing Eastern time**) on [_____ \_\_, **2010**].  Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV.    GENERAL INFORMATION CONCERNING THE DEBTORS

**A.    Overview of Business Operations**

      The Debtors are currently engaged in operating a collection of hotel resorts, golf courses, spa and recreational complexes, together with certain related developed and undeveloped real estate held by the Debtors in connection with their real estate development business, all of which are located in or around St. Simons Island and Sea Island, Georgia. In connection with these operations, the Debtors maintain two "membership programs" commonly referred to as the Sea Island Club and the Ocean Forest Golf Club.

**B.    History of Sea Island**

      Sea Island was relatively uninhabited until 1924, when the causeway from Brunswick to St. Simons Island was completed. A group of area businessmen attempted to capitalize on the potential resort capabilities of Sea Island; but by 1926 they were seeking a buyer. Their search ended with wealthy visionary and automobile pioneer Howard Coffin, inventor of the Hudson motor car. Coffin had long shown interest in the Georgia coast and had previously bought Sapelo Island to the north. He added large tracts of land on St. Simons to his holdings, including Retreat Plantation, an antebellum cotton plantation, and what is now Sea Island. His company, Sea Island Investments, Inc., was later named Sea Island Company.

      The Cloister Hotel opened in 1928 with just 46 rooms. Known as a "friendly little hotel," The Cloister was the focal point of the Company's interests. After surviving the Great Depression under A.W. Jones, Sr.'s leadership, Sea Island Company began to prosper, and over time the hotel grew with additional buildings spread among the historic oaks and along the Atlantic.

      On St. Simons, Coffin turned Retreat Plantation into the Sea Island Golf Club, with British Open champion Walter Travis designing the first 9-hole golf course. Today, Sea Island Golf Club includes three spectacular 18-hole courses—Seaside, Plantation and Retreat—ranked among the world's finest. In addition, the Ocean Forest Golf Club boasts one of the most prestigious courses in America. The Golf Learning Center offers state-of-the-art facilities and highly individualized instruction from top professionals, including four of the nation's top 50 instructors.

      Shortly after the first guests played golf at Sea Island Golf Club, then-President of the United States Calvin Coolidge began a continuing tradition at Sea Island. On December 28, 1928, he planted the first historic oak on the grounds of The Cloister. He has been followed by other Presidents and dignitaries, including President George W. Bush and British Prime Minister Tony Blair, both of whom planted oaks during the G8 Summit, held at Sea Island in 2004.

      In 1998, the Debtors embarked on a multi-year Resort Master Plan which resulted in the transformation of the resort. From 1998 to 2001, three of the Debtors' golf courses were fully redesigned. In 2001, the newly-constructed, 40-room Lodge opened to visitors. With the Lodge construction complete, the Debtors began renovations that culminated in the 2006 and 2007 openings of the Cloister, Beach Club and Spa and the development of the Frederica Golf

Club and Residential Development.  The Debtors' plan for expansion and renovation was intended to establish Sea Island as a marquee brand so as to provide a foundation for sustainable growth.

**C.      Events Leading to Commencement of Chapter 11 Cases**

The Debtors used long-term debt financing and their cash flows from operation, primarily real estate sales, to fund their expansion and renovation plan.  With a view to a profitable future led by their new luxury real estate resort assets and sustained retail real estate sales activity, the Debtors believed that they would have sufficient resources to timely repay their obligations.  Their view was bolstered by the fact that the Debtors owned tens of thousands of acres of undeveloped land in Glynn and Camden counties that had been in constant demand by third party developers.

The Debtors expansion proved to be more costly than budgeted and the newly completed resort did not generate the operating profits that had been projected.  Beginning in 2008, the Debtors took aggressive steps to address the operating losses by rationalizing their cost structure, streamlining their resort and support operations and terminating certain operating executives.

However, because the Debtors' business model was predicated on the ongoing development and sale of residential real estate in and around their resort communities, the historic collapse of the global financial and real estate markets had a dramatic negative impact on both the Debtors' resort and real estate sales businesses.  Falling home prices and the severely restricted availability of real estate financing left the Debtors with little ability to continue to sell residential real estate.  As a result, the Debtors were left without sufficient liquidity to fund their operations or to repay the indebtedness they had borrowed to finance their development and expansion plan.

The Debtors sought to restructure their operations and obligations.  In July 2009, the Debtors reached an agreement with three of their principal lenders led by Synovus Bank to restructure the obligations owed to those lenders that had matured in January 2009.  In November 2009, the Debtors reached an agreement with Wachovia Bank, N.A. to convey the Debtors' Frederica development to Wachovia Bank, N.A. in satisfaction of the obligations owed to it.  Despite the Debtors' significant efforts, the financial and real estate markets did not recover sufficiently to permit the Debtors to comply with their restructured obligations owed to Synovus Bank.

As a result, in late 2009, the Debtors, after reviewing all of their strategic alternatives, determined that a sale of their assets would result in the best recovery for all of their stakeholders.  The Debtors retained Goldman, Sachs & Co. ("Goldman Sachs") as their investment banker to market their assets.  After a robust sales process in which more than 75 potential purchasers participated, the Debtors negotiated and executed an agreement with the Stalking Horse Bidder. These Chapter 11 Cases were filed to consummate that sale.

**D.      Description of the Debtors' Business Operations**

Since their inception, the Debtors have pursued development in a manner that preserved the environmental character and history of their coastal Georgia home.  Currently, the Debtors own and operate a collection of resort, golf, spa and related real estate assets on St. Simons Island and Sea Island, Georgia.  Among these assets, the Cloister and the Lodge are famous for classic architecture, interior design, sculpted landscape, quality service and outstanding amenities.  In addition, the Debtors own and operate two member clubs, Ocean Forest Golf Club and Sea Island Club with memberships of approximately 530 and 2900 respectively.  Finally, the Debtors own a portfolio of real estate assets ranging from undeveloped land parcels to fully-developed beachfront residences.

*1.  The Cloister*

The Cloister is a full service, luxury hotel located on the primary corridor through Sea Island, Georgia.  The hotel consists of rooms and suites, located in the main building and adjacent wings and within the nearby Beach Club and Ocean Villas Rooms and Suites.  The Cloister also contains three restaurants, two lounges, several public spaces, a solarium, a library and retail shops.  The conference center at the Cloister adjoins the west side of the building and contains eight meeting rooms totaling approximately 13,000 square feet and approximately 3,800 square feet of pre-function space.  In addition to the hotel, guests have the opportunity to stay at the beachfront Beach Club Rooms and Suites (sixty-five units) or the Ocean Villas Rooms and Suites (forty units).

Guests have access to a variety of amenities and activities, including a full service spa and fitness center, a beach club, tennis courts, horseback riding, shooting school, beach volleyball, bike rentals, retail shops, a business center and extensive children's programs.

The Cloister Spa and Fitness Center totals approximately 65,000 square feet and contains 23 treatment rooms, a 3,000 square foot weight and cardio studio, two multi-purpose exercise studios and a yoga studio, a full service beauty salon, a water atrium, an indoor four-lane lap pool, a co-ed fitness whirlpool, three squash courts, and full locker rooms equipped with showers, steam room, sauna and massage rooms.

*2.  The Beach Club*

The Sea Island Beach Club includes three outdoor swimming pools, poolside cabanas, Big George's casual restaurant and lounge, a snack bar, a poolside bar, some retail stores, a 100-seat movie theatre, extensive patios and lawn areas for sunning and an expanded children's area.  It also includes facilities with 650 feet of beach frontage, which provide a venue for water sports.

*3.  The Lodge*

The Lodge is a full service golf resort located at the end of the Avenue of the Oaks in St. Simons Island, Georgia.  The resort, which opened in 2001, was constructed as part of the redevelopment of the Seaside, Plantation and Retreat Golf Courses.  The Lodge serves as both a hotel and golf clubhouse.  In addition to thirty-eight guest rooms and two suites, the

21

Lodge contains two restaurants, two meeting rooms and one pre-function room totaling approximately 2,000 square feet, a business center, and concierge, butler, valet and room service.

