Hearing Date: Sept. 9, 2010 at 1 p.m. (EPT)
Objection Deadline: Sept. 7, 2010 at 4 p.m. (EPT)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** | ) | **Case No. 10-21034** |
| **SEA ISLAND COASTAL PROPERTIES LLC,** | ) | **Case No. 10-21035** |
| **SEA ISLAND SERVICES, INC.,** | ) | **Case No. 10-21036** |
| **SEA ISLAND RESORT RESIDENCES, LLC,** | ) | **Case No. 10-21037** |
| **SEA ISLAND APPAREL, LLC,** | ) | **Case No. 10-21038** |
| **FIRST SEA ISLAND, LLC,** | ) | **Case No. 10-21039** |
| **and SICAL, LLC,** | ) | **Case No. 10-21040** |
| | ) | |
| **Debtors.** | ) | |
| _____ | ) | |

**LIMITED OBJECTION TO DEBTORS' MOTION FOR ENTRY OF
AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 1123 AND 1129
(A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH
DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE
SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING
PROCEDURES RELATED TO CONDUCT OF AUCTION, (C) APPROVING
BREAK-UP FEE, (D) FIXING THE MANNER AND EXTENT OF NOTICE, AND
(E) GRANTING RELATED RELIEF**

Sea Island Holdings, L.L.C. ("Anschutz/Starwood"), a Delaware limited liability company, jointly owned by (i) The Anschutz Corporation and (ii) VIII/Hotel 2 Sea Island Holdings, L.L.C., an affiliate of Starwood Capital Group Global, L.P., by and through its undersigned counsel, submit this limited objection (the "Objection") to Debtor's Motion for Entry of An Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 1123 and 1129 (A) Authorizing and Scheduling an Auction at Which Debtors Will Solicit the Highest or Best Bid for the Sale of Substantially All of the Debtors' Assets, (B) Approving Procedures Related to Conduct of Auction, (C) Approving Break-up Fee, (D) Fixing the Manner and Extent of Notice, and (E)

2851288 v02

Granting Related Relief [Docket No. 24] (the "Motion"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. Anschutz/Starwood submits that the proposed breakup fee of $5,925,000 (the "Breakup Fee") and overbid amount of another $2,500,000 (the "Overbid Amount") are not warranted under the circumstances in this case. Breakup fees and other overbid protections, when permitted, are typically designed to protect a stalking horse bidder from having its offer "shopped-around" and outbid after it has invested significant resources in identifying, investigating and negotiating an asset acquisition. The justification for these types of protections are most forceful when a debtor has few or no serious suitors.

2. By the same token, such protective measures have a strong chilling effect on maximizing value to a debtor's estate where, as here, multiple bidders have already (i) incurred substantial costs of their own in conducting due diligence and (ii) shown a willingness to submit serious bids for the Debtors' assets by executing negotiated purchase agreements. Notwithstanding the obvious interest of other bidders for these assets, the Debtors' Motion will compel legitimate competing bidders to pay an exorbitant premium of nearly eight and a half million dollars over the stalking horse bid. In order to maximize recoveries to the Debtors' estates and make possible a truly competitive auction environment, Anschutz/Starwood requests that this Court (i) deny the relief requested in the Motion with regard to the Breakup Fee and Overbid Amount or (ii) in the alternative, significantly reduce the Breakup Fee and Overbid Amount.

## RELEVANT BACKGROUND

3. On August 10, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Southern District of Georgia (this "Court") under 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

2

Concurrently therewith, the Debtors filed numerous first day motions, the Joint Chapter 11 Plan dated as of August 10, 2010 [Docket No. 25] (the "Plan"), the Disclosure Statement with Respect to the Joint Chapter 11 Plan dated as of August 10, 2010 [Docket No. 26] (the "Disclosure Statement") and the Motion.

4. The Debtors in the Motion request, among other things, that this Court approve the Proposed Sale Process[1] and the Bid Procedures, including the procedures for submitting Initial Overbids, conducting the Auction, identifying the Prevailing Bid, and the payment of the Breakup Fee. The proposed Breakup Fee is $5,925,000 (3% of the purchase price). Mot. ¶ 17. The proposed Overbid Amount is $2,500,000. Id. at ¶ 19. The Court established the hearing and objection deadlines indicated above for the Motion on August 16, 2010.

5. On August 27, 2010, Donald F. Walton, the United States Trustee of Region 21, appointed the members of the Official Committee of Unsecured Creditors in the above-captioned cases [Docket No. 118].

