IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEA ISLAND COMPANY, et. al., | ) | Case No. 10-21034 -JSD |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 365, 1123 AND 1129 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING PROCEDURES RELATED TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) FIXING THE MANNER AND EXTENT OF NOTICE, AND (E) <u>GRANTING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "Committee") of (i) Sea Island Company; (ii) Sea Island Coastal Properties, LLC; (iii) Sea Island Services, Inc.; (iv) Sea Island Resort Residences, LLC; (v) Sea Island Apparel, LLC; (vi) First Sea Island, LLC; and (vii) Sical, LLC (collectively, the "Debtors"), by and through undersigned proposed counsel, hereby objects to the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 362, 365, 1123 and 1129 (A) Authorizing And Scheduling An Auction At Which Debtors Will Solicit The Highest Or Best Bid For The Sale Of Substantially All Of The Debtors' Assets, (B) Approving Procedures Related To Conduct Of Auction, (C) Approving Break-Up Fee, (D) Fixing The Manner And Extent Of Notice, And (E) Granting Related Relief.* (the "Sale and Bid Procedures Motion") [D.E. # 24]. In support of this objection, the Committee states:

### A. Summary of Argument

1. In little over a one week period since its formation, the Committee has the undaunting task of reviewing, analyzing, digesting, and comprehending the ramifications of a

3062608-4

pre-negotiated deals between the Debtors, Synovus Bank f/k/a Columbus Bank and Trust, Bank of America, N.A. and Bank of Scotland (collectively the "Lenders"), and Sea Island Acquisition, LP, (the "Stalking Horse Bidder") that has been some time in the making. Although the Committee has just started to receive information in support of the relief sought, the one thing patently clear is that this bankruptcy in general, and the sale in particular, is predominately for the benefit of the Lenders.

2. In addition, it is also clear that the break up protections being sought ($5,925,000 – almost twice what is being left behind for the unsecured creditors – plus an overbid of $2,500,000) are not necessary in light of the extensive pre-auction bidding that the Debtors represent has already occurred and are intended to do nothing more than chill the auction process.

### B. Background

3. This case was commenced on August 10, 2010 (the "Petition Date"), when each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

4. On the Petition Date the Debtors filed the Sale and Bid Procedures Motion that is the subject of this objection, ten other first day motions, the Joint Disclosure Statement, and the Joint Plan of Reorganization. The "second day" hearing on the Sale and Bid Procedures Motion and certain other first day motions is scheduled for September 9, 2010 (the "Second Day Hearing Date").

5. By this Court's Order Granting Motion to Extend Time to File Schedules and Statements of Financial Affairs [D.E. # 62], the Debtors were granted an extension of time to file their Schedules and Statements of Financial Affairs until September 8, 2010 -- one day before

the Second Day Hearing Date, but after the deadline for objections to the Sale and Bid Procedures Motion.

6. On August 27, 2010, the Office of the United States Trustee constituted the Committee. [D.E. # 118].

7. At a duly convened meeting of the Committee on August 27, 2010, the Committee voted to retain Berger Singerman to advise and represent the Committee in these bankruptcy cases. The Committee advised Berger Singerman of its selection on that same day. On August 30, 2010, the Committee voted to elect its chairman.[1] Also on August 30th the Committee voted to retain GlassRatner Advisory & Capital Group, LLC, as its financial advisors in these Chapter 11 cases.[2]

8. Accordingly, the Committee has been working on this case only since August 27, 2010, and for the reasons stated more fully below, the Committee has not had the opportunity to properly evaluate the requested relief, and indeed, certain information, notably the Debtors' schedules and statements of financial affairs, will not even be available until after the objection deadline. Even absent access to, and sufficient time to, review the relevant information[3], the Committee objects to certain aspects of the Sale and Bid Procedures Motion, as follows.

