IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** *et al.* | ) | **Case No. 10-21034-JSD** |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**PURCHASER'S MEMORANDUM IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 1123 AND 1129 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING PROCEDURES RELATED TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) FIXING THE MANNER AND EXTENT OF NOTICE, AND (E) GRANTING RELATED RELIEF**

Sea Island Acquisition LP (the "Purchaser"), a limited partnership formed by certain investment funds managed by Oaktree Capital Management L.P. and Avenue Capital Group, respectfully submits this memorandum in support of the Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 1123 and 1129 (A) Authorizing and Scheduling an Auction at which Debtors will Solicit the Highest or Best Bid for the Sale of Substantially all of Debtors' Assets, (B) Approving Procedures Related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing the Manner and Extent of Notice, and (E) Granting Related Relief (the "Motion").

876716-01

23263859v5

The Purchaser as "stalking horse" has provided – and continues to provide – substantial value to the Debtors'[1] estates which merits approval of the Purchaser's bargained for breakup fee.

## PRELIMINARY STATEMENT

1. The Purchaser and the Debtors entered into the asset purchase agreement, attached to the Motion as Exhibit C (the "Sale Agreement"), shortly before the Debtors commenced these Chapter 11 Cases. The Sale Agreement provides for the purchase by the Purchaser of substantially all of the Debtors' assets for $197,500,000 in cash and the assumption or other provision for the satisfaction of the Debtors' most significant unsecured liabilities. The Sale Agreement also provides for the payment to the Purchaser of a breakup fee in the amount of $5,925,000, representing 3% of the cash purchase price (the "Proposed Breakup Fee"), in the event that the Debtors sell their assets to another purchaser on higher and better terms.

2. Perhaps the best evidence that the Proposed Breakup Fee is commensurate with the value contributed by the Purchaser is the fact that the Debtors' pre-petition lenders, Synovus Bank, Bank of America N.A. and Bank of Scotland plc (collectively, the "Pre-Petition Lenders"), out of whose recovery the Proposed Breakup Fee will ultimately be paid, have committed to support the Debtors' proposed bidding procedures, including the Proposed Breakup Fee.[2]

3. As stalking horse, the Purchaser brought critical stability to the Debtors' operations at the time of the commencement of these Chapter 11 Cases by providing a purchase

---

[1] The Debtors in these Chapter 11 Cases are: Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC and Sea Island Resort Residences, LLC.

[2] *Declaration of David Bansmer in Support of First Day Applications and Motions* ¶ 18 [Docket No. 21].

commitment for the Debtors' assets and certainty for many of the Debtors' key unsecured creditor constituencies (members, employees and trade creditors). The Purchaser's stalking horse terms will continue to benefit the Debtors' estates by serving as the baseline against which potential bidders will be invited to submit competing bids pursuant to the proposed bidding procedures, which bids will be facilitated, rather than discouraged, by having the benefits of the Purchaser's extensive due diligence efforts.

4.  The Purchaser expended significant time and incurred significant expense in the Debtors' pre-petition sale process in the conduct of due diligence and negotiation of contract terms, which resulted in the Sale Agreement and related Disclosure Schedule. The Sale Agreement and Disclosure Schedule have and continue to benefit the Debtors' estates by making it easier for potential bidders to value the Debtors' assets and liabilities and, therefore, participate in the auction. The Purchaser undertook this cost and effort on the inducement that, if selected as stalking horse, the Purchaser would have the benefit of the Proposed Breakup Fee. Having been selected as stalking horse, the Purchaser may terminate its obligations under the Sale Agreement if the Proposed Breakup Fee is not approved.

## **BACKGROUND**[3]

5.  As described more fully in the Motion, in early 2010, the Debtors decided to pursue a sale of all or substantially all of their assets and engaged Goldman, Sachs & Co. ("Goldman Sachs") to run the sale process. As part of this process, the Purchaser received from the Debtors a form of asset purchase agreement which provided for the sale of Debtors' assets in

---

[3] The factual background relating to the Purchaser's involvement in the Debtors' sale process, including its due diligence efforts, is set forth in detail in the *Declaration of Philip Hofmann in Support of Debtors' Motion* filed on September 8, 2010 and incorporated herein by reference.

bankruptcy. As instructed by Goldman Sachs, the form asset purchase agreement was to be marked up and submitted along with the Purchaser's definitive proposal for the acquisition of the Debtors' assets.

