**FILED**
Samuel L. Ray, Clerk
United States Bankruptcy Court
Brunswick, Georgia
By cking at 6:19 pm, Sep 15, 2010

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Brunswick Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Case |
| | ) | Number 10-21034 |
| SEA ISLAND COMPANY, | ) | |
| SEA ISLAND COASTAL PROPERTIES LLC, | ) | Jointly Administered |
| SEA ISLAND RESORT RESIDENCES, LLC, | ) | |
| SEA ISLAND APPAREL, LLC | ) | |
| FIRST SEA ISLAND, LLC | ) | |
| AND SICAL, LLC | ) | |
| | ) | |
|     Debtors in Possession | ) | |
| | ) | |
| SEA ISLAND COMPANY, | ) | |
| SEA ISLAND COASTAL PROPERTIES LLC, | ) | |
| SEA ISLAND RESORT RESIDENCES, LLC, | ) | |
| SEA ISLAND APPAREL, LLC | ) | |
| FIRST SEA ISLAND, LLC | ) | |
| AND SICAL, LLC | ) | |
| | ) | |
|     Debtors in Possession/Movants | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS | ) | |
| | ) | |
|     Creditor Committee | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SEA ISLAND HOLDINGS, L.L.C. | ) | |
| | ) | |
|     Party in Interest | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROBERT STOLZ, | ) | |
| GORDIN MARTIN, | ) | |
| MALINDA MORTIN, et al. | ) | |
| | ) | |
|     Club Member Creditors | ) | |
| | ) | |
|     Respondents | ) | |

AO 72A
(Rev. 8/82)

## ORDER ON OBJECTIONS TO BID PROCEDURES

This matter is before me on the Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§105, 362, 365, 1123 and 1129 (A) Authorizing and Scheduling an Auction at which Debtors Will Solicit the Highest or Best Bid for the Sale of Substantially all of Debtors' Assets , (B) Approving Procedures Related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing the Manner and Extent of Notice and (E) Granting Related Relief ("Motion")(ECF No. #24) and the objections thereto. An evidentiary hearing was held on September 9, 2010. At the conclusion of the hearing, I found the break-up fee to be appropriate, I rejected the initial overbid amount, and I approved the Debtors' rejection of a late offer by Sea Island Holding Company L.L.C. ("Anschutz/Starwood"). I find and conclude the following in making my decision.

### BACKGROUND

On August 10, 2010, the Debtors filed voluntary petitions with this Court under chapter 11 of the Bankruptcy Code. Along with their petitions the Debtors filed various motions including this Motion.

In the Motion, the Debtors requested that the Court approve the proposed sale process and the bid procedures, including procedures for submitting a initial overbid, conducting the auction, identifying the prevailing bid, and providing for the payment of a break-up fee. The proposed overbid amount is $2.5

2

million. (Mot. ¶ 19). The proposed break-up fee is $5,925,000 or 3% of the cash portion of the purchase. (Mot. ¶ 17).

Prior to the petition, in January 2010, the Debtors retained Goldman, Sachs & Co. ("Goldman Sachs") as their investment banker to market their assets and begin the sale process. (Mot. ¶ 14). Through this process the Debtors and Goldman Sachs identified and contacted potential purchasers. (Mot. ¶ 15). After a three-round process, beginning with about seventy-nine parties and concluding with three offerors having fully negotiated asset purchase agreements, Goldman Sachs called for "best and final offers." From the three final offers, Goldman Sachs recommended to Sea Island Company's Boards of Directors the offer of Sea Island Acquisition LP (the "Stalking Horse Bidder" or "Oaktree/Avenue"), a limited partnership formed by certain investment funds managed by Oaktree Capital Management LP and Avenue Capital Group. The Board of Directors accepted the Oaktree/Avenue offer.

Thereafter, on August 4, 2010, the Debtors executed an agreement ("Asset Purchase Agreement") with the Stalking Horse Bidder for the purchase of substantially all of their assets pursuant to the Debtors' Joint Chapter 11 Plan of Liquidation ("Plan"). (Mot. ¶ 17). On August 6, 2010, the Debtors and its prepetition lenders, Synovus Bank, Bank of America, N.A., and Bank of Scotland (collectively the "Bank Lending Group"), executed the Restructuring and Lockup Agreement whereby the Bank

Lending Group agreed to support the Plan and proposed sale, including the bid procedures and break-up fee and the amount of the initial overbid, subject to certain conditions. (Mot. ¶ 18).

