**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY, *et al.*,** | ) | **Case No. 10-21034** |
| | ) | **Jointly Administered** |
| | ) | |
| **Debtors.** | ) | **Judge John S. Dalis** |
| | ) | |

## NOTICE OF FILING OF ASSET PURCHASE AGREEMENT

Sea Island Company; Sea Island Coastal Properties LLC; Sea Island Services, Inc.; Sea Island Resort Residences, LLC; Sea Island Apparel, LLC; First Sea Island, LLC; and SICAL, LLC (collectively, the "Debtors") hereby file the executed Asset Purchase Agreement by and among Sea Island Acquisition LP, Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Resort Residences, LLC, First Sea Island, LLC, Sea Island Apparel, LLC and Sea Island Services, Inc. dated as of October 19, 2010 (the "Final APA"). For the convenience of the Court and parties in interest, the Final APA is attached hereto as Exhibit A and a blackline comparing the Final APA against the Stalking Horse APA is attached hereto as Exhibit B.

Dated:  October 19, 2010
            Brunswick, Georgia

Respectfully submitted,

GILBERT, HARRELL, SUMERFORD &
MARTIN, P.C.

/s/ Robert M. Cunningham
M. F. Martin, III
Georgia Bar No. 473500
mfmartin@gilbertharrelllaw.com
Robert M. Cunningham
Georgia Bar No. 202228
rcunningham@gilbertharrelllaw.com
777 Gloucester Street, Suite 200
P.O. Box 190
Brunswick, Georgia 31521-0190
Telephone:     (912) 265-6700
Facsimile:     (912) 264-3917

            and

KING & SPALDING LLP
Sarah R. Borders
Georgia Bar No. 610649
sborders@kslaw.com
Harris Winsberg
Georgia Bar No. 770892
hwinsberg@kslaw.com
Sarah L. Taub
Georgia Bar No. 556919
staub@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5128

COUNSEL FOR THE
DEBTORS-IN-POSSESSION

**<u>EXHIBIT A</u>**

**EXECUTION COPY**

---

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**SEA ISLAND ACQUISITION LP,**

**SEA ISLAND COMPANY,**

**SEA ISLAND COASTAL PROPERTIES LLC,**

**SEA ISLAND RESORT RESIDENCES, LLC,**

**FIRST SEA ISLAND, LLC,**

**SEA ISLAND APPAREL, LLC**

**and**

**SEA ISLAND SERVICES, INC.**

**October 19, 2010**

---

23289415v2

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of October 19, 2010 (this "Agreement") is entered into by and among Sea Island Acquisition LP, a Delaware limited partnership ("Purchaser"), on the one hand, and Sea Island Company, a Georgia corporation ("SIC"), Sea Island Coastal Properties LLC, a Georgia limited liability company, Sea Island Resort Residences, LLC, a Georgia limited liability company, First Sea Island, LLC, a Georgia limited liability company, Sea Island Apparel, LLC, a Georgia limited liability company, and Sea Island Services, Inc., a Georgia corporation (each a "Seller" and, collectively, "Sellers"), on the other hand.  Purchaser and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS,** Sellers own and operate a collection of exclusive hotel resorts, golf courses, spas and recreational complexes, together with certain related developed and undeveloped real estate held by Sellers in connection with their real estate development and management business, all of which are located in or around St. Simons Island and Sea Island, Georgia (the "Business");

**WHEREAS,** in connection with the conduct of the Business, Sellers own and operate certain properties and amenities, including the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course and the Ocean Forest Golf Course;

**WHEREAS,** Sellers desire to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS,** each of the Sellers has filed voluntary chapter 11 petitions with the United States Bankruptcy Court for the Southern District of Georgia, Brunswick Division (the "Bankruptcy Court"), and are debtors in case nos. 10-21034 to 10-21040 pending before the Bankruptcy Court (collectively, the "Bankruptcy Cases"); and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated pursuant to and in accordance with the Plan of Reorganization (as defined below) and the Confirmation Order (as defined below), pursuant to Sections 105(a), 1123 and 1129 of the Bankruptcy Code (as defined below).

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1. **Definitions**.

1.1.   <u>Definitions</u>.   The following terms, as used herein, have the following meanings:

(a)   "<u>2010 Property Taxes</u>" means Property Taxes with respect to the Acquired Owned Real Property for the Tax period January 1, 2010 through December 31, 2010 payable November 15, 2010.

(b)   "<u>Accounts Receivable</u>" means all accounts and notes receivable, letters of credit and other rights to receive payments (whether current or non-current) of Sellers in respect of goods shipped, products sold or services rendered, or other indebtedness incurred to Sellers, prior to the Closing Date.

(c)   "<u>Accrued Payroll</u>" means Sellers' accrued and unpaid payroll and commissions as of the Closing Date, excluding any amounts payable under any retention or incentive programs.

(d)   "<u>Accrued Payroll Taxes</u>" means Sellers' incurred and, in the ordinary course of business consistent with past practice, not yet remitted payroll Taxes for the current period as of the Closing Date.

(e)   "<u>Accrued Sales and Use Taxes</u>" means Sellers' collected and, in the ordinary course of business consistent with past practice, not yet remitted sales and use Taxes for the current period as of the Closing Date.

(f)   "<u>Acquired Owned Real Property</u>" means collectively (a) all of the Owned Real Property, including, but not limited to, the Owned Real Property set forth on <u>Schedule 2.1(a)</u>, but excluding the Excluded Owned Real Property, and (b) the Specified Condo Units.

(g)   "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

(h)   "<u>Assumed Insurance Policies</u>" means all insurance policies set forth on <u>Schedule 2.1(b)</u>, as such Schedule may be amended in accordance with <u>Section 15.10</u>, provided that (i) such insurance policy is assignable to Purchaser at Closing under applicable law, and (ii) no D&O insurance policy shall be an Assumed Insurance Policy, and all claims arising under such policies prior to the Closing, and all credits, premium refunds, proceeds, causes of action or rights thereunder.

(i)   "<u>Balance Sheet</u>" means the unaudited pro forma adjusted balance sheet of the Business as of the Balance Sheet Date (a copy of which is attached hereto as <u>Exhibit A</u>).

(j)   "<u>Balance Sheet Date</u>" means June 30, 2010.

(k)   "<u>Bankruptcy Code</u>" means Title 11 of the United States Code (11

-2-

U.S.C. § 101 et seq.), as amended.

(l)     "Base Working Capital" means $0, representing total Specified W/C Assets minus Specified W/C Liabilities as shown on the Base Working Capital Statement.

(m)     "Base Working Capital Statement" means the statement of Specified W/C Assets and Specified W/C Liabilities as of the Balance Sheet Date attached hereto as Exhibit B.

(n)     "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Brunswick, Georgia are authorized or required by Law to close.

(o)     "Cash Around the Resort" means as of any date, Sellers' cash held at Sellers' facilities as of such date for day-to-day operations in an amount not to exceed $100,000.

(p)     "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

(q)     "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(r)     "Closing Date" means the date of the Closing.

(s)     "Club Member Agreements" shall mean all agreements entered into by one or more of Sellers with Club Members and relating to Sellers' golfing, club, dining, social or other membership programs, including, without limitation, the Specified Member Agreements.

(t)     "Club Members" shall mean all Persons who are members under the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program.

(u)     "Code" means the Internal Revenue Code of 1986, as amended.

(v)     "Confidentiality Agreement" means the Confidentiality Agreement dated May 26, 2010, between SIC and Oaktree Real Estate Opportunities Fund IV, L.P., OCM Opportunities Fund VIIb, L.P. and Oaktree Opportunities Fund VIII, L.P.

(w)     "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(x)     "Customer Deposits and Prepayments" means any and all deposits, advances, prepayments, booking fees, or other amounts paid to Sellers by any of their customers prior to Closing on account of Customer Reservations.

(y)     "Customer Reservations" shall mean any reservations, tee times, or bookings made by any customer of Sellers prior to Closing on account of services or accommodations to be provided to such customer by Sellers, including hotel or lodging accommodations at the Cloister or the Lodge, dining or catering reservations or arrangements at any of the restaurants or other facilities included within the Business, spa treatments at the Cloister Spa and Fitness Center, tees times for rounds of golf at the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course or the Ocean Forest Golf Course and/or rentals pursuant to the Sea Island Cottage Rental program.

(z)     "Declaration" shall mean a Declaration of Covenants, Conditions, Restrictions and Easements or similar document governing a planned community or condominium regime that is part of the Acquired Owned Real Property.

(aa)     "Deferred Compensation Plan" means the Sea Island Company Executive Deferred Compensation Plan as amended and restated effective as of January 1, 2008.

(bb)     "Effective Date" means the date on which all conditions to effectiveness of the Plan of Reorganization have been satisfied or waived and the transactions contemplated by the Plan of Reorganization are consummated.

(cc)     "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any liability, including, but not limited to, the Sea Island Retirement Plan and Trust Agreement.

(dd)     "Environmental Laws" means all federal, state, and local statutes, Laws, ordinances, directives and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all common Law, in each case concerning public health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(ee)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(ff)     "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

-4-

(gg)    "Escrow Agent"  means SunTrust Bank.

(hh)    "Escrow Agreement" means an Escrow Agreement among the Escrow Agent, Sellers and Purchaser executed and delivered hereunder in form reasonably satisfactory to each of the foregoing Persons.

(ii)    "Escrow Fund " means the Working Capital Adjustment Holdback Amount, plus any earnings accrued thereon under the terms of the Escrow Agreement.

(jj)    "Final Order" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue or rehear shall have been waived in writing in form and substance satisfactory to the parties hereto or, in the event that an appeal, writ of *certiorari* or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order shall not preclude such order from being a Bankruptcy Final Order.

(kk)    "GAAP" means, at a given time, United States generally accepted accounting principles.

(ll)    "Gift Certificate Obligations" means Sellers' obligations in respect of all gift certificates and gift cards issued by Sellers and unredeemed as of the Closing Date.

(mm)  "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(nn)    "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes and any other substance with respect to which liability or standards of conduct may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint.

(oo)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and Laws thereunder

(pp)   "Improvements" means all buildings, improvements, structures, streets, roads, bridges and fixtures located, placed, constructed, or installed on or under the Owned Real Property, including the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course, the Ocean Forest Golf Course, driving ranges, chipping greens, practice bunkers, putting greens, clubhouses, maintenance buildings, cart barns, entrance signage, pavilions, guard houses, fences, walls and gates, food and beverage facilities, cart and pedestrian paths, sidewalks, parking lots, access roads, tees, greens, holding ponds, water wells, effluent systems, irrigation lines, drainage facilities and pump stations, and all fixtures, machinery, apparatus or equipment affixed thereto, including all utilities, utility distribution lines, sewer, sewer lines, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(qq)   "Independent Accounting Firm" means any of the nationally recognized "big four" accounting firms, as mutually agreed.

(rr)   "Intellectual Property Rights" means all of Sellers' intellectual property rights, including, but not limited to: (i) patents, patent applications and patent rights; (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(ss)   "Inventory" means all inventory of Sellers of any kind or nature, whether or not prepaid, and wherever located, held or owned, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, and fuels and other similar items.

(tt)   "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by any of the following individuals: Alfred W. Jones, III, David Bansmer and James B. Gilbert.

(uu)   "Law" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(vv)   "Lien" means, with respect to any property or asset, any mortgage,

-6-

lien (statutory or otherwise), pledge, charge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, right of first refusal, Tax, or Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. For the avoidance of doubt, the definition of Lien shall not be deemed to include the grant of any license or sublicense by any Seller of Intellectual Property Rights.

(ww)  "Material Adverse Effect" means a material adverse effect on the Business and the Purchased Assets, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the Transactions or the public announcement thereof, (ii) changes or conditions affecting the hotel, golf, recreation and/or real estate development industries generally, (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), (v) changes in Law or in GAAP, or (vi) changes resulting from the commencement or continuation of the Bankruptcy Cases.

(xx)  "Ocean Forest Golf Club Membership Program" means the Ocean Forest Golf Club Rules and Regulations dated 2004.

(yy)  "OCGA" means the Official Code of Georgia Annotated.

(zz)  "Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(aaa)  "Owned Real Property" means all land, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto owned by any Seller.

(bbb)  "Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

(ccc)  "Permitted Liens" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement, (ii) non-monetary Liens that (A) do not interfere with the ability of Purchaser to own and operate any underlying Purchased Asset in substantially the manner as conducted immediately prior to the execution of this

-7-

Agreement and (B) do not detract in any material respect from the value of any of the material Purchased Assets, (iii) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would interfere with the ownership or operation by Purchaser of any underlying Purchased Asset following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement, (iv) Liens for Taxes not yet due and payable, (v) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contact, (vi) with respect to Acquired Owned Real Property that is leased or subleased to any third party, the terms and conditions of the lease or sublease applicable thereto, and (vii) any and all matters disclosed on Schedule B, Section 2 of the Title Commitment other than the items described on Schedule 1.1(ccc) hereto.

(ddd)   "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(eee)   "Post-Petition Payables Adjustment Amount" means 50% of the amount, if any, by which (a) Sellers' trade accounts payable related to the Business, incurred in the ordinary course of business after the commencement of the Bankruptcy Cases and outstanding as of the close of business on the Business Day prior to the Closing Date, exceeds (b) $1,700,000.  The Post-Petition Payables Adjustment Amount shall be determined on the business day prior to the Closing based on a "payables run" from Sellers' accounting systems made after close of business on such day.

(fff)   "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ggg)   "Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets; provided, however, that Property Taxes shall not include Transfer Taxes on the transfer of the Purchased Assets pursuant to this Agreement.

(hhh)   "Release" has the meaning set forth in CERCLA.

(iii)   "Sea Island Club Membership Program" means the Sea Island Club Membership Program dated October 1, 2000.

(jjj)   "Secured Lenders" means each of (i) Synovus Bank, as lender under the Loan Agreement, dated as of August 7, 2008 and amended as of July 20, 2009, (ii) Synovus, as lender and agent, Bank of America, N.A., as lender, and Bank of Scotland, as lender, under the Restructuring Agreement, dated as of July 20, 2009 and amended as of August 31, 2009, and (iii) Synovus, as lender under a construction loan made pursuant to the Restructuring Agreement referred to in the preceding clause (ii) .

-8-

(kkk)  "Specified Avoidance Claims" means all avoidance claims of Sellers arising under Sections 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code or any similar state Law against any of the Sellers' vendors, Transferred Employees (other than persons who have served as an officer, director or executive of the Sellers) or Club Members, in each case, in such Person's capacity as a vendor, employee or Club Member, whether arising under the Bankruptcy Code or applicable state Law, and whether asserted or unasserted, all of which claims shall be released by Purchaser on the Closing Date.

(lll)  "Specified Club Member Agreements" means the Sea Island Club Membership Program, the Ocean Forest Golf Club Membership Program and all membership applications and membership agreements thereunder.

(mmm)"Specified Condo Unit Owners" means each of Beach Club Ocean Residences, LLC, Beach Club Garden North Residences, LLC, Beach Club Garden South Residences, LLC, and Ocean Club North Residences, LLC.

(nnn)  "Specified Condo Units" means those condominium units listed on Schedule 1.1(mmm) owned by the Specified Condo Unit Owners, as indicated on such schedule.

(ooo)  "Specified Georgia Tax Obligation" means any obligation or liability (v) under OCGA § 48-8-46 for any Taxes imposed pursuant to Chapter 8 of Title 48 of the OCGA (Sales and Use Taxes), (w) under OCGA § 48-7-106 for any Taxes imposed pursuant to Chapter 7 of Title 48 of the OCGA (Income Taxes), (x) under OCGA § 48-9-7 for any Taxes imposed pursuant to Article 1 of Chapter 9 of Title 48 of the OCGA (Motor Fuel Tax), (y) under OCGA § 48-13-53.1 for any Taxes imposed pursuant to Article 3 of Chapter 13 of Title 48 of the OCHA (Excise Tax on Rooms, Lodgings and Accommodations) or (z) under OCGA § 34-8-175 for any Taxes imposed pursuant to Chapter 8 of Title 34 of the OCGA (Employment Security).

(ppp)  "Specified W/C Assets" means, as of any date, the assets shown on the Base Working Capital Statement determined as of such date.

(qqq)  "Specified W/C Liabilities" means, as of any date, the liabilities shown on the Base Working Capital Statement determined as of such date.

(rrr)  "Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

(sss)  "Tax Return" means any report or return filed with respect to Taxes, including all information returns, estimated Tax returns, claims for Tax refund and

-9-

attachments to or amendments of any of the foregoing.

(ttt)    "Title Commitment" means, collectively, that certain Commitment for Title Insurance dated July 12, 2010 issued by Commonwealth Land Title Insurance Company with respect to the Acquired Owned Real Property (as modified by that certain Endorsement No. 1 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, that certain Endorsement No. 2 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, that certain Endorsement No. 3 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, and that certain Endorsement No. 4 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039 and as may be modified by any additional endorsements mutually agreed to by Purchaser and Sellers issued after the date hereof).

(uuu)    "Working Capital Adjustment Holdback Amount" means $2,000,000.

1.2.    Cross References.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Adjusted Base Working Capital | 2.7(b) |
| Agreement | Preamble |
| Assignment and Assumption Agreement | 2.10(a) |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Certified WC | 2.7(c) |
| Closing | 2.9 |
| Communications Plan | 7.3 |
| Confirmation Order | 8.1 |
| Contracts | 3.14 |
| Deficiency | 2.7(c) |
| Electing Club Members | 11.1(b) |
| End Date | 14.1(b) |
| Excluded Assets | 2.2 |
| Excluded Owned Real Property | 2.2(c) |
| Excluded Liabilities | 2.4 |
| Existing Membership Documents | 3.17 |
| Final Working Capital | 2.7(a) |
| Final Working Capital Statement | 2.7(a) |
| Financial Statements | 3.18 |
| GFD Escrow Agent | 2.8(a) |

-10-

| | |
|---|---|
| Good Faith Deposit | 2.8 (a) |
| Goldman Sachs | 3.19 |
| Holdings Parties | 2.8(a) |
| Inventoried Baggage | 7.6 |
| JLV-VASI Note | 2.10(k) |
| Modifying Order | 14.1(j) |
| New Membership Programs | 11.1(a) |
| Party or Parties | Preamble |
| Plan of Reorganization | 8.1 |
| Plan Support Agreement | 14.1(i) |
| Post-Closing Tax Period | 9.3 |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Seller or Sellers | Preamble |
| Sellers Apportioned Tax Amount | 9.3 |
| SIC | Preamble |
| Specified Additional Deferred Compensation Obligations | 2.3(k) |
| Specified Base Deferred Compensation Obligations | 2.3(d) |
| Specified Deferred Compensation Obligations | 2.3(k) |
| Specified Supplemental Deferred Compensation Obligations | 2.3(j) |
| Taxing Authority | 1.1(qqq) |
| Transactions | Recitals |
| Transferred Employees | 10.1 |
| Transfer Taxes | 9.2 |
| Transferred Employees' Employment Date | 10.8 |
| WARN Act | 10.5 |
| WARN Obligations | 10.5 |

## 2. **Purchase and Sale**.

2.1.    Purchase and Sale.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, all right, title and interest of Sellers in and to the following assets, properties and rights (the "Purchased Assets"), free and clear of all Liens (other than Permitted Liens and Assumed Liabilities):

(a)    the Acquired Owned Real Property;

(b)      all rights of Sellers under the written agreements, contracts and leases set forth on Schedule 2.1(b), as such Schedule may be amended in accordance with Section 15.10 (collectively, the "Assumed Contracts");

(c)      all Accounts Receivable;

(d)      all Inventory;

(e)      all Cash Around the Resort as of the Closing Date;

(f)      all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties and or any other assets may be situated, including, but not limited to, those set forth on Schedule 2.1(f);

(g)      to the extent transferable pursuant to Section 2.5 as of the Closing Date or Section 7.9 thereafter, all Permits from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies, in each case, of Sellers, including, without limitation, the Permits set forth on Schedule 3.8(a);

(h)      all goodwill as a going concern and all other intangible property of Sellers;

(i)      all Intellectual Property Rights, including, but not limited to, the items listed on Schedule 2.1(i), and any rights to sue for and remedies against past, present and future infringements thereof, rights of priority and protection of interests therein under the laws of any jurisdiction worldwide and all tangible embodiments thereof;

(j)      all data and records related to the operation of the Business, including client and customer lists and records, referral sources, equipment logs, operating guides and manuals, financial and accounting records, personnel records that are legally transferrable to Purchaser under applicable Law, Tax records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist);

(k)      all books, records, files and papers of Sellers relating to the Business or the Purchased Assets and not subject to any applicable attorney-client privilege (provided that Sellers shall be entitled to retain copies of such books, records, files and papers);

-12-

(l)      all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever;

(m)      all Specified Avoidance Claims;

(n)      the proceeds of any and all rights under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009 by and among Luxury Apparel Group, L.L.C., Sea Island Apparel, LLC, Winona Capital Partners, LLC Series E-PM and Sea Island Company and the related Escrow Agreement date March 31, 2009 by and among Winona Capital Partners, LLC Series E-PM, Sea Island Apparel, LLC and RBS Citizens, N.A.;

(o)      if Purchaser so elects by written notice to Sellers on or before November 1, 2010, Sellers' equity interest in Resort Hotel Insurance Company to the extent that such equity interests are transferable under applicable law; and

(p)      all other assets, properties, rights and claims, whether tangible or intangible, whether personal or mixed, whether accrued, contingent or otherwise that are reflected on the Balance Sheet.

2.2.    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include the following (the "Excluded Assets"):

(a)      all of Sellers' cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions other than Cash Around the Resort as of the Closing Date;

(b)      all avoidance claims or other causes of action of Sellers, whether arising under the Bankruptcy Code, applicable state Law or otherwise, and the proceeds thereof, including rights, actions and Claims arising under Chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted other than the Specified Avoidance Claims;

(c)      the portion of the Owned Real Property set forth on Schedule 2.2(c), as such Schedule may be amended in accordance with Section 15.10 (the "Excluded Owned Real Property");

(d)      Sellers' corporate seals, stock record books, minute books and organizational documents and other records which are not necessary or useful for the operation of the Business;

(e)      any written or oral agreements, contracts or leases not identified in this Agreement as an Assumed Contract;

(f)      all insurance policies relating to the Business and all claims arising under such policies prior to the Closing, and all credits, premium refunds, proceeds,

-13-

causes of action or rights thereunder, but excluding the Assumed Insurance Policies;

(g)     all rights of Sellers arising under this Agreement or in connection with the Transactions;

(h)     any Inventory sold or otherwise disposed of pursuant to Section 5.2 prior to the Closing Date;

(i)     any Tax refund or reimbursement due to Sellers or their Affiliates for a Pre-Closing Tax Period;

(j)     all amounts owed to any Seller by any one or more of the other Sellers;

(k)     any shares of stock, membership interests or other equity interests in any of Sellers;

(l)     If not included in Purchased Assets in accordance with Section 2.1(o), Sellers' equity interest in Resort Hotel Insurance Company; and

(m)     all other assets listed on Schedule 2.2(m).

2.3.     Assumed Liabilities.   Upon the terms and subject to the conditions of this Agreement, and excluding the Excluded Liabilities, Purchaser shall, effective at the time of the Closing, assume, and thereafter pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Sellers that have not been paid, performed or discharged as of the Closing Date (the "Assumed Liabilities"):

(a)     all trade accounts payable related to the Business, incurred in the ordinary course of business and outstanding as of the Closing Date;

(b)     all obligations and liabilities of Sellers related to or arising under the Assumed Contracts, Permits and Intellectual Property Rights from and after the Closing (to the extent such Assumed Contracts, Permits and Intellectual Property Rights are validly assigned or transferred to Purchaser);

(c)     the Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with Section 15.10, or reflected on the Final Working Capital Statement;

(d)     obligations under the Deferred Compensation Plan to the employees and former employees and in the amounts specified on Schedule 2.3(d) (the "Specified Base Deferred Compensation Obligations");

(e)     all Accrued Payroll and Accrued Payroll Taxes;

(f)     all Accrued Sales and Use Taxes;

-14-

(g)      to the extent expressly set forth in <u>Section 9.2</u>, all Transfer Taxes;

(h)      as contemplated by and in accordance with <u>Section 7.9</u>, all of Sellers' obligations to honor Customer Reservations associated with the Customer Deposits and Prepayments;

(i)      all Gift Certificate Obligations;

(j)      supplemental obligations under the Deferred Compensation Plan owed to the employees and former employees and in the amounts specified on <u>Schedule 2.3(j)</u> (the "<u>Specified Supplemental Deferred Compensation Obligations</u>"); and

(k)      obligations under the Deferred Compensation Plan to the persons set forth on <u>Schedule 2.3(k)</u> in an amount not to exceed $440,520 in the aggregate (the "<u>Specified Additional Deferred Compensation Obligations</u>") (the Specified Base Deferred Compensation Obligations, the Specified Supplemental Deferred Compensation Obligations and the Specified Additional Deferred Compensation Obligations are collectively referred to as "<u>Specified Deferred Compensation Obligations</u>").

2.4.    <u>Excluded Liabilities</u>.  Notwithstanding any other provision of this Agreement to the contrary and regardless of any disclosure to the Purchaser, Purchaser is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter, whether known or unknown, and whether relating to or arising out of the operation of the Business or the Purchased Assets.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of Sellers, (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>"), including but not limited to:

(a)      except for Accrued Payroll Taxes, Accrued Sales and Use Taxes and, to the extent expressly set forth in <u>Section 9.2</u>, Transfer Taxes, any and all Claims, liabilities or obligations relating to Taxes arising out of, relating to or in respect of the Business or the Purchased Assets for any Pre-Closing Tax Period and any and all Claims, liabilities or obligations relating to Taxes of any Seller or any Affiliate of any Seller;

(b)      any and all liabilities, obligations and commitments of the Sellers relating to or arising out of the Excluded Assets;

(c)      any and all liabilities, obligations and commitments of the Sellers with respect to environmental conditions, the presence or Release of Hazardous Substances and violations of Environmental Laws existing or occurring on or prior to the Closing;

(d)      except as expressly set forth in this Agreement, any and all liabilities, obligations and commitments of the Sellers with respect to current or former employees and their dependents and beneficiaries including, but not limited to, arising under any collective bargaining agreement, Employee Benefit Plan, stock appreciation rights plan, unit appreciation rights plan, executive restoration agreement, COBRA

-15-

liabilities, WARN Act liabilities, accrued severance, vacation, salary, wages, bonuses, applicable payroll or employment-related Taxes, employee benefits and other amounts of any kind or nature whatsoever due to or related to employees of the Sellers;

(e)     any and all liabilities, obligations and commitments of the Sellers or their Affiliates relating to or arising out of (i) any third-party debt (other than as expressly set forth in this Agreement) incurred or owed by the Sellers or any Affiliates of the Sellers or (ii) any intercompany debt incurred by the Sellers or any Affiliates of the Sellers;

(f)     any and all claims, liabilities, obligations or commitments related to any pending litigation involving the Sellers;

(g)     any and all obligations and liabilities (A) arising or in connection with any Club Member Agreements, including, but not limited to, obligations and liabilities arising or in connection with the Specified Club Member Agreements, or (B) owed to, or for the benefit of, members of the club located on St. Simons Island related to the Frederica Golf Club, including, but not limited to, any and all obligations and liabilities arising under or related to any membership agreements related to such members; provided, however that Purchaser has agreed to provide to certain Club Members the benefits set forth on Schedule 11.1(b) hereto; and

(h)     any and all liabilities and obligations under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009 by and among Luxury Apparel Group, L.L.C., Sea Island Apparel, LLC, Winona Capital Partners, LLC Series E-PM and Sea Island Company and the related Escrow Agreement date March 31, 2009 by and among Winona Capital Partners, LLC Series E-PM, Sea Island Apparel, LLC and RBS Citizens, N.A.

2.5.     Assumption/Assignment of Assumed Contracts.  To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order.  Purchaser shall pay all Cure Costs due in connection with the assumption and assignment of  the Assumed Contracts, provided, that, to the extent the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with Section 15.10, such excess Cure Costs shall be reflected on the Final Working Capital Statement.  Notwithstanding any other provision of this Agreement to the contrary, except as provided in Section 7.9, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party (unless such consent is not required pursuant to Section 365 of the Bankruptcy Code), would constitute a breach or in any way adversely affect the rights of Purchaser or Sellers thereunder.  If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 365 and/or 1123 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and, subject to Section 12, the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

2.6.    Purchase Price; Allocation of Purchase Price.

(a)    In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing, Purchaser shall (i) deliver to Sellers by wire transfer of immediately available federal funds to a bank account (or accounts) designated by Sellers to Purchaser in writing not later than one (1) day prior to the Closing Date an amount equal to (x) Two Hundred Ten Million Seven Hundred Twenty-Three Thousand Seven Hundred Twenty Dollars ($210,723,720.00) (the "Purchase Price") minus (y) the sum of (A) the Working Capital Adjustment Holdback Amount, (B) the Sellers Apportioned Tax Amount, (C) the Post-Petition Payables Adjustment Amount, and (D) the amount of the Good Faith Deposit retained by Sellers as a credit against the Purchase Price in accordance with Section 2.8(b) and (ii) deposit the Working Capital Adjustment Holdback Amount with the Escrow Agent into the Escrow Fund created under the Escrow Agreement.  In full satisfaction of Sellers obligations under Section 9.3, Purchaser shall pay on behalf of Sellers that portion of the Purchase Price equal to the Sellers Apportioned Tax Amount to the Taxing Authorities entitled thereto.  The Purchase Price shall be subject to adjustment following the Closing as provided in Section 2.7.

(b)    Purchaser and Sellers agree that the Purchase Price (as adjusted), applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder and Schedule 2.6 hereof (such schedule to be determined jointly by Purchaser and SIC prior to Closing). Purchaser and Sellers each agree to provide the other promptly with any other information required to complete Schedule 2.6.  Such allocation shall be binding on Purchaser and Sellers for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the Parties hereto agrees (i) that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state and local income tax returns and will also file such further information or take such further actions as may be necessary to comply with the regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state and local Laws and regulations and (ii) that it will report (including filing its Tax Returns) in a manner consistent with such allocation to the extent permitted by applicable Law.

2.7.    Adjustment of Purchase Price.

(a)    Within thirty (30) days after the Closing Date, Purchaser shall cause to be prepared, at Purchaser's expense, a final statement of Specified W/C Assets and Specified W/C Liabilities as of the Closing Date (together with supporting calculations in reasonable detail, the "Final Working Capital Statement").  The Final Working Capital Statement shall be calculated and determined in the same manner as the Base Working Capital Statement, except that Final Working Capital Statement shall  (i) exclude from Specified W/C Assets any amounts that would otherwise be included in "Prepaid Insurance" or "Prepaid Licenses/Permits/Fees" to the extent such amounts are in respect of assets (x) that are not transferred to Purchaser at Closing or (y) in the case of

-17-

the beer, wine and liquor licenses listed on <u>Schedule 12.2(h)</u>, the benefits of which Purchaser does not continue to receive after the Closing, (ii) exclude from Specified W/C Liabilities the Post-Petition Payables Adjustment Amount, and (iii) include as an additional Specified W/C Liability the amount, if any, by which the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on <u>Schedule 2.3(c)</u>, as such Schedule may be amended in accordance with <u>Section 15.10</u>. The amount equal to total Specified W/C Assets minus total Specified W/C Liabilities, each as shown in the Final Working Capital Statement is referred to as the "<u>Final Working Capital</u>". Upon completion of such statement, Purchaser shall deliver the Final Working Capital Statement to Sellers.

(b)     To the extent the Base Working Capital Statement includes in "Prepaid Insurance" or "Prepaid Licenses/Permits/Fees" any amounts in respect of assets (x) that are not transferred to Purchaser at Closing or (y) in the case of the beer, wine and liquor licenses listed on <u>Schedule 12.2(h)</u>, the benefits of which Purchaser does not continue to receive after the Closing, the Base Working Capital shall be adjusted to exclude such amounts from the calculation thereof. The Base Working Capital as so adjusted is referred to as the "<u>Adjusted Base Working Capital</u>".

(c)     If the Final Working Capital, as set forth on the Final Working Capital Statement as conclusively determined as set forth in <u>Section 2.7(e)</u> (the Working Capital as so determined, the "<u>Certified WC</u>"), is less than the Adjusted Base Working Capital (such difference, the "<u>Deficiency</u>"), then (i) Purchaser shall be entitled to withdraw from the Escrow Fund the amount of the Deficiency up to and including the Working Capital Adjustment Holdback Amount, and (ii) Seller shall be entitled to withdraw from the Escrow Fund the portion of the Working Capital Adjustment Holdback Amount remaining following Purchaser's withdrawal in accordance with this <u>Section 2.7(b)</u>, if any. Any withdrawal pursuant to this <u>Section 2.7(c)</u> shall be made in accordance with the terms of the Escrow Agreement.

(d)     If the Certified WC is greater than or equal to the Adjusted Base Working Capital, then (i) Purchaser shall pay to Sellers the amount of any excess, and (ii) Sellers shall be entitled to withdraw from the Escrow Fund the Working Capital Adjustment Holdback Amount. Any payment pursuant to this <u>Section 2.7(d)</u> shall be made within ten (10) days following the date on which the Final Working Capital Statement (including the Certified WC calculation) becomes final pursuant to <u>Section 2.7(e)</u>. Any payment made pursuant to this <u>Section 2.7(d)</u> shall be made by wire transfer of immediately available federal funds to an account designated by Sellers. Any withdrawal pursuant to this <u>Section 2.7(d)</u> shall be made in accordance with the terms of the Escrow Agreement.

(e)     Unless Sellers notify Purchaser in writing within thirty (30) days after receipt by Sellers of the Final Working Capital Statement, of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes. If Sellers timely notify Purchaser of any such objection, Purchaser and Sellers shall attempt in good faith to reach an agreement as to the matter in

-18-

dispute. If the Parties shall have failed to resolve any such dispute within ten (10) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or Sellers, be submitted to and determined by an Independent Accounting Firm. The fees and expenses of such Independent Accounting Firm incurred in resolving the disputed matter shall be equitably apportioned by such accountants based on the extent to which Purchaser, on the one hand, or Sellers, on the other hand, is or are determined by such accountants to be the prevailing Party or Parties in the resolution of such disputed matters. The Final Working Capital Statement shall, after resolution of any dispute pursuant to this Section 2.7(e), be final, binding and conclusive on all Parties hereto.

2.8.    Good Faith Deposit.

(a)    Purchaser has deposited in escrow with Sellers' counsel or an escrow agent acceptable to Purchaser and Seller (the "GFD Escrow Agent") cash in immediately available federal funds by wire transfer to an account designated by the GFD Escrow Agent, an amount equal to Ten Million Dollars ($10,000,000) (the "Good Faith Deposit"), to be applied as provided in Section 2.8(b). The Good Faith Deposit shall be held by the GFD Escrow Agent in a non-interest bearing bank account and shall not be property of the estate in the Bankruptcy Cases, except to the extent of the Sellers' rights with respect thereto under Section 2.8(b). In the event that Purchaser reaches an agreement on or before October 19, 2010 to permit Sea Island Holdings, L.L.C., The Anschutz Company, Starwood Capital Group Global, L.P. or any of their affiliates (collectively, the "Holdings Parties") to participate in the Transactions, Purchaser will accept an assignment of the Holdings Parties' cash deposit, which shall be held as part of the Good Faith Deposit on the terms hereunder; provided, however, that the Good Faith Deposit shall be increased to $20,000,000 in such event.

(b)    The Good Faith Deposit may be retained by Sellers (i) at the Closing as a credit against the Purchase Price, or (ii) if this Agreement is terminated by Sellers pursuant to Section 14.1(b)(ii) or Section 14.1(e) and, in either case, at the time of such termination this Agreement is not terminable by Purchaser pursuant to Section 14.1(d). Except as described in the previous sentence, the Good Faith Deposit shall be returned to Purchaser within two (2) Business Days after any termination of the Agreement pursuant to Section 14.1.

2.9.    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia, no later than five (5) days after satisfaction of the conditions set forth in Section 12 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Sellers may agree.

2.10.    Deliveries by Sellers. At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

-19-

(a)     a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit C (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(b)     as to the Acquired Owned Real Property, limited warranty deeds in recordable form, duly executed by Sellers and transferring good, valid and marketable fee simple title to the Acquired Owned Real Property to Purchaser in form and substance reasonably satisfactory to Purchaser, other than as set forth in subsection (c) below;

(c)     a quit claim deed, in form and substance reasonably satisfactory to Purchaser, conveying to Purchaser all improvements located within and under any right-of-way, including, without limitation, underground sewer, water and other utility lines and facilities, as well as all improvements, including but not limited to all bridges, guard gates and guard buildings; notwithstanding the foregoing, all rights-of-way will be conveyed by limited warranty deed pursuant to Section 2.10(b);

(d)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all amendments, supplements or modifications thereto) to the extent not already located at the Acquired Owned Real Property;

(e)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(f)     a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)     an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(h)     certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(i)     as to each Declaration, (A) an estoppel certificate from the property owners' association or condominium owners' association identified in the Declaration, (B) an assignment of the applicable Declarant's rights, and (C) an assignment of the "development rights," each of (A), (B) and (C) to be in form and substance reasonably satisfactory to Purchaser;

(j)     as to Dune Cottage Lot 38 at Ocean Forest, located on  Parcel 49 (as identified in the Title Commitment), which is subject to a Declaration, but for which the Title Commitment does not identify the amendment or supplement that annexed such Lot 38 into the Declaration, an amendment or supplement to the applicable Declaration annexing such Lot 38, in form and substance reasonably satisfactory to Purchaser;

(k) the original $2,000,000 Non-Negotiable Promissory Note and Guaranty dated September 5, 2008 by JLV-VASI, LLC, as maker, to Sea Island Company, as payee (the "JLV-VASI Note"), which Sellers shall, on behalf of Purchaser, mark "canceled" and deliver to JLV-VASI, LLC against receipt by Sellers of the items described in the following clause (l) for delivery to Purchaser pursuant to Section 2.10;

(l)  (i) a recordable easement agreement, in form and substance reasonably satisfactory to Purchaser, from JLV-VASI, LLC or its successor-in-interest for the benefit of Parcel 15  (as identified in the Title Commitment) providing (x) Parcel 15 with vehicular and pedestrian access to Sea Island Road (over and across the existing roadways located on the property immediately east of Parcel 15, which property is currently owned by JLV-VASI, LLC and (y) that all parking spaces located in whole or in part within the boundary lines of Parcel 15 are available for the exclusive use of Purchaser and its successors, assigns, affiliates, agents, employees, invitees and guests, and (ii) a recordable termination by and between Seller and JLV-VASI, LLC of that certain Agreement Regarding Right of First Refusal, filed and recorded on September 10, 2008 as Book 2483, Page 84 with the Clerk of the Superior Court of Glynn County;

(m)     a waiver or extinguishment of any rights or options to purchase affecting the Acquired Owned Real Property;

(n)     as to each license and contract set forth on Schedule 2.10(n), consents to assignment of such licenses and contracts to Purchaser; and

(o)     all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

2.11.   Deliveries by Purchaser.  At the Closing, Purchaser will deliver or cause to be delivered to Sellers (unless previously delivered) the following:

(a)     the cash portion of the Purchase Price less the Good Faith Deposit;

(b)     a letter authorizing and directing the GFD Escrow Agent to release the Good Faith Deposit to Sellers;

(c)     the Assignment and Assumption Agreement, duly executed by Purchaser; and

(d)     all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

2.12.   "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN SECTION 3, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY

CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**3. Representations and Warranties of Sellers**. Subject to the terms, conditions and limitations set forth in this Agreement, Sellers hereby represent and warrant to Purchaser as of the date hereof and as of the Closing Date as follows:

3.1.    Organization. Each Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, is qualified to do business in every jurisdiction in which it is required to be qualified and has the corporate or organizational power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted.

3.2.    Corporate Authorization. The execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions are within Sellers' corporate or organizational powers and have been duly authorized by all necessary actions on the part of Sellers. Subject to entry by the Bankruptcy Court of the Confirmation Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Sellers that is enforceable in accordance with its terms. The boards of directors of the Sellers have resolved to request that the Bankruptcy Court approve this Agreement, and the transactions contemplated hereby.

3.3.    Governmental Authorization. Except as set forth on Schedule 3.3, the execution, delivery and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby by Sellers require no action by or in respect of, or filing with,

-22-

any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

      3.4.   <u>Noncontravention</u>.  Except as set forth on <u>Schedule 3.4</u>, and subject to entry by the Bankruptcy Court of the Confirmation Order in the Bankruptcy Cases, the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions do not and will not (a) violate Sellers' articles or certificates of incorporation, bylaws, or other equivalent organizational documents, (b) assuming compliance with the matters referred to in <u>Section 3.3</u>, materially violate any applicable Law, (c) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which any Seller is entitled under any provision of any agreement or other instrument binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

      3.5.   <u>Required Consents</u>.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on <u>Schedule 3.5</u>, there is no agreement or other instrument binding upon Sellers requiring by its terms or pursuant to Section 365 of the Bankruptcy Code a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

      3.6.   <u>Litigation</u>.  Except as disclosed in <u>Schedule 3.6</u>, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets before any court or arbitrator or any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

      3.7.   <u>Compliance with Laws and Court Orders</u>.  To the Knowledge of Sellers, no Seller is in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

      3.8.   <u>Permits</u>.  Sellers maintain and hold all rights to all Permits and all other licenses and permits that are necessary to permit Sellers to lawfully conduct and operate the Business, and to own and use the Purchased Assets, in the manner consistent with the past practices of Sellers.  <u>Schedule 3.8(a)</u> sets forth a list of all Permits required to conduct and operate the Business as it is currently being conducted.  Each such Permit is valid and in full force and effect.  Except as set forth on <u>Schedule 3.8(b)</u>: (a) to the Knowledge of Sellers, each Seller is in compliance with the terms and requirements of each such Permit; and (b) no notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending or, to the Knowledge of Sellers, threatened to revoke or limit any such Permit.

3.9.    Intellectual Property Rights.   Schedule 3.9(a) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets. The Intellectual Property Rights being conveyed hereunder include: (a) all registered and unregistered trademarks, service marks, trade dress, logos and trade names used in connection with the Business (including all registrations and applications therefor), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith and all applications, registrations, and renewals in connection therewith, (b) all copyrightable works, all copyrights, and applications, registrations, and renewals in connection therewith used in connection with the Business and (c) all other Intellectual Property Rights necessary to conduct the Business as currently conducted.  Sellers have taken all actions reasonably necessary to ensure that the Intellectual Property Rights are protected under applicable Law.  Except as set forth on Schedule 3.9(b), to the Knowledge of Sellers, there exist no outstanding challenges to the ownership and use of such Intellectual Property Rights by any Seller, nor any alleged infringements of such Intellectual Property Rights by third parties. Except as set forth on Schedule 3.9(c), none of the Intellectual Property Rights have been licensed by Sellers to any other Person.

3.10.    Environmental Matters.   Other than as may be set forth in the reports described on Schedule 3.10, none of Sellers have received written notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which to the Knowledge of Sellers remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which to the Knowledge of Sellers remains unperformed.

3.11.    Real Property.   Schedule 3.11(a) sets forth the address and description of all Owned Real Property of Sellers.   With respect to each parcel of Acquired Owned Real Property, except as set forth on Schedule 3.11(b), (a) the applicable Seller has fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing; (b) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (c) there are no outstanding options, rights of first offer, or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (d) there are no condemnation or eminent domain proceedings pending or, to the Knowledge of Sellers, threatened with respect to all or any part of the Acquired Owned Real Property.  Except as set forth on Schedule 2.1(b), none of the Sellers are lessees, sublessees or licensees under any leases, subleases or licenses, as applicable, with respect to any real property.

3.12.    Employee Benefit Plans.   Schedule 3.12(a) sets forth a complete and accurate list of each Employee Benefit Plan that provides health benefits to current or former employees of Sellers.  Sellers have provided to Purchaser true and correct copies of each such Employee Benefit Plan and all material documents pursuant to which such Employee Benefit Plans are maintained, funded and administered (including all plan documents and amendments thereto, and the most recent or current summary plan documents, trust documents, annual reports, actuarial reports, service agreements and group insurance contracts, and schedule of employee contributions).

-24-

3.13.  <u>Personnel Matters</u>.  Sellers have provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, base compensation, and any supplemental or bonus compensation (including any retention or stay bonus arrangements) for and any accrued vacation, severance or other commitments that exist with respect to all salaried employees of any Seller including: (a) information about each Seller's obligations to make salary payments to salaried employees who are terminable at will and without notice, and (b) all other commitments that exist with respect to salaried employees, including accrued vacation and severance, whether oral or in writing, including all employment agreements, consulting agreements, retainers and severance agreements, under which any Seller has any obligation to provide wages, salary, commissions, or other compensation, remuneration or benefits.  Sellers have provided to Purchaser true and correct copies of each written employment agreement, consulting agreement, retainer and severance agreement or other similar agreement under which any Seller has any obligation to provide wages, salary, commissions, or other compensation, remuneration or benefits to any salaried employee.  No Seller is in default with respect to any material obligation to any of such salaried employees.  To the Knowledge of Sellers, no key executive employee of any Seller has any plans to terminate his or her employment with such Seller.  Sellers have provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, hourly rate and any accrued vacation, severance or other commitments that exist with respect to hourly employees, whether oral or in writing.  Such schedules also indicate which such employees, if any, are not actively at work as of the date specified therein (other than due to vacation or short-term illness).

3.14.  <u>Contracts</u>.  To the Knowledge of Sellers, there are no material outstanding contracts, commitments, leases, licenses, understandings, undertaking or agreements of any nature, written or oral (including commitments to enter into any of such) to which Sellers or their Affiliates are or may become subject in respect of the Purchased Assets or the Business, except the contracts and agreements listed on <u>Schedule 3.14</u> (the "<u>Contracts</u>").  Except for defaults that will be cured in connection with the assumption and assignment of the Assumed Contracts, Sellers are not currently in default under any term, condition, or provision of any Assumed Contract and no Seller has received written notice from any third party regarding any alleged default that has not been previously cured or resolved.  To the Knowledge of Sellers, no other party to any Assumed Contract is in material default thereunder.  There are no other material amendments or any other material agreements concerning the Contracts that are not listed on <u>Schedule 3.14</u>.  All of the Assumed Contracts are in full force and effect and, following the Closing, shall be enforceable by Purchaser in accordance with their terms.

3.15.  <u>Sufficiency of and Title to the Purchased Assets</u>.  Sellers will have at Closing good,  valid and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens, Liens to be satisfied in full or released at or prior to Closing, and the Assumed Liabilities).   Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens.  The Acquired Owned Real Property is all of the real property owned or used in connection with the Business as currently conducted.   The Purchased Assets constitute all of the assets, properties and rights required for the conduct of the Business as currently conducted and as conducted as of the Closing Date.   The material

-25-

equipment included in the Purchased Assets is in good repair and operating condition, subject only to ordinary wear and tear, and is adequate and suitable for the purposes for which such equipment is presently being used or held for use.

3.16.  <u>Condition of Improvements</u>.   To the Knowledge of Sellers, all Improvements located on the Acquired Owned Real Property are in good general state of repair and good working order sufficient to carry out the functions for which they are currently being used and have no structural defects, and there are no conditions with respect to such Improvements that currently require material repairs or replacements, except for those set forth on <u>Schedule 3.16</u>.  The Improvements located on the Acquired Owned Real Property have been constructed and installed in material compliance with all Laws.  The Improvements located on the Acquired Owned Real Property have been maintained in accordance with industry standards.  The tees, fairways, roughs, bunker complexes, greens and practice areas of the golf properties included in the Acquired Owned Real Property have been properly cultivated, are free of disease, except as is reasonable and customary, and have been properly maintained.

3.17.  <u>Club Documents, Memberships</u>.  <u>Schedule 3.17</u> contains a true and correct copy of the Sea Island Club Membership Program, the Ocean Forest Golf Club Membership Program, and the form of membership application/agreements used by Sellers with respect to each program (the "<u>Existing Membership Documents</u>"), and a complete listing of all of the current Club Members, detailing the type of membership that is applicable to each such Club Member and the amount of all refundable initiation fees paid to Sellers by each such Club Member.  Except as disclosed to Purchaser in writing, each Club Member has paid all amounts due and payable pursuant to the Existing Membership Documents.

3.18.  <u>Financial Statements</u>.  Sellers' consolidated audited financial statements for the year ended December 31, 2009 (the "<u>Financial Statements</u>") attached hereto as <u>Schedule 3.18</u> are complete, true, and correct in all material respects and fairly present the financial condition and the results of operation of the Business, as of the date of and for the period stated in the Financial Statements, in accordance with GAAP except as provided on <u>Schedule 3.18</u>.  There are no material costs or expenses associated with the operation of the Business or the Purchased Assets other than those detailed on <u>Schedule 3.18</u>, and the amounts of such costs and expenses are not materially (individually or in the aggregate) in excess of the amounts shown on <u>Schedule 3.18</u> with respect to such period.   Since the date of the latest of the Financial Statements, there has been no material adverse change in the financial condition or operations of the Business except any change that would not constitute a Material Adverse Effect and the filing of the Bankruptcy Cases.

3.19.  <u>Certain Fees</u>.  Sellers have retained Goldman, Sachs & Co. ("<u>Goldman Sachs</u>") as financial advisor in connection with the Transactions.  Sellers shall be responsible for all fees due and owing to Goldman Sachs and its other professional advisors in connection with the Transactions contemplated in this Agreement and no such advisor is entitled to any fee or commission or like payment from Purchaser in connection with the Transactions.

3.20.   <u>Taxes</u>.  Except as set forth on Schedule 3.20:

(a)    Each Seller has filed all Tax Returns required to be filed by Seller (taking into account any extensions of time within which to file such Tax Returns) with respect to the Purchased Assets and the Business, and all such Tax Returns are complete and accurate in all material respects.  Each Seller has paid all Taxes required to be paid by Seller with respect to the Purchased Assets and the Business.  All Taxes required to be withheld, collected or deposited by or with respect to each Seller have been withheld, collected or deposited, as the case may be, and to the extent required by applicable Law, have been paid to the relevant Governmental Authority.

(b)    To the Knowledge of Sellers, there are no outstanding audits, examinations or judicial or administrative proceedings with respect to Taxes relating to the Purchased Assets or the Business.

**4.   Representations and Warranties of Purchaser**.  Purchaser represents and warrants to Sellers as follows:

4.1.   Organization.  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization and has all corporate or organizational powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

4.2.   Corporate Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the corporate or organizational powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3.   Governmental Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court and (b) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

4.4.   Noncontravention.  Neither the execution and delivery of this Agreement by Purchaser nor the consummation of the Transactions by Purchaser will (a) conflict with or result in any breach of any provision of the articles or certificate of incorporation, bylaws, or other equivalent organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely

-27-

affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Sellers.

4.5.    Financing.  Purchaser has sufficient cash, readily available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    Litigation.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any court or arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.7.    Certain Fees.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    No Other Representations.  Purchaser acknowledges that Sellers make no representation or warranty with respect to (a) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (b) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly set forth in this Agreement.

**5.    Covenants of Sellers**.  Sellers agree that:

5.1.    Intentionally Omitted.

5.2.    Conduct of the Business.  Except as may be required by the Bankruptcy Code or by order of the Bankruptcy Court, and except as may be required or contemplated by this Agreement, from the date hereof until the Closing Date, Sellers shall use their commercially reasonable efforts to conduct the Business in the ordinary course consistent with past practice and to preserve intact their relationships with third parties (including suppliers and customers) and to keep available the services of the present employees of the Business.  Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except (i) as disclosed on Schedule 5.2 or (ii) as may be required or contemplated by this Agreement, Sellers will not:

(a)    with respect to the Business, acquire a material amount of assets from any other Person;

(b)    sell, lease, license or otherwise dispose of any Purchased Assets, except for the leasing of resort and event space and sales of Inventory, in each case, in the ordinary course of business consistent with past practice;

(c)    terminate or amend in any material respect any Assumed Contract or existing insurance policies;

-28-

(d)      incur any material obligation or liability, except current liabilities for trade or business obligations incurred in connection with the purchase of goods or services in the ordinary course of business consistent with past practice or otherwise permitted by the terms of this Agreement;

(e)      transfer, grant or modify any existing rights with respect to the Intellectual Property Rights, except for non-exclusive licenses in the ordinary course of business consistent with past practice;

(f)      bill and collect membership dues for periods after the date of this Agreement on other than a monthly basis;

(g)      agree or commit to do any of the foregoing; or

(h)      take any action that would reasonably be expected to cause the failure of any condition contained in Section 12.2 (other than actions taken by Sellers in connection with the discharge of their fiduciary duties during the Bankruptcy Cases).

5.3.      Access to Information.  From the date hereof until the Closing Date, Sellers shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of the Business for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement.

5.4.      Notices of Certain Events.  Sellers shall promptly notify Purchaser of:

(a)      any written notice or, to Knowledge of Sellers, other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)      any material communication from any Governmental Authority in connection with or relating to the Transactions, the Business or the Purchased Assets; and

(c)      the commencement of any actions, suits, investigations or proceedings relating to Sellers, the Business or the Purchased Assets that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.6.

5.5.      New Club Members.  From the date hereof, the Sellers shall not accept any new members into Sellers' golfing, club, dining, social or other membership programs, including, without limitation, the Specified Club Member Agreements, except (a) Persons to whom Club Members transfer all of their rights under either of the Specified Club Member Agreements with the consent of the Sellers in connection with a sale by such Club Member to such Person of a residence located on Sea Island or a Sea Island development, provided that any such transferee acknowledges in writing the amount of refundable initiation fees associated with

-29-

the transferred membership, which shall not exceed the amount shown on Schedule 3.17 for the transferor, or (b) as agreed to in writing by Purchaser. Sellers shall give Purchaser prompt written notice of any transfer of membership pursuant to clause (a) of the preceding sentence, which notice shall identify the transferor, the transferee and the transferred membership and include a copy of the transferee's acknowledgement referred to in the proviso to such clause (a).

5.6.    Notices to Parties to Assumed Contracts.  Sellers shall provide timely and proper written notice of the Confirmation Order to all parties to executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to this Agreement and to take all other actions necessary to cause such executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code.

5.7    Cooperation with respect to Title.  From and after the date hereof until the Closing Date, Sellers shall reasonably cooperate with Purchaser in order to address and correct any title and/or survey issues that may arise.

5.8    Condemnation, Casualty.  Promptly upon learning thereof, Sellers shall give Purchaser written notice of any condemnation, casualty, damage or destruction of all or any portion of the Acquired Owned Real Property occurring prior to the Closing.  If any such condemnation, casualty, damage or destruction to all or any portion of the Acquired Owned Real Property occurs prior to the Closing and Purchaser does not exercise its right to terminate this Agreement pursuant to Section 14.1(f) to the extent that it is entitled to do so, then (i) the proceeds of any condemnation award or payment under any property or casualty insurance policies (for losses other than business interruption) shall be applied toward the payment of the Purchase Price to the extent such condemnation awards or insurance payments have been received by any Seller and (ii) Purchaser shall receive an assignment from Sellers of Sellers' right, title and interest in any such awards or payments.

5.9    Personnel Matters.   On or before Closing, Sellers shall provide Purchaser an updated version of the lists provided to Purchaser pursuant to Section 3.13, with the data therein as of a date not earlier than five (5) days prior to Closing.

6.   **Covenants of Purchaser**.  Purchaser agrees that:

6.1.    Confidentiality.  Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.

6.2.    Access.  On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Sellers and their agents, advisers and representatives reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Cases or otherwise to enable Sellers to address issues arising in connection with or relating to the Bankruptcy Cases or to permit Sellers to determine any matter relating to their

-30-

rights and obligations hereunder (including in connection with Sellers' review of the Final Working Capital Statement) or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, that any such access by Sellers shall not unreasonably interfere with the conduct of the business of Purchaser or any of its Affiliates. Sellers will hold, and will use their commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or any of its Affiliates or the Business provided to them pursuant to this Section 6.2.

6.3.     Insurance.  Except as otherwise provided in Section 5.8, to the extent that any insurance policies of Sellers or any of their Affiliates cover any loss, liability, claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall use reasonable commercial efforts to cooperate with Sellers in submitting and pursuing such claims for the benefit of Sellers.

7.     **Covenants of Purchaser and Seller**.  Purchaser and Sellers agree that:

7.1.     Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and Sellers will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws and regulations to consummate the Transactions contemplated by this Agreement.  Sellers and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.  Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall be construed as requiring Purchaser or its affiliates to litigate or agree to  hold separate or to dispose of any assets or property in order to obtain approval of any Governmental Authority of the consummation of the Transactions contemplated by this Agreement.

7.2.     Certain Filings.  Sellers and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, including any filing required by the HSR Act, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, including any filings required by the HSR Act, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

7.3.     Public Announcements.  Sellers shall develop a communications plan with respect to the Transactions in consultation with Purchaser.  Such communications plan, including any and all written scripts, handouts, letters or other written communications intended for widespread distribution pursuant thereto, shall be subject to Purchaser's prior written approval (as so approved, the "Communications Plan").  Except pursuant to the Communications Plan or

as otherwise may be required by Law, neither Purchaser nor Sellers shall make any public announcements or statements concerning the Transactions (other than statements made to, or filings with, the Bankruptcy Court in the Bankruptcy Cases) without the prior written consent of the other; in case such consent shall not be unreasonably withheld, delayed or conditioned. Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom Sellers determine it is necessary to provide copies in connection with the Bankruptcy Cases. Sellers also shall be entitled to file copies of this Agreement with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions as may be required to give adequate notice under the Bankruptcy Code thereof. In case any Party is required by Law to make any public announcement or statement, or any filing with any Governmental Entity or any national securities exchange concerning the Transaction that is not made pursuant to the Communications Plan, the Party required to make such announcement, statement or filing shall, to the extent practicable (i) consult with the other Party prior to making such announcement, statement or filing and (ii) provide that the content of such announcement, statement or filing is consistent with the Communications Plan. Nothing herein shall prevent either Sellers or Purchasers from responding to inquiries in a manner consistent with the Communications Plan.

       7.4. <u>Notices</u>. If at any time (a) Purchaser becomes aware of any material breach by Sellers of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers become aware of any material breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 14.1</u>, in writing of such breach. Upon such notice of breach, the breaching Party shall have ten (10) days to cure such breach prior to the exercise of any remedies in connection therewith.

       7.5. <u>Liquor License</u>. Purchaser has made all necessary applications (subject to any amendments that may be required) for, and shall thereafter diligently pursue, issuance of all licenses and approvals required under any Law for the continued sale of alcoholic beverages in connection with the conduct of the Business from and after the Closing Date (including temporary permits, to the extent available) consistent with the practices and procedures in effect as of the date hereof. Purchaser shall keep Sellers informed of the status of such applications, and shall promptly respond to Sellers' inquiries regarding the status of the same.

       7.6. <u>Checked Baggage</u>. On the Closing Date, representatives of Sellers and Purchaser shall make a written inventory of all baggage and similar items left in the care of Sellers by Sellers' customers (collectively, "<u>Inventoried Baggage</u>"). Purchaser shall be responsible for, and shall indemnify Sellers and their Affiliates and their respective directors, officers and employees against, any losses or liabilities incurred by any of them with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage or similar items left in the care of Purchaser on or after the Closing Date which was not inventoried. Sellers shall be responsible for, and shall indemnify the Purchaser against, any losses or liabilities incurred by Purchaser with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage or similar items left in the care of Sellers prior to the Closing Date which was not inventoried.

7.7.   <u>Safe Deposit Boxes</u>. On or before the Closing Date, Sellers shall notify all guests who are then using a safe deposit box owned or maintained by Sellers in connection with the conduct of the Business advising them of the pending change in the management of the Business. At Closing, all safe deposit boxes which are then in use shall be opened in the presence of representatives of Sellers and Purchaser, and the contents thereof shall be inventoried. Following the inventory of each safe deposit box, Sellers shall deliver to Purchaser all keys, receipts and agreements for such box.  Purchaser shall be responsible for, and shall indemnify Sellers and their Affiliates and their respective directors, officers and employees against, any losses or liabilities incurred by any of them with respect to any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is inventoried, provided that such claimed theft, loss or damage relates to contents that were inventoried. Sellers shall be responsible for, and shall indemnify Purchaser against, any losses or liabilities incurred by Purchaser with respect to any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is inventoried.

7.8.   <u>Customer Obligations</u>.   Purchaser agrees that with respect to any Customer Reservation related to services, amenities, activities or accommodations to be provided to a customer of the Business after the Closing Date, (a) Purchaser will honor such Customer Reservation in a manner consistent with Sellers' past practices, and (b) Purchaser will give such customer a credit against the amounts owed with respect to the Customer Reservation in an amount equal to the Customer Deposit and Prepayment made by the customer consistent with Sellers' past practices.  For the sake of clarity, the Parties acknowledge that Sellers have included a line item for outstanding and unapplied Customer Deposits and Prepayments as of the Balance Sheet Date in the current Assumed Liabilities on the Base Working Capital calculation attached hereto as <u>Exhibit B</u>.   Likewise, the Parties agree and acknowledge that the Final Working Capital Statement shall include a similar line item setting forth the outstanding and unapplied Customer Deposits and Prepayments as of the Closing Date in the current Assumed Liabilities used to determine the Final Working Capital.

7.9.   <u>Transfers Not Effected as of Closing</u>.  Nothing herein shall be deemed to require the conveyance, assignment or transfer of any Purchased Asset that by its terms and by operation of applicable Law (including, but not limited to, Section 365 of the Bankruptcy Code) cannot be freely conveyed, assigned, transferred or assumed.  To the extent the parties hereto have been unable to obtain on or before the Closing Date any governmental or any third-party consents or approvals required under applicable Law for the transfer of any Purchased Asset and to the extent not otherwise prohibited by the terms of any Purchased Asset, for not more than ninety 90 days following the Closing Date, (a) the parties hereto shall continue to use their commercially reasonable efforts to obtain such unobtained consents or approvals at the earliest practicable date, (b) Sellers shall continue to be bound by the terms of such applicable Purchased Asset, but shall exercise or exploit their rights in respect of such Purchased Assets only as directed by Purchaser and at Purchaser's expense, and (c) Purchaser shall pay, perform and discharge fully all the obligations of Sellers thereunder from and after the Closing to the extent that the corresponding benefit is received by Purchaser.  If and when any such consents or approvals shall be obtained, then Sellers shall promptly assign their rights and obligations (except to the extent such obligations constitute Excluded Liabilities) thereunder to Purchaser without payment of consideration and Purchaser shall, without the payment of any consideration

-33-

therefore, assume such rights and obligations.  The parties shall execute such good and sufficient instruments as may be necessary to evidence such assignment and assumption.

## 8. **Bankruptcy Related Covenants.**

8.1.    <u>Plan of Reorganization</u>.  Sellers have filed with the Bankruptcy Court (i) a plan of reorganization with respect to Sellers' bankruptcy estates that, among other things, implements, contains or otherwise incorporates the terms, conditions and provisions of this Agreement (the "<u>Plan of Reorganization</u>"), and (ii) a disclosure statement related to and accompanying the Plan of Reorganization.  Sellers shall use commercially reasonable efforts to obtain entry of an Order confirming the Plan of Reorganization (the "<u>Confirmation Order</u>") by no later than November 8, 2010, and such Confirmation Order shall be in form and substance consistent with this Agreement and satisfactory to Purchaser in its reasonable discretion.  The Confirmation Order will provide, among other things, that: (i) the Plan of Reorganization is confirmed and the transactions contemplated therein are approved; (ii) this Agreement and the Transactions contemplated herein are approved; (iii) on the Effective Date, the Purchased Assets shall be sold to Purchaser free and clear of any and all Liens (except for Permitted Liens and the Assumed Liabilities); and (iv) on the Effective Date, the Assumed Contracts shall be assumed by Sellers and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code and Purchaser shall pay all Cure Costs due in connection with the assumption and assignment of the Assumed Contracts, <u>provided</u>, <u>that</u>, to the extent the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with <u>Section 15.10</u>, such excess Cure Costs shall be reflected on the Final Working Capital Statement.  In addition, the Confirmation Order will include the matters specified in <u>Section 9.5</u>.  Sellers and Purchaser agree to use commercially reasonable efforts cooperate, assist and consult with each other to obtain the issuance and entry of the Confirmation Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

8.2.    Bidding Procedures.

(a)    <u>Intentionally Omitted</u>.

(b)    <u>Intentionally Omitted</u>.

(c)    <u>Intentionally Omitted</u>:

(d)    <u>Notice to Parties to Acquired Contracts</u>.  Sellers provided timely and proper written notice of the motion seeking entry of a bidding procedures order (docket no. 190 in the Bankruptcy Cases) to all parties to executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to that certain Asset Purchase Agreement dated as of August 4, 2010 by and among the Sellers, as seller, and Sea Island Acquisition LP, as buyer, and shall take all other actions necessary to cause the executory contracts and unexpired leases set forth on <u>Schedule 2.1(b)</u> to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code and Sellers shall, at or prior to the Closing, comply with all

requirements under Section 365 necessary to assign to the Purchaser the contracts and agreements included in the Assumed Liabilities.

(e)     <u>Intentionally Omitted</u>.

(f)     <u>Intentionally Omitted</u>.

**9.   Tax Matters.**  Except as otherwise provided in this <u>Section 9</u>, Purchaser and Sellers agree that after the Closing:

9.1.   <u>Tax Cooperation</u>.  Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon reasonable written request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall reasonably cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business or in connection with any Tax matter set forth in this <u>Section 9</u>.

9.2.   <u>Allocation of Taxes</u>.

(a)     The Parties acknowledge and agree that the Transactions will be consummated pursuant to a confirmed plan of reorganization in the Bankruptcy Cases. As a result, as contemplated by Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document to evidence, effectuate or perfect the rights, transfers and interests contemplated by this Agreement, shall be free and clear of any and all transfer taxes, stamp taxes or similar taxes. All deeds, instruments, Orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

"Because this [instrument] has been authorized pursuant to Grantor's plan of reorganization that was confirmed by order of the United States Bankruptcy Court for the Southern District of Georgia, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

(b)     In the event that, notwithstanding the provisions of Section 1146(a) of the Bankruptcy Code or for any other reason, any sales, use, value added, transfer, stamp, recording, documentary, registration or other similar taxes, fees or charges (the "<u>Transfer Taxes</u>") are assessed at Closing or at any time thereafter on the transfer of any Purchased Assets pursuant to this Agreement, then in each instance such Transfer Taxes incurred as a result of the Transactions contemplated hereby shall be paid by Purchaser. Purchaser and Sellers shall reasonably cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

-35-

9.3.    Property Taxes.   2010 Property Taxes shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period"). Sellers shall be liable for the proportionate amount of such 2010 Property Taxes that is attributable to the Pre-Closing Tax Period (the "Sellers Apportioned Tax Amount"), and Purchaser shall be liable for the proportionate amount of such 2010 Property Taxes that is attributable to the Post-Closing Tax Period.

9.4.    Return Filing.   Purchaser shall have the right to prepare and file (or cause to be prepared and filed) all Tax Returns due after the Closing with respect to any Property Taxes, Transfer Taxes, Accrued Payroll Taxes or Accrued Sales and Use Taxes and shall pay or cause to be paid any liability shown as due on any such Tax Return to the applicable Taxing Authority.

9.5.    Certain Tax Matters.   Without limiting the provisions of Section 8.1, each Seller shall use its commercially reasonable efforts to include in the Confirmation Order express rulings that: (i) under Ga. Comp. R & Regs. 560-12.1-.07, the transfer of the Purchased Assets to Purchaser or any of its Affiliates as contemplated by this Agreement is exempt from taxation under Chapter 8 of Title 48 of the OCGA (Sales and Use Taxes); (ii) under OCGA § 48-6-2(a)(7.1) and Section 1146(a) of the Bankruptcy Code, the transfer of the Purchased Assets to Purchaser or any of its Affiliates as contemplated by this Agreement is exempt from taxation under OCGA § 48-6-1 (Real Estate Transfer Tax); (iii) upon the payment of the Purchase Price by Purchaser pursuant to this Agreement, any obligation or liability Purchaser or any of its Affiliates may have under any applicable Law to withhold, deduct or deposit any amount from the Purchase Price and any obligation or liability Purchaser or any of its Affiliates may have under any applicable Law as successor or transferee for Taxes of any Seller or any Affiliate of any Seller shall hereby be satisfied and Purchaser and its Affiliates shall hereby be released and discharged from any such obligation or liability (in each case, including, without limitation, all Specified Georgia Tax Obligations); (iv) the Purchased Assets and the Business transferred to Purchaser or any of its Affiliates as contemplated by this Agreement shall be free and clear from, and shall not be subject to, any Liens for or arising from any Tax delinquencies or deficiencies of any Seller or any Affiliate of any Seller (including, without limitation, any Liens for or arising with respect to any Specified Georgia Tax Obligation); and (v) any bank account designated in writing by Sellers pursuant to Section 2.6(a) shall be approved by the Bankruptcy Court to be an account in which the Purchase Price may be deposited, and all amounts deposited therein by Purchaser shall be distributed only pursuant to the Confirmation Order.

9.6.    Tax Treatment.   Purchaser and Sellers agree to treat any payment (including an indemnity payment, if any) made between one another pursuant to, or in connection with, this Agreement as an adjustment to the Purchase Price for Tax purposes to the extent permitted by applicable Law.

**10. Employee Matters.**

-36-

10.1.   Employees and Offers of Employment.   Effective as of the Closing Date, Purchaser shall offer employment to all employees of Sellers that are actively at work at the Closing, including those employees who are away from work due to vacation or short-term illness.   Purchaser shall also offer employment to each other person employed by Sellers at Closing, to be effective as of the date such person is available to return to active employment, provided that the Purchaser shall not be obligated to offer employment to any person who cannot return to active employment on or before the 90th day following Closing.   From and after the date he or she commences employment with the Purchaser, each employee of Seller hired by Purchaser pursuant to the two immediately preceding sentences shall be called "Transferred Employees."   In each case, such offers of employment shall be on terms and with benefits agreed to between Purchaser and such persons and, except as expressly set forth in this Agreement, without regard to, and without assumption or continuation of, any compensation, benefits or arrangements provided by Sellers.   Effective as of the Closing Date, Purchaser shall assume responsibility for the Transferred Employees, but, except as expressly set forth in this Agreement, only to the extent related to (i) services rendered after the Closing Date, (ii) any termination by Purchaser of a Transferred Employee after the Closing Date or (iii) any actions by Purchaser.   Sellers shall retain all liabilities in respect of all Sellers' employees, including Transferred Employees, except (a) liabilities associated with (x) the Transferred Employees' service with Purchaser after the Closing Date, (y) any termination of a Transferred Employee by Purchaser after the Closing Date, or (z) any violation by Purchaser of applicable law or this Section 10.1, and (b) as otherwise expressly set forth in this Agreement.   For the avoidance of doubt, nothing in this Agreement (A) guarantees any Transferred Employee employment with Purchaser for any period of time, (B) causes any Transferred Employee to be employed on any basis other than on an "at-will" basis or (C) in any way restricts Purchaser's right to terminate the employment of any Transferred Employee after the Closing Date.

10.2.   Specified Deferred Compensation Obligations.   The Specified Deferred Compensation Obligations shall be paid by Purchaser at the time and in the manner provided for by the terms of the Deferred Compensation Plan, including employee elections thereunder. Information as to such payment dates (including any employee elections) shall be provided to Purchaser by Sellers as soon as reasonably practicable, but in no event later than 10 business days after Closing; provided, however, that payments with respect to the Specified Additional Deferred Compensation Obligations shall be made on a pro rated basis only to each person Listed on Schedule 2.3(k) who has not waived his or her rights to such claims (each, an "Eligible Payee") in an amount determined by multiplying (i) $440,520 times (ii) the percentage determined with respect to such Eligible Payee by dividing (A) the total obligation to such Eligible Payee in respect of such Special Additional Deferred Compensation Obligations by (B) the aggregate amount of all obligations to all Eligible Payees in respect of such Special Additional Deferred Compensation Obligations.   From and after the date the respective amounts of Specified Deferred Compensation Obligations listed on Schedules 2.3(d), 2.3(j) and 2.3(k) were determined (including after giving effect to the proviso in the immediately preceding sentence), such amounts shall be credited quarterly with interest at an annual rate equal to the "Prime Rate" that is reported in the Money Rates section of the Wall Street Journal published on the first business day of such quarter.

-37-

10.3. <u>Retiree Health Benefits</u>. From and for a period of one year following Closing, Purchaser shall make available to the retirees listed on <u>Schedule 10.3</u> the same health benefit plan as is in effect from time to time for active employees of Purchaser at a level of contribution not greater than the level of contribution in effect for such retirees at the time of Closing under the Sea Island Company Healthgram employee benefits plan designed and maintained by the Sea Island Company to provide health care benefits; provided that for a retiree or any beneficiary thereof eligible for Medicare, the benefits under such health benefit plan shall be secondary to Medicare benefits. Nothing in the immediately preceding sentence shall be construed to limit Purchaser's right to modify the terms of its health benefit plan or, following the period specified therein, to modify the level of contribution required from retirees, or the eligibility of retirees to participate in such health benefit plan; provided, however, that, if Purchaser at any time directly or indirectly ceases to make coverage under its health benefits plan applicable to active employees available to the retirees listed on <u>Schedule 10.3</u> and their beneficiaries, Purchaser shall promptly establish a trust or other funding vehicle to make medical benefits available to such retirees and their beneficiaries and shall contribute to such trust or vehicle an amount, if any, equal to the remainder of (i) $1,448,957 minus (ii) the costs incurred by Purchaser prior to such cessation of coverage to provide medical benefits coverage to such retirees and their beneficiaries. The retiree health benefits provided pursuant to this Section shall be subject to a lifetime maximum for each participant of (x) $50,000 minus (y) the total amount of retiree health benefits received by each such participant prior to Closing. <u>Schedule 10.3</u> shall indicate the total amount of benefits received by each retiree health plan participant, and the amount of the remaining benefits each participant is eligible to receive.

10.4. <u>Employee Plans</u>.

(a)     Each Transferred Employee shall be eligible to receive benefits consistent with Purchaser's applicable human resources policies. As promptly as reasonably practicable after the Closing Date (and as permitted by Purchaser's employee benefit plans and employee policies), Purchaser shall enroll the Transferred Employees in Purchaser's employee benefit plans for which such employees are eligible (and as permitted by Purchaser's employee benefit plans and employee policies). Purchaser shall, as permitted by Purchaser's employee benefit plans and employee policies, recognize the prior service with Sellers of each of the Transferred Employees for purposes of eligibility to participate under such employee benefit plans of Purchaser. Transferred Employees will be eligible to participate in Purchaser's employee benefit plans (including Purchaser's health plans), as permitted by Purchaser's employee benefit plans and employee policies, and will be treated under such plans on the same terms and conditions as any other similarly situated employee of Purchaser with similar service (after giving effect to this <u>Section 10.4</u>) with Purchaser. Notwithstanding anything to the contrary contained herein, (i) Purchaser shall recognize the prior service with the Seller of each of the Transferred Employees for purposes of eligibility to participate under Purchaser's health plans and 401(k) defined contribution plan, if any, and shall enroll the Transferred Employees in such plans without waiting periods so long they have satisfied prior service requirements (after giving effect to the foregoing recognition of prior service with Sellers) and (ii) Purchaser shall provide coverage to such employees who are eligible under Purchaser's health, medical, life insurance and other welfare plans (A)

-38-

without the need to undergo a physical examination or otherwise provide evidence of insurability; (B) by taking into account the period of coverage under Sellers' (or its Affiliates') plans for purposes of applying any pre-existing condition or similar limitations or exclusions; and (C) by applying and giving credit for amounts paid for the plan year in which the Closing Date occurs as deductibles, out of pocket expenses and similar amounts paid by individuals and their beneficiaries. Except as expressly provided by this Agreement, the Purchaser shall retain the right to modify, amend or terminate any and all employee benefit plans and policies at any time.

(b)     Effective as of Closing, Purchaser shall assume and make available to Transferred Employees the accrued vacation amounts indicated on the list provided pursuant to Section 5.9, which accrued vacation amounts shall be determined and administered consistently with the policies of Sellers as of the date of this Agreement. Purchaser may adopt differing policies with respect to any vacation benefits accruing on or after the Closing Date.

(c)     Effective as of Closing, Purchaser shall adopt a policy to provide severance payments to Transferred Employees who are terminated without cause and who have provided at least one complete year of service to the business. If any employee of Sellers who accepts an offer of employment from Purchaser is subsequently terminated by Purchaser within the 6-month period after the Closing Date, then Purchaser shall make severance payments to such employee in an amount that is not less than the amount of severance that such employee would have been entitled to receive under Sellers' severance policy in effect on the date hereof if such employee had been terminated by Sellers as of the Closing Date.

(d)     From and after the Closing Date, Sellers shall remain solely responsible for any and all liabilities relating to or arising in connection with the requirements of Section 4980B of the Code to provide continuation of health care coverage in respect of (A) employees and their covered dependents with respect to any qualifying event occurring prior to the Effective Time and (B) employees other than Transferred Employees with respect to any qualifying event occurring after the Effective Time. Purchaser shall be responsible for any and all liabilities relating or arising in connection with the requirements of Section 4980B of the Code to provide continuation of health care coverage in respect of Transferred Employees and their covered dependents with respect to any qualifying event occurring after the Effective Time.

(e)     Neither Purchaser nor any of its affiliates shall have any liability or responsibility for any (i) claims arising out of the employment by the Sellers of any current or former Employee or a beneficiary or dependent thereof or (ii) benefits payable in respect of any current or former Employee under any Employee Benefits Plan., in each case, other than the Specified Deferred Compensation Obligations. The Sellers shall remain solely responsible for any and all liabilities, obligations and commitments in respect of such current or former Employee relating to or arising out of or as a result of the employment or the actual or constructive termination of employment of any such current or former Employee by the Sellers (including in connection with the

-39-

consummation of the Transaction).  The Sellers shall remain responsible for the payment of any and all severance, retention, change in control or other similar compensation or benefits under the various plans and arrangements maintained or entered into by the Sellers and that are or may become payable in connection with the consummation of the Transaction.

10.5.   WARN Obligations.   From and after the Closing Date, Sellers shall remain solely responsible for any and all obligations that might arise under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), or under any similar provision of any federal, state, regional, foreign or local law, rule or regulation (hereinafter referred to collectively as "WARN Obligations") arising as a result of any employment losses occurring prior to, on or after the Closing Date with respect to all current and former employees.

10.6.   Collective Bargaining Agreements.   The Sellers shall retain all collective bargaining agreements, including all employee benefit obligations thereunder.

10.7.   Employee Records. Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records.

10.8.   Workers' Compensation.    Sellers shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Sellers' employees prior to the Closing Date.  Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by the Transferred Employees on and after the dates (hereinafter, "Transferred Employees' Employment Date") Purchaser hires them, including injuries sustained by a Transferred Employee on or after the Transferred Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Transferred Employees' Employment Date.  Sellers shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate Workers' Compensation authority within ninety (90) days after the Transferred Employees' Employment Date.  Purchaser shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Transferred Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Transferred Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than ninety (90) days after the Transferred Employees' Employment Date.

**11. Club Memberships**.

11.1.   New Membership Programs and Agreements.

-40-

(a)     Purchaser will offer Club Members, including inactive Club Members who have terminated their membership and are waiting for return of their deposit, the opportunity to join the new Ocean Forest and Sea Island clubs and execute agreements on the terms and conditions of new membership programs, which shall set forth and govern the rights of club members post-Closing (the "New Membership Programs").

(b)     The New Membership Programs will be generally consistent with the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program, as applicable, with certain modifications, including, but not limited to, those specified in Schedule 11.1(b). Purchaser will credit to new member accounts of Club Members who execute agreements under the New Membership Programs ("Electing Club Members") an amount equal to their respective existing membership deposits that had been paid in cash. Electing Club Members will not be required to post any additional deposit amounts to join under the New Membership Programs. Purchaser will refund member deposits of Electing Club Members as set forth on Schedule 11.1(b) in paragraphs 1, 3 and 4 under the heading "Sea Island Club" and paragraphs 1, 2, 3 and 4 under the heading "Ocean Forest Golf Club", as applicable.

## 12. **Closing Conditions**.

12.1.   Conditions to Obligations of Purchaser and Seller. The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     the Bankruptcy Court shall have entered the Confirmation Order in the Bankruptcy Cases, authorizing the Transactions and approving this Agreement and the ancillary agreements contemplated hereby under Sections 105(a), 365, 1123 and 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to Sellers and Purchaser, and as of the Closing Date the Confirmation Order shall be a Final Order and shall not be stayed, shall be in full force and effect, and shall not have been vacated or reversed.

(b)     the Effective Date shall have occurred or shall occur as a result of the Closing; and

(c)     no injunction, stay or similar Order, issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

12.2.   Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)     Sellers shall have performed in all material respects all of their obligations hereunder required to be performed by Sellers on or prior to the Closing Date;

(b)      Sellers shall have made all deliveries required of them by <u>Section 2.10</u>;

(c)      the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(d)      a title insurance company selected by Purchaser and Commonwealth Land Title Insurance Company ("<u>Commonwealth Title</u>"), as co-insurers on a 50/50 basis with Commonwealth Title acting as the lead underwriter in connection with the preparation of the Title Commitment, shall have irrevocably and unconditionally committed to issue an owner's title insurance policy in form and substance reasonably satisfactory to Purchaser, insuring Purchaser's good, marketable and indefeasible fee simple title to the Acquired Owned Real Property, subject only to the Permitted Liens;

(e)      no material adverse changes to the condition of any of the Acquired Owned Real Property (other than immaterial Acquired Owned Real Property) shall have occurred since the date of this Agreement for which Purchaser, in its sole discretion, has not consented to in writing; and

(f)      all consents required for the assignment to Purchaser of the Permits listed on <u>Schedule 3.8(a)</u> (other than licenses for the sale of beer, wine and liquor), Assumed Contracts and Intellectual Property Rights listed on <u>Schedule 12.2(f)</u> shall have been received;

(g)      Sellers shall have issued a compliant WARN notice with respect to Sellers' employees and at least sixty (60) days shall have passed since such notice was delivered; and

(h)      Purchaser shall have received approval of the beer, wine and liquor licenses set forth on Schedule 12.2(h) or such licenses are otherwise available to Purchaser on reasonable terms to permit the continued sale of beer, wine and liquor in connection with the Business.

12.3.   <u>Conditions to Obligations of Seller</u>.   The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a)      (i) Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, and (ii) the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

(b)      Purchaser shall have made all deliveries required of it by <u>Section</u>

-42-

2.11.

## 13. **Survival; Indemnification**.

13.1.    Survival.    The (a) representations and warranties of Sellers, and (b) covenants and agreements of Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.    The covenants and agreements of Sellers contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.    The (a) representations and warranties of Purchaser, and (b) covenants and agreements of Purchaser that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing. The covenants and agreements of Purchaser contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

13.2.    Indemnification.    Each of Purchaser and Sellers agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.  There shall be no post-Closing indemnification of Purchaser by Sellers with respect to any matter not set forth in Section 7.6, Section 7.7 or this Section 13.2.

## 14. **Termination**.

14.1.    Grounds for Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Sellers and Purchaser;

(b)     by Sellers or Purchaser, if the Closing shall not have been consummated on or before the later of (i) December 31, 2010, or (ii) eleven (11) days after any notice delivered pursuant to Section 7.4 if the breach that is the subject of such notice remains uncured (the later of clause (i) and (ii), the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)     by Sellers or Purchaser, if any condition set forth in Section 12.1 is not satisfied, and such condition is incapable of being satisfied by the End Date;

(d)     by Purchaser, if any condition set forth in Section 12.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(e)     by Sellers, if any condition set forth in Section 12.3 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(f)     by Purchaser, if a Material Adverse Effect has occurred and is continuing and such matter is incapable of being remedied or cured on or before the End Date;

-43-

(g)      **Intentionally Omitted.**

(h)      by Purchaser, if Sellers execute and deliver a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets;

(i)      by Purchaser, if the Secured Lenders have not entered into an agreement with Sellers, in form and substance satisfactory to Purchaser, to support the Plan of Reorganization, not to credit bid their secured indebtedness or otherwise bid in the auction and not to transfer any of the secured indebtedness they hold unless such transfer is subject to the terms of such agreement (the "Plan Support Agreement");

(j)      Intentionally Omitted;

(k)      by Purchaser, if the Bankruptcy Cases are dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee or examiner with expanded powers is appointed for the Sellers;

(l)      by Purchaser if (A) the Confirmation Order has not been entered by the Bankruptcy Court on or before November 8, 2010, provided that Purchaser shall not be entitled to exercise its rights under this clause if the Confirmation Order has been entered by the Bankruptcy Court prior to Purchaser exercising such rights, or (B) following entry of the Confirmation Order, the Confirmation Order is materially and adversely modified by a Modifying Order and such Modifying Order is not reversed, revoked, voided, vacated, stayed or further modified within thirty (30) days such that the Confirmation Order is in full force and effect;

(m)      by Purchaser, if either (i) Sellers do not obtain from the Secured Lenders prior to commencing the Bankruptcy Cases, (x) consent to debtor-in-possession financing in aggregate principal of $5,000,000 to be provided in the Bankruptcy Cases by Affiliates of Purchaser on the terms previously provided to Sellers or (y) a commitment, in form and substance satisfactory to Purchaser, to provide Sellers not less than $5,000,000 aggregate principal amount of debtor-in-possession financing in the Bankruptcy Cases, (ii) the Bankruptcy Court does not enter an Order approving such debtor-in possession financing on a final basis on or before September 30, 2010, or (iii) such debtor-in possession financing is terminated for any reason and not promptly replaced by another comparable financing facility;

(n)      by Purchaser, if any Secured Lender or transferee of any secured lender is in breach of the Plan Support Agreement.

The Party desiring to terminate this Agreement pursuant to this Section 14.1 (other than pursuant to Section 14.1(a)) shall give notice of such termination to the other Party in accordance with Section 15.1.

14.2.    Effect of Termination.  If this Agreement is terminated as permitted by Section 14.1, such termination shall be without liability of any Party (or any stockholder,

-44-

director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in Sections 2.8 and 14.3. The provisions of Sections 6.1 and 13.2, 14.2, 14.3, 15.1, 15.2, 15.4, 15.5, 15.6, 15.7 and 15.9 shall survive any termination hereof pursuant to Section 14.1.

14.3. Remedies. Effective as of Closing, Purchaser waives irrevocably any rights and Claims Purchaser may have against Sellers, whether in Law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (ii) the Purchased Assets, Assumed Liabilities or the Business. Purchaser and Sellers acknowledge and agree that if this Agreement is terminated by Purchaser pursuant to Section 14.1, the provisions of Section 14.2 set forth the sole and exclusive remedies of Purchaser. Purchaser and Sellers further acknowledge and agree that if this Agreement is terminated by Sellers pursuant to either (i) Section 14.1(e) or (ii) Section 14.1(b)(ii), then, in addition to Sellers' remedies set forth in Section 14.2, Sellers shall also retain any and all claims, rights, remedies, prayers for damages and causes of action, whether arising in law or in equity, arising from or related to any breach of this Agreement by Purchaser, including the right to specific performance.

14.4. Expenses. Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

## 15. Miscellaneous.

15.1. Notices. All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

Sea Island Acquisition GP, LLC
333 South Grand Avenue, 28th Floor
Los Angeles, CA 90071
Attention: Kenneth Liang
Fax:  213-830-8585

with copies to:

Oaktree Capital Management. L.P.
333 South Grand, 28th Floor
Los Angeles, CA 90071

-45-

    Attention: Emily Alexander, Esq.
    Fax:  213-830-8599

    Oaktree Capital Management. L.P.
    1301 Avenue of the Americas, 34th Floor
    New York, NY  10019
    Attention: Philip Hofmann
    Fax:  212-284-7879

    Avenue Capital Management II, LP
    535 Madison Avenue
    New York, NY 10022
    Attention: Edward Gellert
    Fax 212 850 7545

    Debevoise & Plimpton LLP
    919 Third Ave
    New York, NY 10022
    Attention:  Steven R. Gross, Esq.
           George E.B. Maguire, Esq.
    Fax:  212-909-6836
    Fax:  212.521.7586

if to Sellers, to:

    Sea Island Company
    100 Salt Marsh Drive
    Sea Island, Georgia 31522
    Attention: James B. Gilbert, Jr.
    Fax: 912-634-3124

with a copy to:

    King & Spalding LLP
    1180 Peachtree Street
    Atlanta, Georgia  30309
    Attention: Sarah Robinson Borders, Esq.
    Fax: 404-572-5128

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

15.2.    Waivers.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

15.3.    Successors and Assigns.    The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party. Notwithstanding the foregoing, in the event that by written notice to the Sellers given not later than three (3) Business days prior to the Closing, Purchaser may, in its sole discretion, designate one or more entities which have been newly formed for such purpose and are directly or indirectly wholly owned by funds managed by Oaktree Capital Management, L.P., Avenue Capital Management II, L.P., Sea Island Holdings, L.L.C., The Anschutz Company or Starwood Capital Group Global, L.P. to take title to specified Purchased Assets, in which case, Section 2.10 shall be deemed to be appropriately amended to reflect any such designation.

15.4.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Georgia and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

15.5.    Jurisdiction.

(a)    Prior to the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 15.1 shall be deemed effective service of process on such Party.

(b)    Upon the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause

-47-

of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Georgia, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 15.1 shall be deemed effective service of process on such Party.

15.6.   Waiver of Jury Trial.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

15.7.   Third Party Beneficiaries.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

15.8.   Entire Agreement; Amendments; Counterparts.   This Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Sellers.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

15.9.   Captions, Headings, Interpretation.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

15.10.   Disclosure Schedules.

(a)      The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

(b)      Notwithstanding anything in this Agreement to the contrary, Purchaser may amend Schedule 2.1(b) and Schedule 2.3(c) by giving written notice to Sellers on or before October 15, 2010 in order to (i) exclude from the definition of Assumed Contracts and Cure Costs, any contract, agreement or lease not otherwise excluded therefrom, or (ii) include in the definition of Assumed Contracts and Cure Costs, any contract, agreement or lease not otherwise included therein, and Sellers agree to give required notice to any of the non-debtor parties to any such contract, agreement or lease or as otherwise reasonably requested by Purchaser, provided, however, that any such exclusion or inclusion shall not serve to reduce, increase or otherwise affect the amount of the Purchase Price.  In connection with the possible inclusion of any contract, agreement or lease as an Assumed Contract pursuant to this Section 15.10, Sellers shall reasonably cooperate with Purchaser to determining any related Cure Costs to be included on Schedule 2.3(c), which Cure Costs shall be paid by Purchaser and shall not be reflected in the Final Working Capital Statement.

(c)      Notwithstanding anything in this Agreement to the contrary, Purchaser may amend Schedule 2.2(c) by giving written notice to Sellers on or before two (2) days prior to the Closing Date in order to include in the definition of Excluded Owned Real Property any Acquired Owned Real Property set forth in Part II of Schedule 2.1(a) or not otherwise included on Schedule 2.1(a).

15.11.  Certain Cooperation.  Sellers shall use commercially reasonable efforts to facilitate any request by Purchaser to pay a portion of the Purchase Price by making a payment to any or all of the Sellers' secured lenders in exchange for an assignment of the secured debt held by such Persons, which secured debt Purchaser would immediately contribute to Sellers to be cancelled.

15.12.  License of Name.  SIC grants to Purchaser and its Affiliates a royalty free, non-exclusive license to use "Sea Island" in the name of such Persons in connection with the transactions contemplated by this Agreement, provided that such license shall terminate upon a termination of this Agreement pursuant to Section 14.1 and Purchaser and its Affiliates will remove "Sea Island" from the name of any such Person through appropriate filings in the jurisdiction of their organization.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SEA ISLAND ACQUISITION LP

By Sea Island Acquisition GP, LLC
   its General Partner

By: _____
Name:    Amy Johannes
Title:     Authorized Signatory

By: _____
Name:    Philip Hofmann
Title:     Authorized Signatory

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

SEA ISLAND COMPANY

By:
Name:    James B. Gilbert, Jr.
Title:    Senior VP/General Counsel


SEA ISLAND COASTAL PROPERTIES LLC

By Sea Island Company
    its manager

By:
Name:    James B. Gilbert, Jr.
Title:    Senior VP/General Counsel


SEA ISLAND RESORT RESIDENCES, LLC

By Sea Island Company
    its Sole Member

By:
Name:    James B. Gilbert, Jr.
Title:    Senior VP/General Counsel


SEA ISLAND APPAREL, LLC

By Sea Island Company
    its Sole Member

By:
Name:    James B. Gilbert, Jr.
Title:    Senior VP/General Counsel


**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

FIRST SEA ISLAND, LLC

By Sea Island Company
    its Sole Member

By: _____
Name: _____James B. Gilbert, Jr._____
Title: _____Senior VP/General Counsel__


SEA ISLAND SERVICES, INC.

By: _____
Name: _____James B. Gilbert, Jr._____
Title: _____Senior VP/General Counsel__

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

## <u>Exhibit A</u>

Balance Sheet

**Confidential**

**Sea Island Company**
**Consolidated Balance Sheet**
**June 2010**

|  | Actual<br>6/30/2010 |
|---|---|
| **Assets:** | |
| Cash | $      14,266,067 |
| Accounts & Notes Receivable | 11,260,770 |
| Inventories | 3,066,872 |
| Land and Homes Held for Sale | 24,328,720 |
| Residential Construction in Progress | 43,793,660 |
| Prepaid Expenses | 1,738,367 |
| Total Current Assets | 98,454,455 |
| | |
| Property, Plant and Equipment | 598,162,008 |
| Accumulated Depreciation | (173,620,442) |
| Net Fixed Assets | 424,541,566 |
| | |
| Long-term Investments | 53,794,723 |
| Cash Value - Life Insurance | 818,408 |
| Goodwill | - |
| Notes Receivable - other | 3,052,745 |
| Other Assets | 57,665,876 |
| **Total Assets** | **$     580,661,897** |
| | |
| **Liabilities and Equity:** | |
| Current Portion - LTD | $     545,825,299 |
| Trade Accounts Payable | 3,212,202 |
| Retirement, current | 15,658,448 |
| Other Accrued Liabilities | 73,595,378 |
| Property, Payroll and Other Taxes Payable | 3,199,097 |
| Deposits - Resort and Other | 8,788,804 |
| Deferred Revenue - Real Estate | 74,076 |
| Current Liabilities | 650,353,304 |
| | |
| Term Loans | 2,550,173 |
| Club Deposits | 149,613,859 |
| Retirement Obligations | 56,711,270 |
| Other Long Term Obligations | 483,968 |
| Total Long-Term Obligations | 209,359,270 |
| Total Liabilities | 859,712,574 |
| | |
| Capital Stock | 4,835,478 |
| Retained Earnings | (217,561,428) |
| Cost of Treasury Stock | (66,324,727) |
| Total Stockholders Equity | (279,050,677) |
| **Total Liabilities & Stockholders Equity** | **$     580,661,897** |

# **<u>Exhibit B</u>**

Base Working Capital Statement

**Working Capital Statement**

**($ Millions)**

| | Base WC |
|---|---|
| **Working Capital Assets** | **Jun-10** |
| Operating Cash Held in Registers throughout the Resort | $ 0.1 |
| Resort / Member AR (Subject to Excluded Receivables / 60 Day Aging Cap) | 4.5 |
| Inventory | 3.1 |
| Prepaid Insurance | 1.0 |
| Prepaid Licenses / Permits / Fees | 0.3 |
| Prepaid Sales Tax | 0.1 |
| Beverage Deposits (Subject to Final Validation) | 0.1 |
| Total | $ 9.3 |
| **Working Capital Liabilities** | |
| Trade Payables | $ 3.1 |
| Gift Cards | 0.6 |
| Resort Deposits | 2.6 |
| Accrued Payroll / Commissions / Payroll Taxes | 2.3 |
| Sales and Use Taxes | 0.7 |
| Unearned Membership Revenue* | - |
| Total | $ 9.3 |
| **Net Working Capital (Deficiency)/Addition** | $ (0.0) |

*Represents amount of monthly dues billed in advance by the Company for which service has not yet been rendered.

# **Exhibit C**

Assignment and Assumption Agreement

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated [•], 2010, is made and entered into by and between Sea Island Company, a Georgia corporation, Sea Island Coastal Properties LLC, a Georgia limited liability company, Sea Island Resort Residences, LLC, a Georgia limited liability company, First Sea Island, LLC, a Georgia limited liability company, Sea Island Apparel, LLC, a Georgia limited liability company and Sea Island Services, Inc., a Georgia corporation (individually and collectively, "Seller" or "Sellers"), and Sea Island Acquisition LP, a Delaware limited partnership ("Purchaser"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement (the "Asset Purchase Agreement"), dated August 4, 2010, by and among Sellers and Purchaser.

## W I T N E S S E T H:

**WHEREAS**, in accordance with the terms of the Asset Purchase Agreement, Sellers have agreed to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser all right, title and interest of Sellers in and to the Purchased Assets and Purchaser has agreed to purchase, acquire and accept from Sellers all right, title and interest of Sellers in and to the Purchased Assets and to assume the Assumed Liabilities on the conditions and subject to the terms set forth in the Asset Purchase Agreement, for consideration in the amount therein.

**NOW, THEREFORE,** in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.    Assignment. Sellers hereby assign to Purchaser all right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

Section 2.    Assumption. Purchaser hereby assumes and hereafter agrees to pay, perform and discharge the Assumed Liabilities.

Section 3.    Binding Effect. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.

Section 4.    Entire Agreement; No Third Party Beneficiaries. This Agreement (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, and (b) is not intended to confer upon any person other than the parties identified herein and their successors and permitted assigns any rights or remedies hereunder.

Section 5.     Captions.  The Section headings contained in this Agreement are inserted in this Agreement only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

Section 6.     Controlling Law.  This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Georgia.

Section 7.     Further Assurances.  Sellers and Purchaser agree, each at their own expense, to perform all such further acts and execute and deliver all such further agreements, instruments and other documents as the other party shall reasonably request to evidence more effectively the assignments and assumptions made by Sellers and Purchaser under this Agreement.

Section 8.     Counterparts.  This Agreement may be executed in two or more counterparts, and it shall not be necessary that any one of the counterparts be executed by all of the parties hereto.  Each fully or partially executed counterpart shall be deemed an original, but all of such counterparts taken together shall constitute one and the same instrument.

Section 9.     Severability.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, the remainder of this Agreement will continue in full force and effect and the application of such provision will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such invalid, illegal or unenforceable provision with a valid, legal and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid, illegal or unenforceable provision.

Section 10.    Conflicts.  For the avoidance of doubt, the terms and conditions of the Asset Purchase Agreement shall be controlling, and any conflict or inconsistency between the terms of this Agreement and the Asset Purchase Agreement shall be resolved in favor of the Asset Purchase Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first above written.

**SELLERS:**

SEA ISLAND COMPANY

By: _____
Name: _____
Title: _____

SEA ISLAND COASTAL PROPERTIES LLC

By Sea Island Company
    its manager

By: _____
Name: _____
Title: _____

SEA ISLAND RESORT RESIDENCES, LLC

By Sea Island Company
    its Sole Member

By: _____
Name: _____
Title: _____

FIRST SEA ISLAND, LLC

By Sea Island Company
    its Sole Member

By: _____
Name: _____
Title: _____

*Signature page to Assignment and Assumption Agreement*

SEA ISLAND APPAREL, LLC

By Sea Island Company
    its Sole Member


By: _____
Name: _____
Title: _____


SEA ISLAND SERVICES, INC.


By: _____
Name: _____
Title: _____

*Signature page to Assignment and Assumption Agreement*

**PURCHASER:**

SEA ISLAND ACQUISITION LP

By Sea Island Acquisition GP, LLC
    its General Partner


By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____

**EXECUTION COPY**

**DISCLOSURE SCHEDULE TO**

**ASSET PURCHASE AGREEMENT**

**among**

**SEA ISLAND ACQUISITION LP;**

**SEA ISLAND COMPANY,**

**SEA ISLAND COASTAL PROPERTIES, LLC,**

**SEA ISLAND RESORT RESIDENCES, LLC,**

**FIRST SEA ISLAND, LLC,**

**SEA ISLAND APPAREL, LLC**

**and**

**SEA ISLAND SERVICES, INC.**

**Dated as of October 19, 2010**

23290154v5

Reference is hereby made to that certain Asset Purchase Agreement, dated as of October 19, 2010 (the "Agreement"), by and among Sea Island Acquisition LP, a Delaware limited partnership (the "Purchaser"), and Sea Island Company, Sea Island Coastal Properties, LLC, Sea Island Resort Residences, LLC, First Sea Island, LLC, Sea Island Apparel, LLC and Sea Island Services, Inc. (each a "Seller" and, collectively, the "Sellers").  This Disclosure Schedule has been prepared and delivered in accordance with the Agreement. Capitalized terms used in this Disclosure Schedule without definition shall have the respective meanings ascribed to them in the Agreement.

The Parties acknowledge and agree that (i) this Disclosure Schedule may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in this Disclosure Schedule shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

23290154v5

**SECTION 1.1(ccc)**

**Exceptions to Permitted Liens**

See <u>Exhibit A</u> attached hereto.

23290154v5

**SECTION 1.1(mmm)**

**Specified Condo Units**

1.  Parcel 38, Beach Club Residences, Unit BCO1 and BCO2

2.  Parcel 39, Ocean Club Residences, Unit ON3

3.  Parcel 40, Beach Club Residences, Unit GS6

4.  Parcel 42, Ocean Club Residences, ON Resort Unit

5.  Parcel 43, Beach Club Residences, BCO Resort Unit and GN Resort Unit

23290154v5

## SECTION 2.1(a)

## Acquired Owned Real Property[1]

1. Parcel 1, Cloister Hotel and Resort -- West of Sea Island Drive
2. Parcel 2, Black Banks River Residences, a Condominium, Resort Unit
3. Parcel 3, Sea Island Resorts Beach Club Condominium, 25 Resort Units and 209 Parking Units
4. Parcel 4, Cloister Ocean Residences on Sea Island, a Condominium, Quarter Ownership Interests
5. Parcel 5, Cloister Hotel and Resort -- East of Sea Island Drive
6. Parcel 6, Sea Island Strip of Oceanfront Property
7. Parcel 7, Sea Island Street and Road rights of way, including without limitation any bridges
8. Parcel 8, Ocean Forest Lots 30 and 31
9. Parcel 9, Ocean Forest Clubhouse, Golf Course, and Resort Facilities
10. Parcel 10, Lodge, Plantation and Seaside Golf Courses, and Resort Facilities, including, for the avoidance of doubt, the Corn Barn and Golf School depicted as "Real Estate B" and "Real Estate C" respectively, on page 43 of the Sea Island Management Presentation dated June 2010.
11. Parcel 11, Retreat Clubhouse, Golf Course, and Resort Facilities
12. Parcel 13, Black Banks Residential Tract
13. Parcel 14, Sea Island Support Services Campus - South
14. Parcel 15, Sea Island Support Services Campus - North (Parking Area)
15. Parcel 18, Frederica Lots 201, 219, 232 and 240
16. Parcel 26(a) and (b), Dune Cottage Lots, Ocean Forest
17. Parcel 27, Ocean Forest Expansion Property
18. Parcel 29 and 29 (a), Old Seaside Lot 9 and Lot 8
19. Parcel 30, Old Seaside Expansion Property
20. Parcel 31, Sea Island Lake Cottages Lots
21. Parcel 32, Sea Island Lake Cottages Expansion Property
22. Parcel 33, Frederica Lots 202 and 251
23. Parcel 35, Tract IX, "Finger", Cloister Residences East
24. Parcel 36, Expanded Tract V, Cloister Residences East
25. Parcel 37, Tract I (West Point Plantation), Tract III (Lot 12, Marsh Point), Tract IV (Lot 19 Vassar Point), Tract V (Lot 122, Phase 2-B, Oak Forest) and Tract VI (portion of Black Banks Subdivision)
26. Parcel 38(a) and (b), Beach Club Residences, Unit BCO1 and BCO2
27. Parcel 39, Ocean Club Residences, Unit ON3

---

[1] The Acquired Owned Real Property includes the parcels included on this list, as more fully described on the Legal Descriptions attached as <u>Exhibit B</u> hereto, which may be revised to be consistent with the Title Commitment.

23290154v5

28. Parcel 40, Beach Club Residences, Unit GS6

29. Parcel 41, Beach Club Residences, GS Resort Unit

30. Parcel 42, Ocean Club Residences, ON Resort Unit

31. Parcel 43, Beach Club Residences, BCO Resort Unit and GN Resort Unit

32. Parcel 44, Kings Point Lot 13

33. Parcel 45, Kings Point Lot 15

34. Parcel 47, Frederica Subdivision Lot 46

35. Parcel 48, Frederica Subdivision Lot 131 (1/2 interest)

36. Parcel 49, Dune Cottage Lot 38, Ocean Forest

37. Parcel 50, Tracts 1, 2 and 3, Woodbine property

38. Parcel 51, Tabby House at Malcolm McKinnon Airport

39. Parcel 52, Salt Marsh, Frederica and Cannon's Point Tracts

40. Parcel 53, Laundry and Purchasing Facility

41. Parcel 54, Rainbow Hammock

42. Parcel 55, Salt Marsh and Hammocks lying to the west of the Plantation and Seaside Golf Courses and south of Kings Way

43. Parcel 56, South End of Sea Island

44. Parcel 57, Salt Marsh and high ground west of Sea Island Subdivision No. 1

45. Parcel 58, Native American Burial Ground

46. Parcel 59, Well Site, Sea Island

47. Parcel 60, Marshlands Around Hawkins Island bounded south by property of Epworth By The Sea, Inc., by Hamilton Landing Subdivision, etc.

48. Parcel 61, Lanier Island

49. Parcel 62, Sea Island Resorts Beach Club Condominium, Beach Club Suite "CC"

50. Parcel 63, Sixty Acres, more or less (60 +/-), Camden County

51. Parcel 64, Twitty Park lying north of Sea Island Road

52. Parcel 65, Old Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia

53. Parcel 66, 400 Sea Island Drive Subdivision Streets and Buffers

54. Parcel 67, Tract between Sea Island Road and Epworth Oaks Subdivision

55. Parcel 68, St. Perpetual Church Lot

56. Parcel 69, Roads and Streets, St. Simons Island Club Subdivision

23290154v5

**SECTION 2.1(a)**
**Acquired Owned Real Property**


**Part II**

1. Parcel 27, Ocean Forest Expansion Property

2. Parcel 63, Sixty Acres, more or less (60 +/-), Camden County

3. Parcel 64, Twitty Park lying north of Sea Island Road

4. Parcel 65, Old Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia

5. Parcel 66, 400 Sea Island Drive Subdivision Streets and Buffers

6. Parcel 67, Tract between Sea Island Road and Epworth Oaks Subdivision

7. Parcel 68, St. Perpetual Church Lot

8. Parcel 69, Roads and Streets, St. Simons Island Club Subdivision

23290154v5

**SECTION 2.1(b)**
**Assumed Contracts**

1.   Agreement by and among Sea Island Company and E-Z-GO dated August 25, 2008.

2.   Agreement by and among Sea Island Company and Georgia Turf & Tractor, Inc. and John Deere Equipment Company dated March 31, 2008.

3.   Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007.

4.   Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002.

5.   Letter Agreement by and among PGA TOUR, INC., Davis Love III Foundation and Sea Island Company dated January 22, 2010.

6.   Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

7.   Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009.

8.   Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated September 29, 2010.

9.   Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003.

10.  Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007.

11.  Landscape Service Agreements by and among Sea Island Company and certain property owners.

12.  Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008.

13.  Statement of Work by and among Sea Island Company and Network Services Plus, Inc. dated November 11, 2009.

14.  16. Hardware Maintenance Agreement by and among Sea Island Company and Postec, Inc. dated June 16, 2005.

15.  Consulting Services Agreement by and among Sea Island Company and Ultimate Software dated July 18, 2008.

16.  Essentials Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Sea Island Golf Club and Toro National Support Network dated May 28, 2008.

17.  Classic 36 Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Retreat Golf Club and Toro National Support Network dated May 28, 2008.

18.  Lease Agreement by and among Sea Island Company and Golden Isles dated October 1, 2009.

8

19. Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009.

20. Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009.

21. Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009.

22. Agreement by and among Sea Island Company and Due South Publishing, Inc. dated April 8, 2010.

23. Subscription Agreement by and among Sea Island Company and Hoovers dated November 28, 2009.

24. Participation Agreement by and among The Cloister at Sea Island and Kiwi Collection, Inc. dated January 25, 2010 (Visa Luxury Hotel Collection).

25. Agreement by and among The Cloister at Sea Island and Signature Travel Network effective January 1, 2010.

26. Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002.

27. Marketing and Management Services Agreement by and among Sea Island Company and TIG Global, LLC effective January 1, 2010.

28. Subscription Agreement by and among The Cloister at Sea Island and TravelCLICK, Inc. dated December 7, 2009.

29. Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010.

30. Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010.

31. Professional Services Agreement by and among Sea Island Company and Roger and Anne Ditmer dated November 26, 2008.

32. Professional Services Agreement by and among Sea Island Company and Ellen Rogers dated September 12, 2008.

33. Professional Services Agreement by and among Sea Island Company and Celeste Pittman dated February 17, 2009.

34. Professional Services Agreement by and among Sea Island Company and Dulany Hall dated October 2, 2008.

35. Professional Services Agreement by and among Sea Island Company and Audrey Wood dated October 3, 2008.

36. Agreement by and among Sea Island Company and William Lewis Mason dated July 27, 2009.

37. Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009.

38. Professional Services Agreement by and among Sea Island Company and J&S Associates, Inc. dated July 23, 2010.

39.   Service Agreement by and among Sea Island Company and Audio Visual Services Group, Inc. dated September 2, 2009.

40.   Agreement by and among Sea Island Company and E-Z-GO dated September 10, 2009.

41.   Planned Maintenance Agreement by and among Sea Island Company and Agri-Business Technologies, Inc. dated February 11, 2010.

42.   Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and CSI Leasing, Inc. dated January 22, 2009.

43.   Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007.

44.   Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

45.   Lease Agreement by and among Sea Island Company and Williams Scotsman, Inc. dated July 21, 2009.

46.   Lease Agreement by and among Sea Island Company and PNCEF, LLC (f/n/a National City Commercial Capital Company) dated September 24, 2009, as amended.

47.   Agreement by and among Sea Island Company and Hasty's Communications East, Inc.

48.   Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005.

49.   Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008.

50.   Agreement by and among Sea Island Company and Agilysys, NV, LLC dated January 7, 2010.

51.   Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010.

52.   Agreement by and among Sea Island Company and OpenCourse Solutions, LLC dated October 15, 2004.

53.   Agreement by and among Sea Island Company and Tri H Friesians LLC dated February 4, 2010.

54.   Shared Equity Financing Agreement by and among C. Allen Brown and Sea Island Company.

55.   Shared Equity Financing Agreement by and among Todd W. Anderson, Stacey L. Anderson and Sea Island Company.

56.   Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (The Cloister).

57.   Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge).

58.   Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest).

59. Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004.

60. Agreement by and among Sea Island Company and AG-Hill Farms, Inc. dated August 16, 2007.

61. Agreement by and among Sea Island Company and Tabby House, Inc. dated December 6, 2007.

62. Agreements by and among Sellers and any customer entered into in the ordinary course of business for services or accommodations to be provided to such customer by Sellers.

63. Rental agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences Sea Island Cottages and Beach Club Condominiums by Sea Island Company on behalf of unit owners.

64. Rental management agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences, Sea Island Cottages and Beach Club Condominiums between Sea Island Company and the unit owners.

65. Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008, and related individual equipment leases.

66. Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007.

67. National Service Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008.

68. Travel Directory Marketing Agreement by and among The Cloister at Sea Island and Andrew Harper dated October 16, 2009.

69. Agreement by and among Sea Island Resorts and Fortibus Marketing of Charleston, LLC July 17, 2009.

70. Affiliate Hotel Agreement by and among Sea Island Resort and Clubcorp USA, Inc. dated August 7, 2009.

71. Cable Television Service Agreement and License by and among Sea Island Company and Owensboro-Brunswick, Inc. d/b/a Adelphia Cable Communications dated March 28, 2006.

72. Bulk Services Agreement by and among Sea Island Company and Comcast of Florida/Georgia, LLC dated April 23, 2008.

73. Container Lease Agreement #GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

74. Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

75. Net Lease Agreement by and among Sea Island Company and JLV VASI, LLC dated September 5, 2008, as amended December 31, 2008.

76. Professional Services Agreement by and among Sea Island Company and Nancy Adcock.

77. Google Message Delivery Contract by and among Google, Inc. and Sea Island

11

Company dated January 1, 2009.

78. Lease Agreement by and among Sea Island Company and Alfred W. Jones, III dated October 8, 2007.

79. Microsoft Enterprise Enrollment and Pricing for Office Pro Sea Island dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E611258.

80. Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003.

81. Property Exposure Contract No. 000902-0609-31 by and among The Cloister at Sea Island and Kiwi Collection Inc. dated June 23, 2009.

82. Property Exposure Contract No. 001403-0110-250 by and among The Lodge at Sea Island Golf Club and Kiwi Collection Inc. dated January 15, 2010.

83. Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.

84. Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010.

85. Letter Agreement by and among Sea Island Company and Atlantic Bike Shop, Inc. dated March 11, 2010.

86. Agreement by and among Sea Island Company and Georgia Power Company dated January 23, 2004.

87. Equipment Service Agreement by and among Sea Island Company and BancTec, Inc. dated January 22, 2007.

88. Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009.

89. Business Rental Preferred Rate Agreement by and among Sea Island and Enterprise Leasing Company – Southeast dated July 8, 2010.

90. Concessionaire Agreement by and among Sea Island Company and Enterprise Rent-A-Car Southeast dated September 8, 2008.

91. Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

92. Product Service Agreement by and among Sea Island Company and Dowling-Douglas Co. dated July 22, 2010.

93. Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated February 4, 2005.

94. Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated May 18, 2006.

95. Transport Payment Plan by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005.

96. Services Master Agreement by and among Sea Island Co. and BellSouth Company

dated October 4, 2006.

97. Marketing Support Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998.

98. Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002.

99. Master Services Agreement by and among Sea Island Company and International Business Machines Corporation dated December 28, 2005.

100. Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated January 10, 2006.

101. Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

102. Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

103. Agreements entered into in the ordinary course of business with certain unaffiliated Persons for the short-term leasing of resort and event space.

104. Commercial lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009.

105. Contract for Accounting Services by and among Sea Island Company and Eaddy Sams dated August 2, 2010.

106. Letter Agreement by and among Sea Island Company and Jack Lumpkin dated December 17, 2009.

107. Independent Contractor Agreement by and among Sea Island Company and Mike Taylor dated December 18, 2009.

108. Agreement by and among Sea Island Company and PEAK Technologies dated Sepeteimber 29, 2009.

109. SDD Managed Services Agreement (SDD-Hosted) by and between Sea Island Company and Systems Design and Development, Inc. Dated December 10, 2007.

13

**SECTION 2.1(f)**

**Personal Property**

See <u>Exhibit C</u> attached hereto.

23290154v5

## SECTION 2.1(i)
### Intellectual Property Rights

Copyrights

| Sea Island Party | Copyright | Owned / Licensed | Registration Number | Registration Date |
|---|---|---|---|---|
| Sea Island Company | This happy isle : the story of Sea Island and the Cloister / Harold H. Martin | Owned | TX0000250694 | 12/26/78 |
| Sea Island Company | The Sea Island activity and coloring book | Owned | VA0000729934 | 8/7/95 |

Trademarks

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| OCEAN FOREST | United States of America | Registered | 74391941<br><br>May 18, 1993 | 1949354<br><br>Jan 16, 1996 | Sea Island Company | 36      Residential real estate brokerage; residential real estate management.<br>37      Residential real estate development; custom construction of homes.<br>41      Golf club and country club services. |
| SEA ISLAND | United States of America | Registered | 73481430<br><br>May 21, 1984 | 1338346<br><br>May 28, 1985 | Sea Island Company | 36      Planning and laying out of residential communities and real estate brokerage and  management services.<br>37      Garage and auto repair services, laundry and dry cleaning services, landscaping services and construction of resort homes and condominiums.<br>41      Educational services - namely, providing instruction in the fields of dancing, tennis, golf, horseback riding, skeet shooting, swimming, diving, fishing, sailing and windsurfing, entertainment services - namely, arranging and conducting tennis and golf tournaments, lectures and concerts for others; and country club and beach club services.<br>42      Barber and beauty salon services, retail flower shop services and resort hotel and restaurant services. |

23290154v5

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| SEA ISLAND | United States of America | Registered | 74342270<br><br>Dec 22, 1992 | 1789075<br><br>Aug 24, 1993 | Sea Island Company | 03      Personal care products and toiletries, namely, shampoo, hair conditioner, body lotion, bath/shower gel, sunscreen and massage oil. |
| SEA ISLAND | United States of America | Registered | 77025670<br><br>Oct 20, 2006 | 3443477<br><br>Jun 10, 2008 | Sea Island Company | 16      Wedding planning guides and information guides and score cards for playing sports; and paper goods, namely, stationery and photographs; Publications, namely, magazines, newsletters, guidebooks, maps, historical and photographic books and brochures related to a Georgia coastal resort and the scenery, culture, life style and history of the Golden Isles region of the Georgia coast.<br>41      Wedding event planning and coordination services; special events planning and coordination services; wedding party planning and consultation. |
| SEA ISLAND (and shield design)<br><br> | United States of America | Registered | 74444546<br><br>Oct 7, 1993 | 1888148<br><br>Apr 11, 1995 | Sea Island Company | 03      Personal care products and toiletries; namely, hair shampoo, hair conditioner, body lotion, bath and shower gel, skin cleansing lotion, skin moisturizer lotion, skin moisturizer gel, sunscreen preparations, sun block preparations, skin dyes, namely sunless self tanning skin preparations and massage oils. |
| SEA ISLAND (stylized)<br><br> | United States of America | Registered | 73002723<br><br>Oct 3, 1973 | 1001562<br><br>Jan 14, 1975 | Sea Island Company | 25      Trousers, slacks, robes, swimwear, shirts and jackets, [the shirts being known as dress-shirts, outer-shirts, terry shirts, knit-shirts and sport-shirts, and the jackets being known as outer-jackets, parka-jackets, regular-lined jackets, regular-unlined jackets, and ski-jackets]. |

16

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|------|-------------|--------|----------------------|--------------------|-------|-------------------|
| SEA ISLAND (stylized)  | United States of America | Registered | 73481562<br><br>May 22, 1984 | 1338347<br><br>May 28, 1985 | Sea Island Company | 36      Planning and laying out of residential communities and real estate brokerage and management services.<br>37      Garage and auto repair services, laundry and dry cleaning services, landscaping services and construction of resort homes and condominiums.<br>41      Educational services, namely, providing instruction in the fields of dancing, tennis, golf, horseback riding, skeet shooting, swimming, diving, fishing, sailing and windsurfing; entertainment services-namely, arranging and conducting tennis and golf tournaments, lectures and concerts for others; and country club beach club services.<br>42      Barber and beauty salon services, retail flower shop services and resort hotel and restaurant services. |
| SEA ISLAND BEACH CLUB | United States of America | Registered | 74445354<br><br>Oct 8, 1993 | 1885428<br><br>Mar 21, 1995 | Sea Island Company | 42      Snack bar services, restaurant and cocktail lounge services, and retail gift shop services. |
| SEA ISLAND BEACH CLUB (and design)  | United States of America | Registered | 74444466<br><br>Oct 7, 1993 | 1887573<br><br>Apr 4, 1995 | Sea Island Company | 42      Resort services; namely, beach club and swimming club services and beauty care, spa and health club services. |

17

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| SEA ISLAND CLUB | United States of America | Registered | 75563878 Oct 1, 1998 | 3436491 May 27, 2008 | Sea Island Company | 35      Retail stores featuring items, sporting goods, souvenirs, and toiletries; and retail flower shop services. 41      Recreational, educational and entertainment services in connection with providing golf courses, tennis courts, golf and tennis instruction, tournaments, lectures and competitions in the fields of fitness, exercise, beauty, health, yoga, boating, yachting, sailing, fishing, nature, sightseeing, shooting, movies, swimming, diving, windsurfing, history, art, architecture, literature, music, dancing, cooking, wines, decorative arts, games, cards, bingo, bridge, crafts, organized children's activities, volleyball, bicycling, horseback riding, birdwatching, gardening, landscaping, horticulture, storytelling and singing; country club, golf club, tennis club, beach club, health club, swim club and yacht club services; theater productions; live music performances. 42      Resort hotel, restaurant, cocktail bar, and snack bar services, catering services, barber and beauty salon services, health spa services. |
| SEA ISLAND YACHT CLUB | United States of America | Registered | 75125258 Jun 25, 1996 | 2196269 Oct 13, 1998 | Sea Island Company | 39      Marina services and boat and yacht charter services. |
| SEA ISLAND YACHT CLUB | United States of America | Registered | 75125348 Jun 25, 1996 | 2200173 Oct 27, 1998 | Sea Island Company | 41      Yacht club services. 42      Restaurant and bar services and food and beverage catering services. |
| SHIELD DESIGN  | United States of America | Registered | 74491423 Feb 16, 1994 | 1877007 Jan 31, 1995 | Sea Island Company | 41      Resort services, namely beach club, golf club, swimming club, and health club services. 42      Hotel, restaurant, cocktail bar, and snack bar services, beauty salon services, and health spa services, and retail stores featuring clothing, clothing accessories, gift items, sporting goods, souvenirs, and toiletries. |
| THE CLOISTER | United States of America | Registered | 73060424 Aug 13, 1975 | 1197018 Jun 1, 1982 | Sea Island Company | 42      Restaurant services. |

23290154v5

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|------|--------------|--------|-----------------------|--------------------|-------|-------------------|
| THE CLOISTER | United States of America | Registered | 73481518<br><br>May 22, 1984 | 1329070<br><br>Apr 2, 1985 | Sea Island Company | 42    Hotel services. |
| THE CLOISTER | United States of America | Registered | 75566137<br><br>Oct 6, 1998 | 2323479<br><br>Feb 29, 2000 | Sea Island Company | 25    Clothing, namely, shirts, jackets, t-shirts, sweatshirts, caps, hats and shorts.<br>41    Recreational and entertainment services; namely, providing golf courses, tennis courts, conducting and arranging golf and tennis tournaments and competitions, theater productions, and live music performances; educational services; namely, providing instruction and lectures in the fields of golf, tennis, fitness, exercise, beauty, health, yoga, boating, yachting, sailing, fishing, nature, sightseeing, shooting, movies, swimming, diving, windsurfing, history, art, architecture, literature, music, dancing, cooking, wines, decorative arts, games, cards, bingo, bridge, crafts, organized children's activities, ping pong, volleyball, bicycling, horseback riding, birdwatching, gardening, landscaping, horticulture, storytelling and singing; country club, golf club, tennis club, beach club, health club, swim club and yacht club services. |
| THE CLOISTER (stylized)<br><br>*The Cloister* | United States of America | Registered | 77134629<br><br>Mar 19, 2007 | 3637264<br><br>June 16, 2009 | Sea Island Company | 41    Recreational and entertainment services; namely, providing golf courses, tennis courts, squash courts, conducting and arranging golf and tennis tournaments and competitions, live music performances, movies, boating, yachting, sailing, fishing, sightseeing, shooting, swimming, diving, games, cards, bingo, bridge, crafts, organized children's activities, table tennis, volleyball, bicycling, horseback riding, birdwatching, storytelling, and singing; country club, golf club, tennis club, swim club and yacht club services; Educational services; namely, providing instruction and lectures in the fields of golf, tennis, fitness, exercise, beauty, health, yoga, history, art, architecture, literature, music dancing, cooking, wines, gardening, landscaping, horticulture, and decorative arts; special event planning and coordinating, namely, planning and consultation for parties and weddings; Beach club services, namely providing a membership club with beach and pool swimming facilities; Health club services, namely, providing instruction and equipment in the field of physical exercise.<br>43    Hotel and resort services; restaurant services. |

19

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| TREE AND WAVE DESIGN  | United States of America | Registered | 76189092 Jan 3, 2001 | 2512487 Nov 27, 2001 | Sea Island Company | 41    Private club services featuring, tennis, beach club, swimming, organized events and entertainment, bar and restaurant services for members; golf club services. |
| SEA ISLAND | US-Georgia | Registered | | S5177 Jun 20, 1984 | Sea Island Company | 01    Resort hotel and restaurant services. |
| SEA ISLAND | US-Georgia | Registered | | S5178 Jun 20, 1984 | Sea Island Company | 08    Educational, recreational and entertainment. |
| SEA ISLAND | US-Georgia | Registered | | S5180 Jun 20, 1984 | Sea Island Company | 02    Business and retail services. |
| SEA ISLAND | US-Georgia | Registered | | T12413 Jan 27, 1993 | Sea Island Company | 51    Personal care products and toiletries, namely, conditioner, body lotion, bath/shower gel, sunscreen and massage oil. |
| SEA ISLAND | US-Georgia | Registered | | T12475 Feb    15, 1993 | Sea Island Company | 52    Shampoo. |
| SEA ISLAND (stylized)  | US-Georgia | Registered | | S5175 Jun 20, 1984 | Sea Island Company | 02    Retail services. |

20

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | | Class/Description |
|------|-------------|--------|----------------------|-------------------|-------|---|------------------|
| SEA ISLAND (stylized) | US-Georgia | Registered | | S5179<br><br>Jun 20, 1984 | Sea Island Company | 08 | Educational, recreational and entertainment services. |
| SEA ISLAND (stylized) | US-Georgia | Registered | | S5176<br><br>Jun 20, 1984 | Sea Island Company | 01 | Resort hotel and restaurant services. |
| SHOPS AT SEA ISLAND | US-Georgia | Registered | Jul 5, 1995 | S14791<br>Jul 5, 1995 | Sea Island Company | 04 | Shopping center development services. |
| ST. SIMON'S ISLAND CLUB (and oval design) | US-Georgia | Registered | | S5181<br><br>Jun 20, 1984 | Sea Island Company | 08 | Beach, golf and tennis club services. |
| ST. SIMON'S ISLAND CLUB (and oval design) | US-Georgia | Registered | | S5182<br><br>Jun 20, 1984 | Sea Island Company | 01 | Restaurant services. |

21

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description | |
|------|--------------|--------|----------------------|--------------------|-------|-------------------|---|
| ST. SIMON'S ISLAND CLUB (and oval design)  | US-Georgia S1710-010759 | Registered | | S5183 Jun 20, 1984 | Sea Island Company | 02 | Real estate development, sales and management services. |
| THE CLOISTER | US-Georgia S1710-010755 | Registered | | S2944 Oct 3, 1973 | Sea Island Company | 01 | Hotel, restaurant and resort services. |

Patents

None.

Licenses

None.

23290154v5

**SECTION 2.2(c)**
**Excluded Owned Real Property[2]**


None.


---

[2] The Excluded Owned Real Property includes any land tracts included on this list, as more fully described on the Legal Descriptions attached as <u>Exhibit D</u> hereto, which may be revised to be consistent with the Title Commitment.

23

**SECTION 2.2(m)**
**Other Excluded Assets**

1. The personal property of A.W. Jones III and members of the Jones family or extended relatives thereof located within the Purchased Assets, as disclosed to Purchaser in writing on August 4, 2010.

2. For purposes of clarity, any and all personal property of any employee of any Seller kept in the office or other working space of employee is an Excluded Asset under the Agreement.

**SECTION 2.3(c)**
**Cure Costs**

None.

**SECTION 2.3(d)**
**Specified Base Deferred Compensation Obligations**

| Name | Amount ($) |
|---|---|
| Adams, C.T. | 556,844 |
| Alexander, C. | 15,845 |
| Butler, N. | 48,814 |
| Cate, Vassa | 28,547 |
| Edenfield, W. | 97,945 |
| Engel, S. | 11,112 |
| Graham, W.R. | 48,339 |
| Heins, Ann | 7,439 |
| Huffman, C. | 1,290 |
| McNeely, J. | 100,379 |
| Miller, B. | 69,788 |
| Owens, C.A. | 16,340 |
| Rogers, E. | 12,731 |
| Sayer, S. | 466,448 |
| Schneider, Eric | 72,905 |
| Tipton, M. | 125,784 |
| Veal, Brannen | 15,918 |

23290154v5

**SECTION 2.3(j)**
**Specified Supplemental Deferred Compensation Obligations**

| Name | Amount ($) |
|---|---|
| Adams, C.T. | 308,900 |
| Alexander, C. | 2,580 |
| Butler, N. | 34,580 |
| Cason, J. M. | 32,690 |
| Cate, Vassa | 570 |
| Edenfield, W. | 24,370 |
| Engel, S. | 15,480 |
| Fox, G. P. | 6,250 |
| Gibson, B. R. | 133,470 |
| Graham, W.R. | 103,250 |
| Heins, A. | 3,110 |
| Hogan, D. | 12,170 |
| Huffman, C. | 2,770 |
| Johns, B. A. | 50,050 |
| Johnson, M. B. | 1,960 |
| Kelly, J. R. | 10,060 |
| Lembcke, B. | 42,510 |
| McNeely, J. | 31,160 |
| Miller, B. | 10,530 |
| O'Connor, K. | 54,340 |
| Owens Jr., C.A. | 98,470 |
| Sayer, S. | 136,770 |
| Shelnutt, R. D. | 11,150 |
| Shelnutt, T. L. | 4,340 |
| Smith, W. C. | 53,490 |
| Talley Jr., C. P. | 43,280 |
| Theus Jr., A. S. | 9,770 |
| Tipton, M. | 13,210 |
| Veal, B. | 1,500 |
| Watson, D. S. | 7,980 |

27

**SECTION 2.3(k)**
**Specified Additional Deferred Compensation Obligations**

| Name | Amount ($) |
|------|-----------|
| Capone, P. | 401,907 |
| Gibson, B.R. | 282,828 |
| Hodgdon, M. | 48,119 |
| Jones III, A. W. | 1,544,629 |
| Love III, D. | 389,775 |
| McSwiney, J | 512,051 |
| Nunn, S. | 357,093 |
| Smith, W. | 83,444 |
| Williams, J. B. | 432,644 |
| Wright Jr., E. T. | 26,129 |

**For the avoidance of doubt, amounts paid shall be capped at an aggregate amount of $440,520 as provided in the Agreement.**

28

23290154v5

**SECTION 2.6(b)**
**Allocation**

**[To be agreed upon prior to Closing]**

23290154v5

**SECTION 2.10(n)**
**Consents**

None.

## SECTION 3.3
## Governmental Authorizations

1.  Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

2.  Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

3.  Coastal Marshlands Protection Committee Permit #508, dated October 20, 2005, issued by the Coastal Resources Division of the Georgia Department of Natural Resources allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

4.  Department of Army Permit 074OYN dated January 8, 1990 allowing beach renourishment activities.

5.  Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

6.  Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

7.  Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

8.  Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

23290154v5

**SECTION 3.4**
**Noncontravention**

1.  Reference is made to the liquor licenses listed on Section 3.8(a) hereof.

2.  Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

3.  Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002.

4.  Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008.

5.  Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005.

6.  Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002.

7.  Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

8.  Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007.

9.  Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

32

## SECTION 3.5

### Consents

1. Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated December 12, 2005.

2. Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003.

3. Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008.

4. Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002.

5. Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004.

6. Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010.

7. Agreement by and among Sea Island Company and OpenCourse Solutions, LLC dated October 15, 2004.

8. Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009.

9. Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009.

10. Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

11. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

12. Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009.

13. Lease Agreements by and among Sea Island Company and GMAC.

14. Services Agreement by and among Exclusive Resorts Club Management, LLC and Sea Island Company dated May 15, 2007, as amended.

15. Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009.

16. Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

17. Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007.

18. Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010.

19. Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010.

20. Product Purchase Agreement by and among Sea Island Company and Institution Food House, Inc. dated August 1, 2010.

21. Lease by and among Sea Island Company and Donald C. McCaskill III and Annie Bell McCaskill Friedman dated February 5, 2008.

22. Gas Service Agreement by and among Sea Island Company and SouthStar Energy Services, LLC d/b/a Georgia Natural Gas dated April 27, 2009.

23. Premium Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.

24. Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007.

25. Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007.

26. Service Agreement by and among Sea Island and Georgia Trane Service Company dated January 20, 2005.

27. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (New Chiller Plant).

28. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (Cloister Hotel).

29. Service Agreement by and among Sea Island and Georgia Trane Service Company dated July 20, 2006.

30. Service Agreement by and among Sea Island and Georgia Trane Service Company dated December 6, 2007.

31. Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005.

32. Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008.

33. Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008.

34. Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007.

35. Container Lease Agreement # GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

36. Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

37. Reference is made to the liquor licenses listed on Section 3.8(a) hereof.

38. Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

39. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007.

40. Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008.

41. Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005.

42. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission.

43. Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

44. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated  November 6, 2002.

45. Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003.

46. Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009.

47. Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

48. Contract Service Arrangement Agreement by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005.

49. Contract Service Arrangement Agreement by and among Sea Island Company and BellSouth Telecommunications, Inc. dated May 18, 2006.

50. Services Master Agreement by and among Sea Island Company and BellSouth Company dated October 4, 2006.

51. Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 1998.

52. Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

53. Database Management Services Agreement by and among LMG Data Mining and Sea Island Company dated December 3, 2007.

54. Microsoft Enterprise Enrollment and Pricing for Office Pro dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E61258.

55. Commercial Lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009.

56. Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009.

57. Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008.

58. Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010.

59. Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

60. Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

61. Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

62. Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

## SECTION 3.6
## Litigation

1. Claim made orally by owner of Cloister Ocean Residence that Sea Island Company breached an oral representation made by an agent that a like interest in such individual's unit would not be sold for less than what the individual paid for her interest.

2. Cross-claims filed by Joseph Ferguson and Andrew Head, owners of a membership interest in Beach Club Garden North Residences, LLC, alleging fraudulent actions by Sea Island Company to induce them to buy such interest.

3. Claim made orally by owner of Ocean Club Residence alleging that Sea Island Company failed to deliver the purchased unit as agreed upon.

4. Claim asserted by SAI Engineering (orally through a collection agency) in the approximate amount of $225,000 for engineering work alleged to have been performed on property now or formerly owned by Sea Island Company. No lien has been filed of record and the time for perfecting a lien under Georgia law has expired. Because no formal, written statement of the claim has been presented, it is not possible to provide an opinion as to whether all or any part of this amount is due at this time.

5. Claim made orally by property owner alleging that certain landscaping of a beach right of way owned by Sea Island Company is an obstruction to an easement granted to such owner.  The legal action would seek the removal of the landscaping as an obstruction to the claimed easement.

6. Indemnification claim made in writing by Winona Capital Partners, LLC Series E-PM, the purchaser of Sea Island Apparel, LLC's membership interest in Luxury Apparel Group, L.L.C. under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009.  If such claim were to be successful, any amounts due pursuant to such indemnification claim.

7. Audit and investigation by the U.S. Immigration and Customs Enforcement (ICE) into potential violations relating to the Sea Island Company's I-9 forms.

8. Workers' compensation claims made by employees of Sea Island Company, including the following:

   • Claim of Robert Cundy (1998) – Quarterly medical tx/antiflammatories

   • Claim of Raymond Ray (2001) – Claim is closed with final payment to be made

   • Claim of James Smith (2001) – Claim is closed with final payment to be made

   • Claim of Danny Moreu (2004) – Open claim

   • Claim of Don Smith (2006) – Claim is closed with final payment to be made

   • Claim of Rodney Butler (2006) – Company has prevailed and expects to close in October

   • Claim of Joyce West (2007) – Open claim

   • Claim of Carla Pentelakis (2008) – Open claim

   • Claim of Cheryl Peeples (2009) – Open claim

   • Claim of Carlos Recinos (2010) – Claim controverted, deposition August 2nd

   • Claim of Karen Blake (2010) – Open claim

   • Claim of Sonya Floyd  (2010) – Open claim

   • Claim of Hubert Clark (2010) – Open claim

   • Claim of Tina Nimmo (2010) – Open claim

23290154v5

- Claim of Edward Joyner (2010) – Open claim
- Claim of Chuck Dean (2008) – Open claim
- Claim of Octoria Kent (2010) – Open claim
- Claim of Sonny Sullivan (2010) – Open claim

23290154v5

**SECTION 3.8(a)**
**Permits**

<u>Liquor Licenses</u>

The following liquor licenses have been obtained at both the state and county level.  Unless otherwise indicated, the county in which the license has been obtained is Glynn County.

| <u>Location</u> | <u>Licensee</u> | <u>License Type</u> | <u>Products Sold</u> |
|---|---|---|---|
| Davis Love Grill | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf Club  (Tee House) | James B. Gilbert | Retail | Beer |
| Ocean Forest Golf Club | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Sea Island In Room Service | Sea Island Company | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island Additional Facility | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Sea Island Golf Club Snack Bar | Sea Island Company | Retail | Beer |
| Cloister Hotel Clubrooms | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Cloister Hotel | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Hotel In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Cloister Hotel  (Additional Facility, River Bar) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Black Banks Parlor | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom East | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom West | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (North) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (South) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Georgia Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Main Dining Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| South Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Spanish Lounge Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Big George's Raw Bar and Grill | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Beach Club    (In-room) | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |

38

| | | | |
|---|---|---|---|
| Restaurant Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Snack Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Pavilion | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Spa    (NO SUNDAY SALES on county license) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Pub at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff Additional Facility | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff Additional Facility (In Rm Svc) | Ellis H. Howard | Hotel In-Room Service | Beer, Wine & Liquor |

*County license obtained in Camden County.*

Elevator Operating Permits

| Jurisdiction | Serial # | Location | Expiration Date |
|---|---|---|---|
| 225325 | 643-1851 | Beach Club Garden North - #8 | 3/1/2011 |
| 225309 | 642-8512 | Beach Club Garden North - #1 | 3/1/2011 |
| 225310 | 642-8523 | Beach Club Garden North - #3 | 3/1/2011 |
| 225311 | 642-3089 | Beach Club Garden North - #5 | 3/1/2011 |
| 225312 | 642-0226 | Beach Club Garden North - #9 | 3/1/2011 |
| 225313 | 642-0248 | Beach Club Garden North - #4 | 3/1/2011 |
| 225323 | 642-3078 | Beach Club Garden North – Beach Club | 3/1/2011 |
| 225324 | 642-3067 | Beach Club Garden North – Beach Club | 3/1/2011 |
| 241304 | 238073 | Beach Club Garden North - Basement | 2/1/2011 |
| 241313 | 28680831 | Beach Club Garden North - Basement | 2/1/2011 |
| 236852 | 238077 | Beach Club Garden North - #1 | 2/1/2011 |

39

| 236853 | 238078 | Beach Club Garden North - #2 | 2/1/2011 |
|--------|--------|------------------------------|----------|
| 236854 | 238079 | Beach Club Garden North - #3 | 2/1/2011 |
| 236855 | 238080 | Beach Club Garden North - #4 | 2/1/2011 |
| 215427 | B5612-05 | Cloister Hotel - #5 Hotel | 3/1/2011 |
| 215428 | B5614-07 | Cloister Hotel - #7 | 3/1/2011 |
| 215429 | B5615-08 | Cloister Hotel - #8 Hotel | 3/1/2011 |
| 215430 | B4984-03 | Cloister Hotel - #3 Wing | 3/1/2011 |
| 215433 | B5610-03 | Cloister Hotel - #3 Hotel | 3/1/2011 |
| 215463 | B5613-06 | Cloister Hotel - #6 Hotel | 3/1/2011 |
| 215464 | B5616-09 | Cloister Hotel - #9 Hotel | 3/1/2011 |
| 215480 | 4982-01 | Cloister Hotel - #2 Wing | 3/1/2011 |
| 215482 | B4985-04 | Cloister Hotel - #4 Wing | 3/1/2011 |
| 215483 | B5609-01 | Cloister Hotel - #1 Hotel | 3/1/2011 |
| 215484 | B5609-02 | Cloister Hotel - #2 Hotel | 3/1/2011 |
| 220280 | B5611-04 | Cloister Hotel - #4 Hotel | 3/1/2011 |
| 223148 | 34983-02 | Cloister Hotel - #2 Wing | 3/1/2011 |
| 241323 | PD6639A | Cloister Hotel – River Bar | 3/1/2011 |
| 241325 | PD6699B | Cloister Hotel – 100 Hudson | 3/1/2011 |
| 241326 | PD6639C | Cloister Hotel – Main Kitchen | 3/1/2011 |
| 120533 | 457910 | Beach Club Residences P.O.A. - Dunbar | 3/1/2011 |
| 120495 | 457911 | Beach Club Residences P.O.A. - Mackay | 3/1/2011 |
| 241315 | 31820835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241319 | 31830835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241320 | 31840835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241305 | 238071 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 195448 | 1359946 | Beach Club Residences P.O.A. - Office | 3/1/2011 |
| 195353 | 460447 | Beach Club Residences P.O.A. - Abbott | 3/1/2011 |

23290154v5

| 195354 | 460448 | Beach Club Residences P.O.A. - Sinclair | 3/1/2011 |
| 236856 | 238081 | Ocean Club North - #1 | 2/1/2011 |
| 236858 | 238082 | Ocean Club North - #2 | 2/1/2011 |
| 236859 | 238083 | Ocean Club North - #3 | 2/1/2011 |

Water Heater Operating Permits

| **Jurisdiction** | **National Board Number** | **Location** | **Expiration Date** |
| --- | --- | --- | --- |
| 215472 | 107091 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215473 | 107034 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215474 | 107045 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215475 | 107174 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215476 | 107144 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215477 | 107026 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215469 | 107033 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215470 | 107180 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215471 | 107046 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 243496 | 2780 | Cloister Hotel – Womens' Spa | 3/1/2012 |
| 243497 | 2916 | Cloister Hotel – Ladies Fitness | 3/1/2012 |
| 243498 | 2800 | Cloister Hotel – Mens Fitness | 3/1/2012 |
| 243499 | 2910 | Cloister Hotel – Mens Spa | 3/1/2012 |

Low Pressure Water Heater Operating Permits

| **Jurisdiction** | **National Board Number** | **Location** | **Expiration Date** |
| --- | --- | --- | --- |
| 243485 | 243485 | Cloister Hotel – North Wing | 3/1/2012 |
| 243486 | 104943 | Cloister Hotel – North Wing | 3/1/2012 |
| 243487 | 106427 | Cloister Hotel – North Wing | 3/1/2012 |
| 243488 | 106451 | Cloister Hotel – South Wing | 3/1/2012 |
| 242489 | 106479 | Cloister Hotel – South Wing | 3/1/2012 |
| 243490 | 106478 | Cloister Hotel – South Wing | 3/1/2012 |
| 243491 | 108793 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243492 | 108795 | Cloister Hotel – Spa & Tennis | 3/1/2012 |

23290154v5

| 243493 | 108744 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243494 | 108796 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243495 | 108792 | Cloister Hotel – Spa & Tennis | 3/1/2012 |

**Other Permits/Licenses**

1. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

2. Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

3. Coastal Marshlands Protection Committee Permit #508, dated October 20, 2005, issued by the Coastal Resources Division of the Georgia Department of Natural Resources allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

4. MPLC Certificate of License renewal, dated June 3, 2010, issued by the Motion Picture Licensing Corporation allowing the Cloister Hotel – Children's Program the right under copyright law to publicly perform certain lawfully obtained motion pictures.

5. Building Permit CBUI10042 issued July 2, 2010 by the Glynn County, Georgia Building Inspection Department.

6. Department of Army Permit 074OYN dated January 8, 1990 allowing beach renourishment activities.

7. Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

8. Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

9. Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

10. Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

11. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000073 (The Cloister).

12. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000077 (Ocean Forest).

13. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000074 (Beach Club) .

14. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000075 (Rainbow Island).

15. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000076 (The Lodge).

16. Department of Community Health, Division of Public Health Food Service Permit FS139-4224 (Davis Love III Grill).

17. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000073 (The Cloister).

23290154v5

**SECTION 3.8(b)**
**Permits in Violation**

None.

23290154v5

**SECTION 3.9(a)**
**Intellectual Property Rights**

1.    Reference is made to Schedule 2.1(i).

2.    Reference is made to the software licenses listed on Schedule 2.1(b).

**SECTION 3.9(b)**
**Intellectual Property Rights Infringements**

None.

23290154v5

**SECTION 3.9(c)**
**Intellectual Property Rights Licenses**

The Sea Island Company has granted a non-exclusive (except with respect to certain media rights, which may be exclusive) royalty free right and license to PGA TOUR, INC. and the Davis Love III Foundation to use the Sea Island Club logo and the name, logo and images of Seaside Golf Course in connection with the McGladrey Classic, a PGA TOUR co-sanctioned 72 hole competition to take place at the Seaside Golf Course in October 2010.

23290154v5

**SECTION 3.10**
**Environmental Matters**

See reports attached as <u>Exhibit E</u>.

### SECTION 3.11(a)
### Owned Real Property[3]

| DESCRIPTION | ADDRESS | TAX PARCEL |
|---|---|---|
| | | |
| **PARCEL 1** | | |
| Cloister Resort West of Sea Island Drive | 250 Service Rd Sea Island, GA 31561 | Portion of  05-00462 |
| **PARCEL 2** | | |
| Black Banks River Residences RU | 100 Black Banks Ln 90 Sea Island, GA 31561 | 05-01314 |
| **PARCEL 3** | | |
| SIBCR Condo Resort/Parking Units | N/A | 05-00822 |
| SIBCR Condo Resort/Parking Units | N/A | 05-00911 |
| **PARCEL 4** | | |
| COR Unit 1-I | 50 Dune Av 101 Sea Island, GA 31561 | 05-01150 |
| COR Unit 1-II | 50 Dune Av 1012 Sea Island, GA 31561 | 05-01151 |
| COR Unit 1-III | 50 Dune Av 1013 Sea Island, GA 31561 | 05-01152 |
| COR Unit 1-IV | 50 Dune Av 1014 Sea Island, GA 31561 | 05-01153 |
| COR Unit 2-I | 50 Dune Av 102 Sea Island, GA 31561 | 05-01154 |
| COR Unit 2-II | 50 Dune Av 1022 Sea Island, GA 31561 | 05-01155 |
| COR Unit 2-III | 50 Dune Av 1023 Sea Island, GA 31561 | 05-01156 |
| COR Unit 2-IV | 50 Dune Av 1024 Sea Island, GA 31561 | 05-01157 |
| COR Unit 4a-I | 50 Dune Av 106 Sea Island, GA 31561 | 05-01162 |
| COR Unit 4a-II | 50 Dune Av 1062 Sea Island, GA 31561 | 05-01163 |
| COR Unit 4a-III | 50 Dune Av 1063 Sea Island, GA 31561 | 05-01164 |
| COR Unit 4a-IV | 50 Dune Av 1064 Sea Island, GA 31561 | 05-01165 |
| COR Unit 4b-I | 50 Dune Av 107 Sea Island, GA 31561 | 05-01166 |
| COR Unit 4b-II | 50 Dune Av 1072 Sea Island, GA 31561 | 05-01167 |
| COR Unit 4b-III | 50 Dune Av 1073 Sea Island, GA 31561 | 05-01168 |
| COR Unit 4b-IV | 50 Dune Av 1074 Sea Island, GA 31561 | 05-01169 |
| COR Unit 6-I | 50 Dune Av 113 Sea Island, GA 31561 | 05-01174 |
| COR Unit 6-IV | 50 Dune Av 1134 Sea Island, GA 31561 | 05-01177 |
| COR Unit 7-III | 50 Dune Av 1173 Sea Island, GA 31561 | 05-01180 |
| COR Unit 7-IV | 50 Dune Av 1174 Sea Island, GA 31561 | 05-01181 |
| COR Unit 8-I | 50 Dune Av 116 Sea Island, GA 31561 | 05-01182 |
| COR Unit 8-II | 50 Dune Av 1162 Sea Island, GA 31561 | 05-01183 |
| COR Unit 8-III | 50 Dune Av 1163 Sea Island, GA 31561 | 05-01184 |
| COR Unit 8-IV | 50 Dune Av 1164 Sea Island, GA 31561 | 05-01185 |
| COR Unit 9-I | 50 Dune Av 121 Sea Island, GA 31561 | 05-01186 |
| COR Unit 9-III | 50 Dune Av 1213 Sea Island, GA 31561 | 05-01188 |
| COR Unit 10-II | 10 Dune Av 1302 Sea Island, GA 31561 | 05-01191 |
| COR Unit 10-III | 10 Dune Av 1303 Sea Island, GA 31561 | 05-01192 |
| COR Unit 10-IV | 10 Dune Av 1304 Sea Island, GA 31561 | 05-01193 |
| COR Unit 11-I | 10 Dune Av 132 Sea Island, GA 31561 | 05-01194 |
| COR Unit 11-III | 10 Dune Av 1323 Sea Island, GA 31561 | 05-01196 |
| COR Unit 12-I | 10 Dune Av 134 Sea Island, GA 31561 | 05-01198 |
| COR Unit 12-II | 10 Dune Av 1342 Sea Island, GA 31561 | 05-01199 |
| COR Unit 12-III | 10 Dune Av 1343 Sea Island, GA 31561 | 05-01200 |
| COR Unit 12-IV | 10 Dune Av 1344 Sea Island, GA 31561 | 05-01201 |
| COR Unit 14-I | 10 Dune Av 136 Sea Island, GA 31561 | 05-01202 |
| COR Unit 14-II | 10 Dune Av 1362 Sea Island, GA 31561 | 05-01203 |
| COR Unit 14-III | 10 Dune Av 1363 Sea Island, GA 31561 | 05-01204 |
| COR Unit 15-I | 10 Dune Av 137 Sea Island, GA 31561 | 05-01206 |
| COR Unit 15-II | 10 Dune Av 1372 Sea Island, GA 31561 | 05-01207 |
| COR Unit 15-III | 10 Dune Av 1373 Sea Island, GA 31561 | 05-01208 |
| COR Unit 15-IV | 10 Dune Av 1374 Sea Island, GA 31561 | 05-01209 |
| COR Unit 16-II | 10 Dune Av 1402 Sea Island, GA 31561 | 05-01211 |
| COR Unit 16-III | 10 Dune Av 1403 Sea Island, GA 31561 | 05-01212 |
| COR Unit 16-IV | 10 Dune Av 1404 Sea Island, GA 31561 | 05-01213 |
| COR Unit 17-I | 10 Dune Av 142 Sea Island, GA 31561 | 05-01214 |
| COR Unit 18-II | 10 Dune Av 1432 Sea Island, GA 31561 | 05-01219 |

---

[3] Tax parcel identification numbers in this Section 3.11(a) are for information purposes only.

23290154v5

| | | |
|---|---|---|
| COR Unit 18-III | 10 Dune Av 1433 Sea Island, GA 31561 | 05-01220 |
| COR Unit 18-IV | 10 Dune Av 1434 Sea Island, GA 31561 | 05-01221 |
| COR Unit 22-I | 10 Dune Av 152 Sea Island, GA 31561 | 05-01234 |
| COR Unit 22-III | 10 Dune Av 1523 Sea Island, GA 31561 | 05-01236 |
| COR Unit 22-IV | 10 Dune Av 1524 Sea Island, GA 31561 | 05-01237 |
| **PARCEL 5** | | |
| East of Sea Island Drive | N/A | Portion of 05-00462 |
| **PARCEL 6** | | |
| Strip of Oceanfront Property | N/A | Portion of 05-00462 |
| **PARCEL 7** | | |
| Roads | N/A | 05-00796 |
| **PARCEL 8** | | |
| OFOC Lot 30, Ph 9 | 14 Ocean Lane Sea Island, GA 31561 | 05-01146 |
| OFOC Lot 31, Ph 9 | 15 Ocean Lane Sea Island, GA 31561 | 05-01145 |
| **PARCEL 9** | | |
| OF Golf Cottage | 100 Ocean Road Sea Island, GA 31561 | 05-01148 |
| Acreage North of 36th Street (Ocean Forest) | N/A | Portion of 05-00001 |
| **PARCEL 10** | | |
| Sea Island Golf Course | 97 Retreat Ave, St Simons Island, GA 31522 | Portion of 04-04808 |
| Golf Retreat North Common Area | N/A | 04-02852 |
| Golf Retreat North Common Area | N/A | 04-13700 |
| Portion of Old Seaside Drive | N/A | Portion of 04-11777 |
| Lot 24, Golf Retreat North | 16 Retreat Ave, St. Simons Island, GA 31522 | 04-14185 |
| **PARCEL 11** | | |
| Retreat Golf course, club house & support facilities (120 acres Clubhouse area; 89.6 acres Golf Course, 15.9 | 168 Merion 11000 St. Simons Island, GA 31522 | 04-05967 |
| **PARCEL 13** | | |
| Black Banks Residential | N/A | 04-14249 |
| **PARCEL 14** | | |
| Admin Bldg, Salt Marsh Drive | 100 Salt Marsh Dr St. Simons Island, GA 31522 | 04-01597 |
| **PARCEL 15** | | |
| Support Campus North - Parking | N/A | 04-14220 |
| **PARCEL 18** | | |
| FT Lot 201 | 344 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13465 |
| FT Lot 219 | 297 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13432 |
| FT Lot 232 | 435 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13445 |
| FT Lot 240 | 26 Telford Lane St. Simons Island, GA 31522 | 04-13720 |
| **PARCEL 26(a) and 26(b)** | | |
| OFDC Lot 3 | 17 Forest Ln, Sea Island, GA 31561 | 05-00803 |
| OFDC Lot 6 | 426 Forest Rd, Sea Island, GA 31561 | 05-00805 |
| OFDC Lot 7 | 430 Forest Rd, Sea Island, GA 31561 | 05-00806 |
| OFDC Lot 9 | 438 Forest Rd, Sea Island, GA 31561 | 05-00748 |
| OFDC Lot 10 | 442 Forest Rd, Sea Island, GA 31561 | 05-00749 |
| OFDC Lot 12 | 420 Forest Rd, Sea Island, GA 31561 | 05-00808 |
| OFDC Lot 13 | 454 Forest Rd, Sea Island, GA 31561 | 05-00809 |
| OFDC Lot 14 | 458 Forest Rd, Sea Island, GA 31561 | 05-00810 |
| OFDC Lot 16 | 466 Forest Rd, Sea Island, GA 31561 | 05-00812 |
| OFDC Lot 17 | 470 Forest Rd, Sea Island, GA 31561 | 05-00813 |
| **PARCEL 27** | | |
| OF Common Area 9.439 AC Forest Rd | N/A | 05-00687 |
| OF Forest Cottage Expansion, remainder acreage | N/A | 05-00744 |
| OFOC Common Area - Ph 1 | N/A | 05-00693 |
| OFOC Common Area - Ph 2 | N/A | 05-00692 |
| OFOC Common Area - Ph 3 | N/A | 05-00697 |

49

| | | |
|---|---|---|
| OFOC Common Area - Ph 4 | N/A | 05-00715 |
| OFOC Common Area Ph 5 | N/A | 05-00734 |
| OFOC Common Areas, Ph VIII | N/A | 05-00823 |
| **PARCEL 29 and 29(a)** | | |
| OS Lot 8 | 352 Old Seaside Dr, St Simons Island, GA 31522 | 04-11785 |
| OS Lot 9 | 105 Old Seaside Ln, St Simons Island, GA 31522 | 04-11786 |
| **PARCEL 30** | | |
| 7.853 AC, Old Seaside | N/A | 04-11368 |
| Seaside Tract | N/A | Portion of 04-11777 |
| **PARCEL 31** | | |
| SI Lake Cott Lot 8 | 222 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-11405 |
| SI Lake Cott Lot 9 | 212 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-11406 |
| SI Lake Cott Lot 37 | 127 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-14165 |
| SI Lake Cott Lot 38 | 129 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-14166 |
| **PARCEL 32** | | |
| Roads within SI Lake Cottages; 3.595 AC | N/A | 04-11397 |
| SI Lake Cottages Undeveloped Acreage | N/A | 04-00798 |
| **PARCEL 33** | | |
| FT Lot 202 | 348 Pikes Bluff Dr, St Simons Island, GA 31522 | 04-13464 |
| FT Lot 251 | 124 Telford Ln, St Simons Island, GA 31522 | 04-13709 |
| **PARCEL 35** | | |
| Tract 9; 6.550 total acres; "Finger" parcel | N/A | 05-01241 |
| **PARCEL 36** | | |
| Expanded Tract V, Cloister Residences East | 100 Dune Avenue, Sea Island, GA 31561 | 05-00787 |
| 1/2 TIC | | 05-01242 |
| **PARCEL 37** | | |
| Tract 1, West Point Plantation, SSI | 427 Mimosa Dr, St Simons Island, GA 31522 | 04-01009 |
| Lot 12 Marsh Point, SSI | 2023 Sea Palms W Dr, St Simons Island, GA 31522 | 04-09512 |
| Lot 19 Vassar Point | 509 Vassar Point Dr, St Simons Island, GA 31522 | 04-08447 |
| Oak Forest - Phase 2-B | 118 Brookfield Trc, St Simons Island, GA 31522 | 04-10017 |
| Black Banks | 69 Black Banks Dr, St Simons Island, GA 31522 | 04-00742 |
| **PARCEL 38** | | |
| 200 Beach Club Lane, Unit 401; BCO1 | 200 Beach Club Ln 401, Sea Island, GA 31561 | 05-01243 |
| 200 Beach Club Lane, Unit 402; BCO2 Beach Club Residences | 200 Beach Club Ln 402, Sea Island, GA 31561 | 05-01244 |
| **PARCEL 39** | | |
| Ocean Club Unit ON3 | 150 Dune Av 173, Sea Island, GA 31561 | 05-01300 |
| **PARCEL 40** | | |
| Beach Club Residences Unit GS6 | 100 Beach Club Lane, 431, Sea Island, GA 31561 | 05-01286 |
| **PARCEL 41** | | |
| Beach Club Residences GS Resort Unit | 100 Beach Club Ln 10000, Sea Island, GA 31561 | 05-01297 |
| **PARCEL 42** | | |
| Ocean Club Resort Unit | 159 Dune Av 10001, Sea Island, GA 31561 | 05-01312 |
| **PARCEL 43** | | |
| Beach Club Residences BCO Resort Unit | 200 Beach Club Ln 10001, Sea Island, GA 31561 | 05-01263 |

50

| | | |
|---|---|---|
| Beach Club Residences GN Resort Unit | 300 Beach Club Ln 10001, Sea Island, GA 31561 | 05-01280 |
| **PARCEL 44** | | |
| Kings Point Lot 13 | 146 Point Ln, St Simons Island, GA 31522 | 04-11178 |
| **PARCEL 45** | | |
| Kings Point Lot 15 | 145 Point Ln, St Simons Island, GA 31522 | 04-11176 |
| **PARCEL 47** | | |
| FT Lot 46 | 21 Marlin Ln, St Simons Island, GA 31522 | 04-12386 |
| **PARCEL 48** | | |
| FT Lot 131 | 185 Kirkaldy Ln, St Simons Island, GA 31522 | 04-13111 |
| **PARCEL 49** | | |
| OFDC Lot 38 | 220 Forest Rd, Sea Island, GA 31561 | 05-01313 |
| **PARCEL 50** | | |
| Woodbine | N/A | W09 01 002 |
| Woodbine | N/A | W09 01 003 |
| **PARCEL 51** | | |
| Tabby House | 1550 Frederica Rd, St Simons Island, GA 31522 | 04-02802 |
| **PARCEL 52** | | |
| 1545 AC Marsh Frederica Tract | N/A | 04-14275 |
| 6.7 AC Marsh Frederica Tract | N/A | 04-14276 |
| 1268.44 AC Marsh Cannons Point | N/A | 04-14277 |
| **PARCEL 53** | | |
| Laundry Facility - Brunswick | 3374 Cypress Mill Rd, Brunswick, GA 31520 | 01-06954 |
| **PARCEL 54** | | |
| Shooting School | 11 Sea Island Rd, St. Simons Island, GA 31522 | 05-00459 |
| Rainbow Marsh | 46 Rainbow Island Dr, St Simons Island, GA 31522 | 04-00715 |
| **PARCEL 55** | | |
| Salt Marsh and Hammocks lying to the west of the Plantation and Seaside Golf Courses and south of Kings Way | N/A | Portion of 04-02830 |
| **PARCEL 56** | | |
| South End of Sea Island | N/A | Portion of 05-00462 |
| **PARCEL 57** | | N/A |
| Salt Marsh and High Ground west of SI Subdivision No. 1 | N/A | 05-00001 |
| **PARCEL 58** | | |
| Native American Burial Ground | 315 Cedar Bank Rd, St Simons Island, GA 31522 | 04-13359 |
| **PARCEL 59** | | |
| 22nd Street Well Site | 238 W Twenty Second St 21000, Sea Island, GA 31561 | 05-00821 |
| **PARCEL 60** | | |
| Undeveloped Marsh Hamilton Landing | N/A | 04-01706 |
| Undeveloped Marsh Hamilton Hawkins Island | N/A | 04-01116 |
| **PARCEL 61** | | |
| Lanier Island | 0 FJ Torras Cswy, St Simons Island, GA 31522 | 02-00100 |
| **PARCEL 62** | | |
| SIBCR Condo Unit CC | 500 Beach Club Dr 522, Sea Island, GA 31561 | 05-00901 |
| **PARCEL 63** | | |
| 60 Acres - Camden | N/A | 118 036A |
| **PARCEL 64** | | |

| | | |
|---|---|---|
| Twitty Park lying north of Sea Island Road | 3000 Frederica Road, St. Simons Island, Georgia 31522 | 04-13915 |
| **PARCEL 65** | | |
| Old Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia | 100 Sea Island Drive, St. Simons Island, Georgia 31522 | 04-11777 |
| **PARCEL 66** | | |
| 400 Sea Island Drive Subdivision Streets and Buffers | 400 Sea Island Circle, St. Simons Island, Ga 31522 | 04-10248 |
| **PARCEL 67** | | |
| Tract between Sea Island Road and Epworth Oaks Subdivision | 847 Sea Island Road, St. Simons Island, Georgia 31522 | 04-01716 |
| **PARCEL 68** | | |
| St. Perpetua Church Lot | 115 Lawrence Road, St. Simons Island, Ga 31522 | 04-00215 |
| **PARCEL 69** | | |
| Roads and Streets, St. Simons Island Club Subdivision | N/A | None (mapped as public streets) |

52

## SECTION 3.11(b)
### Acquired Owned Real Property Exceptions

1.  As to Parcels 38, 39, and 40, Sea Island Company does not now have fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing, but shall have such title at Closing.  For additional information:

    Parcel 38:  Sea Island Company owns good and valid title to membership interests in Beach Club Ocean Residences, LLC, which entitle it to require Beach Club Ocean Residences, LLC (and Beach Club Garden North Residences, LCC, and Beach Club Garden South Residences, LLC) to convey to it the real property in Parcel 38.

    Parcel 39:  Sea Island Company owns good and valid title to membership interests in Ocean Club North Residences, LLC, which entitle it to require Ocean Club North Residences, LLC, to convey to it the real property in Parcel 39.

    Parcel 40: Sea Island Company owns good and valid title to membership interests in Beach Club Garden South Residences, LLC, which entitle it to require Beach Club Garden South Residences, LLC (and Beach Club Ocean Residences, LCC, and Beach Club Garden North Residences, LLC) to convey to it the real property in Parcel 40.

2.  As to Parcels 42 and 43, Sea Island Resort Residences, LLC does not now have fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing, but shall have such title at Closing.  For additional information:

    Parcel 42: Sea Island Resort Residences, LLC owns good and valid title to membership interests in Ocean Club North Residences, LLC, which entitle it to require Ocean Club North Residences, LLC, to convey to it the real property in Parcel 42.

    Parcel 43: Sea Island Resort Residences, LLC owns good and valid title to membership interests in Beach Club Ocean Residences, LLC, and Beach Club Garden North Residences, LLC, which entitle it to require Beach Club Ocean Residences, LLC, Beach Club Garden North Residences, LLC (and Beach Club Garden South Residences, LLC) to convey to it the real property in Parcel 43.

3.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to the United States Postal Service dated March 17, 2008, as set forth in the Title Commitment.

4.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Atlantic Bike Shop, Inc. dated March 11, 2010.

5.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Steve Hightower dated November 30, 2008.

6.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Resort Photography, LLC dated March 6, 2000.

23290154v5

7.  As to Parcel 01, a portion of Parcel 01 is subject to a Yacht Charter Agreement relating to the Cloister Belle, between Sea Island Company and Captain Brian Quinn dated August 2008.

8.  As to Parcel 03, two parking units, which are currently fenced and identified by signage as reserved for use by certain Beach Club Suites as storage, are subject to agreements reserving such parking units for the benefit of the owners of such Beach Club Suites.

9.  As to Parcels 05, 06, and 07, portions of such parcels are subject to a lease from Sea Island Company to Barry's Beach Service, Inc. dated June 30, 2006.

10. As to Parcels 05, 06, 07, and 54, portions of such parcels are subject to a lease from Sea Island Company to Tri H Friesians LLC dated February 4, 2010.

11. As to Parcels 06 and 07, Sea Island Company has from time to time granted licenses to owners of property on Sea Island (including Ocean Forest) and their guests and invitees to access Sea Island Beach and in some cases to maintain landscaping and/or improvements on real property owned by Sea Island Company within Parcels 06 and 07 including without limitation the rights of way of the roads on Sea Island.

12. As to Parcel 09, portions of Parcel 09 constitute common area and/or limited common area for the benefit of the owners of property within Ocean Forest.

13. As to Parcel 09, a portion of Parcel 09 is subject to a lease from Sea Island Company to Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest), as set forth in the Title Commitment.

14. As to Parcel 10, owners of lots within Old Seaside, and their guests and invitees, have been granted rights to cross the road within Parcel 10 providing access to Old Seaside and to cross the boardwalk and pathway leading from Old Seaside subdivision to the beach adjacent to the St. Simons Sound.

15. As to Parcel 10, a portion of Parcel 10 is subject to a lease from Sea Island Company to Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge), as set forth in the Title Commitment.

16. As to Parcel 11, owners of lots within Retreat (formerly St. Simons Island Club Subdivision), and their guest and invitees, have been granted rights to cross the entrance road to the subdivision crossing a portion of Parcel 11.

17. As to Parcel 15, Parcel 15 is subject to an Agreement Regarding Right of First Refusal by and between Sea Island Company and JLV-VASI, LLC. dated September 5, 2008, as set forth in the Title Commitment.

23290154v5

18. As to Parcel 27, portions of Parcel 27 constitute common area and/or limited common area for the benefit of the owners of property within Ocean Forest.

19. As to Parcel 32, Parcel 32 is subject to a right of first offer in the Purchase Agreement by and among Sea Island Coastal Properties LLC, Lake Cottages III, LLC, and Sea Island Company, dated July 17, 2007, which right of first offer shall be extinguished prior to Closing.

20. As to Parcel 32, portions of Parcel 32 constitute common area and/or limited common area for the benefit of the owners of property within Lake Cottages, and other portions of Parcel 32 indentified as Twitty Park are subject to the rights of others for use as a park.

21. As to Parcel 37, Parcel 37, Tract VI is subject to a lease from Sea Island Company to Alfred W. Jones, III dated October 8, 2007.

22. As to Parcel 48, Parcel 48 is subject to a Shared Equity Financing Agreement with C. Allen Brown dated April 25, 2005, as set forth in the Title Commitment.

23. As to Parcel 50, a portion of Parcel 50 is subject to a lease from Sea Island Company to Satilla River Keeper dated February 15, 2010, as set forth in the Title Commitment.

24. As to Parcel 51, Parcel 51 is subject to a lease from Sea Island Company to The Tabby House, as set forth in the Title Commitment.

25. As to Parcels 52, 55, 57, 60, and 61, such parcels are subject to existing encroachments by existing docks or other existing improvements constructed by third parties.

26. As to Parcel 54, a portion of Parcel 54 is subject to a lease from Sea Island Company to Verizon Wireless of the East dated March 8, 2004 (The Cloister), as set forth in the Title Commitment.

27. As to Parcel 64, the restrictive covenants and reversion clause set out in that certain deed from Glynn County to Sea Island Company dated April 26, 1982, recorded in the office of the Clerk of Superior Court of Glynn County, Georgia at Deed Book 23-P, Page 609 (the Parcel being affected thereby containing 0.892 acre).

28. As to Parcel 65, the rights of owners of lots in Old Seaside Subdivision, their guests, invitees and licensees, to use said road for access to the lots in said subdivision.

29. As to Parcel 66, the rights of owners of lots in 400 Sea Island Drive Subdivision, their guests, invitees and licensees, to use Hamilton Island Circle for access to the lots in said subdivision.

30. As to Parcel 52, lack of a right of access to and from the land.

31. As to Parcels 52, 54, 55, 56, 57, 60 and 61, the terms and conditions of the Georgia Coastal Marshlands Protection Act of 1970 and such title claims as the State of Georgia may choose to exert to the title to salt marshes, which Act and claims may relate only to certain portions of said parcels.

32. As to Parcel 68, the inexact nature of the description of the property, and the rights of others associated with the probability of at least one grave being located upon the property.

33. As to Parcel 69, the rights of lot owners in the nine phases of St. Simons Island Club Subdivision to the streets in said phases, and that certain Agreement, dated February 20, 1989 (recorded as Exhibit A to that certain Agreement, dated April 21, 2004, between the St. Simons Island Club Property Owner's Association, Inc. and Sea Island Company on March 23, 2005 at Deed Book 1675, Page 322), between the St. Simons Island Club Property Owner's Association and Sea Island Company, whereby the Association assumed the duty and responsibility of maintaining all streets in the nine phases of St. Simons Island Subdivision.

56

## SECTION 3.12(a)
## Employee Benefit Plans with Health Benefits

1.  Postretirement Benefit Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

2.  Sea Island Company Healthgram 2010 Health Care Plan

3.  Sea Island Dental Care Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

4.  Prescription Drug Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

5.  Starbridge Sickness and Accident Plan

6.  Long-term Care Insurance

7.  Employment Agreement by and among Sea Island Company and David Bansmer dated April 15, 2006

8.  Separation Agreement by and among Jim Brown and Sea Island Company

9.  Separation Agreement by and among Taylor Adams and Sea Island Company

23290154v5

**SECTION 3.14**
**Contracts**

1.   The contracts listed in Section 2.1(b) hereof.

2.   The permits and licenses listed in Section 3.8(a) hereof.

3.   Sea Island Club Membership agreements with approximately 3,000 members.

4.   Ocean Forest Membership agreements with approximately 450 members.

5.   The Employee Benefit Plans listed in Section 3.12(a) hereof and all other Employee Benefit Plans of Sellers.

6.   Certain insurance policies of Sellers.

**SECTION 3.16**
**Improvements**

Reference is made to that certain Property Condition Assessment Report prepared by Shepard Consulting Group, Inc. dated June 30, 2010 attached hereto as <u>Exhibit F</u>.

23290154v5

**SECTION 3.17**
**Club Documents; Membership**

See documents attached as <u>Exhibit G</u> and the list of all current Club Members of Sea Island Club Membership Program and the Ocean Forest Club Membership Program, detailing the type of membership that is applicable to each such Club Member and the amount of all refundable initiation fees paid to Sellers by each such Club Member provided in writing to Purchaser on August 4, 2010.

23290154v5

**SECTION 3.18**
**Financial Statements**

See financial statements attached as <u>Exhibit H</u>.

23290154v5

**SECTION 3.20**
**Taxes**

None.

## SECTION 5.2
### Conduct of Business

Sellers shall in no way be prohibited from conducting the following activities:

1.  Conducting and completing the sale or transfer of the Excluded Owned Real Property listed on Schedule 2.2(c) hereof.

2.  Reevaluating and reducing the principal amount of that certain loan made my Sea Island Company to Todd W. Anderson and Stacey L. Anderson pursuant to that certain Shared Equity Financing Agreement and related documents.

3.  Entering into a final Tournament Agreement with PGA TOUR, INC. and the Davis Love III Foundation in connection with the McGladrey Classic, a PGA TOUR co-sanctioned 72 hole competition to take place at the Seaside Golf Course in October 2010, provided that the licenses contained therein shall remain non-exclusive, except as to matters where Sea Island has exclusive rights to grant.

63

**SECTION 10.3**
**Retiree Health Benefits**

| Name | Remaining Balance in Medical Plan as of December 31, 2009 ($) | Consumed Balance in Medical Plan as of December 31, 2009 ($) |
|---|---|---|
| ADAMS, CAMILLE | 29,620 | 20,380 |
| ADAMS, CLAUDE T | 30,636 | 19,364 |
| ATKINSON, S.G. | 4,598 | 45,402 |
| BALDWIN, ULYSESS | 14,971 | 35,029 |
| BEISEL, ALICE | 16,540 | 33,460 |
| BENEFIELD, J.D. | 33,915 | 16,085 |
| BENEFIELD, MIRIAM | 36,022 | 13,978 |
| BUTLER, CALVIN | 50,000 | - |
| BUTLER, NANCY | 47,701 | 2,299 |
| BUTLER, ROBERT | 42,749 | 7,251 |
| BYARD, MARGARET | 48,359 | 1,641 |
| CASON, JULIAN | 42,836 | 7,164 |
| CLARK, ALBERT | | |
| CLARK, DONNIE | 23,543 | 26,457 |
| CLAYTON, ERNESTINE | 48,491 | 1,509 |
| CRAWFORD, PAUL | 47,055 | 2,945 |
| DAVIS, ELBA | 48,037 | 1,963 |
| DAVIS, LOUIS | 47,245 | 2,755 |
| DERKACZ, MICHAEL | 48,718 | 1,282 |
| DICKERSON, ROBERT | 44,555 | 5,445 |
| DIXON, EDNA | 45,689 | 4,311 |
| ESPANA, ANGEL | 5,562 | 44,438 |
| FLETCHER, GEORGE | 24,404 | 25,596 |
| FLETCHER, PHYLLIS | 39,238 | 10,762 |
| GALBREATH, ELVENOIR | 43,506 | 6,494 |
| GALBREATH, ELVENOIR | 46,632 | 3,368 |
| GIBSON, BILLY R. | 40,215 | 9,785 |
| GIBSON, LINDA | 43,678 | 6,322 |
| GIBSON, PATRICIA | 43,969 | 6,031 |
| GIVENS, FLORENCE | | |
| GRAHAM, MIRIAM | 48,975 | 1,025 |
| GRAHAM, W.R. | 48,705 | 1,295 |
| GROVNER, CELIA | 44,192 | 5,808 |
| HAAS, BETTY | 46,321 | 3,679 |
| HAMMETT, JANET | 47,004 | 2,996 |
| HAMMETT, WILLIE | 47,805 | 2,195 |
| HARRISON, EDWEINA | | |
| HARRISON, MAYNARD | 44,408 | 5,592 |
| HARRISON, VALERIE F. | 46,778 | 3,222 |
| HARVEY, HARRIS | 44,431 | 5,569 |
| HIGGENBOTHAM, WILLIE M. | 40,558 | 9,442 |
| HOPKINS, ALMA | 49,479 | 521 |

64

23290154v5

| | | |
|---|---|---|
| HUGHES JR, CLAUDE R | | |
| HUTCHERSON, CARLETHA | | |
| IHDE, INGEBORG | 31,744 | 18,256 |
| IHDE, WERNER | 37,458 | 12,542 |
| JOHNS, BARBARA | 48,661 | 1,339 |
| JOHNS, CODY | 44,341 | 5,659 |
| JOHNS, CODY (Larry) | 25,988 | 24,012 |
| JONES JR, IRVIN | 46,410 | 3,590 |
| JONES, ELSIE | 45,389 | 4,611 |
| JONES, JAMES | 49,323 | 677 |
| JONES, JANICE | 46,654 | 3,346 |
| JONES, SARAH | 45,928 | 4,072 |
| KUNTZ, DAVID | 32,257 | 17,743 |
| KUNTZ, MARIANNA | 18,074 | 31,926 |
| LOTT, ARCHIE | 47,217 | 2,783 |
| LOTT, WILLENE | 44,701 | 5,299 |
| MANKIN, LANOLA | | |
| MARION, ISIAH | | |
| MARION, NORMA | 35,253 | 14,747 |
| MAY, DEBORAH | | |
| MAY, ROBERT | 30,683 | 19,317 |
| MCCRARY, DENNIE | 39,426 | 10,574 |
| MCCRARY, FRANCIS | 15,695 | 34,305 |
| MCNEELY, JOYCE | 49,562 | 438 |
| MULLIS, MARY | 33,865 | 16,135 |
| NUNNALLY, HAZEL | 49,750 | 250 |
| NUNNALLY, TOMMY | | |
| O'CONNOR, KATHERINE | 15,727 | 34,273 |
| O'CONNOR, PAUL | 32,225 | 17,775 |
| OUTLAW, NETHEL R. | 49,517 | 483 |
| OWENS, RANDY | 38,080 | 11,920 |
| RAMSEY, CARTER | 38,583 | 11,417 |
| RAMSEY, JOYCE S. | 36,283 | 13,717 |
| RAULS, SHIRLEY | 30,387 | 19,613 |
| SAWYER, JANE | 46,572 | 3,428 |
| SHEDD, LOUISE | 42,752 | 7,248 |
| SMALL, LUVENIA | 43,908 | 6,092 |
| SMITH, WILLIAM C. | 34,440 | 15,560 |
| SMITH, WILLIAM C. | 45,819 | 4,181 |
| TALLEY, CARL PATRICK | 46,300 | 3,700 |
| TALLEY, CLYDE | 41,820 | 8,180 |
| TODD, ELEANOR | 36,525 | 13,475 |
| WALKER, HERCULE | 41,718 | 8,282 |
| WELLS, LENOIR | 46,903 | 3,097 |
| WICKER, GENE | | |
| WILLIAMS, JOHN | | |
| WRIGHT, E.T. | 36,633 | 13,367 |
| WRIGHT, RACHEL | 37,807 | 12,193 |

## SECTION 11.1(b)
## Membership Terms

See <u>Exhibit I</u> attached hereto.

23290154v5

**SECTION 12.2(f)**
**Required Consents**

None.

23290154v5

## SECTION 12.2(h)
## Liquor Licenses

| Location | Licensee | License Type | Products Sold |
|---|---|---|---|
| Davis Love Grill | Sea Island Company | Consumption | Beer & Liquor |
| Ocean Forest Golf Club  (Tee House) | James B. Gilbert | Retail | Beer |
| Ocean Forest Golf Club | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf Club In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Sea Island In Room Service | Sea Island Company | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island Additional Facility | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Sea Island Golf Club Snack Bar | Sea Island Company | Retail | Beer |
| Cloister Hotel Clubrooms | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Cloister Hotel | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Hotel In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Cloister Hotel  (Additional Facility, River Bar) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Black Banks Parlor | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom East | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom West | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (North) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (South) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Georgia Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Main Dining Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| South Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Spanish Lounge Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Big George's Raw Bar and Grill | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Beach Club     (In-room) | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Restaurant Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Snack Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room | James B. Gilbert | Consumption | Beer, Wine & Liquor |

23290154v5

| | | | |
|---|---|---|---|
| Ocean Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Pavilion | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Spa    (NO SUNDAY SALES on county license) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Pub at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff Additional Facility | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff Additional Facility (In Rm Svc) | Ellis H. Howard | Hotel In-Room Service | Beer, Wine & Liquor |

23290154v5

SCHEDULE 11.1(b)

## CERTAIN CHANGES TO THE SEA ISLAND CLUB
## AND OCEAN FOREST GOLF CLUB MEMBERSHIP PROGRAMS

All Club Member Agreements with members under the existing Sea Island Club and Ocean Forest Golf Club Membership Programs will be rejected in the Bankruptcy Cases pursuant to Section 365 of the Bankruptcy Code, including, without limitation, rejection of the possible option of members, which may presently exist under the existing Ocean Forest Golf Club Membership Program, to buy the club facilities. Purchaser will honor the deposit liability owed to each existing Club Member who agrees to be bound by the terms and conditions of new membership documents to be prepared for their respective clubs by crediting the amount of such deposit liability to such member's account pursuant to the applicable New Membership Program; provided that the Purchaser's obligation to refund such credited deposit liability will be exclusively governed by the terms of the applicable New Membership Program, and not by the terms of the applicable existing Club Member Agreements that will be rejected in the Bankruptcy Cases. Please note that those Club Members who received a credit or the benefit of any promotion upon acquiring their existing membership will only receive a credit to their new membership account in the amount of their existing membership deposit paid in cash. Electing Club Members will not be required to post any additional deposit amounts to join *under* the New Membership Programs.

The New Membership Programs will be generally consistent with the existing Sea Island Club and Ocean Forest Golf Club Membership Programs, however, the new documentation will be more contemporary and comprehensive. A determination will have to be made concerning what categories of membership will be offered following the closing, the timing of the offerings and the pricing thereof so as to be responsive to the marketplace and grow the membership, while being sensitive to the interests of existing members. Some of the more significant changes, clarifications and reaffirmations Purchaser presently proposes are set forth below.

Sea Island Club

1.      The 30-year deposit refund obligation for each member who *joins under*  the *New Membership* Program will be reset  to a date which is the later of (a) *December 31, 2035* or (b) the date which is 30 years after the member joined the Sea Island Club.

2.      Limitations or caps on dues increases or fee increases, will be eliminated.     In light of this change, the Club may elect to offer preferred pricing for a member's extended family members (i.e., the member's and spouse's parents, adult children, grandchildren and their respective spouses) versus regular guests with respect to guest cards and usage fees.

3.      Until the Club has issued all of its memberships, the Club will refund one deposit for a membership on the resigned membership list (by reissuing the membership of the member on the resigned membership list) for every three of its memberships that are sold (i.e., 1 in 4). At such time as the Club has issued all of its memberships, each membership issued will be a

23243563v5

resigned membership. Resigned memberships will be reissued on a first-resigned, first-reissued basis, *subject to paragraph 4 below.*

4.      Upon the death of a member, if the surviving spouse or an adult child does not succeed to the membership, the membership will be placed on the resigned wait list for refunding of the applicable deposit below the last membership of a deceased member and above all memberships of resigning but not deceased members.   This change will not be applied to already deceased members and their memberships shall be refunded based upon death of the member prior to the New Membership Program taking effect.

5.       The Club will reaffirm its right to offer memberships to owners of properties that are not located in a Sea Island Company development or a development that has been designated as a "Qualified Residential Development," upon terms and conditions as determined from time to time by the Club.

6.      The Club can be converted to an equity, member-owned club. Further, the Club can sell or otherwise dispose of any or all of the Club facilities.

7.      The Club will reserve the right to modify, eliminate or add to the dues options that are available for any membership category, such as single, family, national, etc.

8.      The Club will reserve the right to offer new dues categories and new membership categories having different membership joining fees, including deposits and non-refundable initiation fees, and different dues. Further, the Club will reserve the right to terminate or modify any dues category or membership category, as well as discontinue offering any dues category or membership category.

9.      Those members who presently do not pay dues as a result of an agreement arising from or in connection with a prior real estate transaction with the Sea Island Company will be obligated to commence paying dues, but at a rate equal to seventy-five percent (75%) of the applicable dues for their particular category.   This lower dues rate is not transferable to the successor member.

10.     Rental guests staying in a member's residence will be entitled to have temporary membership privileges at the Club as renters and not as guests, subject to approval and the payment of applicable fees and charges.

11.     The Club will reserve the right to, from time to time, discontinue or determine the terms of eligibility for inactive status, and to modify the terms and conditions relating to inactive status such as, for example, the duration of this status.

12.     The Club will reserve the right to enter into reciprocal use arrangements with other clubs and resorts.

13.     A membership can be transferred to an adult child during the member's lifetime or upon death, subject to the Club's approval of the adult child and payment of an administrative fee only; a new 30-year period will start for the refund of the membership deposit. This is a one-time only right per membership. The next transfer to an adult child will require the payment of

2

the difference between the then current membership deposit and the amount of the membership deposit previously paid for the membership in question.

14.     Members, through the Club, can exchange their membership privileges and dues obligations, on a membership year basis.

15.     The Club can issue honorary, company and other complimentary memberships on terms and conditions determined by it. These memberships shall not count against any cap or limit on the number of memberships.

Ocean Forest Golf Club

1.     The 30-year deposit refund obligation for each member who *joins under* the *New Membership P*rogram will be reset to a date which is the later of (a) *December 31, 2035* or (b) the date which is 30 years after the member joined the Ocean Forest Golf Club *(the "Outside Refund Date")*.

2.     The refund procedure specified in the existing Ocean Forest Golf Club Membership Program will be revised to provide that until the Club has issued all of its memberships, the Club will refund one deposit for a membership on the resigned membership list (by reissuing the membership of the member on the resigned membership list) for every three of its memberships that are sold (i.e., 1 in 4). At such time as the Club has issued all of its memberships, each membership issued will be a resigned membership. Resigned memberships will be reissued on a first-resigned, first-reissued basis.

3.     At the *Outside Refund Date,* a member who desires to continue the membership privileges must keep their initiation deposit with the Club and continue to pay applicable dues, fees and charges. The member will then be entitled to a deposit refund *30 years thereafter* or earlier, upon resignation and reissuance of the membership.

4.     The obligation of the Club to refund the initiation deposit paid for a spousal membership upon the spousal member succeeding to his or her deceased spouse's primary membership in the Club or in the case of divorce, will be eliminated. Instead, the spousal membership will be placed on a resigned wait list for refunding.

5.     The Club can be converted to an equity, member-owned club. Further, the Club can sell or otherwise dispose of any or all of the Club facilities.

6.     The Club will reserve the right to modify, eliminate or add to the dues options that are available for any membership category, such as single, family, national, etc.

7.     The Club will reserve the right to offer new dues categories and new membership categories having different membership joining fees, including deposits and non-refundable initiation fees, and different dues. Further, the Club will reserve the right to terminate or modify any dues category or membership category, as well as discontinue offering any dues category or membership category.

3

8.      A membership can be transferred to an adult child during the member's lifetime or upon death, subject to the Club's approval of the adult child and payment of an administrative fee only; with a new 30-year period starting for the refund of the initiation deposit. This is a one-time only right per membership. The next transfer to an adult child will require the payment of the difference between the then current initiation deposit and the amount of the membership deposit previously paid.

9.      The age of children who can enjoy membership privileges under a membership will be increased to 25.

10.     Membership in the Club is by invitation only.  The New Member*ship* Program will reaffirm that the *owner of Ocean Forest Golf* Club has the right in its sole discretion to determine eligibility criteria for admission to the Club's membership.

11.     The Club will reserve the right to issue honorary, company and other complimentary memberships on such terms and conditions as are determined by the Club, which memberships do not count against the cap on the number of primary memberships permitted.

23243563v5

**<u>EXHIBIT B</u>**

EXECUTION COPY

---

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**SEA ISLAND ACQUISITION LP,**

**SEA ISLAND COMPANY,**

**SEA ISLAND COASTAL PROPERTIES LLC,**

**SEA ISLAND RESORT RESIDENCES, LLC,**

**FIRST SEA ISLAND, LLC,**

**SEA ISLAND APPAREL, LLC**

**and**

**SEA ISLAND SERVICES, INC.**

~~AUGUST 4~~**October 19**, **2010**

---

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of ~~August 4~~**October 19**, 2010 (this "Agreement") is entered into by and among Sea Island Acquisition LP, a Delaware limited partnership ("Purchaser"), on the one hand, and Sea Island Company, a Georgia corporation ("SIC"), Sea Island Coastal Properties LLC, a Georgia limited liability company, Sea Island Resort Residences, LLC, a Georgia limited liability company, First Sea Island, LLC, a Georgia limited liability company, Sea Island Apparel, LLC, a Georgia limited liability company, and Sea Island Services, Inc.,  a Georgia corporation (each a "Seller" and, collectively, the "Sellers"), on the other hand.  Purchaser and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS,** Sellers own and operate a collection of exclusive hotel resorts, golf courses, spas and recreational complexes, together with certain real estate developed and undeveloped real estate held by Sellers in connection with their real estate development and management business, all of which are located in or around St. Simons Island and Sea Island, Georgia (the "Business");

**WHEREAS,** in connection with the conduct of the Business, Sellers own and operate certain properties and amenities, including the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course and the Ocean Forest Golf Course;

**WHEREAS,** Sellers desire to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS,** ~~as contemplated by Section 5.1~~**each** of ~~this Agreement, promptly following~~ the ~~date hereof,~~ Sellers ~~will each file~~**has filed** voluntary chapter 11 petitions with the United States Bankruptcy Court for the Southern District of Georgia, Brunswick Division (the "Bankruptcy Court"), and ~~it is anticipated that~~**are debtors in case nos. 10-21034 to 10-21040 pending before** the ~~chapter 11 cases of Sellers will be jointly administered with each other~~**Bankruptcy Court** (collectively, the "Bankruptcy Cases"); and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") are subject to the approval of the Bankruptcy Court and will be consummated pursuant to and in accordance with the Plan of Reorganization (as defined below) and the Confirmation Order (as defined below), pursuant to Sections 105(a), 1123 and 1129 of the Bankruptcy Code (as defined below).

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties

agree as follows:

**1.** **Definitions**.

    1.1.   <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

    (a)    "<u>2010 Property Taxes</u>" means Property Taxes with respect to the Acquired Owned Real Property for the Tax period January 1, 2010 through December 31, 2010 payable November 15, 2010.

    (b)    "<u>Accounts Receivable</u>" means all accounts and notes receivable, letters of credit and other rights to receive payments (whether current or non-current) of Sellers in respect of goods shipped, products sold or services rendered, or other indebtedness incurred to Sellers, prior to the Closing Date.

    (c)    "<u>Accrued Payroll</u>" means Sellers' accrued and unpaid payroll and commissions as of the Closing Date, excluding any amounts payable under any retention or incentive programs.

    (d)    "<u>Accrued Payroll Taxes</u>" means Sellers' incurred and, in the ordinary course of business consistent with past practice, not yet remitted payroll Taxes for the current period as of the Closing Date.

    (e)    "<u>Accrued Sales and Use Taxes</u>" means Sellers' collected and, in the ordinary course of business consistent with past practice, not yet remitted sales and use Taxes for the current period as of the Closing Date.

    (f)    "<u>Acquired Owned Real Property</u>" means collectively (a) all of the Owned Real Property, including, but not limited to, the Owned Real Property set forth on <u>Schedule 2.1(a)</u>, but excluding the Excluded Owned Real Property, and (b) the Specified Condo Units.

    (g)    "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

    (h)    "<u>Assumed Insurance Policies</u>" means all insurance policies set forth on <u>Schedule 2.1(b)</u>, as such Schedule may be amended in accordance with <u>Section 15.10</u>, provided that (i) such insurance policy is assignable to Purchaser at Closing under applicable law, and (ii) no D&O insurance policy shall be an Assumed Insurance Policy, and all claims arising under such policies prior to the Closing, and all credits, premium refunds, proceeds, causes of action or rights thereunder.

    (i)    "<u>Balance Sheet</u>" means the unaudited pro forma adjusted balance sheet of the Business as of the Balance Sheet Date (a copy of which is attached hereto as

<u>Exhibit A</u>).

(j)      "<u>Balance Sheet Date</u>" means June 30, 2010.

(k)      "<u>Bankruptcy Code</u>" means Title 11 of the United States Code (11 U.S.C. § 101 <u>et</u> <u>seq</u>.), as amended.

(l)      "<u>Base Working Capital</u>" means $0, representing total Specified W/C Assets minus Specified W/C Liabilities as shown on the Base Working Capital Statement.

(m)      "<u>Base Working Capital Statement</u>" means the statement of Specified W/C Assets and Specified W/C Liabilities as of the Balance Sheet Date attached hereto as Exhibit B.

(n)      "<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in Brunswick, Georgia are authorized or required by Law to close.

(o)      "<u>Cash Around the Resort</u>" means as of any date, Sellers' cash held at Sellers' facilities as of such date for day-to-day operations in an amount not to exceed $100,000.

(p)      "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 <u>et</u> <u>seq</u>.) and any Laws promulgated thereunder.

(q)      "<u>Claim</u>" means a "claim" as defined in <u>Section 101</u> of the Bankruptcy Code.

(r)      "<u>Closing Date</u>" means the date of the Closing.

(s)      "<u>Club Member Agreements</u>" shall mean all agreements entered into by one or more of Sellers with Club Members and relating to Sellers' golfing, club, dining, social or other membership programs, including, without limitation, the Specified Member Agreements.

(t)      "<u>Club Members</u>" shall mean all Persons who are members under the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program.

(u)      "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(v)      "<u>Confidentiality Agreement</u>" means the Confidentiality Agreement dated May 26, 2010, between SIC and Oaktree Real Estate Opportunities Fund IV, L.P., OCM Opportunities Fund VIIb, L.P. and Oaktree Opportunities Fund VIII, L.P.

(w)     "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(x)     "Customer Deposits and Prepayments" means any and all deposits, advances, prepayments, booking fees, or other amounts paid to Sellers by any of their customers prior to Closing on account of Customer Reservations.

(y)     "Customer Reservations" shall mean any reservations, tee times, or bookings made by any customer of Sellers prior to Closing on account of services or accommodations to be provided to such customer by Sellers, including hotel or lodging accommodations at the Cloister or the Lodge, dining or catering reservations or arrangements at any of the restaurants or other facilities included within the Business, spa treatments at the Cloister Spa and Fitness Center, tees times for rounds of golf at the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course or the Ocean Forest Golf Course and/or rentals pursuant to the Sea Island Cottage Rental program.

(z)     "Declaration" shall mean a Declaration of Covenants, Conditions, Restrictions and Easements or similar document governing a planned community or condominium regime that is part of the Acquired Owned Real Property.

(aa)    "Deferred Compensation Plan" means the Sea Island Company Executive Deferred Compensation Plan as amended and restated effective as of January 1, 2008.

(bb)    "Effective Date" means the date on which all conditions to effectiveness of the Plan of Reorganization have been satisfied or waived and the transactions contemplated by the Plan of Reorganization are consummated.

(cc)    "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any liability, including, but not limited to, the Sea Island Retirement Plan and Trust Agreement.

(dd)    "Environmental Laws" means all federal, state, and local statutes, Laws, ordinances, directives and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all common Law, in each case concerning public health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(ee)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(ff)    "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

(gg)    "Escrow Agent"  means SunTrust Bank.

(hh)    "Escrow Agreement" means an Escrow Agreement among the Escrow Agent, Sellers and Purchaser executed and delivered hereunder in form reasonably satisfactory to each of the foregoing Persons.

(ii)    "Escrow Fund " means the Working Capital Adjustment Holdback Amount, plus any earnings accrued thereon under the terms of the Escrow Agreement.

(jj)    "Final Order" means an order of the Bankruptcy Court as to which the time to appeal, petition for *certiorari* or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, reargue or rehear shall have been waived in writing in form and substance satisfactory to the parties hereto or, in the event that an appeal, writ of *certiorari* or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order shall not preclude such order from being a Bankruptcy Final Order.

(kk)    "GAAP" means, at a given time, United States generally accepted accounting principles.

(ll)    "Gift Certificate Obligations" means Sellers' obligations in respect of all gift certificates and gift cards issued by Sellers and unredeemed as of the Closing Date.

(mm)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(nn)    "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes and any other substance with respect to which liability or standards of conduct

may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint.

(oo)    "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and Laws thereunder

(pp)    "Improvements" means all buildings, improvements, structures, streets, roads, bridges and fixtures located, placed, constructed, or installed on or under the Owned Real Property, including the Cloister, the Sea Island Beach Club, the Cloister Spa and Fitness Center, the Lodge, the Seaside Golf Course, the Plantation Golf Course, the Retreat Golf Course, the Ocean Forest Golf Course, driving ranges, chipping greens, practice bunkers, putting greens, clubhouses, maintenance buildings, cart barns, entrance signage, pavilions, guard houses, fences, walls and gates, food and beverage facilities, cart and pedestrian paths, sidewalks, parking lots, access roads, tees, greens, holding ponds, water wells, effluent systems, irrigation lines, drainage facilities and pump stations, and all fixtures, machinery, apparatus or equipment affixed thereto, including all utilities, utility distribution lines, sewer, sewer lines, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(qq)    "Independent Accounting Firm" means any of the nationally recognized "big four" accounting firms, as mutually agreed.

(rr)    "Intellectual Property Rights" means all of Sellers' intellectual property rights, including, but not limited to: (i) patents, patent applications and patent rights; (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(ss)    "Inventory" means all inventory of Sellers of any kind or nature, whether or not prepaid, and wherever located, held or owned, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, and fuels and other similar items.

(tt)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by any of the following

individuals: Alfred W. Jones, III, David Bansmer and James B. Gilbert.

(uu)    "Law" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(vv)    "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, charge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, right of first refusal, Tax, or Order of any Governmental Authority, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.  For the avoidance of doubt, the definition of Lien shall not be deemed to include the grant of any license or sublicense by any Seller of Intellectual Property Rights.

(ww)    "Material Adverse Effect" means a material adverse effect on the Business and the Purchased Assets, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the Transactions or the public announcement thereof, (ii) changes or conditions affecting the hotel, golf, recreation and/or real estate development industries generally, (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), (v) changes in Law or in GAAP, or (vi) changes resulting from the commencement or continuation of the Bankruptcy Cases.

(xx)    "Ocean Forest Golf Club Membership Program" means the Ocean Forest Golf Club Rules and Regulations dated 2004.

(yy)    "OCGA" means the Official Code of Georgia Annotated.

(zz)    "Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(aaa)    "Owned Real Property" means all land, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto owned by any Seller.

(bbb)    "Permits" means licenses, permits, approvals, certificates of

occupancy, authorizations, operating permits, registrations, plans and the like.

(ccc)    "Permitted Liens" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement, (ii) non-monetary Liens that (A) do not interfere with the ability of Purchaser to own and operate any underlying Purchased Asset in substantially the manner as conducted immediately prior to the execution of this Agreement and (B) do not detract in any material respect from the value of any of the material Purchased Assets, (iii) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would interfere with the ownership or operation by Purchaser of any underlying Purchased Asset following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement, (iv) Liens for Taxes not yet due and payable, (v) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contact, (vi) with respect to Acquired Owned Real Property that is leased or subleased to any third party, the terms and conditions of the lease or sublease applicable thereto, and (vii) any and all matters disclosed on Schedule B, Section 2 of the Title Commitment other than the items described on Schedule 1.1(ccc) hereto.

(ddd)    "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(eee)    "Post-Petition Payables Adjustment Amount" means 50% of the amount, if any, by which (a) Sellers' trade accounts payable related to the Business, incurred in the ordinary course of business after the commencement of the Bankruptcy Cases and outstanding as of the close of business on the Business Day prior to the Closing Date, exceeds (b) $1,700,000.  The Post-Petition Payables Adjustment Amount shall be determined on the business day prior to the Closing based on a "payables run" from Sellers' accounting systems made after close of business on such day.

(fff)    "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ggg)    "Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets; provided, however, that Property Taxes shall not include Transfer Taxes on the transfer of the Purchased Assets pursuant to this Agreement.

(hhh)    "Release" has the meaning set forth in CERCLA.

(iii)    "Sea Island Club Membership Program" means the Sea Island Club Membership Program dated October 1, 2000.

-8-

(jjj)    "Secured Lenders" means each of (i) Synovus Bank, as lender under the Loan Agreement, dated as of August 7, 2008 and amended as of July 20, 2009, (ii) Synovus, as lender and agent, Bank of America, N.A., as lender, and Bank of Scotland, as lender, under the Restructuring Agreement, dated as of July 20, 2009 and amended as of August 31, 2009, and (iii) Synovus, as lender under a construction loan made pursuant to the Restructuring Agreement referred to in the preceding clause (ii) .

(kkk)    "Specified Avoidance Claims" means all avoidance claims of Sellers arising under Sections 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code or any similar state Law against any of the Sellers' vendors, Transferred Employees (other than persons who have served as an officer, director or executive of the Sellers) or Club Members, in each case, in such Person's capacity as a vendor, employee or Club Member, whether arising under the Bankruptcy Code or applicable state Law, and whether asserted or unasserted, all of which claims shall be released by Purchaser on the Closing Date.

(lll)    "Specified Club Member Agreements" means the Sea Island Club Membership Program, the Ocean Forest Golf Club Membership Program and all membership applications and membership agreements thereunder.

(mmm)    "Specified Condo Unit Owners" means each of Beach Club Ocean Residences, LLC, Beach Club Garden North Residences, LLC, Beach Club Garden South Residences, LLC, and Ocean Club North Residences, LLC.

(nnn)    "Specified Condo Units" means those condominium units listed on Schedule 1.1(mmm) owned by the Specified Condo Unit Owners, as indicated on such schedule.

(ooo)    "Specified Georgia Tax Obligation" means any obligation or liability (v) under OCGA § 48-8-46 for any Taxes imposed pursuant to Chapter 8 of Title 48 of the OCGA (Sales and Use Taxes), (w) under OCGA § 48-7-106 for any Taxes imposed pursuant to Chapter 7 of Title 48 of the OCGA (Income Taxes), (x) under OCGA § 48-9-7 for any Taxes imposed pursuant to Article 1 of Chapter 9 of Title 48 of the OCGA (Motor Fuel Tax), (y) under OCGA § 48-13-53.1 for any Taxes imposed pursuant to Article 3 of Chapter 13 of Title 48 of the OCHA (Excise Tax on Rooms, Lodgings and Accommodations) or (z) under OCGA § 34-8-175 for any Taxes imposed pursuant to Chapter 8 of Title 34 of the OCGA (Employment Security).

(ppp)    "Specified W/C Assets" means, as of any date, the assets shown on the Base Working Capital Statement determined as of such date.

(qqq)    "Specified W/C Liabilities" means, as of any date, the liabilities shown on the Base Working Capital Statement determined as of such date.

(rrr)    "Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any

Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

(sss)    "Tax Return" means any report or return filed with respect to Taxes, including all information returns, estimated Tax returns, claims for Tax refund and attachments to or amendments of any of the foregoing.

(ttt)    "Title Commitment" means, collectively, that certain Commitment for Title Insurance dated July 12, 2010 issued by Commonwealth Land Title Insurance Company with respect to the Acquired Owned Real Property (as modified by that certain Endorsement No. 1 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, **that certain Endorsement No. 2 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, that certain Endorsement No. 3 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039, and that certain Endorsement No. 4 to Amended and Restated Commonwealth Land Title Insurance Company Owner's Commitment No. 10-039** and as may be modified by any additional endorsements mutually agreed to by Purchaser and Sellers issued after the date hereof).

(uuu)    "Working Capital Adjustment Holdback Amount" means $2,000,000.

1.2.    Cross References.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Adjusted Base Working Capital | 2.7(b) |
| Agreement | Preamble |
| Assignment and Assumption Agreement | 2.10(a) |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Auction | 8.2(e) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Court | Recitals |
| Bid Deadline | 8.2(b)(i) |
| Bidding Procedures | 8.2(b) |
| Bidding Procedures Motion | 8.2(a) |
| Bidding Procedures Order | 8.2(a) |
| Breakup Fee | 8.2(f) |
| Business | Recitals |
| Certified WC | 2.7(c) |
| Closing | 2.9 |

-10-

| | |
|---|---|
| Communications Plan | 7.3 |
| ~~Confirmation Hearing~~ | ~~8.2(e)~~ |
| Confirmation Order | 8.1 |
| Contracts | 3.14 |
| Deficiency | 2.7(c) |
| ~~Disclosure Statement~~ | ~~8.1~~ |
| Electing Club Members | 11.1(b) |
| End Date | 14.1(b) |
| Excluded Assets | 2.2 |
| Excluded Owned Real Property | 2.2(c) |
| Excluded Liabilities | 2.4 |
| Existing Membership Documents | 3.17 |
| Final Working Capital | 2.7(a) |
| Final Working Capital Statement | 2.7(a) |
| Financial Statements | 3.18 |
| GFD Escrow Agent | 2.8(a) |
| Good Faith Deposit | 2.8 (a) |
| Goldman Sachs | 3.19 |
| ~~Incremental Bid Amount~~**Holdings Parties** | ~~8.2(e)~~**2.8(a)** |
| ~~Initial Overbid~~ | ~~8.2(b)(i)~~ |
| ~~Initial Overbid Amount~~ | ~~8.2(b)(i)(A)~~ |
| Inventoried Baggage | 7.6 |
| JLV-VASI Note | 2.10(k) |
| Modifying Order | 14.1(j) |
| New Membership Programs | 11.1(a) |
| Party or Parties | Preamble |
| Plan of Reorganization | 8.1 |
| Plan Support Agreement | 14.1(i) |
| Post-Closing Tax Period | 9.3 |
| ~~Prevailing Bid~~ | ~~8.2(e)~~ |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| ~~Qualified Bidder~~ | ~~8.2(e)~~ |
| Seller or Sellers | Preamble |
| Sellers Apportioned Tax Amount | 9.3 |
| SIC | Preamble |
| Specified **Additional** Deferred Compensation Obligations | 2.3(~~d~~**k**) |
| **Specified Base Deferred Compensation Obligations** | **2.3(d)** |
| **Specified Deferred Compensation Obligations** | **2.3(k)** |
| **Specified Supplemental Deferred Compensation Obligations** | **2.3(j)** |

| | |
|---|---|
| Taxing Authority | 1.1(qqq) |
| Transactions | Recitals |
| Transferred Employees | 10.1 |
| Transfer Taxes | 9.2 |
| Transferred Employees' Employment Date | 10.8 |
| WARN Act | 10.5 |
| WARN Obligations | 10.5 |

## 2.   **Purchase and Sale**.

2.1.   <u>Purchase and Sale</u>.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, all right, title and interest of Sellers in and to the following assets, properties and rights (the "<u>Purchased Assets</u>"), free and clear of all Liens (other than Permitted Liens and Assumed Liabilities):

(a)      the Acquired Owned Real Property;

(b)      all rights of Sellers under the written agreements, contracts and leases set forth on <u>Schedule 2.1(b)</u>, as such Schedule may be amended in accordance with <u>Section 15.10</u> (collectively, the "<u>Assumed Contracts</u>");

(c)      all Accounts Receivable;

(d)      all Inventory;

(e)      all Cash Around the Resort as of the Closing Date;

(f)      all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties and or any other assets may be situated, including, but not limited to, those set forth on <u>Schedule 2.1(f)</u>;

(g)      to the extent transferable pursuant to <u>Section 2.5</u> as of the Closing Date or <u>Section 7.9</u> thereafter, all Permits from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies, in each case, of Sellers, including, without limitation,

the Permits set forth on Schedule 3.8(a);

> (h)     all goodwill as a going concern and all other intangible property of Sellers;

> (i)     all Intellectual Property Rights, including, but not limited to, the items listed on Schedule 2.1(i), and any rights to sue for and remedies against past, present and future infringements thereof, rights of priority and protection of interests therein under the laws of any jurisdiction worldwide and all tangible embodiments thereof;

> (j)     all data and records related to the operation of the Business, including client and customer lists and records, referral sources, equipment logs, operating guides and manuals, financial and accounting records, personnel records that are legally transferrable to Purchaser under applicable Law, Tax records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist);

> (k)     all books, records, files and papers of Sellers relating to the Business or the Purchased Assets and not subject to any applicable attorney-client privilege (provided that Sellers shall be entitled to retain copies of such books, records, files and papers);

> (l)     all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever;

> (m)     all Specified Avoidance Claims;

> (n)     the proceeds of any and all rights under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009 by and among Luxury Apparel Group, L.L.C., Sea Island Apparel, LLC, Winona Capital Partners, LLC Series E-PM and Sea Island Company and the related Escrow Agreement date March 31, 2009 by and among Winona Capital Partners, LLC Series E-PM, Sea Island Apparel, LLC and RBS Citizens, N.A.;

> (o)     if Purchaser so elects by written notice to Sellers on or before ~~two (2) Business Days prior to the Auction~~**November 1, 2010**, Sellers' equity interest in Resort Hotel Insurance Company to the extent that such equity interests are transferable under applicable law; and

> (p)     all other assets, properties, rights and claims, whether tangible or intangible, whether personal or mixed, whether accrued, contingent or otherwise that are reflected on the Balance Sheet.

2.2.    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include the following (the "Excluded Assets"):

(a)    all of Sellers' cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions other than Cash Around the Resort as of the Closing Date;

(b)    all avoidance claims or other causes of action of Sellers, whether arising under the Bankruptcy Code, applicable state Law or otherwise, and the proceeds thereof, including rights, actions and Claims arising under Chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted other than the Specified Avoidance Claims;

(c)    the portion of the Owned Real Property set forth on Schedule 2.2(c), as such Schedule may be amended in accordance with Section 15.10 (the "Excluded Owned Real Property");

(d)    Sellers' corporate seals, stock record books, minute books and organizational documents and other records which are not necessary or useful for the operation of the Business;

(e)    any written or oral agreements, contracts or leases not identified in this Agreement as an Assumed Contract;

(f)    all insurance policies relating to the Business and all claims arising under such policies prior to the Closing, and all credits, premium refunds, proceeds, causes of action or rights thereunder, but excluding the Assumed Insurance Policies;

(g)    all rights of Sellers arising under this Agreement or in connection with the Transactions;

(h)    any Inventory sold or otherwise disposed of pursuant to Section 5.2 prior to the Closing Date;

(i)    any Tax refund or reimbursement due to Sellers or their Affiliates for a Pre-Closing Tax Period;

(j)    all amounts owed to Sellers**any Seller** by any one or more of Sellers' Affiliates**the other Sellers**;

(k)    any shares of stock, membership interests or other equity interests in any of Sellers;

(l)    If not included in Purchased Assets in accordance with Section 2.1(0), Sellers' equity interest in Resort Hotel Insurance Company; and

(m)    all other assets listed on Schedule 2.2(m).

14

2.3.    <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions of this Agreement, and excluding the Excluded Liabilities, Purchaser shall, effective at the time of the Closing, assume, and thereafter pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Sellers that have not been paid, performed or discharged as of the Closing Date (the "<u>Assumed Liabilities</u>"):

(a)    all trade accounts payable related to the Business, incurred in the ordinary course of business and outstanding as of the Closing Date;

(b)    all obligations and liabilities of Sellers related to or arising under the Assumed Contracts, Permits and Intellectual Property Rights from and after the Closing (to the extent such Assumed Contracts, Permits and Intellectual Property Rights are validly assigned or transferred to Purchaser);

(c)    the Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with <u>Section 15.10</u>, or reflected on the Final Working Capital Statement;

(d)    obligations under the Deferred Compensation Plan to the employees and former employees and in the amounts specified on Schedule 2.3(d) (the "Specified **Base** Deferred Compensation Obligations");

(e)    all Accrued Payroll and Accrued Payroll Taxes;

(f)    all Accrued Sales and Use Taxes;

(g)    to the extent expressly set forth in <u>Section 9.2</u>, all Transfer Taxes;

(h)    as contemplated by and in accordance with <u>Section 7.9</u>, all of Sellers' obligations to honor Customer Reservations associated with the Customer Deposits and Prepayments; ~~and~~

(i)    all Gift Certificate Obligations~~.~~**:**

**(j)    supplemental obligations under the Deferred Compensation Plan owed to the employees and former employees and in the amounts specified on Schedule 2.3(j) (the "Specified Supplemental Deferred Compensation Obligations"); and**

**(k)    obligations under the Deferred Compensation Plan to the persons set forth on Schedule 2.3(k) in an amount not to exceed $440,520 in the aggregate (the "Specified Additional Deferred Compensation Obligations") (the Specified Base Deferred Compensation Obligations, the Specified Supplemental Deferred Compensation Obligations and the Specified Additional Deferred Compensation Obligations are collectively referred to as "Specified Deferred Compensation Obligations").**

2.4.   <u>Excluded Liabilities</u>.  Notwithstanding any other provision of this Agreement to the contrary and regardless of any disclosure to the Purchaser, Purchaser is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter, whether known or unknown, and whether relating to or arising out of the operation of the Business or the Purchased Assets.  All such other liabilities and obligations shall be retained by and remain obligations and liabilities of Sellers, (all such liabilities and obligations not being assumed being herein referred to as the "<u>Excluded Liabilities</u>"), including but not limited to:

(a)   except for Accrued Payroll Taxes, Accrued Sales and Use Taxes and, to the extent expressly set forth in <u>Section 9.2</u>, Transfer Taxes, any and all Claims, liabilities or obligations relating to Taxes arising out of, relating to or in respect of the Business or the Purchased Assets for any Pre-Closing Tax Period and any and all Claims, liabilities or obligations relating to Taxes of any Seller or any Affiliate of any Seller;

(b)   any and all liabilities, obligations and commitments of the Sellers relating to or arising out of the Excluded Assets;

(c)   any and all liabilities, obligations and commitments of the Sellers with respect to environmental conditions, the presence or Release of Hazardous Substances and violations of Environmental Laws existing or occurring on or prior to the Closing;

(d)   except as expressly set forth in this Agreement, any and all liabilities, obligations and commitments of the Sellers with respect to current or former employees and their dependents and beneficiaries including, but not limited to, arising under any collective bargaining agreement, Employee Benefit Plan, stock appreciation rights plan, unit appreciation rights plan, executive restoration agreement, COBRA liabilities, WARN Act liabilities, accrued severance, vacation, salary, wages, bonuses, applicable payroll or employment-related Taxes, employee benefits and other amounts of any kind or nature whatsoever due to or related to employees of the Sellers;

(e)   any and all liabilities, obligations and commitments of the Sellers or their Affiliates relating to or arising out of (i) any third-party debt (other than as expressly set forth in this Agreement) incurred or owed by the Sellers or any Affiliates of the Sellers or (ii) any intercompany debt incurred by the Sellers or any Affiliates of the Sellers;

(f)   any and all claims, liabilities, obligations or commitments related to any pending litigation involving the Sellers;

(g)   any and all obligations and liabilities (A) arising or in connection with any Club Member Agreements, including, but not limited to, obligations and liabilities arising or in connection with the Specified Club Member Agreements, or (B) owed to, or for the benefit of, members of the club located on St. Simons Island related to the Frederica Golf Club, including, but not limited to, any and all obligations and

-16-

liabilities arising under or related to any membership agreements related to such members; provided, however that Purchaser has agreed to provide to certain Club Members the benefits set forth on Schedule 11.1(b) hereto; and

(h)     any and all liabilities and obligations under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009 by and among Luxury Apparel Group, L.L.C., Sea Island Apparel, LLC, Winona Capital Partners, LLC Series E-PM and Sea Island Company and the related Escrow Agreement date March 31, 2009 by and among Winona Capital Partners, LLC Series E-PM, Sea Island Apparel, LLC and RBS Citizens, N.A.

2.5.     Assumption/Assignment of Assumed Contracts.  To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order.  Purchaser shall pay all Cure Costs due in connection with the assumption and assignment of the Assumed Contracts, provided, that, to the extent the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with Section 15.10, such excess Cure Costs shall be reflected on the Final Working Capital Statement.  Notwithstanding any other provision of this Agreement to the contrary, except as provided in Section 7.9, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party (unless such consent is not required pursuant to Section 365 of the Bankruptcy Code), would constitute a breach or in any way adversely affect the rights of Purchaser or Sellers thereunder.  If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 365 and/or 1123 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and, subject to Section 12, the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

2.6.     Purchase Price; Allocation of Purchase Price.

(a)     In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing, Purchaser shall (i) deliver to Sellers by wire transfer of immediately available federal funds to a bank account (or accounts) designated by Sellers to Purchaser in writing not later than one (1) day prior to the Closing Date an amount equal to (x) ~~One~~**Two** Hundred ~~Ninety-Seven~~ **Ten** Million ~~Five~~ **Seven** Hundred **Twenty-Three** Thousand **Seven Hundred Twenty** Dollars ($~~197,500,0~~**210,723,720.**00) (the "Purchase Price") minus (y) the sum of (A) the Working Capital Adjustment Holdback Amount, (B) the Sellers Apportioned Tax Amount, (C) the Post-Petition Payables Adjustment Amount, and (D) the amount of the Good Faith Deposit retained by Sellers as a credit against the Purchase Price in accordance with Section 2.8(b) and (ii) deposit the Working Capital Adjustment Holdback Amount with the Escrow Agent into the Escrow Fund created under the Escrow Agreement.  In full satisfaction of Sellers obligations under Section 9.3, Purchaser shall pay on behalf of Sellers that portion of the Purchase Price equal to the

Sellers Apportioned Tax Amount to the Taxing Authorities entitled thereto.   The Purchase Price shall be subject to adjustment following the Closing as provided in <u>Section 2.7</u>.

(b)      Purchaser and Sellers agree that the Purchase Price (as adjusted), applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder and <u>Schedule 2.6</u> hereof (such schedule to be determined jointly by Purchaser and SIC prior to Closing). Purchaser and Sellers each agree to provide the other promptly with any other information required to complete <u>Schedule 2.6</u>.   Such allocation shall be binding on Purchaser and Sellers for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of the Parties hereto agrees (i) that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state and local income tax returns and will also file such further information or take such further actions as may be necessary to comply with the regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state and local Laws and regulations and (ii) that it will report (including filing its Tax Returns) in a manner consistent with such allocation to the extent permitted by applicable Law.

2.7.      <u>Adjustment of Purchase Price</u>.

(a)      Within thirty (30) days after the Closing Date, Purchaser shall cause to be prepared, at Purchaser's expense, a final statement of Specified W/C Assets and Specified W/C Liabilities as of the Closing Date (together with supporting calculations in reasonable detail, the "<u>Final Working Capital Statement</u>").   The Final Working Capital Statement shall be calculated and determined in the same manner as the Base Working Capital Statement, except that Final Working Capital Statement shall  (i) exclude from Specified W/C Assets any amounts that would otherwise be included in "Prepaid Insurance" or "Prepaid Licenses/Permits/Fees" to the extent such amounts are in respect of assets (x) that are not transferred to Purchaser at Closing or (y) in the case of the beer, wine and liquor licenses listed on <u>Schedule 12.2(h)</u>, the benefits of which Purchaser does not continue to receive after the Closing, (ii) exclude from Specified W/C Liabilities the Post-Petition Payables Adjustment Amount, and (iii) include as an additional Specified W/C Liability the amount, if any, by which the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on <u>Schedule 2.3(c)</u>, as such Schedule may be amended in accordance with <u>Section 15.10</u>.   The amount equal to total Specified W/C Assets minus total Specified W/C Liabilities, each as shown in the Final Working Capital Statement is referred to as the "<u>Final Working Capital</u>".   Upon completion of such statement, Purchaser shall deliver the Final Working Capital Statement to Sellers.

(b)      To the extent the Base Working Capital Statement includes in "Prepaid Insurance" or "Prepaid Licenses/Permits/Fees" any amounts in respect of assets (x) that are not transferred to Purchaser at Closing or (y) in the case of the beer, wine and

liquor licenses listed on <u>Schedule 12.2(h)</u>, the benefits of which Purchaser does not continue to receive after the Closing, the Base Working Capital shall be adjusted to exclude such amounts from the calculation thereof.  The Base Working Capital as so adjusted is referred to as the "<u>Adjusted Base Working Capital</u>".

(c)     If the Final Working Capital, as set forth on the Final Working Capital Statement as conclusively determined as set forth in <u>Section 2.7(e)</u> (the Working Capital as so determined, the "<u>Certified WC</u>"), is less than the Adjusted Base Working Capital (such difference, the "<u>Deficiency</u>"), then (i) Purchaser shall be entitled to withdraw from the Escrow Fund the amount of the Deficiency up to and including the Working Capital Adjustment Holdback Amount, and (ii) Seller shall be entitled to withdraw from the Escrow Fund the portion of the Working Capital Adjustment Holdback Amount remaining following Purchaser's withdrawal in accordance with this <u>Section 2.7(b)</u>, if any.  Any withdrawal pursuant to this <u>Section 2.7(c)</u> shall be made in accordance with the terms of the Escrow Agreement.

(d)     If the Certified WC is greater than or equal to the Adjusted Base Working Capital, then (i) Purchaser shall pay to Sellers the amount of any excess, and (ii) Sellers shall be entitled to withdraw from the Escrow Fund the Working Capital Adjustment Holdback Amount.  Any payment pursuant to this <u>Section 2.7(d)</u> shall be made within ten (10) days following the date on which the Final Working Capital Statement (including the Certified WC calculation) becomes final pursuant to <u>Section 2.7(e)</u>.  Any payment made pursuant to this <u>Section 2.7(d)</u> shall be made by wire transfer of immediately available federal funds to an account designated by Sellers.  Any withdrawal pursuant to this <u>Section 2.7(d)</u> shall be made in accordance with the terms of the Escrow Agreement.

(e)     Unless Sellers notify Purchaser in writing within thirty (30) days after receipt by Sellers of the Final Working Capital Statement, of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes.  If Sellers timely notify Purchaser of any such objection, Purchaser and Sellers shall attempt in good faith to reach an agreement as to the matter in dispute.  If the Parties shall have failed to resolve any such dispute within ten (10) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or Sellers, be submitted to and determined by an Independent Accounting Firm.  The fees and expenses of such Independent Accounting Firm incurred in resolving the disputed matter shall be equitably apportioned by such accountants based on the extent to which Purchaser, on the one hand, or Sellers, on the other hand, is or are determined by such accountants to be the prevailing Party or Parties in the resolution of such disputed matters.  The Final Working Capital Statement shall, after resolution of any dispute pursuant to this <u>Section 2.7(e)</u>, be final, binding and conclusive on all Parties hereto.

2.8.    <u>Good Faith Deposit</u>.

(a)     ~~Simultaneously with the execution of this Agreement,~~ Purchaser

-19-

~~shall deposit~~**has deposited** in escrow with Sellers' counsel or an escrow agent acceptable to Purchaser and Seller (the "GFD Escrow Agent") cash in immediately available federal funds by wire transfer to an account designated by the GFD Escrow Agent, an amount equal to Ten Million ~~and No~~ Dollars ($10,000,000) (the "Good Faith Deposit"), to be applied as provided in Section 2.8(b).  The Good Faith Deposit shall be held by the GFD Escrow Agent in a non-interest bearing bank account and shall not be property of the estate in the Bankruptcy Cases, except to the extent of the Sellers' rights with respect thereto under Section 2.8(b).  **In the event that Purchaser reaches an agreement on or before October 19, 2010 to permit Sea Island Holdings, L.L.C., The Anschutz Company, Starwood Capital Group Global, L.P. or any of their affiliates (collectively, the "Holdings Parties") to participate in the Transactions, Purchaser will accept an assignment of the Holdings Parties' cash deposit, which shall be held as part of the Good Faith Deposit on the terms hereunder; provided, however, that the Good Faith Deposit shall be increased to $20,000,000 in such event.**

(b)      The Good Faith Deposit may be retained by Sellers (i) at the Closing as a credit against the Purchase Price, or (ii) if this Agreement is terminated by Sellers pursuant to Section 14.1(b)(ii) or Section 14.1(e) and, in either case, at the time of such termination this Agreement is not terminable by Purchaser pursuant to Section 14.1(d).  Except as described in the previous sentence, the Good Faith Deposit shall be returned to Purchaser within two (2) Business Days after any termination of the Agreement pursuant to Section 14.1.

2.9.    Closing.  The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia, no later than five (5) days after satisfaction of the conditions set forth in Section 12 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Sellers may agree.

2.10.    Deliveries by Sellers.  At the Closing, Sellers will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)      a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit C (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(b)      as to the Acquired Owned Real Property, limited warranty deeds in recordable form, duly executed by Sellers and transferring good, valid and marketable fee simple title to the Acquired Owned Real Property to Purchaser in form and substance reasonably satisfactory to Purchaser, other than as set forth in subsection (c) below;

(c)      a quit claim deed, in form and substance reasonably satisfactory to Purchaser, conveying to Purchaser all improvements located within and under any right-of-way, including, without limitation, underground sewer, water and other utility lines and facilities, as well as all improvements, including but not limited to all bridges, guard

gates and guard buildings; notwithstanding the foregoing, all rights-of-way will be conveyed by limited warranty deed pursuant to Section 2.10(b);

(d)     originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all amendments, supplements or modifications thereto) to the extent not already located at the Acquired Owned Real Property;

(e)     physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(f)     a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)     an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(h)     certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(i)     as to each Declaration, (A) an estoppel certificate from the property owners' association or condominium owners' association identified in the Declaration, (B) an assignment of the applicable Declarant's rights, and (C) an assignment of the "development rights," each of (A), (B) and (C) to be in form and substance reasonably satisfactory to Purchaser;

(j)     as to Dune Cottage Lot 38 at Ocean Forest, located on Parcel 49 (as identified in the Title Commitment), which is subject to a Declaration, but for which the Title Commitment does not identify the amendment or supplement that annexed such Lot 38 into the Declaration, an amendment or supplement to the applicable Declaration annexing such Lot 38, in form and substance reasonably satisfactory to Purchaser;

(k) the original $2,000,000 Non-Negotiable Promissory Note and Guaranty dated September 5, 2008 by JLV-VASI, LLC, as maker, to Sea Island Company, as payee (the "JLV-VASI Note"), which Sellers shall, on behalf of Purchaser, mark "canceled" and deliver to JLV-VASI, LLC against receipt by Sellers of the items described in the following clause (l) for delivery to Purchaser pursuant to Section 2.10;

(l) (i) a recordable easement agreement, in form and substance reasonably satisfactory to Purchaser, from JLV-VASI, LLC or its successor-in-interest for the benefit of Parcel 15 (as identified in the Title Commitment) providing (x) Parcel 15 with vehicular and pedestrian access to Sea Island Road (over and across the existing roadways located on the property immediately east of Parcel 15, which property is

-21-

currently owned by JLV-VASI, LLC and (y) that all parking spaces located in whole or in part within the boundary lines of Parcel 15 are available for the exclusive use of Purchaser and its successors, assigns, affiliates, agents, employees, invitees and guests, and (ii) a recordable termination by and between Seller and JLV-VASI, LLC of that certain Agreement Regarding Right of First Refusal, filed and recorded on September 10, 2008 as Book 2483, Page 84 with the Clerk of the Superior Court of Glynn County;

        (m)    a waiver or extinguishment of any rights or options to purchase affecting the Acquired Owned Real Property;

        (n)    as to each license and contract set forth on <u>Schedule 2.10(n)</u>, consents to assignment of such licenses and contracts to Purchaser; and

        (o)    all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

    2.11.   <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Sellers (unless previously delivered) the following:

        (a)    the cash portion of the Purchase Price less the Good Faith Deposit;

        (b)    a letter authorizing and directing the GFD Escrow Agent to release the Good Faith Deposit to Sellers;

        (c)    the Assignment and Assumption Agreement, duly executed by Purchaser; and

        (d)    all other documents, instruments and writings reasonably requested by Sellers to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

    2.12.   <u>"AS IS" TRANSACTION</u>. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN <u>SECTION 3</u>, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL

PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.   WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.   UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

    **3.** **Representations and Warranties of Sellers**.   Subject to the terms, conditions and limitations set forth in this Agreement, Sellers hereby represent and warrant to Purchaser as of the date hereof and as of the Closing Date as follows:

    3.1.   Organization.   Each Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, is qualified to do business in every jurisdiction in which it is required to be qualified and has the corporate or organizational power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted.

    3.2.   Corporate Authorization.   The execution, delivery and performance by Sellers of this Agreement and the consummation of the Transactions are within Sellers' corporate or organizational powers and have been duly authorized by all necessary actions on the part of Sellers.   Subject to entry by the Bankruptcy Court of the ~~Bidding Procedures Order and the~~ Confirmation Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Sellers that is enforceable in accordance with its terms. The boards of directors of the Sellers have resolved to request that the Bankruptcy Court approve this Agreement, and the transactions contemplated hereby.   ~~Subject to the entry of the Bidding Procedures Order, the Sellers have full power and authority to grant the Breakup Fee without further order of the Bankruptcy Court, and the Breakup Fee shall constitute an administrative expense of the Sellers under Section 503(b)(1) of the Bankruptcy Code.~~

    3.3.   Governmental Authorization.   Except as set forth on Schedule 3.3, the execution, delivery and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby by Sellers require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

    3.4.   Noncontravention.   Except as set forth on Schedule 3.4, and subject to entry by the Bankruptcy Court of the ~~Bidding Procedures Order and the~~ Confirmation Order in the Bankruptcy Cases, the execution, delivery and performance by Sellers of this Agreement and

the consummation of the Transactions do not and will not (a) violate Sellers' articles or certificates of incorporation, bylaws, or other equivalent organizational documents, (b) assuming compliance with the matters referred to in Section 3.3, materially violate any applicable Law, (c) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which any Seller is entitled under any provision of any agreement or other instrument binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

3.5.    Required Consents.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 3.5, there is no agreement or other instrument binding upon Sellers requiring by its terms or pursuant to Section 365 of the Bankruptcy Code a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

3.6.    Litigation.  Except as disclosed in Schedule 3.6, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Sellers, threatened against or affecting, the Purchased Assets before any court or arbitrator or any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7.    Compliance with Laws and Court Orders.  To the Knowledge of Sellers, no Seller is in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

3.8.    Permits.  Sellers maintain and hold all rights to all Permits and all other licenses and permits that are necessary to permit Sellers to lawfully conduct and operate the Business, and to own and use the Purchased Assets, in the manner consistent with the past practices of Sellers.  Schedule 3.8(a) sets forth a list of all Permits required to conduct and operate the Business as it is currently being conducted.  Each such Permit is valid and in full force and effect.  Except as set forth on Schedule 3.8(b): (a) to the Knowledge of Sellers, each Seller is in compliance with the terms and requirements of each such Permit; and (b) no notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending or, to the Knowledge of Sellers, threatened to revoke or limit any such Permit.

3.9.    Intellectual Property Rights.  Schedule 3.9(a) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets. The Intellectual Property Rights being conveyed hereunder include: (a) all registered and unregistered trademarks, service marks, trade dress, logos and trade names used in connection with the Business (including all registrations and applications therefor), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill

associated therewith and all applications, registrations, and renewals in connection therewith, (b) all copyrightable works, all copyrights, and applications, registrations, and renewals in connection therewith used in connection with the Business and (c) all other Intellectual Property Rights necessary to conduct the Business as currently conducted.  Sellers have taken all actions reasonably necessary to ensure that the Intellectual Property Rights are protected under applicable Law.  Except as set forth on Schedule 3.9(b), to the Knowledge of Sellers, there exist no outstanding challenges to the ownership and use of such Intellectual Property Rights by any Seller, nor any alleged infringements of such Intellectual Property Rights by third parties. Except as set forth on Schedule 3.9(c), none of the Intellectual Property Rights have been licensed by Sellers to any other Person.

3.10.   Environmental Matters.  Other than as may be set forth in the reports described on Schedule 3.10, none of Sellers have received written notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which to the Knowledge of Sellers remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which to the Knowledge of Sellers remains unperformed.

3.11.   Real Property.  Schedule 3.11(a) sets forth the address and description of all Owned Real Property of Sellers.  With respect to each parcel of Acquired Owned Real Property, except as set forth on Schedule 3.11(b), (a) the applicable Seller has fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing; (b) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (c) there are no outstanding options, rights of first offer, or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (d) there are no condemnation or eminent domain proceedings pending or, to the Knowledge of Sellers, threatened with respect to all or any part of the Acquired Owned Real Property.  Except as set forth on Schedule 2.1(b), none of the Sellers are lessees, sublessees or licensees under any leases, subleases or licenses, as applicable, with respect to any real property.

3.12.   Employee Benefit Plans.  Schedule 3.12(a) sets forth a complete and accurate list of each Employee Benefit Plan that provides health benefits to current or former employees of Sellers.  Sellers have provided to Purchaser true and correct copies of each such Employee Benefit Plan and all material documents pursuant to which such Employee Benefit Plans are maintained, funded and administered (including all plan documents and amendments thereto, and the most recent or current summary plan documents, trust documents, annual reports, actuarial reports, service agreements and group insurance contracts, and schedule of employee contributions).

3.13.   Personnel Matters.  Sellers have provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, base compensation, and any supplemental or bonus compensation (including any retention or stay bonus arrangements) for and any accrued vacation, severance or other commitments that exist with respect to all salaried

employees of any Seller including: (a) information about each Seller's obligations to make salary payments to salaried employees who are terminable at will and without notice, and (b) all other commitments that exist with respect to salaried employees, including accrued vacation and severance, whether oral or in writing, including all employment agreements, consulting agreements, retainers and severance agreements, under which any Seller has any obligation to provide wages, salary, commissions, or other compensation, remuneration or benefits. Sellers have provided to Purchaser true and correct copies of each written employment agreement, consulting agreement, retainer and severance agreement or other similar agreement under which any Seller has any obligation to provide wages, salary, commissions, or other compensation, remuneration or benefits to any salaried employee. No Seller is in default with respect to any material obligation to any of such salaried employees. To the Knowledge of Sellers, no key executive employee of any Seller has any plans to terminate his or her employment with such Seller. Sellers have provided to Purchaser an accurate and complete list of the names, job classifications, dates of hire, hourly rate and any accrued vacation, severance or other commitments that exist with respect to hourly employees, whether oral or in writing. Such schedules also indicate which such employees, if any, are not actively at work as of the date specified therein (other than due to vacation or short-term illness).

       3.14. <u>Contracts</u>. To the Knowledge of Sellers, there are no material outstanding contracts, commitments, leases, licenses, understandings, undertaking or agreements of any nature, written or oral (including commitments to enter into any of such) to which Sellers or their Affiliates are or may become subject in respect of the Purchased Assets or the Business, except the contracts and agreements listed on <u>Schedule 3.14</u> (the "<u>Contracts</u>"). Except for defaults that will be cured in connection with the assumption and assignment of the Assumed Contracts, Sellers are not currently in default under any term, condition, or provision of any Assumed Contract and no Seller has received written notice from any third party regarding any alleged default that has not been previously cured or resolved. To the Knowledge of Sellers, no other party to any Assumed Contract is in material default thereunder. There are no other material amendments or any other material agreements concerning the Contracts that are not listed on <u>Schedule 3.14</u>. All of the Assumed Contracts are in full force and effect and, following the Closing, shall be enforceable by Purchaser in accordance with their terms.

       3.15. <u>Sufficiency of and Title to the Purchased Assets</u>. Sellers will have at Closing good, valid and marketable title to, or a valid leasehold interest in, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens, Liens to be satisfied in full or released at or prior to Closing, and the Assumed Liabilities). Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens, other than Assumed Liabilities and Permitted Liens. The Acquired Owned Real Property is all of the real property owned or used in connection with the Business as currently conducted. The Purchased Assets constitute all of the assets, properties and rights required for the conduct of the Business as currently conducted and as conducted as of the Closing Date. The material equipment included in the Purchased Assets is in good repair and operating condition, subject only to ordinary wear and tear, and is adequate and suitable for the purposes for which such equipment is presently being used or held for use.

3.16.  <u>Condition of Improvements</u>.  To the Knowledge of Sellers, all Improvements located on the Acquired Owned Real Property are in good general state of repair and good working order sufficient to carry out the functions for which they are currently being used and have no structural defects, and there are no conditions with respect to such Improvements that currently require material repairs or replacements, except for those set forth on <u>Schedule 3.16</u>.  The Improvements located on the Acquired Owned Real Property have been constructed and installed in material compliance with all Laws.  The Improvements located on the Acquired Owned Real Property have been maintained in accordance with industry standards.  The tees, fairways, roughs, bunker complexes, greens and practice areas of the golf properties included in the Acquired Owned Real Property have been properly cultivated, are free of disease, except as is reasonable and customary, and have been properly maintained.

3.17.  <u>Club Documents, Memberships</u>.  <u>Schedule 3.17</u> contains a true and correct copy of the Sea Island Club Membership Program, the Ocean Forest Golf Club Membership Program, and the form of membership application/agreements used by Sellers with respect to each program (the "<u>Existing Membership Documents</u>"), and a complete listing of all of the current Club Members, detailing the type of membership that is applicable to each such Club Member and the amount of all refundable initiation fees paid to Sellers by each such Club Member.  Except as disclosed to Purchaser in writing, each Club Member has paid all amounts due and payable pursuant to the Existing Membership Documents.

3.18.  <u>Financial Statements</u>.  Sellers' consolidated audited financial statements for the year ended December 31, 2009 (the "<u>Financial Statements</u>") attached hereto as <u>Schedule 3.18</u> are complete, true, and correct in all material respects and fairly present the financial condition and the results of operation of the Business, as of the date of and for the period stated in the Financial Statements, in accordance with GAAP except as provided on <u>Schedule 3.18</u>.  There are no material costs or expenses associated with the operation of the Business or the Purchased Assets other than those detailed on <u>Schedule 3.18</u>, and the amounts of such costs and expenses are not materially (individually or in the aggregate) in excess of the amounts shown on <u>Schedule 3.18</u> with respect to such period.  Since the date of the latest of the Financial Statements, there has been no material adverse change in the financial condition or operations of the Business except any change that would not constitute a Material Adverse Effect **and the filing of the Bankruptcy Cases**.

3.19.  <u>Certain Fees</u>.  Sellers have retained Goldman, Sachs & Co. ("<u>Goldman Sachs</u>") as financial advisor in connection with the Transactions.  Sellers shall be responsible for all fees due and owing to Goldman Sachs and its other professional advisors in connection with the Transactions contemplated in this Agreement and no such advisor is entitled to any fee or commission or like payment from Purchaser in connection with the Transactions.

3.20.  <u>Taxes</u>.  Except as set forth on Schedule 3.20:

(a)  Each Seller has filed all Tax Returns required to be filed by Seller (taking into account any extensions of time within which to file such Tax Returns) with respect to the Purchased Assets and the Business, and all such Tax Returns are complete and accurate in all material respects.  Each Seller has paid all Taxes required to be paid

by Seller with respect to the Purchased Assets and the Business. All Taxes required to be withheld, collected or deposited by or with respect to each Seller have been withheld, collected or deposited, as the case may be, and to the extent required by applicable Law, have been paid to the relevant Governmental Authority.

(b)    To the Knowledge of Sellers, there are no outstanding audits, examinations or judicial or administrative proceedings with respect to Taxes relating to the Purchased Assets or the Business.

**4.    Representations and Warranties of Purchaser**.  Purchaser represents and warrants to Sellers as follows:

4.1.    Organization.  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization and has all corporate or organizational powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

4.2.    Corporate Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the corporate or organizational powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3.    Governmental Authorization.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court and (b) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

4.4.    Noncontravention.  Neither the execution and delivery of this Agreement by Purchaser nor the consummation of the Transactions by Purchaser will (a) conflict with or result in any breach of any provision of the articles or certificate of incorporation, bylaws, or other equivalent organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Sellers.

4.5.    <u>Financing</u>.  Purchaser has sufficient cash, readily available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    <u>Litigation</u>.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any court or arbitrator or any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.7.    <u>Certain Fees</u>.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    <u>No Other Representations</u>.  Purchaser acknowledges that Sellers make no representation or warranty with respect to (a) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (b) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly set forth in this Agreement.

**5.    Covenants of Sellers**.  Sellers agree that:

5.1.    ~~Bankruptcy Filing; Joint Administration.  Not later than ten (10) Business Days following the execution of this Agreement, (a) each Seller shall file a voluntary chapter 11 petition for relief with the Bankruptcy Court, and (b) each Seller shall file a substantially similar motion with the Bankruptcy Court seeking to have its bankruptcy case jointly administered with the other Sellers' bankruptcy cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure~~**Intentionally Omitted**.

5.2.    <u>Conduct of the Business</u>.  Except as may be required by the Bankruptcy Code or by order of the Bankruptcy Court, and except as may be required or contemplated by this Agreement, from the date hereof until the Closing Date, Sellers shall use their commercially reasonable efforts to conduct the Business in the ordinary course consistent with past practice and to preserve intact their relationships with third parties (including suppliers and customers) and to keep available the services of the present employees of the Business.  Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except (i) as disclosed on <u>Schedule 5.2</u> or (ii) as may be required or contemplated by this Agreement, Sellers will not:

(a)    with respect to the Business, acquire a material amount of assets from any other Person;

(b)    sell, lease, license or otherwise dispose of any Purchased Assets, except for the leasing of resort and event space and sales of Inventory, in each case, in the ordinary course of business consistent with past practice;

(c)      terminate or amend in any material respect any Assumed Contract or existing insurance policies;

(d)      incur any material obligation or liability, except current liabilities for trade or business obligations incurred in connection with the purchase of goods or services in the ordinary course of business consistent with past practice or otherwise permitted by the terms of this Agreement;

(e)      transfer, grant or modify any existing rights with respect to the Intellectual Property Rights, except for non-exclusive licenses in the ordinary course of business consistent with past practice;

(f)      bill and collect membership dues for periods after the date of this Agreement on other than a monthly basis;

(g)      agree or commit to do any of the foregoing; or

(h)      take any action that would reasonably be expected to cause the failure of any condition contained in Section 12.2 (other than actions taken by Sellers in connection with the discharge of their fiduciary duties during the Bankruptcy Cases).

5.3.     Access to Information.   From the date hereof until the Closing Date, Sellers shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of the Business for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement.

5.4.     Notices of Certain Events.  Sellers shall promptly notify Purchaser of:

(a)      any written notice or, to Knowledge of Sellers, other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)      any material communication from any Governmental Authority in connection with or relating to the Transactions, the Business or the Purchased Assets; and

(c)      the commencement of any actions, suits, investigations or proceedings relating to Sellers, the Business or the Purchased Assets that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.6.

5.5.     New Club Members.  From the date hereof, the Sellers shall not accept any new members into Sellers' golfing, club, dining, social or other membership programs, including, without limitation, the Specified Club Member Agreements, except (a) Persons to

whom Club Members transfer all of their rights under either of the Specified Club Member Agreements with the consent of the Sellers in connection with a sale by such Club Member to such Person of a residence located on Sea Island or a Sea Island development, provided that any such transferee acknowledges in writing the amount of refundable initiation fees associated with the transferred membership, which shall not exceed the amount shown on Schedule 3.17 for the transferor, or (b) as agreed to in writing by Purchaser. Sellers shall give Purchaser prompt written notice of any transfer of membership pursuant to clause (a) of the preceding sentence, which notice shall identify the transferor, the transferee and the transferred membership and include a copy of the transferee's acknowledgement referred to in the proviso to such clause (a).

5.6.    <u>Notices to Parties to Assumed Contracts</u>.  Sellers shall provide timely and proper written notice of the ~~motions seeking entry of the Bidding Procedures Order and the~~ Confirmation Order to all parties to executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to this Agreement and to take all other actions necessary to cause such executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code.

5.7    <u>Cooperation with respect to Title</u>.  From and after the date hereof until the Closing Date, Sellers shall reasonably cooperate with Purchaser in order to address and correct any title and/or survey issues that may arise.

5.8    <u>Condemnation, Casualty</u>.  Promptly upon learning thereof, Sellers shall give Purchaser written notice of any condemnation, casualty, damage or destruction of all or any portion of the Acquired Owned Real Property occurring prior to the Closing.  If any such condemnation, casualty, damage or destruction to all or any portion of the Acquired Owned Real Property occurs prior to the Closing and Purchaser does not exercise its right to terminate this Agreement pursuant to <u>Section 14.1(f)</u> to the extent that it is entitled to do so, then (i) the proceeds of any condemnation award or payment under any property or casualty insurance policies (for losses other than business interruption) shall be applied toward the payment of the Purchase Price to the extent such condemnation awards or insurance payments have been received by any Seller and (ii) Purchaser shall receive an assignment from Sellers of Sellers' right, title and interest in any such awards or payments.

5.9    <u>Personnel Matters.</u>   On or before Closing, Sellers shall provide Purchaser an updated version of the lists provided to Purchaser pursuant to <u>Section 3.13</u>, with the data therein as of a date not earlier than five (5) days prior to Closing.

6.    <u>**Covenants of Purchaser**</u>.  Purchaser agrees that:

6.1.    <u>Confidentiality</u>.  Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.

6.2.    <u>Access</u>.  On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Sellers and their agents, advisers and representatives reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting

matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Cases or otherwise to enable Sellers to address issues arising in connection with or relating to the Bankruptcy Cases or to permit Sellers to determine any matter relating to their rights and obligations hereunder (including in connection with Sellers' review of the Final Working Capital Statement) or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, that any such access by Sellers shall not unreasonably interfere with the conduct of the business of Purchaser or any of its Affiliates. Sellers will hold, and will use their commercially reasonable efforts to cause their officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or any of its Affiliates or the Business provided to them pursuant to this Section 6.2.

6.3.    Insurance.  Except as otherwise provided in Section 5.8, to the extent that any insurance policies of Sellers or any of their Affiliates cover any loss, liability, claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall use reasonable commercial efforts to cooperate with Sellers in submitting and pursuing such claims for the benefit of Sellers.

**7.    Covenants of Purchaser and Seller**.  Purchaser and Sellers agree that:

7.1.    Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and Sellers will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws and regulations to consummate the Transactions contemplated by this Agreement; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).  Sellers and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.  Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall be construed as requiring Purchaser or its affiliates to litigate or agree to hold separate or to dispose of any assets or property in order to obtain approval of any Governmental Authority of the consummation of the Transactions contemplated by this Agreement.

7.2.    Certain Filings.  Sellers and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, including any filing required by the HSR Act, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, including any filings

required by the HSR Act, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

7.3.   Public Announcements.  Sellers shall develop a communications plan with respect to the Transactions in consultation with Purchaser.  Such communications plan, including any and all written scripts, handouts, letters or other written communications intended for widespread distribution pursuant thereto, shall be subject to Purchaser's prior written approval (as so approved, the "Communications Plan").  Except pursuant to the Communications Plan or as otherwise may be required by Law, neither Purchaser nor Sellers shall make any public announcements or statements concerning the Transactions (other than statements made to, or filings with, the Bankruptcy Court in the Bankruptcy Cases) without the prior written consent of the other; in case such consent shall not be unreasonably withheld, delayed or conditioned. Purchaser acknowledges and agrees that Sellers may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom Sellers determine it is necessary to provide copies in connection with ~~soliciting higher or better bids for the Purchased Assets or as otherwise necessary in connection with~~ the Bankruptcy Cases.  Sellers also shall be entitled to file copies of this Agreement with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions as may be required to give adequate notice under the Bankruptcy Code thereof.  In case any Party is required by Law to make any public announcement or statement, or any filing with any Governmental Entity or any national securities exchange concerning the Transaction that is not made pursuant to the Communications Plan, the Party required to make such announcement, statement or filing shall, to the extent practicable (i) consult with the other Party prior to making such announcement, statement or filing and (ii) provide that the content of such announcement, statement or filing is consistent with the Communications Plan.  Nothing herein shall prevent either Sellers or Purchasers from responding to inquiries in a manner consistent with the Communications Plan.

7.4.   Notices.  If at any time (a) Purchaser becomes aware of any material breach by Sellers of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Sellers, or (b) Sellers become aware of any material breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 14.1, in writing of such breach.  Upon such notice of breach, the breaching Party shall have ten (10) days to cure such breach prior to the exercise of any remedies in connection therewith.

7.5.   Liquor License.  ~~Not later than ten (10) days following the date on which the Bidding Procedures Order shall have been entered,~~ Purchaser ~~shall make~~**has made** all necessary applications **(subject to any amendments that may be required)** for, and shall thereafter diligently pursue, issuance of all licenses and approvals required under any Law for the continued sale of alcoholic beverages in connection with the conduct of the Business from and after the Closing Date (including temporary permits, to the extent available) consistent with the practices and procedures in effect as of the date hereof.  Purchaser shall keep Sellers informed of the status of such applications, and shall promptly respond to Sellers' inquiries regarding the status of the same.

7.6. <u>Checked Baggage</u>. On the Closing Date, representatives of Sellers and Purchaser shall make a written inventory of all baggage and similar items left in the care of Sellers by Sellers' customers (collectively, "<u>Inventoried Baggage</u>"). Purchaser shall be responsible for, and shall indemnify Sellers and their Affiliates and their respective directors, officers and employees against, any losses or liabilities incurred by any of them with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage or similar items left in the care of Purchaser on or after the Closing Date which was not inventoried. Sellers shall be responsible for, and shall indemnify the Purchaser against, any losses or liabilities incurred by Purchaser with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage or similar items left in the care of Sellers prior to the Closing Date which was not inventoried.

7.7. <u>Safe Deposit Boxes</u>. On or before the Closing Date, Sellers shall notify all guests who are then using a safe deposit box owned or maintained by Sellers in connection with the conduct of the Business advising them of the pending change in the management of the Business. At Closing, all safe deposit boxes which are then in use shall be opened in the presence of representatives of Sellers and Purchaser, and the contents thereof shall be inventoried. Following the inventory of each safe deposit box, Sellers shall deliver to Purchaser all keys, receipts and agreements for such box. Purchaser shall be responsible for, and shall indemnify Sellers and their Affiliates and their respective directors, officers and employees against, any losses or liabilities incurred by any of them with respect to any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is inventoried, provided that such claimed theft, loss or damage relates to contents that were inventoried. Sellers shall be responsible for, and shall indemnify Purchaser against, any losses or liabilities incurred by Purchaser with respect to any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is inventoried.

7.8. <u>Customer Obligations</u>. Purchaser agrees that with respect to any Customer Reservation related to services, amenities, activities or accommodations to be provided to a customer of the Business after the Closing Date, (a) Purchaser will honor such Customer Reservation in a manner consistent with Sellers' past practices, and (b) Purchaser will give such customer a credit against the amounts owed with respect to the Customer Reservation in an amount equal to the Customer Deposit and Prepayment made by the customer consistent with Sellers' past practices. For the sake of clarity, the Parties acknowledge that Sellers have included a line item for outstanding and unapplied Customer Deposits and Prepayments as of the Balance Sheet Date in the current Assumed Liabilities on the Base Working Capital calculation attached hereto as <u>Exhibit B</u>. Likewise, the Parties agree and acknowledge that the Final Working Capital Statement shall include a similar line item setting forth the outstanding and unapplied Customer Deposits and Prepayments as of the Closing Date in the current Assumed Liabilities used to determine the Final Working Capital.

7.9. <u>Transfers Not Effected as of Closing</u>. Nothing herein shall be deemed to require the conveyance, assignment or transfer of any Purchased Asset that by its terms and by operation of applicable Law (including, but not limited to, Section 365 of the Bankruptcy Code) cannot be freely conveyed, assigned, transferred or assumed. To the extent the parties hereto

have been unable to obtain on or before the Closing Date any governmental or any third-party consents or approvals required under applicable Law for the transfer of any Purchased Asset and to the extent not otherwise prohibited by the terms of any Purchased Asset, for not more than ninety 90 days following the Closing Date, (a) the parties hereto shall continue to use their commercially reasonable efforts to obtain such unobtained consents or approvals at the earliest practicable date, (b) Sellers shall continue to be bound by the terms of such applicable Purchased Asset, but shall exercise or exploit their rights in respect of such Purchased Assets only as directed by Purchaser and at Purchaser's expense, and (c) Purchaser shall pay, perform and discharge fully all the obligations of Sellers thereunder from and after the Closing to the extent that the corresponding benefit is received by Purchaser.  If and when any such consents or approvals shall be obtained, then Sellers shall promptly assign their rights and obligations (except to the extent such obligations constitute Excluded Liabilities) thereunder to Purchaser without payment of consideration and Purchaser shall, without the payment of any consideration therefore, assume such rights and obligations.  The parties shall execute such good and sufficient instruments as may be necessary to evidence such assignment and assumption.

8. **Bankruptcy Related Covenants.**

8.1.    Plan of Reorganization.  ~~As soon as reasonably practicable following the execution of this Agreement (and in any event not later than two (2) Business Days after the commencement of the Bankruptcy Cases),~~ Sellers ~~shall prepare and file~~**have filed** with the Bankruptcy Court (i) a plan of reorganization with respect to Sellers' bankruptcy estates that, among other things, implements, contains or otherwise incorporates the terms, conditions and provisions of this Agreement (the "Plan of Reorganization"), and (ii) a disclosure statement related to and accompanying the Plan of Reorganization ~~(the "Disclosure Statement"), in each case in form and substance consistent with this Agreement and satisfactory to Purchaser in its reasonable discretion~~.  Sellers shall use commercially reasonable efforts to obtain entry of an Order confirming the Plan of Reorganization (the "Confirmation Order") by no later than November ~~1~~**8**, 2010, and such Confirmation Order shall be in form and substance consistent with this Agreement and satisfactory to Purchaser in its reasonable discretion.  The Confirmation Order will provide, among other things, that: (i) the Plan of Reorganization is confirmed and the transactions contemplated therein are approved; (ii) this Agreement and the Transactions contemplated herein are approved; (iii) on the Effective Date, the Purchased Assets shall be sold to Purchaser free and clear of any and all Liens (except for Permitted Liens and the Assumed Liabilities); and (iv) on the Effective Date, the Assumed Contracts shall be assumed by Sellers and assigned to the Purchaser pursuant to Section 365 of the Bankruptcy Code and Purchaser shall pay all Cure Costs due in connection with the assumption and assignment of the Assumed Contracts, provided, that, to the extent the aggregate Cure Costs paid by Purchaser exceed the aggregate Cure Costs set forth on Schedule 2.3(c), as such Schedule may be amended in accordance with Section 15.10, such excess Cure Costs shall be reflected on the Final Working Capital Statement.  In addition, the Confirmation Order will include the matters specified in Section 9.5.  Sellers and Purchaser agree to use commercially reasonable efforts cooperate, assist and consult with each other to obtain the issuance and entry of the Confirmation Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

8.2.    Bidding Procedures.

(a)            Filing of Bidding Procedures Motion.   As soon as reasonably practicable following the execution of this Agreement (and in any event not later than two (2) Business Days after the commencement of the Bankruptcy Cases), Sellers shall file with the Bankruptcy Court a motion (the "Bidding Procedures Motion") seeking entry of an Order (the "Bidding Procedures Order") approving the provisions of Section 8.2 of this Agreement.   The Bidding Procedures Motion and the Bidding Procedures Order shall be in a form approved by Purchaser and shall include, among other matters, the items set forth below.

(b)            Bidding Procedures.   In the Bidding Procedures Motion, Sellers shall seek, among other things, approval of the following bidding procedures (the "Bidding Procedures"), which shall be incorporated into the Bidding Procedures Order:

(i)      Any third party (other than Purchaser) that is interested in acquiring the Purchased Assets must submit an "Initial Overbid" in conformance with the Bidding Procedures at or prior to October 11, 2010 (the "Bid Deadline"). Any such Initial Overbid must:

(A)    Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from this Agreement, including all schedules and exhibits hereto) with, at a minimum, the following requirements: (w) having substantially identical terms and conditions as this Agreement except with higher and better consideration; (x) containing terms and conditions no less favorable to Sellers' estates than the terms and conditions in this Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (y) provide for a purchase price in an amount equal to or greater than the sum of (1) the Purchase Price, (2) the Breakup Fee, and (3) $2,500,000](the "Initial Overbid Amount"); and (z) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Purchased Assets other than those included in this Agreement;

(B)    Include a cashiers' or certified check in the amount of Ten Million and No/00 Dollars ($10,000,000) to be held as a deposit (it being understood that the deposit may also be sent by wire transfer of immediately available funds to the GFD Escrow Agent); and

(C)     To the extent not previously provided to Sellers, be accompanied by evidence satisfactory to Sellers in their commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid at the Auction.

(c)     The Bidding Procedures Order.  The Bidding Procedures Order shall, among other matters:

(i)     approve the Breakup Fee and provide that, if the obligation of the Sellers to pay Purchaser (or such Person or Persons as Purchaser may designate) the Breakup Fee arises, such obligation shall constitute an administrative expense pursuant to Section 503(b)(1) and Section 507(a)(1) of the Bankruptcy Code and shall be payable out of the proceeds to the Sellers from any transactions with any such competing bidder and in accordance with the provisions of this Agreement without further order of the Bankruptcy Court; and

(ii)     approve the Bidding Procedures.

**(a)     Intentionally Omitted.**

**(b)     Intentionally Omitted.**

**(c)     Intentionally Omitted:**

(d)     Notice to Parties to Acquired Contracts.  Sellers shall provide **provided** timely and proper written notice of the motion seeking entry of the Bidding Procedures Order**a bidding procedures order (docket no. 190 in the Bankruptcy Cases)** to all parties to executory contracts and unexpired leases to be assumed by Sellers and assigned to Purchaser pursuant to this**that certain Asset Purchase** Agreement **dated as of August 4, 2010 by** and to **among the Sellers, as seller, and Sea Island Acquisition LP, as buyer, and shall** take all other actions necessary to cause such **the** executory contracts and unexpired leases **set forth on Schedule 2.1(b)** to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code and Sellers shall, at or prior to the Closing, comply with all requirements under Section 365 necessary to assign to the Purchaser the contracts and agreements included in the Assumed Liabilities.

(e)     Auction. In the event that Sellers timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder") in accordance with the Bidding Procedures, then Sellers will conduct an auction (the "Auction") with respect to the sale of the Purchased Assets.  In order to participate in the Auction, each Qualified Bidder shall be required to comply with the requirements of the

-37-

~~Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures.  At the Auction, Qualified Bidders and/or Purchaser may submit successive bids in increments of at least $1.0 million greater than the prior bid (the "Incremental Bid Amount") for the purchase of the Purchased Assets until there is only one offer that Sellers determine, in accordance with the Bidding Procedures and subject to Bankruptcy Court approval, is the highest or best offer (the "Prevailing Bid").  When bidding at the Auction, Purchaser shall receive a "credit" in the amount of the Breakup Fee.  All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing (the "Confirmation Hearing") held in the Bankruptcy Cases to consider confirmation of the Plan of Reorganization and approval of the highest or best bid for the Purchased Assets (which shall serve as the basis for the Plan of Reorganization).  If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Confirmation Hearing will proceed with respect to the Plan of Reorganization and this Agreement~~**Intentionally Omitted**.

(f)     ~~Breakup Fee.  Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a Prevailing Bid for the Purchased Assets, Sellers shall pay to Purchaser (or such Person or Persons as Purchaser may designate) cash or other immediately available funds in an amount equal to Five Million Nine Hundred Twenty Five Thousand Dollars ($5,925,000) (the "Breakup Fee"); provided, however, the Breakup Fee shall not be due and payable if Purchaser has committed a material breach of this Agreement prior to any termination of this Agreement pursuant to Section 14.1(g) or Section 14.1(h) and at the time of such termination this Agreement is not terminable by Purchaser pursuant to Section 14.1(d).  The Parties agree that the Breakup Fee and the return of the Good Faith Deposit shall be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 14.1.  The provisions of this Section 8.2(f) shall survive any termination of this Agreement.  The Breakup Fee shall be treated as an administrative expense claim in the Bankruptcy Cases under Section 503(b)(1) and Section 507(a)(1) of the Bankruptcy Code, shall be paid to Purchaser (or such Person or Persons as Purchaser may designate) at the closing of such sale to the third party, and shall be paid to Purchaser (or such Person or Persons as Purchaser may designate) prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee)~~**Intentionally Omitted**.

**9.     Tax Matters.**  Except as otherwise provided in this <u>Section 9</u>, Purchaser and Sellers agree that after the Closing:

9.1.     <u>Tax Cooperation</u>.  Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon reasonable written request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing

Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall reasonably cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business or in connection with any Tax matter set forth in this Section 9.

        9.2.    Allocation of Taxes.

        (a)    The Parties acknowledge and agree that the Transactions will be consummated pursuant to a confirmed plan of reorganization in the Bankruptcy Cases. As a result, as contemplated by Section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument of transfer, including the filing of any deed or other document to evidence, effectuate or perfect the rights, transfers and interests contemplated by this Agreement, shall be free and clear of any and all transfer taxes, stamp taxes or similar taxes. All deeds, instruments, Orders and agreements transferring the Purchased Assets to Purchaser shall contain the following endorsement:

        "Because this [instrument] has been authorized pursuant to Grantor's plan of reorganization that was confirmed by order of the United States Bankruptcy Court for the Southern District of Georgia, it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. §1146(a)."

        (b)    In the event that, notwithstanding the provisions of Section 1146(a) of the Bankruptcy Code or for any other reason, any sales, use, value added, transfer, stamp, recording, documentary, registration or other similar taxes, fees or charges (the "Transfer Taxes") are assessed at Closing or at any time thereafter on the transfer of any Purchased Assets pursuant to this Agreement, then in each instance such Transfer Taxes incurred as a result of the Transactions contemplated hereby shall be paid by Purchaser. Purchaser and Sellers shall reasonably cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

        9.3.    Property Taxes.  2010 Property Taxes shall be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period"). Sellers shall be liable for the proportionate amount of such 2010 Property Taxes that is attributable to the Pre-Closing Tax Period (the "Sellers Apportioned Tax Amount"), and Purchaser shall be liable for the proportionate amount of such 2010 Property Taxes that is attributable to the Post-Closing Tax Period.

        9.4.    Return Filing.  Purchaser shall have the right to prepare and file (or cause to be prepared and filed) all Tax Returns due after the Closing with respect to any Property Taxes, Transfer Taxes, Accrued Payroll Taxes or Accrued Sales and Use Taxes and shall pay or cause to be paid any liability shown as due on any such Tax Return to the applicable Taxing Authority.

9.5.    Certain Tax Matters.  Without limiting the provisions of Section 8.1, each Seller shall use its commercially reasonable efforts to include in the Confirmation Order express rulings that: (i) under Ga. Comp. R & Regs. 560-12.1-.07, the transfer of the Purchased Assets to Purchaser or any of its Affiliates as contemplated by this Agreement is exempt from taxation under Chapter 8 of Title 48 of the OCGA (Sales and Use Taxes); (ii) under OCGA § 48-6-2(a)(7.1) and Section 1146(a) of the Bankruptcy Code, the transfer of the Purchased Assets to Purchaser or any of its Affiliates as contemplated by this Agreement is exempt from taxation under OCGA § 48-6-1 (Real Estate Transfer Tax); (iii) upon the payment of the Purchase Price by Purchaser pursuant to this Agreement, any obligation or liability Purchaser or any of its Affiliates may have under any applicable Law to withhold, deduct or deposit any amount from the Purchase Price and any obligation or liability Purchaser or any of its Affiliates may have under any applicable Law as successor or transferee for Taxes of any Seller or any Affiliate of any Seller shall hereby be satisfied and Purchaser and its Affiliates shall hereby be released and discharged from any such obligation or liability (in each case, including, without limitation, all Specified Georgia Tax Obligations); (iv) the Purchased Assets and the Business transferred to Purchaser or any of its Affiliates as contemplated by this Agreement shall be free and clear from, and shall not be subject to, any Liens for or arising from any Tax delinquencies or deficiencies of any Seller or any Affiliate of any Seller (including, without limitation, any Liens for or arising with respect to any Specified Georgia Tax Obligation); and (v) any bank account designated in writing by Sellers pursuant to Section 2.6(a) shall be approved by the Bankruptcy Court to be an account in which the Purchase Price may be deposited, and all amounts deposited therein by Purchaser shall be distributed only pursuant to the Confirmation Order.

9.6.    Tax Treatment.    Purchaser and Sellers agree to treat any payment (including an indemnity payment, if any) made between one another pursuant to, or in connection with, this Agreement as an adjustment to the Purchase Price for Tax purposes to the extent permitted by applicable Law.

**10. Employee Matters.**

10.1.    Employees and Offers of Employment.  Effective as of the Closing Date, Purchaser shall offer employment to all employees of Sellers that are actively at work at the Closing, including those employees who are away from work due to vacation or short-term illness.  Purchaser shall also offer employment to each other person employed by Sellers at Closing, to be effective as of the date such person is available to return to active employment, provided that the Purchaser shall not be obligated to offer employment to any person who cannot return to active employment on or before the 90th day following Closing.  From and after the date he or she commences employment with the Purchaser, each employee of Seller hired by Purchaser pursuant to the two immediately preceding sentences shall be called "Transferred Employees."  In each case, such offers of employment shall be on terms and with benefits agreed to between Purchaser and such persons and, except as expressly set forth in this Agreement, without regard to, and without assumption or continuation of, any compensation, benefits or arrangements provided by Sellers.  Effective as of the Closing Date, Purchaser shall assume responsibility for the Transferred Employees, but, except as expressly set forth in this Agreement, only to the extent related to (i) services rendered after the Closing Date, (ii) any

termination by Purchaser of a Transferred Employee after the Closing Date or (iii) any actions by Purchaser.  Sellers shall retain all liabilities in respect of all Sellers' employees, including Transferred Employees, except (a) liabilities associated with (x) the Transferred Employees' service with Purchaser after the Closing Date, (y) any termination of a Transferred Employee by Purchaser after the Closing Date, or (z) any violation by Purchaser of applicable law or this Section 10.1, and (b) as otherwise expressly set forth in this Agreement.  For the avoidance of doubt, nothing in this Agreement (A) guarantees any Transferred Employee employment with Purchaser for any period of time, (B) causes any Transferred Employee to be employed on any basis other than on an "at-will" basis or (C) in any way restricts Purchaser's right to terminate the employment of any Transferred Employee after the Closing Date.

10.2.   Specified Deferred Compensation Obligations.  The Specified Deferred Compensation Obligations shall be paid by Purchaser at the time and in the manner provided for by the terms of the Deferred Compensation Plan, including employee elections thereunder. Information as to such payment dates (including any employee elections) shall be provided to Purchaser by Sellers as soon as reasonably practicable, but in no event later than 10 business days after Closing**; provided, however, that payments with respect to the Specified Additional Deferred Compensation Obligations shall be made on a pro rated basis only to each person Listed on Schedule 2.3(k) who has not waived his or her rights to such claims (each, an "Eligible Payee") in an amount determined by multiplying (i) $440,520 times (ii) the percentage determined with respect to such Eligible Payee by dividing (A) the total obligation to such Eligible Payee in respect of such Special Additional Deferred Compensation Obligations by (B) the aggregate amount of all obligations to all Eligible Payees in respect of such Special Additional Deferred Compensation Obligations**.  From and after the date the respective amounts of Specified Deferred Compensation Obligations listed on ~~Schedule~~**Schedules** 2.3(d)**, 2.3(j) and 2.3(k)** were determined **(including after giving effect to the proviso in the immediately preceding sentence)**, such amounts shall be credited quarterly with interest at an annual rate equal to the "Prime Rate" that is reported in the Money Rates section of the Wall Street Journal published on the first business day of such quarter.

10.3.   Retiree Health Benefits.  From and for a period of one year following Closing, Purchaser shall make available to the retirees listed on Schedule 10.3 the same health benefit plan as is in effect from time to time for active employees of Purchaser at a level of contribution not greater than the level of contribution in effect for such retirees at the time of Closing under the Sea Island Company Healthgram employee benefits plan designed and maintained by the Sea Island Company to provide health care benefits; provided that for a retiree or any beneficiary thereof eligible for Medicare, the benefits under such health benefit plan shall be secondary to Medicare benefits.  Nothing in the immediately preceding sentence shall be construed to limit Purchaser's right to modify the terms of its health benefit plan or, following the period specified therein, to modify the level of contribution required from retirees, or the eligibility of retirees to participate in such health benefit plan; provided, however, that, if Purchaser at any time directly or indirectly ceases to make coverage under its health benefits plan applicable to active employees available to the retirees listed on Schedule 10.3 and their beneficiaries, Purchaser shall promptly establish a trust or other funding vehicle to make medical benefits available to such retirees and their beneficiaries and shall contribute to such trust or

vehicle an amount, if any, equal to the remainder of (i) $1,448,957 ~~million~~ minus (ii) the costs incurred by Purchaser prior to such cessation of coverage to provide medical benefits coverage to such retirees and their beneficiaries.  The retiree health benefits provided pursuant to this Section shall be subject to a lifetime maximum for each participant of (x) $50,000 minus (y) the total amount of retiree health benefits received by each such participant prior to Closing. Schedule 10.3 shall indicate the total amount of benefits received by each retiree health plan participant, and the amount of the remaining benefits each participant is eligible to receive.

      10.4.   Employee Plans.

      (a)   Each Transferred Employee shall be eligible to receive benefits consistent with Purchaser's applicable human resources policies.  As promptly as reasonably practicable after the Closing Date (and as permitted by Purchaser's employee benefit plans and employee policies), Purchaser shall enroll the Transferred Employees in Purchaser's employee benefit plans for which such employees are eligible (and as permitted by Purchaser's employee benefit plans and employee policies).  Purchaser shall, as permitted by Purchaser's employee benefit plans and employee policies, recognize the prior service with Sellers of each of the Transferred Employees for purposes of eligibility to participate under such employee benefit plans of Purchaser. Transferred Employees will be eligible to participate in Purchaser's employee benefit plans (including Purchaser's health plans), as permitted by Purchaser's employee benefit plans and employee policies, and will be treated under such plans on the same terms and conditions as any other similarly situated employee of Purchaser with similar service (after giving effect to this Section 10.4) with Purchaser.  Notwithstanding anything to the contrary contained herein, (i) Purchaser shall recognize the prior service with the Seller of each of the Transferred Employees for purposes of eligibility to participate under Purchaser's health plans and 401(k) defined contribution plan, if any, and shall enroll the Transferred Employees in such plans without waiting periods so long they have satisfied prior service requirements (after giving effect to the foregoing recognition of prior service with Sellers) and (ii) Purchaser shall provide coverage to such employees who are eligible under Purchaser's health, medical, life insurance and other welfare plans (A) without the need to undergo a physical examination or otherwise provide evidence of insurability; (B) by taking into account the period of coverage under Sellers' (or its Affiliates') plans for purposes of applying any pre-existing condition or similar limitations or exclusions; and (C) by applying and giving credit for amounts paid for the plan year in which the Closing Date occurs as deductibles, out of pocket expenses and similar amounts paid by individuals and their beneficiaries.  Except as expressly provided by this Agreement, the Purchaser shall retain the right to modify, amend or terminate any and all employee benefit plans and policies at any time.

      (b)   Effective as of Closing, Purchaser shall assume and make available to Transferred Employees the accrued vacation amounts indicated on the list provided pursuant to Section 5.9, which accrued vacation amounts shall be determined and administered consistently with the policies of Sellers as of the date of this Agreement. Purchaser may adopt differing policies with respect to any vacation benefits accruing on

or after the Closing Date.

(c)     Effective as of Closing, Purchaser shall adopt a policy to provide severance payments to Transferred Employees who are terminated without cause and who have provided at least one complete year of service to the business.  If any employee of Sellers who accepts an offer of employment from Purchaser is subsequently terminated by Purchaser within the 6-month period after the Closing Date, then Purchaser shall make severance payments to such employee in an amount that is not less than the amount of severance that such employee would have been entitled to receive under Sellers' severance policy in effect on the date hereof if such employee had been terminated by Sellers as of the Closing Date.

(d)     From and after the Closing Date, Sellers shall remain solely responsible for any and all liabilities relating to or arising in connection with the requirements of Section 4980B of the Code to provide continuation of health care coverage in respect of (A) employees and their covered dependents with respect to any qualifying event occurring prior to the Effective Time and (B) employees other than Transferred Employees with respect to any qualifying event occurring after the Effective Time.  Purchaser shall be responsible for any and all liabilities relating or arising in connection with the requirements of Section 4980B of the Code to provide continuation of health care coverage in respect of Transferred Employees and their covered dependents with respect to any qualifying event occurring after the Effective Time.

(e)     Neither Purchaser nor any of its affiliates shall have any liability or responsibility for any (i) claims arising out of the employment by the Sellers of any current or former Employee or a beneficiary or dependent thereof or (ii) benefits payable in respect of any current or former Employee under any Employee Benefits Plan., in each case, other than the Specified Deferred Compensation Obligations.  The Sellers shall remain solely responsible for any and all liabilities, obligations and commitments in respect of such current or former Employee relating to or arising out of or as a result of the employment or the actual or constructive termination of employment of any such current or former Employee by the Sellers (including in connection with the consummation of the Transaction).  The Sellers shall remain responsible for the payment of any and all severance, retention, change in control or other similar compensation or benefits under the various plans and arrangements maintained or entered into by the Sellers and that are or may become payable in connection with the consummation of the Transaction.

10.5.   WARN Obligations.   From and after the Closing Date, Sellers shall remain solely responsible for any and all obligations that might arise under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), or under any similar provision of any federal, state, regional, foreign or local law, rule or regulation (hereinafter referred to collectively as "WARN Obligations") arising as a result of any employment losses occurring prior to, on or after the Closing Date with respect to all current and former employees.

10.6.   <u>Collective Bargaining Agreements</u>.  The Sellers shall retain all collective bargaining agreements, including all employee benefit obligations thereunder.

10.7.   <u>Employee Records</u>. Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Sellers reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records.

10.8.   <u>Workers' Compensation</u>.   Sellers shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Sellers' employees prior to the Closing Date.   Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by the Transferred Employees on and after the dates (hereinafter, "<u>Transferred Employees' Employment Date</u>") Purchaser hires them, including injuries sustained by a Transferred Employee on or after the Transferred Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Transferred Employees' Employment Date.  Sellers shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate Workers' Compensation authority within ninety (90) days after the Transferred Employees' Employment Date.  Purchaser shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Transferred Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Transferred Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than ninety (90) days after the Transferred Employees' Employment Date.

**11. <u>Club Memberships</u>.**

11.1.   <u>New Membership Programs and Agreements</u>.

(a)   Purchaser will offer Club Members, including inactive Club Members who have terminated their membership and are waiting for return of their deposit, the opportunity to join the new Ocean Forest and Sea Island clubs and execute agreements on the terms and conditions of new membership programs, which shall set forth and govern the rights of club members post-Closing (the "**"**New Membership Programs"**"**).

(b)   The New Membership Programs will be generally consistent with the Sea Island Club Membership Program or the Ocean Forest Golf Club Membership Program, as applicable, with certain modifications, including, but not limited to, those specified in <u>Schedule 11.1(b)</u>.  Purchaser will credit to new member accounts of Club Members who execute agreements under the New Membership Programs (**"**("**Electing

-44-

Club Members")")** an amount equal to their respective existing membership deposits that had been paid in cash. **Electing Club Members will not be required to post any additional deposit amounts to join under the New Membership Programs.** Purchaser will refund member deposits of Electing Club Members as set forth on Schedule 11.1(b) in paragraphs 1, 3 and 4 under the heading ""Sea Island Club"" and paragraphs 1, 2, 3 and 4 under the heading ""Ocean Forest Golf Club".", as applicable.

**12. Closing Conditions**.

12.1.   Conditions to Obligations of Purchaser and Seller.  The obligations of Purchaser and Sellers to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    the Bankruptcy Court shall have entered the Confirmation Order in the Bankruptcy Cases, authorizing the Transactions and approving this Agreement and the ancillary agreements contemplated hereby under Sections 105(a), 365, 1123 and 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to Sellers and Purchaser, and as of the Closing Date the Confirmation Order shall be a Final Order and shall not be stayed, shall be in full force and effect, and shall not have been vacated or reversed.

(b)    the Effective Date shall have occurred or shall occur as a result of the Closing; and

(c)    no injunction, stay or similar Order, issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

12.2.   Conditions to Obligations of Purchaser.  The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Sellers shall have performed in all material respects all of their obligations hereunder required to be performed by Sellers on or prior to the Closing Date;

(b)    Sellers shall have made all deliveries required of them by Section 2.10;

(c)    the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date);

(d)    a title insurance company selected by Purchaser and Commonwealth Land Title Insurance Company ("Commonwealth Title"), as co-insurers on a 50/50 basis with Commonwealth Title acting as the lead underwriter in connection

-45-

with the preparation of the Title Commitment, shall have irrevocably and unconditionally committed to issue an owner's title insurance policy in form and substance reasonably satisfactory to Purchaser, insuring Purchaser's good, marketable and indefeasible fee simple title to the Acquired Owned Real Property, subject only to the Permitted Liens;

(e)     no material adverse changes to the condition of any of the Acquired Owned Real Property (other than immaterial Acquired Owned Real Property) shall have occurred since the ~~Effective Date~~**date of this Agreement** for which Purchaser, in its sole discretion, has not consented to in writing; and

(f)     all consents required for the assignment to Purchaser of the Permits listed on Schedule 3.8(a) (other than licenses for the sale of beer, wine and liquor), Assumed Contracts and Intellectual Property Rights listed on Schedule 12.2(f) shall have been received;

(g)     Sellers shall have issued a compliant WARN notice with respect to Sellers' employees and at least sixty (60) days shall have passed since such notice was delivered; and

(h)     Purchaser shall have received approval of the beer, wine and liquor licenses set forth on Schedule 12.2(h) or such licenses are otherwise available to Purchaser on reasonable terms to permit the continued sale of beer, wine and liquor in connection with the Business.

12.3.   Conditions to Obligations of Seller.   The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a)     (i) Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date, and (ii) the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

(b)     Purchaser shall have made all deliveries required of it by Section 2.11.

**13. Survival; Indemnification**.

13.1.   Survival.   The (a) representations and warranties of Sellers, and (b) covenants and agreements of Sellers that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.  The covenants and agreements of Sellers contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.  The (a) representations and warranties of Purchaser, and (b) covenants and agreements of

Purchaser that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing. The covenants and agreements of Purchaser contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

       13.2.   <u>Indemnification</u>.  Each of Purchaser and Sellers agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.  There shall be no post-Closing indemnification of Purchaser by Sellers with respect to any matter not set forth in <u>Section 7.6</u>, <u>Section 7.7</u> or this <u>Section 13.2</u>.

**14. <u>Termination</u>**.

       14.1.   <u>Grounds for Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

       (a)   by mutual written agreement of Sellers and Purchaser;

       (b)   by Sellers or Purchaser, if the Closing shall not have been consummated on or before the later of (i) December 31, 2010, or (ii) eleven (11) days after any notice delivered pursuant to <u>Section 7.4</u> if the breach that is the subject of such notice remains uncured (the later of clause (i) and (ii), the "<u>End Date</u>"), unless the Party seeking termination is in breach of its obligations hereunder;

       (c)   by Sellers or Purchaser, if any condition set forth in <u>Section 12.1</u> is not satisfied, and such condition is incapable of being satisfied by the End Date;

       (d)   by Purchaser, if any condition set forth in <u>Section 12.2</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date;

       (e)   by Sellers, if any condition set forth in <u>Section 12.3</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date;

       (f)   by Purchaser, if a Material Adverse Effect has occurred and is continuing and such matter is incapable of being remedied or cured on or before the End Date;

~~(g)      by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement;~~

**<u>(g)      Intentionally Omitted.</u>**

       (h)   by Purchaser, if Sellers execute and deliver a definitive agreement

with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets;

(i)  by Purchaser, if the Secured Lenders ~~do not, on or before the fifth (5) Business Day following the date of this Agreement, enter~~**have not entered** into an agreement with Sellers, in form and substance satisfactory to Purchaser, to support the Plan of Reorganization, not to credit bid their secured indebtedness or otherwise bid in the ~~Auction~~**auction** and not to transfer any of the secured indebtedness they hold unless such transfer is subject to the terms of such agreement (the "Plan Support Agreement");

~~(j)  by Purchaser, if (A) the Sellers do not file with the Bankruptcy Court on or before the August 17, 2010 the Bidding Procedures Motion and thereafter use its commercially reasonable efforts to serve the Bidding Procedures Motion as required by orders of the Bankruptcy Court or applicable rules in existence at 10:00 AM (Brunswick time) on the Business Day prior to the day the Bidding Procedures Motion is filed; (B) the Bidding Procedures Order shall not have been entered, on or before the September 17, 2010, provided, however, that Purchaser shall not be entitled to exercise its rights under this clause if the Bidding Procedures Order has been entered by the Bankruptcy Court prior to Purchaser exercising such rights, or (C) following entry of the Bidding Procedures Order, the Bidding Procedures Order is revised, revoked, voided, vacated, modified or stayed by an order of any Governmental Authority in any manner that is materially adverse to the Purchaser (a "Modifying Order") and such Modifying Order is not reversed, revoked, voided, vacated, stayed or further modified within thirty (30) days such that the Bidding Procedures Order is in full force and effect;~~

**(j)  Intentionally Omitted;**

(k)  by Purchaser, if the Bankruptcy Cases are dismissed or converted to chapter 7 of the Bankruptcy Code or a trustee or examiner with expanded powers is appointed for the Sellers;

(l)  by Purchaser if (A) the Confirmation Order has not been entered by the Bankruptcy Court on or before November 8, 2010, provided that Purchaser shall not be entitled to exercise its rights under this clause if the Confirmation Order has been entered by the Bankruptcy Court prior to Purchaser exercising such rights, or (B) following entry of the Confirmation Order, the Confirmation Order is materially and adversely modified by a Modifying Order and such Modifying Order is not reversed, revoked, voided, vacated, stayed or further modified within thirty (30) days such that the Confirmation Order is in full force and effect;

(m)  by Purchaser, if either (i) Sellers do not obtain from the Secured Lenders prior to commencing the Bankruptcy Cases, (x) consent to debtor-in-possession financing in aggregate principal of $5,000,000 to be provided in the Bankruptcy Cases by Affiliates of Purchaser on the terms previously provided to Sellers or (y) a commitment, in form and substance satisfactory to Purchaser, to provide Sellers not less than $5,000,000 aggregate principal amount of debtor-in-possession financing in the

Bankruptcy Cases, (ii) the Bankruptcy Court does not enter an Order approving such debtor-in possession financing on a final basis on or before September 30, 2010, or (iii) such debtor-in possession financing is terminated for any reason and not promptly replaced by another comparable financing facility;

(n)     by Purchaser, if any Secured Lender or transferee of any secured lender is in breach of the Plan Support Agreement.

The Party desiring to terminate this Agreement pursuant to this <u>Section 14.1</u> (other than pursuant to <u>Section 14.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 15.1</u>.

14.2.   <u>Effect of Termination</u>.  If this Agreement is terminated as permitted by <u>Section 14.1</u>, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Sections 2.8</u>, <u>8.2(f)</u> and <u>14.3</u>.  The provisions of <u>Sections 6.1</u> and <u>13.2</u>, <u>14.2</u>, <u>14.3</u>, <u>15.1</u>, <u>15.2</u>, <u>15.4</u>, <u>15.5</u>, <u>15.6</u>, <u>15.7</u> and <u>15.9</u> shall survive any termination hereof pursuant to <u>Section 14.1</u>.

14.3.   <u>Remedies</u>.  Effective as of Closing, Purchaser waives irrevocably any rights and Claims Purchaser may have against Sellers, whether in Law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (ii) the Purchased Assets, Assumed Liabilities or the Business. Purchaser and Sellers acknowledge and agree that if this Agreement is terminated by Purchaser pursuant to <u>Section 14.1</u>, the provisions of <u>Section 14.2</u> set forth the sole and exclusive remedies of Purchaser.  Purchaser and Sellers further acknowledge and agree that if this Agreement is terminated by Sellers pursuant to either (i) <u>Section 14.1(e)</u> or (ii) <u>Section 14.1(b)(ii)</u>, then, in addition to Sellers' remedies set forth in <u>Section 14.2</u>, Sellers shall also retain any and all claims, rights, remedies, prayers for damages and causes of action, whether arising in law or in equity, arising from or related to any breach of this Agreement by Purchaser, including the right to specific performance.

14.4.   <u>Expenses</u>.  Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

**15. <u>Miscellaneous</u>.**

15.1.   <u>Notices</u>.  All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

Sea Island Acquisition GP, LLC
333 South Grand Avenue, 28th Floor
Los Angeles, CA 90071

-49-

Attention: Kenneth Liang
Fax:  213-830-8585

with copies to:

Oaktree Capital Management. L.P.
333 South Grand, 28th Floor
Los Angeles, CA 90071
Attention: Emily Alexander, Esq.
Fax:  213-830-8599

Oaktree Capital Management. L.P.
1301 Avenue of the Americas, 34th Floor
New York, NY  10019
Attention: Philip Hofmann
Fax:  212-284-7879

Avenue Capital Management II, LP
535 Madison Avenue
New York, NY 10022
Attention: Edward Gellert
Fax 212 850 7545

Debevoise & Plimpton LLP
919 Third Ave
New York, NY 10022
Attention:  Steven R. Gross, Esq.
            George E.B. Maguire**, Esq.**
Fax:  212-909-6836
Fax:  212.521.7586

if to Sellers, to:

Sea Island Company
100 Salt Marsh Drive
Sea Island, Georgia 31522
Attention: James B. Gilbert, Jr.
Fax: 912-634-3124

with a copy to:

> King & Spalding LLP
> 1180 Peachtree Street
> Atlanta, Georgia  30309
> Attention: Sarah Robinson Borders, Esq.
> Fax: 404-572-5128

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

15.2.  <u>Waivers</u>.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

15.3.  <u>Successors and Assigns</u>.   The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; <u>provided</u>, <u>however</u>, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party. Notwithstanding the foregoing, in the event that by written notice to the Sellers given not later than three (3) Business days prior to the Closing, Purchaser may, in its sole discretion, designate one or more entities which have been newly formed for such purpose and are directly or indirectly wholly owned by funds managed by Oaktree Capital Management, L.P. ~~or~~, Avenue Capital Management II, L.P**., Sea Island Holdings, L.L.C., The Anschutz Company or Starwood Capital Group Global, L.P**. to take title to specified Purchased Assets, in which case, Section 2.10 shall be deemed to be appropriately amended to reflect any such designation.

15.4.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Georgia and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

15.5.  <u>Jurisdiction</u>.

(a)    Prior to the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law,

any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 15.1 shall be deemed effective service of process on such Party.

(b)     Upon the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Georgia, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 15.1 shall be deemed effective service of process on such Party.

15.6.   Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

15.7.   Third Party Beneficiaries.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

15.8.   Entire Agreement; Amendments; Counterparts.   This Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Sellers.  This Agreement may be executed in counterparts, each of which when taken together shall constitute an original.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

15.9.   Captions, Headings, Interpretation.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.   Whenever the words "include,"

"includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

15.10.  Disclosure Schedules.

(a)     The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

(b)     Notwithstanding anything in this Agreement to the contrary, Purchaser may amend Schedule 2.1(b) and Schedule  2.3(c) by giving written notice to Sellers on or before ~~two (2) days prior to the Auction~~**October 15, 2010** in order to (i) exclude from the definition of Assumed Contracts and Cure Costs, any contract, agreement or lease not otherwise excluded therefrom, or (ii) include in the definition of Assumed Contracts and Cure Costs, any contract, agreement or lease not otherwise included therein, and Sellers agree to give required notice to any of the non-debtor parties to any such contract, agreement or lease or as otherwise reasonably requested by Purchaser, provided, however, that any such exclusion or inclusion shall not serve to reduce, increase or otherwise affect the amount of the Purchase Price.  In connection with the possible inclusion of any contract, agreement or lease as an Assumed Contract pursuant to this Section 15.10, Sellers shall reasonably cooperate with Purchaser to determining any related Cure Costs to be included on Schedule 2.3(c), which Cure Costs shall be paid by Purchaser and shall not be reflected in the Final Working Capital Statement.

(c)     Notwithstanding anything in this Agreement to the contrary, Purchaser may amend Schedule 2.2(c) by giving written notice to Sellers on or before two (2) days prior to the Closing Date in order to include in the definition of Excluded Owned Real Property any Acquired Owned Real Property set forth in Part II of Schedule 2.1(a) or not otherwise included on Schedule 2.1(a).

15.11.  Certain Cooperation.  Sellers shall use commercially reasonable efforts to facilitate any request by Purchaser to pay a portion of the Purchase Price by making a payment to any or all of the Sellers' secured lenders in exchange for an assignment of the secured debt held by such Persons, which secured debt Purchaser would immediately contribute to Sellers to be cancelled.

15.12.  License of Name.  SIC grants to Purchaser and its Affiliates a royalty free, non-exclusive license to use "**"**Sea Island**"**" in the name of such Persons in connection with the transactions contemplated by this Agreement, provided that such license shall terminate upon a termination of this Agreement pursuant to Section 14.1 and Purchaser and its Affiliates will

remove ""Sea Island"" from the name of any such Person through appropriate filings in the jurisdiction of their organization.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SEA ISLAND ACQUISITION LP

By: _____

Name: _____

Title: _____

SEA ISLAND COMPANY

By: _____

Name: _____ ————————————— **James B. Gilbert, Jr.** _____

Title: _____ ——————————————— **Senior    VP/General**

**Counsel** _____

SEA ISLAND COASTAL PROPERTIES LLC

By: ————————————————————————————

**Sea Island Company**

    **its manager**

**By:** _____

Name: _____ ——————————————————

—————————— **James B. Gilbert, Jr.** _____

Title: _____ ——————————————————

—————————— **Senior VP/General Counsel**

SEA ISLAND RESORT RESIDENCES, LLC

_____By: ————————————————————

**Sea Island Company**

    **its Sole Member**

**By:** _____

Name: _____ ——————————————————

—————————— **James B. Gilbert, Jr.** _____

Title: _____ ——————————————————

**Senior VP/General Counsel** _____

**SEA ISLAND APPAREL, LLC**

    **By Sea Island Company**

    **its Sole Member**

By:

Name:        James B. Gilbert, Jr.

Title:        Senior VP/General Counsel

FIRST SEA ISLAND, LLC

By:
Sea Island Company
        its Sole Member

By:

Name: ____ James B. Gilbert, Jr.

Title: ____ Senior VP/General Counsel

SEA ISLAND SERVICES, INC.

By:

Name: ____ James B. Gilbert, Jr.

Title: ____ Senior VP/General Counsel

CONFIDENTIAL

Execution VersionEXECUTION COPY

**DISCLOSURE SCHEDULE TO**

**ASSET PURCHASE AGREEMENT**

**among**

**SEA ISLAND ACQUISITION LP;**

**SEA ISLAND COMPANY,**

**SEA ISLAND COASTAL PROPERTIES, LLC,**

**SEA ISLAND RESORT RESIDENCES, LLC,**

**FIRST SEA ISLAND, LLC,**

**SEA ISLAND APPAREL, LLC**

**and**

**SEA ISLAND SERVICES, INC.**

**Dated as of August 4October 19, 2010**

Reference is hereby made to that certain Asset Purchase Agreement, dated as of ~~August 4~~**October 19**, 2010 (the "Agreement"), by and among Sea Island Acquisition LP, a Delaware limited partnership (the "Purchaser"), and Sea Island Company, Sea Island Coastal Properties, LLC, Sea Island Resort Residences, LLC, First Sea Island, LLC, Sea Island Apparel, LLC and Sea Island Services, Inc. (each a "Seller" and, collectively, the "Sellers").  This Disclosure Schedule has been prepared and delivered in accordance with the Agreement. Capitalized terms used in this Disclosure Schedule without definition shall have the respective meanings ascribed to them in the Agreement.

The Parties acknowledge and agree that (i) this Disclosure Schedule may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Sellers of any matter in this Disclosure Schedule shall not be deemed to constitute an acknowledgment by Sellers that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

**SECTION 1.1(ccc)**

**Exceptions to Permitted Liens**

See <u>Exhibit A</u> attached hereto.

**SECTION 1.1(mmm)**

**Specified Condo Units**

1.  Parcel 38, Beach Club Residences, Unit BCO1 and BCO2

2.  Parcel 39, Ocean Club Residences, Unit ON3

3.  Parcel 40, Beach Club Residences, Unit GS6

4.  Parcel 42, Ocean Club Residences, ON Resort Unit

5.  Parcel 43, Beach Club Residences, BCO Resort Unit and GN Resort Unit

**23290154v5**

## SECTION 2.1(a)

## Acquired Owned Real Property[1]

1. Parcel 1, Cloister Hotel and Resort -- West of Sea Island Drive
2. Parcel 2, Black Banks River Residences, a Condominium, Resort Unit
3. Parcel 3, Sea Island Resorts Beach Club Condominium, 25 Resort Units and 209 Parking Units
4. Parcel 4, Cloister Ocean Residences on Sea Island, a Condominium, Quarter Ownership Interests
5. Parcel 5, Cloister Hotel and Resort -- East of Sea Island Drive
6. Parcel 6, Sea Island Strip of Oceanfront Property
7. Parcel 7, Sea Island Street and Road rights of way, including without limitation any bridges
8. Parcel 8, Ocean Forest Lots 30 and 31
9. Parcel 9, Ocean Forest Clubhouse, Golf Course, and Resort Facilities
10. Parcel 10, Lodge, Plantation and Seaside Golf Courses, and Resort Facilities, including, for the avoidance of doubt, the Corn Barn and Golf School depicted as "Real Estate B" and "Real Estate C" respectively, on page 43 of the Sea Island Management Presentation dated June 2010.
11. Parcel 11, Retreat Clubhouse, Golf Course, and Resort Facilities
12. Parcel 13, Black Banks Residential Tract
13. Parcel 14, Sea Island Support Services Campus - South
14. Parcel 15, Sea Island Support Services Campus - North (Parking Area)
15. Parcel 18, Frederica Lots 201, 219, 232 and 240
16. Parcel 26(a) and (b), Dune Cottage Lots, Ocean Forest
17. Parcel 27, Ocean Forest Expansion Property
18. Parcel 29 and 29 (a), Old Seaside Lot 9 and Lot 8
19. Parcel 30, Old Seaside Expansion Property
20. Parcel 31, Sea Island Lake Cottages Lots
21. Parcel 32, Sea Island Lake Cottages Expansion Property
22. Parcel 33, Frederica Lots 202 and 251
23. Parcel 35, Tract IX, "Finger", Cloister Residences East
24. Parcel 36, Expanded Tract V, Cloister Residences East
25. Parcel 37, Tract I (West Point Plantation), Tract III (Lot 12, Marsh Point), Tract IV (Lot 19 Vassar Point), Tract V (Lot 122, Phase 2-B, Oak Forest) and Tract VI (portion of Black Banks Subdivision)
26. Parcel 38(a) and (b), Beach Club Residences, Unit BCO1 and BCO2

---

[1] The Acquired Owned Real Property includes the parcels included on this list, as more fully described on the Legal Descriptions attached as Exhibit B hereto, **which may be revised to be consistent with the Title Commitment**.

27. Parcel 39, Ocean Club Residences, Unit ON3

28. Parcel 40, Beach Club Residences, Unit GS6

29. Parcel 41, Beach Club Residences, GS Resort Unit

30. Parcel 42, Ocean Club Residences, ON Resort Unit

31. Parcel 43, Beach Club Residences, BCO Resort Unit and GN Resort Unit

32. Parcel 44, Kings Point Lot 13

33. Parcel 45, Kings Point Lot 15

34. Parcel 47, Frederica Subdivision Lot 46

35. Parcel 48, Frederica Subdivision Lot 131 (1/2 interest)

36. Parcel 49, Dune Cottage Lot 38, Ocean Forest

37. Parcel 50, Tracts 1, 2 and 3, Woodbine property

38. Parcel 51, Tabby House at Malcolm McKinnon Airport

39. Parcel 52, Salt Marsh, Frederica and Cannon's Point Tracts

40. Parcel 53, Laundry and Purchasing Facility

41. Parcel 54, Rainbow Hammock

42. Parcel 55, Salt Marsh and Hammocks lying to the west of the Plantation and Seaside Golf Courses and south of Kings Way

43. Parcel 56, South End of Sea Island

44. Parcel 57, Salt Marsh and high ground west of Sea Island Subdivision No. 1

45. Parcel 58, Native American Burial Ground

46. Parcel 59, Well Site, Sea Island

47. Parcel 60, Marshlands Around Hawkins Island bounded south by property of Epworth By The Sea, Inc., by Hamilton Landing Subdivision, etc.

48. Parcel 61, Lanier Island

49. Parcel 62, Sea Island Resorts Beach Club Condominium, Beach Club Suite "CC"

50. Parcel 63, Sixty Acres, more or less (60 +/-), Camden County

51. ~~Parcel 64, Miscellaneous Parcels, including 400 Sea Island Subdivision Road and Common Area, marsh west of Sea Island Rd. and northeast of Epworth S/D, Twitty Park (Tax Parcel No. 04-13915), miscellaneous gaps and gores of land, and other parcels of land that cannot be accurately described without a survey~~

**51. Parcel 64, Twitty Park lying north of Sea Island Road**

**52. Parcel 65, Old Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia**

**53. Parcel 66, 400 Sea Island Drive Subdivision Streets and Buffers**

**54. Parcel 67, Tract between Sea Island Road and Epworth Oaks Subdivision**

**55. Parcel 68, St. Perpetual Church Lot**

6

~~23290154v5~~

**56. Parcel 69, Roads and Streets, St. Simons Island Club Subdivision**

23290154v5

**SECTION 2.1(a)**
**Acquired Owned Real Property**


**Part II**

1.   Parcel 27, Ocean Forest Expansion Property

2.   Parcel 63, Sixty Acres, more or less (60 +/-), Camden County

3.   Parcel 64, Miscellaneous Parcels, including 400 Sea Island Subdivision Road and Common Area, marsh west of Sea Island Rd. and northeast of Epworth S/D, Twitty Park (Tax Parcel No. 04-13915), miscellaneous gaps and gores of land, and other parcels of land that cannot be accurately described without a survey

**3.   Parcel 64, Twitty Park lying north of Sea Island Road**

**4.   Parcel 65, Old Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia**

**5.   Parcel 66, 400 Sea Island Drive Subdivision Streets and Buffers**

**6.   Parcel 67, Tract between Sea Island Road and Epworth Oaks Subdivision**

**7.   Parcel 68, St. Perpetual Church Lot**

**8.   Parcel 69, Roads and Streets, St. Simons Island Club Subdivision**

8

**SECTION 2.1(b)**
**Assumed Contracts**

1. Agreement by and among Sea Island Company and E-Z-GO dated August 25, 2008.

2. Agreement by and among Sea Island Company and Georgia Turf & Tractor, Inc. and John Deere Equipment Company dated March 31, 2008.

3. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007.

4. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002.

5. Letter Agreement by and among PGA TOUR, INC., ~~David~~**Davis** Love III Foundation and Sea Island Company dated January 22, 2010.

6. Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

7. ~~Services Agreement by and among Exclusive Resorts Club Management, LLC and Sea Island Company dated May 15, 2007, as amended.~~

~~8.~~ Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009.

~~9~~**8**. Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated ~~December 12, 2005~~**September 29, 2010**.

~~10~~**9**. Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003.

11. ~~Database Management Services Agreement by and among LMG Data Mining and Sea Island Company dated December 3, 2007.~~

~~12~~**10**. Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007.

~~13~~**11**. Landscape Service Agreements by and among Sea Island Company and certain property owners.

~~14~~**12**. Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008.

15. ~~Music Services Agreement by and among Sea Island Company and Muzak, LLC dated July 26, 2007.~~

~~16~~**13**. Statement of Work by and among Sea Island Company and Network Services Plus, Inc. dated November 11, 2009.

~~17~~**14. 16**. Hardware Maintenance Agreement by and among Sea Island Company and Postec, Inc. dated June 16, 2005.

18. ~~Client Pricing Agreement by and among Sea Island Company and Pre-employ.com, Inc. dated May 29, 2009.~~

19. ~~Contract by and among Sea Island Company and Southern Nights dated April 1, 2005.~~

9

20. Maintenance Agreement by and among Sea Island Company and Southern Nights dated April 14, 2009.

21. Marketing and Management Services Agreement by and among Sea Island Company and TIG Global dated October 15, 2007.

22. Consulting Services Agreement by and among Sea Island Company and Ultimate Software dated July 18, 2008.

23. Lease Agreements by and among Sea Island Company and GMAC.

24 **16**. Essentials Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Sea Island Golf Club and Toro National Support Network dated May 28, 2008.

25 **17**. Classic 36 Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Retreat Golf Club and Toro National Support Network dated May 28, 2008.

26 **18**. Lease Agreement by and among Sea Island Company and Golden Isles dated October 1, 2009.

27. Lease Agreement by and among Sea Island Company and Satilla Riverkeeper dated February 15, 2010.

28 **19**. Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009.

29. Membership Agreement by and among the Cloister and the Lodge at Sea Island and Associated Luxury Hotels International Holdings, LLC dated January 1, 2010.

30 **20**. Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009.

31 **21**. Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009.

32 **22**. Agreement by and among Sea Island Company and Due South Publishing, Inc. dated April 8, 2010.

33. Agreement by and among Sea Island Company and Elite Meetings International dated September 30, 2009.

34 **23**. Subscription Agreement by and among Sea Island Company and Hoovers dated November 28, 2009.

35. Membership Agreement by and among Sea Island Company and IAGTO dated February 15, 2010.

36 **24**. Participation Agreement by and among The Cloister at Sea Island and Kiwi Collection, Inc. dated January 25, 2010 (Visa Luxury Hotel Collection).

37. Agreement by and among Sea Island Company and Preferred Hotel Group, Inc. dated July 1, 2009.

38 **25**. Agreement by and among The Cloister at Sea Island and Signature Travel Network effective January 1, 2010.

~~39~~**26**. Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002.

~~40~~**27**. Marketing and Management Services Agreement by and among Sea Island Company and TIG Global, LLC effective January 1, 2010.

~~41~~**28**. Subscription Agreement by and among The Cloister at Sea Island and TravelCLICK, Inc. dated December 7, 2009.

~~42~~**29**. Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010.

~~43~~**30**. Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010.

~~44~~**31**. Professional Services Agreement by and among Sea Island Company and Roger and Anne Ditmer dated November 26, 2008.

~~45~~**32**. Professional Services Agreement by and among Sea Island Company and Ellen Rogers dated September 12, 2008.

~~46~~**33**. Professional Services Agreement by and among Sea Island Company and Celeste Pittman dated February 17, 2009.

~~47~~**34**. Professional Services Agreement by and among Sea Island Company and Dulany Hall dated October 2, 2008.

~~48~~**35**. Professional Services Agreement by and among Sea Island Company and Audrey Wood dated October 3, 2008.

~~49~~**36**. Agreement by and among Sea Island Company and William Lewis Mason dated July 27, 2009.

~~50. Letter Agreement by and among Sea Island Company and Davis M. Love III dated August 10, 2006.~~

~~51~~**37**. Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009.

~~52~~**38**. Professional Services Agreement by and among Sea Island Company and J&S Associates, Inc. dated July 23, 2010.

~~53. Product Purchase Agreement by and among Sea Island Company and Institution Food House, Inc. dated August 1, 2010.~~

~~54. Agreement by and among Sea Island Company and Pristine Water Coffee dated May 4, 2010.~~

~~55. Master Maintenance Agreement by and among Sea Island Company and Schindler Elevator Corporation dated May 5, 2010.~~

~~56. Rental/Service Agreements by and among Sea Island Company and Aqua/Quench USA.~~

~~57~~**39**. Service Agreement by and among Sea Island Company and Audio Visual Services Group, Inc. dated September 2, 2009.

~~58~~**40**. Agreement by and among Sea Island Company and E-Z-GO dated September 10, 2009.

59. Lease Agreement by and among Sea Island Company and Action Mobile Industries Inc. dated November 1, 2007.

6041. Planned Maintenance Agreement by and among Sea Island Company and Agri-Business Technologies, Inc. dated February 11, 2010.

6142. Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and CSI Leasing, Inc. dated January 22, 2009.

62. Lease by and among Sea Island Company and Donald C. McCaskill III and Annie Bell McCaskill Friedman dated February 5, 2008.

63. Agreement by and among Sea Island Company and Emery Hardware and Rental Center dated December 1, 2009.

64. Service Agreement by and among Sea Island Company and G&K Services dated September 12, 2006.

65. Gas Service Agreement by and among Sea Island Company and SouthStar Energy Services, LLC d/b/a Georgia Natural Gas dated April 27, 2009.

66. Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.

67. Agreement by and among Sea Island Company and Modular Mailing Systems dated May 8, 2007.

68. Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC date July 9, 2007.

69. Meter Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007.

70. Agreement by and among Sea Island Company and Otis Elevator Company dated July 10, 2002, as amended.

7143. Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007.

7244. Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

73. Service Agreement by and among Sea Island and Georgia Trane Service Company dated January 20, 2005.

74. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (New Chiller Plant).

75. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (Cloister Hotel).

76. Service Agreement by and among Sea Island and Georgia Trane Service Company dated July 20, 2006.

77. Service Agreement by and among Sea Island and Georgia Trane Service Company dated December 6, 2007.

78. Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008.

79. Agreement by and among Sea Island Company and Waste Management of Brunswick dated September 8, 2009.

80**45**. Lease Agreement by and among Sea Island Company and Williams Scotsman, Inc. dated July 21, 2009.

81. Agreement by and among Sea Island Company and Yates-Astro Termite & Pest Co.

82**46**. Lease Agreement by and among Sea Island Company and PNCEF, LLC (f/n/a National City Commercial Capital Company) dated September 24, 2009, as amended January 11, 2010.

83.     **47.**     Agreement by and among Sea Island Company and Hasty's Communications East, Inc.

84. Agreement by and among St. Simons Island Club and Estate Management Services dated September 30, 1996.

85. Agreement by and among Cannon Point Lake and Estate Management Services, Inc. dated June 17, 2004.

86. Agreement by and among Ocean Forest and Estate Management Services dated September 30, 1996.

87. Agreement by and among Lake Sinclair and Estate Management Services dated May 19, 2000.

88. Agreement by and among The Sea Island Golf Club and Estate Management Services dated January 6, 1999.

89**48**. Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005.

90**49**. Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008.

91**50**. Agreement by and among Sea Island Company and Agilysys, NV, LLC dated January 7, 2010.

92**51**. Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010.

93. Agreement by and among Sea Island Company and Crystal Enterprises, Inc. dated March 4, 2009.

94**52**. Agreement by and among Sea Island Company and OpenCourse Solutions, LLC dated October 15, 2004.

95. Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005.

96**53**. Agreement by and among Sea Island Company and Tri H Friesians LLC dated February 4, 2010.

97**54**. Shared Equity Financing Agreement by and among C. Allen Brown and Sea Island

13

Company.

~~98~~**55**. Shared Equity Financing Agreement by and among Todd W. Anderson, Stacey L. Anderson and Sea Island Company.

~~99~~**56**. Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (The Cloister~~s~~).

~~100~~**57**.   Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge).

~~101~~**58**.   Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest).

~~102~~**59**.   Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004.

~~103~~**60**.   Agreement by and among Sea Island Company and AG-Hill Farms, Inc. dated August 16, 2007.

~~104~~**61**.   Agreement by and among Sea Island Company and Tabby House, Inc. dated December 6, 2007.

~~105~~**62**.   Agreements by and among Sellers and any customer entered into in the ordinary course of business for services or accommodations to be provided to such customer by Sellers.

~~106~~**63**.   Rental agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences Sea Island Cottages and Beach Club Condominiums by Sea Island Company on behalf of unit owners.

~~107~~**64**.   Rental management agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences, Sea Island Cottages and Beach Club Condominiums between Sea Island Company and the unit owners.

~~108~~**65**.   Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008**, and related individual equipment leases**.

~~109~~**66**.   Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007.

~~110.   Agreement by and among Sea Island Company and Procleansed, Inc. dated September 17, 2008.~~

~~111~~**67**.   National Service Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008.

~~112~~**68**.   Travel Directory Marketing Agreement by and among The Cloister at Sea Island and Andrew Harper dated October 16, 2009.

~~113~~**69**.   Agreement by and among Sea Island Resorts and Fortibus Marketing of Charleston, LLC July 17, 2009.

~~114~~**70**.   Affiliate Hotel Agreement by and among Sea Island Resort and Clubcorp USA, Inc. dated August 7, 2009.

~~115~~**71**.   Cable Television Service Agreement and License by and among Sea Island Company and Owensboro-Brunswick, Inc. d/b/a Adelphia Cable Communications

14

dated March 28, 2006.

~~116~~72.    Bulk Services Agreement by and among Sea Island Company and Comcast of Florida/Georgia, LLC dated April 23, 2008.

~~117~~73.    Container Lease Agreement #GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

~~118~~74.    Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

~~119~~75.    Net Lease Agreement by and among Sea Island Company and JLV VASI, LLC dated September 5, 2008, as amended December 31, 2008.

~~120~~76.    Professional Services Agreement by and among Sea Island Company and Nancy Adcock.

~~121~~77.    Google Message Delivery Contract by and among Google, Inc. and Sea Island Company dated January 1, 2009.

~~122~~78.    Lease Agreement by and among Sea Island Company and Alfred W. Jones, III dated October 8, 2007.

~~123~~79.    Microsoft Enterprise Enrollment and Pricing for Office Pro Sea Island dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E611258.

~~124~~80.    Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003.

~~125~~81.    Property Exposure Contract No. 000902-0609-31 by and among The Cloister at Sea Island and Kiwi Collection Inc. dated June 23, 2009.

~~126~~82.    Property Exposure Contract No. 001403-0110-250 by and among The Lodge at Sea Island Golf Club and Kiwi Collection Inc. dated January 15, 2010.

~~127~~**83.    Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.**

**84**.    Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010.

~~128.    Agreement by and among Sea Island Company and Barry's Beach Service, Inc. dated June 30, 2006.~~

~~129~~**85**.    Letter Agreement by and among Sea Island Company and Atlantic Bike Shop, Inc. dated March 11, 2010.

~~130.    Agreement by and among Sea Island Company and Steve Hightower dated November 30, 2008.~~

~~131.    Agreement by and among Sea Island Company and Resort Photography, LLC dated March 6, 2000.~~

~~132.    Yacht Charter Agreement by and among Sea Island Company and Captain Brian Quinn dated August 2008.~~

13386.    Agreement by and among Sea Island Company and Georgia Power Company dated January 23, 2004.

13487.    Equipment Service Agreement by and among Sea Island Company and BancTec, Inc. dated January 22, 2007.

13588.    Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009.

13689.    Business Rental Preferred Rate Agreement by and among Sea Island and Enterprise Leasing Company – Southeast dated July 8, 2010.

13790.    Concessionaire Agreement by and among Sea Island Company and Enterprise Rent-A-Car Southeast dated September 8, 2008.

13891.    Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

13992.    Product Service Agreement by and among Sea Island Company and Dowling-Douglas Co. dated July 22, 2010.

14093.    Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated February 4, 2005.

14194.    Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated May 18, 2006.

14295.    Transport Payment Plan by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005.

14396.    Services Master Agreement by and among Sea Island Co. and BellSouth Company dated October 4, 2006.

14497.    Marketing Support Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998.

14598.    Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002.

14699.    Master Services Agreement by and among Sea Island Company and International Business Machines Corporation dated December 28, 2005.

147100.    Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated January 10, 2006.

148101.    Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

149102.    Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

150103.    Agreements entered into in the ordinary course of business with certain unaffiliated Persons for the short-term leasing of resort and event space.

151104.    Commercial lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009.

**105.    Contract for Accounting Services by and among Sea Island Company and**

16

**Eaddy Sams dated August 2, 2010.**

**106.   Letter Agreement by and among Sea Island Company and Jack Lumpkin dated December 17, 2009.**

**107.   Independent Contractor Agreement by and among Sea Island Company and Mike Taylor dated December 18, 2009.**

**108.   Agreement by and among Sea Island Company and PEAK Technologies dated Sepetember 29, 2009.**

**109.   SDD Managed Services Agreement (SDD-Hosted) by and between Sea Island Company and Systems Design and Development, Inc. Dated December 10, 2007.**

**23290154v5**

**SECTION 2.1(f)**

**Personal Property**

See <u>Exhibit C</u> attached hereto.

SECTION 2.1(i)
**Intellectual Property Rights**

Copyrights

| Sea Island Party | Copyright | Owned / Licensed | Registration Number | Registration Date |
|---|---|---|---|---|
| Sea Island Company | This happy isle : the story of Sea Island and the Cloister / Harold H. Martin | Owned | TX0000250694 | 12/26/78 |
| Sea Island Company | The Sea Island activity and coloring book | Owned | VA0000729934 | 8/7/95 |

Trademarks

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| OCEAN FOREST | United States of America | Registered | 74391941 May 18, 1993 | 1949354 Jan 16, 1996 | Sea Island Company | 36    Residential real estate brokerage; residential real estate management. 37    Residential real estate development; custom construction of homes. 41    Golf club and country club services. |
| SEA ISLAND | United States of America | Registered | 73481430 May 21, 1984 | 1338346 May 28, 1985 | Sea Island Company | 36    Planning and laying out of residential communities and real estate brokerage and management services. 37    Garage and auto repair services, laundry and dry cleaning services, landscaping services and construction of resort homes and condominiums. 41    Educational services - namely, providing instruction in the fields of dancing, tennis, golf, horseback riding, skeet shooting, swimming, diving, fishing, sailing and windsurfing, entertainment services - namely, arranging and conducting tennis and golf tournaments, lectures and concerts for others; and country club and beach club services. 42    Barber and beauty salon services, retail flower shop services and resort hotel and restaurant services. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|------|-------------|--------|----------------------|-------------------|-------|-------------------|
| SEA ISLAND | United States of America | Registered | 74342270<br><br>Dec 22, 1992 | 1789075<br><br>Aug 24, 1993 | Sea Island Company | 03     Personal care products and toiletries, namely, shampoo, hair conditioner, body lotion, bath/shower gel, sunscreen and massage oil. |
| SEA ISLAND | United States of America | Registered | 77025670<br><br>Oct 20, 2006 | 3443477<br><br>Jun 10, 2008 | Sea Island Company | 16     Wedding planning guides and information guides and score cards for playing sports; and paper goods, namely, stationery and photographs; Publications, namely, magazines, newsletters, guidebooks, maps, historical and photographic books and brochures related to a Georgia coastal resort and the scenery, culture, life style and history of the Golden Isles region of the Georgia coast.<br>41     Wedding event planning and coordination services; special events planning and coordination services; wedding party planning and consultation. |
| SEA ISLAND (and shield design)<br><br> | United States of America | Registered | 74444546<br><br>Oct 7, 1993 | 1888148<br><br>Apr 11, 1995 | Sea Island Company | 03     Personal care products and toiletries; namely, hair shampoo, hair conditioner, body lotion, bath and shower gel, skin cleansing lotion, skin moisturizer lotion, skin moisturizer gel, sunscreen preparations, sun block preparations, skin dyes, namely sunless self tanning skin preparations and massage oils. |
| SEA ISLAND (stylized)<br><br> | United States of America | Registered | 73002723<br><br>Oct 3, 1973 | 1001562<br><br>Jan 14, 1975 | Sea Island Company | 25     Trousers, slacks, robes, swimwear, shirts and jackets, [the shirts being known as dress-shirts, outer-shirts, terry shirts, knit-shirts and sport-shirts, and the jackets being known as outer-jackets, parka-jackets, regular-lined jackets, regular-unlined jackets, and ski-jackets]. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| SEA ISLAND (stylized)  | United States of America | Registered | 73481562 May 22, 1984 | 1338347 May 28, 1985 | Sea Island Company | 36      Planning and laying out of residential communities and real estate brokerage and management services. 37      Garage and auto repair services, laundry and dry cleaning services, landscaping services and construction of resort homes and condominiums. 41      Educational services, namely, providing instruction in the fields of dancing, tennis, golf, horseback riding, skeet shooting, swimming, diving, fishing, sailing and windsurfing; entertainment services-namely, arranging and conducting tennis and golf tournaments, lectures and concerts for others; and country club beach club services. 42      Barber and beauty salon services, retail flower shop services and resort hotel and restaurant services. |
| SEA ISLAND BEACH CLUB | United States of America | Registered | 74445354 Oct 8, 1993 | 1885428 Mar 21, 1995 | Sea Island Company | 42      Snack bar services, restaurant and cocktail lounge services, and retail gift shop services. |
| SEA ISLAND BEACH CLUB (and design)  | United States of America | Registered | 74444466 Oct 7, 1993 | 1887573 Apr 4, 1995 | Sea Island Company | 42      Resort services; namely, beach club and swimming club services and beauty care, spa and health club services. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| SEA ISLAND CLUB | United States of America | Registered | 75563878<br><br>Oct 1, 1998 | 3436491<br><br>May 27, 2008 | Sea Island Company | 35      Retail stores featuring items, sporting goods, souvenirs, and toiletries; and retail flower shop services.<br>41      Recreational, educational and entertainment services in connection with providing golf courses, tennis courts, golf and tennis instruction, tournaments, lectures and competitions in the fields of fitness, exercise, beauty, health, yoga, boating, yachting, sailing, fishing, nature, sightseeing, shooting, movies, swimming, diving, windsurfing, history, art, architecture, literature, music, dancing, cooking, wines, decorative arts, games, cards, bingo, bridge, crafts, organized children's activities, volleyball, bicycling, horseback riding, birdwatching, gardening, landscaping, horticulture, storytelling and singing; country club, golf club, tennis club, beach club, health club, swim club and yacht club services; theater productions; live music performances.<br>42      Resort hotel, restaurant, cocktail bar, and snack bar services, catering services, barber and beauty salon services, health spa services. |
| SEA ISLAND YACHT CLUB | United States of America | Registered | 75125258<br><br>Jun 25, 1996 | 2196269<br><br>Oct 13, 1998 | Sea Island Company | 39      Marina services and boat and yacht charter services. |
| SEA ISLAND YACHT CLUB | United States of America | Registered | 75125348<br><br>Jun 25, 1996 | 2200173<br><br>Oct 27, 1998 | Sea Island Company | 41      Yacht club services.<br>42      Restaurant and bar services and food and beverage catering services. |
| SHIELD DESIGN<br> | United States of America | Registered | 74491423<br><br>Feb 16, 1994 | 1877007<br><br>Jan 31, 1995 | Sea Island Company | 41      Resort services, namely beach club, golf club, swimming club, and health club services.<br>42      Hotel, restaurant, cocktail bar, and snack bar services, beauty salon services, and health spa services, and retail stores featuring clothing, clothing accessories, gift items, sporting goods, souvenirs, and toiletries. |
| THE CLOISTER | United States of America | Registered | 73060424<br><br>Aug 13, 1975 | 1197018<br><br>Jun 1, 1982 | Sea Island Company | 42      Restaurant services. |

23290154v5

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|---|---|---|---|---|---|---|
| THE CLOISTER | United States of America | Registered | 73481518<br><br>May 22, 1984 | 1329070<br><br>Apr 2, 1985 | Sea Island Company | 42        Hotel services. |
| THE CLOISTER | United States of America | Registered | 75566137<br><br>Oct 6, 1998 | 2323479<br><br>Feb 29, 2000 | Sea Island Company | 25        Clothing, namely, shirts, jackets, t-shirts, sweatshirts, caps, hats and shorts.<br>41        Recreational and entertainment services; namely, providing golf courses, tennis courts, conducting and arranging golf and tennis tournaments and competitions, theater productions, and live music performances; educational services; namely, providing instruction and lectures in the fields of golf, tennis, fitness, exercise, beauty, health, yoga, boating, yachting, sailing, fishing, nature, sightseeing, shooting, movies, swimming, diving, windsurfing, history, art, architecture, literature, music, dancing, cooking, wines, decorative arts, games, cards, bingo, bridge, crafts, organized children's activities, ping pong, volleyball, bicycling, horseback riding, birdwatching, gardening, landscaping, horticulture, storytelling and singing; country club, golf club, tennis club, beach club, health club, swim club and yacht club services. |
| THE CLOISTER (stylized)<br><br> | United States of America | Registered | 77134629<br><br>Mar 19, 2007 | 3637264<br><br>June 16, 2009 | Sea Island Company | 41        Recreational and entertainment services; namely, providing golf courses, tennis courts, squash courts, conducting and arranging golf and tennis tournaments and competitions, live music performances, movies, boating, yachting, sailing, fishing, sightseeing, shooting, swimming, diving, games, cards, bingo, bridge, crafts, organized children's activities, table tennis, volleyball, bicycling, horseback riding, birdwatching, storytelling, and singing; country club, golf club, tennis club, swim club and yacht club services; Educational services; namely, providing instruction and lectures in the fields of golf, tennis, fitness, exercise, beauty, health, yoga, history, art, architecture, literature, music dancing, cooking, wines, gardening, landscaping, horticulture, and decorative arts; special event planning and coordinating, namely, planning and consultation for parties and weddings; Beach club services, namely providing a membership club with beach and pool swimming facilities; Health club services, namely, providing instruction and equipment in the field of physical exercise.<br>43        Hotel and resort services; restaurant services. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description |
|------|--------------|--------|----------------------|--------------------|-------|-------------------|
| TREE AND WAVE DESIGN  | United States of America | Registered | 76189092<br><br>Jan 3, 2001 | 2512487<br><br>Nov 27, 2001 | Sea Island Company | 41    Private club services featuring, tennis, beach club, swimming, organized events and entertainment, bar and restaurant services for members; golf club services. |
| SEA ISLAND | US-Georgia | Registered | | S5177<br><br>Jun 20, 1984 | Sea Island Company | 01    Resort hotel and restaurant services. |
| SEA ISLAND | US-Georgia | Registered | | S5178<br><br>Jun 20, 1984 | Sea Island Company | 08    Educational, recreational and entertainment. |
| SEA ISLAND | US-Georgia | Registered | | S5180<br><br>Jun 20, 1984 | Sea Island Company | 02    Business and retail services. |
| SEA ISLAND | US-Georgia | Registered | | T12413<br><br>Jan 27, 1993 | Sea Island Company | 51    Personal care products and toiletries, namely, conditioner, body lotion, bath/shower gel, sunscreen and massage oil. |
| SEA ISLAND | US-Georgia | Registered | | T12475<br><br>Feb    15, 1993 | Sea Island Company | 52    Shampoo. |
| SEA ISLAND (stylized)  | US-Georgia | Registered | | S5175<br><br>Jun 20, 1984 | Sea Island Company | 02    Retail services. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description | |
|------|-------------|--------|----------------------|--------------------|-------|-------------------|---|
| SEA ISLAND (stylized)  | US-Georgia | Registered | | S5179 Jun 20, 1984 | Sea Island Company | 08 | Educational, recreational and entertainment  services. |
| SEA ISLAND (stylized)  | US-Georgia | Registered | | S5176 Jun 20, 1984 | Sea Island Company | 01 | Resort hotel and restaurant services. |
| SHOPS AT SEA ISLAND | US-Georgia | Registered | Jul 5, 1995 | S14791 Jul 5, 1995 | Sea Island Company | 04 | Shopping center development services. |
| ST. SIMON'S ISLAND CLUB (and oval design)  | US-Georgia | Registered | | S5181 Jun 20, 1984 | Sea Island Company | 08 | Beach, golf and tennis club services. |
| ST. SIMON'S ISLAND CLUB (and oval design)  | US-Georgia | Registered | | S5182 Jun 20, 1984 | Sea Island Company | 01 | Restaurant services. |

| Mark | Jurisdiction | Status | Serial No Filing Date | Reg. No. Reg. Date | Owner | Class/Description | |
|---|---|---|---|---|---|---|---|
| ST. SIMON'S ISLAND CLUB (and oval design)  | US-Georgia S1710-010759 | Registered | | S5183 Jun 20, 1984 | Sea Island Company | 02 | Real estate development, sales and management services. |
| THE CLOISTER | US-Georgia S1710-010755 | Registered | | S2944 Oct 3, 1973 | Sea Island Company | 01 | Hotel, restaurant and resort services. |

Patents

None.

Licenses

None.

## SECTION 2.2(c)
## Excluded Owned Real Property[2]

None.

---

[2]  The Excluded Owned Real Property includes any land tracts included on this list, as more fully described on the Legal Descriptions attached as <u>Exhibit D</u> hereto**, which may be revised to be consistent with the Title Commitment**.

**SECTION 2.2(m)**
**Other Excluded Assets**

1. The personal property of A.W. Jones III and members of the Jones family or extended relatives thereof located within the Purchased Assets, as disclosed to Purchaser in writing on August 4, 2010.

2. For purposes of clarity, any and all personal property of any employee of any Seller kept in the office or other working space of employee is an Excluded Asset under the Agreement.

**SECTION 2.3(c)**
**Cure Costs**

None.

**SECTION 2.3(d)**
**Specified Base Deferred Compensation Obligations**

| Name | Amount ($) |
| --- | --- |
| Adams, C.T. | ~~561,667.05~~556,844 |
| Alexander, C. | 15,~~787.43~~845 |
| Butler, N. | 48,~~636.39~~814 |
| Cate, Vassa | 28,~~443.52~~547 |
| Edenfield, W. | ~~100,371.84~~97,945 |
| Engel, S. | 11,~~671.43~~112 |
| Graham, W.R. | ~~49,319.03~~48,339 |
| Heins, Ann | 7,~~412.32~~439 |
| Huffman, C. | 1,~~285.37~~290 |
| McNeely, J. | ~~104,859.88~~100,379 |
| Miller, B. | ~~71,412.16~~69,788 |
| Owens, C.A. | ~~19,146.55~~16,340 |
| Rogers, E. | 12,~~685.11~~731 |
| Sayer, S. | ~~464,751.03~~466,448 |
| Schneider, Eric | 72,~~639.9~~05 |
| Tipton, M. | 125,~~326.90~~784 |
| Veal, Brannen | 15,~~859.78~~918 |

## SECTION 2.3(j)
### Specified Supplemental Deferred Compensation Obligations

| Name | Amount ($) |
|------|-----------|
| Adams, C.T. | 308,900 |
| Alexander, C. | 2,580 |
| Butler, N. | 34,580 |
| Cason, J. M. | 32,690 |
| Cate, Vassa | 570 |
| Edenfield, W. | 24,370 |
| Engel, S. | 15,480 |
| Fox, G. P. | 6,250 |
| Gibson, B. R. | 133,470 |
| Graham, W.R. | 103,250 |
| Heins, A. | 3,110 |
| Hogan, D. | 12,170 |
| Huffman, C. | 2,770 |
| Johns, B. A. | 50,050 |
| Johnson, M. B. | 1,960 |
| Kelly, J. R. | 10,060 |
| Lembcke, B. | 42,510 |
| McNeely, J. | 31,160 |
| Miller, B. | 10,530 |
| O'Connor, K. | 54,340 |
| Owens Jr., C.A. | 98,470 |
| Sayer, S. | 136,770 |
| Shelnutt, R. D. | 11,150 |
| Shelnutt, T. L. | 4,340 |
| Smith, W. C. | 53,490 |
| Talley Jr., C. P. | 43,280 |
| Theus Jr., A. S. | 9,770 |
| Tipton, M. | 13,210 |

| Veal, B. | 1,500 |
| Watson, D. S. | 7,980 |

### SECTION 2.3(k)
### Specified Additional Deferred Compensation Obligations

| Name | Amount ($) |
|------|------------|
| **Capone, P.** | **401,907** |
| **Gibson, B.R.** | **282,828** |
| **Hodgdon, M.** | **48,119** |
| **Jones III, A. W.** | **1,544,629** |
| **Love III, D.** | **389,775** |
| **McSwiney, J** | **512,051** |
| **Nunn, S.** | **357,093** |
| **Smith, W.** | **83,444** |
| **Williams, J. B.** | **432,644** |
| **Wright Jr., E. T.** | **26,129** |

**For the avoidance of doubt, amounts paid shall be capped at an aggregate amount of $440,520 as provided in the Agreement.**

33

**SECTION 2.6(b)**
**Allocation**

**[To be agreed upon prior to Closing]**

**SECTION 2.10(n)**
**Consents**

None.

## SECTION 3.3
## Governmental Authorizations

1.  Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

2.  Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

3.  Coastal Marshlands Protection Committee Permit #508, dated October 20, 2005, issued by the Coastal Resources Division of the Georgia Department of Natural Resources allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

4.  Department of Army Permit 074OYN dated January 8, 1990 allowing beach renourishment activities.

5.  Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

6.  Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

7.  Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

8.  Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

**SECTION 3.4**
**Noncontravention**

1.  Reference is made to the liquor licenses listed on Section 3.8(a) hereof.

2.  Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

3.  Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002.

4.  Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008.

5.  Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005.

6.  Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002.

7.  Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

8.  Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007.

9.  Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

## SECTION 3.5

### Consents

1. Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated December 12, 2005.

2. Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003.

3. Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008.

4. Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002.

5. Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004.

6. Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010.

7. Agreement by and among Sea Island Company and OpenCourse Solutions, LLC dated October 15, 2004.

8. Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009.

9. Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009.

10. Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

11. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

12. Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009.

13. Lease Agreements by and among Sea Island Company and GMAC.

14. Services Agreement by and among Exclusive Resorts Club Management, LLC and Sea Island Company dated May 15, 2007, as amended.

15. Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009.

16. Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

17. Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007.

18. Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010.

19. Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010.

20. Product Purchase Agreement by and among Sea Island Company and Institution Food House, Inc. dated August 1, 2010.

21. Lease by and among Sea Island Company and Donald C. McCaskill III and Annie Bell McCaskill Friedman dated February 5, 2008.

22. Gas Service Agreement by and among Sea Island Company and SouthStar Energy Services, LLC d/b/a Georgia Natural Gas dated April 27, 2009.

23. Premium Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.

24. Lease Agreement by and among Sea Island Company and Hasler Financial Services, LLC dated July 9, 2007.

25. Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007.

26. Service Agreement by and among Sea Island and Georgia Trane Service Company dated January 20, 2005.

27. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (New Chiller Plant).

28. Service Agreement by and among Sea Island and Georgia Trane Service Company dated June 15, 2006 (Cloister Hotel).

29. Service Agreement by and among Sea Island and Georgia Trane Service Company dated July 20, 2006.

30. Service Agreement by and among Sea Island and Georgia Trane Service Company dated December 6, 2007.

31. Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005.

32. Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008.

33. Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008.

34. Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007.

35. Container Lease Agreement # GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

36. Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

37. Reference is made to the liquor licenses listed on Section 3.8(a) hereof.

38. Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

39. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007.

40. Agreement by and among Sea Island Company and Tennant Capital Services dated May 28, 2008.

41. Software License and Support Agreement by and among Sea Island Company and Datavision Technologies, Inc. dated December 27, 2005.

42. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission.

43.  Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

44.  Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated  November 6, 2002.

45.  Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003.

46.  Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009.

47. Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

48.  Contract Service Arrangement Agreement by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005.

49.  Contract Service Arrangement Agreement by and among Sea Island Company and BellSouth Telecommunications, Inc. dated May 18, 2006.

50.  Services Master Agreement by and among Sea Island Company and BellSouth Company dated October 4, 2006.

51. Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 1998.

52.  Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

53.  Database Management Services Agreement by and among LMG Data Mining and Sea Island Company dated December 3, 2007.

54.  Microsoft Enterprise Enrollment and Pricing for Office Pro dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E61258.

55.  Commercial Lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009.

56.  Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009.

57.  Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008.

58.  Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010.

59.  Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

60.  Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

61.  Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

62.  Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

23290154v5

**SECTION 3.6**
**Litigation**

1. Claim made orally by owner of Cloister Ocean Residence that Sea Island Company breached an oral representation made by an agent that a like interest in such individual's unit would not be sold for less than what the individual paid for her interest.

2. ~~Claim made orally by owner of LLC interest in a condominium development that Sea Island Company breached a written agreement to inform the individual of the availability of a Penthouse unit in the condominium development.~~

~~3.~~ Cross-claims filed by Joseph Ferguson and Andrew Head, owners of a membership interest in Beach Club Garden North Residences, LLC, alleging fraudulent actions by Sea Island Company to induce them to buy such interest.

~~4~~**3**. Claim made orally by owner of Ocean Club Residence alleging that Sea Island Company failed to deliver the purchased unit as agreed upon.

~~5~~**4**. Claim asserted by SAI Engineering (orally through a collection agency) in the approximate amount of $225,000 for engineering work alleged to have been performed on property now or formerly owned by Sea Island Company. No lien has been filed of record and the time for perfecting a lien under Georgia law has expired. Because no formal, written statement of the claim has been presented, it is not possible to provide an opinion as to whether all or any part of this amount is due at this time.

~~6~~**5**. Claim made orally by property owner alleging that certain landscaping of a beach right of way owned by Sea Island Company is an obstruction to an easement granted to such owner. The legal action would seek the removal of the landscaping as an obstruction to the claimed easement.

~~7~~**6**. Indemnification claim made in writing by Winona Capital Partners, LLC Series E-PM, the purchaser of Sea Island Apparel, LLC's membership interest in Luxury Apparel Group, L.L.C. under that certain Amended and Restated Membership Interest Purchase Agreement dated March 26, 2009. If such claim were to be successful, any amounts due pursuant to such indemnification claim.

~~8~~**7**. Audit and investigation by the U.S. Immigration and Customs Enforcement (ICE) into potential violations relating to the Sea Island Company's I-9 forms.

~~9. The following workers'~~**8. Workers'** compensation claims made by employees of Sea Island Company**, including the following**:

- Claim of Robert Cundy (1998) – Quarterly medical tx/antiflammatories

- Claim of Raymond Ray (2001) – Claim is closed with final payment to be made

- Claim of James Smith (2001) – Claim is closed with final payment to be made

- Claim of Danny Moreu (2004) – Open claim

- Claim of Don Smith (2006) – Claim is closed with final payment to be made

- ~~Claim of Rodney Butler (2006) - Hearing judge denied claim, awaiting final decision on appeal~~

- **Claim of Rodney Butler (2006) – Company has prevailed and expects to close in October**

- Claim of Joyce West (2007) – Open claim

- ~~Claim of James Gasque (2008) – Open claim~~

- Claim of Carla Pentelakis (2008) – Open claim
- Claim of Patricia Ryals (2008) – Claim controverted, hearing July 30th
- Claim of Cheryl Peeples (2009) – Open claim
- Claim of Carlos Recinos (2010) – Claim controverted, deposition August 2nd
- Claim of Karen Blake (2010) – Open claim
- Claim of Sonya Floyd  (2010) – Open claim
- Claim of Hubert Clark (2010) – Open claim
- Claim of Tina Nimmo (2010) – Open claim
- Claim of Edward Joyner (2010) – Open claim
- **Claim of Chuck Dean (2008) – Open claim**
- **Claim of Octoria Kent (2010) – Open claim**
- **Claim of Sonny Sullivan (2010) – Open claim**

SECTION 3.8(a)
Permits

Liquor Licenses

The following liquor licenses have been obtained at both the state and county level.  Unless otherwise indicated, the county in which the license has been obtained is Glynn County.

| Location | Licensee | License Type | Products Sold |
|----------|----------|--------------|---------------|
| Davis Love Grill | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf Club  (Tee House) | James B. Gilbert | Retail | Beer |
| Ocean Forest Golf Club | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Sea Island In Room Service | Sea Island Company | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island Additional Facility | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Sea Island Golf Club Snack Bar | Sea Island Company | Retail | Beer |
| Cloister Hotel Clubrooms | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Cloister Hotel | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Hotel In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Cloister Hotel  (Additional Facility, River Bar) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Black Banks Parlor | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom East | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom West | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (North) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (South) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Georgia Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Main Dining Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| South Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Spanish Lounge Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Big George's Raw Bar and Grill | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Beach Club    (In-room) | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |

23290154v5

| | | | |
|---|---|---|---|
| Restaurant Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Snack Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Pavilion | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Spa    (NO SUNDAY SALES on county license) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Pub at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff Additional Facility | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| *The Lodge at Cabin Bluff Additional Facility (In Rm Svc) | Ellis H. Howard | Hotel In-Room Service | Beer, Wine & Liquor |

*County license obtained in Camden County.*

Elevator Operating Permits

| Jurisdiction | Serial # | Location | Expiration Date |
|---|---|---|---|
| 225325 | 643-1851 | Beach Club Garden North - #8 | 3/1/2011 |
| 225309 | 642-8512 | Beach Club Garden North - #1 | 3/1/2011 |
| 225310 | 642-8523 | Beach Club Garden North - #3 | 3/1/2011 |
| 225311 | 642-3089 | Beach Club Garden North - #5 | 3/1/2011 |
| 225312 | 642-0226 | Beach Club Garden North - #9 | 3/1/2011 |
| 225313 | 642-0248 | Beach Club Garden North - #4 | 3/1/2011 |
| 225323 | 642-3078 | Beach Club Garden North – Beach Club | 3/1/2011 |
| 225324 | 642-3067 | Beach Club Garden North – Beach Club | 3/1/2011 |
| 241304 | 238073 | Beach Club Garden North - Basement | 2/1/2011 |
| 241313 | 28680831 | Beach Club Garden North - Basement | 2/1/2011 |
| 236852 | 238077 | Beach Club Garden North - #1 | 2/1/2011 |

23290154v5

| 236853 | 238078 | Beach Club Garden North - #2 | 2/1/2011 |
| 236854 | 238079 | Beach Club Garden North - #3 | 2/1/2011 |
| 236855 | 238080 | Beach Club Garden North - #4 | 2/1/2011 |
| 215427 | B5612-05 | Cloister Hotel - #5 Hotel | 3/1/2011 |
| 215428 | B5614-07 | Cloister Hotel - #7 | 3/1/2011 |
| 215429 | B5615-08 | Cloister Hotel - #8 Hotel | 3/1/2011 |
| 215430 | B4984-03 | Cloister Hotel - #3 Wing | 3/1/2011 |
| 215433 | B5610-03 | Cloister Hotel - #3 Hotel | 3/1/2011 |
| 215463 | B5613-06 | Cloister Hotel - #6 Hotel | 3/1/2011 |
| 215464 | B5616-09 | Cloister Hotel - #9 Hotel | 3/1/2011 |
| 215480 | 4982-01 | Cloister Hotel - #2 Wing | 3/1/2011 |
| 215482 | B4985-04 | Cloister Hotel - #4 Wing | 3/1/2011 |
| 215483 | B5609-01 | Cloister Hotel - #1 Hotel | 3/1/2011 |
| 215484 | B5609-02 | Cloister Hotel - #2 Hotel | 3/1/2011 |
| 220280 | B5611-04 | Cloister Hotel - #4 Hotel | 3/1/2011 |
| 223148 | 34983-02 | Cloister Hotel - #2 Wing | 3/1/2011 |
| 241323 | PD6639A | Cloister Hotel – River Bar | 3/1/2011 |
| 241325 | PD6699B | Cloister Hotel – 100 Hudson | 3/1/2011 |
| 241326 | PD6639C | Cloister Hotel – Main Kitchen | 3/1/2011 |
| 120533 | 457910 | Beach Club Residences P.O.A. - Dunbar | 3/1/2011 |
| 120495 | 457911 | Beach Club Residences P.O.A. - Mackay | 3/1/2011 |
| 241315 | 31820835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241319 | 31830835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241320 | 31840835 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 241305 | 238071 | Beach Club Residences P.O.A. - Basement | 2/1/2011 |
| 195448 | 1359946 | Beach Club Residences P.O.A. - Office | 3/1/2011 |
| 195353 | 460447 | Beach Club Residences P.O.A. - Abbott | 3/1/2011 |

23290154v5

| | | | |
|---|---|---|---|
| 195354 | 460448 | Beach Club Residences P.O.A. - Sinclair | 3/1/2011 |
| 236856 | 238081 | Ocean Club North - #1 | 2/1/2011 |
| 236858 | 238082 | Ocean Club North - #2 | 2/1/2011 |
| 236859 | 238083 | Ocean Club North - #3 | 2/1/2011 |

Water Heater Operating Permits

| Jurisdiction | National Board Number | Location | Expiration Date |
|---|---|---|---|
| 215472 | 107091 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215473 | 107034 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215474 | 107045 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215475 | 107174 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215476 | 107144 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215477 | 107026 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215469 | 107033 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215470 | 107180 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 215471 | 107046 | Cloister Hotel – Boiler Room | 3/1/2012 |
| 243496 | 2780 | Cloister Hotel – Womens' Spa | 3/1/2012 |
| 243497 | 2916 | Cloister Hotel – Ladies Fitness | 3/1/2012 |
| 243498 | 2800 | Cloister Hotel – Mens Fitness | 3/1/2012 |
| 243499 | 2910 | Cloister Hotel – Mens Spa | 3/1/2012 |

Low Pressure Water Heater Operating Permits

| Jurisdiction | National Board Number | Location | Expiration Date |
|---|---|---|---|
| 243485 | 243485 | Cloister Hotel – North Wing | 3/1/2012 |
| 243486 | 104943 | Cloister Hotel – North Wing | 3/1/2012 |
| 243487 | 106427 | Cloister Hotel – North Wing | 3/1/2012 |
| 243488 | 106451 | Cloister Hotel – South Wing | 3/1/2012 |
| 242489 | 106479 | Cloister Hotel – South Wing | 3/1/2012 |
| 243490 | 106478 | Cloister Hotel – South Wing | 3/1/2012 |
| 243491 | 108793 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243492 | 108795 | Cloister Hotel – Spa & Tennis | 3/1/2012 |

23290154v5

| 243493 | 108744 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243494 | 108796 | Cloister Hotel – Spa & Tennis | 3/1/2012 |
| 243495 | 108792 | Cloister Hotel – Spa & Tennis | 3/1/2012 |

**Other Permits/Licenses**

1. Limited Hotel Shuttle Permit, dated January 30, 2006, issued by Glynn County Airport Commission allowing Sea Island Company the nonexclusive right and privilege of providing limited ground transportation services between Brunswick Golden Isles Airport and the Sea Island Company.

2. Department of the Army Permit (No. 200501418), dated December 21, 2005, issued by Savannah District US Army Corps of Engineers allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

3. Coastal Marshlands Protection Committee Permit #508, dated October 20, 2005, issued by the Coastal Resources Division of the Georgia Department of Natural Resources allowing Sea Island Company to perform certain work to construct a marina facility at the Cloister Hotel.

4. MPLC Certificate of License renewal, dated June 3, 2010, issued by the Motion Picture Licensing Corporation allowing the Cloister Hotel – Children's Program the right under copyright law to publicly perform certain lawfully obtained motion pictures.

5. Building Permit CBUI10042 issued July 2, 2010 by the Glynn County, Georgia Building Inspection Department.

6. Department of Army Permit 074OYN dated January 8, 1990 allowing beach renourishment activities.

7. Groundwater Withdrawal Permit # 063-033 (Ocean Forest Golf Course).

8. Groundwater Withdrawal Permit #063-0021 (Island Club Golf Course).

9. Groundwater Withdrawal Permit #063-0020 (Sea Island Golf Course).

10. Groundwater Withdrawal Permit #063-0009 (Cloister Complex).

**11. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000073 (The Cloister).**

**12. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000077 (Ocean Forest).**

**13. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000074 (Beach Club) .**

**14. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000075 (Rainbow Island).**

**15. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000076 (The Lodge).**

**16. Department of Community Health, Division of Public Health Food Service Permit FS139-4224 (Davis Love III Grill).**

**17. Department of Community Health, Division of Public Health Food Service Permit FSP-063-000073 (The Cloister).**

## SECTION 3.8(b)
## Permits in Violation

None.

**SECTION 3.9(a)**
**Intellectual Property Rights**

1.     Reference is made to Schedule 2.1(i).

2.     Reference is made to the software licenses listed on Schedule 2.1(b).

**SECTION 3.9(b)**
**Intellectual Property Rights Infringements**

None.

**SECTION 3.9(c)**
**Intellectual Property Rights Licenses**

The Sea Island Company has granted a non-exclusive (except with respect to certain media rights, which may be exclusive) royalty free right and license to PGA TOUR, INC. and the Davis Love III Foundation to use the Sea Island Club logo and the name, logo and images of Seaside Golf Course in connection with the McGladrey Classic, a PGA TOUR co-sanctioned 72 hole competition to take place at the Seaside Golf Course in October 2010.

**SECTION 3.10**
**Environmental Matters**

See reports attached as <u>Exhibit E</u>.

## SECTION 3.11(a)
## Owned Real Property[3]

| DESCRIPTION | ADDRESS | TAX PARCEL |
|---|---|---|
| | | |
| **PARCEL 1** | | |
| Cloister Resort West of Sea Island Drive | 250 Service Rd Sea Island, GA 31561 | Portion of  05-00462 |
| **PARCEL 2** | | |
| Black Banks River Residences RU | 100 Black Banks Ln 90 Sea Island, GA 31561 | 05-01314 |
| **PARCEL 3** | | |
| SIBCR Condo Resort/Parking Units | N/A | 05-00822 |
| SIBCR Condo Resort/Parking Units | N/A | 05-00911 |
| **PARCEL 4** | | |
| COR Unit 1-I | 50 Dune Av 101 Sea Island, GA 31561 | 05-01150 |
| COR Unit 1-II | 50 Dune Av 1012 Sea Island, GA 31561 | 05-01151 |
| COR Unit 1-III | 50 Dune Av 1013 Sea Island, GA 31561 | 05-01152 |
| COR Unit 1-IV | 50 Dune Av 1014 Sea Island, GA 31561 | 05-01153 |
| COR Unit 2-I | 50 Dune Av 102 Sea Island, GA 31561 | 05-01154 |
| COR Unit 2-II | 50 Dune Av 1022 Sea Island, GA 31561 | 05-01155 |
| COR Unit 2-III | 50 Dune Av 1023 Sea Island, GA 31561 | 05-01156 |
| COR Unit 2-IV | 50 Dune Av 1024 Sea Island, GA 31561 | 05-01157 |
| COR Unit 4a-I | 50 Dune Av 106 Sea Island, GA 31561 | 05-01162 |
| COR Unit 4a-II | 50 Dune Av 1062 Sea Island, GA 31561 | 05-01163 |
| COR Unit 4a-III | 50 Dune Av 1063 Sea Island, GA 31561 | 05-01164 |
| COR Unit 4a-IV | 50 Dune Av 1064 Sea Island, GA 31561 | 05-01165 |
| COR Unit 4b-I | 50 Dune Av 107 Sea Island, GA 31561 | 05-01166 |
| COR Unit 4b-II | 50 Dune Av 1072 Sea Island, GA 31561 | 05-01167 |
| COR Unit 4b-III | 50 Dune Av 1073 Sea Island, GA 31561 | 05-01168 |
| COR Unit 4b-IV | 50 Dune Av 1074 Sea Island, GA 31561 | 05-01169 |
| COR Unit 6-I | 50 Dune Av 113 Sea Island, GA 31561 | 05-01174 |
| COR Unit 6-IV | 50 Dune Av 1134 Sea Island, GA 31561 | 05-01177 |
| COR Unit 7-III | 50 Dune Av 1173 Sea Island, GA 31561 | 05-01180 |
| COR Unit 7-IV | 50 Dune Av 1174 Sea Island, GA 31561 | 05-01181 |
| COR Unit 8-I | 50 Dune Av 116 Sea Island, GA 31561 | 05-01182 |
| COR Unit 8-II | 50 Dune Av 1162 Sea Island, GA 31561 | 05-01183 |
| COR Unit 8-III | 50 Dune Av 1163 Sea Island, GA 31561 | 05-01184 |
| COR Unit 8-IV | 50 Dune Av 1164 Sea Island, GA 31561 | 05-01185 |
| COR Unit 9-I | 50 Dune Av 121 Sea Island, GA 31561 | 05-01186 |
| COR Unit 9-III | 50 Dune Av 1213 Sea Island, GA 31561 | 05-01188 |
| COR Unit 10-II | 10 Dune Av 1302 Sea Island, GA 31561 | 05-01191 |
| COR Unit 10-III | 10 Dune Av 1303 Sea Island, GA 31561 | 05-01192 |
| COR Unit 10-IV | 10 Dune Av 1304 Sea Island, GA 31561 | 05-01193 |
| COR Unit 11-I | 10 Dune Av 132 Sea Island, GA 31561 | 05-01194 |
| COR Unit 11-III | 10 Dune Av 1323 Sea Island, GA 31561 | 05-01196 |
| COR Unit 12-I | 10 Dune Av 134 Sea Island, GA 31561 | 05-01198 |
| COR Unit 12-II | 10 Dune Av 1342 Sea Island, GA 31561 | 05-01199 |
| COR Unit 12-III | 10 Dune Av 1343 Sea Island, GA 31561 | 05-01200 |
| COR Unit 12-IV | 10 Dune Av 1344 Sea Island, GA 31561 | 05-01201 |
| COR Unit 14-I | 10 Dune Av 136 Sea Island, GA 31561 | 05-01202 |
| COR Unit 14-II | 10 Dune Av 1362 Sea Island, GA 31561 | 05-01203 |
| COR Unit 14-III | 10 Dune Av 1363 Sea Island, GA 31561 | 05-01204 |
| COR Unit 15-I | 10 Dune Av 137 Sea Island, GA 31561 | 05-01206 |
| COR Unit 15-II | 10 Dune Av 1372 Sea Island, GA 31561 | 05-01207 |
| COR Unit 15-III | 10 Dune Av 1373 Sea Island, GA 31561 | 05-01208 |
| COR Unit 15-IV | 10 Dune Av 1374 Sea Island, GA 31561 | 05-01209 |
| COR Unit 16-II | 10 Dune Av 1402 Sea Island, GA 31561 | 05-01211 |
| COR Unit 16-III | 10 Dune Av 1403 Sea Island, GA 31561 | 05-01212 |
| COR Unit 16-IV | 10 Dune Av 1404 Sea Island, GA 31561 | 05-01213 |
| COR Unit 17-I | 10 Dune Av 142 Sea Island, GA 31561 | 05-01214 |
| COR Unit 18-II | 10 Dune Av 1432 Sea Island, GA 31561 | 05-01219 |

---

[3] Tax parcel identification numbers in this Section 3.11(a) are for information purposes only.

| | | |
|---|---|---|
| COR Unit 18-III | 10 Dune Av 1433 Sea Island, GA 31561 | 05-01220 |
| COR Unit 18-IV | 10 Dune Av 1434 Sea Island, GA 31561 | 05-01221 |
| COR Unit 22-I | 10 Dune Av 152 Sea Island, GA 31561 | 05-01234 |
| COR Unit 22-III | 10 Dune Av 1523 Sea Island, GA 31561 | 05-01236 |
| COR Unit 22-IV | 10 Dune Av 1524 Sea Island, GA 31561 | 05-01237 |
| **PARCEL 5** | | |
| East of Sea Island Drive | N/A | Portion of 05-00462 |
| **PARCEL 6** | | |
| Strip of Oceanfront Property | N/A | Portion of 05-00462 |
| **PARCEL 7** | | |
| Roads | N/A | 05-00796 |
| **PARCEL 8** | | |
| OFOC Lot 30, Ph 9 | 14 Ocean Lane Sea Island, GA 31561 | 05-01146 |
| OFOC Lot 31, Ph 9 | 15 Ocean Lane Sea Island, GA 31561 | 05-01145 |
| **PARCEL 9** | | |
| OF Golf Cottage | 100 Ocean Road Sea Island, GA 31561 | 05-01148 |
| Acreage North of 36th Street (Ocean Forest) | N/A | Portion of 05-00001 |
| **PARCEL 10** | | |
| Sea Island Golf Course | 97 Retreat Ave, St Simons Island, GA 31522 | Portion of 04-04808 |
| Golf Retreat North Common Area | N/A | 04-02852 |
| Golf Retreat North Common Area | N/A | 04-13700 |
| Portion of Old Seaside Drive | N/A | Portion of 04-11777 |
| Lot 24, Golf Retreat North | 16 Retreat Ave, St. Simons Island, GA 31522 | 04-14185 |
| **PARCEL 11** | | |
| Retreat Golf course, club house & support facilities (120 acres Clubhouse area; 89.6 acres Golf Course, 15.9 | 168 Merion 11000 St. Simons Island, GA 31522 | 04-05967 |
| **PARCEL 13** | | |
| Black Banks Residential | N/A | 04-14249 |
| **PARCEL 14** | | |
| Admin Bldg, Salt Marsh Drive | 100 Salt Marsh Dr St. Simons Island, GA 31522 | 04-01597 |
| **PARCEL 15** | | |
| Support Campus North - Parking | N/A | 04-14220 |
| **PARCEL 18** | | |
| FT Lot 201 | 344 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13465 |
| FT Lot 219 | 297 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13432 |
| FT Lot 232 | 435 Pikes Bluff Dr St. Simons Island, GA 31522 | 04-13445 |
| FT Lot 240 | 26 Telford Lane St. Simons Island, GA 31522 | 04-13720 |
| **PARCEL 26(a) and 26(b)** | | |
| OFDC Lot 3 | 17 Forest Ln, Sea Island, GA 31561 | 05-00803 |
| OFDC Lot 6 | 426 Forest Rd, Sea Island, GA 31561 | 05-00805 |
| OFDC Lot 7 | 430 Forest Rd, Sea Island, GA 31561 | 05-00806 |
| OFDC Lot 9 | 438 Forest Rd, Sea Island, GA 31561 | 05-00748 |
| OFDC Lot 10 | 442 Forest Rd, Sea Island, GA 31561 | 05-00749 |
| OFDC Lot 12 | 420 Forest Rd, Sea Island, GA 31561 | 05-00808 |
| OFDC Lot 13 | 454 Forest Rd, Sea Island, GA 31561 | 05-00809 |
| OFDC Lot 14 | 458 Forest Rd, Sea Island, GA 31561 | 05-00810 |
| OFDC Lot 16 | 466 Forest Rd, Sea Island, GA 31561 | 05-00812 |
| OFDC Lot 17 | 470 Forest Rd, Sea Island, GA 31561 | 05-00813 |
| **PARCEL 27** | | |
| OF Common Area 9.439 AC Forest Rd | N/A | 05-00687 |
| OF Forest Cottage Expansion, remainder acreage | N/A | 05-00744 |
| OFOC Common Area - Ph 1 | N/A | 05-00693 |
| OFOC Common Area - Ph 2 | N/A | 05-00692 |
| OFOC Common Area - Ph 3 | N/A | 05-00697 |

| | | |
|---|---|---|
| OFOC Common Area - Ph 4 | N/A | 05-00715 |
| OFOC Common Area Ph 5 | N/A | 05-00734 |
| OFOC Common Areas, Ph VIII | N/A | 05-00823 |
| **PARCEL 29 and 29(a)** | | |
| OS Lot 8 | 352 Old Seaside Dr, St Simons Island, GA 31522 | 04-11785 |
| OS Lot 9 | 105 Old Seaside Ln, St Simons Island, GA 31522 | 04-11786 |
| **PARCEL 30** | | |
| 7.853 AC, Old Seaside | N/A | 04-11368 |
| Seaside Tract | N/A | Portion of 04-11777 |
| **PARCEL 31** | | |
| SI Lake Cott Lot 8 | 222 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-11405 |
| SI Lake Cott Lot 9 | 212 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-11406 |
| SI Lake Cott Lot 37 | 127 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-14165 |
| SI Lake Cott Lot 38 | 129 Sea Island Lake Cottages Dr, St Simons Island, GA 31522 | 04-14166 |
| **PARCEL 32** | | |
| Roads within SI Lake Cottages; 3.595 AC | N/A | 04-11397 |
| SI Lake Cottages Undeveloped Acreage | N/A | 04-00798 |
| **PARCEL 33** | | |
| FT Lot 202 | 348 Pikes Bluff Dr, St Simons Island, GA 31522 | 04-13464 |
| FT Lot 251 | 124 Telford Ln, St Simons Island, GA 31522 | 04-13709 |
| **PARCEL 35** | | |
| Tract 9; 6.550 total acres; "Finger" parcel | N/A | 05-01241 |
| **PARCEL 36** | | |
| Expanded Tract V, Cloister Residences East | 100 Dune Avenue, Sea Island, GA 31561 | 05-00787 |
| 1/2 TIC | | 05-01242 |
| **PARCEL 37** | | |
| Tract 1, West Point Plantation, SSI | 427 Mimosa Dr, St Simons Island, GA 31522 | 04-01009 |
| Lot 12 Marsh Point, SSI | 2023 Sea Palms W Dr, St Simons Island, GA 31522 | 04-09512 |
| Lot 19 Vassar Point | 509 Vassar Point Dr, St Simons Island, GA 31522 | 04-08447 |
| Oak Forest - Phase 2-B | 118 Brookfield Trc, St Simons Island, GA 31522 | 04-10017 |
| Black Banks | 69 Black Banks Dr, St Simons Island, GA 31522 | 04-00742 |
| **PARCEL 38** | | |
| 200 Beach Club Lane, Unit 401; BCO1 | 200 Beach Club Ln 401, Sea Island, GA 31561 | 05-01243 |
| 200 Beach Club Lane, Unit 402; BCO2 Beach Club Residences | 200 Beach Club Ln 402, Sea Island, GA 31561 | 05-01244 |
| **PARCEL 39** | | |
| Ocean Club Unit ON3 | 150 Dune Av 173, Sea Island, GA 31561 | 05-01300 |
| **PARCEL 40** | | |
| Beach Club Residences Unit GS6 | 100 Beach Club Lane, 431, Sea Island, GA 31561 | 05-01286 |
| **PARCEL 41** | | |
| Beach Club Residences GS Resort Unit | 100 Beach Club Ln 10000, Sea Island, GA 31561 | 05-01297 |
| **PARCEL 42** | | |
| Ocean Club Resort Unit | 159 Dune Av 10001, Sea Island, GA 31561 | 05-01312 |
| **PARCEL 43** | | |
| Beach Club Residences BCO Resort Unit | 200 Beach Club Ln 10001, Sea Island, GA 31561 | 05-01263 |

| | | |
|---|---|---|
| Beach Club Residences GN Resort Unit | 300 Beach Club Ln 10001, Sea Island, GA 31561 | 05-01280 |
| **PARCEL 44** | | |
| Kings Point Lot 13 | 146 Point Ln, St Simons Island, GA 31522 | 04-11178 |
| **PARCEL 45** | | |
| Kings Point Lot 15 | 145 Point Ln, St Simons Island, GA 31522 | 04-11176 |
| **PARCEL 47** | | |
| FT Lot 46 | 21 Marlin Ln, St Simons Island, GA 31522 | 04-12386 |
| **PARCEL 48** | | |
| FT Lot 131 | 185 Kirkaldy Ln, St Simons Island, GA 31522 | 04-13111 |
| **PARCEL 49** | | |
| OFDC Lot 38 | 220 Forest Rd, Sea Island, GA 31561 | 05-01313 |
| **PARCEL 50** | | |
| Woodbine | N/A | W09 01 002 |
| Woodbine | N/A | W09 01 003 |
| **PARCEL 51** | | |
| Tabby House | 1550 Frederica Rd, St Simons Island, GA 31522 | 04-02802 |
| **PARCEL 52** | | |
| 1545 AC Marsh Frederica Tract | N/A | 04-14275 |
| 6.7 AC Marsh Frederica Tract | N/A | 04-14276 |
| 1268.44 AC Marsh Cannons Point | N/A | 04-14277 |
| **PARCEL 53** | | |
| Laundry Facility - Brunswick | 3374 Cypress Mill Rd, Brunswick, GA 31520 | 01-06954 |
| **PARCEL 54** | | |
| Shooting School | 11 Sea Island Rd, St. Simons Island, GA 31522 | 05-00459 |
| Rainbow Marsh | 46 Rainbow Island Dr, St Simons Island, GA 31522 | 04-00715 |
| **PARCEL 55** | | |
| Salt Marsh and Hammocks lying to the west of the Plantation and Seaside Golf Courses and south of Kings Way | N/A | Portion of 04-02830 |
| **PARCEL 56** | | |
| South End of Sea Island | N/A | Portion of 05-00462 |
| **PARCEL 57** | | N/A |
| Salt Marsh and High Ground west of SI Subdivision No. 1 | N/A | 05-00001 |
| **PARCEL 58** | | |
| Native American Burial Ground | 315 Cedar Bank Rd, St Simons Island, GA 31522 | 04-13359 |
| **PARCEL 59** | | |
| 22nd Street Well Site | 238 W Twenty Second St 21000, Sea Island, GA 31561 | 05-00821 |
| **PARCEL 60** | | |
| Undeveloped Marsh Hamilton Landing | N/A | 04-01706 |
| Undeveloped Marsh Hamilton Hawkins Island | N/A | 04-01116 |
| **PARCEL 61** | | |
| Lanier Island | 0 FJ Torras Cswy, St Simons Island, GA 31522 | 02-00100 |
| **PARCEL 62** | | |
| SIBCR Condo Unit CC | 500 Beach Club Dr 522, Sea Island, GA 31561 | 05-00901 |
| **PARCEL 63** | | |
| 60 Acres - Camden | N/A | 118 036A |
| **PARCEL 64** | | |

23290154v5

| | | |
|---|---|---|
| 400Twitty Park lying north of Sea Island Common Area/Road | 400 Sea Island Cir St.3000 Frederica Road, St. Simons Island, GAGeorgia 31522 | 04-1024813915 |
| Marsh W of SI Rd and NE of EpworthPARCEL 65 | N/A | 04-01716 |
| Twitty ParkOld Seaside Drive in Old Seaside Subdivision, St. Simons Island, Glynn County, Georgia | N/A100 Sea Island Drive, St. Simons Island, Georgia 31522 | 04-1391511777 |
| PARCEL 66 | | |
| 400 Sea Island Drive Subdivision Streets and Buffers | 400 Sea Island Circle, St. Simons Island, Ga 31522 | 04-10248 |
| PARCEL 67 | | |
| Tract between Sea Island Road and Epworth Oaks Subdivision | 847 Sea Island Road, St. Simons Island, Georgia 31522 | 04-01716 |
| PARCEL 68 | | |
| St. Perpetua Church Lot | 115 Lawrence Road, St. Simons Island, Ga 31522 | 04-00215 |
| PARCEL 69 | | |
| Roads and Streets, St. Simons Island Club Subdivision | N/A | None (mapped as public streets) |

59

## SECTION 3.11(b)
## Acquired Owned Real Property Exceptions

1.  As to Parcels 38, 39, and 40, Sea Island Company does not now have fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing, but shall have such title at Closing.  For additional information:

    Parcel 38:  Sea Island Company owns good and valid title to membership interests in Beach Club Ocean Residences, LLC, which entitle it to require Beach Club Ocean Residences, LLC (and Beach Club Garden North Residences, LCC, and Beach Club Garden South Residences, LLC) to convey to it the real property in Parcel 38.

    Parcel 39:  Sea Island Company owns good and valid title to membership interests in Ocean Club North Residences, LLC, which entitle it to require Ocean Club North Residences, LLC, to convey to it the real property in Parcel 39.

    Parcel 40: Sea Island Company owns good and valid title to membership interests in Beach Club Garden South Residences, LLC, which entitle it to require Beach Club Garden South Residences, LLC (and Beach Club Ocean Residences, LCC, and Beach Club Garden North Residences, LLC) to convey to it the real property in Parcel 40.

2.  As to Parcels 42 and 43, Sea Island Resort Residences, LLC does not now have fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing, but shall have such title at Closing.  For additional information:

    Parcel 42: Sea Island Resort Residences, LLC owns good and valid title to membership interests in Ocean Club North Residences, LLC, which entitle it to require Ocean Club North Residences, LLC, to convey to it the real property in Parcel 42.

    Parcel 43: Sea Island Resort Residences, LLC owns good and valid title to membership interests in Beach Club Ocean Residences, LLC, and Beach Club Garden North Residences, LLC, which entitle it to require Beach Club Ocean Residences, LLC, Beach Club Garden North Residences, LLC (and Beach Club Garden South Residences, LLC) to convey to it the real property in Parcel 43.

3.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to the United States Postal Service dated March 17, 2008, as set forth in the Title Commitment.

4.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Atlantic Bike Shop, Inc. dated March 11, 2010.

5.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Steve Hightower dated November 30, 2008.

6.  As to Parcel 01, a portion of Parcel 01 is subject to a lease from Sea Island Company to Resort Photography, LLC dated March 6, 2000.

7. As to Parcel 01, a portion of Parcel 01 is subject to a Yacht Charter Agreement relating to the Cloister Belle, between Sea Island Company and Captain Brian Quinn dated August 2008.

8. As to Parcel 03, two parking units, which are currently fenced and identified by signage as reserved for use by certain Beach Club Suites as storage, are subject to agreements reserving such parking units for the benefit of the owners of such Beach Club Suites.

9. As to Parcels 05, 06, and 07, portions of such parcels are subject to a lease from Sea Island Company to Barry's Beach Service, Inc. dated June 30, 2006.

10. As to Parcels 05, 06, 07, and 54, portions of such parcels are subject to a lease from Sea Island Company to Tri H Friesians LLC dated February 4, 2010.

11. As to Parcels 06 and 07, Sea Island Company has from time to time granted licenses to owners of property on Sea Island (including Ocean Forest) and their guests and invitees to access Sea Island Beach and in some cases to maintain landscaping and/or improvements on real property owned by Sea Island Company within Parcels 06 and 07 including without limitation the rights of way of the roads on Sea Island.

12. As to Parcel 09, portions of Parcel 09 constitute common area and/or limited common area for the benefit of the owners of property within Ocean Forest.

13. As to Parcel 09, a portion of Parcel 09 is subject to a lease from Sea Island Company to Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest), as set forth in the Title Commitment.

14. As to Parcel 10, owners of lots within Old Seaside, and their guests and invitees, have been granted rights to cross the road within Parcel 10 providing access to Old Seaside and to cross the boardwalk and pathway leading from Old Seaside subdivision to the beach adjacent to the St. Simons Sound.

15. As to Parcel 10, a portion of Parcel 10 is subject to a lease from Sea Island Company to Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge), as set forth in the Title Commitment.

16. As to Parcel 11, owners of lots within Retreat (formerly St. Simons Island Club Subdivision), and their guest and invitees, have been granted rights to cross the entrance road to the subdivision crossing a portion of Parcel 11.

17. As to Parcel 15, Parcel 15 is subject to an Agreement Regarding Right of First Refusal by and between Sea Island Company and JLV-VASI, LLC. dated September 5, 2008, as set forth in the Title Commitment.

18. As to Parcel 27, portions of Parcel 27 constitute common area and/or limited common area for the benefit of the owners of property within Ocean Forest.

19. As to Parcel 32, Parcel 32 is subject to a right of first offer in the Purchase Agreement by and among Sea Island Coastal Properties LLC, Lake Cottages III, LLC, and Sea Island Company, dated July 17, 2007, which right of first offer shall be extinguished prior to Closing.

20. As to Parcel 32, portions of Parcel 32 constitute common area and/or limited common area for the benefit of the owners of property within Lake Cottages, and other portions of Parcel 32 indentified as Twitty Park are subject to the rights of others for use as a park.

21. As to Parcel 37, Parcel 37, Tract VI is subject to a lease from Sea Island Company to Alfred W. Jones, III dated October 8, 2007.

22. As to Parcel 48, Parcel 48 is subject to a Shared Equity Financing Agreement with C. Allen Brown dated April 25, 2005, as set forth in the Title Commitment.

23. As to Parcel 50, a portion of Parcel 50 is subject to a lease from Sea Island Company to Satilla River Keeper dated February 15, 2010, as set forth in the Title Commitment.

24. As to Parcel 51, Parcel 51 is subject to a lease from Sea Island Company to The Tabby House, as set forth in the Title Commitment.

25. As to Parcels 52, 55, 57, 60, and 61, such parcels are subject to existing encroachments by existing docks or other existing improvements constructed by third parties.

26. As to Parcel 54, a portion of Parcel 54 is subject to a lease from Sea Island Company to Verizon Wireless of the East dated March 8, 2004 (The Cloister), as set forth in the Title Commitment.

27. ~~As to Parcel 64, portions of Parcel 64 constitute common area and/or limited common area for the benefit of the owners of property within 400 Sea Island Road Subdivision, and other portions of Parcel 64 identified as Twitty Park are subject to the rights of others for use as a park~~**As to Parcel 64, the restrictive covenants and reversion clause set out in that certain deed from Glynn County to Sea Island Company dated April 26, 1982, recorded in the office of the Clerk of Superior Court of Glynn County, Georgia at Deed Book 23-P, Page 609 (the Parcel being affected thereby containing 0.892 acre)**.

**28. As to Parcel 65, the rights of owners of lots in Old Seaside Subdivision, their guests, invitees and licensees, to use said road for access to the lots in said subdivision.**

**29. As to Parcel 66, the rights of owners of lots in 400 Sea Island Drive Subdivision, their**

guests, invitees and licensees, to use Hamilton Island Circle for access to the lots in said subdivision.

30. As to Parcel 52, lack of a right of access to and from the land.

31. As to Parcels 52, 54, 55, 56, 57, 60 and 61, the terms and conditions of the Georgia Coastal Marshlands Protection Act of 1970 and such title claims as the State of Georgia may choose to exert to the title to salt marshes, which Act and claims may relate only to certain portions of said parcels.

32. As to Parcel 68, the inexact nature of the description of the property, and the rights of others associated with the probability of at least one grave being located upon the property.

33. As to Parcel 69, the rights of lot owners in the nine phases of St. Simons Island Club Subdivision to the streets in said phases, and that certain Agreement, dated February 20, 1989 (recorded as Exhibit A to that certain Agreement, dated April 21, 2004, between the St. Simons Island Club Property Owner's Association, Inc. and Sea Island Company on March 23, 2005 at Deed Book 1675, Page 322), between the St. Simons Island Club Property Owner's Association and Sea Island Company, whereby the Association assumed the duty and responsibility of maintaining all streets in the nine phases of St. Simons Island Subdivision.

**SECTION 3.12(a)**
**Employee Benefit Plans with Health Benefits**

1.   Postretirement Benefit Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

2.   Sea Island Company Healthgram 2010 Health Care Plan

3.   Sea Island Dental Care Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

4.   Prescription Drug Plan, contained in the Sea Island Company Healthgram 2010 Health Care Plan

5.   Starbridge Sickness and Accident Plan

6.   Long-term Care Insurance

7.   Employment Agreement by and among Sea Island Company and David Bansmer dated April 15, 2006

8.   Separation Agreement by and among Jim Brown and Sea Island Company

9.   Separation Agreement by and among Taylor Adams and Sea Island Company

**SECTION 3.14**
**Contracts**

1.   The contracts listed in Section 2.1(b) hereof.

2.   The permits and licenses listed in Section 3.8(a) hereof.

3.   Sea Island Club Membership agreements with approximately 3,000 members.

4.   Ocean Forest Membership agreements with approximately 450 members.

5.   The Employee Benefit Plans listed in Section 3.12(a) hereof and all other Employee Benefit Plans of Sellers.

6.   Certain insurance policies of Sellers.

**SECTION 3.16**
**Improvements**


Reference is made to that certain Property Condition Assessment Report prepared by Shepard Consulting Group, Inc. dated June 30, 2010 attached hereto as <u>Exhibit F</u>.

**SECTION 3.17**
**Club Documents; Membership**

See documents attached as <u>Exhibit G</u> and the list of all current Club Members of Sea Island Club Membership Program and the Ocean Forest Club Membership Program, detailing the type of membership that is applicable to each such Club Member and the amount of all refundable initiation fees paid to Sellers by each such Club Member provided in writing to Purchaser on August 4, 2010.

**SECTION 3.18**
**Financial Statements**

See financial statements attached as <u>Exhibit H</u>.

**SECTION 3.20**
**Taxes**

None.

**SECTION 5.2**
**Conduct of Business**

Sellers shall in no way be prohibited from conducting the following activities:

1.  Conducting and completing the sale or transfer of the Excluded Owned Real Property listed on <u>Schedule 2.2(c)</u> hereof.

2.  Reevaluating and reducing the principal amount of that certain loan made my Sea Island Company to Todd W. Anderson and Stacey L. Anderson pursuant to that certain Shared Equity Financing Agreement and related documents.

3.  Entering into a final Tournament Agreement with PGA TOUR, INC. and the Davis Love III Foundation in connection with the McGladrey Classic, a PGA TOUR co-sanctioned 72 hole competition to take place at the Seaside Golf Course in October 2010, provided that the licenses contained therein shall remain non-exclusive, except as to matters where Sea Island has exclusive rights to grant.

**SECTION 10.3**
**Retiree Health Benefits**

| Name | Remaining Balance in Medical Plan as of December 31, 2009 ($) | Consumed Balance in Medical Plan as of December 31, 2009 ($) |
|---|---|---|
| ADAMS, CAMILLE | 29,620 | 20,380 |
| ADAMS, CLAUDE T | 30,636 | 19,364 |
| ATKINSON, S.G. | 4,598 | 45,402 |
| BALDWIN, ULYSESS | 14,971 | 35,029 |
| BEISEL, ALICE | 16,540 | 33,460 |
| BENEFIELD, J.D. | 33,915 | 16,085 |
| BENEFIELD, MIRIAM | 36,022 | 13,978 |
| BUTLER, CALVIN | 50,000 | - |
| BUTLER, NANCY | 47,701 | 2,299 |
| BUTLER, ROBERT | 42,749 | 7,251 |
| BYARD, MARGARET | 48,359 | 1,641 |
| CASON, JULIAN | 42,836 | 7,164 |
| CLARK, ALBERT | | |
| CLARK, DONNIE | 23,543 | 26,457 |
| CLAYTON, ERNESTINE | 48,491 | 1,509 |
| CRAWFORD, PAUL | 47,055 | 2,945 |
| DAVIS, ELBA | 48,037 | 1,963 |
| DAVIS, LOUIS | 47,245 | 2,755 |
| DERKACZ, MICHAEL | 48,718 | 1,282 |
| DICKERSON, ROBERT | 44,555 | 5,445 |
| DIXON, EDNA | 45,689 | 4,311 |
| ESPANA, ANGEL | 5,562 | 44,438 |
| FLETCHER, GEORGE | 24,404 | 25,596 |
| FLETCHER, PHYLLIS | 39,238 | 10,762 |
| GALBREATH, ELVENOIR | 43,506 | 6,494 |
| GALBREATH, ELVENOIR | 46,632 | 3,368 |
| GIBSON, BILLY R. | 40,215 | 9,785 |
| GIBSON, LINDA | 43,678 | 6,322 |
| GIBSON, PATRICIA | 43,969 | 6,031 |
| GIVENS, FLORENCE | | |
| GRAHAM, MIRIAM | 48,975 | 1,025 |
| GRAHAM, W.R. | 48,705 | 1,295 |
| GROVNER, CELIA | 44,192 | 5,808 |
| HAAS, BETTY | 46,321 | 3,679 |
| HAMMETT, JANET | 47,004 | 2,996 |
| HAMMETT, WILLIE | 47,805 | 2,195 |
| HARRISON, EDWEINA | | |
| HARRISON, MAYNARD | 44,408 | 5,592 |
| HARRISON, VALERIE F. | 46,778 | 3,222 |
| HARVEY, HARRIS | 44,431 | 5,569 |
| HIGGENBOTHAM, WILLIE M. | 40,558 | 9,442 |
| HOPKINS, ALMA | 49,479 | 521 |

| | | |
|---|---|---|
| HUGHES JR, CLAUDE R | | |
| HUTCHERSON, CARLETHA | | |
| IHDE, INGEBORG | 31,744 | 18,256 |
| IHDE, WERNER | 37,458 | 12,542 |
| JOHNS, BARBARA | 48,661 | 1,339 |
| JOHNS, CODY | 44,341 | 5,659 |
| JOHNS, CODY (Larry) | 25,988 | 24,012 |
| JONES JR, IRVIN | 46,410 | 3,590 |
| JONES, ELSIE | 45,389 | 4,611 |
| JONES, JAMES | 49,323 | 677 |
| JONES, JANICE | 46,654 | 3,346 |
| JONES, SARAH | 45,928 | 4,072 |
| KUNTZ, DAVID | 32,257 | 17,743 |
| KUNTZ, MARIANNA | 18,074 | 31,926 |
| LOTT, ARCHIE | 47,217 | 2,783 |
| LOTT, WILLENE | 44,701 | 5,299 |
| MANKIN, LANOLA | | |
| MARION, ISIAH | | |
| MARION, NORMA | 35,253 | 14,747 |
| MAY, DEBORAH | | |
| MAY, ROBERT | 30,683 | 19,317 |
| MCCRARY, DENNIE | 39,426 | 10,574 |
| MCCRARY, FRANCIS | 15,695 | 34,305 |
| MCNEELY, JOYCE | 49,562 | 438 |
| MULLIS, MARY | 33,865 | 16,135 |
| NUNNALLY, HAZEL | 49,750 | 250 |
| NUNNALLY, TOMMY | | |
| O'CONNOR, KATHERINE | 15,727 | 34,273 |
| O'CONNOR, PAUL | 32,225 | 17,775 |
| OUTLAW, NETHEL R. | 49,517 | 483 |
| OWENS, RANDY | 38,080 | 11,920 |
| RAMSEY, CARTER | 38,583 | 11,417 |
| RAMSEY, JOYCE S. | 36,283 | 13,717 |
| RAULS, SHIRLEY | 30,387 | 19,613 |
| SAWYER, JANE | 46,572 | 3,428 |
| SHEDD, LOUISE | 42,752 | 7,248 |
| SMALL, LUVENIA | 43,908 | 6,092 |
| SMITH, WILLIAM C. | 34,440 | 15,560 |
| SMITH, WILLIAM C. | 45,819 | 4,181 |
| TALLEY, CARL PATRICK | 46,300 | 3,700 |
| TALLEY, CLYDE | 41,820 | 8,180 |
| TODD, ELEANOR | 36,525 | 13,475 |
| WALKER, HERCULE | 41,718 | 8,282 |
| WELLS, LENOIR | 46,903 | 3,097 |
| WICKER, GENE | | |
| WILLIAMS, JOHN | | |
| WRIGHT, E.T. | 36,633 | 13,367 |
| WRIGHT, RACHEL | 37,807 | 12,193 |

23290154v5

**SECTION 11.1(b)**
**Membership Terms**

See <u>Exhibit I</u> attached hereto.

**SECTION 12.2(f)**
**Required Consents**

None.

## SECTION 12.2(h)
### Liquor Licenses

| Location | Licensee | License Type | Products Sold |
|---|---|---|---|
| Davis Love Grill | Sea Island Company | Consumption | Beer & Liquor |
| Ocean Forest Golf Club  (Tee House) | James B. Gilbert | Retail | Beer |
| Ocean Forest Golf Club | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Forest Golf Club In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Sea Island In Room Service | Sea Island Company | Hotel In-Room Service | Beer, Wine & Liquor |
| The Lodge at Sea Island Additional Facility | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Sea Island Golf Club Snack Bar | Sea Island Company | Retail | Beer |
| Cloister Hotel Clubrooms | Sea Island Company | Consumption | Beer, Wine & Liquor |
| Cloister Hotel | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Hotel In Room Service | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Cloister Hotel  (Additional Facility, River Bar) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Black Banks Parlor | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom East | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Ballroom West | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (North) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Garden    (South) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Cloister Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Georgia Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Main Dining Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| North Patio | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| South Hospitality Suite | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Spanish Lounge Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Big George's Raw Bar and Grill | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Beach Club     (In-room) | James B. Gilbert | Hotel In-Room Service | Beer, Wine & Liquor |
| Restaurant Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Snack Bar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Miramar Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Ocean Room | James B. Gilbert | Consumption | Beer, Wine & Liquor |

75

23290154v5

| | | | |
|---|---|---|---|
| Ocean Room Terrace | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Beach Pavilion | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| Sea Island Spa    (NO SUNDAY SALES on county license) | James B. Gilbert | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Pub at Cabin Bluff | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff Additional Facility | Ellis H. Howard | Consumption | Beer, Wine & Liquor |
| The Lodge at Cabin Bluff Additional Facility (In Rm Svc) | Ellis H. Howard | Hotel In-Room Service | Beer, Wine & Liquor |

SCHEDULE 11.1(b)

## CERTAIN CHANGES TO THE SEA ISLAND CLUB
## AND OCEAN FOREST GOLF CLUB MEMBERSHIP PROGRAMS

All Club Member Agreements with members under the existing Sea Island Club and Ocean Forest Golf Club Membership Programs will be rejected in the Bankruptcy Cases pursuant to Section 365 of the Bankruptcy Code, including, without limitation, rejection of the possible option of members, which may presently exist under the existing Ocean Forest Golf Club Membership Program, to buy the club facilities.  Purchaser will honor the deposit liability owed to each existing Club Member who agrees to be bound by the terms and conditions of new membership documents to be prepared for their respective clubs by crediting the amount of such deposit liability to such member's account pursuant to the applicable New Membership Program; provided that the Purchaser's obligation to refund such credited deposit liability will be exclusively governed by the terms of the applicable New Membership Program, and not by the terms of the applicable existing Club Member Agreements that will be rejected in the Bankruptcy Cases.  Please note that those Club Members who received a credit or the benefit of any promotion upon acquiring their existing membership will only receive a credit to their new membership account in the amount of their existing membership deposit paid in cash.  **Electing Club Members will not be required to post any additional deposit amounts to join under the New Membership Programs.**

The New Membership Programs will be generally consistent with the existing Sea Island Club and Ocean Forest Golf Club Membership Programs, however, the new documentation will be more contemporary and comprehensive. A determination will have to be made concerning what categories of membership will be offered following the closing, the timing of the offerings and the pricing thereof so as to be responsive to the marketplace and grow the membership, while being sensitive to the interests of existing members. Some of the more significant changes, clarifications and reaffirmations Purchaser presently proposes are set forth below.

Sea Island Club

1.      The 30-year deposit refund obligation for ~~all members~~**each member** who ~~stay in the program will be reset effective from the date of signing up~~**joins** *under _*the *New Membership* Program **will be reset  to a date which is the later of (a) December 31, 2035** or **(b)** the ~~effective~~ date ~~of~~**which is 30 years after the member joined** the ~~New Membership Program, as applicable~~**Sea Island Club**.

2.      Limitations or caps on dues increases or fee increases, will be eliminated.    In light of this change, the Club may elect to offer preferred pricing for a member's extended family members (i.e., the member's and spouse's parents, adult children, grandchildren and their respective spouses) versus regular guests with respect to guest cards and usage fees.

3.      Until the Club has issued all of its memberships, the Club will refund one deposit for a membership on the resigned membership list (by reissuing the membership of the member

23243563v5

on the resigned membership list) for every ~~four~~**three** of its memberships that are sold (i.e., 1 in ~~5~~**4**). At such time as the Club has issued all of its memberships, each membership issued will be a resigned membership. Resigned memberships will be reissued on a first-resigned, first-reissued basis**, subject to paragraph 4 below**.

4.       Upon the death of a member, if the surviving spouse or an adult child does not succeed to the membership, the membership will be placed on the resigned wait list for refunding of the applicable deposit **below the last membership of a deceased member and above all memberships of resigning but not deceased members**.   This change will not be applied to already deceased members and their memberships shall be refunded based upon death of the member prior to the New Membership Program taking effect.

5.        The Club will reaffirm its right to offer memberships to owners of properties that are not located in a Sea Island Company development or a development that has been designated as a "Qualified Residential Development," upon terms and conditions as determined from time to time by the Club.

6.       The Club can be converted to an equity, member-owned club. Further, the Club can sell or otherwise dispose of any or all of the Club facilities.

7.       The Club will reserve the right to modify, eliminate or add to the dues options that are available for any membership category, such as single, family, national, etc.

8.       The Club will reserve the right to offer new dues categories and new membership categories having different membership joining fees, including deposits and non-refundable initiation fees, and different dues. Further, the Club will reserve the right to terminate or modify any dues category or membership category, as well as discontinue offering any dues category or membership category.

9.       Those members who presently do not pay dues as a result of an agreement arising from or in connection with a prior real estate transaction with the Sea Island Company will be obligated to commence paying dues, but at a rate equal to seventy-five percent (75%) of the applicable dues for their particular category.   This lower dues rate is not transferable to the successor member.

10.       Rental guests staying in a member's residence will be entitled to have temporary membership privileges at the Club as renters and not as guests, subject to approval and the payment of applicable fees and charges.

11.       The Club will reserve the right to, from time to time, discontinue or determine the terms of eligibility for inactive status, and to modify the terms and conditions relating to inactive status such as, for example, the duration of this status.

12.       The Club will reserve the right to enter into reciprocal use arrangements with other clubs and resorts.

13.       A membership can be transferred to an adult child during the member's lifetime or upon death, subject to the Club's approval of the adult child and payment of an administrative

2

23243563v5

fee only; a new 30-year period will start for the refund of the membership deposit. This is a one-time only right per membership. The next transfer to an adult child will require the payment of the difference between the then current membership deposit and the amount of the membership deposit previously paid for the membership in question.

14.     Members, through the Club, can exchange their membership privileges and dues obligations, on a membership year basis.

15.     The Club can issue honorary, company and other complimentary memberships on terms and conditions determined by it. These memberships shall not count against any cap or limit on the number of memberships.

Ocean Forest Golf Club

1.     The 30-year deposit refund obligation for ~~all members~~ **each member** who ~~stay in the program will be reset effective from date of sign-up~~**joins** under _the *New Membership Program* **will be reset to a date which is the later of (a) December 31, 2035** or ~~its effective~~ **(b) the** date~~, as applicable~~ **which is 30 years after the member joined the Ocean Forest Golf Club (the "Outside Refund Date")**.

2.     The refund procedure specified in the existing Ocean Forest Golf Club Membership Program will be revised to provide that until the Club has issued all of its memberships, the Club will refund one deposit for a membership on the resigned membership list (by reissuing the membership of the member on the resigned membership list) for every ~~four~~**three** of its memberships that are sold (i.e., 1 in ~~5~~**4**). At such time as the Club has issued all of its memberships, each membership issued will be a resigned membership. Resigned memberships will be reissued on a first-resigned, first-reissued basis.

3.     At the ~~end of 30 years~~**Outside Refund Date**, a member who desires to continue the membership privileges must keep their initiation deposit with the Club and continue to pay applicable dues, fees and charges. The member will then be entitled to a deposit refund ~~after another~~ *30 years* **thereafter** or earlier, upon resignation and reissuance of the membership.

4.     The obligation of the Club to refund the initiation deposit paid for a spousal membership upon the spousal member succeeding to his or her deceased spouse's primary membership in the Club or in the case of divorce, will be eliminated. Instead, the spousal membership will be placed on a resigned wait list for refunding.

5.     The Club can be converted to an equity, member-owned club. Further, the Club can sell or otherwise dispose of any or all of the Club facilities.

6.     The Club will reserve the right to modify, eliminate or add to the dues options that are available for any membership category, such as single, family, national, etc.

7.     The Club will reserve the right to offer new dues categories and new membership categories having different membership joining fees, including deposits and non-refundable

3

initiation fees, and different dues. Further, the Club will reserve the right to terminate or modify any dues category or membership category, as well as discontinue offering any dues category or membership category.

8.      A membership can be transferred to an adult child during the member's lifetime or upon death, subject to the Club's approval of the adult child and payment of an administrative fee only; with a new 30-year period starting for the refund of the initiation deposit. This is a one-time only right per membership. The next transfer to an adult child will require the payment of the difference between the then current initiation deposit and the amount of the membership deposit previously paid.

9.      The age of children who can enjoy membership privileges under a membership will be increased to 25.

10.      Membership in the Club is by invitation only.  The New ~~Member~~**Membership** Program will reaffirm that the **owner of Ocean Forest Golf** Club has the right in its sole discretion to determine eligibility criteria for admission to the Club's membership.

11.      The Club will reserve the right to issue honorary, company and other complimentary memberships on such terms and conditions as are determined by the Club, which memberships do not count against the cap on the number of primary memberships permitted.

4