**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **SEA ISLAND COMPANY,** *et al.*, | ) | **Case No. 10-21034** |
| | ) | **Jointly Administered** |
| | ) | |
| **Debtors.** | ) | **Judge John S. Dalis** |
| | ) | |

## PLAN SUPPLEMENT

NOW COME Sea Island Company; Sea Island Coastal Properties LLC; Sea Island Services, Inc.; Sea Island Resort Residences, LLC; Sea Island Apparel, LLC; First Sea Island, LLC; and SICAL, LLC (collectively, the "Debtors") and file this Plan Supplement to provide certain information supplemental to the Debtors' Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 (the "Plan"). Capitalized terms not defined herein have the meanings given to them in the Plan.

This Plan Supplement contains the following: (1) the identity of the purchaser of the Debtors' assets; (2) a designation of the Liquidation Trustee; (3) the Liquidating Trust Agreement (Exhibit A); (4) a summary of certain terms of the new Sea Island Club Membership Program, including the member dues schedule (Exhibit B); (5) a summary of certain terms of the new Ocean Forest Golf Club Membership Program, including the member dues schedule (Exhibit C); and (6) the Schedule of Assumed Contracts (Exhibit D).

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan Supplement and any attachments hereto prior to the substantial consummation of the Plan.

## The Purchaser

1.      Pursuant to the Sale and Bid Procedures Order, the Debtors conducted an auction on October 11, 2010 (the "Auction"), at which the Debtors solicited the highest and best bid for the sale of substantially all of the Debtors' assets.  At the Auction, Sea Island Acquisition LP, a limited partnership formed by investment funds managed by the global investment firms Oaktree Capital Management, L.P. and Avenue Capital Group, and Sea Island Holdings, LLC, a limited liability company formed by The Anschutz Corporation and Starwood Capital Group, each submitted multiple bids for the Debtors' assets.  After multiple rounds of bidding by each group, the two groups reached an agreement to jointly purchase the Company's assets (the "Joint Bid") and the Debtors, in consultation with the Secured Lenders and the Committee, determined that the Joint Bid was the highest and best bid for the sale of substantially all of the Debtors' assets. The consideration offered by the combined group included a cash purchase price of approximately $210,725,000, the assumption of approximately $1.7 million of additional deferred compensation claims and enhanced membership terms.  The conforming Asset Purchase Agreement may be found on the following website: http://dm.epiq11.com/seaisland.

## The Liquidation Trustee

2.      The Debtors, with the agreement of the Secured Lenders and the Committee, have appointed Robert Barnett to be the Liquidation Trustee.

## The Liquidating Trust Agreement

3.      Attached hereto as Exhibit A is the Liquidating Trust Agreement, which establishes the Liquidating Trust, defines the rights, interests and responsibilities of the Liquidating Trust and sets forth the powers and responsibilities of the Liquidation Trustee, as provided for in Sections 5.04 and 7.04 of the Plan.  The Liquidating Trust will be established for the purpose of satisfying creditors' claims by liquidating the Debtors' remaining assets

-2-

transferred to the Liquidating Trust and will distribute the proceeds of the liquidation, net of all claims, expenses, charges, liabilities and obligations of the Liquidating Trust, to holders of Allowed Claims in accordance with the terms of the Plan.

### New Sea Island Club Membership

4.      Attached hereto as <u>Exhibit B</u> is a summary of certain terms of the new Sea Island Club Membership Program, including a schedule of dues.  Before December 1, 2010, all members of Sea Island Club will receive final club documents, including a membership agreement and a form pursuant to which each member of Sea Island Club may  indicate whether he or she elects to join the new Sea Island Club.  Club Members shall have until December 31, 2010 to elect to join the new Sea Island Club.  If a member of Sea Island Club elects to join the new Sea Island Club and receives a credit for the deposit liability owed to such member pursuant to section 11.1(b) of the Asset Purchase Agreement, then his or her claim against the Debtors, the Debtors' Estates and the Liquidating Trust on account of the membership deposit liability shall be extinguished.

### New Ocean Forest Golf Club Membership

5.      Attached hereto as <u>Exhibit C</u> is a summary of certain terms of the new Ocean Forest Golf Club Membership Agreement, including a schedule of dues.  Before December 1, 2010, all members of Ocean Forest Golf Club will receive final club documents, including a membership agreement and a form pursuant to which each member of Ocean Forest Golf Club may indicate whether he or she elects to join the new Ocean Forest Golf Club.  Club Members shall have until December 31, 2010 to elect to join the new Ocean Forest Golf Club.  If a member of Ocean Forest Golf Club elects to join the new Ocean Forest Golf Club and receives a credit for the deposit liability owed to such member pursuant to section 11.1(b) of the Asset

Purchase Agreement, then his or her claim against the Debtors, the Debtors' Estates and the Liquidating Trust on account of the membership deposit liability shall be extinguished.

### Schedule of Assumed Contracts

6.      Attached hereto as <u>Exhibit D</u> is the Schedule of Assumed Contracts, which identifies the executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Purchaser.  The Plan provides that all executory contracts and unexpired leases of the Debtors shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (b) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (c) is listed on the Schedule of Assumed Contracts.

7.      The listing of a document on the Schedule of Assumed Contracts, including an insurance policy or agreement or a provider agreement, shall not constitute an admission by the Debtors that such document is an executory contract or unexpired lease or that the Debtors have any liability thereunder.

8.      As provided in the Plan, the cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Asset Purchase Agreement, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases, shall be governed by the terms and conditions of the Sale and Bid Procedures Order, the Asset Purchase Agreement, the Sale Documents, any order approving the Asset Purchase Agreement or authorizing the Sale, and other orders of the Court.  All such cure amounts shall be satisfied by the Purchaser.

9.      The Debtors reserve the right to amend the Schedule of Assumed Contracts, in consultation with the Purchaser, at any time on or prior to the Confirmation Date to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract or unexpired lease shall be deemed to be assumed and assigned or rejected, as the case may be, as of the Effective Date.  The Debtors will provide notice of any such amendment to the parties to any executory contract or unexpired lease affected thereby and an opportunity for such parties to be heard.

This 19th day of October 2010.

Respectfully submitted,

GILBERT, HARRELL, SUMERFORD &
MARTIN, P.C.

/s/ Robert M. Cunningham
Robert M. Cunningham
Georgia Bar No. 202228
rcunningham@gilbertharrelllaw.com
777 Gloucester Street, Suite 200
P.O. Box 190
Brunswick, Georgia 31521-0190
Telephone:    (912) 265-6700
Facsimile:     (912) 264-3917

and

KING & SPALDING LLP
Sarah R. Borders
Georgia Bar No. 610649
sborders@kslaw.com
Harris Winsberg
Georgia Bar No. 770892
hwinsberg@kslaw.com
Sarah L. Taub
Georgia Bar No. 556919
staub@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:      (404) 572-4600
Facsimile:      (404) 572-5128

COUNSEL FOR THE
DEBTORS-IN-POSSESSION

## EXHIBIT A

**Liquidating Trust Agreement**

# TRUST AGREEMENT

## SEA ISLAND COMPANY CREDITORS LIQUIDATION TRUST

Dated: _____, 2010

# TABLE OF CONTENTS

RECITALS ............................................................................................................................. 1

DECLARATION OF TRUST ............................................................................................... 2

I. DEFINITIONS/CONSTRUCTION ................................................................................. 2

    1.1    DEFINITIONS ................................................................................................. 2
    1.2    GENERAL CONSTRUCTION ........................................................................ 4
    1.3    INCORPORATION OF THE PLAN ............................................................... 4

II. THE TRUST ....................................................................................................................... 4

    2.1    CREATION AND NAME ............................................................................... 4
    2.2    OBJECTIVES ................................................................................................. 4
    2.3    PURPOSES ..................................................................................................... 5
    2.4    ACCEPTANCE ............................................................................................... 5
    2.5    FURTHER ASSURANCES ............................................................................. 5
    2.6    OWNERSHIP BY TRUSTEE ......................................................................... 5
    2.7    INCIDENTS OF OWNERSHIP ...................................................................... 6

III. THE TRUSTEE ............................................................................................................... 6

    3.1    NUMBER AND QUALIFICATIONS ............................................................ 6
    3.2    ACTION BY TRUSTEE ................................................................................. 6
    3.3    BINDING NATURE OF TRUSTEE'S ACTION ........................................... 6
    3.4    TERM OF SERVICE ...................................................................................... 6
    3.5    RESIGNATION ............................................................................................... 6
    3.6    REMOVAL ...................................................................................................... 6
    3.7    APPOINTMENT OF SUCCESSOR TRUSTEE ............................................. 6
    3.8    CONTINUANCE OF TRUST ......................................................................... 7
    3.9    COMPENSATION ........................................................................................... 7
    3.10   STANDARD OF CARE; INDEMNIFICATION; EXCULPATION ............... 8
    3.11   RELIANCE BY TRUSTEE ............................................................................ 9
    3.12   RELIANCE BY PERSONS DEALING WITH THE TRUST ........................ 9
    3.13   NO PERSONAL OBLIGATION FOR TRUST LIABILITIES ..................... 9
    3.14   DISCHARGE OF TRUSTEE .......................................................................... 9

IV. POWERS OF THE TRUSTEE ..................................................................................... 10

    4.1    TITLE ........................................................................................................... 10
    4.2    MANAGEMENT POWER ............................................................................ 10
    4.3    BANKRUPTCY COURT APPROVAL OF TRUSTEE ACTIONS ............. 10
    4.4    OTHER POWERS OF TRUSTEE ............................................................... 11
    4.5    REPRESENTATIVE STATUS OF TRUSTEE ........................................... 13
    4.6    RIGHTS OF ACTION/POTENTIAL RIGHTS OF ACTION/AVOIDANCE ACTIONS ............. 14
    4.7    ABANDONMENT .......................................................................................... 14
    4.8    COMMINGLING OF TRUST ASSETS ...................................................... 14
    4.9    EMPLOYMENT AND COMPENSATION OF PROFESSIONALS ............ 14
    4.10   COSTS ......................................................................................................... 15

V. OBLIGATIONS OF THE TRUSTEE ........................................................................... 15

    5.1    CONSULTATION WITH BENEFICIARIES ............................................... 15
    5.2    REPORTS AND RECORDS .......................................................................... 15
    5.3    INVESTMENT GUIDELINES ...................................................................... 15
    5.4    ACCESS TO INFORMATION BY BENEFICIARIES ................................ 16
    5.5    UNITED STATES TRUSTEE FEES AND REPORTS ................................ 16
    5.6    NO IMPLIED OBLIGATIONS .................................................................... 16
    5.7    UNKNOWN PROPERTY AND LIABILITIES ........................................... 16

5.8      TRUST COSTS ................................................................................................16

## VI. BENEFICIAL INTERESTS ........................................................................................17

6.1      ALLOCATION OF BENEFICIAL INTERESTS TO HOLDERS OF CLASS 4 CLAIMS, CLASS 5 CLAIMS AND CLASS 6 CLAIMS ..........................................................................................................17
6.2      TRANSFER OF BENEFICIAL INTERESTS .............................................................17
6.3      REGISTER ENTRIES REGARDING BENEFICIAL INTERESTS .................................17
6.4      ALLOCATION OF BENEFICIAL INTERESTS TO HOLDERS OF DISPUTED CLAIMS OR INTERESTS ..................18
6.5      REPRESENTATION OF BENEFICIAL INTEREST ....................................................18
6.6      TRUST REGISTER .............................................................................................18

## VII. DISTRIBUTION OF THE TRUST ESTATE .......................................................18

7.1      ESTABLISHMENT OF RESERVE ..........................................................................18
7.2      DISTRIBUTIONS TO HOLDERS OF BENEFICIAL INTERESTS ................................19
7.3      DISPUTED CLAIMS ...........................................................................................21

## VIII. TAX MATTERS ....................................................................................................22

8.1      CERTAIN INCOME TAX MATTERS .....................................................................22
8.2      TREATMENT OF TRUST ASSETS FOR TAX PURPOSES ........................................23
8.3      WITHHOLDING .................................................................................................23
8.4      ALLOCATION OF INCOME AND LOSSES .............................................................23
8.5      TAX TREATMENT OF TRUST ASSETS AND INCOME/LOSS ATTRIBUTABLE TO DISPUTED CLAIMS .............24

## IX. TERMINATION ........................................................................................................24

9.1      DURATION .......................................................................................................24
9.2      DISTRIBUTION OF TRUST ASSETS .....................................................................25

## X. MISCELLANEOUS .....................................................................................................25

10.1     NOTICES ..........................................................................................................25
10.2     TRANSFEREE LIABILITIES .................................................................................26
10.3     AMENDMENT ...................................................................................................26
10.4     COUNTERPARTS ...............................................................................................26
10.5     GOVERNING LAW; SEVERABILITY .....................................................................26
10.6     HEADINGS ........................................................................................................26
10.7     RELATIONSHIP TO PLAN ...................................................................................26
10.7     CONSENT TO JURISDICTION .............................................................................27

## TRUST AGREEMENT
## SEA ISLAND COMPANY CREDITORS LIQUIDATION TRUST

THIS TRUST AGREEMENT (the "Trust Agreement") is made as of this _____ day of _____ 2010 by and between SEA ISLAND COMPANY, SEA ISLAND COASTAL PROPERTIES, LLC, SEA ISLAND SERVICES, INC., SEA ISLAND RESORT RESIDENCES, LLC, SEA ISLAND APPAREL, LLC, FIRST SEA ISLAND, LLC AND SICAL, LLC (each a "Debtor" and collectively, the "Debtors"), for the benefit of the Beneficiaries (as hereinafter defined), and Robert Barnett, as Trustee ("Trustee").

