IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Brunswick Division

| | |
|---|---|
| IN RE: | CHAPTER 11 CASE |
| | NUMBER 10-21034 |
| SEA ISLAND COMPANY, et al. | |
| Debtors | |

**FILED**

Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Brunswick, Georgia
*By cking at 9:26 am, Jun 18, 2014*

GOLDMAN, SACHS & CO.

      Financial Advisor/Movant

v.

SYNOVUS BANK,
BANK OF SCOTLAND PLC, AND
BANK OF AMERICA, N.A.

      Creditors

## OPINION AND ORDER ON FINAL FEE APPLICATION OF GOLDMAN, SACHS & CO.

This matter is before me on the "Final Application of Goldman, Sachs & Co. ("Goldman Sachs"), Financial Advisors to the Debtors and Debtors in Possession, for Final Allowance of All Fees and Expenses Incurred During the Period from August 10, 2010 Through December 16, 2010" ("Final Fee Application") (ECF No. 549); the Supplement to the Final Application of Goldman, Sachs & Co., Financial Advisors to the Debtors and Debtors In Possession, for Final Allowance of all Fees and Expenses Incurred" filed on

September 7, 2011 ("Fee Supplement") (ECF No. 673); and the subsequent "Waiver Of Incremental Fees Beyond Amounts Confirmed By The Court's June 14, 2012 Order And Further Supplement To The Final Application Of Goldman, Sachs & Co., Financial Advisors To The Debtors And Debtors In Possession, For Final Allowance Of All Fees And Expenses Incurred" filed on April 21, 2014 ("Fee Waiver") (ECF No. 1132).

A hearing on the Fee Application was held on September 8, 2011, after which I took the matter under advisement. After reviewing the record in this case, and for the reasons that follow, I find that Goldman Sachs is entitled to an advisory fee of $6,007,041.59.[1]

## FINDINGS OF FACT

The Sea Island Company, et al. ("Debtor"), filed a petition for chapter 11 bankruptcy relief on August 10, 2010. (ECF No. 1.) Pursuant to an engagement letter ("Engagement Letter") dated February 1, 2010, the Debtor employed Goldman Sachs to provide a variety of financial advisory services, including "providing

---

[1] The total fee amount represents 1.75% of $343,259,519.00, which is the total aggregate consideration paid for the Debtor's assets. The total aggregate consideration includes the cash purchase price of $210,723,720.00, cash at closing of $5,100,156.31, and assumed membership deposits of $127,435,643.00. Goldman Sachs has already received a payment of $4,000,000.00 on account of the undisputed portion of the advisory fees. Therefore, the net fee payable to Goldman Sachs is $2,007,041.59.

advice with regard to sale process strategy and bidder negotiations, evaluating strategic transaction alternatives and running a competitive and comprehensive public sale process." (Appl. to Employ Goldman Sachs, ECF No. 11 at 3.)

Synovus Bank, Bank of Scotland PLC, and Bank of America N.A. (collectively, the "Lenders") are pre-petition secured creditors of the Debtor that consented to the Debtor's employment of Goldman Sachs pursuant to the terms of the Engagement Letter. (See Lenders' Consent, Ex. C of ECF No. 11, at 61-75.) The Lenders now object to the amount of the Final Fee Application.

By order entered September 10, 2010, I authorized the Debtor to retain Goldman Sachs *nunc pro tunc* to the petition date. (ECF No. 168.) The order approved the Engagement Letter's fee provisions pursuant to 11 U.S.C. § 328(a) and provided that Goldman Sachs would be:

> compensated in accordance with the terms of the Engagement Letter, and, in particular, all of Goldman Sachs's fees and expenses in these chapter 11 cases and the indemnification, contribution and reimbursement provisions of the Engagement Letter are hereby approved pursuant to section 328(a) of the Bankruptcy Code. All compensation and reimbursement of expenses payable to Goldman Sachs pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standards of review set forth in section 330 of the Bankruptcy Code. For the avoidance of doubt, the entirety of the Engagement Letter, including without limitation Annex A thereto, is hereby approved.

(ECF No. 168 at 2.)

The Engagement Letter states that upon the sale of all or substantially all of the Debtor's assets, Goldman Sachs is entitled to a fee equal to the greater of "1.75% of the aggregate consideration paid in such transaction" or $4 million. (Engagement Letter, Ex. B of ECF No. 11, at 49.) "Aggregate consideration" includes the total consideration paid, the value of unsold assets, and "the principal amount of all indebtedness for borrowed money (including, without limitation, . . . any of the [Debtor]'s membership obligations for deposits) assumed by the [P]urchaser." (Id. at 50.)

The Debtor operated the Sea Island Club and the Ocean Forest Golf Club, golf and resort clubs with approximately 3,000 outstanding members at the time the Debtor filed bankruptcy. (Tr. of Final Fee Appl. Hr'g 22:1-22:10, Sept. 8, 2011, ECF No. 679.) Most club members ("Members") were required to pay a deposit to join their club ("Membership Deposits"). (See id. at 20:13-20:25.) The Membership Deposits ranged in amount from several thousand dollars to as much as $250,000.00. (Id. at 21:15-21:25.) Under the Debtor's membership agreements ("Original Membership Agreements"), the Debtor promised to refund each Member's individual Membership Deposit on the date thirty years after the Member joined the club ("Membership Deposit Refund Obligation"). (See Sch. 11.1, Ex. A of ECF No. 293, at 136-39.)

AO 72A
(Rev. 8/82)

The Debtor's chapter 11 plan contemplated the sale of all or substantially all of the Debtor's assets. (See Am. Chapter 11 Plan, ECF No. 217.) The Plan provided that the Debtor would pay Goldman Sachs's Fee as an administrative expense from the proceeds of the sale. (See Am. Discl. Statement, ECF No. 216, at 13.) After satisfaction of these administrative expenses, the Purchase Proceeds plus the Debtor's cash on hand would then be used to make a distribution to the Lenders as holders of secured claims. (See id.)

