## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SEA ISLAND COMPANY, *et al.*, | ) | |
| | ) | Case No. 10-21034 - JSD |
| | ) | Jointly Administered |
| Debtors, | ) | |
| | ) | |
| _____ | ) | |
| | ) | Contested Matter |
| SEA ISLAND ACQUISITION, LLC, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Judge John S. Dalis |
| ROBERT H. BARNETT, Liquidation Trustee under the Sea Island Liquidation Trust, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KINGS POINT PROPERTY OWNERS ASSOCIATION, INC. | ) | |
| | ) | |
| Respondents. | ) | |

### HEARING EXHIBITS FOR THE HEARING ON THE LIQUIDATION TRUSTEE'S MOTION REGARDING THE SUFFICIENCY OF KINGS POINT PROPERTY OWNERS ASSOCIATION, INC.'S RESPONSE TO THE LIQUIDATION TRUSTEE'S FIRST SET OF REQUEST FOR ADMISSIONS, TO EXTEND THE DISCOVERY AND SUMMARY JUDGMENT DEADLINES, AND IN THE ALTERNATIVE <u>FOR AN EXPEDITED HEARING</u>

Robert H. Barnett as the Liquidation Trustee (the "Liquidation Trustee") under the Sea

Island Company Liquidation Trust files the attached hearing exhibits in support of the

Liquidation Trustee's Motion Regarding the Sufficiency of Kings Point Property Owners

Association, Inc.'s Response to the Liquidation Trustee's First Set of Request for Admissions, to

Extend the Discovery and Summary Judgment Deadlines, and in the Alternative for an Expedited

Hearing:

1.  Correspondence dated November 12, 2015 from Robert Mercer to Jason Tate

2.  Liquidation Trustee's First Set of Requests for Admission to Kings Point Property Owners Association

3.  Kings Point Property Owners Association's Response to First Set of Requests for Admission

4.  Liquidation Trustee's First Set of Interrogatories to Kings Point Property Owners Association

5.  Kings Point Property Owners Association's Response to Liquidation Trustee's First Set of Interrogatories

The Liquidation Trustee reserves the right to submit additional exhibits at the hearing.

Dated:  November 12, 2015

_____*/s/ Robert M.D. Mercer*_____
Robert M.D. Mercer
Georgia Bar No. 502317
SCHULTEN WARD & TURNER LLP
260 Peachtree Street
Suite 2700
Atlanta, Georgia  30303
(404) 688-6800  Telephone
(404) 688-6840  Facsimile

*Counsel for Robert H. Barnett as the Liquidation Trustee under the Sea Island Company Liquidation Trust*

**EXHIBIT 1**



WM. SCOTT SCHULTEN
KEVIN L. WARD
DAVID L. TURNER
ERIC L. WEISS
JON R. ERICKSON
WILLIAM M. JOSEPH
MARTHA A. MILLER
J. ZACHARY ZIMMERMAN
ANDREA L. PAWLAK
ROBERT MERCER
MARIA F. STEDRY
DEAN R. FUCHS
BRANDON C. HARDY
TYLER K. KEENAN
STEPHEN W. BROWN
MAHEEN AKHTER

**SCHULTEN WARD & TURNER**
ATTORNEYS AT LAW

A LIMITED LIABILITY PARTNERSHIP

260 PEACHTREE ST., N.W.
SUITE 2700
ATLANTA, GEORGIA 30303
TELEPHONE (404) 688-6800
www.swtlaw.com

STEVEN H. SADOW, SPECIAL COUNSEL
WHITE COLLAR CRIME AND HIGH PROFILE CRIMINAL DEFENSE

Writer's direct dial (404) 688-6804
Fax No. (404) 688-2723
rdm@swtlaw.com

November 12, 2015

***Via Electronic Mail and Federal Express***

Jason Tate, Esq.
Roberts | Tate LLC
P.O. Box 21828
114 Island Professional Park
St. Simons Island, Georgia 31522

      Re:    In re Sea Island Company, et al., Chapter 11 Bankruptcy;
            United States Bankruptcy Court; Southern District of Georgia;
            Case No. 10-21034-JSD

Dear Jason:

      Thank you for your email on November 10.

      Given that we have had several calls and exchanged numerous emails since we filed the Liquidation Trustee's reply brief on September 28, 2015 (this is, of course, on top of all the earlier calls and email), I am surprised that Kings Point Property Owners Association, Inc. ("Kings Point POA") refuses to amend *any* of its responses to the Liquidation Trustee's first requests for admission. For example, as the Liquidation Trustee notes in his reply brief, Kings Point POA states that it "lacks sufficient information to admit or deny" that Goldman Sachs & Co. "was the investment banker for the sale of substantially all of the assets of the Debtors" even though (i) a sworn declaration of an officer of the Debtors states that they "retained Goldman Sachs & Co. ("Goldman Sachs") as their investment banker to market their assets" and (ii) the Court entered an order approving over $6 million in fees for the firm's role in selling substantially all of the Debtors' assets. *See* Bankr. Docket No. 1388 at § III(a). It is hard to understand how Kings Point POA asserts in good faith that it "lacks sufficient information to admit or deny" to deny this request.

Jason Tate, Esq.
November 12, 2015
Page 2

        While I understand that Kings Point POA would have preferred to resolve this matter
through stipulations, the fact that the parties discussed stipulations and exchanged drafts of
stipulations certainly does not obviate Kings Point POA's obligation to comply with Rule
36. And I made that clear on many occasions. For example, in an October 14, 2015 email to
you, I stated: "As we discussed, the LT is willing to consider stipulating to the items that Kings
Point POA proposes. Please advise. Please note, however, that the LT does not view his
willingness to do so as a condition precedent to resolution of the items raised in the motion."

        Last, we have never received the amendment to Kings Point POA's responses to the
Liquidation Trustee's requests for admission. You offered to do so in your September 4, 2015
letter. I sought clarification on September 8, 2015 regarding whether you intended to do so. *See*
Bankr. Docket No. 1388 at Ex. "A" at p. 26 of 33. On September 9, 2015, you stated that your
client "is happy to formally amend its responses if the LT would like it to." *See* Bankr. Docket
No. 1388 at Ex. "B" at p. 28 of 33. That same day, we requested that Kings Point POA formally
amend its responses. *See* Bankr. Docket No. 1388 at Ex. "C" at p. 31 of 33. I renewed my
request on October 14, 2015 and October 19, 2015. But we still have not received any
amendment to Kings Point POA's responses.

        Thank you for your attention to these matters.

                                        Very truly yours,


                                        Robert M.D. Mercer

RMDM/dh

cc:     Mr. Robert H. Barnett
        Thomas Walker, Esq.
        James Drake, Esq.
        J. Zack Zimmerman, Esq.

{01384001.DOCXv1}

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SEA ISLAND COMPANY, *et al.*, | ) | |
| | ) | Case No. 10-21034 - JSD |
| | ) | Jointly Administered |
| Debtors, | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | Contested Matter |
| SEA ISLAND ACQUISITION, LLC, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Judge John S. Dalis |
| ROBERT H. BARNETT, Liquidation Trustee | ) | |
| under the Sea Island Liquidation Trust, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KINGS POINT PROPERTY OWNERS | ) | |
| ASSOCIATION, INC. | ) | |
| | ) | |
| Respondents. | ) | |

**FIRST SET OF REQUESTS FOR ADMISSION**
**PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION**
**TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST**

Robert H. Barnett as the Liquidation Trustee (the "Liquidation Trustee") under the Sea Island Company Liquidation Trust, acting pursuant to Federal Rules of Civil Procedure 26 and 36, as made applicable herein by Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7026 and 7036, hereby serves the following requests for admission. The Liquidation Trustee requests that Kings Point Property Owners Association, Inc., within thirty (30) days after the date of service hereof separately and under oath answer each and every request for admission.

## DEFINITIONS

As used herein, unless specifically indicated otherwise, the following terms shall have the indicated meanings:

1.     As used herein, "Debtors" means Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, and Sea Island Resort Residences, LLC, or any combination of the foregoing referenced Debtors.

2.     As used herein, the "Court" means the United States Bankruptcy Court for the Southern District of Georgia.

3.     As used herein, "SIA" means Sea Island Acquisition LP.

4.     As used herein, "Asset Purchase Agreement" means the Asset Purchase Agreement by and between Sea Island Acquisition, LP and the Debtors [Bankr. Docket Entry No. 293].

5.     As used herein, "Motion to Clarify" means the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan [Bankr. Docket Entry No. 1102].

6.     As used herein, "Confirmation Order" means the Findings of Fact, Conclusions of Law, and Order Confirming the Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 Filed by the Debtors [Bankr. Docket Entry No. 372].

7.     As used herein, "Confirmed Plan" means Debtors' Amended and Restated Joint Plan of August 10, 2010 [Bankr. Docket Entry No. 217].

8.     As used herein, "Kings Point Common Elements" shall have the meaning ascribed to them in the Motion to Clarify.

6417889.6

9.     As used herein, "Deeds" means the deeds executed by an authorized representative of the Debtors in connection with the closing of the transactions contemplated by the Asset Purchase Agreement.

10.     As used herein, "Liquidation Trust Agreement" means the Sea Island Company Creditors Liquidation Trust [Bankr. Docket Entry No. 449-1].

11.     As used herein, "Kings Point POA" means Kings Point Property Owners Association, Inc.

12.     As used herein, "Closing" shall have the meaning ascribed to it in section 2.9 of the Asset Purchase Agreement.

13.     As used herein, "Kings Point POA Preliminary Response" means the Kings Point Property Owners Association, Inc.'s Preliminary Response to Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan [Bankr. Docket Entry No. 1159].

14.     As used herein, the "Plan Supplement" means the Plan Supplement [Bankr. Docket Entry No. 294].

15.     As used herein, the "SIA Break Up Fee Memorandum" means the Purchaser's Memorandum in Support of Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 1213 and 1129 (A) Authorizing and Scheduling An Auction At Which Debtors Will Solicit the Highest or Best Bid for the Sale of Substantially All of Debtors' Assets, (B) Approving Procedures related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing the Manner and Extent of Notice and (E) Granting Related Relief [Bankr. Docket Entry No. 154].

16.     As used herein, the "SIA Break Up Fee Memorandum Declaration" means the Declaration of Philip Hofmann in Support of Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 1213 and 1129 (A) Authorizing and Scheduling An Auction At

Which Debtors Will Solicit the Highest or Best Bid for the Sale of Substantially All of Debtors' Assets, (B) Approving Procedures related to Conduct of Auction, (C) Approving Break-Up Fee, (D) Fixing the Manner and Extent of Notice and (E) Granting Related Relief [Bankr. Docket Entry No. 154-1].

17.    As used herein, the "SIA Break Up Fee Pleadings" shall refer collectively to the SIA Break Up Fee Memorandum and the SIA Break Up Fee Memorandum Declaration.

18.    As used herein, "Purported Liquidation Trust Transfer Obligation" shall refer to the obligation that Kings Point POA alleges arose as a result of the following language in a "whereas" clause in the Liquidation Trust Agreement: "[I]f Property is improperly transferred to the Trust, such Property shall be transferred to the appropriate party." *See* Liquidation Trust Agreement p. 2; *see also* Kings Point POA Preliminary Response at ¶¶ 28–29.

19.    As used herein, "Purported Plan Transfer Obligation" shall refer to the obligation that Kings Point POA alleges arose as a result of the following provision of the Confirmed Plan: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . . .") *See* Confirmed Plan § 7.01; *see also* Kings Point POA Preliminary Response at ¶ 25.

20.    As used herein, "Purported Plan Transfer Obligation Provision" shall refer to the following provision of the Confirmed Plan: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . . .") *See* Confirmed Plan § 7.01.

21.    As used herein, "you" and "your" means Kings Point POA and its officers, directors, representatives, agents, or other persons acting or purporting to act in its name or on its behalf.

22.     As used herein, "persons" means any natural person or entity, including, without limitation, individuals, partnerships, firms, associations, joint ventures, corporations, or other entities, whether real or fictitious.

23.     The term "or" includes "and" and vice versa.

24.     The term "any" includes "all" and vice versa.

## INSTRUCTIONS

1.     If you believe that any of the following requests for admission are ambiguous, please inform the Liquidation Trustee's counsel specifying which request is unclear to you and the basis of the perceived ambiguity. We will respond promptly by letter and attempt to rephrase the request for you.

2.     In accordance with Federal Rule of Civil Procedure 36, as made applicable pursuant to Federal Rule of Bankruptcy 7036, you must supply an answer to any request for admission not unequivocally admitted that specifically denies the matter or sets forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.  If only a portion of the request for admission should, in good faith, be denied, you must specify so much of the matter that is true and qualify or deny the remainder.

## DUTY TO SUPPLEMENT

Pursuant to Federal Rule of Civil Procedure 26(e)(1), you are requested to reasonably supplement your responses to these discovery requests if you learn that a response is in some material respect incorrect and if the additional or corrective material had not otherwise been made known to the Liquidation Trustee during the discovery process or in writing.

## REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION NO. 1.  Admit that neither disclosure schedule 2.1(a), *see* Asset Purchase Agreement pp. 71–73, nor disclosure schedule 3.11(a), *see* Asset Purchase Agreement pp. 114–18, of the Asset Purchase Agreement identify the Kings Point Common Elements.

REQUEST FOR ADMISSION NO. 2.  Admit that the terms of the Asset Purchase Agreement that purportedly create a transfer obligation of the Kings Point Common Elements were rendered unenforceable by the statute of frauds.

REQUEST FOR ADMISSION NO. 3.  Admit that the terms of the Asset Purchase Agreement that purportedly create a transfer obligation of the Kings Point Common Elements are rendered eliminated, abandoned, or discarded by the doctrine of merger.

REQUEST FOR ADMISSION NO. 4.  Admit that the terms that you contend are relevant to this contested matter in the Confirmed Plan, the Asset Purchase Agreement, the Liquidation Trust Agreement, and the Confirmation Order are clear and unambiguous.

REQUEST FOR ADMISSION NO. 5.  Admit that the definition of "Purchased Assets" in the Confirmed Plan contemplates the application of Georgia law, given that the definition restricts such assets to those that you are "acquiring pursuant to the Asset Purchase Agreement," *see* Confirmed Plan at p. 16 of 54, and given that the Asset Purchase Agreement is governed by Georgia law, *see* Asset Purchase Agreement § 15.4.

REQUEST FOR ADMISSION NO. 6.  Admit that Kings Point POA does not have standing or rights under the Liquidation Trust Agreement.

REQUEST FOR ADMISSION NO. 7.  Admit that performance relating to the transfer of the Kings Point Common Elements under the Asset Purchase Agreement requires the delivery and acceptance of a real property deed.

REQUEST FOR ADMISSION NO. 8.  Admit that the factual allegations contained in the SIA Break Up Fee Pleadings are true and correct.

REQUEST FOR ADMISSION NO. 9.  Admit that section 5.04 of the Confirmed Plan governs which assets vested into the Liquidation Trust.

REQUEST FOR ADMISSION NO. 10.  Admit that, pursuant to paragraph 14(iii) of the Confirmation Order, the Confirmed Plan supersedes the Confirmation Order with respect to which assets were transferred to the Liquidation Trust.

REQUEST FOR ADMISSION NO. 11.  Admit that the Confirmation Order does not amend or vary in any way the Confirmed Plan with respect to which assets vested into the Liquidation Trust, given that paragraph 38 of the Confirmation Order states the following: "[E]ach provision of the [Confirmed] Plan shall have the same validity, binding effect, and enforceability as if fully set forth in the [Confirmation] Order."

REQUEST FOR ADMISSION NO. 12.  Admit that the Confirmed Plan and the Asset Purchase Agreement each contain a different definition of "Purchased Assets." *Compare* Confirmed Plan § 1.01 at p. 16 of 54 ("'Purchased Assets' means those assets of the Debtors that

the Purchaser is acquiring pursuant to the Asset Purchase Agreement.") *with* Asset Purchase Agreement § 2.1 (multiple page definition of "Purchased Assets").

REQUEST FOR ADMISSION NO. 13.   Admit that the transfer under the Purported Plan Transfer Obligation must be made "pursuant to the Asset Purchase Agreement."

REQUEST FOR ADMISSION NO. 14.   Admit that the Purported Plan Transfer Obligation is limited to the Closing Date (as that term is defined in the Confirmed Plan) given that the second sentence of the second paragraph of section 7.01 of the Confirmed Plan starts with the following prepositional phrase: "On the Closing Date."

REQUEST FOR ADMISSION NO. 15.   Admit that the Purported Plan Transfer Obligation is limited to the Debtors given that the second sentence of the second paragraph of section 7.01 of the Confirmed Plan states that the "Debtors shall transfer the Purchased Assets" whereas sections 6.03 and 8.04 of the Confirmed Plan state that the "Debtors and the Liquidation Trustee shall . . .."

REQUEST FOR ADMISSION NO. 16.   Admit that, pursuant to section 14.3 of the Asset Purchase Agreement, SIA waived all of its "rights" and "Claims" (as that term is defined in the Confirmed Plan) "whether in law or in equity" that SIA or Kings Point POA are asserting in this contested matter "related to" the "Purchased Assets" (as that term is defined in the Asset Purchase Agreement).

REQUEST FOR ADMISSION NO. 17.   Admit that Robert H. Barnett is the duly appointed Liquidation Trustee under the Sea Island Company Liquidation Trust.

REQUEST FOR ADMISSION NO. 18.   Admit that Kings Point POA is a non-profit corporation organized under the laws of the State of Georgia.

REQUEST FOR ADMISSION NO. 19.   Admit that Goldman, Sachs & Co. ("Goldman Sachs") was the investment banker for the sale of substantially all of the assets of the Debtors. *See* Bankr. Docket Entry Nos. 24 and 1178.

REQUEST FOR ADMISSION NO. 20.   Admit that the Debtors and Goldman Sachs tried to identify and contact all third party purchasers that might be interested in purchasing substantially all of the Debtors' assets. *See* Bankr. Docket Entry No. 24 at ¶ 15.

REQUEST FOR ADMISSION NO. 21.   Admit that in connection with this sale process, approximately seventy-nine (79) parties entered into confidentiality agreements with the Debtors and conducted due diligence. *See* Bankr. Docket Entry No. 24 at ¶ 15.

REQUEST FOR ADMISSION NO. 22.   Admit that more than twelve (12) entities submitted indications of interest to the Debtors, and the Debtors and their legal and financial advisers reviewed the terms and conditions of these proposals (including the consideration offered) and evaluated the financial capabilities of the submitting parties to identify the strongest offers. *See* Bankr. Docket Entry No. 24 at ¶ 15.

REQUEST FOR ADMISSION NO. 23.   Admit that SIA is a limited partnership formed by Oaktree Capital Management L.P. ("Oaktree") and Avenue Capital Group ("Avenue Capital"). *See* Bankr. Docket Entry No. 154-1 at ¶ 1.

REQUEST FOR ADMISSION NO. 24.   Admit that SIA is a "sophisticated and well-informed investor." *See* Bankr. Docket Entry No. 154 at ¶ 22.

REQUEST FOR ADMISSION NO. 25.   Admit that Oaktree is a premier global alternative investment manager with over $76 billion in assets under management as of March 2010. *See* Bankr. Docket Entry No. 154 at ¶ 22.

REQUEST FOR ADMISSION NO. 26.   Admit that Avenue Capital is a distressed investment firm that is headquartered in New York, with offices in London, Madrid, Milan, Munich, and four offices throughout Asia and manages assets estimated to be approximately $13.3 billion as of December 31, 2014. *See* https://www.avenuecapital.com/firm.aspx.

REQUEST FOR ADMISSION NO. 27.   Admit that Philip Hofmann is a Managing Director at Oaktree, *see* Bankr. Docket Entry No. 154-1 at ¶ 1, and received a Masters of Business Administration with Distinction in Real Estate from The Wharton School at the University of Pennsylvania, *see* http://www.oaktreecapital.com/people/bio.aspx?src=it&cat=real-estate&t=real-estate-debt&id=55.

REQUEST FOR ADMISSION NO. 28.   Admit that Mr. Hoffmann negotiated the Asset Purchase Agreement on behalf of Oaktree. *See* SIA's Amended Interrogatory Responses at 1(e).

REQUEST FOR ADMISSION NO. 29.   Admit that, before entering into the Asset Purchase Agreement, SIA thoroughly vetted the Debtors' assets and liabilities. *See* Bankr. Docket Entry No. 154 at ¶ 12.

REQUEST FOR ADMISSION NO. 30.   Admit that, on June 15 and June 16, 2010, Mr. Hoffmann and 13 other representatives of SIA travelled to Sea Island, Georgia to conduct due diligence. *See* Bankr. Docket Entry No. 154-1 at ¶ 9.

REQUEST FOR ADMISSION NO. 31.   Admit that, over the next several weeks after June 15, 2010, SIA continued its extensive due diligence efforts. *See* Bankr. Docket Entry No. 154-1 at ¶ 11.

REQUEST FOR ADMISSION NO. 32. Admit that individuals representing SIA made an additional two trips to Sea Island, Georgia to tour the Debtors' property and met with the Debtors' management. *See* Bankr. Docket Entry No. 154-1 at ¶ 11.

REQUEST FOR ADMISSION NO. 33. Admit that SIA engaged in extensive negotiations with the Debtors related to the terms of the sale, including SIA and its advisors, meeting with the Debtors and its advisors for three full days in New York, New York in July 2010. *See* Bankr. Docket Entry No. 154-1 at ¶ 12.

REQUEST FOR ADMISSION NO. 34. Admit that, at all relevant times, SIA was represented by Debevoise & Plimpton, LLP ("Debevoise").

REQUEST FOR ADMISSION NO. 35. Admit that, at all relevant times, SIA was represented by Hunter Maclean Exley & Dunn, P.C. ("Hunter Maclean").