### 4. Sea Island's Three Award-Winning Golf Courses

Apart from the Ocean Forest Golf Course (discussed below), golf at Sea Island consists of 54 holes that have been constructed in consultation with renowned golf architects. The Seaside Golf Course was redesigned in 1999 by Tom Fazio in the tradition of legendary Scottish links. The Plantation Golf Course was formed in 1998 by Rees Jones. Finally, the Retreat Golf Course was designed in 2000 and 2001 by Davis Love III and his brother, Mark Love.

### 5. Cottage Rentals/Property and POA Management

Approximately 175 of the more than 600 homes and condominiums on Sea Island are available for rent through Sea Island Cottage Rentals. The cottages range from intimate two-bedroom bungalows to spacious eight-bedroom homes.

### 6. Ocean Forest

The Debtors own and operate the 150-acre Ocean Forest development, which began construction in 1995 and consists of: (1) the Ocean Forest Golf Course, a private club facility located within the community of Sea Island, (2) a clubhouse, 3 maintenance buildings and a guest house (8 suites including a two-bedroom suite), all totaling approximately 35,000 square feet, and (3) several currently unsold residential parcels.

### 7. Landscape Retail

The Debtors operate a landscaping business, which provides landscaping supplies and services to residential and commercial clients on Sea Island and St. Simons Island. Services include landscape design, hardscaping services (masonry, woodworking, stonework, tile installation and construction of decks and patios) and other traditional landscaping services.

### 8. Other Real Estate

The Debtors own a number of assets, including land, residential property and special use facilities located in various areas throughout Sea Island and St. Simons Island.

## E.    Pre-Confirmation Capital Structure of the Debtors

### 1.    Corporate Structure

Sea Island Company, a Georgia corporation, is the sole owner of one hundred percent of the equity interest in Sea Island Services Inc., a Georgia corporation; Sea Island Apparel, LLC, a Georgia limited liability company; Sea Island Resort Residences, LLC, a Georgia limited liability company; First Sea Island, LLC, a Georgia limited liability company; and SICAL, LLC, a Georgia limited liability company. Sea Island Company owns 26.5% of the

equity interest in Sea Island Coastal Properties, LLC ("SICP").  The balance of SICP is owned by the same shareholders that own Sea Island Company, in the same ownership percentage.

>    2.    *Prepetition Secured Debt*

Sea Island Company, SICP and Synovus Bank, formerly known as Columbus Bank & Trust ("Synovus") are parties to (a) 2003 Bond Credit Agreement, and (b) 2001 Bond Credit Agreement (collectively with the 2004 Bond Credit Agreement, the "Bond Credit Agreements"), pursuant to which, inter alia, Synovus agreed to issue letters of credit (the "Bond Letters of Credit") for the benefit of Sea Island Company and SICP.  In connection with the issuance of the Bond Letters of Credit, Sea Island Company and SICP issued certain variable rate notes (the "Bonds") and agreed to reimburse Synovus for any drawings under the Bond Letters of Credit.

On June 6, 2007, Sea Island Company and SICP, as borrowers (together, the "Borrowers"), Synovus and the Secured Lenders, entered into that certain Loan and Line of Credit Agreement (the "2007 Credit Agreement"), pursuant to which, inter alia, the Secured Lenders agreed to (a) make a $100,000,000 term loan (the "2007 Term Loan"), (b) continue a $96,000,000 term loan (the "2006 Term Loan"), and (c) increase an existing line of credit from $200,000,000 to $235,000,000 (the "Revolver"; collectively with the 2007 Term Loan and the 2006 Term Loan, the "2007 Bank Group Loans").

In connection with entry into the 2007 Credit Agreement, (a) the Borrowers and Synovus entered into that certain Amended and Restated Agreement (Pari Passu) dated June 6, 2007, and (b) Synovus and the Secured Lenders entered into that certain Third Amended and Restated Agency Agreement dated June 6, 2007, pursuant to which, inter alia, the indebtedness and other obligations and liabilities incurred by the Borrowers under the 2007 Credit Agreement and the Bond Credit Agreements were all cross-defaulted and all 2007 Bank Group Loans and the reimbursement obligations of the Borrowers under the Bond Credit Agreements and the Bonds (collectively, the "2007 Bank Group Debt") were made pari passu.

In connection with the incurrence of the 2007 Bank Group Debt, the Borrowers and Synovus entered into (a) that certain Master Agreement dated April 20, 2006 and a related Confirmation of Interest Rate Swap Transaction dated April 24, 2006 (the "5.63% Swap"), (b) that certain Confirmation of Interest Rate Collar Transaction dated July 2, 2007 (the "4.65% Collar"), and (c) that certain ISDA Master Agreement dated March 1, 2003 and a related Confirmation Interest Rate Swap Fixed/Floating dated March 21, 2003 (the "6.5% Swap"; collectively with the 5.63% Swap and the 4.65% Collar, the "Hedging Obligations").

In 2008, Synovus, as an individual lender, made a bridge loan in favor of the Borrowers in the original principal amount of $37 million pursuant to that certain Loan Agreement dated August 7, 2008 (the "Bridge Loan").

On January 10, 2009, an event of default under the 2007 Credit Agreement occurred when the Borrowers failed to repay in full the entire outstanding principal of, and accrued but unpaid interest on, the 2007 Term Loan (the "January 2009 Default").

In connection with the January 2009 Default, the Borrowers, Synovus and the Secured Lenders entered into that certain Forbearance Agreement dated January 10, 2009 (the "Forbearance Agreement"), pursuant to which, inter alia, Synovus and the Secured Lenders agreed (a) to forbear from exercising their rights and remedies against the Borrowers with respect to the January 2009 Default and other events of default then in existence, and (b) to continue to make advances to the Revolver to the Borrowers during the term of the Forbearance Agreement (the "Forbearance Period"), each notwithstanding the existence of the January 2009 Default and other events of default then in existence.

On April 10, 2009, the Forbearance Period expired, and the Borrowers requested that the Secured Lenders consolidate, restructure and amend the 2007 Bank Group Debt, the Bridge Loan and the Hedging Obligations.  Accordingly, on July 20, 2009, the Borrowers, Synovus and the Secured Lenders entered into that certain Restructuring Agreement (the "Restructuring Agreement"), pursuant to which, inter alia, the 2007 Bank Group Debt and the Hedging Obligations were consolidated or otherwise restructured into the following obligations: (a) a term loan in the principal amount of $73,274,161.03 ("Prepetition Term Loan A"), (b) a term loan in the principal amount of $148,789,618.77 ("Prepetition Term Loan B-1"), and (c) a term loan in the principal amount of $259,985,574.76 ("Prepetition Term Loan B-2"; collectively with Prepetition Term Loan A and Prepetition Term Loan B-1, the "Prepetition Term Loans"). In addition to the Pre-Petition Term Loans, pursuant to the Restructuring Agreement, (i) the Secured Lenders also agreed to make a $21 million revolving credit line available to the Borrowers (the "Prepetition Revolver", (ii) Synovus agreed to extend to the Borrowers that certain construction loan in the original principal amount of $11,000,000 (the "Construction Loan"), and (iii) the Bridge Loan was restructured.  The Pre-Petition Term Loans, the Pre-Petition Revolver, the Construction Loan and the Bridge Loan are referred to herein as the "Prepetition Bank Group Debt").

## F.    Pre-Petition Management and Employees

### 1.    *Existing Management*

Alfred W. Jones III became the Debtors' sole manager and chief executive officer in 1995.

### 2.    *Existing Executive Officers*

The following are the current executive officers of Debtor Sea Island Company:

- Alfred W. Jones III, Chief Executive Officer

- David Bansmer, President and Chief Operating Officer

- Jim Gilbert, Senior Vice President and General Counsel

- Ron Roberts, Vice President of Finance

3.      ***Existing Board Members***

The following are the current board members of Debtor Sea Island Company:

- Alfred W. Jones III (Chairman)

- J. Dewey Benefield, Jr.