**ARGUMENT**

6. Given the highly competitive pre-bankruptcy marketing process, there is no justification for the Breakup Fee and Overbid Amount in connection with the sale of substantially all of the Debtors' assets. This is not a case where the Debtors were desperate to sign up a deal with any party in order to spur on interest; rather, the Debtors have freely acknowledged that several parties were seriously interested in these assets right up until the moment of their bankruptcy filing. Rewarding one of those parties by tilting the auction process steeply in their favor is simply not appropriate. Moreover, the combination of the Breakup Fee and the Overbid Amount provide what could be an insurmountable barrier to entry for interested bidders, thus chilling or perhaps even driving away competing bids.

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

3

7.      To support these steep penalty provisions, the Debtors rely on the extremely debtor-friendly (but inappropriate here) 995 Fifth Avenue/Integrated Resources line of cases ("Integrated Resources"), which follow "the business judgment rule" for determining whether a breakup fee is appropriate. This test originated in the Southern District of New York. See In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989). The Integrated Resources factors are limited to the following: (i) whether the relationship of the parties who negotiated the breakup fee is tainted by self-dealing or manipulation; (ii) whether the fee will hamper, rather than encourage, bidding; and (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price. 147 B.R. at 657.

8.      The Integrated Resources factors should not be the end of the analysis, particularly in light of the fact that those factors have routinely been rejected by the majority of courts outside of the Second Circuit as giving the debtor too much discretion. See C.R. Bowles, The Sale of the Century or a Fraud on Creditors?: The Fiduciary Duty of Trustees and Debtors in Possession Relating to the "Sale" of a Debtor's Assets in Bankruptcy, 28 U. Mem. L. Rev. 781 (1998) ("While the business judgment rule is the standard of review in the Second Circuit, the majority of reported cases outside of that circuit have rejected the deferential 995 Fifth Avenue/Integrated Resources test"). "These [other] courts have adopted stricter standards for evaluating whether economic incentives should be approved . . . . [and t]hese standards focus not on whether the DIP abused its business judgment, but whether the proposed incentives benefit the bankruptcy estate." Id.

9.      Rather, this Court should adopt the standards set forth in In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992), which consider a variety of factors that account for the concerns of other key bankruptcy constituencies, such as the Debtors' creditors. See Hupp, 140 B.R. at 194 (rejecting the business judgment analysis, denying the breakup fee and

4

stating that "a potential harm which follows an imprudent allowance of a Breakup Fee results in a lesser spirited auction process and may preclude further bidding in instances where the fee is so large that it makes competitive bidding too costly").[2] See also In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("[T]he standard is not whether a Breakup Fee is within the business judgment of the debtor, but whether the transaction will "further the diverse interests of the debtor, creditors and equity holders, alike").

10. Regardless of which test this Court adopts, awarding a substantial breakup fee and providing a significant overbid amount are not justifiable here. First, breakup fees are typically used to compensate a stalking horse bidder for (i) the forced transfer of private due diligence information about the target that its bid will reveal to competitors and (ii) its willingness to provide a floor bid to attract other potential serious bidders. See Bruce Markell, The Case Against Breakup Fees in Bankruptcy, 66 Am. Bankr. L.J. 349, 379 (1992) (discussing typical justifications for breakup fees). See also Mot. ¶ 35 ("the inducement of the Breakup Fee was critical in persuading the Stalking Horse Purchaser to make an initial offer, which will serve as a "floor" for other bidders in connection with the Proposed Sale

---

[2] The Hupp court articulated a strict seven factor test for breakup fees that considers:

1) Whether the fee requested correlates with a maximization of value to the debtor's estate;

2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

3) Whether the principal secured creditors and the official creditors committee are supportive of the concession;

4) Whether the subject Breakup Fee constitutes a fair and reasonable percentage of the proposed purchase price;

5) Whether the dollar amount of the Breakup Fee is so substantial that it provides a "chilling effect" on other potential bidders;

6) The existence of available safeguards beneficial to the debtor's estate;

7) Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the Breakup Fee.

140 B.R. at 194.

Process, and to expend the time and resources associated with conducting due diligence regarding the Business and with negotiating and entering into the Agreement").