### C. Argument

#### (i) Facts as Stated by the Debtors.

9. The Debtors disclose that subsequent to their default on their most recent financial

---

[1] The Application to Retain Berger Singerman, P.A. as counsel to the Committee was filed on September 3, 2010. [D.E # 131]
[2] The Application to Employ GlassRatner as Financial Advisor to the Official Committee was filed on September 3, 2010. [D.E # 130]
[3] Undersigned counsel was granted limited access access to the Debtors Inralinks site to access information after 6 p.m. on Friday, September 3rd, and certain other information was provided on Sunday after 5:30 p.m. The Committee is still negotiating the confidentiality agreements that are required in order to obtain full access to the necessary documents, a redraft having been provided to undersigned counsel this morning.

arrangements in January of 2010, the Debtors undertook a review of strategic alternatives, and determined that a sale of all or substantially all of the assets would result in the best recovery for all of their stakeholders, and retained Goldman, Sachs & Co. as their investment banker to market their assets. (¶ 14[4]).

10. In a process that has not yet been revealed to the Committee, Goldman Sachs identified and contacted potential interested purchasers and ultimately 79 parties signed confidentiality agreements and conducted due diligence, and "[M]ore than" 12 indications of interest were submitted.(¶ 15) The Debtors and their legal advisors in their own discretion identified the "strongest offers." (¶15) The Debtors then fully negotiated asset purchase agreements with 3 different bidders. (¶ 16) After consultation with their Lenders, the Debtors selected the Stalking Horse Bidder as the proposed stalking horse bidder. The Committee has not been provided full documentation supporting the selection process of the strongest offers or the process used to ultimately select the Stalking Horse Bidder.

11. The terms of the Stalking Horse Bidder bid provide for a purchase price of $197,500,000 (subject to post-closing purchase price adjustments), paid in immediately available funds at closing, plus Assumed Liabilities. The assets include virtually all of the Debtors' assets, including Specified Avoidance Actions. The Assumed Liabilities include ordinary course trade liabilities, cure costs for assumed contracts,[5] certain liabilities with respect to certain of the Debtors' employees, all of Debtors obligations to honor customer reservations, gift certificates and gift cards, all sales and use taxes and certain pro rated costs, expenses and liabilities. (¶17) In addition, the terms of the Asset Purchase Agreement provide for the rejection of the existing

---

[4] References to paragraphs that are not otherwise identified are to the Sale and Bid Procedures Motion.

[5] Exhibit B to the Sale and Bid Procedures Motion provides that the cure amount for assumed contracts is $0.

membership agreements for the Sea Island Club and the Ocean Forest Golf Club, although existing members will be invited to rejoin based upon new terms and conditions. Id. The net affect of these features on the bankruptcy estate and the justification for their design is not known.

12. The proposed sale process provides for the approval of the Stalking Horse Bidder with extremely aggressive buyer protections and other bid procedures that unduly favor the Stalking Horse Bidder in the circumstances of this case.

13. The process provides that third-parties interested in acquiring the assets must submit a conforming Initial Overbid (in the amount of $2,500,000) by not later than 5:00 p.m. local time October 4, 2010. (¶ 19(i)). In the event of a qualifying Overbid, the Debtors will conduct an auction on October 11, 2010. At the Auction, each bid must be in increments of at least $1,000,000.00 greater than the prior bid, and the stalking horse is entitled to a cash "credit" in the amount of the breakup fee [$5,925,000].

### (a) Objection to Payment of the Break-up Fee and Overbid Features

14. The bid procedures request approval of a break-up fee of $5,925,000, which is equivalent to 3% of the 197,500,000 purchase price as well as an overbid of $2,500,000 (¶ 17). The break-up fee and Overbid are excessive, unnecessary, and not in the best interests of the estates or their creditors.