6. The form of asset purchase agreement provided by the Debtors set out proposed bidding procedures, including a provision for the payment of a breakup fee equivalent to 2% of the purchase price in the event the stalking horse purchaser was not the prevailing bidder at the auction. Pursuant to Goldman's instructions, the Purchaser submitted its proposal, which included a breakup fee in the amount of 3% of the purchase price, as well as a provision for the reimbursement of expenses.

7. Shortly thereafter, principals of the Debtors and the Purchaser reached agreement on the purchase price for the transfer of substantially all of the Debtors' assets and agreed to a breakup fee of approximately 4% of the agreed upon purchase price.

8. The Purchaser continued to engage in extensive negotiations with the Debtors related to the terms of the sale and specifically which liabilities would be assumed by the Purchaser. Significant time was spent discussing membership liabilities, employee obligations, and trade payables. The proposed bid procedures, including breakup fee and expense reimbursement, were also discussed.

9. Although the Pre-Petition Lenders did not participate directly in the negotiations with the Purchaser and the Debtors, it was the Purchaser's understanding that the Debtors were providing the Pre-Petition Lenders with updates on the positions of the parties as they developed. As part of this process, the Purchaser learned that the Pre-Petition Lenders required that the Purchaser assume additional post-petition liabilities of the Debtors and reduce the breakup fee to

3% of the purchase price, with no expense reimbursement, before they would agree to support the sale of substantially all of the Debtors' assets.

10. The Purchaser agreed to many of the Pre-Petition Lenders' conditions, including a reduction in the breakup fee (with no expense reimbursement), ensuring the Pre-Petition Lenders' support for the Sale Agreement, as reflected in the Pre-Petition Lenders' execution of the Restructuring and Lockup Agreement, dated August 6, 2010.

11. On August 4, 2010, Sea Island Acquisition LP and certain of the Debtors entered into the Sale Agreement. The Sale Agreement provides, *inter alia*, that upon the consummation of a sale of all or substantially all of the assets of the Debtors to any third party who submits a higher and better bid for the assets (provided that certain defaults have not occurred), the Purchaser is entitled to $5,925,000, representing 3% of the purchase price provided in the Sale Agreement.

12. In the months leading up to the execution of the Sale Agreement, the Purchaser engaged in extensive due diligence involving many thousands of hours of work on the part of the Purchaser and its advisors.

13. To coordinate the review over 1,250 documents in the electronic data room, the Purchaser retained Debevoise & Plimpton LLP ("Debevoise") as counsel. Given the scope of these documents, Debevoise attorneys with expertise in various disciplines including real estate, employee benefits, environmental, intellectual property and tax participated in this review. These specialists, along with members of the Purchaser's internal business team, also spent substantial time with the Debtors' management and advisors discussing issues and following up on questions raised as part of the review.

14. In addition to Debevoise, the Purchaser retained the following advisors to conduct diligence related to the purchase of the Debtors' assets:

- Local real estate counsel
- Local environmental counsel
- Water and sewer system infrastructure consultant
- Bridge consultant
- Beach renourishment consultant
- Membership consultants
- Membership legal counsel
- Insurance consultants
- Environmental consultants
- Surveyor
- Local real estate appraiser
- Hospitality consulting and valuation firm
- Engineering and construction consultant
- Hotel/resort management company and owner

## ARGUMENT

**I. The Proposed Breakup Fee Is Appropriate Under Existing Case Law and Should Be Approved.**

15. The Debtors' Memorandum of Law in Support of the Motion (the "<u>Memorandum</u>"), filed September 7, 2010, describes the various standards applied by courts in evaluating breakup fees. The Purchaser agrees with the Debtors' legal analysis and supports the

6

Debtors' conclusion that under the existing case law, the Proposed Breakup Fee is appropriate and should be approved.[4]

**II. The Proposed Breakup Fee Reflects the Value Attributed by the Debtors and the Pre-Petition Lenders to the Purchaser as Stalking Horse.**

16.    It is clear that the two parties-in-interest with the most at stake in these Chapter 11 Cases – the Pre-Petition Lenders and the Debtors (representing all constituencies of the estates) – attributed great value to the role of the stalking horse in the Debtors' sale process.  Furthermore, the extensive negotiations among the parties over the terms of the Agreement and the amount of the Proposed Breakup Fee reveal that it was an essential component of securing the Purchaser's participation in the sale process.