After the Oaktree/Avenue offer was accepted and after the bankruptcy filing, Anschutz/Starwood submitted another offer for $1.5 million more in cash and a lower break-up fee of a flat $3 million. The Board of Directors rejected the late offer.

Anschutz/Starwood and the Official Committee of Unsecured Creditors of the Debtors ("Creditors Committee") filed objections to the Motion. At the hearing, Benjamin Leahy of Goldman Sachs testified that in the process of courting purchasers, the assurance of protection in the form of a break-up fee and an initial overbid amount incentivized potential purchasers to increase substantially the amount of cash consideration proposed. (Hr'g. 9/9/10). The break-up fee served as material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Agreement. (Mot. ¶ 22).

## DISCUSSION

Three questions are before me: (1) whether the break-up fee provided for in the bid procedures is appropriate; (2) whether the initial overbid amount set forth in the bid procedures is appropriate; and (3) whether the late offer by Anschutz/Starwood was properly rejected by the Debtors. I find the break-up fee reasonable and appropriate; I sustain the objections to the

initial overbid amount as it merely protects the Stalking Horse Bidder and would chill bidding; and I find the Debtors rejection of the late offer by Anschutz/Starwood to be justified and required.

### I. The Proposed Break-up Fee is in the Best Interests of the Bankruptcy Estate

Bankruptcy courts have examined break-up fee arrangements under three standards. Some courts have used a "business judgment" standard requiring a reviewing court to defer to the business judgment of the debtor in possession and denying the use of such fees only when they are a product of bad faith or would chill bidding. See, e.g., In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992). The Integrated Resources line of cases has considered three questions: Is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation? Does the fee hamper, rather than encourage, bidding? Is the amount of the fee unreasonable relative to the proposed purchase price? See id. at 657. Then, if any or all of those questions are answered affirmatively, the court must judge whether the fee is outside the bounds of sound business judgment.

In contrast, the Third Circuit Court of Appeals has held that the application for break-up fees and expenses under §503(b) is no different from other applications for administrative expenses. See In re Reliant Energy Channel View LP, 598 F.3d 200

(3d Cir. 2010); In re O'Brien Environmental Energy, Inc., 181 F.3d 527 (3d Cir. 1999). Accordingly, this standard turns on "the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535.

Other bankruptcy courts have likewise rejected the business judgment standard, because it fails to account for the best interests of the bankruptcy estate but apply a different standard than the Third Circuit. See In re America West Airlines, Inc., 166 B.R. 908 (Bankr. Arizona 1994); In re Hupp Industries, Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). "The standard is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will 'further the diverse interests of the debtor, creditors and equity holders, alike'" See America West, 166 B.R. at 913. To meet the America West standard, a break-up fee must not unduly burden a debtor's estate, and the relative rights of the parties in interest must be protected. See id.

I find the standard set out in America West the most appropriate of the three standards and, in accordance with that standard, look to the factors set out in Hupp to guide my consideration of the best interest of the bankruptcy estate. See America West, 166 B.R. at 912 (citing Hupp, 140 B.R. 191). These factors are as follows:

1) Whether the fee requested correlates with a maximization of value to the debtor's estate;

2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

3) Whether the principal secured creditors and the official creditors committee are supportive or the concession;

4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

5) Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;

6) The existence of available safeguards beneficial to the debtor's estate [in the event the transaction falls through];

7) Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

Hupp, 140 B.R. at 195.