## RECITALS

WHEREAS, on August 10, 2010, each Debtor filed with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, the Debtors filed their Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 (and as may be amended, the "Plan"), which was confirmed by the Bankruptcy Court on November __, 2010;

WHEREAS, this Trust Agreement is the "Liquidating Trust Agreement" under the Plan that is executed in order to facilitate implementation of the Plan;

WHEREAS, the Trust (as defined herein) is established to receive certain Property of the Debtors and Cash from the Secured Lenders and to distribute such Property and Cash to certain Creditors each in accordance with the Plan; and

WHEREAS, except as otherwise provided in the Plan with respect to Cash, including Sections 3.03, 3.04, 3.05, 3.06 and 3.07 and 3.08 of the Plan, and pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, the Trust shall receive all Property comprising the Estates of the Debtors (including, but not limited to the Accepting Unsecured Creditors Fund and the General Unsecured Creditors Fund) not conveyed to the Purchaser under the Asset Purchase Agreement (each as hereinafter defined) other than Property escrowed pursuant to the Confirmation Order for payment of certain claims under the Plan (the "Trust Assets") so that (i) the Trust Assets can be held in trust for the benefit of the Beneficiaries entitled thereto as a liquidating trust in accordance with Treasury Regulation section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan, (ii) the Claims can be resolved, (iii) distributions may be made in accordance with the Plan, (iv) the Trust Assets can be liquidated, and (v) administrative services relating to the activities of the Trust and relating to the implementation of the Plan can be performed by the Trustee; and

WHEREAS, the Trust Assets shall automatically vest in the Trust, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date (each as defined in the Plan), with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the

rights of Holders of Allowed Accepting Unsecured Claims, Other General Unsecured Claims and Convenience Claims (each as defined in the Plan) to obtain distributions provided for in the Plan.  In no event shall any property of any kind be returned by, or otherwise transferred from, the Trust to any Debtor; provided, however, if Property is improperly transferred to the Trust, such Property shall be transferred to the appropriate party.

## DECLARATION OF TRUST

NOW, THEREFORE, to declare the terms and conditions hereof, and in consideration of the premises, the confirmation of the Plan pursuant to the Bankruptcy Code, and of other good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the Debtors and the Trustee have executed this Trust Agreement for the benefit of the respective Beneficiaries entitled to the Trust Assets, and, at the direction of such Beneficiaries (because the transfer of title to undivided interests in each of the Trust Assets to such Beneficiaries would be impractical), absolutely and irrevocably hereby assign to the Trustee hereby, and to its successors or assigns, all right, title, and interest of the Debtors in and to the Trust Assets as provided for in the Plan;

TO HAVE AND TO HOLD unto the Trustee and its successors in trust and its successors and assigns;

IN TRUST NEVERTHELESS, under and subject to the terms and conditions set forth herein and for the benefit of the Beneficiaries of the Trust, and for the performance of and compliance with the terms hereof and of the Plan;

PROVIDED, HOWEVER, that upon termination of the Trust in accordance with Article IX hereof, this Trust Agreement shall cease, terminate, and be of no further force and effect.

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the Trust Assets conveyed hereby are to be held and applied by the Trustee subject to the further covenants, conditions, and terms set forth below.

## I.  DEFINITIONS/CONSTRUCTION

**1.1**   **Definitions**.   Unless otherwise defined in this Trust Agreement, capitalized terms used herein have the meanings assigned to such terms in the Plan.

Notwithstanding the foregoing, capitalized terms as used in this Trust Agreement shall have the following meanings:

(a)   "Available Cash" means Trust Cash less any Trust Cash held in the Operating Reserve.

(b)    "Beneficial Interests" means the beneficial interests in the Trust Assets that shall be allocated to the Beneficiaries pursuant to this Trust Agreement.

(c)    "Beneficiaries" means the holders of Allowed Claims under Classes 4, 5 and 6.

(d)    "Disputed Claims" means the Class 4, Class 5 or Class 6 Claims of Creditors that have not been allowed or disallowed by Final Order of the Bankruptcy Court.  The estimated amount of Disputed Claims shall be set by the Bankruptcy Court after the Effective Date.

(e)    "Estate Representative" means a person who is a representative of the Debtors' Estates under §1123(a)(5), (1)(7) and (b)(3)(B) of the Bankruptcy Code, and who will have the rights and powers of a trustee appointed under section 1104 of the Bankruptcy Code except to the extent specifically limited by the Plan or this Trust Agreement.

(f)    "Operating Reserve" means that certain reserve of Trust Cash to be established by the Trustee pursuant to this Trust Agreement.

(g)    "Trust" means the "Liquidating Trust" under the Plan and is the Trust created by this Trust Agreement.

(h)    "Trust Agreement" means the "Liquidating Trust Agreement" under the Plan, and is this Trust Agreement.

(i)    "Trust Assets" means the "Property" comprising the "Estates" of the Debtors (including, but not limited to the "Accepting Unsecured Creditors Fund" and the "General Unsecured Creditors Fund") not conveyed to the "Purchaser" under the "Asset Purchase Agreement", each as under the Plan, less amounts required to be paid under the Confirmation Order (including any applicable reserves for such amounts and the amounts required to be paid to the Secured Lenders), and are the Trust Assets subject to this Trust Agreement.

(j)    "Trust Cash" means all Cash received and held by the Trust.

(k)    "Trust Cost" means all costs, expenses, liabilities and obligations incurred by the Trust and Trustee in administering and conducting the affairs of the Trust, and those incurred by the Trust and the Trustee in otherwise carrying out the terms of the Trust and the Plan on behalf of the Trust and the Debtors, including without limitation, any taxes owed by the Trust, the fees and expenses of the Trustee and professionals and other persons employed by the Trust or Trustee, and the expenses and obligations otherwise defined as a Trust Cost in this Trust Agreement or the Plan.

(l)      "Trustee" means the "Liquidation Trustee" under the Plan, and is the Trustee under this Trust Agreement.

**1.2      General Construction**.  As used in this Trust Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply.   "Includes" and "including" are not limiting, and "or" is not exclusive.   References to "Articles," "Sections" and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections, and other subdivisions of this Trust Agreement, and the words "herein," "hereafter," and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section, or subdivision of this Trust Agreement.

**1.3      Incorporation of the Plan**.   The Plan is hereby incorporated into this Trust Agreement and made a part hereof by this reference; provided, however, that in the event of any conflict between the terms of the Plan and this Trust Agreement, the terms of the Plan will control and govern.   A true and complete copy of the Plan is attached hereto as Exhibit A.

## II.  THE TRUST

**2.1      Creation and Name**.   There is hereby created the Trust, which shall be known as the "Sea Island Company Creditors Liquidation Trust", and is the same Trust referred to as the "Liquidating Trust" under the Plan.   The Trustee may conduct the affairs of the Trust under the name of "SIC Creditors Liquidation Trust."

**2.2      Objectives**.  The Trust established pursuant to this Trust Agreement is for the purpose of satisfying claims by liquidating the Trust Assets transferred to it and the Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.  The purpose of the Trust is to provide a mechanism for the liquidation of the Trust Assets, and to distribute the proceeds of the liquidation, net of all claims, expenses, charges, liabilities, and obligations of the Trust to the Beneficiaries holding certain Allowed Claims in accordance with the terms of the Plan.  No business activities will be conducted by the Trust other than those associated with or related to the liquidation of the Trust Assets.  It is intended that the Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.  In furtherance of this objective, the Trustee shall, in its business judgment, make continuing best efforts to (i) dispose of or liquidate the Trust Assets and resolve claims, (ii) make timely distributions as determined by the Trustee and approved by the Bankruptcy Court, and (iii) not unduly prolong the duration of the Trust, in accordance with this Trust Agreement.

**2.3**   **Purposes**.  The purposes of the Trust include, but are not limited to the following, in accordance with the Plan:

(a)   to make payments to holders of Allowed Claims under Classes 4, 5 and 6 of the Plan as are required under the terms of the Plan and this Trust Agreement;

(b)   to marshal, liquidate, sell, abandon, and distribute the Trust Assets and proceeds thereof in an expeditious but orderly manner in accordance with the terms of the Plan and this Trust Agreement;

(c)   to perform the functions and take the actions provided for or permitted by this Trust Agreement and the Plan and in any other agreement executed by the Trustee for the Trust pursuant to the Plan;

(d)   to prosecute, settle, release, or abandon the Retained Actions (subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan), and other causes of action transferred and assigned to the Trust under the Plan as Trust Assets and to distribute the proceeds of any recoveries thereon in accordance with the terms of the Plan and this Trust Agreement; and

(e)   to reconcile, object to, prosecute, or settle all Claims against the Debtors under Classes 4, 5 and 6 of the Plan for purposes of determining the appropriate amount of distributions to be made hereunder to the Beneficiaries under the terms and conditions set forth in this Trust Agreement and by the Debtors under the Plan.

**2.4**   **Acceptance**.  The Trustee accepts the Trust imposed by this Trust Agreement and agrees to observe and perform that Trust, on and subject to the terms and conditions set forth in the Trust Agreement and in the Plan.

**2.5**   **Further Assurances**.  The Debtors (and any successors thereto) will, upon reasonable request of the Trustee, execute, acknowledge, and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Trustee any portion of the Trust Assets intended to be conveyed hereby and in the form and manner provided for in the Plan and to vest in the Trustee the powers, instruments, or funds in trust hereunder.

**2.6**   **Ownership by Trustee**.  The Trustee may record or register in its name, as Trustee, or in the name or names of any nominee or Person in accordance with section 4.1 hereof, ownership of and title to all Trust Assets received by it as Trustee and comply with all provisions of law that may bear on the evidencing of ownership of and title to any portion of the Trust Assets as are necessary and appropriate and that the Trustee determines are in the best interests of the Trust.

**2.7**   **Incidents of Ownership**.   The Beneficiaries shall be the sole beneficiaries of the Trust and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## III.  THE TRUSTEE

**3.1**   **Number and Qualifications**.   There is one Trustee of the Trust.   The Trustee is Robert Barnett, the person appointed by the Bankruptcy Court as Trustee in the Confirmation Order.  The Trustee shall give a bond or a surety to the extent required by the Bankruptcy Court in the Confirmation Order.  All costs and expenses of procuring any such bond shall be paid as a Trust Cost.  The Trustee shall be entitled to engage in such other activities as the Trustee deems appropriate that are not in conflict with the interests of the Trust.

**3.2**   **Action by Trustee**.   The Trust shall be managed by the Trustee as set forth in this Trust Agreement.

**3.3**   **Binding Nature of Trustee's Action**.   All actions taken and determinations made by the Trustee hereunder in accordance with the provisions of the Plan or this Trust Agreement shall be final and binding upon any and all Beneficiaries.

**3.4**   **Term of Service**.  The Trustee shall serve as the Trustee for the duration of the Trust, subject to earlier death, resignation, or removal.