Goldman Sachs assisted the Debtor with seeking out potential buyers. (See Tr. of Final Fee Appl. Hr'g 38:15-42:7.) During the selection process, Goldman Sachs created schedules comparing the consideration that potential buyers had offered. (See id. at 60:10-61:25.) Because the Membership Deposit Refund Obligations could be valued by potential buyers in different ways, Goldman Sachs asked a consultant to place a single value on the Membership Deposit Refund Obligations to help the Debtor better evaluate competing bids. (See id. at 47:21-48:10.) The consultant provided a net present value of approximately $43 million, which Goldman Sachs listed on the schedules comparing competing offers. (See id. at 47:21-50:17, 60:10-61:25.)

At an auction on October 11, 2010, Sea Island Acquisition LP ("Purchaser") was selected as the highest bidder for the Debtor's assets. (Plan Supp., ECF No. 294 at 2.) The Debtor's Plan

AO 72A
(Rev. 8/82)

Supplement included the Liquidation Trust Agreement (Ex. A of ECF No. 294), a summary of the club membership programs the Purchaser planned to offer to Members (Exs. B, C of ECF No. 294), and a schedule of assumed contracts (Ex. D of ECF No. 294). The Asset Purchase Agreement ("APA"), which was filed on October 19, 2010, governed the sale of the Debtor's assets to the Purchaser. (See APA, Ex. A of ECF No. 293, at 4-139.) On November 8, 2010, I confirmed the Debtor's plan and approved the sale of assets to the Purchaser. (ECF No. 372.)

According to the Plan Supplement, the Purchaser would give Members the opportunity to sign new membership agreements ("New Membership Agreements") by December 31, 2010, and those who signed them would receive credit for their Membership Deposits under Section 11.1(b) of the APA. (See ECF No. 294 at 3-4.) Section 11.1(b) of the APA states:

> Purchaser will credit to new member accounts of Club Members who execute [New Membership Agreements] an amount equal to their respective existing [M]embership [D]eposits that had been paid in cash. [Members who sign New Membership Agreements] will not be required to post any additional deposit amounts to join under the New Membership Programs. Purchaser will refund [M]ember[ship] [D]eposits . . . as set forth on Schedule 11.1(b).

(APA, Ex. A of ECF No. 293, at 45.) The Plan Supplement also states that if Members sign New Membership Agreements, then the Members' claims on account of the Membership Deposit Refund

Obligations against the Debtor, the Debtor's estate, and the Liquidation Trust will be extinguished. (See ECF No. 294 at 3-4.)

The Plan Supplement and Schedule 11.1(b) of the APA indicate that the Purchaser's New Membership Agreements would change the date that Members would receive their Membership Deposit Refunds. (See Ex. B of ECF No. 294, at 42-46; Ex. C of ECF No. 294, at 47-50; ECF No. 293 at 136-39, 275-278.) Under the New Membership Agreements, each Member would receive his or her Membership Deposit Refund on the later of December 31, 2035, or thirty years after the Member originally joined the post-bankruptcy New Sea Island Club or New Ocean Forest Golf Club. (See Sch. 11.1, Ex. A of ECF No. 293, at 136-39.)

Section 2.3 of the APA, entitled "Assumed Liabilities," lists certain liabilities and obligations the Purchaser agreed to "assume, and thereafter pay, perform and discharge, promptly when payment or performance is due or required," on the closing date of the sale ("Closing Date"). (APA, Ex. A of ECF No. 293, at 18-19.) The Membership Deposit Refund Obligations are not listed. (See id.)

Section 2.4 of the APA, entitled "Excluded Liabilities," lists liabilities and obligations that the Debtor would retain as of the Closing Date, including:

> any and all obligations and liabilities (A) arising or in connection with any Club Member Agreements, including, but not limited to, obligations and

7

liabilities arising or in connection with the Specified Club Member Agreements, or (B) owed to, or for the benefit of, [Club Members] including, but not limited to, any and all obligations and liabilities arising under or related to any membership agreements related to such members; ***provided, however that Purchaser has agreed to provide to certain Club Members the benefits set forth on Schedule 11.1(b) hereto.***

(APA, Ex. A of ECF No. 293, at 19-20) (emphasis added).

In its Final Fee Application, Goldman Sachs requested $6,346,865.78 in fees and $153,355.52 for reimbursement of expenses. (See Final Fee Appl., ECF No. 549 at 1.) Goldman Sachs filed a Supplement to the Final Fee Application on September 7, 2011, requesting $647,969.42 for reimbursement of additional litigation expenses related to the Final Fee Application. (See Fee Supp., ECF No. 673 at 1-2.) As part of the aggregate consideration, Goldman Sachs initially included $146,854,168.00 as the "Face Value of Assumed Membership Deposits." (See Ex. C of ECF No. 549, at 38.) The Lenders objected to the inclusion of the Membership Deposit Refund Obligations as part of the aggregate consideration, asserting that the Purchaser did not assume the Membership Deposit Refund Obligations as contemplated by the Engagement Letter. (See Lenders' Obj. to Final Appl., ECF No. 581 at 7-9.)

The Lenders only objected to the $2.3 million in fees Goldman Sachs requested over and above the $4 million minimum. (Lenders' Obj. to Final Appl., ECF No. 581.) If the Membership

AO 72A
(Rev. 8/82)

Deposit Refund Obligations are not included in the aggregate consideration, then 1.75 percent of the aggregate consideration would be less than $4 million, resulting in an actual fee paid to Goldman Sachs of the $4 million minimum. Recognizing the dispute over this portion of Goldman Sachs's Fee Application, the Lenders and Goldman Sachs agreed to deposit the disputed $2.3 million in escrow. (Final Fee Appl., ECF No. 549, at 5.)