REQUEST FOR ADMISSION NO. 36. Admit that, in addition to Debevoise, SIA retained the following advisors to conduct diligence related to the purchase of the Debtors' assets:

- Local real estate counsel

- Local environmental counsel

- Water and sewer system infrastructure consultant

- Bridge consultant

- Beach renourishment consultant

- Membership consultants

- Membership legal counsel

- Insurance consultants

- Environmental consultants

- Surveyor

- Local real estate appraiser

- Hospitality consulting and valuation firm

- Engineering and construction consultant

- Hotel/resort management company and owner

*See* Bankr. Docket Entry No. 154-1 at ¶ 18.

REQUEST FOR ADMISSION NO. 37.  Admit that the lawyers representing SIA in the Debtors' bankruptcy cases and in connection with its purchase of substantially all of the Debtors' assets had expertise in, among other things, complex (i) real estate transactions, (ii) mergers and acquisitions, and (iii) chapter 11 bankruptcy cases.

REQUEST FOR ADMISSION NO. 38.   Admit that, in addition to other Debevoise lawyers, the following New York City-based Debevoise lawyers worked on Debevoise's representation of SIA:[1]

| Name | Description |
|---|---|
| Peter Irwin[2] | Corporate Partner and Chair of the firm's Real Estate Group |
| George Macquire[3] | Partner in the Firm's Business Restructuring & Workouts Group |
| Jasmine Ball[4] | Corporate Partner and Member of the firm's Business Restructuring & Workouts Group |
| Steven Gross[5] | Of Counsel and Former Co-Chair of the firm's Business Restructuring & Workouts Group |
| Anne-Lise Quach[6] | Corporate Associate |

---

[1] *See* SIA's Amended Interrogatory Responses at 1(d).
[2] Information about Mr. Irwin can be found at http://www.debevoise.com/peterirwin.
[3] Information about Mr. Macquire can be found at http://www.debevoise.com/georgemaguire.
[4] Information about Ms. Ball can be found at http://www.debevoise.com/jasmineball.
[5] Information about Mr. Gross can be found at http://www.debevoise.com/stevengross.
[6] Information about Ms. Quach can be found at http://www.debevoise.com/annelisequach.

REQUEST FOR ADMISSION NO. 39.  Admit that, in addition to other Hunter Maclean lawyers, the following Hunter Maclean lawyers worked on Hunter Maclean's representation of SIA:[7],[8]

| Name | Description |
|------|-------------|
| Harold Yellin[9] | Real Estate Partner |
| Frank Perch[10] | Of Counsel in the Bankruptcy Group |

REQUEST FOR ADMISSION NO. 40.  Admit that, in the months leading up to the execution of the Asset Purchase Agreement, SIA engaged in extensive due diligence involving many thousands of hours on the part of SIA and its advisors.  *See* Bankr. Docket Entry No. 154 at ¶ 12.

REQUEST FOR ADMISSION NO. 41.  Admit that the efforts of Hunter Maclean leading up to the execution of a stalking horse asset purchase agreement (the "Stalking Horse Asset Purchase Agreement") included: the review of thousands of pages of complex title and survey documents for over 50 individual properties; the review of multiple title commitments (over 200 pages in length) and endorsements; the review of extensive condominium declarations and filings; and multiple on-site visits, including several meetings with the Debtors' local real estate counsel in Brunswick, Georgia.  *See* Bankr. Docket Entry No. 154 at ¶ 21.

REQUEST FOR ADMISSION NO. 42.  Admit that SIA and its advisors spent many thousands of hours on due diligence, resulting in the execution of the Stalking Horse Asset

---

[7] *See* SIA's Amended Interrogatory Responses at 1(i).
[8] *See* Bankr. Docket Entry No. 43.
[9] Information about Mr. Yellin can be found at http://www.huntermaclean.com/attorney/harold-b-yellin/.
[10] At the time, Mr. Perch practiced at the law firm of Hunter Maclean.  Subsequently, he joined the law firm of White & Williams LLP.  His resume can be found at http://www.whiteandwilliams.com/lawyers-FrankPerch.html.

Purchase Agreement and its extensive disclosure schedules and exhibits. *See* Bankr. Docket Entry No. 154-1 at ¶ 21.

REQUEST FOR ADMISSION NO. 43. Admit that, on August 4, 2010, the Debtors and SIA entered into the Stalking Horse Asset Purchase Agreement. *See* Bankr. Docket Entry No. 24 at ¶ 17.

REQUEST FOR ADMISSION NO. 44. Admit that a true and correct copy of the Stalking Horse Asset Purchase Agreement can be found at Bankr. Docket Entry No. 24-1.

REQUEST FOR ADMISSION NO. 45. Admit that the signatories to the Stalking Horse Asset Purchase Agreement on behalf of SIA are Philip Hofmann and Ken Liang.

REQUEST FOR ADMISSION NO. 46. Admit that Ken Liang is a Managing Director and Head of Restructurings at Oaktree, received a Bachelors of Science in Business Finance and Economics from the University of Southern California and a Juris Doctor from Georgetown University Law Center, and previously served as General Counsel of Oaktree. *See* http://www.oaktreecapital.com/people/bio.aspx?src=it&cat=distressed-debt&t=value-opportunities&id=86.

REQUEST FOR ADMISSION NO. 47. Admit that, as part of SIA's request for the Court to approve a break up fee in the amount of $5,925,000.00, SIA stated the following to the Court: "[O]ther bidders will be more encouraged to participate in the Debtors' auction knowing that the Debtors' assets and liabilities have been so thoroughly vetted by a sophisticated and well-informed investor." *See* Bankr. Docket Entry No. 154 at ¶ 22.

REQUEST FOR ADMISSION NO. 48. Admit that, on August 10, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.

REQUEST FOR ADMISSION NO. 49.   Admit that, on the Petition Date, the Debtors filed a motion to approve sale procedures that included, among other things, the "material terms" of the sale to SIA in paragraph 17, which did not refer in any way to the following:

     (a)     SIA purchasing the Kings Point Common Elements;

     (b)     SIA purchasing any common areas of a development;

     (c)     SIA purchasing any residential real property developments;

     (d)     SIA purchasing the real property included in a "catch all" provision;

     (e)     SIA purchasing the Reserved Interests (as that term is defined in the Motion to Clarify);

     (f)     SIA purchasing rights of first refusal;

     (g)     SIA purchasing rights to restrict subdividing of real property;

     (h)     SIA purchasing mineral rights;

     (i)     SIA purchasing timber rights;

     (j)     SIA purchasing rights to require that undisturbed natural buffers remain along private easements which cross and afford access to a parcel of real property; or

     (k)     SIA purchasing non-exclusive rights of ingress or egress.

*See* Bankr. Docket Entry No. 24 at ¶ 17.

REQUEST FOR ADMISSION NO. 50.   Admit that, even after executing the Stalking Horse Asset Purchase Agreement, as of September 8, 2010, SIA continued to conduct substantial due diligence and Hunter Maclean worked toward finalizing the title commitment and endorsement, preparing surveys, coordinating containment letters and zoning letters, and preparing for the transfer of alcohol licenses and other permits.   *See* Bankr. Docket Entry No. 154-1 at ¶ 24.

6417889.6

REQUEST FOR ADMISSION NO. 51.  Admit that the Debtors conducted an auction on October 11, 2010 (the "Auction"), at which the Debtors solicited the highest and best bid for the sale of substantially all of the Debtors' assets. *See* Plan Supplement at ¶ 1.

REQUEST FOR ADMISSION NO. 52.  Admit that, at the Auction, SIA and Sea Island Holdings, LLC, a limited liability company formed by the Anschutz Corporation and Starwood Capital Group (collectively, the "Bidding Parties"), each submitted multiple bids for the Debtors' assets. *See* Plan Supplement at ¶ 1.

REQUEST FOR ADMISSION NO. 53.  Admit that, after multiple rounds of bidding, the Bidding Parties entered into an agreement to jointly purchase the Debtors' assets (the "Joint Bid") and the Debtors, in consultation with the Secured Lenders and the Committee (as these terms are defined in the Confirmed Plan), determined that the Joint Bid was the highest and best bid for the sale of substantially all of the Debtors' assets. *See* Plan Supplement at ¶ 1.

REQUEST FOR ADMISSION NO. 54.  Admit that as of October 19, 2010, the Debtors and SIA entered into the Asset Purchase Agreement.

REQUEST FOR ADMISSION NO. 55.  Admit that, on September 24, 2010, the Debtors filed the Confirmed Plan.

REQUEST FOR ADMISSION NO. 56.  Admit that the signatories to the Asset Purchase Agreement on behalf of SIA are Philip Hofmann and Amy Johannes.

REQUEST FOR ADMISSION NO. 57.  Admit that Amy Johannes is a Senior Vice President with a background in real estate investing at Oaktree and received a Masters of Business Administration from the Stanford University Graduate School of Business.  *See* http://www.oaktreecapital.com/people/bio.aspx?src=al&alpha=h-m&id=363.

REQUEST FOR ADMISSION NO. 58.  Admit that, on November 8, 2010, the Court entered the Confirmation Order.

REQUEST FOR ADMISSION NO. 59.  Admit that, pursuant to section 8.1 of the Asset Purchase Agreement, SIA approved the form and substance of the Confirmation Order.

REQUEST FOR ADMISSION NO. 60.   Admit that, before the Closing, Sea Island Coastal Properties LLC ("Coastal Properties") held title to the Kings Point Common Elements.

REQUEST FOR ADMISSION NO. 61.   Admit that the deeds by which Coastal Properties held title to Kings Point Common Elements were properly and well recorded in the indexed public land records of the Clerk of the Superior Court for Glynn County, Georgia.

REQUEST FOR ADMISSION NO. 62.  Admit that the Kings Point Common Elements have not been conveyed to SIA or any of its affiliates.  *See* Kings Point POA Preliminary Response ¶ 16.

REQUEST FOR ADMISSION NO. 63.   Admit that the Liquidation Trustee currently holds title to the Kings Point Common Elements.

REQUEST FOR ADMISSION NO. 64.  Admit that the Closing occurred on December 15, 2010.  *See* Bankr. Docket Entry No. 444.

REQUEST FOR ADMISSION NO. 65.  Admit that, on December 15, 2010, deeds were executed by authorized representatives of the Debtors as contemplated by the Asset Purchase Agreement (the "Deeds").

REQUEST FOR ADMISSION NO. 66.  Admit that the Debtors and SIA entered into the Bill of Sale, Assignment and Assumption Agreement [Bankr. Docket Entry No. 293 at pp. 62–66 of 278] (the "Bill of Sale").

REQUEST FOR ADMISSION NO. 67.   Admit that the total aggregate consideration under the Asset Purchase Agreement was $343,259,519.00, consisting of the following: the cash purchase price of $210,723,720.00, cash at closing of $5,100,156.31, and assumed membership deposits of $127,435,643.00.  *See* Bankr. Docket Entry No. 1178 at n.1.

REQUEST FOR ADMISSION NO. 68.   Admit that, as of December 15, 2010, the Debtors and the Liquidation Trustee entered into the Liquidation Trust Agreement.  *See* Bankr. Docket Entry No. 449-1.

REQUEST FOR ADMISSION NO. 69.   Admit that the Effective Date (as that term is defined in the Confirmed Plan) occurred on December 16, 2010.  *See* Bankr. Docket Entry No. 444.

REQUEST FOR ADMISSION NO. 70.   Admit that substantial consummation of the Confirmed Plan has occurred.  *See* 11 U.S.C. § 1101(2).

REQUEST FOR ADMISSION NO. 71.   Admit that the Debtors and SICAL LLC were the only proponents of the Confirmed Plan.  *See* Confirmed Plan at p. 54 of 54

REQUEST FOR ADMISSION NO. 72.   Admit that each provision of the Confirmed Plan has the same validity, binding effect, and enforceability as if fully set forth in the Confirmation Order.  *See* Confirmation Order ¶ 38.

REQUEST FOR ADMISSION NO. 73.   Admit that the only parties to the Liquidation Trust Agreement are the Debtors and the Liquidation Trustee.

REQUEST FOR ADMISSION NO. 74.   Admit that the beneficiaries of the Liquidation Trust are the holders of Allowed Claims (as that term is defined in the Confirmed Plan) under Classes 4, 5 and 6.  *See* Liquidation Trust Agreement § 1.1.

REQUEST FOR ADMISSION NO. 75. Admit that the purchase price under the Asset Purchase Agreement is over $210,000,000.00 subject to certain adjustments. *See* Asset Purchase Agreement § 2.6(a).

REQUEST FOR ADMISSION NO. 76. Admit that Kings Point POA is not a party to the Asset Purchase Agreement.

REQUEST FOR ADMISSION NO. 77. Admit that, to the extent that real property falling within the definition of "Acquired Owned Real Property" (as that term is defined in section 2.1(a) of the Asset Purchase Agreement) is identified in the Asset Purchase Agreement, it is identified by one or more of the following: (i) size; (ii) shape; or (iii) location.

REQUEST FOR ADMISSION NO. 78. Admit that the Asset Purchase Agreement does not identify the Kings Point Common Elements by size, shape, or location or in any other way as an asset to be conveyed to SIA.

REQUEST FOR ADMISSION NO. 79. Admit that the Debtors purported obligation to transfer the "Purchased Assets" (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing. *See* Asset Purchase Agreement § 2.1.

REQUEST FOR ADMISSION NO. 80. Admit that the Reserved Interests (as that term is defined in the Motion to Clarify) do not fit within the definition of "Acquired Owned Real Property" in section 2.1(a) of the Asset Purchase Agreement. *See* Asset Purchase Agreement § 2.1(a).

REQUEST FOR ADMISSION NO. 81. Admit that the Asset Purchase Agreement contemplates that the Debtors would deliver at Closing (i) a bill of sale for certain personal property, *see* Asset Purchase Agreement § 2.10(a), and (ii) warranty deeds and quitclaim deeds for real property, *see* Asset Purchase Agreement § 2.10(b) and (c).

6417889.6

REQUEST FOR ADMISSION NO. 82.  Admit that the delivery of the Deeds was not reserved under the Asset Purchase Agreement to occur after the Closing.  *See* Asset Purchase Agreement § 2.10(b) and (c) (stating the delivery of the deeds would occur "[A]t the Closing").

REQUEST FOR ADMISSION NO. 83.  Admit that, pursuant to section 8.1 of the Asset Purchase Agreement, SIA had the right to approve the form and substance of the Confirmation Order.  *See* Bankr. Docket Entry No. 293 at ¶ 8.1.

REQUEST FOR ADMISSION NO. 84.  Admit that the Deeds describe the property that they purport to transfer by legal description.

REQUEST FOR ADMISSION NO. 85.  Admit that the Deeds are written instruments purporting to convey title.

REQUEST FOR ADMISSION NO. 86.  Admit that the Deeds contain words of conveyance.

REQUEST FOR ADMISSION NO. 87.  Admit that the Deeds are signed by authorized representatives of the Debtors.

REQUEST FOR ADMISSION NO. 88.  Admit that, at the Closing, the Deeds were delivered to the representatives of SIA or representatives of one of SIA's designees.

REQUEST FOR ADMISSION NO. 89.  Admit that the Deeds do not identify or describe the Kings Point Common Elements in any way.

REQUEST FOR ADMISSION NO. 90.  Admit that, on March 18, 2014, when Sea Island Acquisition, LLC ("SIA LLC") filed the Motion to Clarify, initiating this contested matter, it was the first time that SIA LLC or any other party sought the relief sought in the Motion to Clarify in the above-referenced bankruptcy cases.

REQUEST FOR ADMISSION NO. 91. Admit that, on May 15, 2014, when Kings Point POA filed its preliminary response, it was the first time that Kings Point POA sought the relief sought in the Kings Point POA Preliminary Response in the above-referenced bankruptcy cases.

REQUEST FOR ADMISSION NO. 92. Admit that the rights Kings Point POA is asserting in connection with this contested matter as to the ownership of the Kings Point Common Elements purportedly arose because of a conditional transfer from SIA LLC to Kings Point POA. *See* Bankr. Docket Entry No. 1176.

REQUEST FOR ADMISSION NO. 93. Admit that a true and correct copy of the Confirmed Plan can be found at Bankr. Docket Entry No. 217.

REQUEST FOR ADMISSION NO. 94. Admit that a true and correct copy of the Asset Purchase Agreement can be found at Bankr. Docket Entry No. 293.

REQUEST FOR ADMISSION NO. 95. Admit that a true and correct copy of the Confirmation Order can be found at Bankr. Docket Entry No. 372.

REQUEST FOR ADMISSION NO. 96. Admit that a true and correct copy of the Liquidation Trust Agreement can be found at Bankr. Docket Entry No. 449-1.

REQUEST FOR ADMISSION NO. 97. Admit that a true and correct copy of the Bill of Sale can be found at Bankr. Docket Entry No. 293.

REQUEST FOR ADMISSION NO. 98. Admit that the information contained in the attached exhibits accurately describes the person or entity referenced:

- Exhibit A-1: Debevoise;

- Exhibit A-2: Avenue Capital;

- Exhibit A-3: Hunter Maclean;

- Exhibit A-4: Jasmine Ball;

6417889.6

21

- <u>Exhibit A-5</u>: Philip Hofmann;

- <u>Exhibit A-6</u>: Harold Yellin;

- <u>Exhibit A-7</u>: Amy Johannes;

- <u>Exhibit A-8</u>: George Maguire;

- <u>Exhibit A-9</u>: Frank Perch;

- <u>Exhibit A-10</u>: Stephen Gross;

- <u>Exhibit A-11</u>: Anne-Lise Quach;

- <u>Exhibit A-12</u>: Ken Liang; and

- <u>Exhibit A-13</u>: Peter Irwin.

<u>REQUEST FOR ADMISSION NO. 99</u>.   Admit that the Purported Plan Transfer Obligation only applies, if at all, to the Debtors and not to the Liquidation Trustee given that other sections of the Confirmed Plan refer to both the Debtors and the Liquidation Trustee and the Purported Plan Transfer Obligation Provision only refers to the Debtors.   *Compare* Confirmed Plan § 7.01 ("*[T]he Debtors* shall transfer the Purchased Assets to the Purchaser . . ..") (emphasis added) *with* Confirmed Plan § 6.03 ("*The Debtors and the Liquidation Trustee* shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.04 of the Plan.") (emphasis added) *and* Confirmed Plan § 8.02 ("Notwithstanding any allowance of Claim, *the Debtors and the Liquidation Trustee* reserve the right to seek, among other things, to have such Claim disallowed if the Debtor or the Liquidation Trustee, as the case may be, at the appropriate time, determines it has a defense under section 502(d) of the Bankruptcy Code, e.g., the Debtor or the Liquidation Trustee holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.") (emphasis added) *and* Confirmed

6417889.6                                     22

Plan § 8.04 ("Unless otherwise ordered by the Court after notice and a hearing, *the Debtors and the Liquidation Trustee* shall have the right, on and after the Effective Date, to File objections to Claims . . ..") (emphasis added).

REQUEST FOR ADMISSION NO. 100.  Admit that the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors.  *See* Confirmed Plan § 5.04.

REQUEST FOR ADMISSION NO. 101.  Admit that the Kings Point Common Elements were not conveyed to SIA under the Asset Purchase Agreement.  *See* Confirmed Plan § 5.04.

REQUEST FOR ADMISSION NO. 102.  Admit that the Kings Point Common Elements automatically vested in the Liquidation Trust.  *See* Confirmed Plan § 5.04.

REQUEST FOR ADMISSION NO. 103.   Admit that the Purported Plan Transfer Obligation was temporally limited to the Closing Date (as that term is defined in the Confirmed Plan) given that other provisions of the Confirmed Plan specifically refer to time periods "after the Closing Date" or "from and after the Closing Date" and the Purported Plan Transfer Obligation Provision specifically refers to a time period set to occur "on the Closing Date." *Compare* Confirmed Plan § 7.01 ("*On the Closing Date*, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser for the aggregate consideration of the Purchase Price plus the assumption by the Purchaser of the Assumed Liabilities.") (emphasis added) *with* Confirmed Plan § 6.05(c)(i) ("Effective as of the Closing Date, Purchaser shall assume responsibility for the Transferred Employees, but, except as expressly set forth in the Asset Purchase Agreement, only to the extent related to (i) services rendered *after the Closing Date*, (ii) any termination by Purchaser of a Transferred Employee *after the Closing Date* or (iii) any actions by Purchaser. Debtors shall retain all liabilities in

respect of all Debtors' employees, including Transferred Employees, except (a) liabilities associated with (x) the Transferred Employees' service with Purchaser *after the Closing Date*, (y) any termination of a Transferred Employee by Purchaser *after the Closing Date*, or (z) any violation by Purchaser of applicable law or Section 10.1 of the Asset Purchase Agreement, and (b) as otherwise expressly set forth in the Asset Purchase Agreement.  For the avoidance of doubt, nothing in the Asset Purchase Agreement (A) guarantees any Transferred Employee employment with Purchaser for any period of time, (B) causes any Transferred Employee to be employed on any basis other than on an "at-will" basis or (C) in any way restricts Purchaser's right to terminate the employment of any Transferred Employee *after the Closing Date*.") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(1) ("As promptly as reasonably practicable *after the Closing Date* (and as permitted by Purchaser's employee benefit plans and employee policies), Purchaser shall enroll the Transferred Employees in Purchaser's employee benefit plans for which such employees are eligible (and as permitted by Purchaser's employee benefit plans and employee policies.)") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(2) ("Purchaser may adopt differing policies with respect to any vacation benefits accruing *on or after the Closing Date*.") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(3) ("If any employee of Debtors who accepts an offer of employment from Purchaser is subsequently terminated by Purchaser within the 6-month period *after the Closing Date*, then Purchaser shall make severance payments to such employee in an amount that is not less than the amount of severance that such employee would have been entitled to receive under Debtors' severance policy in effect on the date hereof if such employee had been terminated by Debtors as of the Closing Date.") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(4) ("*From and after the Closing Date*, Debtors shall remain solely responsible for any and all liabilities relating to or

arising in connection with the requirements of Section 4980B of the Internal Revenue Code to provide continuation of health care coverage in respect of (A) employees and their covered dependents with respect to any qualifying event occurring prior to the Effective Date and (B) employees other than Transferred Employees with respect to any qualifying event occurring after the Effective Date.") (emphasis added).