- Sir Michael F. Bonallack

- Peter Capone

- Richard V. Giery

- Marianna Jones Kuntz

- Davis Love III

- Terence F. McGuirk

- Walter McNeely

- James W. McSwiney

- Sam Nunn

- Katharine Jones O'Connor

- Jennifer Schwartz

- James B. Williams

4.      ***Employees/Labor Relations***

The Debtors employ approximately 1,400 people, of which approximately 80 reside in their corporate offices, with approximately1,320 people located throughout their hotels, golf courses, clubs and related amenities, and real estate operations.  Of the Debtors' 1,400 employees, approximately 180 are employed on a full-time salaried basis, approximately 650 are employed on a full-time hourly basis, and approximately 570 are employed part time or on a seasonal basis.

5.      ***Existing Compensation and Benefits***

Sea Island Company has historically provided a competitive compensation and benefit package to their employees, consistent with its belief that the success of its businesses is dependent to a significant extent upon the efforts and abilities of its employees.

       (a)    *Severance Practices*

For employees who have worked with the Debtors for at least one year, the Debtors customarily offer severance based upon years of service and hourly/salaried status. Specifically, regular full-time hourly staff receive one week per year of completed service with a minimum of two weeks and a maximum of eight weeks of severance pay; salaried staff receive two weeks per year of completed service with a minimum of two weeks and a maximum of twelve weeks of severance pay. Part-time employees receive a flat one-time severance amount of $1,000. Currently, the Debtors do not owe any severance amounts.

       (b)    *Retirement Plans*

       (1)    401(k). The Debtors maintain a retirement savings plan meeting the requirements of Section 401(k) of the Internal Revenue Code for the benefit of all Regular Employees (the "401(k) Plan"). Regular Employees are automatically eligible to participate in the 401(k) Plan. The 401(k) Plan allows for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. The Debtors do not make matching contributions.

       (2)    Sea Island Company Retirement Plan. The Debtors fund and manage the Sea Island Company Retirement Plan, an ERISA defined benefit pension plan that provides retirement benefits to approximately 1,944 participants (1,213 active employees, 412 inactive employees with deferred benefits and 319 inactive employees in pay status). The Plan was frozen on December 31, 2008.

       (3)    Deferred Compensation Plan. Select officers and directors may defer compensation and fees. Deferrals are credited to an individual participant account and are credited with interest earnings. This plan distributes account balances upon the participant's termination of employment (including death or disability). A participant may elect to have the account paid in a lump sum or in installments (annual or monthly) over a period of 5 to 25 years. The Debtors currently owe $5,780,377 under this plan to its 27 participants.

       (4)    Supplemental Plan. For participants in the Deferred Compensation Plan, the Debtors pay an additional benefit equal to the incremental amount that would have been paid to such participant if the Retirement Plan counted all the compensation (including deferrals made to the Deferred Compensation Plan). The supplemental benefits are paid monthly in addition to the Retirement Plan payments. The Debtors currently owe $1,344,426 under this plan to its 30 participants.

(5)     Stock Appreciation Rights ("SARs") and Unit Appreciation Rights ("UARs"). Certain executives have been granted equal numbers of SAR and UAR awards. Under the terms of the grant agreements, the awards become vested after 5 years. The awards are automatically exercised upon the earlier of (i) termination of employment or (ii) expiration of the term of the award. The appreciation in excess of the grant value will be paid to the participant in 5 annual installments following exercise unless the participant properly elects to defer payment. All payments are made from the Company's general assets. No payments have been made under this program since July 2008. The Debtors currently owe $30,670,552 under these plans to their 7 participants.

(6)     Executive Restoration Agreements. These agreements contractually obligate the company to provide compensation to select executives and surviving spouses during their lifetimes. The Debtors ceased making any payments under these agreements prior to the Petition Date. The Debtors are party to 6 executive restoration agreements pursuant to which the Debtors estimate that they owe $19,705,090 in the aggregate based on actual projections.

## G.     Summary of Assets

The Debtors will file schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include real property, cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The schedules will provide asset values on a net book basis, which are not reflective of actual values. The schedules may be reviewed on the Bankruptcy Court electronic case filing system, on the Debtors' case website at http://dm.epiq11.com/seaisland or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as Appendix B.

## H.     Historical Financial Information

Attached as Appendix C is selected financial data for the Debtors for the annual periods ended December 31, 2008 and December 31, 2009.

## I.     Events Leading to Commencement of the Chapter 11 Cases

### *Expansion and Redevelopment*

From 1998 to 2001, three of the Debtors' golf courses were fully redesigned. In 2001, the newly-constructed, 40-room Lodge opened to visitors. With the Lodge construction complete, the Debtors began renovations that culminated in the 2006 and 2007 openings of the Cloister, Beach Club and Spa and the development of the Frederica Golf Club and Residential

Development.  The Debtors' plan for expansion and renovation was intended to establish Sea Island as a marquee brand among the world's finest resorts and resort communities so as to provide a foundation for future projects.

The Debtors used long-term debt financing and its cash flows from operation, primarily real estate sales, to fund its expansion and renovation plan.  With a view to a profitable future led by its new luxury real estate resort assets and sustained retail real estate sales activity, the Debtors believed that they would have sufficient resources to repay their obligations in a timely manner.  Their view was bolstered by the fact that the Debtors owned tens of thousands of acres of undeveloped land in Glynn and Camden counties that had been in constant demand by third party developers.

### Turnover of Frederica

In November 2009, the Debtors gave Wachovia Bank, N.A. (now part of Wells Fargo) deed in lieu of foreclosure to the Frederica development, a 3,000 acre residential community with home sites ranging from two to five acres.

### Restructuring Efforts

The Debtors' expansion proved to be more costly than budgeted and the newly completed resort did not generate the operating profits that had been projected.  The Debtors took aggressive steps to address the operating losses by rationalizing their cost structure, streamlining their resort and support operations and terminating certain operating executives. However, because the Debtors' business model was predicated on the ongoing development and sale of residential real estate in and around their resort communities, the historic collapse of the global financial and real estate markets had a dramatic negative impact on both the Debtors' resort and real estate sales businesses.  Falling home prices and the severely restricted availability of real estate financing left the Debtors with little ability to continue to sell residential real estate.  As a result, the Debtors were left without sufficient liquidity to fund their operations or to repay the indebtedness they had borrowed to finance the development of certain of their resort assets.

The Debtors sought to restructure their operations and obligations.  Despite their efforts to improve performance, the Debtors were unable to refinance a portion of their indebtedness to Synovus and the Secured Lenders which matured in January 2009.  The Debtors, Synovus and the Secured Lenders entered into a Forbearance Agreement on January 10, 2009 to permit the parties to negotiate a restructuring of the Debtors' obligations to Synovus and the Secured Lenders.  On July 20, 2009, the Debtors reached an agreement with Synovus and the Secured Lenders to restructure the Pre-Petition Bank Group Obligations on the terms set forth in the Restructuring Agreement.

### Pre-Petition Sales Process

Despite the Debtors' significant efforts, the financial and real estate markets did not recover sufficiently to permit the Debtors to comply with their restructured obligations owed to Synovus Bank and the Secured Lenders.

In early January 2010, certain events of default occurred under the Restructuring Agreement as a result of, *inter alia*, (a) the Borrowers' failure to repay the Construction Loan prior to its maturity date on December 31, 2009, and (b) the Borrowers' failure to use the net cash proceeds from the sale of SIC's ownership interest in the development known as "Cabin Bluff" to pay down the Senior Lender Credit Facilities in accordance with the terms of the Restructuring Agreement (collectively, and together with other events of default outstanding at the time, the "January 2010 Defaults").

In connection with the January 2010 Defaults, the Borrowers, Synovus and the Secured Lenders entered into that certain Post-Default Administration Agreement dated January 26, 2010 (the "Post-Default Agreement"), pursuant to which, *inter alia*, (a) the Secured Lenders agreed to forbear from exercising their rights and remedies against the Borrowers with respect to the January 2010 Defaults and other events of default then in existence, (b) the Secured Lenders agreed to allow the Borrowers to use the cash generated by their ordinary course business activities (specifically excluding any asset sales) and the Cabin Bluff Proceeds (as defined below) in accordance with an agreed upon budget, and (c) the Secured Lenders and the Borrowers agreed upon a process, timeline and budget related to the sale of substantially all of the Debtors' assets.

As a result, in late 2009, the Debtors, after reviewing all of their strategic alternatives, determined that a sale of the Company's assets would result in the best recovery for all of their stakeholders. The Debtors retained Goldman Sachs as their investment banker to market their assets.