11. As described above, the Debtors' own pleadings reveal that multiple potential bidders engaged in at least three rounds of substantial due diligence, at their own considerable expense -- rather than as so-called "free-riders", prior to the Petition Date. See Disclosure Statement at 29-30. The Debtors are not proposing to compensate these competing bidders for their diligence costs, even though it is clear that the bidding competition contributed to the offer that the Stalking Horse Purchaser eventually put forth. Furthermore, in any asset sale, a purchaser is normally obligated to bear diligence costs. If such costs added to the purchase price exceed the value of the asset, a rational purchaser will not consummate the sale. Markell at 362. Breakup fees are not intended to compensate for due diligence costs as a matter of due course, but rather to ensure that there will be no "free ride on the bidder's due diligence" by competing bidders. Id. at 379. A breakup fee is excessive where, as here, the likely competing bidders have already conducted their own diligence.

12. Second, the presence of a robust market for the Debtors' assets further undermines the remaining justification for the breakup fee, namely, that the Stalking Horse Purchaser was willing to provide a floor for other bidders. The "Debtors fully negotiated asset purchase agreements with three different bidders" before selecting the Stalking Horse Mot. ¶ 16 (emphasis added). Presumably, each of these agreements was accompanied by a sincere desire on the part of the bidder to consummate the transaction. So, realistically, any of these bidders could have set the floor on the proposed purchase price. The Stalking Horse Purchaser should not receive a windfall in the form of the Breakup Fee merely because it happened to be initially selected as the stalking horse. Similarly, the $2,500,000 Overbid Amount will serve only to chill competing bids rather than address the valid concern of

discouraging tedious bidding wars where participants increase offers in *de minimis* amounts.

13.     Given the circumstances in these cases, there is no need to induce bidding, and as a consequence the stalking horse protections are unwarranted.  In a similar case, <u>America West</u>, the debtor had also already been marketed to multiple potential bidders.  166 B.R. at 912.  Four bids resulted and a leading bid was selected.  <u>Id.</u>  In rejecting the breakup fee requested by the leading bidder, the court explicitly concluded that the debtor had "been thoroughly marketed and that the proposed Breakup Fee will not induce further bidding or bidding generally".  <u>Id.</u> at 913.  The situation is virtually identical here and the <u>American West</u> reasoning holds true.  The Debtors' assets have been fully marketed and the existence of other willing bidders has been demonstrated.  In such a case, legitimate bidders who might otherwise have renewed or revised their offers will now be chilled by the high incremental bidding price caused solely by the excessive Breakup Fee and Overbid Amount.

14.     Alternatively, if this Court decides to approve some stalking horse protections, it should only do so after reducing the Breakup Fee and Overbid Amount to appropriate levels.  "[T]he maximum breakup fee that a court should approve is one that offers to repay a bidder's direct costs of preparing and making its bid."  Markell at 369.  "Given the direct correlation between revenues from the sale and creditor dividends, paying a fee in excess of reimbursable costs is tantamount to paying a party to do something that it already was going to do."  <u>Id.</u>  The Court's broad powers under section 105 of the Bankruptcy Code grant it wide latitude to fashion equitable relief to respond to the Objection.  <u>See</u> <u>In re Nepsco, Inc.</u>, 36 B.R. 25, 26-27 (Bankr. D. Me. 1983) (following recommendation of an objector without standing in ordering public rather than private sale moved for by debtor to increase returns to the estate).  Indeed, even under the liberal standards for breakup fees in New York and Delaware, courts often request, *sua sponte*, significant reductions in stalking horse protections.  <u>See</u> e.g., <u>In re Metaldyne Corp.</u>, 409 B.R. 661 (Bankr. S.D.N.Y. 2009) (reducing

breakup fee by 25%); In re Anchor Glass Container Corp., Case No. 96-1434 (Bankr. D. Del. October 11, 1996) (reducing breakup fee by 70%); and In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992) (reducing requested breakup fees by approximately 33%).

## CONCLUSION

WHEREFORE, Anschutz/Starwood respectfully requests that this Court (i) deny in its entirety the Breakup Fee and Overbid Amounts requested in the Motion, (ii) in the alternative, reduce the Breakup Fee and Overbid Amount to more reasonable amounts and (iii) grant Anschutz/Starwood such other relief as is just and proper.

Dated: September 7, 2010

**MORRIS, MANNING & MARTIN, LLP**

By: /s/ Frank W. DeBorde            _

Frank W. DeBorde
Georgia Bar No. 215415
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Direct: 404.233.7000
Fax: 404.365.9532
Email: fwd@mmmlaw.com

- and -

**HOGAN LOVELLS US LLP**

Robin Keller
Christopher R. Donoho III
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: robin.keller@hoganlovells.com
Email: chris.donoho@hoganlovells.com

*Attorneys for Anschutz/Starwood*

Application for admission pro hac vice to be submitted.