15. A "break-up" fee is a form of buyer protection intended to provide a prospective buyer of all or a significant portion of an estate's assets, as an assurance that the debtor-in-possession, or trustee, must either complete the sale or pay the buyer's expenses. *See* 3-363 Collier on Bankruptcy P263.02[7]. By inducing a prospective buyer to spend time and effort in

due diligence and purchase negotiations, where they otherwise would not do so, the "break-up" fee can provide value for the bankruptcy estate. *See, Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999). Where, as is the case here, multiple parties already have the motivation to conduct due diligence and engage in purchase negotiations, the break-up fee provides no value to the various bankruptcy estates or their creditors. *Id.*

16. As noted by the Debtors in their Motion, break-up fees may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking" (¶ 33 citing to *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)). However, that is not the case here. Through a process not fully explained to the Committee, at least 79 other parties have conducted due diligence, and "[m]ore than" 12 persons submitted indications of interest to the Debtors with 3 fully negotiated asset purchase agreements. While courts have stated various standards to determine when break-up fees are appropriate, all of the standards indicate that a break-up fee would be inappropriate under these circumstances.

17. The lead Circuit Court case remains the Third Circuit's decision in *O'Brien*. *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *O'Brien* the Third Circuit held that an unsuccessful stalking horse bidder at a § 363 auction must seek approval of a break-up fee pursuant to § 503(b), which requires that post-petition administrative expenses be allowed only for "actual, necessary costs and expenses of preserving the estate." *Id.* at 535. In so holding, the Third Circuit explicitly rejected the business judgment standard and a granular analysis of specific factors that

other courts around the nation had used, by finding that courts do not have the authority to create new ways to authorize the payment of fees from a bankruptcy estate. *Id.* at 536. *O'Brien* has been followed by numerous courts outside of the Third Circuit. *See, e.g. AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing Inc.)*, 290 B.R. 90, 97-98 (BAP 8th Cir. 2003); *In re CXM, Inc.*, 307 B.R. 94 (Bankr. N.D. Ill. 2004); *In re Kitty Hawk, Inc.*, 2003 Bankr LEXIS 859 (Bankr N.D. Tex. July 29, 2003); and *In re Dorado Marine*, 332 B.R. 637 (Bankr. M.D.Fla. 2005).

18. *O'Brien* was recently followed by the same court in *In re Reliant Energy Channelview, LP, et. al.*, 594 F.3d 200 (3d Cir. 2010). In *Reliant Energy*, the Third Circuit found that a break up fee was not necessary to preserve the estate where the fee did not induce the stalking horse to make its initial bid or entice the stalking to remain committed in the face of an auction. *Id.* at 207. The court found that break-up fee was not necessary to induce the initial bid, because that bid was made without the assurance of a break-up fee. In the case before the Court today, the break-up fee was likewise not required to induce the initial bid. Nine parties were turned away from negotiating purchase contracts with the Debtors. Two other bidders negotiated asset purchase agreements at great time, cost, and expense without the promise of a break-up fee.

19. In *Reliant Energy*, the court also noted that a break-up fee provides benefit to the estate if it entices a bidder to adhere and remain committed to its initial bid, rather than abandoning its attempts to purchase assets. In that case the asset purchase agreement provided that an auction would be held only if the court required it. Despite the fact that the court ordered an auction to be held, the break-up fee was deemed not necessary to keep the bidder at the table.

The court stated, "we see no reason to believe that bidders who already have made a full and complete bid necessarily will abandon their efforts to obtain an asset without assurance of a break-up fee." *Id.* at 208.

20. Like the situation in *Reliant*, the facts before the court do not support that Sea Island Acquisition, LP, would abandon its initial bid. The asset purchase agreement provides for an auction to be held, so it is clear that the break-up fee is not required to keep the Stalking Horse Bidder around in the event of an auction. Further, based upon the interest expressed in the assets by other bidders, the prospect of purchasing the assets cheaply is the lure attracting all of the bidders and driving the market for the assets, and not the prospect of a break-up fee. Clearly the Debtors have not met their burden to justify the break up fee under the prevailing case law.