17.    The Debtors' decision to provide for the payment of a breakup fee reflects their belief that a breakup fee was necessary and appropriate to induce the Purchaser's initial bid, which, in turn, would promote additional competitive bidding through the stability the Purchaser's bid provided to the Debtors.  The Debtors undoubtedly were aware that breakup fees were commonplace in auctions under these circumstances and that sophisticated bidders like the Purchaser and Anschutz/Starwood would expect to include such a fee in the final stalking horse agreement.  The Proposed Breakup Fee of 3% is reasonable in amount and well within the range of breakup fees approved by Georgia bankruptcy courts for transactions of this size.[5]

18.    Although the Pre-Petition Lenders insisted on a reduced breakup fee, there was also never any indication that they did not consider a breakup fee to be a necessary inducement

---

[4] Specifically, the Purchaser agrees that the bidding procedures, including the Proposed Breakup Fee, are appropriate under both the business judgment standard and the administrative expense test formulated by the Third Circuit Court of Appeals. *See Memorandum* at 4–5.

[5] *See id.* at 6 n.5.

to the Purchaser to act as the stalking horse.  Indeed, the Pre-Petition Lenders agreed to support the Debtors' proposed sale process, including the Proposed Bidding Procedures and the Proposed Breakup Fee provided therein, after the Purchaser agreed, *inter alia*, to reduce the breakup fee to 3% of the purchase price.  Since the Proposed Breakup Fee will ultimately be paid by the Pre-Petition Lenders out of the proceeds of the sale of substantially all of the Debtors' assets, the Pre-Petition Lenders' support for the Proposed Breakup Fee is a strong indication of the value the Purchaser is providing to the Debtors' sale process.

**III. The Extensive Due Diligence Performed by the Purchaser Resulted in the Agreement and Disclosure Schedule, Which Will Provide Increased Value for the Debtors at the Auction.**

19.   The Purchaser's efforts and participation in the sale process have provided – and continue to provide – value to the process and to the Debtors' estates by establishing a baseline for additional competitive bidding and by providing stability to the Debtors' business functions and relationships.

20.   The Purchaser expended considerable time, effort and expense conducting due diligence on the Debtors.  The Purchaser's internal business team, along with Debevoise as outside counsel, spent thousands of hours coordinating and conducting review of documents related to the business of the Debtors.  The Purchaser also retained an additional fourteen consultants with unique expertise to conduct surveys and inspections, prepare reports, and assist the Purchaser in analyzing and preparing for the purchase of the Debtors' assets and the assumption the Debtors' liabilities.

21.   As one example of the tremendous time and resources involved in the Purchaser's diligence process, the efforts of the Purchaser's local real estate counsel leading up to the

execution of the Sale Agreement included: the review of thousands of pages of complex title and survey documents for over 50 individual properties; the review of multiple title commitments (over 200 pages in length) and endorsements; the review of extensive condominium declarations and filings; and multiple on-site visits, including several meetings with the Debtors' local real estate counsel in Brunswick, Georgia.

22.     The result of the Purchaser's extensive due diligence efforts is the Sale Agreement and the Disclosure Schedule, which provide for the assumption of most of the significant liabilities of the Debtors.  These documents provide a continuing benefit to the Debtors and the Pre-Petition Lenders in at least three ways.  First, the Sale Agreement serves as a baseline for all future bids: the Proposed Bidding Procedures specify that any bidder will have to offer no less favorable terms than these.  Second, other bidders will be more encouraged to participate in the Debtors' auction knowing that the Debtors' assets and liabilities have been so thoroughly vetted by a sophisticated and well-informed investor.  Third, the Purchaser's efforts have provided substantial stability to the Debtors' business functions and relationships through the various liabilities that the Debtor has assumed in the Sale Agreement.

23.     As noted in the Debtors' Memorandum, under the "administrative expense" standard, the approval of a breakup fee is warranted where "the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely," thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999).  The Purchaser's extensive due diligence efforts have resulted in exactly this type of value to the Debtors' sale process.  All potential bidders now have access to the Sale

Agreement and the Disclosure Schedule that was produced by the Purchaser's diligence as they prepare their bids.