Here, the negotiated break-up fee is appropriate. First, extensive testimony as to the bidding process demonstrated that when the break-up fee became an integral part of the final rounds of the process, the amounts offered increased substantially, thereby maximizing the value to the Debtors' estate. Next, the record establishes that this was an arms-length transaction, given the lengthy negotiations between multiple parties over the terms and amount of the break-up fee from at least the second round of the process. Further, the Bank Lending Group, which includes the principal secured creditors, supports and, as the

7

case stands today, provides a carve-out for the payment of the possible break-up fee from their proceeds. Though the Creditors Committee does not support the fee at this point, I do not find that approval of a break-up fee of 3% has a substantial adverse impact on the unsecured creditors. The fee constitutes a fair and reasonable percentage of the proposed purchase price, given the range of fees approved within the Southern District of Georgia as well as within the State of Georgia.[1] Moreover, I do not believe that the fee is so substantial as to chill bidding, as the amount is 3% of only the *cash* consideration, not the total consideration.[2] Finally, there exists a safeguard beneficial to the Debtors' estate in that the only way a break-up fee will be paid is if a bidder other than the Stalking Horse Bidder

---

[1] See, e.g., In re Lake Burton Development, LLC, No. 09-22830 (Bankr. N.D. Ga. Apr. 1, 2010)(J. Bonapfel)(approving break-up fee equal to 4.75% of the cash purchase price); In re Case Engineered Lumber, Inc., No. 09-22499 (Bankr. N.D. Ga. Sept. 1, 2009)(J. Brizendine)(approving break-up fee equal to 3.5% of the cash purchase price); In re Firstline Corporation, No. 06-70145 (Bankr. M.D. Ga. Aug. 16, 2006)(J. Walker)(approving break-up fees equal to 2.25% and 2.6% of the cash purchase prices); In re TI Acquisition, LLC, No. 08-42370 (Bankr. N.D. Ga. Aug. 15, 2008)(J. Diehl)(approving break-up fee equal to approximately 3% of the cash purchase price); In re Rhodes, Inc., No 04-78434 (Bankr. N.D. Ga. July 26, 2005)(J. Massey)(approving break-up fee equal to 2.5% of the cash purchase price); In re Adventure Parks Group, LLC, No. 06-70659 (Bankr. M.D. Ga. Sept. 14, 2007)(J. Laney)(approving break-up fee equal to 3% of the cash purchase price); In re Durango Georgia Paper Company, No. 02-21669 (Bankr. S.D. Ga. Nov. 16, 2005)(J. Davis)(approving a break-up fee equal to 3% of the cash purchase price); In re Dan River, Inc., No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004)(J. Drake)(approving break-up fee equal to 5.3% of the cash purchase price).

[2] The Oaktree/Avenue offer proposes a cash purchase price of $197.5 million-- $191 million after holdbacks and deductions along with $170.1 million in other consideration, including the face value of assumed membership deposits ($155.6 million), pre-petition trade payables ($3.1 million), rank and file deferred compensation ($1 million), customer deposits and prepayments ($2.6 million), accrued employee vacation ($1 million), accrued employee severance ($4 million) and gift cards ($600,000) for a total implied aggregate consideration of $361.1 million. (Hr'g Movant's Exhibit #7).

purchases the assets at a price that includes the break-up fee paid from the Bank Lending Group's proceeds. In sum, the break-up fee here satisfies each of the seven relevant factors. I therefore conclude that the break-up fee is in the best interests of the bankruptcy estate.

## II. The Initial Overbid Amount is Not in the Best Interests of the Bankruptcy Estate and in Effect Discourages Bidding

The Debtors contended that the initial overbid amount was subject to a business judgment standard, as the amount simply represents a value beyond the amount of incremental benefit an auction process must create to encourage bidders to participate in it. In this case, the incremental value is set at $1 million and the $2.5 million initial overbid amount represents a value above the incremental bid.

I agree with the Debtors that the amount of an initial overbid is not subject to the administrative expense standard of O'Brien, since the amount is not an expense of the estate. See O'Brien, 181 F.3d at 535. Nevertheless, the amount must still be in the best interest of the bankruptcy estate. See America West, 166 B.R. at 913.

Having considered the Debtors' position, I conclude there is insufficient justification for an initial overbid amount of $2.5 million in addition to the protection and incentive already provided to the Stalking Horse Bidder in the form of a 3% break-

up fee. In effect, this added protection would have only the effect of chilling rather than encouraging bidding. I therefore decline to approve the initial overbid amount and instead set the overbid amount and all incremental bids at $1 million, an amount no party has objected to.