**3.5**   **Resignation**.   The Trustee may resign as Trustee of the Trust by an instrument in writing delivered to the Bankruptcy Court and Beneficiaries at least 60 days before the proposed effective date of resignation.  The Trustee shall continue to serve as Trustee after the delivery of the Trustee's resignation until the proposed effective date, unless the Trustee consents to an earlier effective date, which shall be the date of appointment of a successor Trustee in accordance with section 3.7 hereof becomes effective.

**3.6**   **Removal.** The Trustee may be removed from office for (i) willful fraud or willful misconduct in connection with the affairs of the Trust, (ii) for such physical or mental disability as substantially prevents the Trustee from performing the duties of Trustee hereunder, or (iii) for cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clauses (i) and (ii), and in each case, upon order and finding of the Bankruptcy Court.

**3.7**   **Appointment of Successor Trustee.**

3.7.1  Appointment of Successor Trustee.  In the event of a vacancy by reason of the death or removal of the Trustee or prospective vacancy by reason of resignation, a successor Trustee shall be appointed by the Bankruptcy Court.  The Bankruptcy Court shall appoint a successor Trustee as soon as practicable, but in any

event within 60 days after the occurrence of the vacancy or, in the case of resignation, at least 40 days before the proposed resignation.  Beneficiaries and the retiring Trustee shall have the right to nominate a successor trustee for appointment by the Bankruptcy Court.

3.7.2   Vesting of Rights in Successor Trustee.  Every successor Trustee appointed hereunder shall execute, acknowledge, and deliver to the Trust, the retiring Trustee, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Trustee shall provide a bond or surety to the extent required by the Bankruptcy Court.  The successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee, except that the successor Trustee shall not be liable for the acts or omissions of the retiring Trustee.  In no event shall the retiring Trustee be liable for the acts or omissions of the successor Trustee.

3.8   **Continuance of Trust**.  The death, resignation, or removal of the Trustee shall not operate to terminate the Trust created by this Trust Agreement or to revoke any existing agency (other than any agency of the Trustee as the Trustee) created pursuant to the terms of this Trust Agreement or invalidate any action taken by the Trustee.  In the event of the resignation or removal of the Trustee, the Trustee shall promptly (i) execute and deliver by the effective date of resignation or removal such documents, instruments, and other writings as may be reasonably requested by the successor Trustee to effect the termination of the resigning or removed Trustee's capacity under this Trust Agreement and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee; (ii) deliver to the successor Trustee all documents, instruments, records, and  other writings relating to the Trust as may be in the possession or under the control of the resigning or removed Trustee, provided, the resigning or removed Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Trustee and the cost of making such copies shall be a Trust Cost to be paid by the Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee, provided that the fees and expenses of such assistance and cooperation shall be paid to the resigning or removed Trustee by the Trust as a Trust Cost.  The resigning or removed Trustee hereby irrevocably appoints the successor Trustee as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this section 3.8.  Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment.

3.9   **Compensation**.  As compensation for services as Trustee hereunder, and any other services rendered by the Trustee in connection with the Plan, this Trust Agreement or the Debtors, the Trustee shall receive the following compensation:  $_____ per hour, adjusted annually upward or downward to reflect the prevailing rate that Trustee charges to other large corporate clients.  The Trustee will also be reimbursed for reasonable and necessary expenses.

Compensation of any successor Trustee shall be determined prior to the time of the Trustee's appointment by the Bankruptcy Court.  The compensation and expenses of the Trustee shall constitute a Trust Cost that will be paid by the Trust.

**3.10    Standard of Care; Indemnification; Exculpation**.

(a) The Trustee, acting in the capacity as the Trustee, on behalf of the Debtors, or in any other capacity contemplated by this Trust Agreement or the Plan, shall not be personally liable to the Trust or to any other Person (including Beneficiaries) in connection with the affairs of the Trust or the Debtors unless it is ultimately determined by Final Order that the Trustee's acts or omissions constituted willful fraud, willful misconduct, or gross negligence.  The employees, agents and professionals retained by the Trustee shall not be personally liable to the Trust or any other Person (including Beneficiaries) in connection with the affairs of the Trust or the Debtors, unless it is ultimately determined by Final Order that such acts or omissions by such employee, agent or professional constituted willful fraud, willful misconduct, or gross negligence. In no event shall the Trust or the Trustee, or employees, agents and professionals of the Trust or Trustee, be liable to any Person (including Beneficiaries) if the action or inaction of the Trustee or the Debtors is authorized by the Bankruptcy Court, or if the Trustee takes any action or fails to take any action in good faith with a reasonable basis for taking such action or not taking such action.  The Trustee shall not be personally liable to the Trust or to any Person for the acts or omissions of any employee, agent or professional of the Trust or Trustee unless it is ultimately determined by Final Order that the Trustee acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Trust.

(b)    The Trustee (including each former Trustee) shall be indemnified by the Trust against and held harmless by the Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorney fees, disbursements, and related expenses) to which the Trustee may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against the Trustee in connection with any matter arising out of or related to the Plan,  this Trust Agreement, or the affairs of the Trust or the Debtors, unless it is ultimately determined by Final Order that the acts or omissions of the Trustee constituted willful fraud, willful misconduct, or gross negligence.  If the Trustee becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Trust Agreement or the affairs of the Trust or the Debtors, the Trust shall periodically advance or otherwise reimburse on demand the reasonable legal and other expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and related expenses) of the Trustee incurred in connection therewith as a Trust Cost, but the Trustee shall be required to repay promptly to the Trust the amount of any such advanced or reimbursed expenses paid to the Trustee to the extent that it shall be ultimately determined by Final Order that the Trustee engaged in willful fraud, willful misconduct, or gross negligence in connection with the affairs of the Trust or the Debtors with respect to which such

expenses were paid.  The Trust shall indemnify and hold harmless the officers, employees, agents, affiliates, and professionals of the Trust and the Trustee to the same extent as provided in this <u>section 3.10</u> for the Trustee.  The provisions of this <u>section 3.10</u> shall remain available to any former Trustee or the estate of any decedent Trustee.  The indemnification provided hereby shall be a Trust Cost.

**3.11**   **Reliance by Trustee**.  The Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other instrument or document that the Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Trustee may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein.  The Trustee may consult with counsel, and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee in accordance therewith.  The Trustee shall have the right at any time to seek instructions from the Bankruptcy Court or any other court of competent jurisdiction concerning the Trust Assets, this Trust Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Trustee in accordance therewith.

**3.12**   **Reliance by Persons Dealing With the Trust**.  In the absence of actual knowledge to the contrary, any Person dealing with the Trust shall be entitled to rely on the authority of the Trustee to act in connection with the acquisition, management, sale, liquidation, or disposition of Trust Assets and shall have no obligation to inquire into the existence of such authority.

**3.13**   **No Personal Obligation for Trust Liabilities**.  Persons dealing with the Trustee in matters relating to the Trust shall have recourse only against the Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Trust Agreement or the Plan, and the Trustee shall have no personal or individual obligation to satisfy such liability.

**3.14**   **Discharge of Trustee.**

3.14.1 <u>Statement of Discharge</u>.  The Trustee shall upon termination of the Trust or upon the Trustee's resignation or removal render a statement of discharge containing the following information: (i) the Trust Assets originally charged under the Trustee's control, (ii) a summarized accounting, in sufficient detail, of all purchases, sales, gains, losses, and income in connection with the Trust during the Trustee's term of service, and (iii) the ending balance of all assets and funds of the Trust as of the date of discharge.

3.14.2 <u>Approval of Statement of Discharge</u>.  The statement of discharge required by <u>section 3.14.1</u> hereof shall be presented to the Bankruptcy Court for approval.  Upon approval by the Bankruptcy Court, the withdrawing Trustee shall be

discharged from all liability to the Trust, Beneficiaries and all Persons for acts or omissions in the Trustee's capacity as the Trustee or in any other capacity contemplated by this Trust Agreement or the Plan. The expenses of any accounting, including, but not limited to any statement of discharge hereunder and obtaining approval from the Bankruptcy Court, shall be a Trust Cost.

## IV.  POWERS OF THE TRUSTEE

**4.1**   **Title**.  Legal title to all Trust Assets shall be vested in the Trustee, except that the Trustee shall have the power to cause legal title (or evidence of title) to any of the Trust Assets to be held by any nominee or Person, on such terms, in such manner, and with such powers as the Trustee may determine.

**4.2**   **Management Power**.  The Trustee shall have control and authority over the Trust Assets, including the Retained Actions over the management and disposition thereof, and over the management of the Trust to the same extent as if the Trustee were the sole owner thereof in its own right.

**4.3**   **Bankruptcy Court Approval of Trustee Actions.**

(a)   Except as provided in the Plan or otherwise specified in the Trust Agreement, the Trustee need not obtain the order or approval of the Bankruptcy Court in the exercise of any power, rights, or discretion conferred hereunder, or account to the Bankruptcy Court.  The Trustee shall exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Trust Assets and distributions, giving due regard to the cost, risk, and delay of any course of action.

(b)   Notwithstanding the foregoing, the Trustee, in its sole discretion and judgment, shall have the right to submit to the Bankruptcy Court any question or questions regarding which the Trustee may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Trustee with respect to the Trust Assets, this Trust Agreement, the Plan, or the Debtors, including the administration and distribution of the Trust Assets.  The Bankruptcy Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon motion by the Trustee.

(c)   Unless otherwise directed by the Bankruptcy Court or expressly provided in this Trust Agreement, notice of any motion by the Trustee under any provision of this Trust Agreement need only be given to Beneficiaries, the United States Trustee and any Person named in the motion.  Any such proposed action submitted to the Bankruptcy Court for approval by motion may be approved by the Bankruptcy Court if no person having standing to do so objects to such motion within 20 days of service of the motion. If there are objections by any person having standing to object to such action by the Trustee, the Bankruptcy Court shall approve or disapprove such action after hearing. Upon approval of a proposed action by the Bankruptcy Court by order, the Trustee shall be authorized to take the proposed action without any liability with respect thereto.  If

such action is not approved by the Bankruptcy Court, the Trustee shall not take such action, without any liability with respect thereto.

(d)     In addition, the Trustee shall specifically have the power and authority to seek Bankruptcy Court approval to sell any Trust Asset free and clear of all liens, claims and encumbrances.

### 4.4     Other Powers of Trustee.

In connection with the management and use of the Trust Assets and administration of the Trust, the Trustee's powers, except as otherwise expressly limited in this Trust Agreement or the Plan, shall include, but not be limited to, the following:

(i)     to accept, preserve and protect the Trust Assets;

(ii)    to review, reconcile, settle, object to, or request estimation under section 502(c) of the Bankruptcy Code of, Claims against Debtors in Classes 4, 5 and 6, and to succeed to the Debtors in the pursuit of any pending objections, estimation requests, or proceedings relating to such Claims after the Effective Date;

(iii)   except to the extent that any Claim is Allowed, to set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Trustee may have against such Creditors;

(iv)    to investigate and, if appropriate, prosecute, settle, release or abandon the Retained Actions;

(v)     to make or cause to be made distributions of Available Cash in accordance with the terms of this Trust Agreement and the Plan;

(vi)    to manage, liquidate, sell, assign, transfer, or deal in any other manner with the Trust Assets or any part thereof or any interest therein, and to sell and dispose of the Trust Assets for cash or upon such terms and for such consideration as the Trustee deems proper in its discretion;

(vii)   to investigate, prosecute, defend, resolve and settle any litigation relating to the Trust;

(viii)  to engage in all acts that would constitute ordinary performance of the obligations of a trustee under a liquidating trust, and to file all returns of the Trust as a grantor trust for the Beneficiaries pursuant

to Treasury Regulation section 1.671-4(a) or (b) and any other tax returns that may be required with respect to the Trust;

(ix)   to, on behalf of the Trust and Trustee, appoint, engage, employ, supervise, and compensate employees, and other Persons as may be necessary or desirable, including managers, consultants, accountants, and attorneys;

(x)   to open and take all actions with respect to bank accounts on behalf of and in the name of the Trust;

(xi)   to invest and reinvest Trust Cash, pending distribution, and to liquidate such investments;

(xii)   to pay any taxes owed by the Trust, or that may be paid by the Trust on behalf of the holders of Disputed Claims (both of which shall be considered a Trust Cost), and execute, deliver, and perform any closing agreement made with the IRS, with respect to the Debtors or the Trust;

(xiii)   to determine the manner of ascertainment of income and principal, and the apportionment of income and principal, and the apportionment between income and principal of all receipts and disbursements, and to select an annual accounting period, for the Trust;

(xiv)   to appear and participate in any proceeding before the Bankruptcy Court or any other court with respect to any matter regarding or relating to the Chapter 11 Cases, the Plan, or the Trust and be entitled to notice and opportunity for a hearing on all such issues;

(xv)   to establish such funds, reserves and accounts within the Trust estate, as deemed by the Trustee in its discretion to be useful in carrying out the purposes of the Trust;

(xvi)   to sue, defend, and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding (including adversary proceedings and other contested matters) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere;

(xvii)   to delegate any or all of the discretionary power and authority herein conferred at any time with respect to all or any portion of the Trust estate to any one or more reputable individuals, without liability for any action taken or omission made because of any such delegation, except as provided in section 3.10 hereof;

(xviii)  to consult with the Beneficiaries at such times and with respect to such issues relating to the conduct of the Trust as the Trustee considers desirable and in accordance with the terms of the Trust Agreement;

(xix)  to pay all fees, expenses, debts and liabilities of the Trust, including Trust Costs;

(xx)  to execute, deliver and perform such other agreements and documents and to take or cause to be taken any and all such other actions as it may deem necessary or desirable to effectuate and carry out the purposes of this Trust Agreement;

(xxi)  to undertake any action or perform any obligation provided for or required by the Plan;

(xxii)  to terminate this Trust with approval of the Bankruptcy Court;

(xxiii)  to seek to close the Chapter 11 Cases pursuant to 11 U.S.C. § 305(a) and the Plan;

(xxiv)  to exercise such other powers and duties as necessary or appropriate in the discretion of the Trustee to accomplish the purposes of the Trust as set forth herein and in the Plan; and

(xxv)  to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate.