On July 20, 2011, the Lenders filed a Motion in Limine to Exclude Parol Evidence from the hearing on the Final Fee Application ("Motion in Limine"). (ECF No. 618.) The Lenders sought to prevent Goldman Sachs from introducing extrinsic evidence concerning the nature, terms, purpose, or intent of the Engagement Letter. (ECF No. 654-1 at 1.) After objection by Goldman Sachs, I recused myself from the Motion in Limine and assigned it to Susan D. Barrett, Chief Bankruptcy Judge for the Southern District of Georgia. (Order Reassigning Hr'g, ECF No. 643.)

A hearing was held on August 30, 2011, and the Motion in Limine was granted. (Order Granting Mot. in Limine, ECF No. 667.) Judge Barrett determined that the Engagement Letter was unambiguous on its face and therefore the intent of the parties must be gleaned from within the four corners of the document. (See id. at 8.) Judge Barrett held that the term "assume," as used in the Engagement Letter, is not limited to its definition

AO 72A

(Rev. 8/82)

under 11 U.S.C. § 365 of the Bankruptcy Code, but instead "takes on its broad, plain and ordinary layman's meaning." (Id. at 8-9.) Citing Webster's Dictionary, Judge Barrett held that "assume" means to "take up or into," "to take to or upon oneself," "to take over as one's own (the debts of another)," or "to make oneself formally liable for." (Id. at 9.)

On September 8, 2011, Goldman Sachs's Final Fee Application and the Lenders' objection came on for hearing. At the close of hearing, I declared that evidence was closed. (See Tr. of Final Fee Appl. Hr'g 78:18-79:6, ECF No. 679.) In its Post-Trial Memorandum, Goldman Sachs stated that the amount of Membership Deposit Refund Obligations assumed by the Purchaser would be on the record in this case once the Liquidation Trustee filed objections to the bankruptcy claims of Members who signed New Member Agreements.[2] (Goldman Post-Trial Mem., ECF No. 686 at 4.)

On November 16, 2011, the Liquidation Trustee filed the Fourth Omnibus Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 ("Fourth Omnibus Objection"). (ECF No. 699.) The Liquidation Trustee sought disallowance of 304 claims totaling $30,300,325.38 (See Ex. A of

---

[2] In addition, at the hearing on September 8, 2011, Mr. David Bansmer (former president and chief operating officer of the Debtor throughout the preconfirmation transition) alluded to the significance of claims objections when he said that he "believe[d] that you can look at the unsecured claimant claims in this case and you will understand exactly those members that didn't take up the new membership." (Tr. of Final Fee Appl. Hr'g 30:20-31:1, ECF No. 679.)

ECF No. 699, at 1-51), stating that the claims had been extinguished as a matter of law when the Member-claimants had signed New Membership Agreements (ECF No. 699 at 3-4). On the schedule accompanying the Fourth Omnibus Objection, each claim's "Reason for Disallowance" was stated as "CLUB MEMBERSHIP CLAIM." (See Ex. A of ECF No. 699, at 1-51.) According to the Liquidation Trustee, the Fourth Omnibus Objection addressed claims for which Members filed proofs of claim on account of their Membership Deposits. (Statement by Liquidation Trustee, Hr'g on Feb. 9, 2012.)

After claimants filed responses and the Liquidation Trustee withdrew his objection to several claims, claims totaling $29,595,180.89 were disallowed as a result of the Fourth Omnibus Objection. (See Order Sustaining Fourth Omnibus Objection, ECF No. 750; Further Order Sustaining Fourth Omnibus Objection, ECF No. 763.)

On January 9, 2012, the Liquidation Trustee filed the Fifth Omnibus Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007 ("Fifth Omnibus Objection"). (ECF No. 729.) The Liquidation Trustee sought disallowance of 1824 claims totaling $127,938,143.00 (See Ex. A of ECF No. 729, at 1-305), stating that these claims had been extinguished as a matter of law when the Member-claimants had signed New Membership Agreements (See ECF No. 729 at 3-4). On the

AO 72A

(Rev. 8/82)

schedule accompanying the Fifth Omnibus Objection, each claim's "Reason for Disallowance" was stated as "No Liability–Membership Deposit has been Assumed." (Ex. A of ECF No. 729, at 1–305.) According to the Liquidation Trustee, the Fifth Omnibus Objection addressed those claims that the Debtor listed on its bankruptcy schedules. (Statement by Liquidation Trustee, Hr'g on Feb. 9, 2012.)

After claimants filed responses and the Liquidation Trustee withdrew his objection to several claims and reinstated others, claims totaling $127,435,643.00 were disallowed as a result of the Fifth Omnibus Objection. (See Order Sustaining Fifth Omnibus Objection, ECF No. 851; Further Order Sustaining Fifth Omnibus Objection, ECF No. 929.)

On April 18, 2012, a Notice was issued stating that, pursuant to Rule 201 of the Federal Rules of Evidence, the Court intended to take judicial notice of the Fourth and Fifth Omnibus Objections and the Orders sustaining those Objections. (ECF No. 855.) The Notice provided:

> At the close of hearing on the Final Fee Application on September 8, 2011, the matter was taken under advisement. Counsel for Goldman Sachs noted at hearing and in his post-trial memorandum that the Liquidation Trustee would be filing objections to certain claims and that the resolution of those objections would establish the amount on which a portion of the fees sought by Goldman Sachs was based. Indeed, while the matter has been under advisement, the Liquidation Trustee filed objections to the claims of two relevant groups of unsecured creditors. The Fourth Omnibus

AO 72A
(Rev. 8/82)

Objection addressed creditors who filed proofs of claim for membership deposit refunds owed by the Debtor. The Fifth Omnibus Objection addressed creditors who held claims for membership deposit refunds by virtue of appearing on the Debtor's bankruptcy schedules and not being listed as disputed, contingent, or unliquidated.