REQUEST FOR ADMISSION NO. 104. Admit that the Asset Purchase Agreement and the transactions contemplated thereby were negotiated at arm's length and entered into by the Debtors and SIA in good faith. *See* Confirmation Order ¶ WW.

REQUEST FOR ADMISSION NO. 105. Admit that the terms of the Confirmed Plan are incorporated into the Confirmation Order and are an integral part of the Confirmation Order. *See* Confirmation Order ¶ 1.

REQUEST FOR ADMISSION NO. 106. Admit that the provisions of the Confirmation Order are integrated with each other and are mutually dependent and not severable. *See* Confirmation Order ¶ 1.

REQUEST FOR ADMISSION NO. 107. Admit that the Confirmed Plan governs the transfer of assets into the Liquidation Trust. *See* Confirmation Order ¶ 14.

REQUEST FOR ADMISSION NO. 108. Admit that the Confirmed Plan is incorporated in its entirety in the Confirmation Order. *See* Confirmation Order ¶ 38.

REQUEST FOR ADMISSION NO. 109. Admit that the Liquidation Trust Agreement does not contain any implied obligations or covenants. *See* Liquidation Trust Agreement § 5.6.

REQUEST FOR ADMISSION NO. 110. Admit that Kings Point POA is not a party to the Liquidation Trust Agreement.

REQUEST FOR ADMISSION NO. 111.  Admit that the "recitals" of the Liquidation Trust Agreement do not contain covenants and obligations of the Liquidation Trustee.

REQUEST FOR ADMISSION NO. 112.  Admit that the Kings Point Common Elements were properly transferred to the Liquidation Trust.

REQUEST FOR ADMISSION NO. 113.  Admit that the Purported Liquidation Trust Transfer Obligation is not a covenant or obligation of the Liquidation Trustee.

REQUEST FOR ADMISSION NO. 114.  Admit that, pursuant to the terms of the Liquidation Trust Agreement, the Liquidation Trustee may seek to amend the Liquidation Trust Agreement by only giving notice to the Beneficiaries (as that term is defined in the Liquidation Trust Agreement). *See* Liquidation Trust Agreement § 10.3.

REQUEST FOR ADMISSION NO. 115.  Admit that the only parties to the Asset Purchase Agreement are the Debtors and SIA.

REQUEST FOR ADMISSION NO. 116.  Admit that SIA was prohibited by the Asset Purchase Agreement after the Closing from assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement without the written consent of the Debtors. *See* Asset Purchase Agreement § 15.3.

REQUEST FOR ADMISSION NO. 117.  Admit that Kings Point POA is not a third-party beneficiary of the Asset Purchase Agreement. *See* Asset Purchase Agreement § 15.7 and pp. 64–66.

REQUEST FOR ADMISSION NO. 118.  Admit that the Debtors, pursuant to section 1 of the Bill of Sale, transferred all right, title, and interest in certain personal property of the Debtors to SIA "in accordance with the terms of the Asset Purchase Agreement" by entering into the Bill of Sale. *See* Bill of Sale at p. 1 ("*[I]n accordance with the terms of the Asset Purchase*

6417889.6

26

*Agreement*, Sellers have agreed to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser all right, title and interest of Sellers in and to the Purchased Assets and Purchaser has agreed to purchase, acquire and accept from Sellers all right, title and interest of Sellers and to the Purchased Assets and to assume the Assumed Liabilities on the conditions and subject to the terms set forth in the Asset Purchase Agreement, for consideration in the amount therein.") (emphasis added) and § 1.

REQUEST FOR ADMISSION NO. 119.  Admit that SIA, pursuant to section 2 of the Bill of Sale, assumed the Assumed Liabilities (as that term is defined in the Asset Purchase Agreement) "in accordance with the terms of the Asset Purchase Agreement" by entering into the Bill of Sale.  *See* Bill of Sale at p. 1 ("*[I]n accordance with the terms of the Asset Purchase Agreement*, Sellers have agreed to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser all right, title and interest of Sellers in and to the Purchased Assets and Purchaser has agreed to purchase, acquire and accept from Sellers all right, title and interest of Sellers and to the Purchased Assets and to assume the Assumed Liabilities on the conditions and subject to the terms set forth in the Asset Purchase Agreement, for consideration in the amount therein.") (emphasis added) and § 2.

REQUEST FOR ADMISSION NO. 120.  Admit that SIA waived all of the rights that Kings Point POA is asserting in this contested matter.  *See* Asset Purchase Agreement § 14.3.

REQUEST FOR ADMISSION NO. 121.  Admit that Debevoise is a prominent New City based law firm with approximately 650 lawyers.  *Compare* Bankr. Docket Entry No. 43 (entry of appearance) *with* http://www.debevoise.com/aboutus/overview.

REQUEST FOR ADMISSION NO. 122.  Admit that Hunter Maclean is a prominent law firm headquartered in Savannah, which is one of the largest law firms in the State of Georgia

outside of Atlanta.   *Compare* Bankr. Docket Entry No. 43 (entry of appearance) *with* http://www.huntermaclean.com/about-us/history/ ("Today HunterMaclean is one of the largest law firms in Georgia outside of Atlanta.").

   REQUEST FOR ADMISSION NO. 123.   Admit that the Debtors have not consented in writing to SIA assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement.

   REQUEST FOR ADMISSION NO. 124.   Admit that the Liquidation Trustee possesses the Debtors' written consent rights of section 15.3 of the Asset Purchase Agreement.

   REQUEST FOR ADMISSION NO. 125.   Admit that the Liquidation Trustee has not consented in writing to SIA assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement.

   REQUEST FOR ADMISSION NO. 126.   Admit that, assuming that Kings Point POA has rights under the Asset Purchase Agreement, such rights, if any, are no greater than the rights of SIA under the Asset Purchase Agreement.   *See, e.g., Pridgen v. Auto-Owners Ins. Co.*, 204 Ga. App. 322, 323 (1992).

   REQUEST FOR ADMISSION NO. 127.   Admit that, assuming that Kings Point POA has rights under the Asset Purchase Agreement, such rights are subject to the same defenses as SIA's rights, if any, would be.   *See, e.g., Pridgen v. Auto-Owners Ins. Co.*, 204 Ga. App. 322, 323 (1992).

   REQUEST FOR ADMISSION NO. 128.   Admit that all of the Deeds are identified in and attached to the Declaration of Carter L. Stout in Support of The Liquidation Trustee's Motion Summary Judgment as to the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan that has been previously provided to you.

REQUEST FOR ADMISSION NO. 129.  Admit that SIA retained Debevoise as counsel to advise it in connection with the sale process and to coordinate the review of over 1,250 documents in the electronic data room.  *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

REQUEST FOR ADMISSION NO. 130.  Admit that, given the scope of the over 1,250 documents in the electronic data room, Debevoise attorneys with expertise in various disciplines including real estate, employee benefits, environmental, intellectual property and tax participated in this review.  *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

REQUEST FOR ADMISSION NO. 131.  Admit that the Debevoise attorneys, along with members of SIA's internal business team, spent substantial time with the Debtors' management and advisors discussing issues and following up on questions raised as part of the review of the over 1,250 documents in the electronic data room.  *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

Dated: March 30, 2015

_____

Robert M.D. Mercer
Georgia Bar No. 502317
BRYAN CAVE LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3488
(404) 572-6600 Telephone
(404) 572-6999 Facsimile

*Counsel for Robert H. Barnett as the*
*Liquidation Trustee under the Sea Island*
*Company Liquidation Trust*

# **Exhibit A-1**

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:37 of 164

# Debevoise & Plimpton

## About Us

Debevoise & Plimpton LLP is a premier law firm with market-leading practices, a global perspective and strong New York roots. Our clients look to us to bring a distinctively high degree of quality, intensity and creativity to resolve legal challenges effectively and cost efficiently.

Deep partner commitment, industry expertise and a strategic approach enable us to bring clear commercial judgment to every matter. We draw on the strength of our culture and structure to deliver the best of our firm to every client through true collaboration.

By any measure, Debevoise is among the leading law firms in the world. Nearly 85% of our partners are recognized by *Chambers*, *Legal 500* or *IFLR*. The firm was also the winner of *The American Lawyer*'s "10-Year A-List," a ranking of the law firms who have earned the highest cumulative score on the A-List since its inception.

Approximately 650 lawyers work in eight offices across three continents, within integrated global practices, serving clients around the world. Our lawyers prioritize developing a deep understanding of the business of our clients. We then pursue each matter with both intensity and creativity to achieve optimal results.

Further, Debevoise is recognized as one of the leading firms for diversity. We believe that a diverse workforce, where all of our colleagues feel respected, builds a stronger firm, and benefits clients and the wider community. Debevoise was also ranked No. 1 overall in pro bono in *The American Lawyer*'s "10-Year A-List."

The firm's culture fosters a collaborative approach across disciplines and regions, and, as a result, clients benefit from the dedication, cohesiveness and superior quality that we bring to all of our work worldwide.

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:38 of 164

# Exhibit A-2

 **AVENUE CAPITAL GROUP**®

## *Firm*

Avenue Capital Group was founded in 1995 by Marc Lasry and Sonia Gardner. Pioneers in the distressed debt market, Mr. Lasry and Ms. Gardner have successfully invested in the public and private debt and equity securities of distressed companies across a variety of industries for over two decades.

Prior to founding Avenue, Mr. Lasry and Ms. Gardner founded Amroc Investments, LLC. Amroc began in 1989 as a $100 million distressed debt investment partnership organized by Mr. Lasry and Ms. Gardner in association with the Robert M. Bass Group, Inc.

Headquartered in New York, with offices in London, Madrid, Milan, Munich and four offices throughout Asia, the firm manages assets estimated to be approximately $13.1 billion as of February 28, 2015. Avenue draws on the skills and experience of approximately 200 employees and its Senior Principals, Marc Lasry and Sonia Gardner, who have spent virtually their entire careers in the field of distressed investments.

# Exhibit A-3

🖶 PRINT



**HunterMaclean**
ATTORNEYS   | HunterMaclean

**Savannah** *912.236.0261*
**Brunswick** *912.262.5996*

## About Us

Founded in 1879, HunterMaclean is one of the oldest and most accomplished law firms in the state of Georgia, serving clients across the Southeast and beyond.

## History

HunterMaclean marked its 135th anniversary in 2014, making it one of the oldest law firms in the state of Georgia.

The Firm has engaged in the general practice of law since 1879, when Walter G. Charlton, a graduate of the law department of the University of Virginia, formed a partnership with N.C. Collier, who was later a United States Judge in New Mexico. J. Randolph Anderson joined the firm in 1891, and the Firm was re-named Charlton, Mackall & Anderson. J. Randolph Anderson served as lieutenant governor of Georgia and also helped form the railroad lines that became the Seaboard Coast Line Railroad, now part of CSX. In later years, the Firm acted as system-wide counsel for the Seaboard Coast Line in employment discrimination and other matters, and it continues to serve CSX. The Firm became Anderson, Cann & Cann in 1903. One of its specialties was maritime law, a practice it established through acting as a regional representative of various London Protection and Indemnity Clubs. HunterMaclean continues to handle "P & I" matters and today represents an expanded number of maritime interests.

In 1946, Anderson, Cann, Dunn & Houlihan formed a seven-man firm when it merged with Connerat, Hunter & Cubbedge. In 1980 the Firm, then known as Hunter, Houlihan, Maclean, Exley, Dunn & Connerat. P.C., became Hunter, Maclean, Exley & Dunn, P.C.

Today, HunterMaclean continues to grow. In 1995, the Firm merged with Miller, Simpson and Tatum in Savannah. In 1999, former partners of Chamlee, Dubus and Sipple, and Ronald H. Cohen joined the Firm. In 2002, the Firm expanded to include an office in Brunswick, Georgia.

The Life and Legacy of Malcolm Maclean, presented by Wade W. Herring, II at the Georgia Legal History Foundation CLE event *Oglethorpe's Nightmare: Lawyers in Savannah.*



## Serving The Community

Through the years, the Firm's members have actively participated in professional, civic, and charitable organizations and endeavors and have maintained a long-standing tradition of service to the community. E. Ormonde Hunter and Spencer Connerat served in the Georgia General Assembly. Walter G. Charlton and George Cann were Superior Court judges, and Sam Cann was a district attorney. Malcolm R. Maclean was mayor of Savannah. John B. Miller served as chairman of the Savannah-Chatham County Board of Education and as chairman of the Georgia Board of Bar Examiners. William Mallie Exley, Jr. was a former chairman of Savannah's Metropolitan Planning Commission.

Brooks Stillwell served as alderman and mayor *pro tem* of Savannah and as chairman of the Chatham County Board of Elections. He was recently named City Attorney for the City of Savannah. Mills Fleming served as president of The Lucas Theater of the Arts. Brooks Stillwell, Jennifer Dickenson, and Wade Herring have served as president of the Savannah Bar Association. John Miller has served as vice president of the Georgia Bar Association. Ben Hartman has served as president of the Glynn County Bar Association.

## Our Present And Future

Today HunterMaclean is one of the largest law firms in Georgia outside of Atlanta. The Firm maintains offices in Savannah and Brunswick to serve the breadth of the thriving coastal region. HunterMaclean represents a wide variety of companies and individuals throughout Georgia, South Carolina, the Southeast, and the United States. HunterMaclean is committed to its clients and connected to the communities in which it practices law.

The Firm has extensive experience representing businesses and individuals in litigation, corporate, tax, real estate, employment, and business planning matters. Its clients include Fortune 500 manufacturing companies, privately held businesses, banks, hospitals, professional service organizations, public authorities, and nonprofit corporations.

In recent years, HunterMaclean has expanded its business practice areas to include health care, employee benefits, immigration, bankruptcy, and environmental law. The Firm has been joined by attorneys licensed to practice in South Carolina, allowing it to effectively serve clients that work in both states.

The Firm's commitment to professional excellence and growth over the years has created a lasting and vital organization that today employs over 120 people. For 135 years, HunterMaclean has served its clients and community with distinction. Its lawyers are dedicated to continuing that tradition well into the future.

# Exhibit A-4

# Debevoise & Plimpton



### Jasmine Ball
Partner

---

**New York**

---

Tel: +1 212 909 6845

---

Jasmine Ball is a corporate partner and member of the firm's Business Restructuring & Workouts Group. Ms. Ball regularly represents ...

---

## Experience

American Airlines and AMR, as special aircraft counsel, in their successful Chapter 11 proceedings involving the restructuring of complex financing arrangements relating to more than 400 aircraft generating savings in excess of $1.8 billion and to the raising of more than $9 billion of new financing through various capital markets, syndicated lending and other financing transactions. This restructuring was honored by Turnarounds & Workouts as one of a dozen "Successful Restructurings – 2013."

OSX Brasil S.A., OSX Leasing Group B.V. and certain related entities, as international counsel, in connection with the restructuring of a $500 million financing of, and other transactions related to, FPSO OSX-3, an oil production vessel chartered to Oleo e Gas Participações SA and positioned off the coast of Brazil.

Oaktree Capital Management, with TPG Capital and JH Investments, in their $955 million acquisition of the North American businesses of Taylor Wimpey.

GoldenTree Asset Management and various funds under its management in the out-of-court restructuring and corporate reorganization of Source Home Entertainment.

Delta Air Lines and Comair, as special aircraft counsel, in their successful Chapter 11 proceedings, involving the refinancing of more than 275 aircraft via new debt or lease

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:46 of 164

arrangements, the return or other disposition of more than 140 aircraft, the elimination of four aircraft types from Delta's fleet and the litigation of substantial aircraft financing claims.

Oaktree Capital Management and Avenue Capital Group, in connection with the acquisition, with Anschutz Corp. and Starwood Capital Group, of the assets of Sea Island Resort through its Chapter 11 case.

Justice Gary S. Stein, as trustee and conservator of the Tropicana Atlantic City, in connection with the Chapter 11 bankruptcy proceeding of Tropicana Entertainment LLC and the sale of the Atlantic City casino.

Globo Comunicações e Participações, the largest Brazilian Media conglomerate and one of the world's leading media groups, in its $1.3 billion restructuring of international bond and international and Brazilian bank debt.

Leiner Health Products in its purchase of Pharmaceutical Formulations in a Chapter 11 sale.

Numerous large suppliers to distressed companies in various sectors both in and out of bankruptcy and in cross-border insolvencies.

Advising the mortgage certificate holder in the Chapter 11 case of Extended Stay Hotels.

MIG, Inc., as special corporate and litigation counsel to the debtor in its Chapter 11 case.

Oaktree Capital Management, as mezzanine lender, in the challenging and successful out-of-court restructuring of an after-market parts distributor.

North Castle Partners in the sale of Naked Juice Company, a leader in the fast growing super premium juice category, to PepsiCo.

North Castle Partners in the $650 million recapitalization of Leiner Health Products.

## Education

University of Michigan Law School, 1999, J.D.

Princeton University, 1996, B.S.

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:47 of
164

## Practices

Restructuring

## Regions

Latin America

US/North America

# Exhibit A-5



Home | Careers | Contact us | Unitholders | Memos from our Chairman    CLIENT PORTAL

| ABOUT OAKTREE    PEOPLE    STRATEGIES | INVESTOR TYPE



Senior executives and directors

Senior advisors

Portfolio managers

Investment teams

   Corporate Debt

   Convertible Securities

   Distressed Debt

   Control Investing

   Real Estate

   Listed Equities

Corporate

Marketing and Client Relations

Legal and Compliance

Accounting and Tax

Infrastructure Services

home > people > investment teams > real estate > real estate debt > phil hofmann

# PHIL HOFMANN
## Managing Director



Since joining Oaktree in 1999, Mr. Hofmann has been a senior member of the real estate team and has been involved in the investment and management of its real estate funds. His responsibilities include acquisitions, dispositions, financings/re-financings, asset management, development and redevelopment of all property types, including office, hotels, retail, residential, land and other miscellaneous property types. Prior to joining Oaktree, Mr. Hofmann spent six years with The Taubman Company, most recently as its Director of Acquisitions. During his time at Taubman, he was involved in the acquisition, leasing, management and redevelopment of regional shopping centers. His prior experience includes four years as a management consultant with A.T. Kearney, Inc., an international consulting firm. Mr. Hofmann received a B.S. degree in Accounting from Lehigh University and an M.B.A. with Distinction in Real Estate from The Wharton School at the University of Pennsylvania.

Go back to Real Estate Debt Team page

© 2007-2015 Oaktree Capital Management, L.P. All Rights Reserved.

Use of this website is governed by the Terms and Conditions | Privacy Policy.

Securities offered through OCM Investments, LLC (Member FINRA), a subsidiary of Oaktree Capital Management, L.P. | Business Continuity Plan

# Exhibit A-6



HunterMaclean

**Savannah** *912.236.0261*
**Brunswick** *912.262.5996*

## Attorneys

# Harold B. Yellin

*Partner*

*200 E. Saint Julian Street*
*P.O. Box 9848*
*Savannah, GA 31412*
*Tel 912.236.0261*
*Fax 912.236.4936*

hyellin@HunterMaclean.com 🔳 Download vCard 🔳 Download Bio/CV 🔳 Connect with Attorney

**Related Practices**

- Commercial Finance
- Commercial Real Estate
- Government Relations
- Economic Development
- Zoning / Land Use



Case:10-21034-EJC    Doc#:1423    Filed:11/12/15    Entered:11/12/15 18:35:22    Page:52 of 164





Rated By
Super Lawyers

Harold B. Yellin

visitsuperlawyers.com

**EDUCATION**

Emory University School of Law: J.D., 1982
Emory University: M.B.A., 1982
University of North Carolina at Chapel Hill: B.A., 1977

**LICENSED TO PRACTICE**

Georgia

**PROFESSIONAL AFFILIATIONS**

Savannah Bar Association
State Bar of Georgia

**COMMUNITY INVOLVEMENT**

Congregation Bnai Brith Jacob: Board of Directors, President
Savannah Jewish Federation: Board of Directors, President
Savannah Music Festival: Board of Directors, Chairman
Silent Witness: Board of Directors, Chairman
Union Mission: Board of Directors
Workmen's Circle Credit Union: Board of Directors; Executive Committee

Experience

Harold Yellin is a partner in the Savannah office, practicing in the areas of commercial real estate, zoning/land use, and commercial leasing. Harold has broad experience in commercial real estate matters, including the purchase, sale, and refinance of retail shopping centers, hotels and motels, and office, industrial, and mixed-use developments. He is actively involved in the negotiation and drafting of commercial sales contracts and commercial leases on behalf of owners of shopping centers and office and industrial parks.

Harold also has extensive experience representing developers and other clients in various zoning and land use matters before local governmental bodies in the metropolitan Savannah area, including the Savannah City Council, Chatham County Commission, Chatham-Savannah Metropolitan Planning Commission, and the Savannah Historic Review Board.

Harold has served as president of Congregation Bnai Brith Jacob, president of the Savannah Jewish Federation, chairman of the Savannah Jewish Federation Endowment Fund, chairman of the Savannah Music Festival, and chairman of the board of directors of Silent Witness. He has previously served on the board of directors of Union Mission and as chairman of the Attorneys Division of the United Way Campaign. He is also on the board of directors and a member of the Executive Committee of the Workmen's Circle Credit Union.

Harold graduated from the University of North Carolina with a B.A. in 1977 and from Emory University with an M.B.A. and a J.D. in 1982. While in law school, Harold served as managing editor of the *Emory Law Review*.