Beginning in March 2010, the Debtors and their advisors identified and contacted all persons identified as candidates who might have an interest in pursuing a sale transaction. In connection with this process, 79 parties executed confidentiality agreements, received a confidential information memorandum (the "CIM") and were given access to a data room containing round one due diligence information.

On April 23, 2010, Goldman Sachs received 12 round one offers, which represented participation by 13 of the 79 parties that received the CIM. The Debtors evaluated these offers internally and consulted with Synovus and the Secured Lenders as to which offers were viable prospects for a transaction. Based on that evaluation, eight potential investors were advanced to the second round of the sales process.

From April 29, 2010, through June 18, 2010, the second round participants conducted detailed due diligence. The Debtors also provided onsite meetings, which consisted of site tours, an executive management presentation and detailed due diligence breakout sessions.

On June 18, 2010, the Debtors received 6 second round bids from parties participating in the process. Of these six bids, three potential buyer groups were selected to proceed with further diligence and negotiation of definitive documentation. After substantial negotiations and frequent consultation with its Secured Lenders, the Debtors determined that the offer with the Stalking Horse Bidder presented the best and highest return for the Debtors'

Stakeholders and on August 4, 2010, the Debtors executed the Stalking Horse Agreement with the Stalking Horse Bidder.  These Chapter 11 cases were filed to consummate that sale.

On August 6, 2010, the Debtors and the Secured Lenders entered into a Plan Support Agreement, pursuant to which the Secured Lenders agreed to support the Plan and the Plan Sale under certain terms and conditions.

On August 10, 2010, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

## V.    THE CHAPTER 11 CASES

### A.    Continuation of Business; Stay of Litigation

As described above, on August 10, 2010, the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess their businesses and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Cases are pending.

### B.    First Day Motions

On the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders."  First day motions and orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.  The first day motions filed in the Chapter 11 Cases are typical of motions filed in large chapter 11 cases across the country.  Such motions sought, among other things, the following relief:

- **joint administration of the Debtors' bankruptcy cases;**

- **an order establishing notice and administrative procedures;**

- **extension of the time period in which the Debtors must file schedules and statements of financial affairs;**

- **payment of employees' prepetition compensation, benefits and expense reimbursement amounts;**

- **authority to continue maintenance of certain insurance programs and insurance financing agreements;**

- **maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date, the continuing use of business forms, and the maintenance of existing investment practices;**

- **payment of certain prepetition sales, use, trust fund, and other taxes and related obligations;**

- **authority to administer customer programs; to honor certain prepetition obligations to customers and to pay fees arising from the Debtors' membership in certain Property Owners Associations;**

- **interim use of cash collateral (as further discussed below) and granting of adequate protection to Secured Lenders; and**

- **an order establishing procedures for utilities to request adequate assurance of payment and establishing procedures for resolving disputes related to adequate assurance of payment.**

**C.      Retention of Professionals**

The Debtors are represented in the Chapter 11 Cases by King & Spalding LLP ("K&S") and Gilbert, Harrell, Sumerford & Martin, P.C. ("Gilbert Harrell").  The Debtors obtained the financial advisory services of FTI Consulting, Inc. ("FTI") and the investment banking services of Goldman Sachs.  The Debtors obtained the accounting services of Moore Stephens ("Moore Stephens").  Epiq Bankruptcy Solutions, LLC was authorized to provide claims, noticing and balloting services to the Debtors.

**D.      Authorization to Use Cash Collateral of Existing Lenders**

As of the Petition Date, the Debtors held proceeds of assets on which the Secured Lenders assert first priority liens and security interests (the "Cash Collateral").  Cash collateral is defined in section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, .  .  .  other cash equivalents. . . and . . . proceeds, products, offspring, rents or profits of property subject to a security interest." 11 U.S.C. § 363(a).  Under the Bankruptcy Code, the Debtors are prohibited from using, selling or leasing cash collateral unless either the appropriate creditors consent or the Bankruptcy Court, after notice and a hearing, authorizes such action.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion For Entry of an Interim and Final Order (A) Authorizing the Use of Cash Collateral Pursuant to Section*

*363 of the Bankruptcy Code, (B) Granting Adequate Protection Pursuant to Sections 361, 363, and 364 of the Bankruptcy Code, and (C) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c)* [Docket No. [__]] (the "Cash Collateral Motion").

By the Cash Collateral Motion, the Debtors sought (i) authority on an interim basis to use cash collateral in accordance with a proposed budget; (ii) authority on an interim basis to provide adequate protection to the Secured Lenders; (iii) a final hearing on the Cash Collateral Motion; (iv) authority on a final basis to use cash collateral in accordance with a proposed budget and (v) authority on a final basis to provide adequate protection to the Secured Lenders.

On [_____ __,] 2010, the Court entered the *Interim Order (a) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders and Granting Adequate Protection for Use and (b) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing* [Docket No. [__]] (the "Interim Cash Collateral Order").  By the Interim Cash Collateral Order, the Court authorized the Debtors, among other things, to use cash collateral in accordance with a proposed budget pending a final hearing.

On [_____ __,] 2010, the Court entered the *Final Order (a) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders and Granting Adequate Protection for Use* [Docket No. [__]] (the "Final Cash Collateral Order" and collectively, with the Interim Cash Collateral Order the "Cash Collateral Order").  By the Final Cash Collateral Order, the Court authorized the Debtors, among other things, to use cash collateral through and including week ending September 11, 2009 in accordance with a proposed budget.

## E.    Postpetition DIP Financing

On the Petition Date, the Debtors filed the *Debtors' Motion For Entry of an Order Authorizing the Debtors to Obtain Postpetition Financing* [Docket No. [__]] (the "DIP Motion").

By the DIP Motion, the Debtors sought authority to obtain postpetition financing from the Secured Lenders, in their capacity as postpetition lenders [_____].

## F.    Sale and Bid Procedures

On the Petition Date, the Debtors filed the *Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 1123 and 1129 (A) Authorizing and Scheduling an Auction at Which Debtors Will Solicit The Highest or Best Bid For The Sale of Substantially All of Debtors' Assets, (B) Approving Procedures Related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing The Manner and Extent of Notice, and (E) Granting Related Relief* [Docket No. [__]] (the "Bid Procedures Motion").

By the Bid Procedures Motion, the Debtors sought entry of an order approving, among other things, (a) the scheduling of an auction on October 11, 2010, at which the Debtors will solicit the highest or best bid for the sale of substantially all of the Debtors' assets, (b) payment of the break-up fee in an amount equal to $5,925,000 (the "Breakup Fee") payable to the Stalking Horse Bidder, and (c) establishment of the bid procedures related to the conduct of

the auction, including the establishment of (i) an "Initial Overbid", which must have substantially identical terms and conditions as the Stalking Horse Agreement, except with higher and better consideration; contain terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Stalking Horse Agreement; provide for a cash purchase price in an amount equal to or greater than the sum of (1) $197,500,000, (2) the Breakup Fee, and (3) $2,500,000; and (ii) bidding increments of at least $1,000,000.

## VI.     SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.     Overall Structure of the Plan

The Plan constitutes a plan of liquidation and sets forth the means for satisfying Claims against and Interests in the Debtors.  Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated: (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.  On the Effective Date and at certain times thereafter, the Debtors or the Liquidation Trustee will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes

under the Plan and the securities and other property to be distributed under the Plan are described below.

On the Effective Date, All Property comprising the Estates of the Debtors (including, but not limited to the Accepting Unsecured Creditors Fund and the General Unsecured Creditors Fund) not conveyed to the Purchaser under the Stalking Horse Agreement shall automatically vest in the Liquidating Trust, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the rights of Holders of Allowed Accepting Unsecured Claims, Other General Unsecured Claims and Convenience Claims to obtain distributions provided for in this Plan.  In no event shall any property of any kind be returned by, or otherwise transferred from, the Liquidating Trust to any Debtor.  A copy of the Liquidating Trust Agreement shall be included with the Plan Supplement to be filed on or before the fifth day prior to the Confirmation Hearing.