21. In addition to the foregoing, *Reliant Energy*, and all of the various tests used by courts in evaluating break-up fees place great importance on whether the fee hampers rather than encourage bidding. The fee in this case is completely unnecessary, does not in any way encourage bidding, and in fact deters possible purchasers from bidding for the assets. As stated previously, over nine parties wishing to bid were for some reason not invited to participate in the process of negotiating asset purchase agreements. The parties were competing for a chance to propose asset purchase agreements. Because a market for bidding exists, the break-up fee can only operate to chill and complicate the bidding process.

22. The reasonableness of the amount of the break up fee is also questionable. Notwithstanding bankruptcy "lore" that 3 % breakup fees are "market" (albeit the high end of market), in light of the case law cited above and the facts and circumstances of this case, a break up fee of almost $6 million is simply not reasonable. The break-up fee is twice the amount of the

unsecured creditors' set aside, and in order for any competing bidder to come the table, they must bid approximately $205,925,000 ($5,925,000 break-up fee plus the initial bid price of 197,500,000 plus $2,500,000 overbid). In addition, the overbid of $2,500,000 likewise places a chill on the bidding. The break-up fee and over bid are not reasonable under these circumstances. To the extent that the court deems any break-up fee to be necessary and reasonable, the Committee believes any fee should be limited to the actual and necessary expenses incurred by the bidder, and the over bid amount should be reduce to promote active bidding.

    **b.**     **Objection to Provisions for Assuming and Rejecting, and Fixing Cure Amounts for Executory Contracts and Unexpired Leases**

23.     The Committee objects to the portion of the Sale and Bid Procedures Motion that relates to the fixing of the cure amounts of specific executory contracts and unexpired leases.

24.     The fixing of the cure amounts is procedurally flawed and improper. The motion provides for the sale of substantially all of the debtors assets and the fixing of the cure amounts for specific assumed and assigned contracts under § 365. In order to protect the rights of non-debtor parties, Federal Rules of Bankruptcy Procedure Rule 6006 provides that a proceeding to assume, reject, other than as part of a plan, is governed by Rule 9014. Rule 9014 provides that for contested matters relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought. As an additional due process safeguard, Rule 6006(c) explicitly provides that notice of such motion "shall be given to the other party to the contract or lease, to other parties in interest as the court may direct, and to the United States Trustee."

25.     Proper notice and opportunity for hearing has not been provided to either the non-

debtor parties assumed and assigned in the sale, or the non-debtor parties rejected. By including the fixing of the cure costs in this Sale and Bid Procedures Motion, and indicating that only specific contracts will be assumed and assigned, the Debtors are violating the due process rights of all of the non-debtor parties. Importantly, the procedure impairs the non-debtor parties ability to assert defaults and cure amounts prior to assumption, as this court has noted is required in *Georgia Ports Authority v. Diamond Manufacturing Company, Inc. (In re Diamond Manufacturing Company, Inc.)*, 164 B.R. 189 (Bankr. S.D. Ga 1994).

26. To the extent that the identification of specific executory contracts/leases has a binding effect on the terms of the sale, or on the estate, the committee objects. The decision has significant consequences for the estate. If a contract is improperly rejected, the estate will lose any benefit from the contract and it will be liable for damages for the breach, which may be allowed as a prepetition claim and thereby dilute recoveries to the unsecured creditors.

27. Further, the cure amounts for each and every assumed contract is listed at $0.00. If the cure amounts for any of the contracts are improperly fixed at $0.00, without proper notice or opportunity for the non-debtor parties to object, and a later determination of a cure cost in excess of $0.00 is made, additional liability could result for the estate. Such liability would reduce the dividend to unsecured creditors, rather than being attributed to the buyer.

    **d.**    **Objection to Miscellaneous Provisions**

28. The Committee objects to the extent the Sale and Bid Procedures Motion seeks the Court to approve the form of the Asset Purchase Agreement now, as well as the requirement as set forth on Exhibit A to the Sale and Bid Procedures Motion, the form of the proposed order, that competing bidders submit an asset purchase agreement "having substantially identical terms

and conditions" as the Asset Purchase Agreement. The foregoing will unnecessarily hamper prospective bidders who may wish to submit bids that may be on more favorable terms that as currently set forth in the Asset Purchase Agreement.