24. Further, throughout the sale process, the Debtors made clear to the Purchaser that the assumption of most of the Debtors' liabilities would be critical to stabilizing the Debtors during the chapter 11 process. Through the many thousands of hours of due diligence performed, the Purchaser was in a position to agree to assume many of the Debtors' most significant liabilities, including payables, most membership liabilities and certain obligations related to the Debtors' employees, prior to the Debtors' chapter 11 filing. The assumption of these liabilities has provided additional certainty to the Debtors' operations as the sale process proceeds.

25. For example, as part of its extensive review of the Company's membership liabilities, the Purchaser engaged membership counsel who spent more than 130 hours reviewing membership documents and existing membership plans. The Purchaser also engaged two specialized membership consultants, who made multiple trips to Sea Island, Georgia, to assist in the design of a new membership program and strategy. As a result of these efforts, the Purchaser agreed to offer to all members the opportunity to confirm their memberships in the Purchaser's new membership programs with full credit given to their cash deposits. Concurrently with the Debtors' chapter 11 filing, the Purchaser and the Debtors were able to provide members with this assurance, as well as additional information related to the terms of the new membership programs. Reassuring members, who are critical to the viability of the Debtors' future, was an important outcome of the Purchaser's efforts.

26. Further, after reviewing information related to the Debtors' employees and employee benefit plans, the Purchaser agreed to offer employment to all of the Debtors' active employees and to assume certain liabilities related to health care, accrued vacation and severance, helping to stabilize the Debtors' workforce during the bankruptcy process.

**IV. The Purchaser Participated in the Sale Process With the Expectation That It Would Receive a Breakup Fee and There Is No Justification for Disruption of This Expectation.**

27. Finally, the Purchaser participated in the initial sale process (and won) with the expectation that if it were outbid at the auction, it would receive the Proposed Breakup Fee. This expectation was reasonably based on the explicit support of both the Debtors and Pre-Petition Lenders.

28. None of the circumstances or facts here suggests that the expectations of the parties – including the Pre-Petition Lenders – should be disregarded. In fact, the opposite is true. The fact that the Pre-Petition Lenders agreed to support the Proposed Bidding Procedures, including the Proposed Breakup Fee, indicates that, in the experienced judgment of both the Debtors and the Pre-Petition Lenders, the Purchaser is not only preserving, but increasing the value of the estate. In addition, the extensive due diligence performed by the Purchaser resulted in the Sale Agreement and Disclosure Schedule, which will provide continuing value to the estate by making it easier for potential bidders to value the Debtors' assets and liabilities and participate in the auction.

## Conclusion

For the foregoing reasons, the Purchaser submits that the Court should approve the Debtors' proposed bidding procedures, including the Proposed Breakup Fee. First, the Proposed

11

Breakup Fee is supported by the Debtors and the Pre-Petition Lenders, out of whose proceeds the Proposed Breakup Fee will ultimately be paid. Second, the Purchaser invested substantial time and resources in due diligence, resulting in an agreement with the Debtors that includes the assumption of most of the Debtors' most significant liabilities and will lead to higher and better offers for the Debtors' assets. Finally, the Purchaser was induced to participate in the Debtors' sale process based on the expectation that it would receive a breakup fee, and there are no factors that suggest that the Court should disregard these expectations.

Dated:    Brunswick, Georgia
          September 8, 2010

Respectfully submitted,

HUNTER, MACLEAN, EXLEY & DUNN, P.C.

/s/ Frank J. Perch, III
Frank J. Perch, III
Georgia Bar No. 142225
fperch@huntermaclean.com

Post Office Box 9848
Savannah, Georgia  31412-0048
Tel (912) 236-0261
Fax (912) 236-4936

and

DEBEVOISE & PLIMPTON LLP

/s/ Joseph P. Moodhe
Joseph P. Moodhe (*jpmoodhe@debevoise.com*)
Steven R. Gross (*srgross@debevoise.com*)
George E.B. Maguire (*gebmagui@debevoise.com*)
Jasmine Ball (*jball@debevoise.com*)

919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Sea Island Acquisition LP*