### III. The Debtor's Rejection of Anschutz/Starwood's Offer is Appropriate

In order for all participants in this process to have faith and confidence in the fairness, openness, and integrity of the process, at the very least, everyone must be held to the same set of rules. Here, Goldman Sachs engaged in a worldwide search for a capable purchaser for virtually all the assets of these Debtors ("Sea Island Assets"). The solicitation was open. The information provided to potential purchasers was adequate and readily available at each step of the process to allow potential purchasers to perform due diligence and to determine further interest. From an initial response of seventy-nine potential purchasers, three rounds of offers and negotiations ultimately reduced the number to three: Oaktree/Avenue, Anschutz/Starwood, and KSL Capital Partners, LLC. Goldman Sachs then called for "best and final offers." From the three final offers, Goldman Sachs recommended to the Board of Directors that the offer of Oaktree/Avenue be accepted. The Board accepted that offer.

Early in this process, two factors proved critical to maximizing the offers for the Sea Island Assets: (1) the commitment to support the process by the Bank Lending Group which asserts a security interest in virtually all of the Sea Island Assets, as acknowledged by the Debtors, and (2) the Bank Lending Group's commitment to a break-up fee in the event that the Stalking Horse Bidder is outbid in a subsequent required bankruptcy auction. From an early point in this process, it was disclosed that the ultimate sale would be consummated through a confirmed chapter 11 bankruptcy plan of liquidation and that any plan must provide for a bankruptcy auction of the Sea Island Assets with the offer accepted pre-bankruptcy acting as the stalking horse bid that is the floor bid in amount and terms. The negotiated terms of the Asset Purchase Agreement with Oaktree/Avenue provided for a breakup fee of 3% or $5,925,000 and an initial overbid of $2.5 million with a minimum $1 million incremental bid.

Anschutz/Starwood's late offer is nothing more than an attempt to buy the advantage of the stalking horse position with an offer $1.5 million more than Oaktree/Avenue rather than follow the clear rules of the process and bid in the bankruptcy auction, which will require an initial offer of at least $197.5 million cash to match Oaktree/Avenue's offer plus the break-up fee of

$5,925,000 and an initial overbid of at least $1 million. The late offer was properly rejected.

Moreover, had the Debtors attempted to substitute Anschutz/Starwood's late offer for Oaktree/Avenue's offer as the Stalking Horse Bidder, I would not have allowed it. As pointed out by the Creditors Committee, the Debtors have a fiduciary duty to the bankruptcy estate to maximize the value of the assets for the benefit of all stakeholders. In fact, the Creditors Committee points out that the accepted Oaktree/Avenue offer contains a "fiduciary out" provision.[3] The Committee is in error, however, in believing that this fiduciary duty requires the Debtors to accept this late submitted higher offer. To the contrary, to accept this offer would violate the Debtors' fiduciary duty. The highest and best price for the Sea Island Assets will be obtained through a process in which all participants have faith and confidence in a fair, open, and honest process where everyone follows the same rules.

In an auction sale with these expectations fulfilled, the bidders are certain to offer their best price and not strategically hold back or simply just not devote the time, effort, and money necessary to informatively bid and therefore bid "safely" low, fearing that any deal would not be truly final,

---

[3] In relevant part the Asset Purchase Agreement provides: "Sellers shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets)." (Hr'g Movant's Exhibit #8).

regardless of the rules, until a closing occurs. Here, the pre-bankruptcy filing offering process resulting in the selection of the Stalking Horse Bidder is only half of the sale process. Remaining is the bankruptcy auction and the procedures approved by me for the selection of the ultimate purchaser. To allow Anschutz/Starwood to disrupt this process now would destroy the confidence of any potential auction bidder that the sale would in fact follow these approved procedures, thereby chilling the bidding.

## CONCLUSION

Having heard and duly considered the arguments of Anschutz/Starwood and the Creditors Committee, the objections to the break-up fee are **ORDERED OVERRULED**;

**FURTHER ORDERED** that Anschutz/Starwood's and the Creditors Committee's objections to the initial overbid amount are **SUSTAINED** and the overbid amount is reduced to $1 million, the amount required for incremental bids. A separate order approving the Motion and incorporating my determinations here is entered.

JOHN S. DALIS
United States Bankruptcy Judge

Dated at Brunswick, Georgia,
this 15th day of September, 2010.