**4.5**  **Representative Status of Trustee**.  The Trustee will directly and indirectly be an Estate Representative and will have the rights and powers provided for in the Bankruptcy Code, including section 1107 thereof, in addition to all rights and powers granted in this Trust Agreement.  The Trustee will be the successor-in-interest to the Debtors with respect to any Retained Action which was or could have been commenced by the Debtors prior to the Effective Date, and shall be deemed substituted for the Debtors as the party in such action.  All Retained Actions are preserved and retained and may be enforced by the Trustee as an Estate Representative, subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan.

**4.6** **Rights of Action/Potential Rights of Action/Avoidance Actions**.

4.6.1 Investigation and Pursuit.

(a) The Trustee shall have the authority to investigate, evaluate, and if appropriate, prosecute and pursue the Retained Actions. Notwithstanding the foregoing, the Trustee shall be required to pursue a Retained Action only to the extent the Trustee, in its discretion, deems reasonable and appropriate. In making its decision to pursue or not pursue a Retained Action, the Trustee shall be entitled to consider the merits, cost, potential benefit (including the ability to collect), litigation risk, and delay of pursuing any such action.

(b) Nothing contained in this Trust Agreement or the Plan shall be construed as (i) obligating or requiring the Trustee to evaluate, investigate, or pursue every Retained Action; or (ii) obligating or requiring the Trustee to seek Bankruptcy Court approval of any decision by the Trustee not to pursue a Retained Action.

4.6.2 Compromise and Settlement.

The Trustee may compromise, settle or release a Retained Action upon approval of the Bankruptcy Court following motion by the Trustee and with notice and opportunity to object by the Beneficiaries and United States Trustee. Any such compromise and settlement shall be approved or disapproved by the Bankruptcy Court utilizing the standards set forth in Bankruptcy Rule 9019 and related case law.

**4.7** **Abandonment**. The Trustee may abandon any Trust Asset upon approval of the Bankruptcy Court following motion by the Trustee and with notice and opportunity to object by the Beneficiaries and the United States Trustee.

**4.8** **Commingling of Trust Assets**. The Trustee shall not commingle any of the Trust Assets with its own property or the property of any other Person.

**4.9** **Employment and Compensation of Professionals**.

(a) The Trustee shall have the authority to employ and compensate attorneys, accountants, managers, employees, financial advisors, experts, investment advisors and other professionals as determined from time to time by the Trustee to render services for the Trust or the Trustee. Specifically, the Trustee shall have the right to employ professional retained by the Debtors or the Official Committee of Unsecured Creditors during the Chapter 11 Cases, as well as firms with which the Trustee is associated. The Trustee shall also have the right to retain professionals on such terms and conditions as the Trustee deems reasonable, including contingency-based fee and expense arrangements for prosecution of Retained Actions.

(b) The Trustee shall pay the reasonable fees and expenses of such professionals and persons set forth in section 4.10(a) hereof as a Trust Cost without

need for approval of the Bankruptcy Court.  The Trustee will have the duty and responsibility for reviewing and approving such fees and expenses.

**4.10**  **Costs**.  All fees, costs and expenses incurred by the Trustee and the Trust in the exercise of any right, power or authority conferred by <u>section 4</u> hereof shall be as a Trust Cost.

# V.  OBLIGATIONS OF THE TRUSTEE

**5.1**  **Consultation with Beneficiaries**.  The Trustee shall have the right, but not the obligation, to consult in good faith with the Beneficiaries regarding all material issues affecting the Trust, including the resolution of Claims, the pursuit of Retained Actions, and the disposition of Trust Assets.

**5.2**  **Reports and Records.**

5.2.1  Quarterly Reports.  The Trustee shall cause to be prepared within 90 days after the end of each fiscal quarter (for such fiscal quarter), financial statements of the Trust as of the end of and for such periods, including (i) a statement of assets and liabilities, (ii) a statement of cash receipts and disbursements, (iii) a schedule, summarizing by type of investment and asset, all acquisitions and dispositions, and (iv) a summary listing of the status of the resolution of Claims for such fiscal year and disposition of Trust Assets.  In addition, such financial statements shall contain the following supplementary information: (A) a statement of the Beneficial Interests outstanding, (B) the amount of distributions to Beneficiaries, and (C) a schedule of expenses of the Trust, including Trust Costs.

5.2.2  Records.  The Trustee shall maintain records and books of account relating to the Trust Assets, the management thereof and all transactions undertaken by the Trustee.  The Trustee shall also maintain records and books of account relating to all distributions contemplated under the Plan and this Trust Agreement.

**5.3**  **Investment Guidelines**.  Trust Cash held pending distribution, including Trust Cash held in reserves, shall, to the extent permitted by applicable law, be invested by the Trustee in (i) direct obligations of, or obligations guaranteed by, or obligations secured by, the United States of America (including without limitation United States Treasury Bills); (ii) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an Act of the Congress of the United States as an agency or instrumentality thereof, or (iii) demand deposits or short-term certificates of deposit at any bank or financial institution approved by the United States Trustee.  However, the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d) may be permitted to hold, pursuant to any amendment or addition to the Internal Revenue Code or to the Treasury Regulations, or any modification in IRS

guidelines whether set forth in IRS rulings, other IRS pronouncements, or otherwise. Such investments shall mature in such amounts and at such times as, in the judgment of the Trustee at the times such investments are made, are necessary, or are desirable with a view to providing funds when needed to make payments from the Trust Assets. Any investment purchased with the Trust Assets shall be deemed a part of the Trust Assets.  All interest, distributions, dividends and proceeds received by the Trustee in respect of such investments shall be a part of the Trust Assets.

       **5.4**    **Access to Information by Beneficiaries.**  Each Beneficiary shall have access to the business records of the Trust for the purpose of obtaining information relating to the management of Trust Assets for any purpose reasonably related to the interests generally of the Beneficiaries, so long as access is reasonably exercised during normal business hours (after at least five business days' notice to the Trustee), does not constitute an undue burden on the Trustee, and is not detrimental to the Trust or other Beneficiaries.  Notwithstanding the foregoing, in the event of any dispute or controversy between a Beneficiary and the Trustee or Trust, such Beneficiary must follow the discovery provisions provided in the Bankruptcy Rules and may not exercise the rights provided by this section in lieu of legal discovery.  Nothing herein contained is intended to restrict any Beneficiary from access to the business records of the Trustee, which the Trustee, in its discretion elects to provide.

       **5.5**    **United States Trustee Fees and Reports**.  After the Effective Date, the Trust shall pay as a Trust Cost, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Trust's disbursements until the Chapter 11 Cases is closed.  After the Confirmation Date, the Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Trust as required by the United States Trustee for as long as the Chapter 11 Cases remain open.

       **5.6**    **No Implied Obligations**.  No other further covenants or obligations of the Trustee shall be implied into this Trust Agreement.  The Trustee shall not be responsible in any manner whatsoever for the correctness of any recital, statement, representation, or warranty herein, or in any documents or instrument evidencing or otherwise constituting a part of the Trust Assets.

       **5.7**    **Unknown Property and Liabilities**.  The Trustee shall be responsible for only that property delivered to it, and shall have no duty to make, nor incur any liability for failing to make, any search for unknown property or for any liabilities.

       **5.8**    **Trust Costs**.  From the Trust Assets, the Trustee shall pay all Trust Costs when due if not disputed in good faith by the Trustee, or provide for payment of such Trust Costs in full through reserve, prior to making distributions to any Beneficiaries.

## VI.  BENEFICIAL INTERESTS

**6.1** **Allocation of Beneficial Interests to Holders of Class 4 Claims, Class 5 Claims and Class 6 Claims**.

      6.1.1  <u>Class 4 Claims</u>.   The Trustee shall allocate to each holder of an Allowed Claim under Class 4, a Beneficial Interest in the Trust equal to its Pro Rata Share of the Accepting Unsecured Creditors Fund.  If the holder of an Accepting Unsecured Claim is not fully satisfied by the distribution from the Accepting Unsecured Creditors Fund, the remainder of the claim will be treated as an Allowed Class 5 Claim and entitled to its Pro Rata share of the General Unsecured Creditors Fund.

      6.1.2  <u>Class 5 Claims</u>.  The Trustee shall allocate to each holder of an Allowed Claim under Class 5, a Beneficial Interest in the Trust equal to its Pro Rata Share of the General Unsecured Creditors Fund; provided, however, in calculating the Pro Rata Share held by each holder of an Allowed Claim under Class 5, the Secured Lender Deficiency Claims shall equal fifty percent (50%) of the total Allowed Claims in Class 5.

      6.1.3  <u>Class 6 Claims</u>.  The Trustee shall allocate to each holder of an Allowed Claim under Class 6, in full satisfaction, settlement, release and extinguishment of such Allowed Claim, a Beneficial Interest in the Trust equal to an agreed upon percentage of such Allowed Claim from the General Unsecured Creditors Fund.

**6.2** **Transfer of Beneficial Interests**.  No transfer of a Beneficial Interest shall be effective or binding upon the Trust or the Trustee for any purpose, unless and until written notification of such transfer or assignment, executed by duly authorized representatives of both the assignor and assignee of such Beneficial Interest, is sent by certified mail to the Trustee and received by the Trustee.

**6.3** **Register Entries Regarding Beneficial Interests**.  The Trustee shall make appropriate notations in a Trust Register and calculate the following ratios prior to each distribution to Beneficiaries:

      (i)     the Beneficial Interest and Allowed Claim held by each Beneficiary;

      (ii)    as to each Beneficiary holding a Class 4 Allowed Claim, the Pro Rata Share of the Accepting Unsecured Creditors Fund;

      (iii)   as to each Beneficiary holding a Class 4 Allowed Claim, the amount of the Class 4 Allowed Claim that is not fully satisfied by the distribution from the Accepting Unsecured Creditors Fund;

      (iv)   as to each Beneficiary holding a Class 5 Allowed Claim, the Pro Rata Share of the General Unsecured Creditors Fund allocable to each claim holder; recognizing, however, that the Secured Lender

Deficiency Claims shall equal fifty percent (50%) of the total Allowed Claims in Class 5; and

(v)     as to each Beneficiary hold a Class 6 Allowed Claim, the amount that is an agreed upon percentage of such Allowed Claim.

**6.4     Allocation of Beneficial Interests to Holders of Disputed Claims or Interests**.  No Beneficial Interest shall be allocated to a Creditor under Class 4, Class 5 or Class 6 unless and until such Creditor holds an Allowed Claim.  In the event and upon allowance of additional Allowed Claims under Classes 4, 5 and 6, the Beneficial Interests held by the first and subsequent creditors holding Allowed Claims under Classes 4, 5 and 6 will be adjusted as necessary.