**Interested parties are afforded thirty (30) days to submit briefs addressing the relevance of the Liquidation Trustee's Fourth and Fifth Omnibus Objections to the Final Fee Application of Goldman, Sachs & Co.**

(ECF No. 855.)

The parties submitted briefs on the judicial notice issue in May 2012 (ECF No. 881; ECF No. 900) and reply briefs in June 2012 (ECF No. 926; ECF No. 941).

Since that time, the Liquidation Trustee has continued to file new claims objections. The deadline for filing objections to claims in the Debtor's bankruptcy case has been repeatedly extended; the current deadline is August 29, 2014. (ECF No. 1135.)

On April 21, 2014, Goldman Sachs filed a Waiver of its right to any incremental advisory fees based on the membership deposit liability beyond the amount confirmed in the Orders Sustaining the Liquidation Trustee's Fifth Omnibus Objection. (ECF No. 1132.) The $18 million difference between the $145 million "Face Value of Assumed Membership Deposits" and the $127.4 million established by the Orders Sustaining the Liquidation Trustee's Fifth Omnibus Objection amounts to a waiver of approximately

AO 72A
(Rev. 8/82)

$340,000.00 of the $2.3 million in dispute. (<u>See</u> ECF No. 1132 at 3.)

## CONCLUSIONS OF LAW

### I) <u>The Lenders' Objections to Goldman Sachs's Fee Application are Without Merit and are Therefore Overruled.</u>

The Lenders object to Goldman Sachs's Final Fee Application for several reasons. First, the Lenders argue that the Membership Deposit Refund Obligations should not be considered part of the aggregate consideration of the sale because they were not "assumed" by the Purchaser as contemplated by the Engagement Letter. (Lenders' Obj. to Final Appl., ECF No. 581 at 2.) Alternatively, the Lenders argue that even if the Purchaser did assume the obligations, Goldman Sachs's fee should be reduced because it is not reasonable. (<u>Id.</u> at 11.) A reasonable fee, according to the Lenders, should be based upon the net present value of the Purchaser's payment obligations for membership deposits rather than the "face value" of such obligations as advocated by Goldman Sachs. (<u>See</u> Lenders' Post-Trial Br., ECF No. 687 at 11-15.) Finally, the Lenders contend that Orders Sustaining the Liquidation Trustee's Fifth Omnibus Objection do not establish the actual measure of its advisory fee. (<u>See</u> Response to Goldman Sachs's Fee Waiver, ECF No. 1154 at 7-10.)

AO 72A
(Rev. 8/82)

### a) Under the Terms Of the Engagement Letter, the Purchaser Assumed the Membership Deposit Refund Obligations of the Debtor When It Credited the Old Membership Deposits to the Members' New Accounts.

First, the Lenders argue that the APA, by itself, shows that the Purchaser did not assume the Membership Deposit Refund Obligations. (Lenders' Post-Trial Br., ECF No. 687 at 8-9.) According to the Lenders, the "Assumed Liabilities" and the "Excluded Liabilities" in the APA clearly identify which obligations the Purchaser assumed and which it did not. (Id. at 9.) The Lenders contend that the APA is clear and unambiguous and contains a merger clause, and therefore no further information is necessary to determine whether the Purchaser assumed any Membership Deposit Refund Obligations. (Id. at 8.) According to the Lenders' reasoning, it was impossible for the Purchaser to assume any Membership Deposit Refund Obligations after the APA was executed because those obligations were listed under "Excluded Liabilities" and not under "Assumed Liabilities." (See id.)

I disagree. The APA identified the liabilities and obligations the Purchaser assumed "effective at the time of the Closing." (APA, Ex. A of ECF No. 293, at 18.) The Membership Deposit Refund Obligations were not listed under "Assumed Liabilities" because the Purchaser did not agree to assume all those obligations on the Closing Date. (See id.) Rather, the

15

Purchaser planned to assume the obligations by crediting the Members' accounts for the amount of their Membership Deposits when the Members signed New Membership Agreements post-closing. (See Ex. A of ECF No. 293, at 44-45.)

The Engagement Letter states that Goldman Sachs would be paid a fee based on the Membership Deposit Refund Obligations "assumed by the [P]urchaser." (Ex. A of ECF No. 11, at 50.) The Engagement Letter does not restrict the fee to only those Membership Deposit Refund Obligations that the Purchaser assumed on the Closing Date. (See id.)

Moreover, the amount of Membership Deposit Refund Obligations assumed by the Purchaser was unascertainable at the time the APA was executed. It was impossible to predict how many Members, if any, would sign New Membership Agreements.[3] Thus, the Membership Deposit Refund Obligations could not be listed under "Assumed Liabilities" in the APA. Likewise, the Membership Deposit Refund Obligations were listed under "Excluded Liabilities" because the obligations remained those of the Debtor until the individual Members signed New Membership Agreements. It does not mean, however, that the Purchaser could never assume those obligations at a later date. Accordingly, whether the

---

[3] It was possible, although unlikely, that none of the Members would sign New Membership Agreements. If so, the Purchaser would not have assumed any of the Membership Deposit Refund Obligations.

AO 72A

(Rev. 8/82)

Purchaser assumed any obligations on the Closing Date under the APA is not dispositive.