## Spotlight



### HunterMaclean Critical Issues Forum: Creating the Best Downtowns in America

Mayor Knox White of Greenville, S.C. was the keynote speaker for the HunterMaclean Savannah Critical Issues Forum: *Creating the Best Downtowns in America*. HunterMaclean partnered with the Savannah Area Chamber of Commerce and the Savannah Economic Development Authority to present the 2014 Forum.

Read more »



### Flying High: Firm Protects Gulfstream's Dispute Resolution Policy

One of Savannah's largest employers, Gulfstream Aerospace Corporation designs, develops, manufactures, markets, services and supports the world's most technologically advanced business-jet aircraft. HunterMaclean attorneys have worked with Gulfstream since it first moved to Savannah in 1967 with the encouragement and support of the late Malcolm R. Maclean, then a HunterMaclean partner and former Savannah mayor.

Read more »



### Big Plans: Firm Clears the Way for Westin Resort's Development

The Westin Savannah Harbor Golf Resort & Spa is well-known as one of the most popular and most successful hotels in Savannah, but the hotel, which is located on Hutchinson Island just across the river from Savannah's National Landmark Historic District, had several major legal hurdles to overcome when it was first conceived in the 1980's.

Read more »

# **Exhibit A-7**




Home | Careers | Contact us | Unitholders | Memos from our Chairman    **CLIENT PORTAL**



| ABOUT OAKTREE    **PEOPLE**    STRATEGIES    | INVESTOR TYPE

Senior executives and directors

Senior advisors

Portfolio managers

Investment teams

Corporate

Marketing and Client Relations

Legal and Compliance

Accounting and Tax

Infrastructure Services

home > people > alphabetical listing > amy johannes



### AMY JOHANNES
Senior Vice President

Prior to joining Oaktree in 2008, Ms. Johannes was an Associate in the Real Estate group at Morgan Stanley, where she focused on advisory assignments for investment banking clients and principal investing opportunities for Morgan Stanley Real Estate Funds (MSREF). Before that, Ms. Johannes was a Project Manager on the Hudson Yards team at the New York City Economic Development Corporation. Prior to that, she spent two years at UBS Warburg as an Investment Banking Analyst in the Global Industrial group. Ms. Johannes graduated with a B.A. degree in Economics and Latin American Studies magna cum laude from Wellesley College, where she was elected to Phi Beta Kappa. She then went on to receive an M.B.A. from the Stanford University Graduate School of Business.

Go back to Alphabetical Listing page

© 2007-2015 Oaktree Capital Management, L.P. All Rights Reserved.
Use of this website is governed by the Terms and Conditions | Privacy Policy.
Securities offered through OCM Investments, LLC (Member FINRA),
a subsidiary of Oaktree Capital Management, L.P. | Business Continuity Plan

# Exhibit A-8

Case:10-21034-EJC    Doc#:1423    Filed:11/12/15    Entered:11/12/15 18:35:22    Page:59 of 164

# Debevoise & Plimpton



## George E.B. Maguire
Partner

**New York**

Tel: +1 212 909 6072

George Maguire is a member of the firm's Business Restructuring & Workouts Group.  He represents debtors and creditors and other parties ...

## Experience

Standard General in the $285 million debtor-in-possession financing facility in RadioShack's Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware.

GoldenTree Asset Management and various funds under its management in the out-of-court restructuring and corporate reorganization of Source Home Entertainment.

Oaktree Capital Management, with TPG Capital and JH Investments, in their $955 million acquisition of the North American businesses of British homebuilder Taylor Wimpey.

Group of investors, including Oaktree Capital Management and Avenue Capital Group, in the acquisition of the assets of the Sea Island Resort through its Chapter 11 case.

Oaktree Capital Management, as one of the largest investors in Woodside Homes, in its comprehensive out-of-court recapitalization led by Oaktree.

Bondholders of Energy Future Holdings in connection with its tender offer and consent solicitation.

Pegasus Communications Corporation in the Chapter 11 case of certain of its subsidiaries operating its broadcast satellite and traditional television businesses.

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:60 of
164

Institutional creditors in the Chapter 11 cases of US Airways, United Airlines and ATA Airlines.

Novus International in connection with the Chapter 11 case of Solutia.

Verizon Communications in its acquisition of MCI, a transaction with an equity value of $8.5 billion.

Noteholders in the restructuring of MXEnergy, an energy trading company. Noteholders received a combination of stock, cash and equity, and became the majority shareholders following the restructuring.

## Education

University of Virginia School of Law, 1986, J.D.

University of Oxford, 1983, B.A.

Princeton University, 1980, A.B.

## Languages

English

## Practices

Restructuring

Litigation

Bankruptcy Litigation

## Regions

US/North America

# **Exhibit A-9**

# White and Williams LLP



## Frank J. Perch, III   [ Counsel ]

Philadelphia, PA | Direct 215.864.6273 | Fax 215.789.7626
|
perchf@whiteandwilliams.com

Frank Perch has over 25 years of diverse experience as a business litigator and legal advisor, concentrating principally on insurance coverage, bankruptcy and business restructuring matters. He has advised insurance carriers regarding questions of coverage in matters ranging from moderately sized first-party claims to mass tort and environmental claims of national significance such as asbestos and Love Canal claims. Frank is skilled in all aspects of coverage disputes, including evaluating coverage positions, negotiating settlements, mediation and litigation, and defense of bad faith claims. He has represented insurers in asbestos bankruptcies.

Frank is also experienced in representing financial institutions, investors, asset purchasers, landlords, vendors, and creditors' committees in bankruptcy proceedings and out-of-court restructurings. Frank counsels clients on preserving rights and maximizing outcomes in bankruptcies. He has represented Chapter 11 debtors and confirmed Plans of Reorganization, and he has both prosecuted and defended preference and fraudulent transfer litigation. He has spoken on bankruptcy issues at the Pennsylvania Bar Institute, the National Bankruptcy Training Institute of the U.S. Department of Justice, the Practising Law Institute, the Coastal Bankruptcy Law Institute of Savannah, Georgia, and the Emory Bankruptcy Developments Journal Symposium.

As a result of his experience in both insurance coverage and bankruptcy, Frank is able to address the unique problems that exist when coverage issues arise in the context of bankruptcy. He has served as an expert for insurance carriers on mass tort bankruptcy issues.

### REPRESENTATIVE MATTERS

- Represented insurers in settlement of coverage issues arising out of the Love Canal disaster
- Represented insurers in asbestos bankruptcy cases
- Negotiated settlement for insurer in nondischargeability case against insured arising from fraudulent business loss claim
- Represented Official Committee of Unsecured Creditors in Chapter 11 case of consumer finance business, obtaining 100 percent payout on all claims with interest

## News

Coverage College®
2014 Brings Over 600
Students Together for
Eighth Annual Insurance
Industry Event
October 3, 2014

## Events

To Defend Or Not To
Defend: Consequences
To An Insurer Of Failing
To Defend Its Insured
White and Williams
Coverage College
October 2, 2014

## Publications

Business Bankruptcies a
Sign of the Times
Business in Savannah
March 16, 2011

Case:10-21034-EJC    Doc#:1423    Filed:11/12/15    Entered:11/12/15 18:35:22    Page:64 of
164

- Successfully prosecuted involuntary bankruptcy petition, obtained appointment of Chapter 11 Trustee and obtained recovery for unsecured creditors of business being looted by owners accused of perpetrating a penny stock fraud.
- Successfully defended real estate investor against $1.8 million fraudulent transfer suit by trustee of bankrupt seller

## RECOGNITION & INVOLVEMENT

Frank served as an Assistant United States Trustee, District of Delaware from 2003 to 2005. He also served as an Investment Volunteer (grant application review) and member of Vision Council, United Way of the Coastal Empire (Savannah, GA) from 2009 to 2013. Since 2009, Frank has served as a member of the Finance Committee and Executive Committee of the Friends General Conference.

Frank has been AV® rated by the Martindale-Hubbell peer review rating system.

## Practice areas

Insurance Coverage and Bad Faith

Financial Restructuring and Bankruptcy

## Bar and Court Admissions

Pennsylvania

New Jersey

Georgia

U.S. Court of Appeals for the Third Circuit

U.S. Court of Appeals for the Eleventh Circuit

U.S. District Court for the Eastern District of Pennsylvania

U.S. District Court for the Northern District of Georgia

U.S. District Court for the Middle District of Georgia

U.S. District Court for the Southern District of Georgia

## Education

University of Pennsylvania Law School, JD *cum laude*, 1983

Haverford College, BA in Political Science with Departmental Honors, 1980

## Memberships

American Bankruptcy Institute

# **Exhibit A-10**

Case:10-21034-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:66 of 164

# Debevoise & Plimpton



## Steven R. Gross

Of Counsel

**New York**

Tel: +1 212 909 6586

Steven Gross is of counsel and former Co-Chair of the firm's Business Restructuring & Workouts Group. Mr. Gross represented debtors, creditors ...

## Experience

Culligan Investments S.àr.l, a leading provider of global water treatment solutions, and over 40 affiliates in the U.S., Canada and Europe in their successful out-of-court restructuring of more than $700 million in secured debt obligations.

Oaktree Capital Management with Avenue Capital and Lowe Hospitality Group, in acquiring the assets of Sea Island Company.

Trustees of Chemtura's UK pension scheme in the Chapter 11 case of Chemtura Corporation.

Group of holders of AMBAC-wrapped residential mortgage backed securities in the rehabilitation proceeding of AMBAC's Segregated Account.

Globo Comunicações e Participações, its affiliate TV Globo and their respective subsidiaries in the restructuring of approximately $1.3 billion of debt.

Private placement lenders in connection with several debt restructurings of Asian issuers.

Eutelsat S.A. in contract matters relating to Sea Launch Company's Chapter 11 proceedings.

Case:10-21034-EJC Doc#:1423 Filed:11/12/15 Entered:11/12/15 18:35:22 Page:67 of 164

Mortgage certificate holder in the Chapter 11 case of Extended Stay Hotels.

Trustees of the 1983 Sea Containers Pension Scheme, one of the major creditors of Sea Containers Limited in its chapter 11 bankruptcy proceedings.

## Education

Yale Law School, 1973, J.D.

University of Cambridge, 1971, LL.B.

Columbia University, 1968, B.A.

## Languages

English

## Practices

Restructuring

## Regions

Latin America

US/North America

# Exhibit A-11

Case:10-21634-EJC   Doc#:1423   Filed:11/12/15   Entered:11/12/15 18:35:22   Page:69 of 164

# Debevoise &Plimpton



## Anne-Lise Quach

Associate

---

New York

---

Tel: +1 212 909 6427

Anne-Lise Quach is a corporate associate based in the New York office and a member of the firm's Investment Management Group. Her practice focuses on advising sponsors of, and institutional investors in, private investment funds.

Ms. Quach joined the firm in 2008. She received a J.D. from Columbia Law School in 2008 where she was a Harlan Fiske Stone Scholar and a Managing Editor for the Journal of Transnational Law. She received a B.A. from Stanford University in Human Biology and an M.A. from Stanford University in Sociology.

Ms. Quach is a member of the Bar of the State of New York.

## Education

Columbia Law School, 2008, J.D.

Stanford University, 2004, M.A.

Stanford University, 2002, B.A.

## Bar Admissions

New York

# **Exhibit A-12**

 OAKTREE

Home | Careers | Contact us | Unitholders | Memos from our Chairman    CLIENT PORTAL

| ABOUT OAKTREE    PEOPLE    STRATEGIES    | INVESTOR TYPE



Senior executives and directors
Senior advisors
Portfolio managers
Investment teams
  Corporate Debt
  Convertible Securities
  Distressed Debt
  Control Investing
  Real Estate
  Listed Equities
Corporate
Marketing and Client Relations
Legal and Compliance
Accounting and Tax
Infrastructure Services

home > people > investment teams > distressed debt > value opportunities > ken liang

# KEN LIANG
Managing Director and Head of Restructurings



Mr. Liang serves as the Distressed Debt group's head of restructurings, working on restructurings and reorganizations. From Oaktree's formation in 1995 until June 2001, Mr. Liang was Oaktree's General Counsel. Earlier, he served as a Senior Vice President at TCW with primary legal responsibility for Special Credits Funds investments and, before that, as Senior Corporate Counsel at Dole Food Company and as an Associate at the law firm of O'Melveny & Myers. Mr. Liang holds a B.S. degree in Business Finance and Economics from the University of Southern California and a J.D. from Georgetown University Law Center. He is a member of the State Bar of California.

Go back to Value Opportunities Team page

© 2007-2015 Oaktree Capital Management, L.P. All Rights Reserved.
Use of this website is governed by the Terms and Conditions | Privacy Policy.
Securities offered through OCM Investments, LLC (Member FINRA), a subsidiary of Oaktree Capital Management, L.P. | Business Continuity Plan

# **Exhibit A-13**

# Debevoise & Plimpton



## Peter J. Irwin
Partner

**New York**

Tel: +1 212 909 7469

Peter Irwin is a corporate partner and chair of the firm's Real Estate Group. He regularly advises clients, including JPMorgan Asset Management, ...

## Experience

JPMorgan Asset Management in a $1.5 billion equity transaction with national retail real estate investment company Edens Investment Trust and in the acquisition by Edens of AmREIT for $763 million.

A foreign investor in the acquisition of an interest in an investment vehicle sponsored by Tishman Speyer that plans to develop a 2.85 million square foot tower in the Hudson Yards district on the far west side of Manhattan.

JPMorgan Asset Management in its joint venture acquisition and financing of an office building located at 195 Broadway in New York City.

JPMorgan Asset Management in the acquisition of an office building located at 425 Lexington Avenue in New York City.

JPMorgan Asset Management in the acquisition of an office building located at 125 West 55th Street in New York City.

JPMorgan Asset Management in a joint venture with Hines Holdings to develop a Class A office building in New York City that will be known as 7 Bryant Park.

Beacon Capital Partners in the recapitalization of 1633 Broadway in New York City.

The Rockefeller Group in its joint venture with Mitsubishi Estate New York on the acquisition and financing of 50 Beale Street in San Francisco, CA.

Oaktree Capital Management in its joint venture with the Kushner Companies on the acquisition and financing of a mixed-use development in Philadelphia, PA known as Northern Liberties.

JPMorgan Asset Management in the joint venture acquisition and financing of the former International Toy Center building located at 200 Fifth Avenue in New York City.

Beacon Capital Partners in obtaining construction financing for 330 Hudson Street in New York City.

JPMorgan Asset Management in the joint venture development and financing of New City, a mixed-use project in the Lincoln Park area of Chicago, IL.

Beacon Capital Partners in the joint venture acquisition and financing of 195 Broadway in New York City.

A leading hedge fund in the sale of its interest in 340 Madison Avenue and 450 W. 33rd Street in New York City and hotels in Los Angeles, CA and Honolulu, HI.

A leading hedge fund on the workout and restructuring of a $1.3 billion equity bridge loan made to Harry and William Macklowe in connection with their acquisition of a portfolio of office buildings from Equity Office Properties.

JPMorgan Asset Management in its acquisition of Edgewater Apartments, a luxury apartment building in Philadelphia, PA.

JPMorgan Asset Management in its acquisition of Calhoun Square, an urban retail center in the Uptown neighborhood of Minneapolis, MN.

Oaktree Capital Management with Avenue Capital and Lowe Hospitality Group, in acquiring the assets of Sea Island Company.

UBS Wealth Management in its acquisition of office buildings in San Diego and San Francisco, California and its joint venture acquisitions of ten shopping centers in California

and Nevada with Kimco Realty and an office park in Fulton County, Georgia with Colonial Properties Trust.

Beacon Capital Partners in the joint venture acquisition of two office buildings located in Washington, D.C.

UBS Wealth Management in establishing a joint venture platform with Thomas Properties Group, Inc.

Mitsui in its joint venture with Dow Chemical to construct, own and operate a membrane chlor-alkali facility in Freeport, TX.

## Education

St. John's University School of Law, 1996, J.D.

Cornell University, 1993, B.S.

## Practices

Real Estate

## Industries

Real Estate

## Regions

US/North America

## EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEA ISLAND COMPANY, *et al.,* | ) | Case No.: 10-21034 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| ———————————————— | ) | |
| | ) | Contested Matter |
| | ) | |
| SEA ISLAND ACQUISITION, LLC | ) | |
| | ) | |
| Movant, | ) | Judge John S. Dalis |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT H. BARNETT, Liquidation Trustee | ) | |
| under the Sea Island Liquidation Trust, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| KINGS POINT PROPERTY OWNERS | ) | |
| ASSOCIATION, INC. | ) | |
| | ) | |
| Respondents. | ) | |

---

**KINGS POINT PROPERTY OWNERS ASSOCIATION, INC.'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST**

Pursuant to Federal Rule of Civil Procedure 36, as adapted by Bankruptcy Rule 7026 and 7036, Respondent Kings Point Property Owners Association, Inc. (hereinafter "KPPOA") hereby responds to Robert H. Barnett, Liquidation Trustee under the Sea Island Liquidation Trust's (hereinafter "Liquidation Trustee") First Request for Admissions to KPPOA as follows:

## GENERAL OBJECTIONS

KPPOA objects to Liquidation Trustee's First Request for Admissions to the extent they seek to impose duties upon KPPOA that exceed the scope of permissible discovery under the Federal Rules of Civil Procedure, as adopted by the Bankruptcy Rules.

KPPOA objects to Liquidation Trustee's First Request for Admissions to the extent they seek information exempt from discovery by the attorney/client privilege, the work product doctrine, or any other applicable privileges or immunities.

KPPOA objects to Liquidation Trustee's First Request for Admissions to the extent they seek information that is not relevant to the subject matter of the pending litigation or reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving these objections, KPPOA further responds as follows:

## SPECIFIC RESPONSES:

**REQUEST FOR ADMISSION NO. 1:** Admit that neither disclosure scheduled 2.1(a), *see* Asset Purchase Agreement pp. 71-73, nor disclosure scheduled 3.11(a), *see* Asset Purchase Agreement pp. 114-118, of the Asset Purchase Agreement identify the Kings Point Common Elements.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 2:** Admit that the terms of the Asset Purchase Agreement that purportedly create a transfer obligation of the Kings Point Common Elements were rendered unenforceable by the statute of frauds.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request**

2

on the grounds it seeks the admission of a matter that is a conclusion of law. **Subject to and without waiving said objections, Request No. 2 is denied.**

**REQUEST FOR ADMISSION NO. 3:** Admit that the terms of the Asset Purchase Agreement that purportedly create a transfer obligation of the Kings Point Common Elements are rendered eliminated, abandoned, or discarded by the doctrine of merger.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 3 is denied.**

**REQUEST FOR ADMISSION NO. 4:** Admit that the terms you contend are relevant to this contested matter in the Conformed Plan, the Asset Purchase Agreement, the Liquidation Trust Agreement, and the Confirmation Order are clear and unambiguous.

**RESPONSE: Denied as stated. KPPOA admits that this is a matter of contractual interpretation that can be determined by the Court as a matter of law, but cannot admit that all applicable provisions of the above named documents are clear and unambiguous.**

**REQUEST FOR ADMISSION NO. 5:** Admit that the definition of "Purchased Assets" in the Confirmed Plan contemplates the application of Georgia law, given that the definition restricts such assets to those that you are "acquiring pursuant to the Asset Purchase Agreement," *see* Confirmed Plan at p. 16 of 54, and given that the Asset Purchase Agreement if governed by Georgia law, *see* Asset Purchase Agreement § 15.4.

**RESPONSE: KPPOA admits that the terms of the "Asset Purchase Agreement" are governed by Georgia law. The remainder of Request No. 5 is denied.**

3

**REQUEST FOR ADMISSION NO. 6:** Admit that Kings Point POA does not have standing or rights under the Liquidation Trust Agreement.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 6 is denied.**

**REQUEST FOR ADMISSION NO. 7:** Admit that performance relating to the transfer of the Kings Point Common Elements under the Asset Purchase Agreement requires the delivery and acceptance of a real property deed.

**RESPONSE: Denied as stated. KPPOA admits that a deed must be executed, accepted, and recorded to transfer real property.**

**REQUEST FOR ADMISSION NO. 8:** Admit that the factual allegations contained in the SIA Break Up Fee Pleadings are true and correct.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. Subject to and without waiving said objections, Request No. 8 is denied.**

**REQUEST FOR ADMISSION NO. 9:** Admit that section 5.04 of the Confirmed Plan governs which assets vested into the Liquidation Trust.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 10:** Admit that, pursuant to paragraph 14(iii) of the Confirmation Order, the Confirmed Plan supersedes the Confirmation Order with respect to which assets were transferred to the Liquidation Trust.

4

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 10 is denied.**

**REQUEST FOR ADMISSION NO. 11:** Admit that the Confirmation Order does not amend or vary in any way the Confirmed Plan with respect to which assets vested into the Liquidation Trust, given that paragraph 38 of the Confirmation Order states the following: "[E]ach provision of the [Confirmed] Plan shall have the same validity, binding effect, and enforceability as if fully set forth in the [Confirmation] Order."

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 12:** Admit that the Confirmed Plan and the Asset Purchase Agreement each contain a different definition of "Purchased Assets." *Compare* Confirmed Plan § 1.01 at p. 16 of 54 ("'Purchased Assets' mean those assets of the Debtors that the Purchaser is acquiring pursuant to the Asset Purchase Agreement.") *with* Asset Purchase Agreement § 2.1 (multiple page definition of "Purchased Assets").

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 13:** Admit that the transfer under the Purported Plan Transfer Obligation must be made "pursuant to the Asset Purchase Agreement."

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 14:** Admit that the Purported Plan Transfer Obligation is limited to the closing Date (as that term is defined in the Confirmed Plan) given that the second sentence of the second paragraph pf section 7.01 of the Confirmed Plan starts with the following prepositional phrase: "On the Closing Date."