**B.      Substantive Consolidation**

The Plan is premised on the substantive consolidation of all of the Debtors with respect to the treatment of all Claims and Interests.  The Plan shall serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the treatment of all Claims and Interests as follows:   on the Effective Date, (a) all assets and liabilities of the Debtors will be merged or treated as though they were merged; (b) all guarantees of the Debtors of the obligations of any of Debtor and any joint and several liability of any of the Debtors shall be eliminated; and (c) each and every Claim and Interest against any Debtor shall be deemed Filed against the consolidated Debtors and all Claims Filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors.

**C.      Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, DIP Facility Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan

acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  In the event any Class rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class.  Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests.  Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.  *Treatment of Unclassified Claims under the Plan*

(a)  *Administrative Claims*

An Administrative Claim is defined in the Plan as a Claim for: (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iii) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (iv) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Secured Lenders pursuant to the Cash Collateral Order;

provided, however, that the term Administrative Claim does not include any Assumed Liabilities under the Stalking Horse Agreement.

Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for herein, and subject to (x) the bar date provisions set forth in this Section 3.03(c) hereof and (y) additional requirements for Professionals and certain other entities set forth below, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and extinguishment of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, (iii) a date agreed to in writing by the Debtors and the Holder of such Administrative Claim, and (iv) the date on which the Administrative Claim becomes due in accordance with its terms; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or as the Bankruptcy Court may order. Ordinary Course Trade Claims that, but for the proviso to the definition of Administrative Claims, would constitute Administrative Claims shall be assumed by the Purchaser.

Under the Plan, all U.S. Trustee's Fee Claims, as determined, if necessary, by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date by the Debtors.

Under the Plan, except for Administrative Claims of Professionals for Professional Fee Claims, which are addressed in Section 3.03(c)(ii) below, and except as otherwise provided herein, requests for payment of Administrative Claims must be Filed and served on counsel for the Debtors no later than (x) the Administrative Claim Bar Date, or (y) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of the Administrative Claim Bar Date. Holders of Administrative Claims (including, without limitation, the holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors, the Liquidation Trustee or any of their respective properties.

Under the Plan, applications for compensation for services rendered and reimbursement of expenses incurred by Professionals from the Petition Date through the Effective Date shall be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves. Such applications shall be served on: (a) the Debtors; (b) Sarah R. Borders and Sarah L. Taub, King & Spalding LLP, 1180 Peachtree Street NE, Atlanta, Georgia 30309, counsel to the Debtors; (c) M.F. Martin, III, Gilbert, Harrell, Sumerford & Martin, P.C., 777 Gloucester Street, Suite 200, PO Box 190, Brunswick, Georgia 31521-0190, co-counsel to the Debtors; (d) the Office of the United States Trustee; (e) Jason H. Watson, Alston & Bird, LLP, 1201 West Peachtree Street NE, Atlanta, Georgia 30309, counsel for the Secured Lenders; and (f) [_____], counsel to the Committee. Applications that are not timely Filed will not be considered by the Court. The Debtors or Liquidation Trustee, as the case may be, may pay any Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

      (b)    *DIP Facility Claims*

An DIP Facility Claim is defined in the Plan as a Secured Claims arising under or pursuant to the DIP Credit Documents.

Under the Plan, except to the extent that Holders of the DIP Facility Claims agree to different treatment, the DIP Facility Claims shall be repaid by the Debtors in full, in Cash, on the Effective Date in full and final satisfaction, settlement and release of such DIP Facility Claims.

      (c)    *Priority Tax Claims*

The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.  Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8).  The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A), (b) property taxes meeting the requirements of section 507(a)(8)(B), (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C), (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4), to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E), (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.  The Debtors have estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $[_____].

Priority Tax Claims are Unimpaired.  Under the Plan, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, in full satisfaction, settlement, release, and extinguishment of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or as the Bankruptcy Court may order.  Prior to the Effective Date, the Debtors shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

    2.    *Treatment of Classified Claims and Interests under the Plan*

      (a)    *Class 1:  Miscellaneous Secured Claims*

Class 1 Miscellaneous Secured Claims are Unimpaired under the Plan.  Each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in the sole discretion of the Debtors in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim on or as soon as

practicable after the later of (i) the Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 1 Miscellaneous Secured Claim; (b) Reinstatement of such Allowed Miscellaneous Secured Claim; (c) the Property securing such Miscellaneous Secured Claim without representation or warranty by or recourse against the Debtors; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors.

(b)     *Class 2:  Secured Lender Claims*

Class 2 Secured Lender Claims are Impaired Under the Plan.  On the Effective Date, each Holder of an Allowed Class 2 Secured Lender Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, and as a condition precedent thereto, its share of an amount equal to (i) the portion of the Purchase Price under the Stalking Horse Agreement allocated to the collateral in which the Secured Lender has a Lien, <u>less</u> (ii) certain amounts required to be paid by the Debtors under the Stalking Horse Agreement (including but not limited to Cure Amounts), <u>less</u>  (iii) provided that (a) Classes 5 and 6 vote to accept the Plan and (b) an allocation of proceeds from the Sale under the Stalking Horse Agreement between encumbered and unencumbered property by the Debtors that is acceptable to the Secured Lenders, the Accepting Unsecured Creditor Fund, <u>less</u> (iv) an amount necessary to pay Administrative Claims, the DIP Facility Claims, the Priority Tax Claims, Other Priority Claims, and Miscellaneous Secured Claims, to be distributed in accordance with the Prepetition Restructuring Agreement.

(c)     *Class 3:  Other Priority Claims*

Class 3 Other Priority Claims are Unimpaired under the Plan.  Each Holder of an Allowed Class 3 Other Priority Claim shall receive, in the sole discretion of the Debtors, in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Other Priority Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Priority Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the Holder of such Class 3 Other Priority Claim; (b) or such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors.

(d)     *Class 4:  Accepting Unsecured Claims*

Class 4 Accepting Unsecured Claims are Impaired under the Plan.  Each Holder of an Allowed Class 4 Accepting Unsecured Claim shall receive its Pro Rata share of the Accepting Unsecured Creditors Fund (provided that (a) Classes 5 and 6 vote to accept the Plan and (b) an allocation of proceeds from the Sale under the Stalking Horse Agreement between encumbered and unencumbered property that is acceptable to the Secured Lenders, the Accepting Unsecured Creditor Fund) on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Accepting Unsecured Claim becomes Allowed, and (iii) a date agreed to by the Liquidation Trustee and the Holder of such Class 4 Accepting Unsecured Claim**.**  To the extent that the Allowed Accepting Unsecured Claims are not satisfied through the distribution of the Accepting Unsecured Creditors Fund, the remaining portion of such

Allowed Accepting Unsecured Claims shall be treated as Other General Unsecured Claims entitled to the treatment set forth in Section 3.10 of the Plan.

(e)   *Class 5:  Other General Unsecured Claims*

Class 5 Other General Unsecured Claims are Impaired under the Plan.  On either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Other General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 5 Other General Unsecured Claim shall receive its Pro Rata Distribution of the General Unsecured Creditors Fund.  On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee shall continue to make Pro Rata Distributions to Holders of Allowed Class 5 Other General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation Date.

(f)   *Class 6:  Convenience Claims*

Class 6 Convenience Claims are Impaired under the Plan.  On either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 6 Convenience Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount equal to an agreed upon percentage of such Allowed Claim from the General Unsecured Claims Fund.   Any Holder of an Allowed General Unsecured Claim in excess of the Convenience Class Cap may elect to reduce its Claim to the Convenience Class Cap.

(g)   *Class 7:  Interests in the Debtors*

Class 7 Interests in the Debtors are Impaired under the Plan.  Holders of Class 7 Interests in the Debtors shall not receive or retain any property under the Plan on account of such Interests.  On the Effective Date, all Interests shall be cancelled.

**D.   Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan and the Stalking Horse Agreement, nothing will affect the Debtors' or the Liquidation Trustee's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  The Debtors specifically reserve all rights, remedies, claims, defenses and Causes of Action.