29. The Committee reserves the right to raise all objections to the terms of the Asset Purchase Agreement, and the propriety of the Debtors' decisions with regard to the assumption and rejection of executory contracts and unexpired leases, until the hearings on the respective motions.

30. In the Sale and Bid Procedures Motion the Debtors indicate the intention of the Stalking Horse Bidder to assume certain obligations for deferred compensation and retiree benefits, but the Committee has not been provided sufficient information to determine whether the obligations being assumed are for all creditors with deferred compensation claims and retiree benefits, or only certain creditors, and if only certain creditors, what criteria were used to determine which creditors are included and which are excluded.

31. Pursuant to § 365(a), the trustee, subject to the court's approval, may assume or reject any executory contract of the debtor. The statute does not provide a standard to be applied in determining the priority of the trustee's decision. In evaluating a decision to assume or reject most courts, including the Eleventh Circuit, apply the traditional "business judgment rule." *Georgia Ports* 164 B.R. 189 (Bankr. S.D. Ga 1994) (citing the Eleventh Circuit precedent in *In re Gardinier, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987), for the proposition that "a trustee's decision is subject to court approval and is reviewed under the traditional "business judgment" standard). Generally, this test simply requires a showing that the assumption or rejection will likely benefit the estate (*In re Sun City Investments, Inc*, 89 B.R. 245, 248-249 (Bankr. M.D. Fla.

1988). A decision to assume or reject cannot, however, derive from bad faith, whim, or caprice. *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007); In re Nickels Midway Pier, LLC, 341 B.R. 486, 493 (Bankr. D.N.J. 2006, aff'd in part, 341 B.R. 486 (D.N.J. 2006).

32. The Committee has not had sufficient information or time to determine all aspects of the Asset Purchase Agreement that may be objectionable, and reserves the right to provide further objection to the specific terms of the Asset Purchase Agreement. Nor has the Committee been able to determine whether the decision regarding which deferred compensation or retiree benefits are being assumed were made in bad faith, or by whim or caprice.

33. The Asset Purchase Agreement provides for the sale of certain assets to the Stalking Horse Bidder, and for significant liabilities to be left with the Debtors' estates. For example, the Asset Purchase Agreement provides for the sale of the Debtors' interest in Luxury Apparel Group and also provides for the transfer of Specified Avoidance Actions. As of this date, the Committee has not been able to determine what the value of these assets are and whether sufficient consideration has been paid on account of their transfer.

34. Finally the Committee objects to the provisions of the Asset Purchase Agreement related to the treatment of members of the Sea Island Club and the Ocean Forest Golf Club, including resetting the 30 year deposit program; changing the ability of a member's deposit to be refunded upon death, (under the new program the member's estate must wait in line with other resigned members); and it unclear when existing members dues are credited whether they will get full membership in the new club or whether the member must pay any shortfall between the credit and the current amount of deposits.

35. The Committee is cognizant of the need to proceed quickly in order to monetize the Debtors' assets for the benefit of all of their creditors, however, the need for speed does not negate the Committee's fiduciary obligations to make sure the process it fair and reasonable, and does not unnecessarily chill bidding or result in unfair treatment if certain creditors. Likewise, the Court must insure a fair process, especially for a sale of this magnitude. *See, e.g., Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 14 C.B.C.2d 1298 (6th Cir. 1986); *In re Abbotts Dairies*, 788 F.2d 143, 150, 14 C.B.C.2d 811, 819 (3d Cir. 1986) (section 363(b)(1) "mirrors the requirement of section 1129 that the bankruptcy court independently scrutinize the debtor's reorganization plan"); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 9 C.B.C.2d 941 (2d Cir.1983) (sale requires business justification); *see also Western Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus., Inc.)*, 43 F.3d 714, 720 n.9, 32 C.B.C.2d 923, 931 n.9 (1st Cir. 1994) (collecting authorities) ("the order confirming a chapter 11 liquidation sale warrants special bankruptcy scrutiny"); *In re Public Serv. Co.*, 90 B.R. 575 *(Bankr. D.N.H. 1988)* (the more the sale or transaction affects the terms of the ultimate plan, the more scrutiny is required).