12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | CHAPTER 11 |
| SEA ISLAND COMPANY, et al. | ) | CASE NO. 10-21034-JSD |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing *PURCHASER'S MEMORANDUM IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 1123 AND 1129 (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) APPROVING PROCEDURES RELATED TO CONDUCT OF AUCTION, (C) APPROVING BREAK-UP FEE, (D) FIXING THE MANNER AND EXTENT OF NOTICE, AND (E) GRANTING RELATED RELIEF* upon all parties to this matter by depositing a true copy of same in the U.S. Mail, proper postage prepaid, addressed to counsel of record as follows:

Sea Island Company
100 Salt Marsh Lane
St. Simons Island, GA  31522

Harris Winsberg
Robert M. Cunningham
Sarah R. Borders
Sarah L. Taub
Jeffrey R. Dutson
King & Spalding, LLP
1180 Peachtree Street
Atlanta, GA  30309-3521

Office of the United States Trustee
222 West Oglethorpe Avenue
Suite 302
Savannah, GA  31401

John H. Watson
David A. Wender
Jonathan T. Edwards
John Carson Weitnauer
Alston & Bird, LLP
1201 W. Peachtree Street
Atlanta, GA  30309

876716-01

23263859v5

| | |
|---|---|
| Kristin C. Wigness<br>Kenneth E. Noble<br>Katten Muchin Rosenman, LLP<br>575 Madison Avenue<br>New York, New York  10022 | Robert M. Brennan<br>Rufus T. Dorsey, IV<br>J. David Freedman,<br>Parker, Hudson, Rainer & Dobbs, LLP<br>1500 Marquis Two Tower<br>285 Peachtree Center Avenue, N.E.<br>Atlanta, GA  30303 |
| Robert M. Cunningham<br>Gilbert, Harrell, Sumerford & Martin, P.C.<br>Post Office Box 190<br>Brunswick, GA  31521-0190 | Kathleen Horne<br>Margaret S. Puccini<br>Inglesby, Falligant, Horne Courington & Chisholm, P.C.<br>Post Office Box 1368<br>Savannah, GA  31402-1368 |
| Lisa H. Baggett<br>Kenney, Solomon & Medina, P.C.<br>3675 Crestwood Parkway<br>Suite 300<br>Duluth, GA  30096 | M. Katherine Burgess<br>Pension Benefit Guaranty Company<br>1200 K Street, NW<br>Washington, DC  20005 |
| James S. Carr<br>Kelley Drye & Warren, LLP<br>101 Park Avenue<br>New York, NY  10178 | Shelli Willis<br>Ezra H. Cohen<br>Troutman Sanders, LLP<br>Bank of America Plaza<br>600 Peachtree Street, NE<br>Atlanta, GA  30308 |
| Kenneth Crowder<br>US Attorney<br>Federal Justice Center<br>600 James Brown Boulevard<br>Post Office Box 2017<br>Augusta, GA  30903 | Jeffrey W. Kelley<br>A. Michelle Willis<br>Troutman Sanders, LLP<br>Bank of America Plaza<br>600 Peachtree Street, NE<br>Suite 5200<br>Atlanta, GA  30308 |
| Lloyd's America, Inc.<br>The Museum Office Building<br>25 West 53rd Street<br>14th Floor<br>New York, NY  10019 | David W. Adams<br>Drew K. Stutzman<br>Ellis, Painter, Ratteree & Adams<br>2 E. Bryan Street<br>10th Floor<br>Post Office Box 9946<br>Savannah, GA  31412 |

Michael B. Pugh
Thompson O'Brien Kemp & Nash, P.C.
40 Technology Parkway
Suite 300
Norcross, GA  30082

Barry Hannah
Barry's Beach Service, Inc.
4225 4th St. East Beach
St. Simons Island, GA  31522

Bill Edenfield
236 Devonwood
St. Simons Island, GA  31522

Billy Ray Gibson
406 Whitfield Avenue
St. Simons Island, GA  31522

CT Adams
503 Vassar Point
St. Simons Island, GA  31522

Clifford Owens, Jr.
500 Inverness Court
St. Simons Island, GA  31522

Dennie McCrary
283 West 13th Street
Sea Island, GA  31561

Georgia Department of Labor
148 Andrew Young International Blvd, NE
Suite 826
Atlanta, GA  30303