**6.5     Representation of Beneficial Interest**.  The Beneficial Interests shall be uncertified.  The Beneficial Interests shall be represented by appropriate book entries in the Trust Register.

**6.6     Trust Register**.

6.6.1   Register of Beneficial Interests.  The Trustee shall cause the Trust Register to be kept at the office of the Trustee or at such other place or places that shall be designated by the Trustee from time to time.

6.6.2   Access to Register by Beneficiaries.  Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Trustee, and in accordance with reasonable regulations prescribed by the Trustee, to inspect and at the expense of the Beneficiary make copies of the Trust Register, in each case only for a purpose reasonable and related to such Beneficiary's Beneficial Interest in the Trust.

6.6.3   Absolute Owners.  The Trustee may deem and treat the Beneficiary of record as determined pursuant to section 6.1 or if and when appropriate, section 6.2 of this Trust Agreement as the absolute owner of such Beneficial Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

## VII.  DISTRIBUTION OF THE TRUST ESTATE

**7.1     Establishment of Reserve**.

The Trustee shall establish an Operating Reserve funded from time to time with Trust Cash in an amount determined by the Trustee to be reasonably necessary to pay existing and anticipated Trust Costs, to fund litigation, fund contingent liabilities, and otherwise conduct the affairs and satisfy existing and anticipated liabilities and obligations of the Trust.

**7.2**     **Distributions to Holders of Beneficial Interests**.

7.2.1   Distributions Generally.  The Trustee may make distributions from Available Cash, or from Trust Assets as provided in section 9.2 hereof.  The Trustee shall make all distributions required under the Plan in a manner consisted with the Plan. A Beneficiary who is the holder of an Allowed Claim under Class 4 shall receive on a distribution date its Pro Rata Share of the Accepting Unsecured Creditors Fund until the amount of such Beneficiary's Class 4 Allowed Claim is paid in full.  A Beneficiary who is the holder of an Allowed Claim under Class 5 shall receive on a distribution date its Pro Rata Share of the General Unsecured Creditors Fund until the amount of such Beneficiary's Class 5 Allowed Claim is paid in full.  A Beneficiary who is the holder of an Allowed Claim under Class 6 shall receive on a distribution date, in full satisfaction, settlement, release and extinguishment of such Allowed Claim, an agreed upon percentage of such Allowed Claim from the General Unsecured Creditors Fund.   All such distributions shall be based on each Creditor's Pro Rata Share (for Classes 4 and 5) or percentage (for Class 6) as outlined in the Plan and in section 6.1 hereof; provided, further, that of the net amount distributable, the Trustee shall hold in trust in accordance with section 7.3 hereof, such amounts as would be distributable in respect of the estimated amount of Disputed Claims (treating such Disputed Claims, for this purpose only, as if they were Allowed Claims).  The Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

7.2.2   Distributions to Holders of Allowed Class 4 Accepting Unsecured Claims.  Each Holder of an Allowed Class 4 Accepting Unsecured Claim shall receive its Pro Rata share of the Accepting Unsecured Creditors Fund on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Accepting Unsecured Claim becomes Allowed, and (iii) a date agreed to by the Trustee and the Holder of such Class 4 Accepting Unsecured Claim.

7.2.3   Distributions to Holders of Allowed Class 5 General Unsecured Claims.   Each Holder of an Allowed Class 5 Other General Unsecured Claim shall receive its Pro Rata Distribution of the General Unsecured Creditors Fund on either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Other General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.  On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Trustee shall continue to make Pro Rata Distributions to Holders of Allowed Class 5 Other General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation Date.

7.2.4   Distributions to Holders of Allowed Class 6 Convenience Class Claims.  Each Holder of an Allowed Class 6 Convenience Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount

equal to an agreed upon percentage of such Allowed Claim from the General Unsecured Claims Fund on either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

      7.2.5   <u>Distributions to Beneficiaries After Allowance</u>.   As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Trustee will distribute to the Holder thereof all Distributions to which such Holder is then entitled under this Trust Agreement and the Plan.  All Distributions made under this <u>section 7.2.5</u> will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Holders included in the applicable Class.

      7.2.6   <u>Remaining Trust Assets</u>.   In the event that (a) the amount of all Class 4 Allowed Claims and all Class 5 Allowed Claim are paid in full by the Trust, (b) an agreed upon percentage of each Allowed Class 6 Claim is paid by the Trust, (c) Trust Assets or Trust Cash remain available for distribution after such payment, and (d) upon approval by the Bankruptcy Court, then such remaining Trust Assets and Trust Cash (less any reserve deemed appropriate by the Trustee to pay anticipated Trust Costs) shall be transferred by the Trust to the Purchaser.

      7.2.7   <u>Place and Manner of Payments or Distributions</u>.  The Trustee shall make distributions to the Beneficiaries of record as of the distribution date by mailing such distribution to the Beneficiary at the address of such Beneficiary as listed in the Schedules, or any proof of claim filed by the Beneficiary, or as listed in the Trust Register, or at such other address as such Beneficiary shall have specified for payment purposes in a written notice to the Trustee at least 20 days before a distribution date. The Trustee shall distribute any cash by check or such other method as the Trustee deems appropriate under the circumstances.  Prior to receiving any distributions, all Beneficiaries, at the Trustee's request, must provide to the Trustee written notification of their respective Federal Tax Identification Numbers or Social Security Numbers.  The Trustee may suspend distributions to any Beneficiary that has not provided its Federal Tax Identification Number or Social Security Number, as the case may be.

      7.2.8   <u>Unclaimed or Undeliverable Distributions</u>.

      (a)   If a distribution to any Beneficiary is returned as undeliverable, no further distributions to such Beneficiary shall be made unless and until the Debtors or the Trustee is notified of such Beneficiary's then current address, at which time all missed distributions shall be made to such Beneficiary without interest.

(b)     If such Beneficiary does not provide an updated address within 6 months after the date of the first returned distribution, with approval of the Bankruptcy Court upon motion by the Trustee, (a) such Person shall no longer be deemed to be a Beneficiary, and (b) any Trust Assets, Trust Cash and interest and proceeds thereon allocable to such Person, net of any allocable portion of taxes paid by the Trust, shall become part of the Trust Assets free and clear of and from any claim to such property by or on behalf of such Person (who shall be deemed to have released such claim or interest) and shall be distributed to the other Beneficiaries as provided in the Trust Agreement, with such adjustments as are required to take into account that such person is no longer deemed a Beneficiary.

(c)     Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance. Any amounts returned to the Debtors or the Trustee in respect of such non-negotiated checks shall be forwarded to (if necessary) and held by the Trustee or the Debtors, as the case may be.  Requests for reissuance for any such check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued.  All amounts represented by any voided check will be held until the earlier of: (a) one (1) month after the date on which the check is voided, or (b) the date on which the Bankruptcy Court enters the Final Decree, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to such date.  Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 5.08 of the Plan, and all Holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtors or their respective assets, the Trustee or the Trust.

**7.3    Disputed Claims**.

7.3.1   <u>General</u>.  All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or the Liquidation Trustee and the Holder of such Claim, by operation of law, by Final Order, or by the Plan. Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.  The Trustee shall hold in trust for the holders of Disputed Claims any amounts attributable to the estimated amount of Disputed Claims as calculated in accordance with the Plan and <u>section 6.1</u> hereof, and any amounts treated as set aside on account of Disputed Claims in accordance with <u>section 7.2.1</u>.   Such distributable amounts shall be made in accordance with the Plan and with <u>section 7.2.5</u> hereof.

7.3.2   <u>Taxable Income Allocable to Disputed Claims</u>.  As more fully set forth in <u>section 8.5</u>, taxes with respect to income of the Trust attributable to the estimated amount of Disputed Claims shall be the responsibility of the Trust.  In the event and to the extent the amount held in trust for the holders of Disputed Claims produce insufficient cash to pay such taxes, the Trust shall fund such taxes and deduct

an amount equal to such taxes from subsequent earnings with respect to the amount held in trust for Disputed Claims or amounts that may be subsequently distributed to holders of Disputed Claims that have become Allowed Claims; holders of Disputed Claims will in all circumstances bear the cost of Trust taxes attributable to their respective shares of Trust assets and income.

## VIII. TAX MATTERS

**8.1** **Certain Income Tax Matters**.  The Trust established pursuant to this Trust Agreement is established for the purpose of satisfying claims by liquidating the Trust Assets transferred to it and the Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.  The purpose of the Trust is to provide a mechanism for the liquidation of the Trust Assets conveyed by the Debtors to the Trust, and to distribute the proceeds of the liquidation, net of all claims, expenses, charges, liabilities, and obligations of the Trust, to the holders of Beneficial Interests in accordance with the terms of the Plan and this Trust Agreement.  No business activities will be conducted by the Trust other than those associated with or related to the liquidation of the Trust Assets.  It is intended that the Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.  All parties hereto shall treat the transfers in trust described herein as transfers to the Beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including, sections 61(12), 483, 1001, 1012, and 1274).  All the parties hereto shall treat the transfers in trust as if all the transferred assets, including all the Trust Assets, had been first transferred to the Beneficiaries and then transferred by the Beneficiaries to the Trust.  The Beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Trust and the owners of the Trust.  The Trustee shall file returns for the Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) or (b), to the extent interests of the Trust are attributable to Allowed Claims.  The parties hereto, including the Trustee and the Beneficiaries shall value the property transferred to the Trust consistently and such valuations shall be used for all federal income tax purposes.  Each Beneficiary with an Allowed Claim shall be responsible for payment of any taxes due to the operation of their share of the Trust, and the Trust shall pay the taxes attributable to the shares of the Trust allocable to the estimated amount of Disputed Claims (which will reduce the amount available to distribute to holders of Disputed Claims that may become Allowed Claims).  During its existence, the Trust shall not receive or retain cash or cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities or to maintain the value of its assets during liquidation.  The Trustee shall use its continuing best efforts to dispose of the Trust Assets, make timely distributions, and shall not unduly prolong the duration of the Trust.  The Trustee is authorized to take any action as may be necessary or appropriate to minimize any potential tax liability of the Trust and, thereafter, the Beneficiaries, arising out of the operations of the Trust.  The Trustee is directed to allocate all costs, charges, expenses and deductions, or any of them in whole or in part, to income or principal at such time and in such a manner as the Trustee shall determine will reduce or eliminate the Trust's taxes, if any.  Subject to

section 7.2.1, the Trustee shall generally attempt to distribute at least annually to the holders of Beneficial Interests all net cash income plus all net cash proceeds from the liquidation of assets of the Trust; provided, however, the Trustee shall be required to make such distributions only if cash exists to be distributed after retaining and setting aside such amounts of cash (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Trust during liquidation, the amount of which will be determined by the Trustee in its discretion, (ii) to pay existing and anticipated Trust Costs (including any taxes imposed on the Trust or in respect of the assets of the Trust) including the Operating Reserve, the amount of which will be determined by the Trustee in its discretion, and (iii) to satisfy other existing or anticipated liabilities incurred or assumed by the Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Trust Agreement, the amount of which will be determined by the Trustee in its discretion.  In addition, the Trustee shall, not less often than annually, provide to Beneficiaries such information as is appropriate or necessary, to enable the Beneficiaries to determine their respective tax obligations, if any, arising out of the operations of the Trust.  The Beneficiaries shall each report their share of the net income of the Trust as reported to them by the Trustee and pay any tax owing thereon on a current basis.  Each taxable year, all income of the Trust will be taxed either to the Beneficiaries or to the Trust.  No Beneficiary shall have any claim to or with respect to any specific property held in trust and shall have no claim to or for a distribution of property in kind.

**8.2**   **Treatment of Trust Assets for Tax Purposes**.  The Trustee shall have the right to request the Bankruptcy Court to determine the aggregate value of the Trust Assets which shall be reported to the Beneficiaries.  The value of the Trust Assets shall be consistently reported for federal income tax purposes by the Debtors, the Trust, and the Beneficiaries.

**8.3**   **Withholding**.  The Trustee may withhold from the amount distributable from the Trust at any time to any Person such sum or sums as may be sufficient to pay any tax or taxes or other charge or charges that have been or may be imposed on such Person or upon the Trust with respect to the amount distributable or to be distributed under the income tax laws of the United States or of any state or political subdivision or entity by reason of any distribution provided for in Article VIII, whenever such withholding is determined by the Trustee in its discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement, and the Trustee, in the exercise of its discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts as may be withheld in accordance with the provisions of this section.  Notwithstanding the foregoing but without prejudice to the Trustee's rights hereunder, such Person shall have the right with respect to the United States, or any state, or any political subdivision of either, to contest the imposition of any tax or other charge by reason of any distribution hereunder.