Second, the Lenders argue that the Purchaser did not assume the Membership Deposit Refund Obligations because the Purchaser altered the terms of the Original Membership Agreements. (Lenders' Obj. to Final Appl., ECF No. 581 at 2.) The New Membership Agreements extended the date on which Members would be refunded their Membership Deposits. According to the New Membership Agreements, the Membership Deposit Refund Obligations would become due on a later date than what was promised under the Original Membership Agreements. The Lenders contend that this change in terms could not have resulted in an assumption of the obligations by the Purchaser. (See Lenders' Post-Trial Br., ECF No. 687 at 7-8.)

Conversely, Goldman Sachs argues that "[t]he Engagement Letter does not require the Purchaser to assume the [Original Membership Agreements] without alteration or amendment; it only requires that the [P]urchaser assume the 'indebtedness' reflected in the '[M]embership [D]eposit [Refund Obligations].'" (Goldman's Pretrial Mem., ECF No. 674 at 7.)

I agree with Goldman Sachs. The plain language of the Engagement Letter states that Goldman Sachs is entitled to a fee based on any indebtedness assumed or repaid by the Purchaser.

AO 72A

(Rev. 8/82)

There is no requirement that the indebtedness be assumed or repaid on identical terms.

Moreover, in advancing their argument, the Lenders rely on the legal definition of "assume" rather than its "plain and ordinary layman's meaning," as instructed by Judge Barrett. (See Order, ECF No. 667 at 8-9.) According to the Lenders,

> [The Purchaser] simply agreed to *offer* New Membership Programs to the old club members, who then had the option of accepting or rejecting those new terms. [Purchaser's] undertaking was to offer a novation of the prior membership club agreements. This is very different from agreeing to be bound as the Debtors had been bound by those prior agreements, and therefore this was no assumption of the Debtors' obligations under the common understanding of the term "assumed."

(Lenders' Resp. to Waiver, ECF No. 1154 at 5.)

The Lenders cite to case law in an effort to demonstrate that an assumption occurs only when the assuming party is "bound as such other was bound" or agrees to "pay that debt when it is due." (Lenders' Post-Trial Br., ECF No. 687 at 7.) Furthermore, the Lenders assert that they cannot find any legal authority in support of the proposition that one can assume an obligation when there are alterations to the material terms. (See id. at 7 n.1) However, I am not persuaded that consulting case law is the appropriate means to ascertain a word's plain and ordinary layman's meaning. I find it more appropriate to look at what a "plain and ordinary layman" would think the word "assume" means in this context. The Lenders argue that Members would not think

18

that the Purchaser assumed the Debtor's Membership Deposit Refund Obligation because the Members would have to wait an additional twenty-five to thirty years to get their Membership Deposit Refunds. (See Tr. of Final Fee Appl. Hr'g 12:17–12:24, ECF No. 679.)

I disagree. According to Judge Barrett, the text of the Engagement Letter does not indicate "assume" should be interpreted so formally:

> The terms "Transaction," "Advisory Fee" and "Aggregate Consideration" are clearly and unambiguously defined in the Engagement Letter. "Transaction" is broadly defined to include both bankruptcy and non-bankruptcy sales and mergers, excluding credit bids by the Lenders. "Aggregate consideration" includes "the principal amount of all indebtedness for borrowed money {including, without limitation . . . any of the [Debtors' club] membership obligations for deposits} assumed by the purchaser." The focus is upon what is "assumed" by the purchaser. **"Assume" takes on its broad, plain and ordinary layman's meaning.** According to Webster's dictionary, the word "assume" means to "take up or into", "to take to or upon oneself", "to take over as one's own (the debts of another)" or "to make oneself formally liable for." See Webster's Third New International Dictionary 133 (2002).
>
> To the extent the Lenders argue the word "assume" can only be defined under section 365 of the Bankruptcy Code regarding the acceptance/rejection of executory contracts, I find the word is not so limited. The Engagement Letter was entered into six months before the bankruptcy petitions were filed. From a review of the Engagement Letter, it is clear that bankruptcy is one of the many possibilities, but not the only course of action. The parties expressly incorporated the Bankruptcy Code when they intended to confine the scope of a provision to the Bankruptcy Code. For example, in defining "Transaction" the parties specifically included within the definition a sale consummated

through a plan of reorganization pursuant to chapter 11, title 11 of the United States Code; the Engagement Letter specifically states in a chapter 11 proceeding Goldman [Sachs] would be retained pursuant to §327 and §328 of the Bankruptcy Code and not subject to §330 standard of review; and the Engagement letter also states Goldman's fees and expenses will be entitled to be treated as administrative expense claims pursuant to §§503(b) (1) (A) and 507(a) (1). Engagement Letter, Dckt. No. 11, pp. 53-54.

The parties are highly sophisticated and entered into a well-drafted and thoroughly negotiated Engagement Letter. Contemporaneously, they also obtained a detailed consent from the Lenders. "[M]ere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of fact." Innophos, Inc. v. Rhodia, S.A., 832 N.Y.S.2d 197, 199 (N.Y. App. Div. 2007) (citations omitted). **From the Engagement Letter, it is clear that if the parties intended "assume" to mean anything other than its plain, ordinary meaning, they would have taken steps to set forth such a definition.** Omni Quartz, Ltd. v. CVS Corp., 287 F .3d 61, 64 (2d Cir. 2002) (it is "well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract").

(Order Granting Mot. in Limine, ECF No. 667 at 8-10) (emphasis added.)

Applying the plain and ordinary layman's meaning, I find that the Purchaser assumed the Membership Deposit Refund Obligations. The Members paid a specific amount of money to join the clubs and expected a refund of that money approximately thirty years later. When the Purchaser bought the Debtor's assets, the Members did not have to pay any additional fees when they signed New Membership Agreements. Their Membership Deposits

AO 72A
(Rev. 8/82)

were credited to their new accounts. Therefore, the Members will receive their Membership Deposit Refunds from the Purchaser instead of the Debtor, albeit at a later date. Whenever the refund is paid, it will remain a refund of the original Membership Deposit that the Member paid. Accordingly, I find that the Purchaser "took over as its own the debt of the Debtor" when it credited the Membership Deposits to the Members' new accounts.