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 15: Admit that the Purported Plan Transfer Obligation is limited to the Debtors given that the second sentence of the second paragraph of section 7.01 of the Confirmed Plan states that the "Debtors shall transfer the Purchased Assets" whereas sections 6.03 and 8.04 of the Confirmed Plan state that the "Debtors and the Liquidation Trustee shall…."

RESPONSE: Denied.

REQUEST FOR ADMISSION NO. 16: Admit that, pursuant to section 14.3 of the Asset Purchase Agreement, SIA waived all of its "rights" and "Claims" (as that term is defined in the Confirmed Plan) "whether in law or in equity" that SIA or Kings Point POA are asserting in this contested matter "related to" the "Purchased Assets" (as that term is defined in the Asset Purchase Agreement).

RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 16 is denied.

REQUEST FOR ADMISSION NO. 17: Admit that Robert H. Barnett is the duly appointed Liquidation Trustee under the Sea Island Company Liquidation Trust.

RESPONSE: Admitted.

REQUEST FOR ADMISSION NO. 18: Admit that Kings Point POA is a non-profit corporation organized under the laws of the State of Georgia.

RESPONSE: Admitted.

6

**REQUEST FOR ADMISSION NO. 19:** Admit that Goldman, Sachs & Co. ("Goldman Sachs") was the investment banker for that sale of substantially all of the assets of the Debtors. *See* Bankr. Docket Entry Nos. 24 and 1178.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 20:** Admit that the Debtors and Goldman Sachs tried to identify and contact all third party purchasers that might be interested in purchasing substantially all of the Debtor's assets. *See* Bankr. Docket Entry No. 24 at ¶ 15.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 21:** Admit that in connection with this sole process, approximately seventy-nine (79) parties entered into confidentiality agreements with the Debtors and conducted due diligence. *See* Bankr. Docket Entry No. 24 at ¶ 15.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 22:** Admit that more than twelve (12) entities submitted indications of interest to the Debtors, and the Debtors and their legal and financial advisers reviewed the terms and conditions of these proposals (including the consideration offered) and evaluated the financial capabilities of the submitting parties to identify the strongest offers. *See* Bankr. Docket Entry No. 24 at ¶ 15.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 23:** Admit that SIA is a limited partnership formed by Oaktree Capital Management L.P. ("Oaktree") and Avenue Capital Group ("Avenue Capital"). *See* Bankr. Docket Entry No. 154-1 at ¶ 22.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 24:** Admit that SIA is a "sophisticated and well-informed investor." *See* Bankr. Docket Entry No. 154 at ¶ 22.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 25:** Admit that Oaktree is a premier global alternative investment manager with over $76 billion in assets under management as of March 2010. *See* Bankr. Docket Entry No. 154 at ¶ 22.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 26:** Admit that Avenue Capital is a distresses investment firm that is headquartered in New York, with offices in London, Madrid, Milan, Munich,

and four other offices throughout Asia and manages assets estimated to be approximately $13.3 billion as of December 31, 2014. *See* http://www.avenuecapital.com/firm.aspx.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 27:** Admit that Philip Hofmann is a managing Director at Oaktree, *see* Bankr. Docket Entry No. 154-1 at ¶ 1, and received a Masters of Business Administration with Distinction in Real Estate from The Wharton School at the University of Pennsylvania, *see* http://www/oaktreecapital.com/people/bio.aspx?src=it&cat=real-estate-debt&id=55.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 28:** Amit that Mr. Hoffmann negotiated the Asset Purchase Agreement on behalf of Oaktree. *See* SIA's Amended Interrogatory Responses at 1(e).

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 29:** Admit that Mr. Hoffmann negotiated the Asset Purchase Agreement, SIA thoroughly vetted the Debtors' assets and liabilities. *See* Bankr. Docket Entry No. 154 at ¶ 12.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 30:** Admit that, on June 15 and 16, 2010, Mr. Hoffman and 13 other representatives of SIA travelled to Sea Island, Georgia, to conduct due diligence. *See* Bankr. Docket Entry No. 154-1 at ¶ 9.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 31:** Admit that, over the next several weeks after June 15, 2010, SIA continued its extensive due diligence efforts. *See* Bankr. Docket Entry NO. 154-1 at ¶ 11.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 32:** Admit that individuals representing SIA made an additional two trips to Sea Island, Georgia to tour the Debtors' property and met with the Debtors' management. *See* Bankr. Docket Entry No. 154-1 at ¶ 11.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 33:** Admit that SIA engaged in extensive negotiations with the Debtors related to the terms of the sale, including SIA and its advisors, meeting with the

10

Debtors and its advisors for three full days in New York, New York in July 2010. *See* Bankr. Docket

Entry No. 154-1 at ¶ 12.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 34:** Admit that, at all relevant time, SIA represented by Debevoise & Plimpton, LLP ("Debevoise").

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 35:** Admit that, at all relevant time, SIA was represented by Hunter Maclean Exley & Dunn, P.C. ("Hunter Maclean").

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 36:** Admit that in addition to Debevoise, SIA retained the following advisors to conduct diligence related to the purchase of the Debtors' assets:

- Local real estate counsel

- Local environmental counsel

- Water and sewer system infrastructure consultant

- Bridge consultant

- Beach renourishment consultant

- Membership consultants

11

- Membership legal counsel

- Insurance consultants

- Environmental consultants

- Surveyor

- Local real estate appraiser

- Hospitality consulting and valuation firm

- Engineering and construction consultant

- Hotel/resort management company and owner

*See* Bankr. Docket Entry No. 154-1 at ¶ 18.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 37:** Admit that the lawyers representing SIA in the Debtors' bankruptcy cases and in connection with its purchase of substantially all of the Debtors' assets had expertise in, among other things, complex (i) real estate transactions, (ii) mergers and acquisitions, and (iii) chapter 11 bankruptcy cases.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 38:** Admit that, in addition to other Debevoise lawyers, the following New York City-based Debevoise lawyers worked on Debevoise's representation of SIA[1]

---

[1] *See* SIA's Amended Interrogatory Responses at 1(d).

12

| Name | Description |
|---|---|
| Peter Irwin[2] | Corporate Partner and Chair of the firm's Real Estate Group |
| George Maguire[3] | Partner in the Firm's Business Restructuring & Workouts Group |
| Jasmine Ball[4] | Corporate Partner and Member of the firm's Business Restructuring & Workouts Group |
| Steven Gross[5] | Of Counsel and Former Co-Chair of the firm's Business Restructuring & Workouts Group |
| Anne-Lise Quach[6] | Corporate Associate |

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 39:** Admit that, in addition to other Hunter Maclean lawyers, the following Hunter Maclean lawyers worked on Hunter Maclean's representation of SIA:[7],[8]

| Name | Description |
|---|---|
| Harold Yellin[9] | Real Estate Partner |
| Frank Perch[10] | Of Counsel in the Bankruptcy Group |

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

---

[2] Information about Mr. Irwin can be found at http://debevoise.com/peterirwin.
[3] Information about Mr. Maguire can be found at http://debevoise.com/georgemaguire.
[4] Information about Ms. Ball can be found at http://debevoise.com/jasmineball.
[5] Information about Mr. Gross can be found at http://debevoise.com/stevengross.
[6] Information about Ms. Quach can be found at http://debevoise.com/annelisequach.
[7] *See* SIA's Amended Interrogatory Responses at 1(i).
[8] *See* Bankr. Docket Entry No. 43.
[9] Information about Mr. Yellin can be found at http://www.huntermaclean.com/attorney/harold-b-yellin/.
[10] At the time, Mr. Perch practiced law at the law firm of Hunter Maclean. Subsequently, he joined the law firm of White & Williams, LLP. His resume can be found at http://www.whiteandwilliams.com/lawyers-FrankPerch.html.

13

**REQUEST FOR ADMISSION NO. 40:** Admit that, in the months leading up to the execution of the Asset Purchase Agreement, SIA engaged in extensive due diligence involving many thousands of hours on the part of SIA and its advisors. *See* Bankr. Docket Entry No. 154 at ¶ 12.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 41:** Admit that the efforts of Hunter Maclean leading up to the execution of a stalking horse asset purchase agreement (the "Stalking Horse Asset Purchase Agreement") included: the review of thousands of pages of complex title and survey documents for over 50 individual properties; the review of multiple title commitments (over 200 pages in length) and endorsements; the review of extensive condominium declarations and filings; and multiple on-site visits, including several meetings with the Debtors' local real estate counsel in Brunswick, Georgia. *See* Bankr. Docket Entry No. 154 at ¶ 21.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 42:** Admit that SIA and its advisors spent many thousands of hours on due diligence, resulting in the execution of the Stalking Horse Asset Purchase Management and its extensive disclosure schedules and exhibits. *See* Bankr. Docket Entry No. 154-1 at ¶ 21.

14

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 43:** Admit that, on August 4, 2010, the Debtors and SIA entered into the Stalking Horse Asset Purchase Agreement. *See* Bankr. Docket Entry No. 24 at ¶ 17.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 44:** Admit that a true and correct copy of the Stalking Horse Asset Purchase Agreement can be found at Bankr. Docket Entry No. 24-1.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 45:** Admit that the signatories to the Stalking Horse Asset Purchase Agreement on behalf of SIA are Philip Hofmann and Ken Liang.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 46:** Admit that Ken Liang is a Managing Director and Head of Restructurings at Oaktree, received a Bachelors of Science in Business Finance and Economics from the University of Southern California and a Juris Doctor from Georgetown University Law Center, and previously served as General Counsel of Oaktree. *See* http://www.Oaktreecapital.com/people/bio.aspx?src=it&cat=distressed-debt&t=valueopportunites&id=86.

15

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 47:** Admit that, as part of SIA's request for the Court to approve a break up fee in the amount of $5,925,000.00, SIA stated the following to the Court: "[O]ther bidders will be more encouraged to participate in the Debtors' auction knowing that the Debtors' assets and liabilities have been so thoroughly vetted by a sophisticated and well-informed investor." *See* Bankr. Docket Entry No. 154 at ¶ 22.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 48:** Admit that, on August 10, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 49:** Admit that, on the Petition Date, the Debtors filed a motion to approve sale procedures that included, among other things, the "material terms" of the sale to SIA in paragraph 17, which did not refer in any way to the following:

(a)     SIA purchasing the Kings Point Common Elements;

(b)     SIA purchasing any common areas of a development;

(c)     SIA purchasing any residential real property developments;

(d)     SIA purchasing the real property included in a "catch all" provision;

(e)     SIA purchasing the Reserved Interests (as that term is defined in the

16

Motion to Clarify);

    (f)     SIA purchasing rights of first refusal;

    (g)    SIA purchasing rights to restrict subdividing of real property;

    (h)    SIA purchasing mineral rights;

    (i)     SIA purchasing timber rights;

    (G)    SIA purchasing rights to require that undisturbed natural buffers remain along private easements which cross and afford access to a parcel of real property; or

    (k)    SIA purchasing non-exclusive rights of ingress or egress.

*See* Bankr. Docket Entry No. 24 at 17.

    **RESPONSE: Denied.**

    **REQUEST FOR ADMISSION NO. 50:** Admit that, even after executing the Stalking Horse Asset Purchase Agreement, as of September 8, 2010, SIA continued to conduct substantial due diligence and Hunter Maclean worked toward finalizing the title commitment and endorsement, preparing surveys, coordinating containment letters and zoning letters, and preparing for the transfer of alcohol licenses and other permits. *See* Bankr. Docket Entry NO. 154-1 at ¶ 24.

    **RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

    **REQUEST FOR ADMISSION NO. 51:** Admit that the Debtors conducted an auction on October 11, 2010 (the "Auction"), at which the Debtors solicited the highest and best bid for the sale of substantially all of the Debtors' assets. *See* Plan Supplement at ¶ 1.

    **RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 52:** Admit that, at the Auction, SIA and Sea Island Holdings, LLC, a limited liability company formed by the Anschutz Corporation and Starwood Capital Group (collectively, the "Bidding Parties"), each submitted multiple bids for the Debtors' assets. *See* Plan Supplement at ¶ 1.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 53:** Admit that, after multiple rounds of bidding, the Bidding Parties entered into an agreement to jointly purchase the Debtors' assets (the "Joint Bid") and the Debtors, in consultation with the Secured Lenders and the Committee (as these terms are defined in the Confirmed Plan), determined that the Joint Bid was the highest and best bid for the sale of substantially all of the Debtors' assets. *See* Plan Supplement at ¶ 1.

**ESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 54:** Admit that as of October 19, 2010, the Debtors and SIA entered into the Asset Purchase Agreement.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 55:** Admit that, on September 24, 2010, the Debtors filed the Confirmed Plan.

**RESPONSE: Admitted.**

18

**REQUEST FOR ADMISSION NO. 56:** Admit that the signatories to the Asset Purchase Agreement on behalf of SIA are Philip Hofmann and Amy Johannes.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 57:** Admit that Amy Johannes is a Senior Vice President with a background in real estate investing at Oaktree and received a Masters of Business Administration from the Stanford University Graduate School of Business. See http://www.oaktreecapital.com.people/bio.aspx?src=al&alpha=h-m&id=363.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 58:** Admit that, on November 8, 2010, the Court entered the Confirmation Order.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 59:** Admit that, pursuant to section 8.1 of the Asset Purchase Agreement, SIA approved the form and substance of the Confirmation Order.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 60:** Admit that, before the Closing, Sea Island Coastal Properties LLC ("Coastal Properties") held title to the Kings Point Common Elements.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 61:** Admit that the deeds by which Coastal Properties held title to Kings Point Common Elements were properly and well recorded in the indexed public land records of the Clerk of the Superior Court for Glynn County, Georgia.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 62:** Admit that the Kings Point Common Elements have not been conveyed to SIA or any of its affiliates. *See* Kings Point POA Preliminary Response ¶ 16.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 63:** Admit that the Liquidation Trustee currently holds title to the Kings Point Common Elements.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 64:** Admit that the Closing occurred on December 15, 2010. *See* Bankr. Docket Entry No. 444.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 65:** Admit that, on December 15, 2010, deeds were executed by authorized representatives of the Debtors as contemplated by the Asset Purchase Agreement (the "Deeds").

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

20

**REQUEST FOR ADMISSION NO. 66:** Admit that the Debtors and SIA entered into the Bill of Sale, Assignment and Assumption Agreement [Bankr. Docket Entry No. 293 at pp. 62-66 of 278] (the "Bill of Sale").

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 67:** Admit that the total aggregate consideration under the Asset Purchase Agreement was $343,259,519.00, consisting of the following: the cash purchase price of $210,723,720.00, cash at closing of $5,100,156.31, and assumed membership deposits of $127,435,643.00. *See* Bankr. Docket Entry No. 1178 at n. 1.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 68:** Admit that, as of December 15, 2010, the Debtors and the Liquidation Trustee entered into the Liquidation Trust Agreement. *See* Bankr. Docket Entry No. 449-1.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 69:** Admit that the Effective Date (as that term is defined in the Confirmed Plan) occurred on December 16, 2010. *See* Bankr. Docket Entry No. 444.

21

**RESPONSE:** KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.

**REQUEST FOR ADMISSION NO. 70:** Admit that substantial consummation of the Confirmed Plan has occurred. *See* 11 U.S.C. § 1101(2).

**RESPONSE:** KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 70 is denied.

**REQUEST FOR ADMISSION NO. 71:** Admit that the Debtors and SICAL, LLC were the only proponents of the Confirmed Plan. *See* Confirmed Plan at p. 54 of 54.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 72:** Admit that each provision of the Confirmed Plan has the same validity, binding effect, and enforceability as if fully set forth in the Confirmation Order. *See* Confirmation Order ¶ 38.

**RESPONSE:** KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 72 is denied.

**REQUEST FOR ADMISSION NO. 73:** Admit that the only parties to the Liquidation Trust Agreement are the Debtors and the Liquidation Trustee.

**RESPONSE: Denied as stated. KPPOA admits that Debtors and the Liquidation Trustee were the only signatories to the Liquidation Trust Agreement.**

**REQUEST FOR ADMISSION NO. 74:** Admit that the beneficiaries of the Liquidation Trust are the holders of Allowed Claims (as that term is defined in the Confirmed Plan) under Classes 4, 5 and 6. *See* Liquidation Trust Agreement § 1.1.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 74 is denied.**

**REQUEST FOR ADMISSION NO. 75:** Admit that the purchase price under the Asset Purchase Agreement is over $210,000,000.00 subject to certain adjustments. *See* Asset Purchase Agreement § 2.6(a).

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 76:** Admit that Kings Point POA is not a party to the Asset Purchase Agreement.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 77:** Admit that, to the extent that real property falling within the definition of "Acquired Owned Real Property" (as that term is defined in section 2.1(a) of the Asset Purchase Agreement) is identified in the Asset Purchase Agreement, it is identified by one or more of the following: (i) size; (ii) shape; or (iii) location.

**RESPONSE: Denied.**

23

**REQUEST FOR ADMISSION NO. 78:** Admit that the Asset Purchase Agreement does not identify the Kings Point Common Elements by size, shape, or location or in any other way as an asset to be conveyed to SIA.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 79:** Admit that the Debtors purported obligation to transfer the "Purchased Assets" (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing. *See* Asset Purchase Agreement § 2.1.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 80:** Admit that the Reserved Interests (as that term is defined in the Motion to Clarify) do not fit within the definition of "Acquired Owned Real Property" in section 2.1(a) of the Asset Purchase Agreement. *See* Asset Purchase Agreement § 2.1(a).

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 81:** Admit that the Asset Purchase Agreement contemplates that the Debtors would deliver at Closing (i) a bill of sale for certain personal property, see Asset Purchase Agreement § 2.10(a), and (ii) warranty deeds and quitclaim deeds for real property, see Asset Purchase Agreement § 2.10(b) and (c).

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 82:** Admit that the delivery of the Deeds was not reserved under the Asset Purchase Agreement to occur after the Closing. *See* Asset Purchase Agreement § 2.10(b) and (c) (stating the delivery of the deeds would occur "[A]t the Closing").

24

RESPONSE: Denied.

**REQUEST FOR ADMISSION NO. 83:** Admit that, pursuant to section 8.1 of the Asset Purchase Agreement, SIA had the right to approve the form and substance of the Confirmation Order. *See* Bankr. Docket Entry No. 293 at    8.1.

RESPONSE: Denied.

**REQUEST FOR ADMISSION NO. 84:** Admit that the Deeds describe the property that they purport to transfer by legal description.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 84 is denied.**

**REQUEST FOR ADMISSION NO. 85:** Admit that the Deeds are written instruments purporting to convey title.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 85 is denied.**

**REQUEST FOR ADMISSION NO. 86:** Admit that the Deeds contain words of conveyance.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 86 is denied.**

25

**REQUEST FOR ADMISSION NO. 87:** Admit that the Deeds are signed by authorized representatives of the Debtors.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 88:** Admit that, at the Closing, the Deeds were delivered to the representatives of SIA or representatives of one of SIA's designees.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 89:** Admit that the Deeds do not identify or describe the Kings Point Common Elements in any way.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 90:** Admit that, on March 18, 2014, when Sea Island Acquisition, LLC ("SIA LLC") filed the Motion to Clarify, initiating this contested matter, it was the first time that SIA LLC or any other party sought the relief sought in the Motion to Clarify in the above-referenced bankruptcy cases.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 91:** Admit that, on May 15, 2014, when Kings Point POA filed its preliminary response, it was the first time that Kings Point POA sought the

relief sought in the Kings Point POA Preliminary Response in the above-referenced bankruptcy cases.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 92:** Admit that the rights Kings Point POA is asserting in connection with this contested matter as to the ownership of the Kings Point Common Elements purportedly arose because of a conditional transfer from SIA LLC to Kings Point POA. *See* Bankr. Docket Entry No. 1176.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 93:** Admit that a true and correct copy of the Confirmed Plan can be found at Bankr. Docket Entry No. 217.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 94:** Admit that a true and correct copy of the Asset Purchase Agreement can be found at Bankr. Docket Entry No. 293.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 95:** Admit that a true and correct copy of the Confirmation Order can be found at Bankr. Docket Entry No. 372.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 96:** Admit that a true and correct copy of the Liquidation Trust Agreement can be found at Bankr. Docket Entry No. 449-1.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 97:** Admit that a true and correct copy of the Bill of Sale can be found at Bankr. Docket Entry No. 293.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 98:** Admit that the information contained in the attached exhibits accurately describes the person or entity referenced:

- Exhibit A-1: Debevoise;

- Exhibit A-2: Avenue Capital;

- Exhibit A-3: Hunter Maclean;

- Exhibit A-4: Jasmine Ball;

- Exhibit A-5: Philip Hofmann

- Exhibit A-6: Harold Yellin;

- Exhibit A-7: Amy Johannes;

- Exhibit A-8: George Maguire;

- Exhibit A-9: Frank Perch;

- Exhibit A-10: Stephen Gross;

- Exhibit A-11: Anne-Lise Quach;

- Exhibit A-12: Ken Liang; and

- Exhibit A-13: Peter Irwin.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 99:** Admit that the Purported Plan Transfer Obligation only applies, if at all, to the Debtors and not to the Liquidation Trustee given that other sections of the Confirmed Plan refer to both the Debtors and the Liquidation Trustee and the Purported Plan Transfer Obligation Provision only refers to the Debtors. *Compare* Confirmed Plan § 7.01 *("[T}he Debtors* shall transfer the Purchased Assets to the Purchaser ...")

(emphasis added) *with* Confirmed Plan § 6.03 (*"The Debtors and the Liquidation Trustee* shall have the right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.04 of the Plan.") (emphasis added) *and* Confirmed Plan § 8.02 ("Notwithstanding any allowance of Claim, *the Debtors and the Liquidation Trustee* reserve the right to seek, among other things, to have such Claim disallowed if the Debtor or the Liquidation Trustee, as the case may be, at the appropriate time, determines it has a defense under section 502(d) of the Bankruptcy Code, e.g., the Debtor or the Liquidation Trustee holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.") (emphasis added) *and* Confirmed Plan § 8.04 ("Unless otherwise ordered by the Court after notice and a hearing, *the Debtors and the Liquidation Trustee* shall have the right, on and after the Effective Date, to File objections to Claims . . ..") (emphasis added).