**E.   Allowed Claims, Distribution Rights and Objections to Claims**

1.   *Allowance Requirement*

Only Holders of Allowed Claims are entitled to receive distributions under the Plan.  An Allowed Administrative Claim is a Claim or any portion thereof that has been

Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become Allowed by failure to object pursuant to Section 8.04 of the Plan.  An Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date (or the Administrative Claim Bar Date if an Administrative Claim), provided that at the time of the Effective Date the Debtors have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

2.    *Date of Distribution*

All Distributions to Holders of Allowed Claims as of the Effective Date will be made as and when provided in the Plan.

3.    *Making of Distributions*

Distributions to Holders of Allowed Claims will be made by the Debtors or the Liquidation Trustee as provided in the Plan (a) to the last known addresses of such Holders, or (b) to the addresses set forth in any written notices of address changes delivered to the Liquidation Trustee or the Debtors, as appropriate.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Debtors or the Liquidation Trustee is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest.

All Property distributed on account of Claims must be claimed prior to the date on which the Bankruptcy Court enters the Final Decree, or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.07 of the Plan.  All Unclaimed Property will be retained by and will vest in the Liquidating Trust.  All full or partial payments made by the Debtors and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtors or the Liquidation Trustee pursuant to the Plan.  Nothing contained in the Plan shall require the Debtors or the Liquidation Trustee to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Debtors and any Claims filed in the Chapter 11 Cases.  Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Section 5.08 will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets, the Liquidation Trustee or the Liquidating Trust.

4.      *Objection Procedures*

Unless otherwise ordered by the Court after notice and a hearing, the Debtors and the Liquidation Trustee shall have the right, on and after the Effective Date, to File objections to Claims (except those specifically Allowed by the Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the applicable Claims Objection Deadline.  The foregoing deadlines may be extended by order of the Court.  An objection to any Claim shall be deemed properly served on the Holder thereof if the Liquidation Trustee effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.  An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline.  Each such Tort Claim shall remain a Disputed Claim until it becomes an Allowed Claim in accordance with Section 5.02 of the Plan.

After the Effective Date, the Debtors or the Liquidation Trustee, as the case may be, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided that (a) the Debtors or the Liquidation Trustee, as the case may be, shall promptly File with the Bankruptcy Court a written notice of any settlement or compromise of a Claim that results in an Allowed Claim in excess of $500,000 and (b) the United States Trustee and the Secured Lenders shall be authorized to contest the proposed settlement or compromise by Filing a written objection with the Bankruptcy Court and serving such objection on the Debtors or the Liquidation Trustee, as the case may be, within 20 days of the service of the settlement notice.  If no such objection is Filed, the applicable settlement or compromise shall be deemed final without further action of the Bankruptcy Court.

## F.      Disposition of Executory Contracts and Unexpired Leases

1.      *Contracts and Leases Deemed Rejected*

The Plan provides that all contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (b) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (c) is listed on the Schedule of Assumed Contracts, provided, however, that the Debtors and the Purchaser shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Assumed Contracts in any manner set forth in the Stalking Horse Agreement, the Sale and Bid Procedures Order, or by any other means approved by the Court or to delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant to the Plan or to add any executory contract or unexpired lease thereto, thus providing for its assumption and assignment pursuant to the Plan and the terms of the Stalking Horse Agreement. The assumption, assumption and assignment, and rejection of executory leases and unexpired

41

contracts under the Plan shall be governed by the terms of the Stalking Horse Agreement, the Sale Documents, the Sale and Bid Procedures, and other orders of the Court.

Under the Plan, each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

2.      *Cure with Respect to Assumed Contracts and Leases*

The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Stalking Horse Agreement, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be governed by the terms and conditions of the Sale and Bid Procedures, the Stalking Horse Agreement, the Sale Documents, any order approving the Stalking Horse Agreement or authorizing the Sale, and other orders of the Court.

3.      *Bar Date for Rejection Damages*

Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Article VI of the Plan must be filed with the Bankruptcy Court no later than the later of (a) thirty (30) days after the Effective Date, or (b) thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred. The Debtors and the Liquidation Trustee shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 9.08 of the Plan.

4.      *Employee Benefit Programs*

(a)     *Employment Agreements.*

Except and to the extent previously rejected by an order of the Bankruptcy Court on or before the Effective Date, all employment and severance agreements between the Debtors and their employees entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected under Section 6.01 of the Plan, except for any such employment agreement that is specifically assumed under Section 6.01 of the Plan. Any Claim arising out of such rejection shall be treated in accordance with Section 6.04 of the Plan.

(b)    *Employment Benefit Plans.*

Except and to the extent previously rejected by an order of the Bankruptcy Court on or before the Effective Date, all Employee Benefit Plans entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected under Section 6.01 of the Plan.  Any Claim arising out of such rejection shall be treated in accordance with Section 6.04 of the Plan.

(c)    *Employee Obligations*.  Notwithstanding anything to the contrary in the Plan, on the Closing Date, the Purchaser will assume (i) the Debtors' accrued and unpaid payroll and as of the Closing Date, excluding any amounts payable under any retention or incentive programs; and (ii) the Debtors' incurred and, in the ordinary course of business consistent with past practice, not yet remitted payroll Taxes for the current period as of the Closing Date.

5.    *Club Member Agreements.*

Except and to the extent previously rejected by an order of the Bankruptcy Court on or before the Effective Date, all Club Member Agreements entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are rejected under Section 6.01 of the Plan.  Notwithstanding the above, each party (other than the Debtors) to any Club Member Agreement shall be entitled to elect to have its Claims against the Debtors arising under the Club Member Agreement treated pursuant to the terms of Section 11 of the Stalking Horse Agreement in full satisfaction of such Claims.  In the event a Club Member does not elect in writing to have his or her Claim treated as provided by Section 11 of the Stalking Horse Agreement, all Claims under the applicable Club Member Agreement, including any Rejection Claim shall be treated in accordance with Section 6.04 of the Plan.

## G.    Post-Consummation Corporate Structure, Management and Operation

1.    *Cancellation of Interests*

On the Effective Date, except as otherwise provided for in the Plan, (a) all of the Interests, and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be cancelled, and (b) the obligations of the Debtors under any agreements, indentures, or certificates of designations governing the Interests and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor will be extinguished.

2.    *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Debtors to take or to cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, the execution and delivery of the Stalking Horse Agreement.  Subject to the terms and conditions of the Stalking Horse Agreement, all such actions shall be deemed to have occurred

and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors. On the Effective Date, the appropriate officers and managers of the Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, the Plan Supplement and the Sale Documents in the name and on behalf of the Debtors.

## H.    Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### 1.    *Requirements for Confirmation of the Plan*

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. See Section X.D.

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the

date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors and the Holder of such Priority Tax Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or as the Bankruptcy Court may order.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the plan "not discriminate unfairly" and be "fair and equitable" with respect to such class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Debtors believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting class.

2.      *Conditions to Confirmation Date and Effective Date*

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part by the Debtors, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the form and substance of the Confirmation Order, as well as any amendments to the Plan, shall have been approved by the Debtors; (b) the Confirmation Order shall authorize the transactions contemplated by the Plan; and (c) the Confirmation Order shall provide that the provisions of the Confirmation Order are non-severable and mutually dependent.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order shall have been entered and shall not be stayed by order of a court of competent jurisdiction; (b) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto; (c) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Liquidation Trustee to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended,

45

supplemented, modified or adopted in connection with the Plan; (d) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; and (e) no order of a court of competent jurisdiction shall have been entered and shall remain in effect restraining the Debtors from consummating the Plan.

## I.    Releases, Injunctions, Exculpation and Indemnification

### 1.    *Releases by Debtors*

**The Plan provides for certain releases to be granted by the Debtors on and as of the Effective Date.  Specifically, effective as of the as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, and waived the Releasees and the D&O Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or the Liquidation Trustee to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that (a) no Releasee or D&O Releasee shall be released from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors and (b) no Cause of Action against any insurer arising out of or relating to matters for which the Debtors would otherwise be liable or suffer an insurable loss shall be released, including without limitation, any Cause of Action against the Debtors' Directors and Officers insurance carrier(s).**

### 2.    *Releases by Holders of Claims and Interests*

**Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest who votes in favor of the Plan or is presumed to have voted in favor of the Plan pursuant to section 1126(f) of the Bankruptcy Code shall be deemed to have forever waived and released (i) the Debtors, (ii) the Liquidation Trustee, (iii) the Liquidating Trust, (iv) the Releasees, and (v) the D&O Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Liquidation Trustee to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered**

thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan; provided, however, that Section 10.03(b) shall not release any Releasees or the D&O Releasee from any Causes of Action held by a Governmental Unit existing as of the Effective Date based on (i) any criminal laws of the United States or any domestic state, city or municipality or (ii) sections 1104-1109 and 1342(d) of ERISA.