36. Based upon the information before it, the Committee believes the break up fee and overbid features are unreasonable, and certain provisions of the Asset Purchase Agreement may unfairly exclude certain creditors while leaving behind liabilities to be borne by the estate.

WHEREFORE, the Committee respectfully requests that the Court deny the Debtors' Sale and Bid Procedures Motion. The Committee respectfully requests that the Court grant such other and further relief as may be just and proper.

Dated: September 7, 2010					Respectfully submitted,

ELLIS, PAINTER, RATTERREE & ADAMS, LLP
2 East Bryan Street, 10th Floor
Savannah, Georgia 31401
Telephone (912) 233-9700
Facsimile: (912) 233-2281

By: _____
David W. Adams
Georgia State Bar No. 002860
dadams@epr-law.com
Drew K. Stutzman
Georgia State Bar No. 000098
dstutzman@epra-law.com

and

BERGER SINGERMAN, P.A.

Paul Steven Singerman
Florida Bar No. 378860
psingerman@bergersingerman.com
Jordi Guso
Florida Bar No. 0863580
jguso@bergersingerman.com
Debi Evans Galler
Florida Bar No. 985236
dgaller@bergersingerman.com
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

*Proposed Counsel to the Official Committee of Unsecured Creditors of the Debtors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served Regular Mail or via Electronic Mail (where indicated by an *) upon the parties on the attached Service List this 7th day of September, 2010.

By: _____
Debi Evans Galler

## Service List

| | |
|---|---|
| **Lisa Howell Baggett**<br>Kenney Solomon & Medina<br>3675 Crestwood Pkwy, Ste 300<br>Duluth, GA 30096 | **Jasmine Ball, Esq.***<br>Debevoise and Plimpton, LLP<br>919 Third Avenue<br>New York, NY 10022 |
| **Sarah R. Borders***<br>King & Spalding, LLP<br>1180 Peachtree Street<br>Atlanta, GA 30309-3521 | **Sea Island Company**<br>100 Salt Marsh Lane<br>St. Simons Island, GA 31522 |
| **Robert M. Brennan**<br>Parker, Hudson, Rainer & Dobbs<br>1500 Marquis Two Tower<br>285 Peachtree Center Avenue, N.E.<br>Atlanta, GA 30303 | **M. Katherine Burgess**<br>Pension Benefit Guaranty Corporation<br>1200 K Street, NW<br>Washington, DC 20005 |
| **James S. Carr**<br>Kelley Drye & Warren, LLP<br>101 Park Avenue<br>New York, NY 10178 | **Shelli Willis***<br>**Ezra H. Cohen***<br>Troutman Sanders LLP<br>600 Peachtree St, NE<br>Atlanta, GA 30308 |
| **Kenneth D. Crowder**<br>U. S. Attorney<br>Federal Justice Ctr 600<br>James Brown Blvd<br>P O Box 2017<br>Augusta, GA 30903 | **Rufus T. Dorsey, IV***<br>Parker Hudson Rainer & Dobbs LLP<br>1500 Marquis Two Tower<br>285 Peachtree Center Ave, NE<br>Atlanta, GA 30303 |
| **Robert M Cunningham**<br>Gilbert, Harrell, Sumerford & Martin PC<br>P O Box 190<br>Brunswick, GA 31521 | **Steven R. Gross***<br>Debevoise and Plimpton, LLP<br>919 Third Avenue<br>New York, NY 10022 |
| **Jeffrey R. Dutson***<br>King & Spalding, LLP<br>1180 Peachtree Street<br>Atlanta, GA 30309-3521 | **Jeffrey W. Kelley***<br>**A. Michelle Willis**<br>Troutman Sanders LLP<br>Bank of America Plaza Suite 5200<br>600 Peachtree Street NE<br>Atlanta, GA 30308 |