Georgia Power
c/o Terry Hodges
Attn:  Shirley Douglass
241 Ralph MacGill Blvd.
B-10180
Atlanta, GA  30308

Barbara Ann Johns
Route 3
Box 485 P
Hortense, GA  31543

Bernd Lembecke
254 Murray Road
West Palm Beach, Florida  33405

Bill Miller
110 Temple Terrace
Woodbine, GA  31569

Bob Flight
24 Gayfield Road
Cape Elizabeth, ME  04107

Carl Patrick Talley
105 Meadowbrook
St. Simons Island, GA  31522

David Everett
319 West 48th Street
Sea Island, GA  31561

Edward T. Wright
107 Author J. Moore Drive
Sea Island, GA  31522

Georgia Department of Revenue
Bankruptcy Section
1800 Century Center Blvd.
Suite 15300
Atlanta, GA  30345

Scott Sullivan
Glynn Landscaping
1955 Coast Street
Brunswick, GA  31520

15

Dawn Nelson
Imperial Credit Corporation
101 Hudson Street
Jersey City, NJ  07302

Internal Revenue Service
Post Office Box 21126
Philadelphia, PA  19114

John Deere Credit
6400 NW 86tj Street
#600
Johnston, IA  50131

William M. Flatau
Katz, Flatau & Boyer, LLP
355 Cotton Avenue
Macon, GA  31201

Matt Hodgdon
307 Carnoustie
St. Simons Island, GA  31522

Ed Ralston
Merrell Hawkins, LLC
404 Ribault Lane
Sea Island, GA  31522

Nancy Butler
105 Dudley Lane
St. Simons Island, GA  31522

Alreda Baran
PBGC
Department of Insurance Supervision & Compliance
1200 K Street, NW
Washington, DC  20005

Institution Food House
2801 Alex Lee Blvd.
Florence, SC  29506

Internal Revenue Service
Insolvency Stop 334 D, Room 400
West Peachtree Street, NW
Atlanta, GA  30308

Joyce McNeely
102 Cascades
St. Simons Island, GA  31522

Lesco/John Deere Landscaping
24110 Network Place
Chicago, IL  60673

Ed Ralston
Merrell Hawkins, LLC
One Premier Plaza
5605 Glenridge Drive NE
Suite 720
Atlanta, GA  30342

Mary T. Tipton
126 St. Clair Drive
St. Simons Island, GA  31522

Network Services Plus, Inc.
5080 Old Ellis Pointe
Roswell, GA  30076

Sue M. Sayer
302 Forest Oaks
St. Simons Island, GA  31522

23263859v5
876716-01

| | |
|---|---|
| Tom Fazio<br>401 N. Main Street<br>Suite 400<br>Hendersonville, NC  28792 | Scott Freeman<br>Travelers<br>Account Resolution<br>One Tower Square, 5MN<br>Hartford, CT  06183 |
| United States Attorney<br>100 Bull Street<br>Suite 201<br>Savannah, GA  31401 | William C. Smith<br>147 Point Lane<br>St. Simons Island, GA  31522 |
| William R. Graham<br>172 Merion<br>St. Simons Island, GA  31522 | Wiley A. Wasden, III<br>William E. Dillard<br>Brennan and Wasden, LLP<br>Post Office Box 8047<br>Savannah, GA  31412 |
| Paul S. Singerman<br>Jordi Guso<br>Debi E. Galler<br>Berger Singerman, P.A.<br>200 s. Biscayne Boulevard<br>Suite 1000<br>Miami, FL  33131 | Frank W. DeBorde<br>Morris Manning & Martin, LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road, NE<br>Atlanta, GA  30326 |
| Robin Keller<br>Christopher R. Donoho, III<br>Hogan Lovells US LLP<br>875 Third Avenue<br>New York, NY  10022 | |

This 8th day of September, 2010.

HUNTER, MACLEAN, EXLEY & DUNN, P.C.

/s/ Frank J. Perch, III
Frank J. Perch, III
Georgia Bar No. 142225

*ATTORNEY FOR SEA ISLAND ACQUISITION, P.C.*

200 East St. Julian Street
P.O. Box 9848
Savannah, Georgia 31412-0048
(912) 236-0261  Telephone

17

23263859v5
876716-01

18

23263859v5
876716-01