**8.4**   **Allocation of Income and Losses**.  Unless otherwise determined by the Trustee in its reasonable discretion, allocations between Beneficiaries of taxable income of the Trust for each of its tax years shall be determined by reference to the manner in

which an amount of cash equal to the amount of such taxable income would be distributed (without regard to any restrictions on distributions described in the Plan) if, immediately before such deemed distribution, the Trust had, with respect to the portion of the Trust treated as a grantor trust, distributed all its other assets (valued for this purpose at their tax book value) in respect of the Beneficial Interests, taking into account all prior and concurrent distributions from the Trust made in accordance with the Plan.  Similarly, taxable loss generally will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Trust.  The tax book value of assets for purpose of Article VIII and Article IX hereof means their fair-market value on the Effective Date or, if later, the date on which such assets were acquired by the Trust, adjusted in either case in accordance with applicable tax accounting principles.  With regard to transfers of Beneficial Interests in accordance with Article VI hereof, the Trustee shall promptly establish a standard convention for allocating and apportioning taxable income and loss between a transferor and its transferee and shall not be required to so allocate and apportion based on the actual Trust activities prior and subsequent to the date of any transfer.  The Trustee shall notify the Beneficiaries of the convention adopted promptly after such adoption.  The Trustee shall use its sole discretion to establish a fair and equitable convention to apply and may, but is not required to, adopt a monthly, quarterly, or similar record date convention.

**8.5   Tax Treatment of Trust Assets and Income/Loss Attributable to Disputed Claims**.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) treat the portion of the Trust assets attributable to the estimated amount of Disputed Claims as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of the estimated amount of each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), (ii) treat the taxable income or loss of the Trust attributable to such portion of the Trust assets allocated to the estimated amount of Disputed Claims as taxable income or loss with respect to which the Trust will pay the tax liability (but only with respect to the portion of the year with respect to which such claims are Disputed Claims), (iii) after a Disputed Claim is allowed by Final Order of the Bankruptcy Court, treat the holder of such Allowed Claim as a grantor of the liquidating trust as described in section 8.1 hereof, and as the party responsible for payment of all taxes on its share of any income of Trust after the Claim is Allowed, and (iv) to the extent permitted by applicable law, shall report consistent with the foregoing for state and local income tax purposes.  All holders of Allowed Claims in Class 4, Class 5 and Class 6 shall report, for tax purposes, consistent with the foregoing.

## IX.  TERMINATION

**9.1   Duration**.  The Trust shall terminate upon the earlier of (i) the date which is 5 years after the Effective Date (the date this Trust is created); or (ii) the disposition of

the Trust Assets; or (iii) the fulfillment of Trust purposes as determined by the Trustee as evidenced by an order of the Bankruptcy Court closing the Chapter 11 Cases and discharging the Trustee.   Notwithstanding the foregoing, with Bankruptcy Court approval, the Trustee may extend the term of the Trust for one or more finite terms based upon the particular facts and circumstances at that time, if it is in the best interest of the Beneficiaries and an extension is necessary to the liquidating purpose of the Trust.

**9.2** **Distribution of Trust Assets**.  The Trust may not be terminated at any time by the Beneficiaries.  If permitted under the applicable law and not contrary to the classification of the Trust as a liquidating trust and a pass-through entity under applicable income tax law, and if in the best interests of the Beneficiaries and with approval of the Bankruptcy Court, the Trustee may distribute interests in the Trust Assets, or contribute the Trust Assets to another Person and then distribute interests in such Person to the Beneficiaries.  Trust Assets to be distributed in kind shall be valued by the Trustee in its reasonable discretion at their tax book value.  After all liabilities of the Trust have been satisfied or duly provided for, such remaining Trust Assets shall be distributed to Beneficiaries as a final distribution.

## X.  MISCELLANEOUS

**10.1** **Notices**.  Any notice required to be given by this Trust Agreement to Beneficiaries, the Trustee, or any other Person shall be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

a) <u>If to the Trustee</u>:
Robert Barnett

_____

_____
Fax:   _____

b) <u>If to the Debtors</u>

Sea Island Company
100 Salt Marsh Drive
Sea Island, Georgia 31522
Attention:    James B. Gilbert, Jr.
Facsimile:    (912) 634-3124

(c)    if to any Beneficiary, at such Beneficiary's address as listed in the Schedules, proof of claim filed by the Beneficiary, the Trust Register, or as identified in a written request for notice delivered to the Trustee.

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Trust Agreement by furnishing

written notice pursuant to the provisions of this <u>section 10.1</u> to the entity to be charged with knowledge of such change.

**10.2   <u>Transferee Liabilities</u>**.  The Trust shall have no liability for, and the Trust Assets shall not be subject to, any claim arising by, through or under the Debtors except as expressly set forth in the Plan or this Trust Agreement.  In no event shall the Trustee have any personal liability for such claims.  If any liability shall be asserted against the Trust or the Trustee as the transferees of the Trust Assets on account of any claimed liability of, through or under the Debtors, the Trustee may use such part of the Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Trustee as a Trust Cost.

**10.3   <u>Amendment</u>**.  This Trust Agreement may be amended by the proposal of the Trustee of an amendment through motion filed with notice to the Beneficiaries, and approval of such proposed amendment by the Bankruptcy Court.  As long as any amendment of this Trust Agreement does not conflict with the terms of the Plan, this Trust Agreement may be amended without amending or modifying the Plan.  This Trust Agreement may be amended by the Trustee without the approval of any Beneficiaries or the Bankruptcy Court to correct typographical errors or if such amendment is not material, and in either case if such amendment does not adversely affect the interests of any Beneficiary, but such amendment shall not be effective until 45 days after the Beneficiaries shall have been given notice of such amendment.

**10.4   <u>Counterparts</u>**.  This Trust Agreement may be executed in one or more Counterparts, all of which shall taken together to constitute one and the same instrument.

**10.5   <u>Governing Law; Severability</u>**.  This Trust Agreement shall be governed by construed under and interpreted in accordance with the laws of the State of Georgia.  If it shall be determined by a court of competent jurisdiction that any provision of this Trust Agreement shall be invalid or unenforceable under such applicable law, such invalidity or unenforceability, shall not invalidate the entire Trust Agreement.  In that case, this Trust Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, if such term or provision cannot be so limited, this Trust Agreement shall be construed to omit such invalid or unenforceable provisions provided that such construction, to the maximum extent possible, shall give effect to the purposes of the Plan.

**10.6   <u>Headings</u>**.  Sections, subheadings and other headings used in this Trust Agreement are for convenience only and shall not affect the construction of this Trust Agreement.

**10.7   <u>Relationship to Plan</u>**.  The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore the entirety of this Trust Agreement is incorporated into the Plan.  To that end, the Trustee shall have full power and

authority to take any action consistent with the purpose and provisions of the Plan and shall be bound by the terms of the Plan.  If any provision of this Trust Agreement is found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control.

**10.7  Consent to Jurisdiction**.  Each of the parties hereto (and each Beneficiary by its acceptance of the benefits of the Trust created hereunder) consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement or construction of any right, remedy, obligation, or liability arising under or by reason of this Trust Agreement or the Plan.

Remainder of page intentionally left blank; signatures follow

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

**TRUSTEE:**

By:

Name: Robert  Barnett

Title:  Trustee of the Sea Island Company
           Creditors Liquidation Trust

DEBTORS:

SEA ISLAND COMPANY

By: _____
        Name: David Bansmer
        Title: President and Chief Operating Officer

SEA ISLAND COASTAL PROPERTIES LLC

By Sea Island Company
    its manager

By: _____
        Name: David Bansmer
        Title: President and Chief Operating Officer

SEA ISLAND RESORT RESIDENCES, LLC

By Sea Island Company
    its Sole Member

By: _____
        Name: David Bansmer
        Title: President and Chief Operating Officer

SEA ISLAND APPAREL, LLC

By Sea Island Company
    its Sole Member

By: _____
        Name: David Bansmer
        Title: President and Chief Operating Officer

FIRST SEA ISLAND, LLC

By Sea Island Company
    its Sole Member

By: _____
       Name: David Bansmer
       Title: President and Chief Operating Officer

SICAL, LLC

By Sea Island Company
    its Sole Member

By: _____
       Name: David Bansmer
       Title: President and Chief Operating Officer

SEA ISLAND SERVICES, INC.

By: _____
       Name: David Bansmer
       Title: President and Chief Operating Officer

## <u>EXHIBIT A</u>

Debtors' Amended and Restated Joint Chapter 11 Plan as of August 10, 2010

## EXHIBIT B

**Summary of Certain Terms of the New Sea Island Club Membership Program**

# SEA ISLAND CLUB

## SUMMARY OF MEMBERSHIP PROGRAM

**Membership Opportunity.**  Sea Island Acquisition L.P. (the "Company"), doing business as Sea Island Club (the "Club"), will offer non-equity memberships in the new Sea Island Club (the "New Sea Island Club").  The New Sea Island Club features golf, tennis, beach club, spa, health/fitness, swim, boating/fishing, shooting and social facilities (the "Club Facilities").  The Club Facilities will be owned and managed by the Club. Memberships will be offered pursuant to a Membership Plan, Rules and Regulations and Membership Agreements, as the same may be amended, modified or supplemented from time to time.

**Eligibility for Membership.**  Memberships will be offered to members of the existing Sea Island Club ("Existing Members") and to those individuals and entities who apply and are approved for membership by the Club.

**Membership Use Privileges.**  As for Existing Members who acquire a membership in the New Sea Island Club, they will be able to select annually a dues category which shall provide certain use privileges for the member and his or her immediate family members as more particularly described below.

**Immediate Family Privileges.**  A member's spouse or "Designated Family Member" (i.e., significant other)and their unmarried children under the age of 26 and living at home, attending school on a full-time basis or serving in the military, will be entitled to the same use privileges as the member without having to pay additional membership dues.

**Extended Family Privileges.**  A member's extended family will be entitled to use the Club Facilities in accordance with the member's use privileges, upon payment of preferred fees.  The extended family includes children who do not qualify as immediate family, parents and grandchildren of the member and spouse or Designated Family Member and their respective spouses and Designated Family Members.

**Rental Guest Privileges.**  Members may authorize a renter of their residence to apply for temporary membership privileges in the New Sea Island Club, subject to approval by the Club and payment of the required fees as may be established from time to time.

**Limit on Number of Memberships.**  The maximum number of memberships that can be issued and outstanding in the New Sea Island Club shall be determined by the Club from time to time.

**Membership Deposit.**  Persons who desire to acquire a membership in the New Sea Island Club will be required to pay a membership deposit (the "Membership Deposit") to the Club; provided, however, that Existing Members shall not be required to pay any additional deposit for their membership and shall receive a credit for the deposit that they paid in cash to the existing Sea Island Club.  The amount of the Membership Deposit will be determined by the Club from time to time.

**Return of Membership Deposit.**  The Membership Deposit will be repayable by the Club to Existing Members who become members of the New Sea Island Club on the earlier to occur of:

(i)     December 31, 2035 or 30 years after the date the membership in the existing Sea Island Club was issued, whichever is the later, or:

(ii)    within 30 days after resignation and reissuance of the membership to a new member (as provided hereinafter).

A member shall have the right to renew such member's membership for an additional 30 years at the end of the period specified in (i) above by making a new deposit in an amount equal to such member's original Membership Deposit.

**Transfer of Membership.**  A member may arrange for transfer of the membership only through the Club.

**Transfer Through Resale Waiting List.**  Resigned memberships which are not being transferred to a subsequent real estate purchaser as provided below, will be placed on a resale waiting list for reissuance.  As long as the Club has memberships available for initial sale, every fourth membership sold by the Club in a particular category will be a resigned membership, if a resigned membership is available for resale at such time.  If the Club no longer has memberships available for initial sale, each membership sold will be a resigned membership from the resale waiting list. Memberships will be sold on the basis of first-resigned, first-resold; provided, however, that memberships that are resigned as a result of death of the member shall be offered for resale prior to other resigned memberships. Existing Members who are on the resignation list of the old Sea Island Club and who acquire a membership in the New Sea Island Club and elect to immediately then resign, shall keep their place on the resigned resale list of the New Sea Island Club on a relative basis.