### b) The Fee Requested by Goldman Sachs is Not Improvident Pursuant to 11 U.S.C. § 328(a).

The Lenders argue that awarding Goldman Sachs a fee based on the principal amount of the Membership Deposit Refund Obligations would be unreasonable or improvident. (See Lenders' Post-Trial Br., ECF No. 687 at 11-15.) I approved the Debtor's employment of Goldman Sachs (ECF No. 168) pursuant to 11 U.S.C. § 328(a), which states that:

> the court may allow compensation different from the compensation provided under such terms and conditions [agreed to by the parties] after the conclusion of such employment, if such terms and conditions prove to have been **improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.**

11 U.S.C. § 328(a) (emphasis added).

When a court has approved retention of a professional pursuant to § 328(a), the court is constrained to apply only the

AO 72A
(Rev. 8/82)

legal standard of § 328(a) in reviewing a fee application. See Lazard Freres & Co. LLC v. Northwestern Corp. (In re Northwestern Corp.), 344 B.R. 40, 43 (D. Del. 2006); Unsecured Creditors Comm. v. Webb & Daniel, 204 B.R. 830, 834 (M.D. Ga. 1997). Therefore, I may only award Goldman Sachs different compensation than what is stated in the Engagement Letter if the terms and conditions of the Engagement Letter are shown to be "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." See 11 U.S.C. § 328(a).

Compensation cannot be altered merely because a party failed to actually anticipate a development. See Unsecured Creditors Comm., 204 B.R. at 834 (stating that to alter a fee agreement under § 328(a), a court must find that it was not possible to anticipate a certain development). Here, the calculation of Goldman Sachs's fee based on the principal amount of the Membership Deposit Refund Obligations was not only capable of being anticipated, it was expressly stated in the Engagement Letter. (Ex. A of ECF No. 11, at 50) (stating that aggregate consideration includes "the principal amount of . . . [the Debtor's Membership Deposit Refund Obligations] assumed by the [P]urchaser.")

The Lenders argue that they "could not anticipate that Goldman [Sachs] would attempt to use the greater face value of allegedly assumed membership deposits in calculating its fees

while it used the substantially lower net present value in its efforts to market the resort." (Lenders' Post-Trial Br., ECF No. 687 at 12.) However, the Engagement Letter does not use the words "net present value." The Debtor and Goldman Sachs signed the Engagement Letter, to which the Lenders consented, months before anyone calculated the net present value of the Membership Deposit Refund Obligations. Again, the Engagement Letter clearly states that the "principal amount" of the Membership Deposit Refund Obligations assumed by the Purchaser would be used to calculate the fee. The Lenders seek to change the basis of the fee paid to Goldman Sachs by arguing that they did not anticipate a development that was expressly stated in the Engagement Letter. I find that argument disingenuous.

The Lenders further argue that the fee sought by Goldman Sachs is not reasonable because it gives Goldman Sachs a "double recovery." (See Lenders' Post-Trial Br., ECF No. 687 at 13-15.) The Lenders aver that the Purchaser benefited from the ability to alter the terms of the Membership Agreements by extending the date the Membership Deposits would have to be refunded, and that benefit enabled them to pay more for the Debtor's assets. (Id.) The Lenders contend that because Goldman Sachs's fee was based on that increased purchase price, allowing them to receive an additional fee for the assumed Membership Deposit Refund Obligations would be unreasonable. (Id.) The Lenders maintain

AO 72A

(Rev. 8/82)

that "it would be highly improvident to allow a double recovery as Goldman has requested." (Id. at 15.)

Again, this argument runs afoul of the clear language of the Engagement Letter, which states that a portion of Goldman Sachs's fee will be based on the principal amount of assumed Membership Deposit Refund Obligations. Accordingly, I find that the calculation of Goldman Sachs's fee is not improvident in light of developments not capable of being anticipated at the time I approved the Debtor's employment of Goldman Sachs. Therefore, Goldman Sachs must be compensated according to the terms set forth in the Engagement Letter.

### c) Goldman Sachs Is Entitled to Advisory Fees Based Upon $127,435,643.00 of Membership Deposit Refund Obligations Assumed By the Purchaser.

A fee applicant has the burden to show it is entitled to the fees it requests. See In re Golf Augusta Pro Shops, Inc., No. 01-11989, 2004 WL 768576, at *2 (Bankr. S.D. Ga. 2004) (citing Norman v. Hous. Auth. Of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988)). In its Fee Waiver, Goldman Sachs adopts its previous position that the record in this case can establish the amount of Membership Deposit Refund Obligations assumed by the Purchaser. (See Fee Waiver, ECF No. 1132 at 3; see also Goldman Sachs's Post-Trial Mem., ECF No. 686 at 16.) For purposes of determining

24

the amount of Membership Deposit Refund Obligations assumed by the Purchaser, Goldman Sachs invokes as instructive the Liquidation Trustee's objections to claims on the grounds that the claims were extinguished because the Members holding the claims signed New Membership Agreements. (See ECF No. 686 at 16.) According to Goldman Sachs, the dollar amount of the claims that were disallowed for this reason would "unequivocally establish the exact dollar amount" of Membership Deposit Refund Obligations assumed by the Purchaser. (Id. at 4.)