    **RESPONSE: Denied.**

    **REQUEST FOR ADMISSION NO. 100:** Admit that the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors. *See* Confirmed Plan § 5.04.

    **RESPONSE: Denied.**

    **REQUEST FOR ADMISSION NO. 101:** Admit that the Kings Point Common Elements was not conveyed to SIA under the Asset Purchase Agreement. *See* Confirmed Plan § 5.04.

    **RESPONSE: Denied.**

    **REQUEST FOR ADMISSION NO. 102:** Admit that the Kings Point Common Elements automatically vested in the Liquidation Trust. *See* Confirmed Plan § 5.04.

    **RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 103:** Admit that the Purported Plan Transfer Obligation was temporally limited to the Closing Date (as that term is defined in the Confirmed Plan) given that other provisions of the Confirmed Plan specifically refer to time periods "after the Closing Date" or "from and after the Closing Date" and the Purported Plan Transfer Obligation Provision specifically refers to a time period set to occur "on the Closing Date." *Compare* Confirmed Plan § 7.01 *("On the Closing Date,* pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser for the aggregate consideration of the Purchase Price plus the assumption by the Purchaser of the Assumed Liabilities.") (emphasis added) *with* Confirmed Plan § 6.05(c)(i) ("Effective as of the Closing Date, Purchaser shall assume responsibility for the Transferred Employees, but, except as expressly set forth in the Asset Purchase Agreement, only to the extent related to (i) services rendered *after the Closing Date,* (ii) any termination by Purchaser of a Transferred Employee *after the Closing Date* or (iii) any actions by Purchaser. Debtors shall retain all liabilities in associated with (x) the Transferred Employees' service with Purchaser *after the Closing Date,* (y) any termination of a Transferred Employee by Purchaser *after the Closing Date,* or (z) any vio(b) as otherwise expressly set forth in the Asset Purchase Agreement. For the avoidance of doubt, nothing in the Asset Purchase Agreement (A) guarantees any Transferred Employee employment with Purchaser for any period of time, (B) causes any Transferred Employee to be employed on any basis other than on an "at-will" basis or (C) in any way restricts Purchaser's right to terminate the employment of any Transferred Employee *after the Closing Date.")* (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(l) ("As promptly as reasonably practicable *after the Closing Date* (and as permitted by Purchaser's employee benefit plans and employee policies), Purchaser shall enroll the Transferred Employees in

30

Purchaser's employee benefit plans for which such employees are eligible (and as permitted by Purchaser's employee benefit plans and employee policies.)") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(2) ("Purchaser may adopt differing policies with respect to any vacation benefits accruing *on or after the Closing Date."*) (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(3) ("If any employee of Debtors who accepts an offer of employment from Purchaser is subsequently terminated by Purchaser within the 6-month period *after the Closing Date*, then Purchaser shall make severance payments to such employee in an amount that is not less than the amount of severance that such employee would have been entitled to receive under Debtors' severance policy in effect on the date hereof if such employee had been terminated by Debtors as of the Closing Date.") (emphasis added) *and* Confirmed Plan § 6.05(c)(iv)(4) *("From and after the Closing Date,* Debtors shall remain solely responsible for any and all liabilities relating to or arising in connection with the requirements of Section 4980B of the Internal Revenue Code to provide continuation of health care coverage in respect of (A) employees and their covered dependents with respect to any qualifying event occurring prior to the Effective Date and (B) employees other than Transferred Employees with respect to any qualifying event occurring after the Effective Date.") (emphasis added).

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 104:** Admit that the Asset Purchase Agreement and the transactions contemplated thereby were negotiated at arm's length and entered into by the Debtors and SIA in good faith. *See* Confirmation Order ¶ WW.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 105:** Admit that the terms of the Confirmed Plan are incorporated into the Confirmation Order and are an integral part of the Confirmation Order. See Confirmation Order ¶ 1.

**RESPONSE: Denied as stated. KPPOA admits that the terms of the Confirmed Plan are incorporated into the Confirmation Order.**

**REQUEST FOR ADMISSION NO. 106:** Admit that the provisions of the Confirmation Order are integrated with each other and are mutually dependent and not severable. *See* Confirmation Order ¶ 1.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 106 is denied.**

**REQUEST FOR ADMISSION NO. 107:** Admit that the Confirmed Plan governs the transfer of assets into the Liquidation Trust. *See* Confirmation Order ¶ 14.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 108:** Admit that the Confirmed Plan is incorporated in its entirety in the Confirmation Order. *See* Confirmation Order ¶ 38.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 109:** Admit that the Liquidation Trust Agreement does not contain any implied obligations or covenants. *See* Liquidation Trust Agreement § 5.6.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 109 is denied.**

**REQUEST FOR ADMISSION NO. 110:** Admit that Kings Point POA is not a party to the Liquidation Trust Agreement.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 111:** Admit that the "recitals" of the Liquidation Trust Agreement do not contain covenants and obligations of the Liquidation Trustee.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 111 is denied.**

**REQUEST FOR ADMISSION NO. 112:** Admit that the Kings Point Common Elements were properly transferred to the Liquidation Trust.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 113:** Admit that the Purported Liquidation Trust Transfer Obligation is not a covenant or obligation of the Liquidation Trustee.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request**

33

on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 113 is denied.

**REQUEST FOR ADMISSION NO. 114:** Admit that, pursuant to the terms of the Liquidation Trust Agreement, the Liquidation Trustee may seek to amend the Liquidation Trust Agreement by only giving notice to the Beneficiaries (as that term is defined in the Liquidation Trust Agreement). *See* Liquidation Trust Agreement § 10.3.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 115:** Admit that the only parties to the Asset Purchase Agreement are the Debtors and SIA.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 116:** Admit that SIA was prohibited by the Asset Purchase Agreement after the Closing from assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement without the written consent of the Debtors. *See* Asset Purchase Agreement § 15.3.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 116 is denied.**

**REQUEST FOR ADMISSION NO. 117:** Admit that Kings Point POA is not a third-party beneficiary of the Asset Purchase Agreement. *See* Asset Purchase Agreement § 15.7 and pp. 64-66.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 117 is denied.**

**REQUEST FOR ADMISSION NO. 118:** Admit that the Debtors, pursuant to section 1 of the Bill of Sale, transferred all right, title, and interest in certain personal property of the Debtors to SIA "in accordance with the terms of the Asset Purchase Agreement" by entering into the Bill of Sale. See Bill of Sale at p. 1 *("[I]n accordance with the terms of the Asset Purchase Agreement,* Sellers have agreed to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser all right, title and interest of Sellers in and to the Purchased Assets and Purchaser has agreed to purchase, acquire and accept from Sellers all right, title and interest of Sellers and to the Purchased Assets and to assume the Assumed Liabilities on the condition and subject to the terms set forth in the Asset Purchase Agreement, for consideration in the amount therein.") (emphasis added) and § 1.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 119:** Admit that SIA, pursuant to section 2 of the Bill of Sale, assumed the Assumed Liabilities (as that term is defined in the Asset Purchase Agreement) "in accordance with the terms of the Asset Purchase Agreement" by entering into the Bill of Sale. *See* Bill of Sale at p. 1 *("[I]n accordance with the terms of the Asset Purchase Agreement,* Sellers have agreed to sell, transfer, convey, assign and deliver, or cause to be sold, transferred, conveyed, assigned and delivered, to Purchaser all right, title and interest of Sellers in and to the Purchased Assets and Purchaser has agreed to purchase, acquire and accept from Sellers all right, title and interest of Sellers and to the Purchased

35

Assets and to assume the Assumed Liabilities on the conditions and subject to the terms set forth in the Asset Purchase Agreement, for consideration in the amount therein.") (emphasis added) and § 2.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 119 is denied.**

**REQUEST FOR ADMISSION NO. 120:** Admit that SIA waived all of the rights that Kings Point POA is asserting in this contested matter. *See* Asset Purchase Agreement § 14.3.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 120 is denied. Denied.**

**REQUEST FOR ADMISSION NO. 121:** Admit that Debevoise is a prominent New City based law firm with approximately 650 lawyers. *Compare* Bankr. Docket Entry No. 43 (entry of appearance) *with* http://www.debevoise.com/aboutus/overview.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 122:** Admit that Hunter Maclean is a prominent law firm headquartered in Savannah, which is one of the largest law firms in the State of Georgia outside of Atlanta. *Compare* Bankr. Docket Entry No. 43 (entry of appearance) with

http://www.huntermaclean.com/about-us/history/ ("Today Hunter Maclean is one of the largest law firms in Georgia outside of Atlanta.").

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 123:** Admit that the Debtors have not consented in writing to SIA assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 124:** Admit that the Liquidation Trustee possesses the Debtors' written consent rights of section 15.3 of the Asset Purchase Agreement.

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 124 is denied.**

**REQUEST FOR ADMISSION NO. 125:** Admit that the Liquidation Trustee has not consented in writing to SIA assigning, delegating, or otherwise transferring any of its rights or obligations under the Asset Purchase Agreement.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 126:** Admit that, assuming that Kings Point POA has rights under the Asset Purchase Agreement, such rights, if any, are no greater than the rights of SIA under the Asset Purchase Agreement. *See, e.g., Pridgen v. Auto-Owners Ins. Co.,* 204 Ga. App. 322, 323 (1992).

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 126 is denied.**

**REQUEST FOR ADMISSION NO. 127:** Admit that, assuming that Kings Point POA has rights under the Asset Purchase Agreement, such rights are subject to the same defenses as SIA's rights, if any, would be. *See, e.g., Pridgen v. Auto-Owners Ins. Co.,* 204 Ga. App. 322, 323 (1992).

**RESPONSE: KPPOA objects to this Request on the grounds it exceeds the scope of discovery permitted by the Federal Rules of Civil Procedure. KPPOA objects to this request on the grounds it seeks the admission of a matter that is a conclusion of law. Subject to and without waiving said objections, Request No. 127 is denied.**

**REQUEST FOR ADMISSION NO. 128:** Admit that all of the Deeds are identified in and attached to the Declaration of Carter L. Stout in Support of The Liquidation Trustee's Motion Summary Judgment as to the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan that has been previously provided to you.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

38

**REQUEST FOR ADMISSION NO. 129:** Admit that SIA retained Debevoise as counsel to advise it in connection with the sale process and to coordinate the review of over 1,250 documents in the electronic data room. *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 130:** Admit that, given the scope of the over 1,250 documents in the electronic data room, Debevoise attorneys with expertise in various disciplines including real estate, employee benefits, environmental, intellectual property and tax participated in this review. *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

**REQUEST FOR ADMISSION NO. 131:** Admit that the Debevoise attorneys, along with members of SIA's internal business team, spent substantial time with the Debtors' management and advisors discussing issues and following up on questions raised as part of the review of the over 1,250 documents in the electronic data room. *See* Bankr. Docket Entry No. 154-1 at ¶ 18.

**RESPONSE: KPPOA lacks sufficient information or knowledge to admit or deny this request after reasonable inquiry and based on the information known or readily obtainable to it.**

Respectfully submitted this 4th day of May, 2015.

ROBERTS TATE, LLC

_____

Jason M. Tate

39

Georgia State Bar No. 140827
jtate@robertstate.com

Post Office Box 21828
St. Simons Island, Georgia  31522
(912) 638-5200
(912) 638-5300-Fax


MCGUIRE WOODS LLP

Thomas R. Walker
Georgia State Bar No. 732755
trwalker@mcguirewoods.com


1230 Peachtree Street, NE
Suite 2100
Atlanta, Georgia 30309
(404) 443-5705

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re: ) | **Chapter 11** |
| ) | |
| **SEA ISLAND COMPANY,** *et al.*, ) | **Case No.: 10-21034** |
| ) | **Jointly Administered** |
| Debtors. ) | |
| ) | |
| ———————————————— ) | **Contested Matter** |
| ) | |
| **SEA ISLAND ACQUISITION, LLC** ) | |
| ) | |
| Movant, ) | **Judge John S. Dalis** |
| ) | |
| vs. ) | |
| ) | |
| **ROBERT H. BARNETT, Liquidation Trustee** ) | |
| **under the Sea Island Liquidation Trust,** ) | |
| ) | |
| And ) | |
| ) | |
| **KINGS POINT PROPERTY OWNERS** ) | |
| **ASSOCIATION, INC.** ) | |
| ) | |
| Respondents. ) | |

## CERTIFICATE OF SERVICE

I, Jason M. Tate, of Roberts Tate, LLC do hereby certify that, on this date, I served a copy of the foregoing **KINGS POINT PROPERTY OWNERS ASSOCIATION, INC.'S RESPONSE TO FIRST SET OF REQUESTS FOR ADMISSION PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTESS UNDER THE SEA ISLAND LIQUIDATION TRUST,** upon the following parties, by U.S. Mail with proper postage affixed, to:

Robert M.D. Mercer
BRYAN CAVE, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309

[Signature page follows]

41

SO CERTIFIED, this ___4th___ day of May, 2015.

Jason M. Tate

42

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| In re: | Chapter 11 |
| SEA ISLAND COMPANY, *et al.*, | Case No.: 10-21034 |
| Debtors. | Jointly Administered |
| | Contested Matter |
| SEA ISLAND ACQUISITION, LLC | |
| Movant, | Judge John S. Dalis |
| vs. | |
| ROBERT H. BARNETT, Liquidation Trustee under the Sea Island Liquidation Trust, | |
| And | |
| KINGS POINT PROPERTY OWNERS ASSOCIATION, INC. | |
| Respondents. | |

## CERTIFICATE REGARDING SERVICE OF DISCOVERY

This is to certify that, on May 4, 2015, I caused to be served a true and correct copy of the *Kings Point Property Owners Association, Inc.'s Response to First Set of Requests for Admission Propounded by Robert H. Barnett, Liquidation Trustee Under the Sea Island Liquidation Trust* by depositing it in the United States mail, in a properly addressed envelopes, with sufficient postage affixed thereon, addressed to the following parties:

Robert D. Mercer
Bryan Cave LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3488

Thomas R. Walker, Esq.
McGuireWoods LLP
Promenade
1230 Peachtree Street, N.W., Suite 2100
Atlanta, Georgia 30309

Bradley M. Harmon, Esq.
HunterMaclean
200 E. Saint Julian Street
Post Office Box 9848
Savannah, Georgia 31412-0048

Robert·M. Cunningham, Esq.
HunterMaclean
777 Gloucester Street, Suite 400
Brunswick, Georgia 31520

Dated: May 4, 2015

ROBERTS TATE, LLC

*/s/ Jason M. Tate*
Jason M. Tate
Georgia Bar No. 140827
jtate@robertstate.com

114 Island Professional Park
Saint Simons Island, Georgia 31522
(912) 638-5200 Telephone
(912) 638-5300 Facsimile

*Counsel for Kings Point Property Owners Association*

**EXHIBIT 4**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SEA ISLAND COMPANY, *et al.*, | ) | |
| | ) | Case No. 10-21034 - JSD |
| | ) | Jointly Administered |
| Debtors, | ) | |
| | ) | |
| _____ | ) | |
| | ) | Contested Matter |
| SEA ISLAND ACQUISITION, LLC, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Judge John S. Dalis |
| ROBERT H. BARNETT, Liquidation Trustee | ) | |
| under the Sea Island Liquidation Trust, | ) | |
| | ) | |
| Respondent. | ) | |

## FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND SECOND REQUESTS FOR ADMISSION PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST

Robert H. Barnett as the Liquidation Trustee (the "Liquidation Trustee") under the Sea Island Company Liquidation Trust, acting pursuant to Federal Rules of Civil Procedure 33, 34, and 36 as made applicable herein by Bankruptcy Rules 7033, 7034, and 7036, hereby serves the following interrogatories, requests for production, and requests for admission. The Liquidation Trustee requests that Kings Point Property Owners Association, Inc. ("Kings Point POA") within thirty (30) days after the date of service hereof (1) separately and under oath answer each and every interrogatory; (2) produce for inspection and copying the requested documents at the office of Bryan Cave, LLP at 1201 W. Peachtree St., NW, 14th Floor, Atlanta, Georgia 30309, attn: Robert M.D. Mercer; and (3) separately and under oath answer each and every request for admission.

6444423.3

## DEFINITIONS

As used herein, unless specifically indicated otherwise, the following terms shall have the indicated meanings:

1.    As used herein, "Debtors" means Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC, and Sea Island Resort Residences, LLC, or any combination of the foregoing referenced Debtors.

2.    As used herein, "Asset Purchase Agreement" means the Asset Purchase Agreement by and between Sea Island Acquisition, LP and the Debtors [Doc. No. 293].

3.    As used herein, "Motion to Clarify" means the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan [Doc. No. 1102].

4.    As used herein, "Confirmation Order" means the Findings of Fact, Conclusions of Law, and Order Confirming the Amended and Restated Joint Chapter 11 Plan as of August 10, 2010 Filed by the Debtors [Doc. No. 372].

5.    As used herein, "Confirmed Plan" means Debtors' Amended and Restated Joint Plan of August 10, 2010 [Doc. No. 217].

6.    As used herein, "King's Point Common Elements" shall have the meaning ascribed to them in the Motion to Clarify.

7.    As used herein, "Deeds" means the deeds executed by an authorized representative of the Debtors in connection with the closing of the transactions contemplated by the Asset Purchase Agreement.

8.    As used herein, "Liquidation Trust Agreement" means the Sea Island Company Creditors Liquidation Trust [Doc. No. 449-1].

6444423.3

9.      As used herein, "Closing" shall have the meaning ascribed to it in Section 2.9 of the Asset Purchase Agreement.

10.     As used herein, "Kings Point POA Preliminary Response" shall mean the Kings Point Property Owners Association, Inc.'s Preliminary Response to Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan [Doc. No. 1159].

11.     As used herein, "Kings Point POA Pleadings" shall refer to the Kings Point POA Preliminary Response, Kings Point POA's Amended Preliminary Response to Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan [Doc. No. 1161], and Kings Point POA's Response to Liquidation Trustee's Objection on a Lack of Standing Filed by Interested Party King's Point Property Owner's Association, Inc. [Doc. No. 1176].

12.     As used herein, "you" and "your" means Kings Point POA and its officers, directors, representatives, agents, or other persons acting or purporting to act in its name.

13.     As used herein, "persons" means any natural person or entity, including, without limitation, individuals, partnerships, firms, associations, joint ventures, corporations, or other entities, whether real or fictitious.

14.     As used herein, "Document" shall mean the full scope of documents and things discoverable under the Federal Rule of Civil Procedure 34(a) and Bankruptcy Rule 7034 and shall include any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, analyses, valuations, schedules, reconciliations, correspondence, memoranda, notes, messages, letters, telegrams, teletypes, telefaxes, bulletins, meetings or other communications, interoffice and intraoffice

6444423.3

telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, bulletins, printed matter, charts, ledgers, invoices, work-sheets, receipts, returns, computer printouts, prospectuses, financial statements, affidavits, contracts, canceled checks, statements, transcripts, statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations and modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including micro-film, videotape, recordings, motion pictures) and electronic, mechanical or electric recordings or representations of any kind (including without limitation tapes, cassettes, discs, and records).  For the avoidance of doubt, the foregoing shall include electronically stored information.

   15. As used herein, the term "identify" when used in reference to a person, means to set forth:

    A. The person's name;

    B. The person's present or last known business address and telephone number; and

    C. The person's present or last known residence address and telephone number.

   16. As used herein, the term "identify" when used in reference to a Document, means to set forth: the approximate date of preparation; its title, if any; the type of Document (*e.g.*, letter, memorandum);  its substance; the present or last known location and custodian of it and of any copies; and the identity of each person who was its author and/or signatory, along with all of the information specified in above concerning such person(s).

   17. The terms "relating to" and "related to" mean to embody, record, concern, reflect, pertain, contain, describe, embody, mention, support, corroborate, demonstrate, prove, evidence,

6444423.3

show, refute, reflect, dispute, rebut, contradict, or in any manner involve or otherwise implicate the subject matter of the request.

18.     The term "or" includes "and" and vice versa.

19.     The term "any" includes "all" and vice versa.

## INSTRUCTIONS

1.     If the same person or Document is required to be identified in your answer to two or more interrogatories, it is sufficient to identify it in your answer to the first interrogatory and thereafter to refer to that answer in response to call subsequent interrogatories calling for identification of the same person or Document.

2.     If any communication or Document required to be identified in response to these interrogatories and/or requests for production of documents is claimed to be privileged, identify such communication or Document by giving the title, date of its creation, subject matter, author, addressee, where it was made or created, persons to whom copies were furnished and to whom the substance of the communication or Documents was communicated at any time after its creation, and the ground(s) for the privilege claim.

3.     Whenever in the interrogatories the information requested is contained in or may otherwise be derived or ascertained from a Document, you may, in lieu of setting forth the requested information:

A.     Identify the document from which the answer may be derived; and

B.     Specify the portion (or portions) of the Document that contains the information, or the way in which the information may be derived or ascertained from the Document; and produce the Document for inspection and copying (in electronic format, if available, otherwise as printed on the Document), or deliver a copy of the Document to the

-5-

Liquidation Trustee's counsel prior to, or contemporaneous with, service of the answer to the interrogatories.

4.    When producing Documents, copies may be produced in lieu of originals.  If a document is provided in print form, both sides of any two-sided Document must be reproduced and you or your officer must attest by affidavit or declaration under penalty or perjury that the copies provided are true, correct, complete, and accurate duplications of the originals, including any subsequent notations thereon or attachments thereto.