In consideration for these releases, holders of Accepting Unsecured Claims will receive their Pro Rata Share of the Accepting Unsecured Creditors Fund. The Accepting Unsecured Creditors Fund is Cash in the amount of $3,000,000, which the Secured Lenders will fund from their allocation of proceeds from the sale under the Asset Purchase Agreement, to the Liquidating Trust for the benefit of the Accepting Unsecured Claims subject to (i) the acceptance of the Plan by Classes 5 and 6, and (ii) an allocation of proceeds from the Sale under the Asset Purchase Agreement between encumbered and unencumbered property that is acceptable to the Secured Lenders. To the extent that the Allowed Accepting Unsecured Claims are not satisfied through the distribution of the Accepting Unsecured Creditors Fund, the remaining portion of such Allowed Accepting Unsecured Claims shall be treated as Other General Unsecured Claims entitled to the treatment set forth in Section 3.10 of the Plan.

3.    *Injunction*

(a)    Claims and Interests. The Plan provides that, except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors, the Liquidating Trust, the Liquidation Trustee, the Purchaser, or the Property of any of the foregoing on account of any such Claims, debts or liabilities or such terminated Interests or rights: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (d) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors; and (e) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

47

(b)    <u>Released Claims</u>.  The Plan provides that, as of the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to Section 10.03 of the Plan from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against (i) any Debtor, (ii) the Liquidating Trust, (iii) any Releasee, (iv) any D&O Releasee, or (v) any Exculpated Person, or any of their respective Property, based on, arising from or relating to, in whole or in part, any act, omission, or other occurrence taking place on or prior to the Effective Date with respect to or in any way relating to the Chapter 11 Cases, all of which claims, demands, debts, rights, Causes of Action or liabilities shall be deemed released on and as of the Effective Date; <u>provided</u>, <u>however</u>, that with respect to the former directors, officers and employees of the Debtors, this injunction shall apply only to the enforcement of Claims, demands, debts, rights, Causes of Action or liabilities with respect to which such former directors, officers and employees would be entitled to indemnification from the Debtors under contract or law; and, <u>provided</u> <u>further</u>, <u>however</u>, that this injunction shall not apply to (a) any claims Creditors may assert under the Plan to enforce their rights thereunder to the extent permitted by the Bankruptcy Code or (b) any claims Creditors or other third parties may have against each other, which claims are not related to the Debtors, it being understood, however, that any defenses, offsets or counterclaims of any kind or nature whatsoever which the Debtors may have or assert in respect of any of the claims of the type described in (a) or (b) of this proviso are fully preserved.

4.    *Exculpation Relating to Chapter 11 Cases*

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Cases.  Specifically, the Plan provides that, none of the Debtors, the Liquidation Trustee, the Purchaser or any Exculpated Person shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases, <u>provided</u>, <u>however</u>, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

5.    *Post-Effective Date Indemnifications*

To the extent not inconsistent with the Plan, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify a Person with respect to all present and future actions, suits and proceedings against the Debtors or such indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors, shall terminate as of the Effective

Date; _provided_, _however_, that to the extent such liabilities and/or obligations are expressly assumed by the Purchaser under the Stalking Horse Agreement, such obligations and liabilities shall be deemed to be and treated as executory contracts that are assumed and assigned to the Purchaser, except to the extent any such obligation has been released or modified pursuant to the Plan. Such indemnification obligations described in the foregoing proviso shall survive unaffected by the Plan and shall be performed and honored by the Purchaser.

## J.    Preservation of Rights of Action

Except as otherwise provided in the Plan, the Stalking Horse Agreement or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Liquidation Trustee (as a representative of the Debtors' Estates) will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Retained Actions, and none of such Retained Actions is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Retained Actions are not identified or described. Absent such express waiver or release by the Debtors, the Liquidation Trustee may pursue Retained Actions, as appropriate, in accordance with the best interests of the Liquidating Trust.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Liquidation Trustee from utilizing, pursuing, prosecuting or otherwise acting upon all or any of its Retained Actions and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after Confirmation, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against a Person, by the Liquidation Trustee shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, list of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or, Interest of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Debtors and the Liquidation Trustee reserve the right to seek, among other things, to have such Claim disallowed if the Debtor or the Liquidation Trustee, as the case may be, at the appropriate time, determines that it has a defense under section 502(d) of the Bankruptcy Code, e.g., the Debtor or the Liquidation Trustee holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

## K.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)      classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

(b)      grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

(c)      determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)      ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(e)      construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Liquidation Trustee in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

(f)      determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(g)      hear any application of the Debtors or the Liquidation Trustee to modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 12.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any

Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(h)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(i)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(j)    determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the Asset Purchase Agreement, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, the Asset Purchase Agreement or the Confirmation Order, except as otherwise provided in the Plan;

(k)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(m)    hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Asset Purchase Agreement;

(n)    enter one or more Final Decrees closing each of the Chapter 11 Cases;

(o)    determine and resolve any and all controversies relating to the rights and obligations of the Liquidation Trustee or the Disbursing Agent in connection with the Chapter 11 Cases;

(p)    allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

(q)    permit the Debtors (and the Liquidation Trustee or the Purchaser, to the extent provided for in the Plan, the Asset Purchase Agreement or the Liquidating Trust Agreement) to recover all assets of the Debtors and Property of their respective Estates, wherever located;

(r)    hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(s)    hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Liquidation Trustee thereafter, including Retained Actions, proceedings with respect to the rights of the Liquidation Trustee to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have had; and

(t)    hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above, nothing in the Plan shall prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## L.    Amendment, Alteration and Revocation of Plan

The Debtors may alter, amend or modify the Plan in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may, so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan.  If the Plan is withdrawn or if the Confirmation Date does not occur, the Plan shall be null and void and have no force and effect.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## M.    Plan Implementation Documents

The documents necessary to implement the Plan include the following:

- Stalking Horse Agreement

52

- Liquidating Trust Agreement

Such documents are either enclosed herewith or will be submitted in substantially the form to be implemented on the Effective Date as part of the Plan Supplement. All documents in the Plan Supplement shall be in form, scope, and substance satisfactory to the Debtors. Upon such filing, all documents included in the Plan Supplement may be viewed and downloaded free of charge from the Debtors' case website at http://dm.epiq11.com/seaisland, viewed and downloaded from the Bankruptcy Court electronic case filing system or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' Voting Agent at the address set forth in Section III.C or to the Debtors' counsel, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309 (Attn: Sarah R. Borders).

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes 2, 4, 5 and 6 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. See Section VI.C of this Disclosure Statement entitled "Classification and Treatment of Claims and Interests" for a description of the treatments of each class of Claims and Interests. Certain Claims and Interests receive no distributions pursuant to the Plan.

### B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix B for a liquidation analysis of the Debtors.

### C.    Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or

should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

**D.      Conditions Precedent to Consummation**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**E.      Certain Tax Considerations**

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Section IX regarding certain U.S. federal income tax consequences of the Plan to the Debtors and to the Holders of Claims who are entitled to vote to accept or reject the Plan.

**VIII.      APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS**

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to any transfer under the Plan.

**IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO THE DEBTORS AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASS-THROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT

DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN. THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN SOME RESPECTS.  EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN.  EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER.  NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**To ensure compliance with Treasury Department Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by Holders, for purposes of avoiding penalties that may be imposed on such Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each Holder of a claim should seek advice based on such Holder's particular circumstances from an independent tax advisor.**

A.    **Federal Income Tax Consequences to the Debtors**

The sale of the assets of the Debtors pursuant to the Plan will result in the recognition of gain or loss with respect to each asset being sold.  Each Debtor's gains and losses will depend on the portion of the sales proceeds that is allocated to each asset of the Debtor that is sold and the Debtor's tax basis in that asset.