| | |
|---|---|
| **Jonathan T. Edwards\***<br>Alston & Bird, LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309 | **Joseph P. Moodhe, Esq.**<br>Debevoise and Plimpton, LLP<br>919 Third Avenue<br>New York, NY 10022 |
| **Kathleen Horne**<br>**Margaret S. Puccini**<br>Inglesby, Falligant, Horne, Courington,<br>P.O Box 1368<br>Savannah, GA 31402 | **Frank J Perch, III**<br>Hunter Maclean Exley & Dunn PC<br>P O Box 9848<br>Savannah, GA 31412 |
| **George E.B. Mcguire, Esq.**<br>Debevoise and Plimpton, LLP<br>919 Third Avenue<br>New York, NY 10022 | **John Carson Weitnauer\***<br>Alston & Bird, LLP<br>One Atlantic Center<br>1201 West Peachtree St.<br>Atlanta, GA 30309-3424 |
| **Kenneth E. Noble**<br>Katten Muchin Rosenman, LLP<br>575 Madison Avenue<br>New York, NY 10022 | **Kristin C. Wigness**<br>Katten Muchin Rosenman, LLP<br>575 Madison Avenue<br>New York, NY 10022 |
| **Sarah L. Taub\***<br>King & Spalding, LLP<br>1180 Peachtree Street<br>Atlanta, GA 30309-3521 | **Lloyd's America, Inc.**<br>The Museum Office Building<br>25 West 53rd Street, 14th Floor<br>New York, NY 10019 |
| **Jason Harold Watson\***<br>Alston & Bird, LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309 | **David Allan Wender\***<br>Alston & Bird, LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309 |
| **Harris Winsberg\***<br>King & Spalding<br>1180 Peachtree Street<br>Atlanta, GA 30309 | **Office of the U.S. Trustee\***<br>222 West Oglethorpe Ave., Ste. 302<br>Savannah, GA 31401 |
| **J. David Freedman**<br>Parker, Hudson, Rainer & Dobbs<br>1500 Marquis Two Tower<br>285 Peachtree Center Avenue, N.E.<br>Atlanta, GA 30303 | **David W. Adams\***<br>Ellis, Painter, Ratterree & Adams<br>2 E Bryan St, 10th Flr<br>P O Box 9946<br>Savannah, GA 31412 |

| | |
|---|---|
| **Michael B. Pugh**<br>Thompson O'Brien Kemp & Nash, PC<br>40 Technology Pkwy South, Suite 300<br>Norcross, GA 30082 | **Barbara Ann Johns**<br>RT 3 Box 485 P<br>Hortense, GA 31543 |
| **Barry Hannah**<br>Barry's Beach Service, Inc.<br>4225 4th St. East Beach<br>St. Simons Island, GA 31522 | **Bernd Lembecke**<br>254 Murray Rd.<br>West Palm Beach, FL 33405 |
| **Bill Edenfield**<br>236 Devonwood<br>St Simons Island, GA 31522 | **Bill Miller**<br>110 Temple Terrace<br>Woodbine, GA 31569 |
| **Billy Ray Gibson**<br>406 Whitfield Ave.<br>St. Simons Island, GA 31522 | **Bob Flight**<br>24 Gayfield Road<br>Cape Elizabeth, ME 04107 |
| **CT Adams**<br>503 Vassar Point<br>St. Simons Island, GA 31522 | **Carl Patrick Talley**<br>105 Meadowbrook<br>St Simons Island, GA 31522 |
| **Clifford Owens, Jr.**<br>500 Inverness Ct<br>St Simons Island, GA 31522 | **David Everett**<br>319 West 48th Street<br>Sea Island, GA 31561 |
| **Dennie McCrary**<br>283 West 13th Street<br>Sea Island, GA 31561 | **Edward T. Wright**<br>107 Author J. Moore Drive<br>Sea Island, GA 31522 |
| **Edward T. Wright**<br>107 Author J. Moore Drive<br>St Simons Island, GA 31522 | **Georgia Department of Labor**<br>148 Andrew Young International, Blvd., NE<br>Suite 826<br>Atlanta, GA 30303 |
| **Georgia Department of Revenue**<br>Bankruptcy Section<br>1800 Century Center Blvd., Suite 15300<br>Atlanta, GA 30345 | **Georgia Power**<br>c/o Terry Hodges 241 Ralph McGill<br>Blvd. B-10180<br>Atlanta, GA 30308<br>Attn: Shirley Douglass |