**Transfer Upon Sale of Residence or Homesite.**  A member who sells his or her residence or homesite on Sea Island or in a Designated Community (i.e., a community developed by Sea Island Company or by the Company, or their affiliates, or their respective successors or assigns, or any other community designated by the Club as being eligible for the transfer of membership upon sale of residence or homesite privilege), may arrange with the Club for the reissuance of his or her membership to the subsequent purchaser of the subject residence or homesite.  The subsequent purchaser desiring the resigned membership will be required to submit a Membership Agreement, will be subject to the approval of the Club and will be required to pay to the Club the Membership Deposit which is then in effect.  The subsequent purchaser must acquire the membership within 30 days of the real estate closing.

**Legacy Feature.**  Members may request the transfer of the membership through the Club to the member's adult child who is approved by the Club without the payment of any additional Membership Deposit one time.  A new 30-year period for the refund of the deposit will commence upon issuance of the membership to the adult child.

**Inheritability.**  Upon the death of a member, the membership can be transferred to the surviving spouse, if any, or to an adult child who is approved by the Club, without the payment of any additional Membership Deposit.  The transfer to an adult child without the payment of any

additional Membership Deposit is a one time right and a new 30-year period for the refund of the Membership Deposit commences upon reissuance of the membership to the adult child.

**Dues and Other Charges.**  The Club will from time to time determine the amount of dues, charges and fees to be payable by members. Limitations or caps on dues increases or fees increases, shall be eliminated. The following dues categories will initially be offered and the annual dues for such categories will not exceed the amounts shown:

|  |  |
|---|---|
| Full | $12,000 |
| Social | $4,500 |
| Inactive | $1,000 (payable annually in advance) |

All dues are family dues and are payable monthly. Individual dues will no longer be offered.

**Inactive Status**. Members will have the right to request "inactive status" in the New Sea Island Club. The Club, in its discretion, may or may not grant any given request, depending on the circumstances involved. If granted, the Club has the right to establish the terms and conditions of the inactive status, including the duration thereof. Members who have inactive status shall not be entitled to use the Club Facilities for the period of inactive status unless otherwise and to the extent determined by the Club. Members who have inactive status are required to pay a fee as determined by the Club from time to time for such status, which fee is payable in full in advance of the inactive status period (but for no more than  one year), and as a condition to becoming inactive. Existing Members who presently have inactive status and who acquire a membership in the New Sea Island Club are eligible to continue their inactive status on a membership year basis and shall pay the annual fee established by the Club therefor in advance. Once an Existing Member chooses to become an active member, his or her ability to again go to inactive status shall be subject to the Club's determination as aforesaid.

**No Assessments Against Members.**  Members will not be subject to any liability for capital or operating assessments for the costs and expenses of ownership or operation of the New Sea Island Club or the Club Facilities.  The Club will pay all operating deficits incurred in the operation of the Club Facilities and will be entitled to all operating profits resulting from operation of the Club Facilities.

**Use of Club Facilities by Resort Guests.**  The Club will permit the use of the Club Facilities by guests of The Cloister Hotel and The Lodge upon such terms and conditions as shall be determined by the Club.

**Other.**  The Club will reserve the right to enter into reciprocal use arrangements with other clubs and resorts.  The Club will also reserve the right, in its sole and absolute discretion, to terminate, amend, modify or supplement the Membership Plan and the Rules and Regulations, to reserve memberships, to add, issue, modify or terminate any type, category or class of membership or dues category, to discontinue operation of any or all of the Club Facilities, to convert Sea Island Club into a member-owned club and to make any other changes in the terms and conditions of membership or in the Club Facilities available for use by members.

In the event of termination of the Membership Plan (which terminates all memberships in Sea Island Club),  termination of a person's category of membership (without offering a replacement category for the terminated category) or the permanent discontinuance of operation of all or substantially all of the Club Facilities, the Club will refund the Membership Deposit paid to the affected members, less any amount owed to the Club, within 30 days after the occurrence of the event giving rise to the refund.

The Company, for itself and on behalf of its successors and assigns, will reserve the right to sell, merge, assign, convey, transfer or otherwise dispose of any or all of its right, title and interest in the Club Facilities to any party or parties. Upon any such sale, merger, assignment, conveyance, transfer or other disposition of all right, title and interest in the Club Facilities, the transferring party shall be relieved of and released from any and all obligations under the Membership Plan, the Rules and Regulations and each Membership Agreement then in effect, provided however, the purchaser or the surviving company acquires such right, title and interest subject to the terms and conditions of the Membership Plan, the Rules and Regulations and Membership Agreements then in effect and assumes the obligations of the transferring party thereunder.

Holders of "dormant memberships" in the Sea Island Club are entitled to be issued replacement "dormant memberships" in the New Sea Island Club upon request therefor. Any given "dormant membership" in the New Sea Island Club must be assigned and activated within three years of the effective date of the Membership Plan or it shall terminate. In order for a "dormant membership" to be activated, the then current Membership Deposit for a membership in the New Sea Island Club must be paid to the Club and applicable dues, fees and charges are also required to be paid during the term of the membership.

Those Existing Members who acquire a membership in the New Sea Island Club who presently do not pay dues as a result of an agreement arising from or in connection with a prior real estate transaction with the Sea Island Company or its affiliate, will be obligated to commence paying dues, but at a rate equal to seventy-five percent (75%) of the applicable dues for their particular category. This lower dues rate will not be transferable to the successor member.

This is a summary of the membership program to be implemented for the New Sea Island Club. The terms of membership will be contained in the Membership Plan, Rules and Regulations and Membership Agreement.

## <u>EXHIBIT C</u>

**Summary of Certain Terms of the New Ocean Forest Golf Club Membership Program**

**OCEAN FOREST GOLF CLUB**


**SUMMARY OF MEMBERSHIP PROGRAM**

**Membership Opportunity.** Sea Island Acquisition L.P. (the "Company"), doing business as Ocean Forest Golf Club (the "Club"), will offer non-equity memberships in the new Ocean Forest Golf Club (the "New Ocean Forest Golf Club"). The New Ocean Forest Golf Club features golf and social facilities (the "Club Facilities"). The Club Facilities will be owned and managed by the Club. Memberships will be offered pursuant to a Membership Plan, Rules and Regulations and Membership Agreements, as the same may be amended, modified or supplemented from time to time.

**Eligibility for Membership.** Memberships will be offered to members of the existing Ocean Forest Golf Club ("Existing Members") and to those individuals who apply and are invited for membership by the Club. Existing members can acquire a membership in the corresponding category in the New Ocean Forest Golf Club, except that. Emeritus Membership referred to below will be available to individuals who are 70 years of age or older.

**Membership Categories and Privileges.** The Club will offer memberships in the following basic categories: Primary, Spousal, Emeritus and Legacy. Members will have the right to use all of the Club Facilities. The Club will reserve the right to restrict the number of golf rounds which can be played by Emeritus Members to no more than 20 in each membership year.

**Privileges.** A member's "family" will be entitled to use the Club Facilities. The "family" includes the member's spouse (provided the spouse does not hold a Spousal Membership) or Designated Family Member (i.e., a significant other), children or stepchildren and their spouses, brothers, sisters and their spouses, parents and grandchildren. Family members other than children under the age of 26, will be entitled to preferred greens fees when playing golf. Children of the member under the age of 26 are not required to pay a greens fee when playing golf. Family members other than children under the age of 26 who have been certified by the Director of Golf, must be accompanied by the member when playing golf unless otherwise determined by the Club. The Club can adopt such rules, regulations and policies concerning use by family members as it shall determine from time to time.

**Limit on Number of Memberships.** The maximum number of Primary Memberships that can be issued and outstanding in the New Ocean Forest Golf Club shall be 400.   The Club can also issue a limited number of Spousal Memberships, Emeritus Memberships and Legacy Memberships.

**Membership Deposit.** Persons who desire to acquire a membership in the New Ocean Forest Golf Club will be required to pay a membership deposit (the "Membership Deposit") to the Club; provided, however, that Existing Members shall not be required to pay any additional deposit for their membership and shall receive a credit for the deposit that they paid in cash to the existing Ocean Forest Golf Club.  The amount of the Membership Deposit will be determined by the Club from time to time.

**Return of Membership Deposit.**  The Membership Deposit will be repayable by the Club to Existing Members who become members of the New Ocean Forest Golf Club on the earlier to occur of:

(i)     December 31, 2035 or 30 years after the date the membership in the existing Ocean Forest Golf Club was issued, whichever is the later, or:

(ii)    within 30 days after resignation and reissuance of the membership to a new member (as provided hereinafter).

A member shall have the right to renew such member's membership for an additional 30 years at the end of the period specified in (i) above by making a new deposit in an amount equal to such member's original Membership Deposit.

**Transfer of Membership.**  A member may arrange for transfer of the membership only through the Club.

**Transfer Through Resale Waiting List.**  As long as the Club has memberships available for initial sale, every fourth membership sold by the Club in a particular category will be resigned membership, if a resigned membership is available for resale at such time.  If the Club no longer has memberships available for initial sale in a particular category, each membership sold in that category will be a resigned membership from the resale waiting list. Memberships will be sold on the basis of first-resigned, first-resold; provided, however, that memberships that are resigned as a result of death of the member shall be offered for resale prior to other resigned memberships.  Existing Members who are on the resignation list of the old Ocean Forest Golf Club and who acquire a membership in the New Ocean Forest Golf Club, and who also elect to immediately then resign, shall keep their place on the resigned resale list of the New Ocean Forest Golf Club on a relative basis.

**Legacy Feature.**  Members may request the transfer of the membership through the Club to the member's adult child who is approved by the Club without the payment of any additional Membership Deposit one time.  A new 30-year period for the refund of the deposit will commence upon issuance of the membership to the adult child.

**Inheritability.**  Upon the death of a member, the membership can be transferred to the surviving spouse, if any, or to an adult child, who is approved by the Club, without the payment of any additional Membership Deposit.  The transfer to a spouse or an adult child without the payment of any additional Membership Deposit is a one time right and a new 30-year period for the refund of the Membership Deposit will commence upon reissuance of the membership to the adult child. In the event a spousal member succeeds to his or her spouse member's Primary Membership upon the member's death, the Spousal Membership shall be resigned and placed on the spousal member resale waiting list for reissuance.

**Dues and Other Charges.**  The Club will from time to time determine the amount of dues, charges and fees to be payable by members. Dues shall be payable monthly and the initial annual dues will not exceed the amounts shown below:

| Primary | $15,000 |
|---------|---------|
| Spousal | $7,500 |
| Emeritus | $7,500 |
| Legacy | $15,000 |

**No Assessments Against Members.**  Members will not be subject to any liability for capital or operating assessments for the costs and expenses of ownership or operation of the New Ocean Forest Golf Club or the Club Facilities.  The Club will pay all operating deficits incurred in the operation of the Club Facilities and will be entitled to all operating profits resulting from operation of the Club Facilities.

**Other.**  The Club will reserve the right to enter into reciprocal use arrangements with other clubs and resorts.  The Club will also reserve the right, in its sole and absolute discretion, to terminate, amend, modify or supplement the Membership Plan and the Rules and Regulations, to reserve memberships, to add, issue, modify or terminate any type, category or class of membership or dues category, to discontinue operation of any or all of the Club Facilities, to convert Ocean Forest Golf Club into a member-owned club and to make any other changes in the terms and conditions of membership or in the Club Facilities available for use by members.  The Club will reserve the right to issue honorary, company and other complimentary memberships on such terms and conditions as it shall determine, which memberships will not count against the cap on Primary Memberships.

In the event of termination of the Membership Plan (which terminates all memberships in Ocean Forest Golf Club),  termination of a person's category of membership (without offering a replacement category for the terminated category) or the permanent discontinuance of operation of all or substantially all of the Club Facilities, the Club will refund the Membership Deposit paid to the affected members, less any amount owed to the Club, within 30 days after the occurrence of the event giving rise to the refund.

The Company, for itself and on behalf of its successors and assigns, will reserve the right to sell, merge, assign, convey, transfer or otherwise dispose of any or all of its right, title and interest in the Club Facilities to any party or parties. Upon any such sale, merger, assignment, conveyance, transfer or other disposition of all right, title and interest in the Club Facilities, the transferring party shall be relieved of and released from any and all obligations under the Membership Plan, the Rules and Regulations and each Membership Agreement then in effect, provided however, the purchaser or the surviving company acquires such right, title and interest subject to the terms and conditions of the Membership Plan, the Rules and Regulations and Membership Agreements then in effect and assumes the obligations of the transferring party thereunder.