Rule 201 of the Federal Rules of Evidence governs a court's ability to take judicial notice of adjudicative facts. Fed. R. Evid. 201. According to Rule 201(c), "the court may take judicial notice, whether requested or not." A court is not required to notify parties when it takes judicial notice; however, a party is entitled to be heard on the matter upon request. Fed. R. Evid. 201(e). Ordinarily, when taking judicial notice of a fact, the judge should notify the parties and afford them an opportunity to be heard. See U.S. v. Garcia, 672 F.2d 1349, 1356 n.9 (11th Cir. 1982). Accordingly, I afforded the Lenders and Goldman Sachs an opportunity to submit briefs on the relevance of the Fourth and Fifth Omnibus Objections in determining the amount of Membership Deposit Refund Obligations assumed by the Purchaser. (Notice, Apr. 18, 2012, ECF No. 855.)

In their brief, the Lenders repeat many of the arguments they raised at the hearing on the Fee Application—that the Purchaser did not assume any Membership Deposit Refund Obligations and that the fee should be based on net present value. (See ECF No. 881 at 1-7.) The only argument advanced by the Lenders that addresses the Court's intention to take judicial notice of the Fourth and Fifth Omnibus Objections is the Lenders' contention that the Objections are not accurate because there are duplicative entries. (See ECF No. 881 at 7-8.)

The Fourth Omnibus Objection disallowed $29,595,180.89 of claims and the Fifth Omnibus Objection disallowed $127,435,643.00 of claims, for a total of $157,030,823.89 of claims disallowed. Goldman Sachs's initial Fee Application contends that the Purchaser assumed approximately $146 million of Membership Deposit Refund Obligations. In its brief, Goldman Sachs explains that duplicate entries exist because some Members decided to file proofs of claim for their Membership Deposit Refunds even though the debts appeared on the Debtor's schedules and were not contingent, unliquidated, or disputed. (See ECF No. 900 at 5-6.) Therefore, the Liquidation Trustee had to object to both the proofs of claim and the scheduled debts. (See id.) Considering the inevitable overlap of the claims covered by the Fourth and Fifth Omnibus Objections, the amount disallowed under the

AO 72A
(Rev. 8/82)

Objections is too vague to establish the Membership Deposit Obligations assumed by the Purchaser. (See ECF No. 881 at 7-8.)

Goldman Sachs's Fee Waiver addresses this problem completely. By relying solely on the Fifth Omnibus Objection to determine the Membership Deposit Obligations assumed, there is no overlap between the two objections, and identification of the duplicated scheduled debts and claims is unnecessary. Furthermore, the Fifth Omnibus Objection states that the claims are disallowed because the "Membership Deposit has been Assumed." On the other hand, the Fourth Omnibus Objection merely states that the claims are "CLUB MEMBERSHIP CLAIM(S)." Thus, unlike the Fourth Objection, "[t]here can be no dispute that the *only* basis for disallowing the claims in the Fifth Objection was that the underlying membership deposits have 'been Assumed'; The Liquidation Trustee cited those grounds, and no others, in support of the Fifth Objection." (ECF No. 941, at 2.) Since the Liquidation Trustee is empowered to "exercise its business judgment for the benefit of the Beneficiaries in order to maximize the value of the Trust Assets and distributions," the Trustee's stated reason for seeking disallowance of claims is compelling evidence that the Purchaser assumed the Membership Deposit Obligations. (Ex. A of ECF No. 294, at 20.)

AO 72A

(Rev. 8/82)

The Lenders object to the application of the Fifth Omnibus Objection to determine the amount of Membership Deposit Refund Obligations assumed by the Purchaser:

> It is the responsibility of the Court, not the Liquidation Trustee, to interpret the contractual language in the Engagement Letter to determine whether there has been an assumption. Simply repeating a conclusory phrase, that of the Liquidation Trustee in this instance, does not change the contract terms and create an assumption. Additionally, the only way that the Liquidation Trustee could have obtained the information set forth in the Exhibits to the Objections is from SIA, the purchaser of the Debtor's assets. . . . Goldman does not know this first hand, and it certainly did not prove its "understanding" at the evidentiary hearing. Once again, the Exhibits to the Objections merely constitute hearsay evidence upon which Goldman is now relying in an attempt to prove "the exact dollar amount of the credits the Purchaser extended to club members for membership deposits."

(Lenders' Response to Waiver, ECF No. 1154 at 9.)

"Hearsay" has nothing to do with the determinations made here. In the Liquidation Trustee's Fifth Omnibus Objection to Claims, which is a matter of record in this case, the Liquidation Trustee stated as the sole grounds for objection "No liability-Membership Deposit has been assumed. (See Ex. A of ECF No. 729.) Under the confirmed plan, which is also a matter of record in this case, the Plan Supplement gave Members the opportunity to sign new membership agreements. (See § 6.06 Club Membership Agreements, ECF No. 217, at 37-38.) According to the APA, which is also of record in this case, for those who signed new membership agreements:

> Purchaser will credit to new member accounts of Club Members who execute [New Membership Agreements] an amount equal to their respective existing [M]embership [D]eposits that had been paid in cash. [Members who sign New Membership Agreements] will not be required to post any additional deposit amounts to join under the New Membership Programs. Purchaser will refund [M]ember[ship] [D]eposits . . . as set forth on Schedule 11.1(b).

(APA, Ex. A of ECF No. 293, at 45.) The Plan Supplement also states that if Members sign New Membership Agreements, then the Members' claims on account of the Membership Deposit Refund Obligations against the Debtor, the Debtor's estate, and the Liquidation Trust will be extinguished. (See ECF No. 294 at 3-4.)

The determinations made here rely on the record in this case, not on any possible hearsay. The basis for finding that the Purchaser assumed the debt for Membership Deposits is the success of the Liquidation Trustee's objections in his Fifth Omnibus Objection, not merely his characterization of the objected to claims as assumed. The liability of the Liquidation Trust was extinguished only because the members signed on to the new club which rendered the Purchaser liable for the debt according to the Plan Supplement.