5.    If you believe that any of the following requests for admission, interrogatories, or request for production of documents are ambiguous, please inform the Liquidation Trustee's counsel specifying which request or interrogatory is unclear to you and the basis of the perceived ambiguity.  We will respond promptly by letter and attempt to rephrase the interrogatory or request for you.

6.    These interrogatories shall be deemed continuing and you shall promptly supply, by way of supplemental answers, any and all information that may become known prior to the trial of this action that is additionally responsive or necessary to maintain the accuracy of answers previously served.

7.    In accordance with Federal Rule of Civil Procedure 36, as made applicable pursuant to Federal Rule of Bankruptcy 7036, you must supply an answer to any request for admission not unequivocally admitted that specifically denies the matter or sets forth in detail the reasons why the answering party cannot truthfully admit or deny the matter.  If only a portion of the request for admission should, in good faith, be denied, you must specify so much of the matter that is true and qualify or deny the remainder.

6444423.3

8.     The documents shall be provided to counsel for the Liquidation Trustee on a CD-ROM in single page tiffs that are OCR'd by document with an .lfp load file.

## DUTY TO SUPPLEMENT

Pursuant to Federal Rule of Civil Procedure 26(e)(1), you are requested to reasonably supplement your responses to these discovery requests if you learn that a response is in some material respect incorrect and if the additional or corrective material had not otherwise been made known to the Liquidation Trustee during the discovery process or in writing.

## REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION NO. 1.   Admit that the following sentence from the Confirmation Order is clear and unambiguous: "The terms of the Plan are incorporated herein and are an integral part of this Order." *See* Confirmation Order ¶ 1.

REQUEST FOR ADMISSION NO. 2.   Admit that the following sentence from the Confirmation Order is clear and unambiguous: "The provisions of this Order are integrated with each other and are mutually dependent and not severable." *See* Confirmation Order ¶ 1.

REQUEST FOR ADMISSION NO. 3.   Admit that the following sentence from the Confirmation Order is clear and unambiguous: "On or before the Effective Date . . . (iii) the property of the Debtors as set forth in the Plan, shall be transferred to the Liquidation Trust in accordance with the provisions of the Plan." *See* Confirmation Order ¶ 14.

REQUEST FOR ADMISSION NO. 4.   Admit that the following sentence from the Confirmation Order is clear and unambiguous: "The failure to reference or discuss any particular provision of the Plan in this Order shall have no effect on the validity, binding effect, and enforceability of such provision, and each provision of the Plan shall have the same validity,

binding effect, and enforceability as if fully set forth in this Order." *See* Confirmation Order ¶ 38.

REQUEST FOR ADMISSION NO. 5.   Admit that the following sentence from the Confirmed Plan is clear and unambiguous: "Capitalized but undefined terms shall have the meaning set forth in Article I hereof." *See* Confirmed Plan Introduction ¶.

REQUEST FOR ADMISSION NO.6.   Admit that the following sentence from the Confirmed Plan is clear and unambiguous: "Debtors shall have the meaning set forth in the Introduction." *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 7.   Admit that the term "Debtors" is defined in the Introduction of the Confirmed Plan collectively as Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC, and Sea Island Resort Residences, LLC. *See* Confirmed Plan Introduction ¶.

REQUEST FOR ADMISSION NO. 8.   Admit that the term "Debtors" is defined in the Confirmed Plan collectively as Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC, and Sea Island Resort Residences, LLC.

REQUEST FOR ADMISSION NO. 9.   Admit that the term "Debtors" as defined in the Introduction of the Confirmed Plan does not include any entity (as that term is defined in the Bankruptcy Code) other than Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC, and Sea Island Resort Residences, LLC. *See* Confirmed Plan Introduction ¶.

REQUEST FOR ADMISSION NO. 10.  Admit that the term "Debtors" as defined in the Confirmed Plan does not include any entity (as that term is defined in the Bankruptcy Code)

-8-

other than Sea Island Company, Sea Island Coastal Properties LLC, Sea Island Services, Inc., First Sea Island, LLC, Sea Island Apparel, LLC, SICAL, LLC, and Sea Island Resort Residences, LLC.

REQUEST FOR ADMISSION NO. 11.  Admit that the term "Debtors" as defined in the Confirmed Plan does not include Liquidation Trustee or the Liquidation Trust.  *See* Confirmed Plan Introduction ¶.

REQUEST FOR ADMISSION NO. 12.  Admit that the term "Debtors" as defined in the Confirmed Plan is used in the following sentence of section 7.01 of the Confirmed Plan: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . .."  *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 13.  Admit that the term "Debtors" as used in the following sentence of section 7.01 of the Confirmed Plan does not include the Liquidation Trustee: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . .."  *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 14.  Admit that the following sentence from the Confirmed Plan is clear and unambiguous: "Closing shall have the meaning set forth in section 2.9 of the Asset Purchase Agreement."  *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 15.  Admit that the term "Closing" in the Asset Purchase Agreement is defined in section 2.9 of the Asset Purchase Agreement.  *See* Asset Purchase Agreement §§ 1.2 & 2.9.

REQUEST FOR ADMISSION NO. 16.  Admit that the term "Closing" in the Asset Purchase Agreement and the term "Closing" in Confirmed Plan have the same meaning.

*Compare* Confirmed Plan § 1.01 (definition of "Closing" in the Confirmed Plan) *with* Asset Purchase Agreement §§ 1.2 & 2.9 (definition of "Closing" in the Asset Purchase Agreement).

REQUEST FOR ADMISSION NO. 17.  Admit that the "Closing" as that term is defined in both the Asset Purchase Agreement and the Confirmed Plan occurred on December 15, 2010. *See* Kings Point POA  Earlier Response to Request to Admit 64.

REQUEST FOR ADMISSION NO. 18.   Admit that the following sentence from the Confirmed Plan is clear and unambiguous: "'Closing Date' means the date of the Closing."  *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 19.   Admit that the following sentence from the Asset Purchase Agreement is clear and unambiguous: "'Closing Date' means the date of the Closing."  *See* Asset Purchase Agreement § 1(r).

REQUEST FOR ADMISSION NO. 20.  Admit that the term "Closing Date" in the Asset Purchase Agreement and the term "Closing Date" in Confirmed Plan have the same meaning. *Compare* Confirmed Plan §§ 1.01 (definition of "Closing" in the Confirmed Plan) & (definition of "Closing Date" in Confirmed Plan) *with* Asset Purchase Agreement §§  1(r) (definition of "Closing Date" in the Asset Purchase Agreement) & 1.2 (cross reference to definition of "Closing" in Asset Purchase Agreement) & 2.9 (definition of "Closing" in the Asset Purchase Agreement).

REQUEST FOR ADMISSION NO. 21.  Admit that the "Closing Date" as that term is defined in both the Asset Purchase Agreement and the Confirmed Plan is December 15, 2010. *Compare* Kings Point POA Earlier Response to Request to Admit 64 (admitting that the "Closing occurred on December 15, 2010")  *with* Confirmed Plan §§ 1.01 (definition of "Closing" in the Confirmed Plan) & (definition of "Closing Date" in Confirmed Plan) *with* Asset

Purchase Agreement §§ 1(r) (definition of "Closing Date" in the Asset Purchase Agreement) & 1.2 (cross reference to definition of "Closing" in Asset Purchase Agreement) & 2.9 (definition of "Closing" in the Asset Purchase Agreement).

REQUEST FOR ADMISSION NO. 22.  Admit that the phrase "Closing Date" as used in the following sentence of section 7.01 of the Confirmed Plan means December 15, 2010: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . . ." *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 23.   Admit that the term "Asset Purchase Agreement" as used in the Confirmed Plan has the meaning ascribed to it in paragraph D of the Confirmation Order.  *See* Confirmation Order ¶ YY.

REQUEST FOR ADMISSION NO. 24.   Admit that the term "Asset Purchase Agreement" as used in the following sentence has the meaning ascribed to it in paragraph D of the Confirmation Order: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . .." *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 25.   Admit that the following sentence from the Confirmed Plan is clear and unambiguous: "'Purchased Assets' means those assets of the Debtors that the Purchaser is acquiring pursuant to Asset Purchase Agreement." *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 26.  Admit that the term "Purchase Assets" as used in the Asset Purchase Agreement is solely defined in section 2.1 of the Asset Purchase Agreement and that such definition is clear and unambiguous.

REQUEST FOR ADMISSION NO. 27.  Admit that the phrase "Purchased Assets" as used in the following sentence of section 7.01 of the Confirmed Plan has the meaning ascribed to

-11-

it in the Confirmed Plan and not the Asset Purchase Agreement: "On the Closing Date, pursuant to the Asset Purchase Agreement, the Debtors shall transfer the Purchased Assets to the Purchaser . . .." *See* Confirmed Plan § 1.01.

REQUEST FOR ADMISSION NO. 28. Admit that the phrase "under the Asset Purchase Agreement" has the same meaning in the following three sentences of the Confirmed Plan[1]:

      a.     ". . . less (ii) certain amounts required to be paid by the Debtors *under the Asset Purchase Agreement*." *See* Confirmed Plan § 3.07(b) (emphasis added).

      b.     "[A]ll Property comprising Estates of the Debtors . . . not conveyed to the Purchaser *under the Asset Purchase Agreement* shall automatically vest in the Liquidation Trust . . .." *See* Confirmed Plan § 5.04 (emphasis added).

      c.     "The cure of all defaults under executory contracts and unexpired leases to be assumed *under the Asset Purchase Agreement* . . . shall be governed by the terms and conditions of Sale and Bid Procedures, the Asset Purchase Agreement, the Sale Documents, and any order approving the Asset Purchase Agreement or authorizing the Sale, and other orders of the Court." *See* Confirmed Plan § 6.02 (emphasis added).

REQUEST FOR ADMISSION NO. 29. Admit that the phrase "under the Asset Purchase Agreement" means "in accordance with the Asset Purchase Agreement"[2] in the following the following three sentences of the Confirmed Plan[3]:

---

[1] *See Rainbow USA, Inc. v. Cumberland Mall, LLC*, 688 S.E.2d 631, 301 Ga. App. 642, 647 (2009) (rejecting argument about the meaning of the word "premises" in the lease because it would be inconsistent with other uses of the word in the lease).

[2] *See Grizzard Communications Group v. Monk*, 2005 WL 2563046, *6 (D. Neb. Oct. 11, 2005) (concluding that "hereunder" means "under the employment agreement" based in part on dictionary definition); BLACKS LAW DICTIONARY 844 (10th ed. 2014) (The word "hereunder" means, among other things, "in accordance with this document."); BLACKS LAW DICTIONARY 17 (6th ed. 2014) ("Accordance" means, among other things, "conformity.")

6444423.3

a.      ". . . <u>less</u> (ii) certain amounts required to be paid by the Debtors *under the Asset Purchase Agreement*." *See* Confirmed Plan § 3.07(b) (emphasis added).

b.      "[A]ll Property comprising Estates of the Debtors . . . not conveyed to the Purchaser *under the Asset Purchase Agreement* shall automatically vest in the Liquidation Trust . . .." *See* Confirmed Plan § 5.04 (emphasis added).

c.      "The cure of all defaults under executory contracts and unexpired leases to be assumed *under the Asset Purchase Agreement* . . . shall be governed by the terms and conditions of Sale and Bid Procedures, the Asset Purchase Agreement, the Sale Documents, and any order approving the Asset Purchase Agreement or authorizing the Sale, and other orders of the Court." *See* Confirmed Plan § 6.02 (emphasis added).

## <u>INTERROGATORIES</u>

<u>INTERROGATORY NO. 1</u>.  Identify each and every person of whom you are aware has any knowledge with respect to any of the factual allegations in any of the following pleadings as well as any other allegations upon which Kings Point POA relies to prosecute this contested matter and summarize each person's knowledge: (i) the Motion to Clarify, (ii) the Preliminary Response to the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan and Motion for Entry of an order Directing the Application of Rule 7016 of the Federal Rules of Bankruptcy Procedure [Doc. No. 1103], and (iii) Kings Point POA's Pleadings.

<u>INTERROGATORY NO. 2</u>.  Kings Point POA's response to the Earlier Request to Admit No. 4 states that it "cannot admit that all applicable provisions of" the Confirmed Plan, the Asset Purchase Agreement, the Liquidation Trust Agreement, and the Confirmation Order (collectively, the "Plan Documents") are clear and unambiguous.  Please (i) identify such

---

[3] *See  Rainbow USA, Inc. v. Cumberland Mall, LLC*, 688 S.E.2d 631, 301 Ga. App. 642, 647 (2009) (rejecting argument about the meaning of the word "premises" in the lease because it

provisions of the Plan Documents Kings Point POA contends are not clear and unambiguous, (ii) explain the basis for such contention for each provision, and—if you contend that evidence is appropriate to resolve such purported lack of clarity or ambiguity, and (iii) identify such evidence.

INTERROGATORY NO. 3. Kings Point POA's response to the Earlier Request to Admit No. 7 states that the request it "denied as stated" and then admits that a "deed must be executed, accepted, and recorded to transfer real property." But Kings Point POA denies that "performance relating to the transfer of Kings Point Common Elements under the Asset Purchase Agreement requires the delivery and acceptance of a real property deed." Please set forth all facts upon which you rely for such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 4. Kings Point POA denies that "section 5.04 of the Confirmed Plan governs which assets vested into the Liquidation Trust," *see* Response to Earlier Request to Admit No. 9, and denies that the "Confirmed Plan governs the transfer of assets into the Liquidation Trust," *see* Response to the Earlier Request to Admit No. 107, even though paragraph 14 of the Confirmation Order provides that "property of the Debtors as set forth in the Plan, shall be transferred to the Liquidation Trust *in accordance with the provisions of the Plan*," *see* Confirmation Order ¶ 14 (emphasis added). Please set forth all facts upon which you rely for to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

---

would be inconsistent with other uses of the word in the lease).

INTERROGATORY NO. 5.  Kings Point POA denies that the "Confirmation Order does not amend or vary in way the Confirmed Plan with respect to which assets vested into the Liquidation Trust," *see* Response to Earlier Request to Admit No. 11, even though paragraph 38 of the Confirmation Order states that "each provision of the [Confirmed] Plan shall have the same validity, binding effect, and enforceability as if fully set forth in the [Confirmation] Order." *See* Confirmed Plan ¶ 38.  Please set forth all facts upon which you rely to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 6.   Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Request to Admit No. 12, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 7.  Kings Point POA denies that the transfer that must purportedly be made on account of the Purported Plan Transfer Obligation (as defined in the Liquidation Trustee's first requests to admit) must be made "pursuant to the Asset Purchase Agreement," *see* response to Request to Admit No. 13, even though the Purported Plan Transfer Obligation provides the following: "On the Closing Date, *pursuant to the Asset Purchase Agreement*, the Debtors shall transfer the Purchased Assets to the Purchaser," see Confirmed Plan 7.01 (emphasis added).  Please set forth all facts upon which Kings Point POA  relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

-15-

6444423.3

INTERROGATORY NO. 8.   Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Request to Admit No. 14 and 103, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 9.   Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Request to Admit No. 15 and 99, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 10.   Kings Point POA admits "that, before the Closing, Sea Island Coastal Properties LLC held title to the Kings Point Common Elements." *See* Response to Earlier Request to Admit No. 60.  Kings Point POA denies that "the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors." *See* Response to Earlier Request to Admit No. 100.  Please set forth all facts upon which Kings Point POA relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 11.   Kings Point POA contends that the "Kings Point Common Elements have . . . been conveyed to SIA or [one] of its affiliates," *see* Response to Earlier Request to Admit No. 62 (denying the request to admit), even though Kings Point POA denies that "the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors," *see* Response to Earlier Request to Admit No. 100.  Please set forth all facts upon which Kings Point POA relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any

-16-

person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 12. Kings Point POA denies that the "Asset Purchase Agreement does not identify the Kings Point Common Elements by size, shape, or location or in any or way as an asset to be conveyed to SIA." *See* Response to Earlier Request to Admit No. 78. Please set forth all facts upon which Kings Point POA relies to support such denial (this should include, but may not be limited to, provisions of the Asset Asset Purchase Agreement upon which Kings Point POA relies), identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 13. Kings Point POA denies that the "Debtors purported obligation to transfer the 'Purchased Assets' (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing." *See* Response to Earlier Request to Admit No. 79. But the Asset Purchase Agreement states that, "*[a]t the Closing*, [the Debtors] shall sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned, and delivered" the "Purchased Assets" to SIA. *See* Asset Purchase Agreement § 2.1 (emphasis added). Kings Point POA admits that the "Closing occurred on December 15, 2010." *See* Response to Earlier Request to Admit No. 64. In other places of the Asset Purchase Agreement, the phrase "at *or after* the Closing" is used reflecting "considered choice"[4] in drafting. *See* Asset Purchase Agreement § 1.01(ccc) (emphasis added). Given that section 2.1 of the Asset Purchase Agreement states that the Debtors shall transfer the Purchased Assets "at the Closing," which Kings Point POA admits occurred on December 15, 2010, and the use of the

-17-

6444423.3

phrase "at the Closing" instead of "at *or after* the Closing" reflects "considered choice" in drafting, please set forth all facts upon which Kings Point POA relies to support its denial that the "Debtors purported obligation to transfer the 'Purchased Assets' (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing," identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

INTERROGATORY NO. 14. Kings Point POA denies that the "Debtors purported obligation to transfer the 'Purchased Assets' (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing." *See* Response to Earlier Request to Admit No. 79. But the Asset Purchase Agreement states that, "*[a]t the Closing*, [the Debtors] shall sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned, and delivered" the "Purchased Assets" to SIA. *See* Asset Purchase Agreement § 2.1 (emphasis added). Kings Point POA admits that the "Closing occurred on December 15, 2010." *See* Response to Earlier Request to Admit No. 64. In other places of the Asset Purchase Agreement, the phrase "at *or after* the Closing" is used reflecting "considered choice"[5] in drafting. *See* Asset Purchase Agreement § 1.01(ccc) (emphasis added). Given that section 2.1 of the Asset Purchase Agreement states that the Debtors shall transfer the Purchased Assets "at the Closing," which Kings Point POA admits occurred on December 15, 2010, and the use of the phrase "at the Closing" instead of "at *or after* the Closing" reflects "considered choice" in drafting, please set forth all facts upon which Kings Point POA relies to support its contention

---

[4] *See Flynt v. Life of the S. Ins. Co.*, 718 S.E.2d 343, 312 Ga. App. 430, 436 (2011) (construing a "matter of considered choice" not to restrict the effective date of one policy provision after restricting the effective date of another policy).

[5] *See Flynt v. Life of the S. Ins. Co.*, 718 S.E.2d 343, 312 Ga. App. 430, 436 (2011) (construing a "matter of considered choice" not to restrict the effective date of one policy provision after restricting the effective date of another policy).

6444423.3

that the purported obligation has not expired, identify any documents upon which you rely (and the basis for such reliance) to support such contention, and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge) to support such contention.

INTERROGATORY NO. 15.  Set forth with reasonable specificity any other facts and identify any documents not already asked for in the above interrogatories that support the arguments and positions Kings Point POA advances in this contested matter.

INTERROGATORY NO. 16.  Set forth with specificity the names and addresses of any experts you intend to call as a witness in this contested matter and set forth with specificity all opinions of such experts.

INTERROGATORY NO. 17.  Please set forth all facts upon which Kings Point POA relies to support its response to Earlier Request to Admit No. 16, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

## REQUEST FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1.  Please produce all Documents in your possession, custody, or control identified in your responses to the above interrogatories.

REQUEST FOR PRODUCTION NO. 2.  Please produce all Documents in your possession, custody, or control relating to the Plan including, but not limited to, all communications relating to and drafts of the Plan.

REQUEST FOR PRODUCTION NO. 3.  Please produce all Documents in your possession, custody, or control relating to the Asset Purchase Agreement including, but not limited to, all communications relating to and drafts of the Asset Purchase Agreement.

-19-

REQUEST FOR PRODUCTION NO. 4.   Please produce all Documents in your possession, custody, or control relating to the Confirmation Order including, but not limited to, all communications relating to and drafts of the Confirmation Order.

REQUEST FOR PRODUCTION NO. 5.   Please produce all Documents in your possession, custody, or control relating to the Liquidation Trust Agreement including, but not limited to, all communications relating to and drafts of the Liquidation Trust Agreement.

REQUEST FOR PRODUCTION NO. 6.   Please produce all Documents in your possession, custody, or control relating to the Deeds including, but not limited to, all communications relating to and drafts of the Deeds.

REQUEST FOR PRODUCTION NO. 7.   If not already provided in response to prior requests above, please produce all Documents you intend to introduce as exhibits at trial of this matter.

REQUEST FOR PRODUCTION NO. 8.   Please produce any and all reports, summaries, or other Documents prepared, reviewed, relied upon, or which may be reviewed or relied upon, by any expert whom you expect to call to testify in this case.

[remainder of page intentionally left blank]

6444423.3

REQUEST FOR PRODUCTION NO. 9.  To the extent not already provided in your responses to the above requests for production, produce each and every Document relating to the facts set forth in response to (i) the interrogatories set forth above or (ii) Kings Point POA's Pleadings.

Dated:  August 4, 2015.