Sea Island Company is an S corporation for federal income tax purposes, and Sea Island Apparel, LLC, First Sea Island, LLC, and SICAL, LLC are limited liability companies that are wholly owned by Sea Island Company and are disregarded for federal income tax purposes.  SICP and Sea Island Resort Residences, LLC are partnerships for federal income tax purposes, and Sea Island Company is a partner of each of them.  Sea Island Services, Inc. is a C corporation for federal income tax purposes.  Because gains and losses of S corporations and partnerships pass through to their shareholders and partners for federal income tax purposes, any taxable gains recognized by Sea Island Company (including any gains resulting from the sale of the assets of Sea Island Apparel, LLC, and First Sea Island, LLC), SICP and Sea Island Resort Residences, LLC will not give rise to any federal income tax liabilities to those Debtors.  In

contrast, because Sea Island Services, Inc. is a C corporation for federal income tax purposes, it may incur a liability for income taxes as a result of the sale of its assets pursuant to the Plan.

In addition, the Debtors will incur cancellation of debt ("COD") income as a result of the Plan. In general, COD income is the amount by which the indebtedness of a taxpayer that is discharged exceeds any consideration given by the taxpayer in exchange therefore. A Debtor is not subject to federal income tax with respect to COD income, however, if that Debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge occurs pursuant to that proceeding (the "bankruptcy exception"). Instead, the Debtor is required to reduce its tax attributes by the amount of COD income that was excluded from gross income as a result of the bankruptcy exception. Generally, tax attributes will be reduced in the following order: (i) net operating losses, (ii) certain tax credits, (iii) capital loss carryovers, (iv) tax basis in assets, and (v) foreign tax credits. For partnerships, the bankruptcy exception is applied at the partner level.

COD income incurred by Sea Island Company (including any COD income realized by Sea Island Apparel, LLC, First Sea Island, LLC, and SICAL, LLC) and Sea Island Services, Inc. will qualify for the bankruptcy exception. The COD income incurred by SICP and Sea Island Resort Residences, LLC must be reported on their federal income tax returns and on the Schedules K-1 issued to their partners. The COD income of the partnerships will qualify for the bankruptcy exception to the extent that such income is properly allocated to Sea Island Company (which is a partner of both partnerships) under the income tax rules applicable to partnerships. None of the Debtors should incur any liability for federal income tax with respect to COD income.

The Liquidating Trust will be treated as either a grantor trust or a partnership for federal income tax purposes. The Debtors will be treated as the grantors or the partners, respectively, and items of income, gain, loss, deduction and credit will be allocated to the Debtors accordingly.

## B.      Federal Income Tax Consequences to Claim Holders

The federal income tax consequences to a Holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Holder's method of accounting, and its own particular tax situation. Because the Holders' Claims and tax situations differ, Holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

In general, a Holder receiving a payment under the Plan in satisfaction of its Claim recognizes income or loss for federal income tax purposes measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the

Claim.  This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the Holder's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the Holder's hands.

**C.     Other Tax Matters**

       1.     *Information Reporting and Backup Withholding*

       Certain payments or distributions pursuant to the Plan may be subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

       Backup withholding is not an additional tax.  It is merely an advance payment that may be refunded to the extent it results in an overpayment of tax if the appropriate information is supplied to the IRS.

       In addition, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

       2.     *Importance of Obtaining Professional Tax Assistance*

       THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**X.     FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**

**A.     Feasibility of the Plan**

       In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

       The Plan itself proposes a Sale of the substantially all of the Debtors' assets, and thus meets the feasibility test embodied in section 1129(a)(11) of the Bankruptcy Code.  The

Debtors along with Goldman Sachs believe that the Purchaser can and will close the transaction and pay the Purchase Price. In addition, the Debtors believe that the fact that the Plan contemplates the funding of a Liquidating Trust to, in part, realize the value of the Debtors' assets for the benefit of creditors and the Estates ensures that no further financial restructuring will be necessary. The Debtors should have sufficient cash to fund their activities through the closing of the Sale contemplated by the Plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**B.    Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes 2, 4, 5 and 6 will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

**C.    Best Interests Test**

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases,

litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.     Liquidation Analysis**

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as <u>Appendix B</u> (the "<u>Liquidation Analysis</u>"), which concludes that in the event of a forced liquidation of the Debtors' assets under chapter 7, the aggregate value to be realized by the Debtors' estates would be approximately [$_____] (net of repayment of the DIP Facility Claims). In the event of an orderly liquidation of the Debtors' assets in chapter 7, the aggregate value to be realized by the Debtors' estates would be approximately [$_____] (net of repayment of the DIP Facility Claims). In either event, all such value would be distributed to either the DIP Lender in repayment of the DIP Facility Claims or to Holders of Allowed Class 2 Secured Lender Claims, and no other Holder of a Claim, including unpaid Administrative Priority Claims incurred during the administration of the Debtors' Chapter 11 Cases (other than the DIP Facility Claims), would receive a distribution. These conclusions are premised upon the assumptions set forth in Appendix B, which the Debtors and FTI believe are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced or orderly sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**E.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim.  Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation.  Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**F.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.  The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 2, 4, 5, 6 and 7.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims and Interests in Classes 2, 4, 5, 6 and 7

**XI.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors believe that the Plan affords Holders of Claims in Classes 2, 4, 5 and 6 the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## A.    Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party-in-interest) could attempt to formulate and propose a different plan or plans of liquidation. Such a plan or plans might involve an orderly liquidation of assets. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

## B.    Liquidation Under Chapter 7

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. It is, however, possible to predict that the Secured Lenders would assert that they held security interests in substantially all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that a liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

## XII.    THE SOLICITATION; VOTING PROCEDURES

## A.    Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

61

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

**B.    Classes Entitled to Vote to Accept or Reject the Plan**

Holders of Claims in Classes 2, 4, 5 and 6 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1 and 3 are deemed to have accepted the Plan and Class 7 is deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

**C.    Solicitation Order**

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at http://dm.epiq11.com/seaisland or by making written request upon the Debtors' counsel or Voting Agent.

**D.    Waivers of Defects, Irregularities, Etc.**

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek rejection of any and all ballots not in proper form. The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Ballots previously furnished

(and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

## E.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Agent in a timely manner via regular mail, at Sea Island Company, Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, F.D.R. Station, P.O. Box 5014, New York, NY 10150-5014, or via overnight courier or hand delivery at Sea Island Company, Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY.  The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received.  As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan.  In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F.    Voting Rights of Disputed Claimants

Holders of Disputed Claims in Classes 2, 4, 5 and 6 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Voting Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Voting Record Date (collectively, the "Disputed Claimants") are not permitted to vote on the Plan except as provided in the Solicitation Order.  Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion").  Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel and the Voting Agent no later than 5:00 p.m. (Eastern time) on the seventh (7th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim.  The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing.  Any party timely filing and serving a Rule 3018

Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan.  If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote on the Plan.  Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date.  With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

## G.    Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

**If by regular mail:**

SEA ISLAND COMPANY BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
F.D.R. STATION
P.O. BOX 5014
NEW YORK, NY 10150-5014

**If by overnight courier or hand delivery:**

SEA ISLAND COMPANY BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10017

**If by telephone:**

EPIQ BANKRUPTCY SOLUTIONS, LLC
(646) 282-2400

## XIII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Classes 2, 4, 5 and 6 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before **[_____, 2010]** at 5:00 p.m.  prevailing Eastern time.

Dated August 10, 2010    SEA ISLAND COMPANY; SEA ISLAND COASTAL
PROPERTIES LLC; SEA ISLAND SERVICES, INC.;
SEA ISLAND APPAREL, LLC; SEA ISLAND RESORT
RESIDENCES, LLC; FIRST SEA ISLAND AND
SICAL, LLC


By:  /s/ David Bansmer
Name: David Bansmer
Title: President and Chief Operating Officer

65

# **Appendix A**

## **The Plan**

**Appendix B**

**Liquidation Analysis**

**[TO COME]**

**Appendix C**

**Financial Data for the Periods Ended December 31, 2008 and December 31, 2009**

**Appendix D**

**Stalking Horse Agreement**