| | |
|---|---|
| **Scott Sullivan**<br>Glynn Landscaping<br>1955 Coast Street<br>Brunswick, GA 31520 | **Dawn Nelson**<br>Imperial Credit Corporation<br>101 Hudson Street<br>Jersey City, NJ 07302 |
| **Institution Food House**<br>2801 Alex Lee Blvd.<br>Florence, SC 29506 | **Internal Revenue Service**<br>PO Box 21126<br>Philadelphia, PA 19114 |
| **Internal Revenue Service**<br>Insolvency Stop 334D, Room 400<br>West Peachtree, Street, NW<br>Atlanta, GA 30308 | **John Deere Credit**<br>6400 NW 86th St., #6600<br>Johnston, IA 50131 |
| **Joyce McNeely**<br>102 Cascades<br>St Simons Island, GA 31522 | **William M. Flatau**<br>Katz, Flatau & Boyer, LLP<br>355 Cotton Ave<br>Macon, GA 31201 |
| **Lesco/ John Deere Landscape**<br>24110 Network Place<br>Chicago, IL 60673 | **Matt Hodgdon**<br>307 Carnoustie<br>St Simons Island, GA 31522 |
| **Matthew E. Mills**<br>Assistant US Trustee of the US Trustee<br>222 W. Oglethorpe Ave, Suite 302<br>Savannah, GA 31401 | **Ed Ralston**<br>Merrell Hawkins, LLC<br>One Premier Plaza<br>5605 Glenridge Dr. NE, Suite 720<br>Atlanta, GA 30342 |
| **Ed Ralston**<br>Merrell Hawkins, LLC<br>404 Ribault Ln<br>Sea Island, GA 31522 | **Mary T. Tipton**<br>126 St Clair Dr<br>St Simons Island, GA 31522 |
| **Nancy Butler**<br>105 Dudley Ln<br>St Simons Island, GA 31522 | **Network Services Plus, Inc.**<br>5080 Old Ellis Pointe<br>Roswell, GA 30076 |
| **Oscar B. Fears, III**<br>Senior Assistant Attorney General<br>40 Capitol Square, SW<br>Atlanta, GA 30334 | **Alfreda Baran**<br>PBGC<br>Department of Insurance Supervision & Compliance<br>1200 K Street, NW<br>Washington, DC 20005 |

3062608-4

19

| | |
|---|---|
| **Sue M. Sayer**<br>302 Forest Oaks<br>St Simons Island, GA 31522 | **Tom Fazio**<br>401 N Main Street, Suite 400<br>Hendersonville, NC 28792 |
| **Scott Freeman**<br>Travelers<br>Account Resolution<br>One Tower Square, 5MN<br>Hartford, CT 06183 | **US Attorney**<br>100 Bull Street, Suite 201<br>Savannah, GA 31401 |
| **William C. Smith**<br>147 Point Lane<br>St Simons Island, GA 31522 | **William R. Graham**<br>172 Merion<br>St Simons Island, GA 31522 |