This is a summary of the membership program to be implemented for the New Ocean Forest Golf Club.  The terms of membership will be contained in the Membership Plan, Rules and Regulations and Membership Agreement.

## <u>EXHIBIT D</u>

### Schedule of Assumed Contracts

1. Agreement by and among Sea Island Company and E-Z-GO dated August 25, 2008.

2. Agreement by and among Sea Island Company and Georgia Turf & Tractor, Inc. and John Deere Equipment Company dated March 31, 2008.

3. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated September 26, 2007.

4. Master Lease Agreement by and among Textron Financial Corporation and Sea Island Company dated November 6, 2002.

5. Letter Agreement by and among PGA TOUR, INC., Davis Love III Foundation and Sea Island Company dated January 22, 2010.

6. Caddie Services Agreement by and among Sea Island Company d/b/a Ocean Forest Golf Club and GCI, LLC.

7. Management Agreement by and among MeadWestvaco Coated Board, Inc. and MWV Cabin Bluff, LLC and Sea Island Company dated December 2009.

8. Software License Agreement by and among Host Analytics, Inc. and Sea Island Company dated September 29, 2010.

9. Software License Agreement by and among InvoTech Systems, Inc. and Sea Island Company dated April 11, 2003.

10. Licensing and Services Agreement by and among Littleton Marketing Group LLC and Sea Island Company dated December 3, 2007.

11. Landscape Service Agreements by and among Sea Island Company and certain property owners.

12. Outsourcing Services Agreement by and among Sea Island Company and Network Services Plus, Inc. dated November 7, 2008.

13. Statement of Work by and among Sea Island Company and Network Services Plus, Inc. dated November 11, 2009.

14. 16. Hardware Maintenance Agreement by and among Sea Island Company and Postec, Inc. dated June 16, 2005.

15. Consulting Services Agreement by and among Sea Island Company and Ultimate Software dated July 18, 2008.

16. Essentials Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Sea Island Golf Club and Toro National Support Network dated May 28, 2008.

17. Classic 36 Renewal Service Agreement and Extended Warranty by and among Sea Island Company d/b/a Retreat Golf Club and Toro National Support Network dated May 28, 2008.

18. Lease Agreement by and among Sea Island Company and Golden Isles dated October 1, 2009.

19. Lodging Official Appointment Agreement by and among Sea Island Company and the American Automobile Association dated May 28, 2009.

20. Agreement by and among the Cloister Hotel and American Express Travel Related Services Company, Inc. dated July 24, 2009.

21. Agreement by and among the Lodge at Sea Island and American Express Travel Related Services Company, Inc. dated July 24, 2009.

22. Agreement by and among Sea Island Company and Due South Publishing, Inc. dated April 8, 2010.

23. Subscription Agreement by and among Sea Island Company and Hoovers dated November 28, 2009.

24. Participation Agreement by and among The Cloister at Sea Island and Kiwi Collection, Inc. dated January 25, 2010 (Visa Luxury Hotel Collection).

25. Agreement by and among The Cloister at Sea Island and Signature Travel Network effective January 1, 2010.

26. Agreement by and among Sea Island Company and SpearTek, Inc. effective October 1, 2002.

27. Marketing and Management Services Agreement by and among Sea Island Company and TIG Global, LLC effective January 1, 2010.

28. Subscription Agreement by and among The Cloister at Sea Island and TravelCLICK, Inc. dated December 7, 2009.

29. Preferred Supplier Agreement by and among Sea Island – The Cloister and Virtuoso, Ltd. effective January 1, 2010.

30. Preferred Supplier Agreement by and among Sea Island – The Lodge and Virtuoso, Ltd. effective January 1, 2010.

31. Professional Services Agreement by and among Sea Island Company and Roger and Anne Ditmer dated November 26, 2008.

32. Professional Services Agreement by and among Sea Island Company and Ellen Rogers dated September 12, 2008.

33. Professional Services Agreement by and among Sea Island Company and Celeste Pittman dated February 17, 2009.

34. Professional Services Agreement by and among Sea Island Company and Dulany Hall dated October 2, 2008.

35. Professional Services Agreement by and among Sea Island Company and Audrey Wood dated October 3, 2008.

36. Agreement by and among Sea Island Company and William Lewis Mason dated July 27, 2009.

37. Independent Contractor Agreement by and among Sea Island Company and Coastal Commercial Laundry Services, Inc. dated January 5, 2009.

38. Professional Services Agreement by and among Sea Island Company and J&S Associates, Inc. dated July 23, 2010.

39. Service Agreement by and among Sea Island Company and Audio Visual Services Group, Inc. dated September 2, 2009.

40. Agreement by and among Sea Island Company and E-Z-GO dated September 10, 2009.

41. Planned Maintenance Agreement by and among Sea Island Company and Agri-Business Technologies, Inc. dated February 11, 2010.

42. Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and CSI Leasing, Inc. dated January 22, 2009.

43. Care Management Services Agreement by and among Sea Island Company and Primary PhysicianCare, Inc. dated December 17, 2007.

44. Agreement by and among Sea Island Company and Stromberg dated December 23, 2005.

45. Lease Agreement by and among Sea Island Company and Williams Scotsman, Inc. dated July 21, 2009.

46. Lease Agreement by and among Sea Island Company and PNCEF, LLC (f/n/a National City Commercial Capital Company) dated September 24, 2009, as amended.

47. Agreement by and among Sea Island Company and Hasty's Communications East, Inc.

48. Lease Agreement by and among Sea Island Company and Ecolab Inc. dated June 23, 2005.

49. Lease Agreement by and among Sea Island Company and the United States Postal Service dated March 17, 2008.

50. Agreement by and among Sea Island Company and Agilysys, NV, LLC dated January 7, 2010.

51. Products and Services Agreement by and among Sea Island Company and The Active Network, Inc. dated  April 1, 2010.

52. Agreement by and among Sea Island Company and OpenCourse Solutions, LLC dated October 15, 2004.

53. Agreement by and among Sea Island Company and Tri H Friesians LLC dated February 4, 2010.

54. Shared Equity Financing Agreement by and among C. Allen Brown and Sea Island Company.

55. Shared Equity Financing Agreement by and among Todd W. Anderson, Stacey L. Anderson and Sea Island Company.

56. Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (The Cloister).

57. Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 24, 2004 (Sea Island Lodge).

58. Land Lease Agreement by and among Sea Island Company and Verizon Wireless of the East LP dated March 8, 2004 (Ocean Forest).

59. Master Lease Agreement by and among Sea Island Company and Sea Island Coastal Properties LLC and Computer Sales International, Inc. dated March 10, 2004.

60. Agreement by and among Sea Island Company and AG-Hill Farms, Inc. dated August 16, 2007.

61. Agreement by and among Sea Island Company and Tabby House, Inc. dated December 6, 2007.

62. Agreements by and among Sellers and any customer entered into in the ordinary course of business for services or accommodations to be provided to such customer by Sellers.

63. Rental agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences Sea Island Cottages and Beach Club Condominiums by Sea Island Company on behalf of unit owners.

64. Rental management agreements for the rental of the Beach Club Suites, the Cloister Ocean Residences, Sea Island Cottages and Beach Club Condominiums between Sea Island Company and the unit owners.

65. Master Lease Agreement by and among Sea Island Company and Deere Credit, Inc. dated July 8, 2008, and related individual equipment leases.

66. Agreement by and among Sea Island Resorts and CapSure, Inc. dated May 5, 2007.

67. National Service Agreement by and among Sea Island Company and Verizon Wireless dated December 23, 2008.

68. Travel Directory Marketing Agreement by and among The Cloister at Sea Island and Andrew Harper dated October 16, 2009.

69. Agreement by and among Sea Island Resorts and Fortibus Marketing of Charleston, LLC July 17, 2009.

70. Affiliate Hotel Agreement by and among Sea Island Resort and Clubcorp USA, Inc. dated August 7, 2009.

71. Cable Television Service Agreement and License by and among Sea Island Company and Owensboro-Brunswick, Inc. d/b/a Adelphia Cable Communications dated March 28, 2006.

72. Bulk Services Agreement by and among Sea Island Company and Comcast of Florida/Georgia, LLC dated April 23, 2008.

73. Container Lease Agreement #GGL 104459 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

74. Container Lease Agreement #GGL 105115 by and among Sea Island Company and Con Global Industries dated February 29, 2008.

75. Net Lease Agreement by and among Sea Island Company and JLV VASI, LLC dated September 5, 2008, as amended December 31, 2008.

76. Professional Services Agreement by and among Sea Island Company and Nancy Adcock.

77. Google Message Delivery Contract by and among Google, Inc. and Sea Island Company dated January 1, 2009.

78. Lease Agreement by and among Sea Island Company and Alfred W. Jones, III dated October 8, 2007.

79. Microsoft Enterprise Enrollment and Pricing for Office Pro Sea Island dated November 1, 2006 under Business Agreement U9423233 and Master Agreement Number 01E611258.

80. Software License Agreement by and among Sea Island Company and Newmarket International, Inc. dated December 30, 2003.

81. Property Exposure Contract No. 000902-0609-31 by and among The Cloister at Sea Island and Kiwi Collection Inc. dated June 23, 2009.

82. Property Exposure Contract No. 001403-0110-250 by and among The Lodge at Sea Island Golf Club and Kiwi Collection Inc. dated January 15, 2010.

83. Finance Agreement by and among Sea Island Company and Imperial Credit Corporation dated March 16, 2010.

84. Premium Finance Agreement and Disclosure Statement and Security Agreement by and among Sea Island Company and Imperial Credit Corporation dated June 17, 2010.

85. Letter Agreement by and among Sea Island Company and Atlantic Bike Shop, Inc. dated March 11, 2010.

86. Agreement by and among Sea Island Company and Georgia Power Company dated January 23, 2004.

87. Equipment Service Agreement by and among Sea Island Company and BancTec, Inc. dated January 22, 2007.

88. Merchant Agreement by and among Sea Island Resort and Columbus Bank and Trust dated March 11, 2009.

89. Business Rental Preferred Rate Agreement by and among Sea Island and Enterprise Leasing Company – Southeast dated July 8, 2010.

90. Concessionaire Agreement by and among Sea Island Company and Enterprise Rent-A-Car Southeast dated September 8, 2008.

91. Extended Warranty Agreement by and among Sea Island Company and SAFLOK, Inc. dated December 3, 2007.

92. Product Service Agreement by and among Sea Island Company and Dowling-Douglas Co. dated July 22, 2010.

93. Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated February 4, 2005.

94. Contract Service Arrangement Agreement by and among Sea Island Company and Bellsouth Telecommunications, Inc. dated May 18, 2006.

95. Transport Payment Plan by and among Sea Island Company and BellSouth Telecommunications, Inc. dated February 4, 2005.

96. Services Master Agreement by and among Sea Island Co. and BellSouth Company dated October 4, 2006.

97. Marketing Support Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998.

98. Card Acceptance Agreement by and among Sea Island Company and American Express Travel Related Services Company, Inc. dated November 20, 1998, as amended November 20, 1998 and January 15, 2002.

99. Master Services Agreement by and among Sea Island Company and International Business Machines Corporation dated December 28, 2005.

100. Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated January 10, 2006.

101. Service Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

102. Software License Agreement by and among Sea Island Company and Badger Meter, Inc. dated July 10, 2001.

103. Agreements entered into in the ordinary course of business with certain unaffiliated Persons for the short-term leasing of resort and event space.

104. Commercial lease contract by and among Sea Island Company and Island Acquisitions, LLC dated September 28, 2009.

105. Contract for Accounting Services by and among Sea Island Company and Eaddy Sams dated August 2, 2010.

106. Letter Agreement by and among Sea Island Company and Jack Lumpkin dated December 17, 2009.

107. Independent Contractor Agreement by and among Sea Island Company and Mike Taylor dated December 18, 2009.

108. Agreement by and among Sea Island Company and PEAK Technologies dated Sepetember 29, 2009.

109. SDD Managed Services Agreement (SDD-Hosted) by and between Sea Island Company and Systems Design and Development, Inc. Dated December 10, 2007.