I determine here that the Fifth Omnibus Objection and the Orders sustaining it sufficiently establish the amount of Membership Deposit Refund Obligations assumed by the Purchaser. Thus, Goldman Sachs is entitled to an incremental advisory fee based on $127,435,643.00 of Membership Deposit Refund Obligations

AO 72A
(Rev. 8/82)

assumed by the Purchaser based upon the Liquidation Trustee's success in his Fifth Omnibus Objection.


## II) **Pursuant to 11 U.S.C. § 503(b)(1)(A) and the Terms and Conditions of the Engagement Letter, Goldman Sachs May Be Entitled to Reimbursement of Its Expenses and Attorneys' Fees.**

In addition to its incremental advisory fee, Goldman Sachs also requests reimbursement for expenses in the amount of $1,001,482.58:

- $153,355.52 incurred during the period from August 10, 2010, through December 16, 2010, as set forth in the initial Fee Application (ECF No. 549);

- $550,378.00 of legal fees and $97,591.42 of reimbursable expenses from December 17, 2010 through August 31, 2011, incurred in litigating the Fee Application, including the September 2011 hearing and pre- and post-hearing briefing, as set forth in the Fee Supplement(ECF No. 673); and

- $200,157.64 in additional legal fees and costs since August 31, 2011, incurred in further litigating the Fee Application, including the preparation of supplemental briefing in 2012 regarding the significance of the Fifth Objection (together with the expenses set forth in the Fee Supplement, the "Additional Expenses").

AO 72A
(Rev. 8/82)

(Waiver, ECF No. 1132 at 6.) The Engagement Letter provides for reasonable attorneys' fees:

> You also agree to reimburse us quarterly, and upon consummation of the transaction or transactions contemplated hereby or upon termination of our services pursuant to this letter, for our reasonable expenses, **including the reasonable fees and disbursements of our attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this letter agreement,** whether incurred before or after the execution of this letter agreement (such amounts which expressly exclude the indemnity obligations set forth in Annex A, the "Expenses"); provided, however, that such expenses shall not include any allocated overhead or fees of internal personnel including counsel. **The fees and disbursements of counsel retained pursuant to the immediately preceding sentence shall not exceed $100,000 in the aggregate without the prior consent of the Company, such consent not to be unreasonably withheld; provided, however, this sentence shall in no way affect the Company's obligations as set forth in Annex A to this letter.**

(Engagement Letter, Ex. B to ECF No. 11, at 53.) Pursuant to the terms of the Engagement Letter, a "$100,000 reserve has been established in escrow . . . which may be applied toward the costs and expenses that Goldman Sachs incurs in prosecuting this Final Application and responding to any objections hereto, including, without limitation, Goldman Sachs' attorneys' fees and expenses." (See Final Fee Appl., ECF No. 549, at 5 n.3.) It is unclear what amounts, if any, above the $100,000.00 in escrow have been consented to by the Debtors. (See Engagement Letter, Ex. B to ECF No. 11, at 53.)

AO 72A

(Rev. 8/82)

The Engagement Letter also provides that Goldman Sachs's expenses shall be treated as administrative expenses:

> If Goldman Sachs is authorized by the Bankruptcy Court to be retained in such Chapter 11 case, the Company agrees that the Fees, Expenses and other amounts payable to Goldman Sachs hereunder or any amended letter (including Annex A hereto) shall be entitled to priority as administrative expenses under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and any and all such Fees, Expenses and other amounts shall be entitled to the benefit of any "carve outs" for professional fees and expenses in effect in any case commenced by the Company under the Bankruptcy Code pursuant to any financing orders and/or cash collateral orders now or hereafter in effect.

(Engagement Letter, Ex. B to ECF No. 11, at 53-54.)

The order authorizing Goldman Sachs's retention specifies that "[a]ll compensation and reimbursement of expenses payable to Goldman Sachs pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) . . . and shall not be subject to the standards of review set forth in section 330 of the Bankruptcy Code." (ECF No. 168 at 2.) Having already determined that the terms and conditions of the Engagement Letter are not improvident under 11 U.S.C. § 328(a), the Court is obliged to enforce the terms of the Engagement Letter as written. See Unsecured Creditors Comm., 204 B.R. at 834.

However, the limited review of § 328(a) only mandates that the court grant Goldman Sachs reimbursement under the terms of the Engagement Letter; it does not entitle Goldman Sachs to avoid

AO 72A
(Rev. 8/82)

its burden of proof. Goldman Sachs has not submitted proof that it actually incurred these fees and expenses, nor has it submitted proof of the reasonableness of the Additional Expenses under the terms of the Engagement Letter. (See ECF Nos. 549, 673, 1132; Ex. D to ECF No. 549, at 40.)

Absent proof that the expenses sought to be reimbursed were actually incurred and reasonable under the terms of the Engagement Letter, the Court will not grant Goldman Sachs's application for reimbursement at this time:

> If a professional was permitted to perform his services and subsequently seek reimbursement for any and all expenses without any kind of court review, the effect of such a practice would be to give the professional carte blanche status with the court. There is no way for a court to anticipate, in its initial order authorizing employment, the plethora of expenses that might possibly be sought by the professional at the conclusion of his employment.

In re Cal Farm Supply Co., 110 B.R. 461, 465 (Bankr. E.D. Cal. 1989).

AO 72A

(Rev. 8/82)

**ORDER**

Accordingly, the Final Fee Application of Goldman Sachs is **ORDERED GRANTED** in the amount of $6,009,491.59. The Clerk will set a prompt hearing on Goldman Sachs's application for reimbursement of attorneys' fees and expenses under the terms of the Engagement Letter.

_____
JOHN S. DALIS
United States Bankruptcy Judge


Dated at Brunswick, Georgia,
this _17th_ day of June, 2014.

AO 72A
(Rev. 8/82)