_____
Robert M.D. Mercer
Georgia Bar No. 502317
BRYAN CAVE LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3488
(404) 572-6600 Telephone

*Counsel for Robert H. Barnett as the Liquidation Trustee Under the Sea Island Company Liquidation Trust*

6444423.3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SEA ISLAND COMPANY, *et al.*, | ) | |
| | ) | Case No. 10-21034 - JSD |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Judge John S. Dalis |
| | ) | |

## CERTIFICATE OF SERVICE

This is to certify that on August 4, 2015, a true and correct copy of the FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST was caused to be served by depositing a copy of the same in the United States mail, in a properly addressed envelope, with sufficient postage affixed thereon addressed to the following parties:

Jason M. Tate, Esq.
Roberts Tate, LLC
114 Island Professional Park
P. O. Box 21828
St. Simons, GA 31522

Robert M. Cunningham, Esq.          Bradley M. Harmon, Esq.
HunterMaclean                       HunterMaclean
777 Gloucester Street, Suite 400    200 E. Saint Julian Street
Brunswick, GA 31520                 P. O. Box 9848
                                    Savannah, GA 31412-0048

In addition, on August 4, 2015, a true and correct copy of the FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST the following party was caused to be served by Hand Delivery:

Thomas R. Walker, Esq.
McGuireWoods LLP
Promenade
1230 Peachtree Street, NE, Suite 2100
Atlanta, GA 30309

6444423.3

Dated:  August 4, 2015.

Robert M.D. Mercer
Georgia Bar No. 502317
BRYAN CAVE LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3488
(404) 572-6600 Telephone

*Counsel for Robert H. Barnett as the Liquidation Trustee Under the Sea Island Company Liquidation Trust*

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SEA ISLAND COMPANY**, *et al.*, | ) | Case No.: 10-21034 |
| | ) | **Jointly Administered** |
| Debtors. | ) | |
| ―――――――――――――――――― | ) | |
| | ) | **Contested Matter** |
| | ) | |
| **SEA ISLAND ACQUISITION, LLC** | ) | |
| | ) | |
| Movant, | ) | **Judge John S. Dalis** |
| | ) | |
| vs. | ) | |
| | ) | |
| **ROBERT H. BARNETT, Liquidation Trustee** | ) | |
| **under the Sea Island Liquidation Trust,** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **KINGS POINT PROPERTY OWNERS** | ) | |
| **ASSOCIATION, INC.** | ) | |
| | ) | |
| Respondents. | ) | |

---

**KINGS POINT PROPERTY OWNERS ASSOCIATION, INC.'S RESPONSE TO FIRST
INTERROGATORIES PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION
TRUSTEE UNDER THE SEA ISLAND LIQUIDATION TRUST**

Pursuant to Federal Rule of Civil Procedure 33, as adapted by Bankruptcy Rule 7026,

Respondent Kings Point Property Owners Association, Inc. (hereinafter "KPPOA") hereby

responds to Robert H. Barnett, Liquidation Trustee under the Sea Island Liquidation Trust's

(hereinafter "Liquidation Trustee") First Interrogatories to KPPOA as follows:

## **GENERAL OBJECTIONS**

KPPOA objects to Liquidation Trustee's First Interrogatories to the extent they seek to impose duties upon KPPOA that exceed the scope of permissible discovery under Federal Rules of Civil Procedure, as adopted by the Bankruptcy Rules.

KPPOA objects to Liquidation Trustee's First Interrogatories to the extent they seek information exempt from discovery by the attorney/client privilege, the work product doctrine, or any other applicable privileges or immunities.

KPPOA objects to Liquidation Trustee's First Interrogatories to the extent they seek information that is not relevant to the subject matter of the pending litigation or reasonably calculated to lead to the discovery of admissible evidence.

KPPOA objects to Liquidation Trustee's First Interrogatories to the extent they are over broad, unreasonably cumulative, duplicative, vague, unduly burdensome, and to the extent Plaintiff already has in its possession documents containing, or has other less cumbersome and more practical means of obtaining, the information sought by Liquidation Trustee's discovery requests.

Identifying or producing any document or supplying any information does not constitute an admission by KPPOA that the document or information is authentic, admissible, or relevant to the subject matter of this action. The inadvertent production of any privileged information by KPPOA shall not constitute a waiver of any privilege with respect to such information.

Subject to and without waiving these objections, KPPOA further responds as follows:

## SPECIFIC RESPONSES:

INTERROGATORY NO. 1: Identify each and every person of whom you are aware has any knowledge with respect to any of the factual allegations in any of the following pleadings as well as any other allegations upon which Kings Point POA relies to prosecute this contested matter and summarize each person's knowledge: (i) the Motion to Clarify, (ii) the Preliminary Response to the Motion to Clarify Provisions Relating to Implementation of the Confirmed Plan and Motion for Entry of an order Directing the Application of Rule 7016 of the Federal Rules of Bankruptcy Procedure [Doc. No. 1103], and (iii) Kings Point POA's Pleadings.

**RESPONSE:   In response to Interrogatory No. 1, KPPOA identifies the following persons:**

- **The Liquidation Trustee;**
- **Representatives of Sea Island Acquisitions, LLC;**
- **Any party that was served with a copy of the documents identified;**
- **Tom Regan – President of KPPOA.  Can be contacted through Counsel.**
- **George Williams – Board Member of KPPOA. Can be contacted through Counsel.**
- **John Campbell - Board Member of KPPOA. Can be contacted through Counsel.**

**All of the above named individuals have general knowledge about the documents identified, the matters at issue in this case, and the relief being requested by the various parties hereto.**

INTERROGATORY NO. 2: Kings Point POA's response to the Earlier Request to Admit No. 4 states that it "cannot admit that all applicable provisions of" the Confirmed Plan, the Asset Purchase Agreement, the Liquidation Trust Agreement, and the Confirmation Order (collectively, the "Plan Documents") are clear and unambiguous. Please (i) identify such provisions of the Plan Documents Kings Point POA contends are not clear and unambiguous, (ii) explain the basis for such

contention for each provision, and – if you contend that evidence is appropriate to resolve such purported lack of clarity or ambiguity and (iii) identify such evidence.

**RESPONSE:  KPPOA objects to Interrogatory No. 2 on the grounds it is over broad, unduly burdensome, and beyond the scope of discovery permitted by the Federal Rules of Civil Procedure.  KPPOA further objects to Interrogatory No. 2 on the grounds it seeks information which is not relevant to the subject matter of the pending litigation or reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the forgoing objections, KPPOA states that it is not in a position to admit that every single word, sentence, paragraph, section, and provision of the Confirmed Plan, the Asset Purchase Agreement, the Liquidation Trust Agreement, and the Confirmation Order are, individually or collectively, clear and unambiguous.  By way of further response, KPPOA does state that it believes that the matters relating to the Kings Point Common Elements which are before this Court can and should be decided as a matter of law.  To that end, KPPOA does not believe that a trial of these issues is necessary and does not anticipate introducing any evidence regarding any ambiguity in these documents at this time.  KPPOA reserves the right to supplement this response depending on the Court's ruling on any dispositive motion filed by any party.**

INTERROGATORY NO. 3: Kings Point POA's response to the Earlier Request to Admit No. 7 states that the request it "denied as stated" and then asserts that a "deed must be executed, accepted, and recorded to transfer real property." But Kings Point POA denies that "performance relating to the transfer of Kings Point Common Elements under the Asset Purchase Agreement requires the delivery and acceptance of a real property deed." Please set forth all facts upon which you rely for such denial, identify any documents upon which you rely (and the basis for such reliance),

and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 3, KPPOA states that generally speaking a deed must be executed, accepted, and recorded to transfer real property. In this case, however, the Kings Point Common Elements were purportedly transferred to KPPOA under the December 17, 2009 Deed from Sea Island Company to KPPOA. Pursuant to O.C.G.A. § 23-2-25, "[i]f the form of conveyance is, by accident or mistake, contrary to the intention of the parties in their contract, equity shall interfere to make it conform thereto." Therefore, to the extent defective, the transfer of the Kings Point Common Elements could be effected in this case through an reformation of the December 17, 2009 Deed that would relate back to the original date of its execution, and would not require the delivery and acceptance of a real property deed under the Asset Purchase Agreement for the transfer of the Kings Point Common Elements.**

INTERROGATORY NO. 4: Kings Point POA denies that "section 5.04 of the Confirmed Plan governs which assets vested into the Liquidation Trust," *see* Response to Earlier Request to Admit No. 9, and denies that the "Confirmed Plan governs the transfer of assets into the Liquidation Trust," *see* Response to Earlier Request to Admit No. 107, even though paragraph 14 of the Confirmation Order provides that "property of the Debtors as set forth in the Plan, shall be transferred to the Liquidation Trust *in accordance with the provision of the Plan*," *see* Confirmation Order ¶ 14 (emphasis added). Please set forth all facts upon which you rely for to support such denial. Identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 4, KPPOA states that the Asset Purchase Agreement, through Paragraph 12 of the Confirmation Order, governs which assets transfer into the Liquidation Trust.**

INTERROGATORY NO. 5: Kings Point POA denies that the "Confirmation Order does not amend or vary in way the Confirmed Plan with respect to which assets vested into the Liquidation Trust," *see* Response to Earlier Request to Admit No. 11, even though paragraph 38 of the Confirmation Order states that "each provision of the [Confirmed] Plan shall have the same validity, binding effect, and enforceability as if fully set forth in the [Confirmation] Order." *See* Confirmed Plan ¶ 38. Please set forth all facts upon which you rely to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 5, KPPOA disputes that the Confirmed Plan governs which assets transfer into the Liquidation Trust. KPPOA states that the Asset Purchase Agreement, through Paragraph 12 of the Confirmation Order, governs which assets transfer into the Liquidation Trust.**

INTERROGATORY NO. 6: Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Request to Admit No. 12, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge.

**RESPONSE: In response to Interrogatory No. 6, KPPOA states that the Confirmation Order is intended to and does expressly give effect to and approve the transactions contemplated by the Asset Purchase Agreement, and further provides that in the event of any**

6

inconsistencies between the Asset Purchase Agreement, the Confirmed Plan, or the Confirmation Order, the terms of the Asset Purchase Agreement control.

INTERROGATORY NO. 7:  Kings Point POA denies that the transfer that must purportedly be made on account of the Purported Plan Transfer Obligation (as defined in the Liquidation Trustee's first requests to admit) must be made "pursuant to the Asset Purchase Agreement," see response to Request to Admit No. 13, even though the Purported Plan Transfer Obligation provides the following: "On the Closing Date, *pursuant to the Asset Purchase Agreement*, the Debtors shall transfer the Purchased Assets to the Purchaser, "see Confirmed Plan 7.01 (emphasis added). Please set forth all facts upon which Kings Point POA relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

RESPONSE:  In response to Interrogatory No. 7, KPPOA incorporates its response to Interrogatory No. 3.

INTERROGATORY NO. 8: Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Requests to Admit No. 14 and 103, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

RESPONSE:  In response to Interrogatory No. 8, KPPOA disputes that the obligation to transfer the Purchased Assets was temporally limited to the Closing.  To the contrary, the Asset Purchase Agreement contemplates that some transfer of the Purchased Assets may occur post-Closing.  For example, Section 7.1 of the Asset Purchase Agreement provides that "Sellers and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or

7

desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities", including after Closing.  In addition, Section 7.9 of the Asset Purchase Agreement expressly provides for "Transfers Not Effected as of Closing" thereby providing mechanism for transfers of the Purchased Assets to occur post-Closing.  Furthermore, the Trust Agreement states that "if Property is improperly transferred to the Trust, such Property shall be transferred to the appropriate party", again providing for post-Closing transfer of the Purchased Assets.

INTERROGATORY NO. 9: Please set forth all facts upon which Kings Point POA relies to support its denial of the Earlier Request to Admit No. 15 and 99, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 9, KPPOA disputes that the obligation to transfer the Purchased Assets was limited to Debtors.  The Trust Agreement expressly states that "if Property is improperly transferred to the Trust, such Property shall be transferred to the appropriate party."**

INTERROGATORY NO. 10: Kings Point POA admits "that, before the Closing, Sea Island Coastal Properties LLC held title to the Kings Point Common Elements." See Response to Earlier Request to Admit No. 60. Kings Point POA denies that "the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors." *See* Response to Earlier Request to Admit No. 100. Please set forth all facts upon which Kings Point POA relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

8

**RESPONSE: In response to Interrogatory No. 10, KPPOA states that any interests that Debtors had with respect to the Kings Point Common Elements, if any, are subject to the legal right of equitable reformation which provides for the relation back to the original date of the execution of the December 17, 2009 Deed.**

INTERROGATORY NO. 11: Kings Point POA contends that the "Kings Point Common Elements have…been conveyed to SIA or [one] of its affiliates," *see* Response to Earlier Request to Admit No. 62 (denying the request to admit), even though Kings Point POA denies that "the Kings Point Common Elements were Property comprising the Estate (as these terms are defined in the Confirmed Plan) of the Debtors," see Response to Earlier Request to Admit No. 100. Please set forth all facts upon which Kings Point POA relies to support such denial, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge.

**RESPONSE: In response to Interrogatory No. 11, KPPOA states that Purchaser acquired all interest in the Purchased Assets pursuant to the Asset Purchase Agreement, Confirmed Plan, and Confirmation Order, which included whatever interests still exist with respect to the Kings Point Common Elements, if any, but subject to the legal right of equitable reformation which provides for the relation back to the original date of the execution of the December 17, 2009 Deed.**

INTERROGATORY NO. 12: Kings Point POA denies that the "Asset Purchase Agreement does not identify the Kings Point POA Common Elements by size, shape, or location or in any way as an asset to be conveyed to SIA." *See* Response to Earlier Request to Admit No. 78. Please set forth all facts upon which Kings Point POA relies to support such denial (this should include, but may not be limited to, provisions of the Asset Purchase Agreement upon which Kings Point POA relies),

9

identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 12, KPPOA states that the Kings Point Common Elements are included within the definitions of "Acquired Owned Real Property" and "Owned Real Property." Moreover, Section 3.15 of the Asset Purchase Agreement states that "Acquired Owned Real Property is all of the real property owner used in connection with the Business as currently conducted." The term "Business" is defined on page 1 of the Asset Purchase Agreement as "Sellers own and operate a collection of exclusive hotel resort, golf courses, spas and recreational complex is, together with certain related development and undeveloped real estate held by Sellers in connection with the real estate development and management business, all of which are located in around Saint Simons Island and Sea Island, Georgia." Again, as reflected in the Liquidation Trustee's Responses to KPPOA's First Continuing Interrogatories to Robert H. Barnett, in his capacity as a Liquidation Trustee, the Kings Point Common Elements were included within the definition of the Sellers "Business" as that term is defined by the Asset Purchase Agreement. The fact that the Kings Point Common Elements are contained within the definitions of "Acquired Owned Real Property," "Owned Real Property," and "Business" as these terms are used in the Asset Purchase Agreement necessarily means that the Kings Point Common Elements are identified as an asset to be conveyed thereunder.**

INTERROGATORY NO. 13: Kings Pont POA denies that the "Debtors purported obligation to transfer the 'Purchased Assets' (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing." *See* Response to Earlier Request to Admit No. 779. But the Asset Purchase Agreement state that, ""[a]t the Closing, [the Debtors] shall sell, transfer, convey,

assign and deliver or cause to be sold, transferred, conveyed, assigned, and delivered" the Purchase Assets to SIA. *See* Asset Purchase Agreement § 2.1 (Emphasis added). Kings Point POA admits that the "Closing occurred on December 15, 2010." *See* Response to Earlier Request to Admit No. 64. In other places of the Asset Purchase Agreement, the phrase "at *or after* the Closing" is used reflecting "considered choice"[4] in drafting. *See* Asset Purchase Agreement § 1.01 (ccc) (emphasis added). Given that section 2.1 of the Asset Purchase Agreement states that the Debtors shall transfer the Purchased Assets "at the Closing," which Kings Point POA admits occurred on December 15, 2010, and the use of the phrase "at the Closing" instead of "at *or after* the Closing" reflects "considered choice" in drafting, please set forth all facts upon which Kings Point POA relies to support its denial that the Debtors purported obligation to transfer the 'Purchased Assets' )as that term is defined in the Asset Purchase Agreement) to SIA was temporarily limited to the Closing," identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 13, KPPOA incorporates its response to Interrogatory No. 8.**

INTERROGATORY NO. 14: Kings Point POA denies that the "Debtors purported obligation to transfer the 'Purchased Assets' (as that term is defined in the Asset Purchase Agreement) to SIA was temporally limited to the Closing." *See* Response to Earlier Request to Admit No. 79. But the Asset Purchase Agreement states that, "*[a]t the Closing,* [the Debtors] shall sell, transfer, convey, assign and deliver or cause to be sold, transferred, conveyed, assigned, and delivered" the "Purchased Assets" to SIA. *See* Asset Purchase Agreement § 2.1 (emphasis added). Kings Point POA admits that

---

[4] *See Flynt v. Life of the S. Ins. Co.*, 718 S.E.2d 343, 312 Ga. App. 430, 436 (2011) (constructing a "matter of considered choice" not to restrict the effective date of one policy provision after restricting the effective date of another policy).

the "Closing occurred on December 15, 2010." *See* Response to Earlier Request to Admit No. 64. In other places of the Asset Purchase Agreement, the phrase "at *or after* the Closing" is used reflecting "considered choice"[5] in drafting. *See* Asset Purchase Agreement § 1.01 (ccc) (emphasis added). Given that section 2.1 of the Asset Purchase Agreement states that the Debtors shall transfer the Purchased Assets "at the Closing," which Kings Point POA admits occurred on December 15, 2010, and the use of the phrase "at the Closing" instead or "at or after the Closing" reflects "considered choice" in drafting, please set forth all facts upon which Kings Point POA relies to support its contention that the purported obligation has not expired, identify any documents upon which you rely (and the basis for such reliance) to support such contention, and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge) to support such contention.

**RESPONSE: In response to Interrogatory No. 14, KPPOA incorporates its response to Interrogatory No. 8.**

INTERROGATORY NO. 15: Set forth with reasonable specificity any other facts and identify any documents not already asked for in the above interrogatories that support that arguments and positions Kings Point POA advances in this contested matter.

**RESPONSE: KPPOA objects to Interrogatory No. 15 on the grounds it is over broad, unduly burdensome, and beyond the scope of discovery permitted by the Federal Rules of Civil Procedure. Subject to and without waiving the forgoing objections, KPPOA hereby incorporates its prior discovery responses and all other pleadings it has filed in this case.**

INTERROGATORY NO. 16: Set forth all facts upon which Kings Point POA relies to support its response to Earlier Request to Admit No. 16, identify any documents upon which you rely

---

[5]*See Flynt v. Life of the S. Ins. Co.*, 718 S.E.2d 343, 312 Ga. App. 430, 436 (2011) (constructing a "matter of considered choice" not to restrict the effective date of one policy provision after restricting the effective date of another policy).

(and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 16, KPPOA objected to Earlier Request No. 16 as a matter of law. To the extent this Interrogatory seeks to discover the reasons and basis for this objection, KPPOA objects on the grounds that on the grounds it seeks information protected by the attorney/client privilege and/or the work product doctrine.**

INTERROGATORY NO. 17: Please set forth all facts upon which Kings Point POA relies to support its response to Earlier Request to Admit No. 16, identify any documents upon which you rely (and the basis for such reliance), and identify any person with knowledge upon which you rely (and a reasonable summary of such person's knowledge).

**RESPONSE: In response to Interrogatory No. 17, KPPOA objected to Earlier Request No. 16 as a matter of law. To the extent this Interrogatory seeks to discover the reasons and basis for this objection, KPPOA objects on the grounds that on the grounds it seeks information protected by the attorney/client privilege and/or the work product doctrine.**

Respectfully submitted this 3rd day of September, 2015.

ROBERTS TATE, LLC

Jason M. Tate
Georgia State Bar No. 140827
jtate@robertstate.com

Post Office Box 21828
St. Simons Island, Georgia  31522
(912) 638-5200
(912) 638-5300-Fax

MCGUIRE WOODS LLP

Thomas R. Walker

13

Georgia State Bar No. 732755
trwalker@mcguirewoods.com

1230 Peachtree Street, NE
Suite 2100
Atlanta, Georgia 30309
(404) 443-5705

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEA ISLAND COMPANY, *et al.*, | ) | Case No.: 10-21034 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| | ) | Contested Matter |
| | ) | |
| SEA ISLAND ACQUISITION, LLC | ) | |
| | ) | |
| Movant, | ) | Judge John S. Dalis |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT H. BARNETT, Liquidation Trustee | ) | |
| under the Sea Island Liquidation Trust, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| KINGS POINT PROPERTY OWNERS | ) | |
| ASSOCIATION, INC. | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Jason M. Tate, of Roberts Tate, LLC do hereby certify that, on this date, I served a copy of the foregoing KINGS POINT PROPERTY OWNERS ASSOCIATION, INC.'S **RESPONSE TO FIRST INTERROGATORIES PROPOUNDED BY ROBERT H. BARNETT, LIQUIDATION TRUSTESS UNDER THE SEA ISLAND LIQUIDATION TRUST,** upon the following parties, by U.S. Mail with proper postage affixed, to:

Robert M.D. Mercer
BRYAN CAVE, LLP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309

15

SO CERTIFIED, this ___ day of September, 2015.

_____

Jason M. Tate

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| SEA ISLAND COMPANY, *et al.*, | ) | Case No. 10-21034 |
| | ) | Jointly Administered |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| SEA ISLAND ACQUISITION LLC, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Contested Matter |
| | ) | |
| ROBERT H. BARNETT, Liquidation Trustee | ) | |
| under the Sea Island Liquidation Trust, | ) | Judge John S. Dalis |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## VERIFICATION

Personally appeared before me, Tom Regan, duly authorized agent appointed by Kings Point Property Owners Association, Inc. (hereinafter "KPPOA") for the limited purpose of verifying the facts set forth in KPPOA's Responses to Robert H. Barnett, as Liquidation Trustee's First Interrogatories to KPPOA, who after being duly sworn does depose and say that, to the best of his knowledge, the facts set forth in KPPOA's Response to Robert H. Barnett, as Liquidation Trustee's First Interrogatories to KPPOA are true and correct.

*[Signatures on Next Page]*

Tom Regan

Sworn to and subscribed before me
this _3rd_ day of April, 2014. 2015
September

Notary Public, _Glynn_
County, Georgia
My commission expires: _9/12/17_

(NOTARIAL SEAL)